UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **AFSHIN ZARINEBAF, ZACHARY CHERNIK, and JOAN MEYER,** individually and on behalf of a class of similarly situated individuals,<br><br>**PLAINTIFFS,**<br><br>V.<br><br>**CHAMPION PETFOODS USA, INC.** and **CHAMPION PETFOODS LP,**<br><br>**DEFENDANTS**. | Case No. 1:18-cv-06951<br><br>Honorable Virginia M. Kendall<br><br>**DEMAND FOR JURY TRIAL** |

**THIRD AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS


INTRODUCTION ..................................................................................................1

JURISDICTION AND VENUE ..................................................................................2

PARTIES ..........................................................................................................3

FACTUAL ALLEGATIONS ......................................................................................8

I. BACKGROUND—EVOLUTION OF DEFENDANTS' PACKAGING CLAIMS ..........8

A. Original Packaging Claims Were Plain and Generic ..................................8

B. New Packaging Claims Resulted In Premium Prices ..................................9

C. Other Claims Support the Misleading Packaging Claims..........................10

D. Defendants Charged Consumers Premium Prices For the Contaminated Dog Food ..........................................................................11

II. MISLEADING PACKAGING CLAIMS ..........................................................14

A. Natural Claims ..........................................................................14

B. Biologically Appropriate ..................................................................15

C. "Fresh Regional Ingredients"..............................................................16

D. Defendants' Omissions ......................................................................16

III. WHY PACKAGING CLAIMS AND OMISSIONS WERE MISLEADING ..................17

A. Heavy Metals ..............................................................................17

1. Presence of Heavy Metals..........................................................18

2. Inadequate Testing for Heavy Metals ..........................................20

B. Non-Fresh Ingredients ......................................................................21

C. Non-Regional Ingredients....................................................................24

D. Featured Farmers Imagery Supports Misleading Packaging Claims ..................26

E. Animal Ingredient Inclusion Rates Supports Misleading Packaging Claims ........28

F. BPA..........................................................................................29

G. Pentobarbital—Red Meat Diets ..........................................................31

1. Pentobarbital Was a Well-Known Risk ....................................................31

2. Failure to Monitor for Pentobarbital .......................................................33

3. Material Risk of Pentobarbital Ignored for Years....................................35

4. Failure to Disclose or Recall Pentobarbital Adulterated Red Meat Diets ....................................................................................................35

5. Undisclosed Pentobarbital Risk Was Misleading ....................................36

IV. MISLEADING PACKAGING CLAIMS AND OMISSIONS MISLED AND DECEIVED CONSUMERS ...........................................................................37

V. DEFENDANTS' MISLEADING PACKAGING CLAIMS AND MATERIAL OMISSIONS VIOLATED ILLINOIS LAWS...................................................39

VI. CONSUMER RELIANCE WAS REASONABLE AND FORESEEABLE.....................40

VII. DEFENDANTS' KNOWLEDGE OF THE MISREPRESENTATIONS AND THEIR MATERIALITY ..........................................................................41

VIII. DEFENDANTS ACTED NEGLIGENTLY AND/OR INTENTIONALLY TO MISLEAD CONSUMERS ...........................................................................42

CLASS ACTION ALLEGATIONS ...........................................................................42

CLAIMS FOR RELIEF ...........................................................................................48

COUNT I - Violations of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq*., Against Defendants on Behalf of the Class ..............48

COUNT II - Fraudulent Misrepresentation Against Defendants Individually and on Behalf of the Class ........................................................................................51

COUNT III - Unjust Enrichment Against Defendants Individually and on Behalf of the Class ....................................................................................................52

PRAYER FOR RELIEF ...........................................................................................53

JURY DEMAND ....................................................................................................54

Exhibit 1 ..............................................................................................................58

Exhibit 2 ..............................................................................................................77

## INTRODUCTION

1. Plaintiffs Zachary Chernik ("Plaintiff Chernik"), Afshin Zarinebaf ("Plaintiff Zarinebaf"), and Joan Meyer ("Plaintiff Meyer") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, brings this Third Amended Class Action Complaint against Defendants Champion Petfoods USA, Inc. ("Defendant Champion USA") and Champion Petfoods LP ("Defendant Champion Canada") (together, "Defendants"), for their negligent, reckless, and/or intentional marketing practices of using misleading packaging claims and material omissions to misrepresent the quality and characteristics of their dog food diets ("Contaminated Dog Food") and ingredients.

2. Defendants intentionally labeled the Contaminated Dog Food to include packaging claims that targeted consumers who were willing to pay premium prices based on Defendants' representations that the Contaminated Dog Food contained fresh and local or regionally sourced ingredients. Among other things, these packaging claims included representations that the food would "Deliver[] Nutrients Naturally," was Biologically Appropriate™, and contained "Fresh Regional Ingredients."

3. From at least 2014 through the present, Defendants' packaging claims were misleading and fraudulently omitted that the Contaminated Dog Food contained and/or had a material risk of containing undisclosed and non-conforming ingredients and contaminants, such as heavy metals, a material amount of non-fresh ingredients, a material amount of non-regional ingredients, Bisphenol A ("BPA"), and pentobarbital. Defendants' packaging claims and fraudulent omissions injured consumers, such as Plaintiffs, who reasonably relied upon the packaging claims and/or were otherwise misled by the omissions when purchasing Defendants' dog food at premium prices.

4. Plaintiffs seek both injunctive and monetary relief on behalf of the proposed Class (defined below), including, but not limited to: (i) an order enjoining Defendants from selling the Contaminated Dog Food until the non-conforming ingredients, contaminants, and/or unnatural or other ingredients, such as heavy metals, BPA, a material amount of non-fresh ingredients, including regrinds, a material amount of non-regional ingredients, and/or pentobarbital, are removed or full disclosure of the presence of such appear on all labels, packaging, and advertising; (ii) an order enjoining Defendants from selling the Contaminated Dog Food in any manner suggesting or implying that they conform to their packaging claims of Biologically Appropriate™; "Fresh Regional Ingredients," and "Delivering Nutrients Naturally"; (iii) an order requiring Defendants to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing products; and (iv) an order requiring Defendants to pay all actual and statutory damages permitted under the counts alleged herein. Plaintiffs allege the following based upon personal knowledge as well as investigation by their counsel and discovery and as to all other matters, upon information and belief.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs and more than two-thirds of the Class resides in states other than the states in which Defendants are citizens and in which this case is filed, and therefore any exemptions to jurisdiction under 28 U.S.C. §1332(d) do not apply.

6. Venue is proper in this Court pursuant to 28 U.S.C. §1391, because Plaintiffs reside and suffered injury as a result of Defendants' acts in this District, many of the acts and transactions giving rise to this action occurred in this District, Defendants conduct substantial business in this

District, Defendants have intentionally availed themselves of the laws and markets of this District, and Defendants are subject to personal jurisdiction in this District.

## PARTIES

### A. Plaintiffs

7. Plaintiff Chernik is, and at all times relevant hereto has been, a resident of the state of Illinois. Plaintiff Chernik purchased the Contaminated Dog Food for his nineteen dogs: Jackie, a Border Collie who has passed away; Bob, a Border Collie who has passed away; Jazzy, a Border Collie who has passed away; Tweak, a seventeen-and-one-half-year-old Border Collie-Jack Russell mix; Squeeze, a seventeen-and-one-half-year-old Border Collie-Jack Russell mix; Kerwyn, a Border Collie-Jack Russell mix who has passed away; Cruise, a Jack Russell who has passed away; RazR, a Border Collie-Jack Russell mix who passed away on Christmas Eve of 2017 of a choroid plexus papilloma at the age of twelve-and-one-quarter-years-old; Stealer, a Border Collie-Jack Russell mix who passed away on February 12, 2020; BurnE, a Border Collie-American Staffordshire Terrier mix who has passed away; Talon, a twelve year old Border Collie-Jack Russell mix; Phantom, a twelve-year-old Border Collie-Jack Russell mix; Mirage, a twelve-year-old Border Collie-Jack Russell mix; Layla, an eleven-year-old Labrador Retriever-American Staffordshire Terrier mix; Elf, a six-year-old Border Collie-Jack Russell mix; Vixen, a six-year-old Border Collie-Jack Russell mix; Ricochet, a five-year-old Border Collie-Whippet mix; Glide, a four-year-old Border Collie-Whippet mix; and Hydro, a three-year-old Border Collie-Whippet mix (all performance dogs):

(a) *Orijen Diets*: Orijen Six Fish, Orijen Adult, and Orijen Regional Red;

(b) *Acana Heritage Diets*: Acana Heritage Free Run Poultry, Acana Heritage Meats;

(c) *Acana Regional Diets*: Acana Regionals Wild Atlantic, Acana Regionals Grasslands, Acana Regionals Wild Prairie, Acana Regionals Ranchlands, Acana Regionals Pacifica, and Acana Regionals Grasslands;

(d) *Acana Singles Diets*: Acana Singles Lamb and Apple, Acana Singles Pork and Squash, and Acana Singles Duck and Pear.

8. Plaintiff Chernik purchased the Contaminated Dog Food on average one per bag week from approximately April 2006 through approximately July 2017, generally from Pet Food Experts and Zeus and Company Pet Supply, Inc.

9. Plaintiff Zarinebaf is, and at all times relevant hereto has been, a resident of the state of Illinois. Plaintiff Zarinebaf purchased the following Contaminated Dog Food for his dogs, Rex, a seven-year-old American Stafford, and Stitch, a three-year-old Siberian Husky:

(a) *Orijen Diets:* Orijen Six Fish and Orijen Regional Red;

(b) *Acana Singles Diets:* Acana Singles Lamb and Apple.

8. Plaintiff Zarinebaf purchased the Contaminated Dog Food on average one bag per month from approximately July 2013 and to approximately September 2018, generally from Pet Supplies Plus, Dog Patch Pet & Feed, and Two Bostons Pet Boutique, all located in Naperville, Illinois.

9. Plaintiff Meyer is, and at all times relevant hereto has been, a resident of the state of Illinois. Plaintiff Meyer purchased the following Contaminated Dog Food for her dogs, Neil, a fourteen-year-old Shetland Sheepdog who passed away on June 19, 2018, and Aimiee, a ten-year-old Shetland Sheepdog who passed away on August 12, 2019:

(a) *Orijen Diets:* Orijen Six Fish;

(b) *Acana Singles Diets:* Acana Singles Lamb and Apple, and Acana Singles Duck and Pear.

10. Plaintiff Meyer, as a Canine trainer, purchased the Contaminated Dog Food in bulk from approximately 2004 to approximately June 2019, generally from a distributor, Bark to Basics, located in Lenexa, Kansas.

11. Prior to purchase, Plaintiffs all saw and relied upon Defendants' packaging when making their decision to buy Defendants' Contaminated Dog Food.

12. Defendants' Contaminated Dog Food packaging and labeling included the following packaging claims, among others:

(a) "Delivering Nutrients Naturally";

(b) Biologically Appropriate™; and

(c) "Fresh Regional Ingredients."[1]

13. Plaintiffs were deceived and misled by Defendants' Packaging Claims because Defendants' Contaminated Dog Food contained and/or had a material risk of containing non-conforming ingredients and contaminants, such as:

(a) Heavy Metals[2];

(b) a material amount of non-fresh ingredients;

(c) a material amount of non-regional ingredients;

(d) BPA; and/or

(e) pentobarbital.

14. Plaintiffs, like other reasonable consumers, reasonably relied on Defendants' Packaging Claims when deciding to pay premium prices for Defendants' Contaminated Dog Food.

---

[1] Hereafter collectively referred to as "Packaging Claims."

[2] Hereafter, "Heavy Metals" shall refer to arsenic, cadmium, lead, and mercury.

Plaintiffs were unaware of Defendants' inclusion and/or risk of including these non-conforming ingredients and contaminants, in part, because of Defendants' Packaging Claims.

15. Despite a duty to disclose this material information, Defendants also intentionally omitted the presence and/or risk of these contaminants and ingredients anywhere on the Contaminated Dog Food's packaging in order to induce and mislead reasonable consumers, such as Plaintiffs, to purchase the Contaminated Dog Food at premium prices.

16. As the result of Defendants' wrongful conduct, as alleged herein, Defendants injured Plaintiffs when Plaintiffs, along with other reasonable consumers, were misled to pay premium prices for Defendants' misleadingly packaged Contaminated Dog Food because the Contaminated Dog Food did not deliver what was promised.

17. Plaintiffs and the Class Members would not have purchased Defendants' Contaminated Dog Food at all, let alone at Defendants' premium prices, had Defendants not used these Packaging Claims or had Defendants properly disclosed the risk and inclusion of contaminants and ingredients that did not conform to the packaging.

18. Plaintiffs and the proposed Class Members will continue to purchase dog food in the future, and when they encounter Defendants' Contaminated Dog Food, they will not be able to rely on the truthfulness of the packaging unless Defendants correct their misleading Packaging Claims and material omissions.

**B. Defendants**

19. Defendant Champion USA is incorporated in Delaware. Its headquarters and principal place of business, as of March 2016, is located at 12871 Bowling Green Road, Auburn, Kentucky 42206. Since that time, all Contaminated Dog Food sold in the United States are manufactured, sourced, and sold by Champion USA.

20. Defendant Champion Canada is a Canadian limited partnership with its headquarters and principal place of business located at 11403-186 St NW, Edmonton, Alberta T5S 2W6. Defendant Champion Canada wholly owns, operates, and/or controls Defendant Champion USA. Prior to March 2016, all Contaminated Dog Food sold in the United States were manufactured, sourced, and sold by Champion Canada.

21. Defendants formulated, developed, manufactured, labeled, distributed, marketed, advertised, and sold the Contaminated Dog Food to distributors throughout the United States, including in this District, during the Class Period.

22. The packaging for the Contaminated Dog Food that Plaintiffs relied upon was prepared, reviewed, and/or approved by Defendants and their agents, and was disseminated by Defendants and their agents through packaging and labeling that contained the misrepresentations alleged herein. Defendants similarly prepared, reviewed, and/or approved the packaging for the Contaminated Dog Food despite the omissions alleged herein.

23. Defendants intended for consumers, such as Plaintiffs, to rely on the Packaging Claims when deciding to purchase the Contaminated Dog Food. As a result of Defendants' misleading Packaging Claims and material omissions, reasonable consumers, including the Plaintiffs and the Class Members, were deceived into purchasing the Contaminated Dog Food at premium prices.

24. Defendants owned, manufactured, and distributed the Contaminated Dog Food and created, allowed, negligently oversaw, and/or authorized, the unlawful, fraudulent, and deceptive use of their Packaging Claims and omissions.

25. Defendants were responsible for sourcing ingredients, manufacturing the products, and conducting all relevant quality assurance protocols, including sufficient Heavy Metal, BPA, and/or pentobarbital testing, for the Contaminated Dog Food and ingredients.

26. Defendants knew or should have known that the Contaminated Dog Food packaging omitted material information, such as the presence and/or risk of containing non-conforming ingredients and contaminants, and that Defendants had a duty to disclose this material information. Defendants also knew or should have known that the Contaminated Dog Food and its ingredients were deceptive because it did not conform to their Packaging Claims.

## FACTUAL ALLEGATIONS

### I. BACKGROUND—EVOLUTION OF DEFENDANTS' PACKAGING CLAIMS

#### A. Original Packaging Claims Were Plain and Generic

27. In the 1970s, Defendants entered the dog food industry by selling a traditional, dry dog food kibble and used plain and minimal packaging claims on their packaging.

28. In the 1990s, Defendants launched their Acana brand, which made packaging claims such as "premium" and "high quality" on its packaging. The following is an example of Defendant's original Acana packaging:

*Old Acana Packaging:*



**B. New Packaging Claims Resulted In Premium Prices**

29. Defendants believed that some consumers perceive their dogs as members of the family. Defendants referred to these consumers as "Pet Lovers" and targeted Pet Lovers as potential consumers who would be willing to pay premium prices for dog foods.

30. Defendants believed that consumers, including Pet Lovers, would be willing to pay premium prices for dog foods that advertised and represented that they contained fresh and locally or regionally sourced ingredients.

31. In 2006, Defendants launched their new dog food brand, Orijen. Before launching Orijen, Defendants developed new Packaging Claims for Orijen's packaging that aligned with their belief that consumers were willing to pay premium prices for dog foods that used fresh and locally or regionally sourced meat and fish ingredients. Defendants designed their new Packaging Claims to target and appeal to such consumers.

32. Defendants' new Packaging Claims for their Orijen brand included the representation that Orijen was a Biologically Appropriate™ dog food. Biologically Appropriate™ was a marketing concept that Defendants intended to represent that Orijen diets contained large amounts of fresh meat and fish ingredients, which Defendants advertised were purchased from local or regional farmers, ranchers, and fisheries.

33. Defendants' Packaging Claim of Biologically Appropriate™ was also trademarked, and reflected an objective advertising concept that Defendants intended to communicate to consumers that they designed their dog food to mirror a dog's natural diet. Defendants' packaging further defined Biologically Appropriate™ as dog food that "mirrors the richness, freshness, and variety of … meats … dogs are evolved to eat."

34. Defendants included this Packaging Claim on their labels to emphasize and induce consumers to purchase Orijen diets based on their represented use of meat and fish ingredients that were fresh, natural, and nourishing.

35. After Orijen's launch, Defendants saw that they could sell the Contaminated Dog Food at premium prices because they represented to consumers that the Contaminated Dog Food contained fresh, locally or regionally sourced ingredients and omitted the inclusion and/or risk of including non-conforming ingredients and contaminants. Defendants eventually conformed Acana's Packaging Claims to be substantially similar to those advertised for Orijen.

36. Defendants next expanded their Packaging Claims and began representing that Defendants made the Contaminated Dog Food from "Fresh Regional Ingredients." Defendants' packaging claim of "Fresh Regional Ingredients" promised and represented to consumers that Defendants emphasized the use of fresh ingredients that they sourced locally or regionally, in the Contaminated Dog Food.

37. Defendants also added the Packaging Claim of "Delivering Nutrients Naturally" to the Contaminated Dog Food packaging. Defendants added this "natural" Packaging Claim to communicate to consumers that the Contaminated Dog Food and the ingredients used in the Contaminated Dog Food were natural and nutritious.

**C. Other Claims Support the Misleading Packaging Claims**

38. In an effort to further support their premium prices, Defendants used additional representations, labels, and imagery to bolster their Packaging Claims, such as:

(a) "Trusted Everywhere";

(b) "Ingredients We Love [From] People We Trust";

(c) Advertised inclusion ratios of animal ingredients; and

(d) Featured Farmer imagery and photographs.

39. Defendants used their misleading "Trusted Everywhere" and "Ingredients We Love [From] People We Trust," advertisements to reassure consumers to trust and have confidence that all of Defendants' Packaging Claims were accurate, reliable, and trustworthy.

40. Defendants' misleading animal ingredient ratio claims advertised that their Contaminated Dog Food contained specific inclusion ratios of meat and fish ingredients as a means to support and quantify their represented emphasis of "Fresh Regional Ingredients" that were Biologically Appropriate™ for dogs to consume.

41. Defendants used misleading Featured Farmer imagery on their packaging, which displayed large photographs of local, family owned farmers and ranchers, to leverage their purported use of fresh, local, and regional ingredients, in accordance with their "Fresh Regional Ingredients" packaging claim.

42. Defendants were further aided in selling the Contaminated Dog Food at premium prices and maintaining their status in the premium dog food market by using their misleading "trust" claims, animal ingredient ratios claims, and Featured Farmer imagery.

43. The above statements reinforced Defendants' Packaging Claims of "Delivering Nutrients Naturally," Biologically Appropriate™, and "Fresh Regional Ingredients." Within the context of the above statements and Defendants' Packaging Claims, Defendants conveyed to consumers that the Contaminated Dog Food emphasized the use of fresh, Biologically Appropriate™ meat and fish ingredients that were natural, nourishing, and locally or regionally sourced.

**D. Defendants Charged Consumers Premium Prices For the Contaminated Dog Food**

44. Defendants charged premium prices for the Contaminated Dog Food, which consumers were willing to pay based on Defendants' Packaging Claims and material omissions.

45. Defendants' Packaging Claims were the driving force that increased the sale of the Contaminated Dog Food and secured their status as a leader and innovator in the premium priced dog food market.

46. Defendants charged one of the highest, if not the highest, premium prices for their dog foods during the Class Period.

47. Defendants' average retail price for their Orijen diets was approximately $9 per kilogram ($4 per pound) and $7 per kilogram ($3 per pound) for Acana diets.

48. The average price point for premium dry dog food is approximately at $4 per kilogram ($2 per pound). On average, the Contaminated Dog Food had the premium price of $7 per kilogram ($3 per pound)—almost double the average price that consumers paid for other premium priced dog foods.

49. Defendants knew or should have known that the Contaminated Dog Food was one of the most expensive dog foods sold in retail markets.

50. The following is a representative example of the old Acana packaging compared to the Contaminated Dog Food packaging (Acana Singles Lamb and Apple):

*Old Acana Packaging:*



*New Acana Packaging:*




51. Photographs of the following Contaminated Dog Food packaging can be found in Exhibit 1:

(a) Acana Regionals Appalachian Ranch with Ranch-Raised Red Meats & Freshwater Catfish;

(b) Acana Regionals Grasslands with Grass-Fed Kentucky Lamb, Freshwater Trout & Game Bird;

(c) Acana Regionals Meadowland with Free-Run Kentucky Poultry, Freshwater Fish, and Nest-Laid Eggs;

(d) Acana Regionals Wild Atlantic with Wild-Caught New England Fish & Fresh Kentucky Greens;

(e) Orijen Original with Fresh Free-Run Chicken and Turkey, Wild-Caught Fish and Nest-Laid Eggs;

(f) Orijen Regional Red with Angus Beef, Wild Boar, Boer Goat, Romney Lamb, Yorkshire Pork & Wild Mackerel;

(g) Orijen Six Fish with New England Mackerel, Herring, Flounder, Redfish, Monkfish and Silver Hake;

(h) Acana Singles Duck and Pear;

(i) Acana Singles Lamb and Apple;

(j) Acana Heritage Free-Run Poultry;

(k) Acana Heritage Freshwater Fish;

(l) Orijen Six Fish Wild-Caught Regional Saltwater and Freshwater Fish;

(m) Orijen Tundra with Goat, Venison, Mutton, Bison, Arctic Char, Rabbit;

(n) Orijen Grain Free Puppy with Chicken, Turkey, Wild-Caught Fish, Eggs;

(o) Acana Singles Mackerel and Greens;

(p) Acana Singles Pork and Squash;

(q) Orijen Regional Red Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Dry Dog Food; and

(r) Acana Heritage Meats.

## II. MISLEADING PACKAGING CLAIMS

### A. Natural Claims

52. The following images are some representative examples of Defendants' "Delivering Nutrients Naturally" Packaging Claim with regard to the Contaminated Dog Food respectively:

*As Represented on Acana Singles Lamb and Apple:*

DELIVERING NUTRIENTS NATURALLY.

**B. Biologically Appropriate**

53. The following images are some representative examples of Defendants' Biologically Appropriate™ Packaging Claims with regard to the Contaminated Dog Food respectively:

*As Represented on Orijen Regional Red:*




*As Represented on Acana Singles Lamb & Apple:*



**C. "Fresh Regional Ingredients"**

54. The following images are some examples of Defendants' "Fresh Regional Ingredient" Packaging Claim with regard to the Contaminated Dog Food respectively:

*As Represented on Orijen Six Fish:*




*As Represented on Acana Singles Duck and Pear*:




**D. Defendants' Omissions**

55. As discussed above, Defendants' packaging also misleadingly omitted the presence and/or material risk of Heavy Metals, a material amount of non-fresh ingredients, a material amount of non-regional ingredients, BPA, pentobarbital, and/or any other ingredients or contaminants that did not conform to Defendants' Packaging Claims. Defendants intentionally omitted these ingredients and contaminants in order to induce and mislead reasonable consumers

to believe that the Packaging Claims were truthful and accurate, and to purchase Defendants' dog food at premium prices.

## III. WHY PACKAGING CLAIMS AND OMISSIONS WERE MISLEADING

56. Defendants' Packaging Claims and material omissions were false, deceptive, and inaccurate because the Contaminated Dog Food contained and/or had a material risk of containing ingredients and contaminants that did not conform to the Packaging Claims. For example, the Contaminated Dog Food contained and/or had a material risk of containing Heavy Metals, material amounts of non-fresh ingredients, material amounts of non-regional ingredients, BPA, and/or pentobarbital.

### A. Heavy Metals

57. At all times during the Class Period, Defendants knew or should have known that the Contaminated Dog Food contained and/or had a material risk of containing Heavy Metals. Nevertheless, Defendants failed to sufficiently test the Contaminated Dog Food for Heavy Metals. Defendants knew or should have known that the presence and/or material risk of Heavy Metals was a material concern for their consumers.

58. Defendants knew or should have known that they owed consumers a duty of care to prevent, or at the very least, sufficiently test for and minimize the presence of Heavy Metals in the Contaminated Dog Food to the extent reasonably possible, consistent with the highest of standards for premium priced dog food.

59. Despite Defendants' knowledge that the Contaminated Dog Food contained Heavy Metals and that Heavy Metals were not insufficiently monitored, Defendants negligently, and/or

knowingly sold the Contaminated Dog Food during the Class Period while wrongfully omitting that the Contaminated Dog Food contained Heavy Metals.[3]

**1. Presence of Heavy Metals**

60. Defendants knew that Heavy Metals potentially pose health risks to dogs and humans. Defendants knew or should have known that the standards for heavy metal levels generally have become increasingly prohibitive in recent years.

61. Based on the risks associated with exposure to arsenic, both the U.S. Environmental Protection Agency ("EPA") and U.S. Food and Drug Administration ("FDA") have set limits concerning the allowable limit of arsenic at 10 parts per billion ("ppb") for human consumption in apple juice (regulated by the FDA) and drinking water (regulated by the EPA).[4]

62. The FDA has set standards that regulate the maximum ppb of lead permissible in water: bottled water cannot contain more than 5 ppb of total lead or 10 ppb of total arsenic. *See* 21 C.F.R. §165.110(b)(4)(iii)(A) (2016).

63. Indeed, the FDA has acknowledged that "exposure to [these four heavy] metals are likely to have the most significant impact on public health" and has prioritized them in connection with its heavy metals workgroup looking to reduce the risks associated with human consumption of heavy metals.[5]

---

[3] *See* Exhibit 2.

[4] The FDA has taken action based on consumer products exceeding this limit, including testing and sending warning letters to the manufacturers. *See*, *e.g.*, Warning Letter from FDA to Valley Processing, Inc. (June 2, 2016), https://www.fda.gov/iceci/enforcementactions/warningletters/2016/ucm506526.htm.

[5] https://www.fda.gov/Food/FoodborneIllnessContaminants/Metals/default.htm (last accessed June 15, 2020).

64. Defendants were aware that their pet-loving consumers were concerned about the presence of Heavy Metals in the Contaminated Dog Food and that consumers expected Defendants to exceed the highest of standards, including standards for heavy metals in premium dog food.

65. Defendants knew that excluding Heavy Metals from their Contaminated Dog Food was desirable. Defendants believed that excluding Heavy Metals from the Contaminated Dog Food was consistent with their "Fresh Regional Ingredient" Packaging Claim. In fact, Defendants aspired to the goal of having "no … Heavy Metals" in future Contaminated Dog Food products as a "key differentiator" of their "Fresh Regional Ingredients" packaging claim.

66. Defendants knew or should have known that they could control the concentration levels of Heavy Metals in the Contaminated Dog Food by, among other things, properly monitoring the ingredients' Heavy Metals and making adjustments to the Contaminated Dog Food formula or ingredients.

67. Several of Defendants' own employees believed that the Contaminated Dog Food did not contain any Heavy Metals.

68. Defendants' Packaging Claims of Biologically Appropriate™ and "Fresh Regional Ingredients" were misleading because the Contaminated Dog Food contained and/or had a material risk of containing Heavy Metals and was sold in packaging that did not disclose the presence and/or material risk of containing Heavy Metals in the Contaminated Dog Food.

69. Defendants' Packaging Claims and material omission as to the presence of Heavy Metals on the Contaminated Dog Food packaging was intended to induce and deceive consumers to purchase the Contaminated Dog Food at premium prices. Defendants' intention was revealed, at least in part, when Defendants actively concealed the presence of Heavy Metals from consumers that asked about the presence of Heavy Metals in the Contaminated Dog Food.

### 2. Inadequate Testing for Heavy Metals

70. During the Class Period, Defendants knew or should have known that they failed to adequately test for Heavy Metals in the Contaminated Dog Food and ingredients. Defendants were on notice that their pet loving consumers were concerned about whether Defendants sufficiently tested for the presence of Heavy Metals and that consumers reasonably expected Defendants to adequately test for Heavy Metals in a way that would exceed the highest standards for premium priced dog foods.

71. Defendants knew that failing to test for Heavy Metals would be negligent on their part. Defendants' internal policies called for regular Heavy Metal testing with regard to the Contaminated Dog Food and its ingredients. Defendants failed to take these Heavy Metal testing policies seriously and failed to follow their internally established Heavy Metal testing schedule.

72. Defendants knew that they were running blind with regard to the presence of Heavy Metals in the Contaminated Dog Food due to Defendants' failure to sufficiently test for Heavy Metals.

73. Defendants' Packaging Claims of Biologically Appropriate and "Fresh Regional Ingredients" were misleading based on Defendants' failure to adequately test for Heavy Metals, which resulted in the Contaminated Dog Food containing and/or having a material risk of containing Heavy Metals that were insufficiently monitored.

74. Despite Defendants' knowledge that the Contaminated Dog Food was not adequately tested for Heavy Metals, Defendants negligently, and/or knowingly sold the Contaminated Dog Food without disclosing that the Contaminated Dog Food was not adequately tested for Heavy Metals. Defendants' omission as to the inadequate heavy metal testing on the Contaminated Dog Food packaging was misleading and intended to induce consumers to purchase the Contaminated Dog Food at premium prices when consumers otherwise would not have.

**B. Non-Fresh Ingredients**

75. At all times during the Class Period, Defendants knew or should have known that the Contaminated Dog Food contained a material amount of non-fresh ingredients, such as regrind ingredients, expired ingredients, frozen ingredients, and refreshed ingredients.

76. Defendants knew or should have known that their Packaging Claims were misleading to consumers due to Defendants' use of regrinds, which is an undisclosed, low quality, non-fresh, and overcooked ingredient that was commonly used in the Contaminated Dog Food. The Contaminated Dog Food routinely incorporated large amounts of non-fresh regrind ingredients.

77. Defendants' use of regrind ingredients was a widespread business practice that occurred throughout the Class Period. Defendants routinely used regrinds as a major ingredient in the Contaminated Dog Food. Defendants did not disclose the use of regrinds anywhere on the Contaminated Dog Food packaging, including the ingredient panel.

78. Defendants sometimes made regrind ingredients from already cooked, non-fresh dog and cat food that had failed nutritional testing, water activity/product temperature testing, and/or microbiological testing. Defendants also made regrinds from finished dog and cat food that was too old to sell.

79. By using regrinds in their manufacturing process, Defendants used ingredients that they cooked twice—first in the production that resulted in out-of-specification dog food and second as a reused ingredient.

80. Defendants had flowcharts that tracked the various dog and cat food diets regrinds that they used as an ingredient in each dog food diet. Defendants used cat food as a regrind ingredient in the Contaminated Dog Food.

81. Defendants also used regrinds that were nutritionally deficient, nutritionally dangerous, and contaminated with salmonella.

82. Defendants used millions of pounds of regrinds each year during the Class Period. For example, Defendants' DogStar kitchen used over 3.1 million pounds of regrinds from 2016 to 2018. In fact, Defendants' nickname for their regrind inventory was "Regrind Mountain."

83. Defendants manufactured the Contaminated Dog Food with high inclusion rates of regrinds. For example, some production lots of Orijen contained up to 5.6% regrinds, while Acana production lots contained up to 15.5% regrinds.

84. As a double-cooked ingredient, Defendants knew or should have known that regrinds were not fresh. In addition, Defendants were aware that reprocessing and recooking regrinds caused the Contaminated Dog Food to lose nutritional value and taste.

85. Defendants knew or should have known that some manufacturers in the food industry would not use out-of-specification ingredients in premium food products. Instead, the food industry would repurpose out-of-specification regrind ingredients for non-premium products. For instance, meat manufacturers used out-of-specification meat for hot dogs while cheese manufacturers used out of specification cheese for processed cheese.

86. However, Defendants rejected these industry practices for premium food products and instead used their out-of-specification regrind ingredients in the Contaminated Dog Food.

87. Defendants knew or should have known that their use of regrinds contradicted their Packaging Claims. For instance, Defendants took active steps to try to hide their use of regrinds during consumer, retailer, and distributor visits to their kitchens.

88. Defendants knew or should have known that their use of regrind ingredients failed to substantiate their Packaging Claims. Regrind ingredients are not fresh because regrinds are dried, twice-cooked ingredients. Regrind ingredients are also not Biologically Appropriate™

because regrinds are nutritionally deficient compared to fresh, Biologically Appropriate™ ingredients.

89. Defendants did not disclose their use of regrinds as an ingredient on the Contaminated Dog Food ingredient panels or anywhere on their packaging. Defendants omitted this material information to ensure that consumers believed that "Fresh Regional Ingredients" was an accurate and truthful representation.

90. Consistent with Defendants' use of a material amount of non-fresh regrind ingredients, Defendants' also used expired ingredients in the Contaminated Dog Food. Defendants' monitoring and evaluation of ingredients was insufficient to prevent the use of non-fresh, expired ingredients in the Contaminated Dog Food. Defendants knew expired ingredients were not fresh.

91. Furthermore, Defendants returned ingredients that they did not need to their ingredient suppliers, who then stored these ingredients. When Defendants requested these ingredients, their suppliers would then thaw and send these old, "refreshed" ingredients back to Defendants. Defendants knew that these "refreshed" ingredients, which could be weeks old and frozen during storage, were not fresh.

92. Defendants also knew that frozen ingredients were frequently used in the Contaminated Dog Food. Defendants were also aware that a reasonable consumer would not understand that the "raw" ingredients described in their packaging referred to "frozen" ingredients. Defendants misleadingly omitted any definition that explained that "raw" ingredients meant that the ingredients were frozen or previously frozen.

93. Defendants' Biologically Appropriate™ packaging claim was misleading because expired ingredients are nutritionally deficient.

94. Defendants' "Fresh Regional Ingredients" packaging claim was misleading based on inclusion of regrind, frozen, expired, and refreshed ingredients in the Contaminated Dog Food. None of these ingredients are fresh.

**C. Non-Regional Ingredients**

95. At all times during the Class Period, Defendants knew or should have known that their Packaging Claims were misleading because Defendants sourced many ingredients from non-local and non-regional ingredient suppliers, including international ingredient suppliers.

96. Defendants' Packaging Claims for the Contaminated Dog Food emphasized and represented that Defendants focused on the use of fresh, regional ingredients that were locally grown near their kitchens.

97. During the Class Period, Defendants manufactured the Contaminated Dog Food using imported, non-regional ingredients from international and non-regional ingredient suppliers.

98. For instance, Defendants purchased, imported, and used the following non-regional ingredients for the Contaminated Dog Food: spray dried sardines from Peru, spray dried mackerels from Morocco, herring oil and herring meal from Denmark, salmon oil from Chile, duck meal and pork meal from the European Union, palatants and vitamins from China, turmeric from India, and large amounts of lamb, cattle, goat, and mutton ingredients from New Zealand and Australia.

99. Ingredients sourced from further than 100 miles from Defendants were neither regional nor local to Defendants.

100. During the Class Period, Defendants sourced a majority of their ingredients from non-regional ingredient suppliers. For example, in 2017, Defendants sourced about 70% of their ingredients outside of Kentucky, of which 25% was sourced internationally.

101. Defendants represented to consumers that they focused on local and regional ingredients in the Contaminated Dog Food. Yet, Defendants sourced a majority of their pork meat

and beef from outside of Kentucky in 2017. Defendants also sourced a majority of their goat, lamb, and mutton from international ingredient suppliers in 2017.

102. Even when Defendants did disclose non-regional suppliers on the Contaminated Dog Food's packaging, Defendants did so in a misleading manner. For example, while Defendants made a small reference to New Zealand lamb on the back of their Acana packaging, Defendants' packaging overall emphasized the use of Kentucky lamb. Defendants' Acana Singles Lamb and Apple packaging referenced the use of Kentucky lamb seven times, often in larger and bolded text, and associated these claims with photographs of lamb raised in Kentucky. Defendants' Orijen packaging did not disclose that any lamb came from New Zealand.

103. Furthermore, Defendants did not disclose that these ingredients came from international ingredient suppliers on their Orijen packaging.

104. Defendants' recipes for the Contaminated Dog Food incorporated various palatants, vitamin premixes, and botanical blends from China and India. Defendants knew or should have known that sourcing ingredients from high-risk locations, such as China and India, did not align with Defendants' "Fresh and Regional Ingredients" Packaging Claim. Defendants nonetheless purchased and used palatants and vitamins from China and turmeric from India.

105. Defendants did not disclose that they used Chinese or Indian ingredients anywhere on the Contaminated Dog Food packaging.

106. Defendants' "Fresh Regional Ingredients" packaging claim was also misleading, in part, because Defendants regularly used non-regional ingredients from North Africa, South America, Europe, New Zealand, and Australia. Defendants purchased the majority of some of their meat ingredients, such as lamb, from international suppliers.

107. Despite Defendants' knowledge that the Contaminated Dog Food contained a material amount of non-regional ingredients, Defendants negligently, and/or knowingly sold the

Contaminated Dog Food while misleadingly omitting that the Contaminated Dog Food contained ingredients from non- regional suppliers. Defendants' misleading omission as to the presence of non-regional ingredients on the Contaminated Dog Food packaging was intended to induce and deceive consumers to purchase the Contaminated Dog Food at premium prices.

108. Defendants' use of undisclosed imported meat ingredients was also deceiving to consumers because these imported ingredients were frozen, and thus, misleading based on their "Fresh Regional Ingredients" packaging claim.

**D. Featured Farmers Imagery Supports Misleading Packaging Claims**

109. Defendants knew or should have known that their advertised Featured Farmers were misleading and deceiving to consumers because Defendants did not purchase a material amount of their advertised ingredients from their local Featured Farmers.

110. Defendants advertised their Featured Farmers through large photographs on the back of the Contaminated Dog Food packaging. Defendants' packaging imagery portrayed Featured Farmers as local, family-owned farmers, ranchers, and fisheries. Defendants further omitted from the Contaminated Dog Food packaging that Defendants purchase ingredients from large, corporate owned ingredient suppliers.

111. Defendants' packaging also described that Featured Farmers were their "trusted supplier" of various local or regional ingredients.

112. Defendants did not source a majority of their advertised local or regional ingredients from many of their local or regional Featured Farmers.

113. For instance, Defendants' Orijen Regional Red packaging advertised that a small, family owned local farm ("Beef Featured Farmer") was their "trusted supplier" of "fresh local beef." Defendants used their Featured Farmers imagery to represent to consumers that their Beef Featured Farmer, a small farmer in their local community, supplied Defendants with a material

amount of the beef used in Orijen Regional Red. Defendants did not disclose any other beef supplier on their Orijen Regional Red packaging.

114. Defendants knew or should have known that they did not purchase a material amount of the beef used in Orijen Regional Red manufactured at DogStar from Beef Featured Farmer during the Class Period.

115. For instance, Defendants purchased a very small minority of their beef from Beef Featured Farmer in 2016 and 2017.

116. Similarly, Defendants advertised that a small, family owned local farm ("Lamb Featured Farmer") was their "trusted supplier" of "fresh grass-fed Suffolk lamb" located in Russellville, Kentucky. However, Defendants purchased a very small minority of their lamb from Lamb Featured Farmer. Instead, Defendants purchased the majority of their lamb from undisclosed suppliers in New Zealand.

117. Defendants knew or should have known that consumers expected that Defendants' "Featured Farmers" supplied most, if not all of their advertised ingredients. For instance, Defendants purchase almost all of their saltwater fish from a New England based fishery ("Fish Supplier").

118. Although Defendants did not deceive consumers by failing to purchase a material amount of fish from Fish Supplier, Defendants' advertisement was still misleading because Defendants did not purchase a material amount of ***fresh*** fish from Fish Supplier.

119. Defendants represented that Fish Supplier was their "trusted supplier of fresh wild-caught Atlantic fish."

120. However, Defendants actually purchased a material amount of frozen or previously frozen fish ingredients from Fish Supplier. Fish Supplier blended and ground frozen blocks of fish until thawed and unfrozen, which it then shipped to Defendants in an unfrozen, blended state.

121. Defendants then used a material amount of this previously frozen fish blend as the primary fish ingredient in their fish-based dog food diets. Defendants did not disclose anywhere on their packaging that the fish from Fish Supplier was frozen or previously frozen.

122. In addition, Defendants contracted with Fish Supplier to process and blend many other red meat ingredients, such as beef and lamb, which were also frozen or previously frozen.

123. Defendants knew or should have known that freezing an ingredient disqualified them from representing that said ingredient is "fresh."

124. Furthermore, Defendants knew or should have known that advertising frozen ingredients as "fresh or raw" was confusing to consumers, who would not understand that "raw" means "frozen" or "previously frozen."

125. Defendants do not define that "raw" means "frozen" anywhere on their packaging.

126. Defendants' "Fresh Regional Ingredient" packaging claim was further misleading because Defendants did not use a material amount of fresh ingredients from their featured local or regional suppliers. Even when Defendants used a majority of ingredients from Fish Supplier, Defendants' Fresh Regional Ingredient packaging claim was still inaccurate and deceptive based on Defendants' use of predominately frozen fish.

**E. Animal Ingredient Inclusion Rates Supports Misleading Packaging Claims**

127. At all times during the Class Period, Defendants knew or should have known that their animal ingredient inclusion rates were misleading because Defendants did not use the advertised amounts of meat and fish ingredients when manufacturing the Contaminated Dog Food.

128. Defendants' packaging included claims and labels that represented that Defendants used specific amounts of meat and fish ingredients in the Contaminated Dog Food to reinforce their Packaging Claims of Biologically Appropriate and "Fresh Regional Ingredients." Defendants

referred to these representations as MeatMath for Orijen and Biologically Appropriate Ratios for Acana.

129. During the earlier years of the Class Period, Defendants' MeatMath packaging claims represented that their Orijen diets used 75% or 80% meat and fish ingredients. During the later years of the Class Period, Defendants' packaging represented that Orijen contained 85% meat and fish ingredients.

130. Defendants' Acana products advertised various amounts of Biologically Appropriate Ratios of meat and fish ingredients, with Acana products' packaging representing that those products contained either 50%, 60%, or 70% meat and fish ingredients.

131. However, Defendants' MeatMath and Biologically Appropriate Ratio claims were inaccurate. Defendants' recipes revealed that the Contaminated Dog Food have consistently used materially less than the advertised amount of meat and fish ingredients during the Class Period.

132. Defendants' Biologically Appropriate and "Fresh Regional Ingredients" Packaging Claims were misleading because Defendants misrepresented the amount of fresh, regional, and Biologically Appropriate™ meat and fish ingredients they used in the Contaminated Dog Food.

**F. BPA**

133. Defendants knew or should have known that the Contaminated Dog Food contained and/or had a material risk of containing BPA. Defendants also knew or should have known that the Contaminated Dog Food should have been tested for BPA to conform to the Packaging Claims.

134. Defendants knew or should have known that consumers expected Defendants to have sufficient BPA testing for the Contaminated Dog Food and to provide the appropriate disclosures regarding the presence of BPA.

135. Defendants did not monitor or test for BPA in the Contaminated Dog Food. Defendants did not schedule any BPA testing on the Contaminated Dog Food or any of the ingredients and packaging used in the Contaminated Dog Food.

136. Even when Defendants requested affidavits from packaging suppliers regarding the presence of BPA, Defendants accepted ineffective guarantees that only claimed that no BPA was "intentionally added." Despite these ineffective guarantees, Defendants did not conduct any BPA testing to confirm that their packaging actually did not contain BPA, whether intentionally added or not.

137. Defendants utilized rendered ingredients, such as meal and tallow, in the Contaminated Dog Food even though Defendants knew or should have known that many of these non-fresh, rendered ingredients had the material threat of plastic contamination. Defendants knew or should have known that the Contaminated Dog Food and the ingredients used in the Contaminated Dog Food should have been tested for BPA based on these red flags.

138. Through their Packaging Claims, Defendants misleadingly conveyed to consumers that the Contaminated Dog Food, and the ingredients used to make the Contaminated Dog Food, were natural and nutritious, and thus, would not contain and/or have a material risk of containing unnatural, non-nutritious contaminants like BPA.

139. Defendants' Biologically Appropriate packaging claim was misleading. The Contaminated Dog Food was not Biologically Appropriate™ because it contained and/or had a material risk of containing BPA, a biologically inappropriate, non-nutritious contaminant.

140. Defendants' "Fresh Regional Ingredients" packaging claim was misleading. Defendants' use of a material amount of non-fresh, rendered ingredients exposed the Contaminated Dog Food to containing and/or the material risk of containing BPA. Furthermore, "Fresh Regional

Ingredients" was misleading because fresh ingredients, among other reasons alleged herein, do not contain BPA, an unnatural, non-nutritious contaminant.

141. Defendants' Packaging Claims were also deceptive due to Defendants' misrepresentations that the Contaminated Dog Food would "Deliver[] Nutrients Naturally." Reasonable consumers would not expect that the Contaminated Dog Food contained and/or had a material risk of containing BPA, which was a non-nutritious and unnatural contaminant that did not deliver nutrients naturally.

142. Defendants also misleadingly omitted from its packaging that the Contaminated Dog Food contained and/or had a material risk of containing BPA. Defendants also misleadingly omitted from the Contaminated Dog Food packaging that Defendants did not test the Contaminated Dog Food or the ingredients used in the Contaminated Dog Food for BPA.

### G. Pentobarbital—Red Meat Diets

143. Defendants knew or should have known that the Packaging Claims on their Red Meat diets[6] were misleading to consumers because Defendants failed to monitor and test their ingredients and the Contaminated Dog Food for the presence of pentobarbital and/or the material risk of containing pentobarbital.

#### 1. Pentobarbital Was a Well-Known Risk

144. Pentobarbital is a Class II controlled substance. There is no safe or set level for pentobarbital in dog food. If pentobarbital is present in dog food, the dog food is adulterated.

145. The ingestion of pentobarbital by a dog can lead to adverse health issues, including: tyalism (salivation); emesis (vomiting); stool changes (soft to liquid stools, blood, mucus, urgency,

[6] "Red Meat" diets refer to Acana Appalachian Ranch, Acana Heritage Red Meats, and Orijen Regional Red.

explosive nature, etc.); hyporexia (decreased appetite); lethargy/depression; neurologic abnormalities (tremor, seizure, vocalization, unusual eye movements); ataxia (difficulty walking); collapse; coma; and death.

146. According to the FDA, dog food manufacturers, such as Defendants, were responsible for taking appropriate and responsible steps to ensure that their dog food and ingredients did not contain pentobarbital, such as verifying the safety and source of their ingredients and raw materials.

147. Defendants knew or should have known that rendered ingredients, including beef tallow, had a material risk of containing pentobarbital.

148. Beef tallow is a rendered ingredient that is not fresh, but rather liquid ingredient that should be derived from the fat of healthy, slaughtered cows.

149. Defendants considered beef tallow to be a high-risk ingredient. Defendants' internal policies generally required annual audits for high-risk ingredient suppliers.

150. Defendants purchased their beef tallow from third party suppliers. For example, Defendants purchased hundreds of thousands of pounds of beef tallow from a large rendered ingredient supplier ("Tallow Supplier") from August 2016 to May 2018.

151. Defendants were on notice as to the material risk of pentobarbital because they knew that other dog food companies experienced problems and recalls because they used ingredients that were adulterated with pentobarbital.

152. In 2017, a dog food company recalled its products once it found out that its dog food was adulterated with pentobarbital after using pentobarbital adulterated beef ingredients. In light of this news, Defendants internally questioned whether they could be confident that their ingredients did not contain pentobarbital.

153. In 2018, another dog food company recalled its dog food after it became adulterated with pentobarbital from rendered beef ingredients. Concerned by this recall, Defendants' employees requested that they ask their rendered ingredient suppliers to verify that there were adequate controls in place to exclude euthanized animals from their rendered ingredients. Defendants' employees also urged that they needed to test for pentobarbital. Neither occurred.

**2. Failure to Monitor for Pentobarbital**

154. Defendants' used ***beef tallow (fat)*** in their Red Meat diets. The following is an example of Defendants' ingredient panel for Orijen Regional Red:

INGREDIENTS

Deboned beef, deboned lamb, deboned mutton, green beef tripe, lamb liver, whole blue catfish, beef liver, deboned pork, whole atlantic mackerel, beef kidney, dehydrated beef, dehydrated whole egg, dehydrated pork, dehydrated beef liver, dehydrated lamb, whole green peas, whole navy beans, red lentils, beef heart, pork liver, pork kidney, deboned goat, chickpeas, green lentils, ground lamb bone, pinto beans, alfalfa, natural pork flavor, beef fat, beef cartilage, pork cartilage, green lamb tripe, herring oil, dried kelp, whole pumpkin, whole butternut squash, kale, spinach, mustard greens, collard greens, turnip greens, whole carrots, apples, pears, freeze-dried beef liver, freeze-dried beef tripe, freeze-dried lamb liver, freeze-dried lamb tripe, pumpkin seeds, sunflower seeds, zinc proteinate, mixed tocopherols (preservative), chicory root, turmeric, sarsaparilla root, althea root, rosehips, juniper berries, dried lactobacillus acidophilus fermentation product, dried bifidobacterium animalis fermentation product, dried lactobacillus casei fermentation product.

155. Defendants failed to properly monitor and audit Tallow Supplier regarding the material risk of pentobarbital adulteration in their beef tallow.

156. Since 2016, Tallow Supplier handled condemned carcasses. Tallow Supplier had a standard operating procedure that outlined its protocol to segregate condemned carcasses from the raw materials that were used to create Defendants' beef tallow.

157. Defendants never verified that Tallow Supplier's standard operating procedure effectively segregated condemned carcasses and/or other undesirable raw materials, such as pentobarbital, from Defendants' beef tallow.

158. Defendants never tested the beef tallow they used from Tallow Supplier to confirm that pentobarbital and/or euthanized animal carcasses were excluded.

159. Defendants knew or should have known that Tallow Supplier's practice of handling raw materials from condemned animal carcasses that were not fit for slaughter increased the likelihood that Tallow Supplier's beef tallow contained undesirable raw materials, including pentobarbital.

160. Defendants did not follow their policy of annually auditing high-risk ingredient suppliers. Defendants did not conduct any audits for Tallow Supplier in 2016 or 2017, even though Defendants considered Tallow Supplier to be a high-risk ingredient supplier.

161. Despite the news of recent pentobarbital recalls, Defendants did not require any additional quality control safeguards to confirm, test, or verify that Tallow Supplier was effectively preventing Defendants' beef tallow from becoming adulterated with pentobarbital. As mentioned above, Defendants instead ignored internal requests to do so.

162. When Defendants finally audited Tallow Supplier in early 2018, Defendants observed that other raw materials and products were spilled and built up on the floors and equipment. Defendants' observations indicated that Tallow Supplier's segregation protocol was ineffective.

163. Defendants did not request any corrective action from Tallow Supplier. Defendants acknowledged that follow-up corrective actions after Quality Assurance audits was one of their weaknesses.

### 3. Material Risk of Pentobarbital Ignored for Years

164. Defendants knew or should have known that Tallow Supplier's manufacturing process and quality assurance practices failed to effectively screen and prevent their beef tallow and the Contaminated Dog Food from containing pentobarbital for years.

165. Tallow Supplier conducted additional testing on their own and found that their beef tallow tested positive for pentobarbital in November 2017, January 2018, and February 2018. During this same time period, Defendants purchased approximately 282,000 pounds of beef tallow from Tallow Supplier.

166. Defendants have not taken any steps to test, verify, or confirm that these earlier shipments of beef tallow from Tallow Supplier did not contain any pentobarbital.

167. Defendants have also not tested any of the Contaminated Dog Food they manufactured from November 2017 to February 2018 that used Tallow Supplier's beef tallow as an ingredient to determine to whether the Contaminated Dog Food contained pentobarbital.

### 4. Failure to Disclose or Recall Pentobarbital Adulterated Red Meat Diets

168. On May 7, 2018, government agencies notified Defendants that beef tallow shipped by Tallow Supplier to Defendants' DogStar kitchen had tested positive for pentobarbital.

169. Defendants produced over 1.7 million pounds of finished kibble that used pentobarbital-adulterated tallow as an ingredient.

170. Defendants also used over 10,000 pounds of regrinds that contained pentobarbital as an ingredient in the Contaminated Dog Food.

171. Defendants estimated that the Red Meat diets that used the adulterated beef tallow as an ingredient contained pentobarbital at levels of up to 3.4 ppb.

172. The FDA has zero tolerance for any pentobarbital in dog food. Defendants knew or should have known that the FDA did not tolerate any amount of pentobarbital in dog food.

173. Despite estimating that pentobarbital was present in their Red Meat diets, Defendants did not recall the Red Meat diets that were already in retail markets.

174. While Defendants retrieved much of their dog food, Defendants allowed over 100,000 pounds to remain in retail stores despite knowing that it contained some level of pentobarbital. Defendants also sold dog food that used over 10,000 pounds of pentobarbital contaminated regrinds as an ingredient.

175. Defendants never disclosed to consumers that they purchased Red Meat diets in retail stores that contained some level of pentobarbital or pentobarbital contaminated regrinds.

176. Defendants refused to offer any refund to consumers who purchased the Red Meat diets that contained pentobarbital.

177. In November 2018, Defendants filed a lawsuit against Tallow Supplier for damages from the pentobarbital incident in 2018.

178. Defendants sued Tallow Supplier for contaminating the Contaminated Dog Food with pentobarbital. Defendants argued that Tallow Supplier was liable because they failed to immediately disclose to Defendants that their beef tallow contained pentobarbital.

179. In their complaint, Defendants admitted that the FDA considers any amount of pentobarbital to constitute adulteration under Federal law.

180. Defendants knew that Tallow Supplier should have disclosed the presence of pentobarbital in their beef tallow. At the same time, Defendants also assert that they did not need to disclose the presence of pentobarbital in the Contaminated Dog Food to consumers.

**5. Undisclosed Pentobarbital Risk Was Misleading**

181. Despite Defendants' knowledge that the Contaminated Dog Food contained and/or had a material risk of containing pentobarbital, Defendants negligently, and/or knowingly sold the Contaminated Dog Food while misleadingly omitting that the Contaminated Dog Food contained

and/or had a material risk of containing or being adulterated by pentobarbital. Defendants' material omissions as to the presence and/or risk of containing or being adulterated by pentobarbital on the Contaminated Dog Food packaging was intended to induce and deceive consumers to purchase the Contaminated Dog Food at premium prices.

182. Furthermore, Defendants failed to substantiate, test, or verify that Tallow Supplier could be trusted to exclude pentobarbital or undesirable raw materials from their beef tallow. Defendants' misrepresentations were further evidenced by their refusal to establish that Tallow Supplier was effectively excluding pentobarbital despite internal requests to do so.

183. Defendants' Biologically Appropriate™ and "Fresh Regional Ingredients" packaging claims were also misleading based on the presence and/or risk of pentobarbital. Pentobarbital is a dangerous, unnatural poison that is not Biologically Appropriate™. Defendants' Contaminated Dog Food was contaminated with pentobarbital only because Defendants used beef tallow, a non-fresh ingredient that did not conform to their "Fresh Regional Ingredient" representations.

184. Defendants' Packaging Claims were also deceptive due to Defendants' misrepresentations that the Contaminated Dog Food would "Deliver[] Nutrients Naturally." Pentobarbital is an unnatural euthanasia drug that offers no nutritional value and poses health risks to dogs.

## IV. MISLEADING PACKAGING CLAIMS AND OMISSIONS MISLED AND DECEIVED CONSUMERS

185. Defendants' Packaging Claims and material omissions were misleading to consumers because Contaminated Dog Food contained and/or had a material risk of containing non-conforming ingredients and contaminants.

186. The following generally summarizes the Packaging Claims that Defendants negligently, recklessly, or intentionally used to mislead and deceive reasonable consumers:

| **Packaging Claims** | **Acana** | **Orijen** |
|---|---|---|
| *"Deliver[] Nutrients Naturally"* | ✓ | |
| *Biologically Appropriate*™ | ✓ | ✓ |
| *"Fresh Regional Ingredients"* | ✓ | ✓ |

187. Reasonable consumers, like Plaintiffs, paid premium prices for the Contaminated Dog Food because the consumers relied on the accuracy of Defendants' Packaging Claims.

188. Reasonable consumers, like Plaintiffs and other Class Members, considered the above packaging claims to be material to their decision to purchase Defendants' Contaminated Dog Food.

189. Defendants knew or should have known, yet omitted, that the Contaminated Dog Food contained and/or had a material risk of containing ingredients and contaminants that were non-conforming to these packaging claims.

190. Defendants also knew or should have known that consumers would consider these non-conformances with their packaging claims to be a material consideration when purchasing Defendants' Contaminated Dog Food.

191. A reasonable consumer would not have purchased the Contaminated Dog Food, let alone at Defendants' price premium, had they known that the Contaminated Dog Food contained and/or had a material risk of containing these non-conforming ingredients and contaminants.

192. Furthermore, many reasonable consumers would have refused to purchase the Contaminated Dog Food entirely if they had known that Defendants used non-conforming

ingredients and/or failed to monitor, test, and screen for the presence of unnatural and non-nourishing contaminants.

193. As a result of these false or misleading statements and omissions, consumers, like Plaintiffs, suffered financial losses by overpaying premium prices for the Contaminated Dog Food that did not conform to their packaging claims.

## V. DEFENDANTS' MISLEADING PACKAGING CLAIMS AND MATERIAL OMISSIONS VIOLATED ILLINOIS LAWS

194. Illinois laws were designed to ensure that a company's packaging claims and representations about its products were truthful and accurate.

195. Defendants violated Illinois laws by negligently, recklessly, and/or intentionally misrepresenting that the Contaminated Dog Food conformed to the following packaging claims:

(a) "Delivering Nutrients Naturally"

(b) Biologically Appropriate™; and

(c) "Fresh Regional Ingredients."

196. Defendants also owed consumers a legal duty to disclose that the Contaminated Dog Food contained and/or had a material risk of containing Heavy Metals, a material amount of non-fresh ingredients, a material amount of non-regional ingredients, BPA, pentobarbital and/or other ingredients and contaminants that did not conform to Defendants' packaging claims.

197. Defendants' marketing and advertising campaign on its packaging was sufficiently lengthy in duration, and widespread in dissemination, that it would be unrealistic to require Plaintiffs to plead reliance upon each advertised misrepresentation.

198. Defendants' deceptive marketing practices implicated the public as consumers because Defendants directed their misrepresentations at the market generally.

199. Defendants engaged in this long-term advertising campaign to convince potential customers that they should pay Defendants a price premium for the Contaminated Dog Food because consumers expected and had confidence that Defendants used ingredients that conformed to all of their packaging claims and effectively prevented the inclusion of contaminants that did not conform to the Packaging Claims.

## VI. CONSUMER RELIANCE WAS REASONABLE AND FORESEEABLE

200. Plaintiffs reasonably relied upon Defendants' Packaging Claims alleged herein when Plaintiffs made their decision to purchase the Contaminated Dog Food.

201. Any reasonable consumer would consider the packaging of a dog food product (as well as the other false and/or misleading representations alleged herein) when deciding whether to purchase said dog food.

202. Consumers reasonably relied upon Defendants' Packaging Claims as objective statements that communicated, represented, and advertised that the Contaminated Dog Food had specific product characteristics.

203. Plaintiffs, along with other reasonable consumers, reasonably interpreted and relied upon Defendants' misleading Packaging Claim of Biologically Appropriate™ to mean that the Contaminated Dog Food did not contain biologically inappropriate, unnatural, or non-nutritious ingredients and contaminants.

204. Plaintiffs, along with other reasonable consumers, relied and interpreted Defendants' "Fresh Regional Ingredients" Packaging Claim to mean that the Contaminated Dog Food did not contain a material amount of non-fresh and non-regional ingredients.

205. Plaintiffs, along with other reasonable consumers, relied and interpreted Defendants' "Delivering Nutrients Naturally" Packaging Claim to mean that the Contaminated

Dog Food did not contain unnatural and non-nutritious contaminants, such as BPA and/or pentobarbital.

206. As discussed above, Defendants foresaw Plaintiffs' reliance on their Packaging Claims. Defendants designed their packaging claims to target and induce reasonable consumers, like Plaintiffs, to pay premium prices for the Contaminated Dog Food based on Defendants' Packaging Claims.

207. Moreover, Plaintiffs' reliance on Defendants' Packaging Claims was reasonable given the material omissions on the Contaminated Dog Food's packaging regarding the Contaminated Dog Food containing and/or having a material risk of containing Heavy Metals, a material amount of non-fresh ingredients, a material amount of non-regional ingredients, BPA, and/or pentobarbital.

## VII. DEFENDANTS' KNOWLEDGE OF THE MISREPRESENTATIONS AND THEIR MATERIALITY

208. Defendants had exclusive knowledge of the physical and chemical makeup and formula of the Contaminated Dog Food and ingredients, including whether any of the Contaminated Dog Food and its ingredients contained and/or had a risk of containing non-conforming contaminants, such as Heavy Metals, BPA, and/or pentobarbital.

209. Defendants also had exclusive knowledge of their ingredients and supply chain, including, among other things, the location and identity of their ingredient suppliers as well as the quality and quantity of the ingredients used in the Contaminated Dog Food based on Defendants' diet formulas and manufacturing practices.

210. Furthermore, consumers, like Plaintiffs, had no means to ascertain that the Contaminated Dog Food contained and/or had a material risk of containing ingredients and contaminants that did not conform to Defendants' Packaging Claims. Defendants alone had

exclusive knowledge as to their use of a material amount of non-fresh ingredients, such as regrinds, and a material amount of non-regional ingredients in the Contaminated Dog Food. Consumers could not discover on their own that Defendants were purchasing material amounts of ingredients from non-regional suppliers, or that Defendants testing of the Contaminated Dog Food and its ingredients for non-conforming contaminants was insufficient.

## VIII. DEFENDANTS ACTED NEGLIGENTLY AND/OR INTENTIONALLY TO MISLEAD CONSUMERS

211. Defendants acted intentionally to hide the true quality and composition of the Contaminated Dog Food. Defendants willingly misrepresented and materially omitted to consumers that the Contaminated Dog Food contained and/or had a material risk of containing Heavy Metals, a material amount of non-fresh ingredients, including regrinds, a material amount of non-regional ingredients, BPA, and/or pentobarbital.

212. Defendants did so despite knowing that the presence and/or material risk of the presence of these non-conforming ingredients in the Contaminated Dog Food was material to a reasonable consumer. Defendants knew that consumers trusted and relied on Defendants to ensure that the Contaminated Dog Food did not contain any ingredients and contaminants that did not conform to their packaging claims and representations.

## CLASS ACTION ALLEGATIONS

213. Plaintiffs bring this action individually and on behalf of the following Class pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

*Class #1 ("Main Class," represented by Plaintiffs)*: All persons who reside in the State of Illinois who, from July 1, 2014 to the present (the "Class Period"), purchased Orijen or

Acana dog food products[7] in the State of Illinois for household or business use, and not resale.

*Subclass #1 ("Orijen Class" represented by Plaintiff Chernik, Plaintiff Zarinebaf, and Plaintiff Meyer)*: All persons who reside in the State of Illinois who, from July 1, 2014 to the present, purchased Orijen dog food products[8] in the State of Illinois for household or business use, and not resale.

*Subclass #2 ("Acana Singles Class," represented by Plaintiff Zarinebaf and Meyer)*: All persons who reside in the State of Illinois who, from July 1, 2014 to the present, purchased Acana Singles dog food products[9] in the State of Illinois for household or business use, and not resale.

*Subclass #3 ("Acana Regionals Class," represented by Plaintiff Chernik)*: All persons who reside in the State of Illinois who, from July 1, 2014 to the present, purchased Acana

[7] Specifically, Plaintiffs in the Main Class represent consumers that purchased (1) Acana Regionals Grasslands with Grass-Fed Kentucky Lamb, Freshwater Trout & Game Bird; (2) Acana Regionals Meadowland with Free-Run Poultry, Freshwater Fish, and Nest-Laid Eggs; (3) Acana Regionals Wild Atlantic with Wild-Caught New England Fish & Fresh Kentucky Greens; (4) Orijen Original with Fresh Free- Run Chicken and Turkey, Wild-Caught Fish and Nest-Laid Eggs; (5) Orijen Six Fish with New England Mackerel, Herring, Flounder, Redfish, Monkfish and Silver Hake; (6) Acana Singles Duck and Pear; (7) Acana Singles Lamb and Apple; (8) Acana Heritage Free-Run Poultry; (9) Acana Heritage Freshwater Fish; (10) Orijen Six Fish Wild-Caught Regional Saltwater and Freshwater Fish; (11) Orijen Tundra Goat, Venison, Mutton, Bison, Arctic Char, Rabbit; (12) Orijen Grain Free Puppy with Chicken, Turkey, Wild-Caught Fish, Eggs; (13) Acana Singles Mackerel and Greens; (14) Acana Singles Pork and Squash; (15) Acana Regionals Appalachian Ranch with Ranch-Raised Red Meats & Freshwater Catfish; (16) Orijen Regional Red with Angus Beef, Wild Boar, Boer Goat, Romney Lamb, Yorkshire Pork & Wild Mackerel; (17) Orijen Regional Red Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Dry Dog Food; and (18) Acana Heritage Meats.

[8] The Orijen Class represents (1) Orijen Original; (2) Orijen Six Fish; (3) Orijen Tundra; (4) Orijen Grain Free Puppy; and (5) Orijen Regional Red.

[9] The Acana Singles Class represents consumers that purchased (1) Acana Singles Duck and Pear; (2) Acana Singles Lamb and Apple; and (3) Acana Singles Pork and Squash.

Regionals dog food products[10] in the State of Illinois for household or business use, and not resale.

_Subclass #4 ("Acana Heritage Class," represented by Plaintiff Chernik)_: All persons who reside in the State of Illinois who, from July 1, 2014 to the present, purchased Acana Heritage dog food products[11] in the State of Illinois for household or business use, and not resale.

_Subclass #5 ("Red Meat Class," represented by Plaintiff Zarinebaf and Chernik)_: All persons who reside in the State of Illinois who, from July 1, 2014 to the present, purchased a "Red Meat" diet[12] that used beef tallow in the State of Illinois for household or business use, and not resale.

214. Excluded from the Class are the Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

215. This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Class members are easily ascertainable.

---

[10] The Acana Regionals Class represents consumers that purchased (1) Acana Regionals Wild Atlantic; (2) Acana Regionals Meadowland; (3) Acana Regionals Appalachian Ranch; and (4) Acana Regionals Grassland.

[11] The Acana Heritage Class represents consumers that purchased (1) Acana Heritage Free-Run Poultry; (2) Acana Heritage Freshwater Fish Formula; and (3) Acana Heritage Meats.

[12] The Red Meat Class represents consumers that purchased (1) Acana Regionals Appalachian Ranch with Ranch-Raised Red Meats & Freshwater Catfish; (2) Orijen Regional Red with Angus Beef, Wild Boar, Boer Goat, Romney Lamb, Yorkshire Pork & Wild Mackerel; (3) Orijen Regional Red Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Dry Dog Food; and (4) Acana Heritage Meats.

216. The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class Members in a single action will provide substantial benefits to the parties and Court.

217. Questions of law and fact common to Plaintiffs and the Class include, but are not limited to, the following:

(a) whether Defendants owed a duty of care to Plaintiffs and the Class;

(b) whether Defendants knew or should have known that the Contaminated Dog Food contained and/or had a material risk of containing Heavy Metals, BPA, a material amount of non-fresh ingredients, a material amount of non-regional ingredients, including regrinds, pentobarbital, and/or any other ingredients or contaminants that did not conform to the packaging claims;

(c) whether Defendants failed to test the Contaminated Dog Food and ingredients for the presence of Heavy Metals, pentobarbital, BPA, and/or unnatural or other contaminants that did not conform to the packaging claims;

(d) whether Defendants wrongfully represented that the Contaminated Dog Food conformed to the following packaging claims: “Delivering Nutrients Naturally”; Biologically Appropriate™; and “Fresh Regional Ingredients”;

(e) whether Defendants wrongfully represented and continue to represent that the Contaminated Dog Food was natural, nutritious, and of a superior quality;

(f) whether Defendants wrongfully represented that the manufacturing of the Contaminated Dog Food was subjected to rigorous quality assurances and standards;

(g) whether Defendants' omissions were false, deceptive, and misleading;

(h) whether those representations are likely to deceive a reasonable consumer;

(i) whether Defendants' omissions were likely to deceive a reasonable consumer;

(j) whether a reasonable consumer would consider that the Contaminated Dog Food containing and/or having a material risk of containing the following ingredients or contaminants to be a material fact in purchasing dog food: Heavy Metals, BPA, a material amount of non-fresh ingredients, including regrinds, a material amount of non-regional ingredients, pentobarbital, and/or any other ingredients and contaminants that did not conform to the labels, packaging, advertising, and statements;

(k) whether Defendants had knowledge that the Packaging Claims used on the Contaminated Dog Food packaging were false, deceptive, and misleading;

(l) whether Defendants continue to disseminate those representations despite knowledge that the representations are false, deceptive, and misleading;

(m) whether Defendants' representations and descriptions on the packaging of the Contaminated Dog Food was likely to mislead, deceive, confuse, or confound consumers acting reasonably;

(n) whether Defendants violated Illinois law;

(o) whether Defendants engaged in deceptive business practices;

(p) whether Defendants engaged in false advertising;

(q) whether Defendants made fraudulent misrepresentations;

(r) whether Defendants made fraudulent omissions;

(s) whether Defendants unjustly enriched themselves at consumers' expense;

(t) whether Defendants' conduct was negligent per se;

(u) whether Defendants' had a duty to disclose the material omissions concerning the quality and nature of the Contaminated Dog Food and its ingredients;

(v) whether Plaintiffs and the Class Members are entitled to actual, statutory, and treble damages; and

(w) whether Plaintiffs and the Class Members are entitled to declaratory and injunctive relief.

218. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other Class Members. Identical statutory violations and business practices and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

219. Plaintiffs' claims are typical of those of the Class Members because they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct.

220. Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

221. Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

222. Questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

223. As a result of the foregoing, class treatment is appropriate.

## CLAIMS FOR RELIEF

## COUNT I

**Violations of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq*., Against Defendants on Behalf of the Class**

224. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

225. The conduct described herein constitutes a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq*. (hereinafter, "ICFA").

226. Defendants' deceptive conduct alleged herein violated the following provisions of Illinois' Consumer Protection Act:

(a) 815 Ill. Comp. Stat. 505/2(a)(4), by negligently, recklessly, and/or intentionally using deceptive representations or designations of geographic origin in connection with its Contaminated Dog Food using the following Packaging Claims:

(1) "Delivering Nutrients Naturally";

(2) Biologically Appropriate™; and

(3) "Fresh Regional Ingredients."

(b) 815 Ill. Comp. Stat. 505/2(a)(7), by negligently, recklessly, and/or intentionally representing that the Contaminated Dog Food were of a particular standard, quality, or grade, when they were of another; and

(c) 815 Ill. Comp. Stat. 505/2(a)(9), by negligently, recklessly, and/or intentionally advertising the Contaminated Dog Food with intent not to sell them as advertised.

227. Specifically, Defendants failed to disclose that the Contaminated Dog Food contained and/or had a material risk of containing Heavy Metals, BPA, pentobarbital, a material amount of non-fresh ingredients, a material amount of non-regional ingredients, and/or other ingredients and contaminants that did not conform to Defendants' packaging claims.

228. Defendants intended for Plaintiffs and the Class Members to rely on and accept as true these advertisements and representations in deciding whether to purchase the Contaminated Dog Food, and at what price.

229. Defendants' misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive consumers with respect to the Contaminated Dog Foods' quality, ingredients, and suitability for consumption by dogs.

230. Defendants' misrepresentations, concealment, omissions, and other deceptive conduct were likely to cause consumers to purchase and/or overpay for the Contaminated Dog Food.

231. Defendants' deceptive trade practices were misleading and deceiving to Illinois consumers because the Contaminated Dog Food contained and/or had a material risk of containing the following non-conforming ingredients and contaminants:

(a) Heavy Metals;

(b) a material amount of non-regional ingredients;

(c) a material amount of non-fresh ingredients, including regrinds;

(d) BPA;

(e) pentobarbital; and/or

(g) any other ingredients or contaminants that do not conform to the Packaging Claims.

232. Defendants' deceptive trade practices significantly impacted the public.

233. Defendants' misrepresentations, concealment, omissions, and other deceptive acts occurred before Plaintiffs and the Class decided to purchase the Contaminated Dog Food.

234. Defendants' misrepresentations, concealment, omissions, and other deceptive conduct did in fact deceive Plaintiffs and the Class with respect to the Contaminated Dog Food quality, ingredients, and suitability for consumption by dogs.

235. Defendants' misrepresentations, concealment, omissions, and other deceptive conduct did in fact deceive and cause Plaintiff and the Class Members to purchase and/or overpay for the Contaminated Dog Food. The facts misrepresented, concealed, or not disclosed by Defendants with respect to the presence of Heavy Metals, non-regional and non-fresh ingredients, BPA, pentobarbital and/or unnatural or other ingredients that do not conform to the Packaging Claims are material facts because Plaintiffs and any reasonable consumer would have considered those facts important in deciding whether to purchase the Contaminated Dog Food, and at what price.

236. If Plaintiffs and the Class Members had known that the Contaminated Dog Food did not in fact match the quality and ingredients described above, they would not have paid the price premium they paid for the Contaminated Dog Food.

237. If Plaintiffs and the Class Members had known that the Contaminated Dog Food did not in fact match the quality and ingredients described above, they would not have purchased the Contaminated Dog Food at all.

238. As a result of Defendants' conduct and deceptive business trade practices, Plaintiffs and the Class Members have suffered actual damages, and losses as described above as a result.

239. As a direct and proximate result of the deceptive, misleading, unfair, and unconscionable practices of the Defendants set forth above, Plaintiffs and the Class Members are entitled to actual damages, compensatory damages, penalties, attorneys' fees, and costs, as set forth in Section 10a of the ICFA. Defendants' deceptive, misleading, unfair, and unconscionable practices set forth above were done willfully, wantonly, and maliciously, entitling Plaintiffs and the Class Members to an award of punitive damages.

**COUNT II**
**Fraudulent Misrepresentation Against Defendants**
**Individually and on Behalf of the Class**

240. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

241. Defendants falsely represented to Plaintiffs and the Class regarding the Contaminated Dog Food with the following Packaging Claims:

(a) "Delivering Ingredients Naturally";

(b) Biologically Appropriate™; and

(c) "Fresh Regional Ingredients."

242. Defendants intentionally and knowingly made these misrepresentations to induce Plaintiffs and the Class Members to purchase the Contaminated Dog Food.

243. Defendants knew that their representations about the Contaminated Dog Food were false because the Contaminated Dog Food contained and/or had a material risk of containing the following non-conforming contaminants and ingredients:

(a) Heavy Metals;

(b) a material amount of non-fresh ingredients, including regrinds;

(c) a material amount of non-regional ingredients;

(d) BPA;

(e) pentobarbital; and/or

(f) any other ingredients and contaminants that do not conform to the Packaging Claims.

244. Defendants allowed their packaging claims to intentionally mislead consumers, such as Plaintiffs and the Class Members.

245. Plaintiffs and the Class Members did in fact rely on these misrepresentations and purchased the Contaminated Dog Food to their detriment. Given the deceptive manner in which Defendants advertised, represented, and otherwise marketed the Contaminated Dog Food on their packaging, reliance by the Plaintiffs and Class Members on Defendants' misrepresentations was justifiable.

246. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members suffered actual damages in that they purchased the Contaminated Dog Food that was worth less than the price they paid.

247. Plaintiffs and the Class would not have purchased the Contaminated Dog Food at all had they known of the presence of non-conforming contaminants and ingredients. Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT III
## Unjust Enrichment Against Defendants Individually and on Behalf of the Class

248. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

249. Substantial benefits have been conferred on Defendants by Plaintiffs and the Class through the purchase of the Contaminated Dog Food. Defendants knowingly and willingly accepted and enjoyed these benefits.

250. Defendants either knew or should have known that the payments rendered by Plaintiffs were given and received with the expectation that the Contaminated Dog Food would have the qualities, characteristics, ingredients, and suitability for consumption represented by Defendants' Packaging Claims. As such, it would be inequitable for Defendants to retain the benefit of the payments under these circumstances.

251. Defendants' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Defendants to retain the benefits without payment of the value to Plaintiffs and the Class.

252. Plaintiffs and the Class are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon. Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against the Defendants as to each and every count, including:

A. An order declaring this action to be a proper class action, appointing Plaintiffs and their counsel to represent the Class, and requiring Defendants to bear the costs of class notice;

B. An order enjoining Defendants from selling the Contaminated Dog Food until the non-conforming ingredients, contaminants, and/or unnatural or other ingredients, such as heavy metals, BPA, a material amount of non-fresh ingredients, including regrinds, a material amount of non-regional ingredients, and/or pentobarbital are removed or full disclosure of the presence of such appear on all labels, packaging, and advertising;

C. An order enjoining Defendants from selling the Contaminated Dog Food in any manner suggesting or implying that they conform to their Packaging Claims of Biologically Appropriate; "Fresh Regional Ingredients," and "Delivering Nutrients Naturally."

D. An order requiring Defendants to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing products;

E. An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendants' past conduct;

F. An order requiring Defendants to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of Illinois law, plus pre- and post-judgment interest thereon;

G. An order requiring Defendants to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

H. An order requiring Defendants to pay all actual and statutory damages permitted under the counts alleged herein;

I. An order requiring Defendants to pay punitive damages on any count so allowable;

J. An order awarding attorneys' fees and costs, including the costs of pre-suit investigation, to Plaintiffs and the Class; and

K. An order providing for all other such equitable relief as may be just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: June 17, 2020

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

By: /s/ Rebecca A. Peterson

ROBERT K. SHELQUIST, *Pro Hac Vice*
REBECCA A. PETERSON, *Pro Hac Vice*
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail: rapeterson@locklaw.com
rkshelquist@locklaw.com

WEXLER WALLACE LLP
KENNETH A. WEXLER
UMAR SATTAR
MICHELLE PERKOVIC
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Tel: (312) 346-2222
Fax: (312) 346-0022
Email: kaw@wexlerwallace.com
us@wexlerwallace.com
mp@wexlerwallace.com

WEXLER WALLACE LLP
MARK T. TAMBLYN, *Pro Hac Vice*
333 University Avenue, Suite 200
Sacramento, CA 95825
Tel: (916) 565-7692
Email: mjt@wexlerwallace.com

ROBBINS LLP
KEVIN A. SEELY (199982)
STEVEN M. MCKANY (271405)
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: kseely@robbinsllp.com
smckany@robbinsllp.com

GUSTAFSON GLUEK, PLLC
DANIEL E. GUSTAFSON, *Pro Hac Vice*
KARLA M. GLUEK
RAINA C. BORRELLI, *Pro Hac Vice*
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
rborrelli@gustafsongluek.com

CUNEO GILBERT & LADUCA, LLP
CHARLES J. LADUCA
KATHERINE VAN DYCK
4725 Wisconsin Ave NW, Suite 200
Washington, DC 20016
Telephone: 202-789-3960
Facsimile: 202-789-1813
E-mail: kvandyck@cuneolaw.com
charles@cuneolaw.com

LITE DEPALMA GREENBERG, LLC
JOSEPH J. DEPALMA
SUSANA CRUZ HODGE
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
E-mail: jdepalma@litedepalma.com
scruzhodge@litedepalma.com

ANDREWS DEVALERIO LLP
GLEN DEVALERIO
DARYL ANDREWS
265 Franklin Street, Suite 1702
Boston, MA 02110
Telephone: (617) 936-2796
E-mail: glen@andrewsdevalerio.com
daryl@andrewsdevalerio.com

POMERANTZ LLP
GUSTAVO F. BRUCKNER
SAMUEL J. ADAMS
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
E-mail: gfbruckner@pomlaw.com
sjadams@pomlaw.com

LITE DEPALMA GREENBERG, LLC
KATRINA CARROLL
KYLE A. SHAMBERG
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
E-mail: kcarroll@litedepalma.com
kshamberg@litedepalma.com

**Attorneys for Plaintiffs**

# Exhibit 1

Defendants used misleading and deceptive packaging claims on the following dog food diets:

(a) Acana Regionals Appalachian Ranch with Ranch-Raised Red Meats & Freshwater Catfish






(b) Acana Regionals Grasslands with Grass-Fed Kentucky Lamb, Freshwater Trout & Game Bird






(c) Acana Regionals Meadowland with Free-Run Poultry, Freshwater Fish, and Nest-Laid Eggs






(d) Acana Regionals Wild Atlantic with New Wild New England Fish & Fresh Kentucky Greens






(e) Orijen Original with Fresh Free-Run Chicken and Turkey, Wild-Caught Fish and Nest-Laid Eggs






(f) Orijen Regional Red with Angus Beef, Wild Boar, Boer Goat, Romney Lamb, Yorkshire Pork & Wild Mackerel






(g) Orijen Regional Red Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Dry Dog Food



(h) Orijen Six Fish with New England Mackerel, Herring, Flounder, Redfish, Monkfish and Silver Hake:






(i) Acana Singles Duck and Pear Formula Dry Dog Food






(j) Acana Singles Lamb and Apple Formula Dry Dog Food






(k) Acana Heritage Free-Run Poultry Formula Dry Dog Food






(l) Acana Heritage Freshwater Fish Formula Dry Dog Food






(m) Orijen Regional Red Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Dry Dog Food




(n) Orijen Six Fish Wild-Caught Regional Saltwater and Freshwater Fish Dry Dog Food



(o) Orijen Tundra Goat, Venison, Mutton, Bison, Arctic Char, Rabbit Dry Dog Food



(p) Orijen Grain Free Puppy Chicken, Turkey, Wild-Caught Fish, Eggs Dry Dog Food






(q) Acana Singles Mackerel and Greens Formula Dry Dog Food






(r) Acana Heritage Meats Formula Dry Dog Food






(s) Acana Singles Pork and Squash Formula Dry Dog Food






# Exhibit 2

| Product Name | arsenic ug per kg | cadmium ug per kg | mercury ug per kg | lead ug per kg |
|---|---|---|---|---|
| Acana Regionals Wild Atlantic New England Fish and Fresh Greens Dry Dog Food | 3256.40 | 113.00 | 51.20 | 249.30 |
| Orijen Six Fish With New England Mackerel, Herring, Flounder, Redfish, Monkfish, Silver Hake Dry Dog Food | 3169.80 | 200.50 | 54.90 | 38.70 |
| Orijen Original | 907.60 | 93.20 | 10.80 | 489.80 |
| Chicken, Turkey, Wild-Caught Fish, Eggs Dry Dog Food | | | | |
| Orijen Regional Red Angus Beef, Boar, Goat, Lamb, Pork, Mackerel Dry Dog Food | 849.40 | 123.10 | 21.40 | 167.70 |
| Acana Regionals Meadowland with Poultry, Freshwater Fish and Eggs Dry Dog Food | 846.40 | 37.50 | 8.70 | 489.00 |
| Acana Regionals Appalachian Ranch with Red Meats and Freshwater Catfish Dry Dog Food | 358.20 | 32.50 | 14.90 | 336.70 |
| Acana Regionals Grasslands with Lamb, Trout, and Game Bird Dry Dog Food | 262.80 | 30.60 | 9.60 | 305.00 |

| Product Name | arsenic ug per kg | cadmium ug per kg | mercury ug per kg | lead ug per kg |
|---|---|---|---|---|
| Orijen Regional Red Angus Beef, | 1066.50 | 62.10 | 21.70 | 138.50 |
| Ranch Raised Lamb, Wild Boar, Pork, Bison Dry Dog Food | | | | |
| Acana Singles Duck and Pear Formula Dry Dog Food | 523.40 | 30.90 | 15.40 | 537.40 |
| Acana Singles Lamb and Apple Formula Dry Dog Food | 401.20 | 35.00 | 3.20 | 423.40 |
| Acana Heritage Free-Run Poultry Formula Dry Dog Food | 292.90 | 27.80 | 3.30 | 290.20 |
| Acana Heritage Freshwater Fish Formula Dry Dog Food | 977.70 | 56.20 | 27.40 | 486.80 |
| Orijen Regional Red Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Dry Dog Food | 1066.50 | 62.10 | 21.70 | 138.50 |
| Orijen Six Fish Wild- Caught Regional Saltwater and Freshwater Fish Dry Dog Food | 2173.90 | 92.20 | 58.80 | 55.10 |
| Orijen Tundra Goat, Venison, Mutton, Bison, Arctic Char, Rabbit Dry Dog Food | 1628.50 | 134.50 | 43.60 | 471.80 |
| Orijen Grain Free Puppy Chicken, Turkey, Wild-Caught | 791.20 | 87.20 | 12.20 | 490.80 |
| Fish, Eggs Dry Dog Food | | | | |

| Product Name | arsenic ug per kg | cadmium ug per kg | mercury ug per kg | lead ug per kg |
|---|---|---|---|---|
| Acana Singles Mackerel and Greens Formula Dry Dog Food | 1510.70 | 112.20 | 29.60 | 251.10 |
| Acana Heritage Meats Formula Dry Dog Food | 384.80 | 24.40 | 6.40 | 1731.90 |
| Acana Singles Pork and Squash Formula Dry Dog Food | 373.70 | 25.60 | 4.00 | 329.60 |