**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AFSHIN ZARINEBAF, ZACHARY CHERNIK, and JOAN MEYER, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>CHAMPION PETFOODS USA INC. and CHAMPION PETFOODS LP,<br><br>Defendants. | Case No. 1:18-cv-06951<br><br>Honorable Virginia M. Kendall |

# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. THE PACKAGING CLAIMS AND OMISSIONS .......... 1

III. FACTUAL SUMMARY .......... 5

A. CPF's Uniform Packaging Claims and Omissions .......... 5

B. CPF Knew the Packaging Claims and Omissions are Misleading and Deceptive .......... 7

1. Fresh Regional Ingredients .......... 7

a. The Dog Food Ingredients Are Not Fresh as Promised .......... 7

b. The Ingredients are Not Regional as Promised .......... 8

2. Inclusion of Heavy Metals Renders the Packaging Misleading .......... 10

3. BPA or Pentobarbital Are Not Fresh or Biologically Appropriate .......... 11

a. BPA .......... 11

b. Pentobarbital .......... 12

C. Plaintiffs Are Representative of the Classes .......... 14

IV. CLASS DEFINITIONS .......... 15

V. ARGUMENT .......... 16

A. The Rule 23(a) Requirements .......... 17

1. Numerosity is Satisfied .......... 17

2. There Are Numerous Common Issues of Fact and Law .......... 17

3. Plaintiffs' Claims Are Typical .......... 19

4. Plaintiffs and Their Counsel Are Adequate Representatives .......... 20

B. Rule 23(b)(3) Is Satisfied .......... 21

1. Predominance .......... 21

a. Illinois Consumer Fraud Act ..... 22

b. Damages ..... 24

2. Superiority ..... 28

C. Rule 23(b)(2) Is Satisfied ..... 28

D. Alternative Rule 23(c)(4) Issues Class ..... 29

VI. CONCLUSION ..... 30

# TABLE OF AUTHORITIES

Page(s)

CASES

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)....................16, 28

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*,
568 U.S. 455 (2013)....................16, 21, 23

*Apple Inc. v. Samsung Elecs. Co.*,
735 F.3d 1352 (Fed. Cir. 2013)....................27

*Astiana v. Kashi Co.*,
291 F.R.D. 493 (S.D. Cal. 2013)....................19

*Barnes v. Air Line Pilots Ass'n*,
310 F.R.D. 551 (N.D. Ill. 2015)....................30

*Beaton v. SpeedyPC Software*,
907 F.3d 1018 (7th Cir. 2018)....................19

*Bell v. Publix Super Markets, Inc.*,
982 F.3d 468 (7th Cir. 2020)....................1, 18, 22

*Burns v. First Am. Bank*,
No. 04-cv-7682, 2006 WL 3754820 (N.D. Ill. Dec. 19, 2006)....................16, 17, 21

*Butler v. Sears, Roebuck & Co.*,
727 F.3d 796 (7th Cir. 2013)....................21, 22, 25

*Carnegie v. Household Int'l, Inc.*,
376 F.3d 656 (7th Cir. 2004)....................29

*Clark v. Tap Pharma Prods., Inc.*,
798 N.E.2d 123 (Ill. Ct. App. 2003)....................23

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)....................25, 27

*De La Fuente v. Stokely-Van Camp, Inc.*,
713 F.2d 225 (7th Cir. 1983)....................19

*Endo v. Albertine*,
147 F.R.D. 164 (N.D. Ill. 1993)....................30

*Espenscheid v. DirectSat USA, LLC*,
705 F.3d 770 (7th Cir. 2013)....................29

*Fitzpatrick v. Gen. Mills, Inc.*,
263 F.R.D. 687 (S.D. Fla. 2010)....................................................................................19

*Flynn v. FCA US LLC*,
327 F.R.D. 206 (S.D. Ill. 2018) ....................................................................................27

*Fournigault v. Independence One Mortg. Co.*,
234 F.R.D. 641 (N.D. Ill. 2006)....................................................................................20

*Gordon v. Boden*,
586 N.E.2d 461 (Ill. App. Ct. 1991) ...............................................................................19

*In re Allstate Ins. Co.*,
400 F.3d 505 (7th Cir. 2005) ........................................................................................30

*In re ConAgra Foods, Inc.*,
90 F. Supp. 3d 919 (C.D. Cal. 2015) .......................................................................23, 27

*In re Dial Complete Mktg. & Sales Practices Litig.*,
312 F.R.D. 36 (D.N.H. 2015) ........................................................................................23

*In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*,
No. 14-CV-5696, 2017 WL 1196990 (N.D. Ill. Mar. 31, 2017)...................................25, 27

*In re Scotts EZ Seed Litig.*,
304 F.R.D. 397 (S.D.N.Y. 2015)....................................................................................27

*IWOI, LLC v. Monaco Coach Corp.*,
581 F. Supp. 2d 994 (N.D. Ill. 2008)..............................................................................22

*Johns v. Bayer Corp.*,
280 F.R.D. 551 (S.D. Cal. 2012) ...................................................................................19

*Johnson v. Gen. Mills, Inc.*,
275 F.R.D. 282 (C.D. Cal. 2011)....................................................................................19

*Keele v. Wexler*,
149 F.3d 589 (7th Cir. 1998) ........................................................................................17

*Kleen Prod. LLC v. Int'l Paper Co.*,
831 F.3d 919 (7th Cir. 2016) ........................................................................................22

*Kramer v. Am. Bank & Tr. Co., N.A.*,
No. 11 C 8758, 2017 WL 1196965 (N.D. Ill. Mar. 31, 2017) ..............................................25

*Krommenhock v. Post Foods, LLC*,
334 F.R.D. 552 (N.D. Cal. 2020)....................................................................................28

*McMahon v. LVNV Funding, LLC*,
807 F.3d 872 (7th Cir. 2015) ....29

*Mednick v. Precor, Inc.*,
320 F.R.D. 140 (N.D. Ill. 2017)....23, 30

*Morse v. Bankers Life & Cas. Co.*,
No. 99-cv-0193, 2000 WL 246245 (N.D. Ill. Feb. 24, 2000)....23

*Mullen v. GLV, Inc.*,
330 F.R.D. 155 (N.D. Ill. 2019)....24

*Mullins v. Direct Digital, LLC*,
795 F.3d 654 (7th Cir. 2015) ....18, 25, 28

*Mullins v. Premier Nutrition Corp., No. 13-cv-01271-RS*,
2016 WL 1535057 (N.D. Cal. Apr. 15, 2016) ....19

*Oshana v. Coca-Cola Co.*,
472 F.3d 506 (7th Cir.2006) ....19

*Rikos v. Procter & Gamble Co.*,
799 F.3d 497 (6th Cir. 2015) ....17, 23

*Robert J. Kowalski, P.C. v. N. Tr. Co.*,
No. 84 C 1087, 1985 WL 3935 (N.D. Ill. Nov. 13, 1985)....24

*Rosario v. Livaditis*,
963 F.2d 1013 (7th Cir.1992) ....17

*Saltzman v. Pella Corp.*,
257 F.R.D. 471 (N.D. Ill. June 4, 2009) ....20, 29

*Sonner v. Schwabe N. Am., Inc.*,
2019 WL 4266808 (C.D. Cal. July 2, 2019)....19

*Suchanek v. Sturm Foods, Inc.*,
311 F.R.D. 239 (S.D. Ill. 2015) .... passim

*Suchanek v. Sturm Foods, Inc.*,
No. 11-cv-565, 2018 WL 6617106 (N.D. Ill. July 3, 2018) ....23

*Suchanek v. Sturm Foods, Inc.*,
764 F.3d 750 (7th Cir. 2014) .... passim

*Swanagan v. Al Piemonte Ford Sales, Inc.*,
No. 94 C 4070, 1995 WL 493480 (N.D. Ill. Aug. 15, 1995)....24

*Tylka v. Gerber Prod. Co.*,
178 F.R.D. 493 (N.D. Ill. 1998) ........ passim

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ........ 29

*West v. Timberlake*,
No. 08-CV-670, 2009 WL 959655 (E.D. Wis. Apr. 8, 2009) ........ 29

*Yamagata v. Reckitt Benckiser LLC, No. 17-cv-03529-VC*,
2019 WL 3815718 (N.D. Cal. June 5, 2019) ........ 19

**RULES**

Federal Rules of Civil Procedure Rule 23 ........ *passim*

**STATUTES**

Illinois Consumer Fraud Act ........ *passim*

## I. INTRODUCTION

This case involves a single Illinois Consumer Fraud Act ("ICFA") claim of false or misleading advertising of certain dog food made by CPF.[1] The governing standard here is whether a "reasonable consumer" would have been misled and as this Court made clear, it is "irrelevant" whether the dog food is unsafe. ECF 47 at 8. The Seventh Circuit recently made clear in *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 475 (7th Cir. 2020), that "[w]hat matters most [in a false advertising case] is how real consumers understand and react to the advertising" when evaluating the reasonable consumer standard. *Id.* at 476. The evidence in this case shows that reasonable consumers were in fact misled into paying premium prices for dog food they believed to be high quality, healthy, and nutritious dog food.

Plaintiffs seek certification of classes of Illinois consumers damaged by CPF's misleading and deceptive packaging. These consumers were targeted by CPF because they loved their pets and were willing to pay high premium prices. Courts in this Circuit hold that ICFA claims are appropriate for class treatment because deception is determined by an objective, reasonable consumer standard and the alleged wrongdoing stems from conduct that is uniform to all class members. Since the requirements of Rule 23 of the Federal Rules of Civil Procedure are satisfied in this case, class certification is proper.

## II. THE PACKAGING CLAIMS AND OMISSIONS

Plaintiffs bring this class action lawsuit alleging misrepresentations on and material omissions from CPF's packaging that caused them to pay price premiums for the Dog Food they purchased.[2] Plaintiffs' ICFA claim rests on CPF's promises that its Dog Food is "*Biologically*

---

[1] "CPF" refers to Champion Petfoods USA, Inc. and Champion Petfoods LP.

[2] "Dog Food" refers to the following diets: (1) Acana Free-Run Poultry; (2) Acana Regionals Grasslands; (3) Acana Heritage Meats; (4) Acana Singles Lamb & Apple, (5) Acana Singles Pork & Squash, (6) Acana Regionals Meadowland, and (7) Acana Singles Wild Mackerel (collectively the "Acana Diets") and (8)

*Appropriate*," that it is made with "*Fresh Regional Ingredients*," and that it "*Delivers Nutrients Naturally*" (collectively, the "Packaging Claims"). Both the Acana and Orijen Diets at issue bear these Packaging Claims:

| **Packaging Claims** | **Acana** | **Orijen** |
|---|---|---|
| *"Deliver[] Nutrients Naturally"* | ✓ | |
| *Biologically Appropriate™* | ✓ | ✓ |
| *"Fresh Regional Ingredients* | ✓ | ✓ |

The Packaging Claims dominate CPF's packaging and were read and relied upon by Plaintiffs:

| **Diet** | **Total Number of "Biologically Appropriate" Claims** | **Total Number of "Fresh Regional Ingredients" Claims** | **Total Number of "Delivering Nutrients Naturally" Claims [*Acana only*]** |
|---|---|---|---|
| *Acana Free-Run Poultry 2015. Ex. 1 at -32.* | 9 | 4 | 1 |
| *Acana Free-Run Poultry 2018. Ex. 1 at -33.* | 9 | 3 | 1 |
| *Acana Heritage Meats 2015. Ex. 3 at -36.* | 9 | 4 | 1 |
| *Acana Heritage Meats 2017. Ex. 3 at -1872.* | 9 | 4 | 1 |
| *Acana Heritage Meats 2018. Ex. 3 at -2834.* | 9 | 4 | 1 |

Orijen Six Fish, (9) Orijen Original, (10) Orijen Regional Red, (11) Orijen Senior (collectively, the "Orijen Diets").

| **Diet** | **Total Number of "Biologically Appropriate" Claims** | **Total Number of "Fresh Regional Ingredients" Claims** | **Total Number of "Delivering Nutrients Naturally" Claims [*Acana only*]** |
|---|---|---|---|
| *Acana Regionals Grasslands 2015. Ex. 2 at -39.* | 9 | 4 | 1 |
| *Acana Regionals Grasslands 2018. Ex. 2 at -40.* | 9 | 4 | 1 |
| *Acana Regionals Meadowland 2015. Ex. 6 at -42.* | 9 | 5 | 1 |
| *Acana Regionals Meadowland 2018. Ex. 6 at -43.* | 9 | 5 | 1 |
| *Acana Singles Lamb & Apple 2016-2017. Ex. 4 at -50.* | 9 | 5 | 1 |
| *Acana Singles Lamb & Apple 2018. Ex. 4 at -52.* | 5 | 3 | 1 |
| *Acana Singles Pork & Squash 2016-2017. Ex. 5 at -56.* | 9 | 5 | 2 |
| *Acana Singles Pork & Squash 2018. Ex. 5 at -57.* | 5 | 3 | 1 |
| *Acana Singles Wild Mackerel 2015. Ex. 7 at -55.* | 9 | 5 | 2 |
| *Acana Singles Wild Mackerel 2017. Ex. 7 at -1878.* | 9 | 5 | 1 |
| *Acana Singles Wild Mackerel 2018. Ex. 7 at -2858.* | 9 | 5 | 2 |

| Diet | Total Number of "Biologically Appropriate" Claims | Total Number of "Fresh Regional Ingredients" Claims | Total Number of "Delivering Nutrients Naturally" Claims [*Acana only*] |
|---|---|---|---|
| *Orijen Six Fish 2015. Ex. 8 at -84.* | 8 | 2 | n/a |
| *Orijen Six Fish 2017. Ex. 8 at -88.* | 7 | 2 | n/a |
| *Orijen Six Fish 2018. Ex. 8 at -89.* | 6 | 2 | n/a |
| *Orijen Original 2016-2017. Ex. 9 at -61.* | 8 | 4 | n/a |
| *Orijen Original 2018. Ex. 9 at -65.* | 7 | 4 | n/a |
| *Orijen Regional Red 2015. Ex. 10 at -77.* | 8 | 3 | n/a |
| *Orijen Regional Red 2018. Ex. 10 at -82.* | 6 | 3 | n/a |
| *Orijen Senior 2016-2017. Ex. 11 at -1906.* | 6 | 4 | n/a |
| *Orijen Senior 2018. Ex. 11 at -2883.* | 6 | 4 | n/a |

ECF 68, ¶¶12-17, 206.[3]

Plaintiffs allege that a reasonable consumer would not, based on these Packaging Claims, "understand that [CPF]'s dog food contained heavy metals, BPA, pentobarbital, non-regional, non-fresh, or un-natural ingredients." ECF 47 at 13-15; ECF 68, ¶¶51, 53, 55-56, 69, 82-84. Plaintiffs

[3] Unless otherwise noted, "¶" references are to the Third Amended Complaint (ECF 68) and references to "Ex. _" are exhibits to the Declaration of Rebecca A. Peterson in support of this motion.

also allege that CPF "owed consumers a legal duty to disclose that the [] Dog Food may contain Heavy Metals, and a material amount of non-fresh ingredients… [and] BPA." ECF 68 ¶196. These "Omissions" also violate the ICFA. ECF 68, ¶¶194-99, 211-12, 227-39.

## III. FACTUAL SUMMARY

### A. CPF's Uniform Packaging Claims and Omissions

CPF's packaging uniformly promises that its Dog Food is Biologically Appropriate and made from fresh, regional ingredients, and that its Acana Diets "deliver nutrients naturally." Exs. 1-11. CPF did not choose these Packaging Claims by accident. It chose them because it knew reasonable consumers would rely on these "key attributes" that differentiate the Dog Food from other premium dog food. Ex. 12 at -7812, -7818, -7831, -7842, -7853. As CPF puts it, its target market of "Pet Lovers," like Plaintiffs, "want the best for their dogs…insist on the freshest and most nourishing ingredients, and hold us to the highest standards." Ex. 13 at -9068.

"Biologically Appropriate" dog food made from Fresh Regional Ingredients is CPF's core marketing mission, which it ensures is "Printed on Every Bag." *See* Ex. 14 at -3677. CPF knew it stood "to benefit from the continued customer demand for, and willingness to pay for, premium products" that guarantee Biologically Appropriate "protein dense formulations" and target consumers that have a "keen…focus on knowing where ingredients come from." *Id.* at -3660.

The "fresh" and "regional" packaging promises are a "great asset," that give CPF the "greatest advantage" over competitors and its "biggest opportunity" to convince reasonable consumers to purchase the Dog Food. *See* Ex. 15 at -3444 (admitting the "ability to ***feature and tell this story is a great asset***. More pet lovers are looking beyond the ingredient panel to see where their ingredients come from.") (emphasis added). The Dog Food packaging also contains other images and text to bolster these claims, such as featuring "exemplar suppliers" that are CPF's "trusted" suppliers of specific fresh, regional, or local ingredients. ECF 68, ¶38; Exs. 1-11.

Additionally, every Acana Diet promises that its Dog Food "deliver[s] nutrients naturally." Exs. 1-7. Consistent with its other packaging claims, CPF believes this promise induces consumers to believe that the Dog Food contains "nutrients in their freshest, most natural and flavorful form" and that "authentic fresh ingredients mirror those Mother Nature provides." Ex. 16 at -8858.

Despite these repeated uniform Packaging Claims of higher quality, healthy, and premium ingredients, CPF intentionally omitted material information it knew contradicted these promises. Specifically, no packaging discloses that the Dog Food contains or may contain heavy metals, BPA, and significant amounts of non-fresh ingredients (frozen and expired ingredients) (collectively, the "Omissions"). CPF knows that consumers would be less likely, or completely unwilling to purchase the Dog Food if such information was disclosed. Ex. 17 at ¶¶32(k), 225.

In the end, the Packaging Claims and Omissions were misleading to consumers, as a recent survey of premium pet food purchasers indicates:

| **EXPECTATIONS SURVEY OF REASONABLE CONSUMERS** | **Orijen Diets** | **Acana Diets** |
|---|---|---|
| **From the "Biologically Appropriate" statements on the Dog Food, consumers would expect that:** | | |
| The dog food shown does not contain heavy metals. | 82.8% | 84.3% |
| The dog food shown does not contain BPA (Bisphenol A). | 71.3% | 73.2% |
| The dog food shown does not contain pentobarbital. | 69.9% | 68.2% |
| The dog food shown only contains fresh ingredients, unless specifically stated otherwise on the packaging. | 89% | 83.9% |
| **From the "Fresh" statements on the Dog Food, consumers would expect that:** | | |
| The dog food shown contains only fresh ingredients unless specifically stated otherwise on the packaging. | 84.2% | 84.7% |
| The dog food shown does not contain any expired ingredients. | 79.4% | 88.4% |
| The dog food shown does not contain any reground dog food (dog food previously manufactured by this manufacturer but that did not meet its specifications for sale). | 78.5% | 76.9% |

| **From the "Regional" statements on the Dog Food, consumers would expect that:** | | |
|---|---|---|
| The dog food shown does not contain imported ingredients. | 73.7% | 76.9% |
| Each ingredient in the dog food shown is from the region where the food is made unless specifically stated otherwise on the packaging. | 79.4% | 77.3% |
| **From the "Delivering nutrients naturally" statements on the Dog Food, consumers would expect that:** | | |
| The dog food shown does not contain heavy metals. | n/a | 84.7% |
| The dog food shown does not contain BPA (Bisphenol A). | n/a | 74.4% |

Ex. 70 at Figures 12-23, Ex. 17 at ¶¶32(k)-(l), 147.

### B. CPF Knew the Packaging Claims and Omissions are Misleading and Deceptive

#### 1. Fresh Regional Ingredients

##### a. The Dog Food Ingredients Are Not Fresh as Promised

As a matter of regular business practice, CPF knowingly uses ingredients that are frozen, expired, and regrinds (i.e. old, nonconforming kibble that was rejected, reground, recooked, and reintroduced as an ingredient). ECF 68, ¶¶75-94. For instance, most, if not all of the fish used in the Acana Singles Wild Mackerel, Orijen Six Fish, Orijen Adult, and Orijen Regional Red diets is frozen, before one of CPF's fish suppliers grinds it into a non-frozen state prior to delivery to CPF. *See* Ex. 18 at -6514 ("Our facility takes frozen blocks, grinds them in to a fresh slurry and ships the slurry in insulated food vats."). CPF regularly manufactures its Dog Food with red meat—such as Acana Regionals Grasslands, Acana Heritage Meats, Acana Lamb & Apple, Orijen Adult, and Orijen Regional Red—using frozen meat ingredients from New Zealand. In 2017, CPF was purchasing half of its goat meat and almost all of its lamb and mutton meat from New Zealand in frozen form. Ex. 19.

CPF routinely uses expired (i.e. outdated) ingredients in its Dog Food, quality controlled only by subjective "smell tests" or sensory evaluation by CPF's employees. *See* Ex. 20 (five-person panel assessed the "odor, color and consistency" of fresh meat products and found that the

odor and color of 11-day-old ingredients were more acceptable than 9-day-old ingredients). Even when scientific testing suggests discarding expired ingredients, CPF will include expired ingredients, such as the chicken meal used in Acana Free-Run Poultry and Acana Regionals Meadowland, based on its employees' subjective sensory say-so. *See* Ex. 21 (chicken meal "failed with High PV; accepted based on sensory evaluation by upper management.").

At its DogStar Kitchen, CPF included regrinds regularly in its production of the Dog Food and used [redacted] Ex. 22. CPF's Kitchen Manager, Keith Arnold, testified that at its Kentucky Dog Star plant, regrinds were used more often than not in manufacturing its Dog Food. Ex. 23 at 73:4-6. And while CPF's internal guidelines only permit 3-5% regrind ingredients to be utilized in the Dog Food, its manufacturing records show that this maximum is routinely not followed. Ex. 24 at 126:13-18; *see also* [redacted] CPF's common practice and use of these undisclosed non-fresh ingredients renders the "fresh" promise deceptive and misleading to reasonable consumers. *See* Table 1; Ex. 17 at ¶¶203-204, 217.

**b. The Ingredients are Not Regional as Promised**

CPF commonly uses undisclosed, non-regional ingredients in its Dog Food. For example, CPF sources its ingredients from undisclosed, international suppliers in [redacted]

[redacted]

To reinforce its "regional" claim, the Dog Food packaging displays images of "exemplar suppliers" to suggest that a material amount of ingredients are supplied by local farmers that CPF "knows and trusts." Exs. 1-11; ECF 68, ¶38. This is literally false and certainly misleading. In 2016, for example, [redacted]. Ex. 28. Although CPF purchases all of its Atlantic fish from its advertised fish supplier, CPF describes the supplier as its "trusted supplier of fresh" fish, but it actually purchases mostly *frozen* fish from this supplier. Exs. 7-8; Ex. 18 at -6514.

CPF also omits key information regarding the corporate identity of some of these exemplar suppliers to further reinforce its "regional" promise. For example, CPF did not disclose that Hefton Farms in Hanson, Kentucky is actually owned by Tyson, Inc. because it knew its "Pet Lover" consumers relied upon the packaging's representations. *See* Ex. 1 at -33; Ex. 29 at -7672 ("My take is that we shouldn't mention the name of the farm, since Tyson is a huge multinational conglomerate…); Ex. 30 (Hefton Farms is owned by Tyson). Similarly, CPF internally voiced its concern over consumers asking whether CPF purchased chicken from their supplier Pilgrim's Pride because it "had a Class 1 recall involving over 4.5 million pounds of chicken for contamination with plastic, wood, rubber, and metal." Ex. 31. CPF purposefully chose to never disclose Tyson or Pilgrim Pride to its consumers because it knows consumers rely on its material Packaging Claims when making purchasing decisions. Exs. 1-11.

CPF's routine and undisclosed use of non-regional ingredients makes its "regional" packaging claim misleading and deceptive, which CPF itself admits. *See* Table 1; Ex. 17 at ¶¶214,

217; *see also* Ex. 32 at -07 ("We have recently considered changing this [regional] definition [] as we have outgrown our ability to source from our local region.").

**2. Inclusion of Heavy Metals Renders the Packaging Misleading**

It is undisputed that the Dog Food contains heavy metals. *See* Ex. 33 (CPF's White Paper admitting its foods contain heavy metals); Ex. 71 at p. 5. But the Dog Food packaging misleads reasonable consumers who, like CPF's own employees, believe that Biologically Appropriate Dog Food would not contain heavy metals based on the Packaging Claims and Omissions. *See* Table 1; Ex. 17 at ¶¶172-173; Ex. 34 at 14:22-24 ("I'm not aware of heavy metals being in our foods. I'm aware of heavy metals naturally occurring in the environment."); Ex. 35 at 141:14-20; Ex. 36 at 97:7-9; Ex. 37 at 142:19-143:14. [redacted]. Despite this, CPF failed to prevent or at least reduce the inclusion of heavy metals, which CPF could have achieved by using only fresh ingredients with non-detectable amounts of heavy metals. *See* Ex. 38 at 92:1-7, 139:1-2 ("[CPF] should buy ingredients that don't have heavy metals in it"); Ex. 39. Additionally, given the presence of heavy metals, the promise of "delivering nutrients naturally" is also misleading because consumers would reasonably expect *all* of the Dog Food to provide nutrition for their dogs. Ex. 17 at ¶¶126-127; *see also* Ex. 35 at 187:24-188:8 (["delivering nutrients naturally is] species-specific, as Mother Nature intended, which would be BPA-free, it would be, you know, heavy metal-free.").

CPF could have reduced or even prevented the presence of detectable amounts of heavy metals if CPF had only used fresh ingredients. ECF 68, ¶66; Ex. 38 at 139:1-2. Although the Dog Food undeniably contains detectable amounts of heavy metals, CPF's own test results demonstrate that fresh meat ingredients, such as deboned chicken, can be purchased without detectable amounts of heavy metals. Ex. 40. Instead, CPF incorporated dried ingredients in its Dog Food that contain

amounts of heavy metals that even exceeded CPF's outdated and unreliable standard for heavy metals. *See* Ex. 41 (Eurofins testing results for CPF, which show spray dried herring with mercury levels of 0.65 ppm, exceeding the National Research Council's maximum tolerable limit of 0.267 ppm for mercury).

CPF knew testing its Dog Food for heavy metals was critical for consumers and its failure to do so is negligent. *See* Ex. 42 (Peter Muhlenfeld, VP, Sales & Marketing stating that failure to test for heavy metals would be negligent). CPF was and continues to be running blind to the presence of heavy metals in its Dog Food because it does not adequately test for heavy metals in its Dog Food. *See* Ex. 43 ("[T]here are a number of risks that we are completely blind to…These include …heavy metals…."); Ex. 44 ("It looks like the testing schedule hasn't been followed too well, all of the fish diets are supposed to get heavy metals analysis as part of their extra testing."). CPF's White Paper reveals that CPF did not conduct a single heavy metal test on several of its Dog Foods for over a year and that CPF did not test *any* of its Acana Lamb & Apple, Acana Pork & Squash, or Orijen Regional Red for heavy metals between April 2016 and 2017. *See* Ex. 39 (heavy metal test results used as the basis for CPF's White Paper).

### 3. BPA or Pentobarbital Are Not Fresh or Biologically Appropriate

#### a. BPA

BPA is a synthetic, chemical molecule that can be controlled and excluded from products. Ex. 45 at 133:9-134:10; Ex. 46 at 187:3-5. BPA-free products are commonly sold in retail markets. Ex. 45 at 133:9-134:10. Although BPA can be controlled and excluded, CPF did not test its Dog Food, ingredients, or packaging for BPA because it concluded that BPA was a "negligible risk." Ex. 47. Instead, CPF relied upon ineffective and limited guarantees from some of its packaging suppliers. Ex. 48 at 116:11-19; *see also* Ex. 49 (Sun Coast Packaging, Inc. Continuing Product Guaranty: "[A]ll product shipped to or on the order of Buyer after the date of this guaranty

shall…Not contain ***any intentionally added*** [] (BPA).”). CPF’s failure to test and screen for BPA resulted in its Dog Food containing BPA. *See* Ex. 50.

A reasonable consumer would not expect the Dog Food to contain BPA, given the Packaging Claims and Omissions. *See* Table 1; Ex. 17 at ¶¶179-180; Ex. 35 at 70:1-4, 141:11-20, 187:24-188:4; Ex. 36 at 96:24-97:1, 97:10-12; Ex. 37 at 142:19-143:14. BPA is an unnatural contaminant that is neither Biologically Appropriate, fresh, regional, nor natural and offers no nutritional value for dogs. Plaintiffs, like other reasonable consumers, do not have any viable means to discover that the Dog Food contains and/or may contain BPA because the Dog Food packaging does not disclose the presence and/or material risk of BPA.

**b. Pentobarbital**

Pentobarbital is an unnatural, dangerous poison that is the opposite of Biologically Appropriate and is neither “fresh” nor natural. ECF 68, ¶183. CPF exposed the Dog Food, including diets purchased by Plaintiffs, to the presence and/or material risk of containing pentobarbital for over a year by utilizing beef tallow that contained pentobarbital and/or had the material risk of being contaminated with pentobarbital based on the subpar manufacturing practices of CPF and one of its beef tallow suppliers, JBS USA Food Company (“JBS”). ECF 68, ¶¶144-180.

CPF purchased beef tallow from JBS from August 2016 to May 2018. *See* Ex. 51 at 226:14-16; Ex. 52 at ¶21. Since at least 2016, [redacted] at its rendering facility, which exposed its beef tallow to the risk of pentobarbital unless effective segregation measures were taken. *See* Ex. 53 [redacted]

[redacted] However, CPF repeatedly failed to ensure these controls were either used by JBS or effective in preventing pentobarbital.

By failing to audit JBS in 2016 and 2017, CPF turned a blind eye to JBS's subpar manufacturing practices, which included its inability to properly segregate CPF's beef tallow from the condemned carcasses. Ex. 54. When CPF finally audited JBS in early 2018, its auditor uncovered built-up excessive product on JBS's equipment, evidencing a pattern and practice of cross-contamination between CPF beef tallow and other products, such as those derived from condemned carcasses, which have the potential of being contaminated with pentobarbital. Ex. 55. Despite this troubling observation, CPF did not require JBS to adjust its manufacturing practices to better segregate CPF's beef tallow. *See* Ex. 56 (in discussing JBS's audit, CPF's Director of Certification and Compliance admits "following up on [corrective action] after audits" is "a weak point" for him).

Unsurprisingly, the FDA later discovered that beef tallow manufactured at JBS during the period CPF received beef tallow from JBS tested positive for pentobarbital. *See* Ex. 57 (test results confirming three samples of beef tallow from November 2017, December 2017, January 2018, and March 2018 *all tested positive* for pentobarbital). These test results demonstrate that JBS's manufacturing practices were wholly unable to prevent pentobarbital contamination and that all Dog Food manufactured with JBS tallow was exposed to the same risk of pentobarbital contamination, including food purchased by Plaintiffs, because there is no evidence that JBS ever segregated condemned carcasses from CPF's products nor that CPF ever audited JBS to confirm it was doing so. ECF 68, ¶¶164-167.

In May 2018, CPF learned its lax quality control requirements for JBS resulted in the delivery of at least two lots of beef tallow that were contaminated with pentobarbital. Ex. 51 at

42:24-43:4. CPF manufactured over 1.7 million pounds of Dog Food with this contaminated beef tallow. Ex. 58 at 61:7-17. CPF admits the knowing inclusion of pentobarbital-contaminated ingredients is illegal. *See id.* at 51:7-11 ("So once you know an ingredient has a contaminant in it and it's detectable, you can't use it. So we by law cannot use it. We wouldn't use it if it had a potential risk with it."). Over 100,000 pounds of Dog Food made with this pentobarbital-contaminated beef tallow remained in retail markets. *Id.* at 131:11-18. CPF never tried to recall the 100,000 pounds of affected Dog Food, nor did CPF notify consumers about the presence of pentobarbital in this food (or the risk of presence in all their dog food that contained beef tallow), because it wanted to avoid "panic in the marketplace." *Id.* at 47:10-20, 47:25-48:17; 98:6-20.

Based on CPF's Packaging and Omissions, a reasonable consumer would be shocked to discover that the Dog Food contained or may contain pentobarbital. Ex. 17 at ¶¶190-193; Ex. 35 at 70:1-4, 141:14-20; Ex. 37 at 142:19-143:14.

### C. Plaintiffs Are Representative of the Classes

Plaintiff Chernik purchased the Dog Food from approximately April 2006 until approximately July 2017. ECF 68, ¶8; Ex. 35 at 60:23-61:6. During the Class Period, he purchased various Dog Food diets for his dogs, including Orijen Six Fish, Orijen Original, Orijen Regional Red, Orijen Senior, Acana Regionals Grasslands, Acana Heritage Meats, Acana Free-Run Poultry, Acana Singles Lamb & Apple, and Acana Singles Pork & Squash. ECF 68, ¶¶7-8; Ex. 35 at 61:16-62:17, 98:25-101:6. Plaintiff Meyer purchased the Dog Food from approximately 2004 until 2019. ECF 68, ¶10; Ex. 36 at 30:25-31:19, 49:7-16. During the Class Period, she purchased various Dog Food diets for her dogs, including Orijen Original, Acana Singles Lamb & Apple, Acana Singles Wild Mackerel, Acana Heritage Meats, and Acana Regionals Meadowland. ECF 68, ¶¶9-10; Ex. 36 at 53:12-23, 56:23-61:7. Plaintiff Zarinebaf purchased the Dog Food from approximately July 2013 until September 2018. ECF 68, ¶8; Ex. 37 at 46:22-47:6. During the Class Period, he

purchased various Dog Food diets for his dogs, including Acana Singles Lamb & Apple. ECF 68, ¶¶8-9; Ex. 37 at 66:11-71:24.

Like the members of the putative Classes, Plaintiffs relied on the Packaging Claims and Omissions when making their purchasing decisions. Ex. 35 at 34:24-35:7, 36:6-9, 111:10-19, 112:8-16, 190:14-22; Ex. 36 at 68:21-25, 76:7-17, 80:21-81:2, 84:23-85:4; Ex. 37 at 38:24-39:12, 86:19-87:5, 96:23-97:11, 98:14-99:7, 112:11-16. Plaintiffs were unaware the Dog Food may contain heavy metals, BPA, pentobarbital, non-regional, and non-fresh ingredients, and would not have purchased the Dog Food had this information been disclosed. Ex. 35 at 70:1-4, 141:14-20, 205:6-13, 242:5-19; Ex. 36 at 93:23-94:2, 94:13-21, 96:24-97:18; Ex. 37 at 113:13-21, 142:19-143:14, 145:19-22, 176:19-177:14. Plaintiffs have satisfied their duties as class representative and understand their responsibilities as representatives of the Classes they seek to represent. Ex. 35 at 239:9-23, 240:14-20, 242:2-24, 248:18-25; Ex. 36 at 12:10-16, 19:22-20:1; Ex. 37 at 163:21-164:15, 165:8-166:1.

## IV. CLASS DEFINITIONS

Plaintiffs propose the following Classes:

> ***Acana Free-Run Poultry Class:*** All persons residing in of the State of Illinois who purchased Acana Free-Run Poultry from June 1, 2016, to the present;
>
> ***Acana Regionals Grasslands Class:*** All persons residing in of the State of Illinois who purchased Acana Grassland from June 1, 2016, to the present;
>
> ***Acana Heritage Meats Class:*** All persons residing in of the State of Illinois who purchased Acana Heritage Meats from June 1, 2016, to the present;
>
> ***Acana Singles Pork & Squash Class:*** All persons residing in of the State of Illinois who purchased Acana Pork & Squash from June 1, 2016, to the present;
>
> ***Acana Regionals Meadowland:*** All persons residing in of the State of Illinois who purchased Acana Regionals Meadowland from June 1, 2016, to the present;
>
> ***Acana Singles Lamb & Apple Class:*** All persons residing in of the State of Illinois who purchased Acana Singles Lamb & Apple from June 1, 2016, to the present;

> ***Acana Singles Wild Mackerel Class:*** All persons residing in of the State of Illinois who purchased Acana Singles Wild Mackerel from June 1, 2016, to the present;
>
> ***Orijen Six Fish Class:*** All persons residing in of the State of Illinois who purchased Orijen Six Fish from June 1, 2016, to the present;
>
> ***Orijen Original Class:*** All persons residing in of the State of Illinois who purchased Orijen Original from June 1, 2016, to the present;
>
> ***Orijen Regional Red Class:*** All persons residing in of the State of Illinois who purchased Orijen Regional Red from June 1, 2016, to the present; and
>
> ***Orijen Senior Class:*** All persons residing in of the State of Illinois who purchased Orijen Senior from June 1, 2016, to the present.

Plaintiffs seek to pursue their claims under the ICFA on behalf of the putative Classes.[4]

## V. ARGUMENT

To obtain class certification, Plaintiffs must satisfy the requirements of Rule 23(a) and at least one of the three subsections of Rule 23(b). *Tylka v. Gerber Prod. Co.*, 178 F.R.D. 493, 496 (N.D. Ill. 1998). Although the Court's analysis "must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim,'" *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 465-66 (2013), "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Id.* at 466; *see also Burns v. First Am. Bank*, No. 04-cv-7682, 2006 WL 3754820, at *2 (N.D. Ill. Dec. 19, 2006) ("While this preliminary inquiry into the merits allows the Court to understand the elements of the parties' claims and defenses and the nature of the evidence that must be presented to adjudicate them, the Court will not assess the ultimate merits of those claims."). Federal courts routinely recognize that consumer protection claims are well-suited for class certification. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

[4] Excluded from these Classes are persons or entities who purchased these foods for business use or resale, governmental entities, CPF and its affiliates, subsidiaries, employees, current and former officers, director, agents, representatives, and members of this Court and its staff.

**A. The Rule 23(a) Requirements**

**1. Numerosity is Satisfied**

Rule 23(a)(1) requires the class be "so numerous that joinder of all members is impracticable." *Suchanek v. Sturm Foods, Inc.* ("*Suchanek II*"), 311 F.R.D. 239, 253 (S.D. Ill. 2015) (quoting Fed. R. Civ. P. 23(a)(1)). "In terms of numbers, forty often is identified as the number sufficient, but not necessary, to satisfy Rule 23(a)." *Burns*, 2006 WL 3754820, at *7. Numerosity is easily satisfied here because between 2016 and 2018, CPF's retail sales of its Dog Food in Illinois were in the [redacted]. Ex. 59.

**2. There Are Numerous Common Issues of Fact and Law**

"A common nucleus of operative facts is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir.1992); *see also Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 508 (6th Cir. 2015) (commonality satisfied if claims share a "common question" that "will yield a common answer for the entire class that goes to the heart of whether [the defendant] will be found liable under the relevant false-advertising laws"). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc.* ("*Suchanek I*"), 764 F.3d 750, 756 (7th Cir. 2014) (collecting authorities); *see also Tylka*, 178 F.R.D. at 496-97 ("where a defendant directs standardized conduct toward the class, commonality is typically found"). "Once a common nucleus of facts is identified, commonality will not be upset by 'factual variations among class members' grievances.'"
*Burns*, 2006 WL 3754820, at *7 (quoting *Keele v. Wexler*, 149 F.3d 589, 593 (7th Cir. 1998)).

Numerous common questions drive this litigation:

- Whether the Packaging Claims and Omissions are false or misleading;

- Whether the Packaging Claims and Omissions are likely to deceive a reasonable consumer;
- Whether CPF intended to induce consumers to buy the Dog Food based on the Packaging Claims and Omissions;
- Whether CPF had a duty to disclose the presence or risk of heavy metals, BPA, non-fresh ingredients, non-regional ingredients, or pentobarbital; and
- Whether the Packaging Claims and Omissions caused consumers to pay a price premium for the Dog Food;
- The percentage of price premium paid by the consumers.

These questions hinge on CPF's conduct and a reasonable consumer standard. *See* Section I. The jury will be asked whether "…the general consuming public or [] targeted consumers, acting reasonably in the circumstances, could be misled." *Bell*, 982 F.3d at 475 (citation omitted). And "the determination of [the Packaging Claims'] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 673 (7th Cir. 2015) (quotations omitted); *see also Suchanek I*, 764 F.3d at 757 ("The claims of every class member will rise or fall on the resolution of that question."). The question will be answered with common evidence—namely, CPF's packaging, market research, consumer surveys, and scientific studies and expert testimony.

Plaintiffs and the Classes purchased the same Dog Food, which was sold in uniform packages throughout the Class Period. Without a doubt, CPF [redacted]

[redacted]."[5] Ex. 60 at -442, 451. The commonality requirement, as in many other deceptive advertising cases, is met.[6]

### 3. Plaintiffs' Claims Are Typical

Typicality is satisfied where the plaintiffs' claims "arise from the same events or course of conduct that give rise to the putative class members' claims." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1026 (7th Cir. 2018). Factual variations do not defeat typicality "as long as Plaintiffs' claims have "the same essential characteristics as the claims of the class at large." *Suchanek II*, 311 F.R.D. at 254 (quoting *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir.2006)).). In false advertising cases, typicality is readily met because class members are all subjected to the same alleged misconduct. *Tylka*, 178 F.R.D. at 500. Here, Plaintiffs' claims are typical as they "'…arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and [their] claims are based on the same legal theory.'" *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983).

The Packaging Claims and Omissions are uniform as to each Class because each package focuses on them to induce the purchase of the Dog Food by consumers. *See* Section III.A "BAFRINO" is regarded as the company's "roadmap" and mandate directing them to their destination of "being trusted by pet lovers everywhere." Ex. 61 at p. 7; Ex. 62. CPF's USA Retail Program Guide described its mission as:

---

[5] CPF uses the term "BAFRINO" to reference its "Biologically Appropriate", "Fresh Regional Ingredients", and "No Outsourcing" claims. The "NO" of the acronym is not at issue here.

[6] *See Mullins v. Premier Nutrition Corp.*, No. 13-cv-01271-RS, 2016 WL 1535057, at *3 (N.D. Cal. Apr. 15, 2016) (common questions included whether product packaging was "false or likely to deceive a reasonable consumer"); *Sonner v. Schwabe N. Am., Inc.*, 2019 WL 4266808, at *5 (C.D. Cal. July 2, 2019) (same); *Johns v. Bayer Corp.*, 280 F.R.D. 551, 556 (S.D. Cal. 2012) (same); *Yamagata v. Reckitt Benckiser LLC*, No. 17-cv-03529-VC, 2019 WL 3815718, at *1 (N.D. Cal. June 5, 2019) (same); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 501-02 (S.D. Cal. 2013) (same); *Johnson v. Gen. Mills, Inc.*, 275 F.R.D. 282, 286 (C.D. Cal. 2011) (same); *Fitzpatrick v. Gen. Mills, Inc.*, 263 F.R.D. 687, 697 (S.D. Fla. 2010) (same); *Gordon v. Boden*, 586 N.E.2d 461, 465 (Ill. App. Ct. 1991) (same).

> WE MAKE BIOLOGICALLY APPROPRIATE™ PET FOODS FROM FRESH REGIONAL INGREDIENTS FROM START TO FINISH IN OUR AWARD-WINNING KITCHENS.

Ex. 63. CPF's practices as to non-fresh and non-regional ingredients are also similar and common to the Dog Food at issue in each Class and not a single package discloses the Omissions. *See* Section III.A. "[T]he class members were all exposed to the exact same course of conduct by [CPF]: the…packaging." *Suchanek II*, 311 F.R.D. at 255. Plaintiffs' and class members' claims all arise from the same conduct—CPF's mislabeling of its Dog Food—and the same legal arguments and evidence will answer the liability issues for each Class. Finally, the alleged injury, paying a price premium for the Dog Food, is also identical among Plaintiffs and the members of the Classes because the injury stems from CPF's uniform misrepresentations and material omissions. Typicality is easily satisfied.

**4. Plaintiffs and Their Counsel Are Adequate Representatives**

"The adequacy requirement is satisfied when the named representatives have 'a sufficient interest in the outcome of the case to ensure vigorous advocacy' and '[do] not have interests antagonistic to those of the class.'" *Id.* at 256 (citation omitted). To be adequate, a plaintiff must (1) retain competent counsel; (2) have a sufficient stake in the outcome of the litigation to ensure vigorous advocacy for the class; and (3) have no conflict of interest with the class. *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 480; *see also Fournigault v. Independence One Mortg. Co.*, 234 F.R.D. 641, 646 (N.D. Ill. 2006) (finding the subclass representatives met the "low standard" of adequacy).

The interests of Plaintiffs and the absent class members are fully aligned as they "all have the same interest in proving the…[CPF] packaging was unfair or deceptive." *Suchanek II*, 311 F.R.D. at 257. Each Class is defined to include class members who purchased the same Orijen or Acana Diet bearing the same Packaging Claims with no disclosure of the material Omissions. *See*

*supra* Sections III.A.; IV. Their claims will rise or fall on whether the Packaging Claims are untrue, deceptive, or misleading. Plaintiffs are adequate representatives. There is no dispute that class counsel are qualified lawyers experienced in the successful prosecution of class actions, and their respective firm resumes set forth their experience and expertise in the management and leadership of class action litigation. Exs. 64-69. These firms have already undertaken substantial work in this litigation and will continue to devote the resources necessary to see this case through to a successful outcome. Rule 23(a)'s adequacy requirement is satisfied.

**B. Rule 23(b)(3) Is Satisfied**

"In addition to satisfying the four requirements in Rule 23(a), a class also must fall within one of the Rule 23(b) categories." *Burns*, 2006 WL 3754820, at *9. A class may be certified under Rule 23(b)(3) if "the questions of law or fact predominate over any questions affecting individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

**1. Predominance**

The "'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation'…[a]nd…'common issues need only predominate, not outnumber individual issues.'" *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 802 (7th Cir. 2013) (citations omitted). And although "the focus of Rule 23(b)(3) is on the predominance of common *questions*," it does not require that Plaintiffs prove the common questions will be answered "in favor of the class." *Amgen*, 568 U.S. 159, 460 (emphasis in original).

As Judge Posner observed, "predominance… 'is a question of efficiency.'" *Butler*, 727 F.3d at 800. "[T]he existence of individual issues does not automatically defeat certification." *Burns*, 2006 WL 3754820, at *9. Thus, predominance is satisfied when "common questions represent a significant aspect of a case and…can be resolved for all members of a class in a single

adjudication." *Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919, 925 (7th Cir. 2016) (alteration in original) (internal quotation marks omitted); *Butler*, 727 F.3d at 801.

**a. Illinois Consumer Fraud Act**

Plaintiffs' ICFA claim requires proof of "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." ECF 47 at 12. (citations omitted). ICFA does not require a showing of reliance and this is no obstacle to class certification. *Tylka*, 178 F.R.D. at 499; *IWOI, LLC v. Monaco Coach Corp.*, 581 F. Supp. 2d 994, 1002 (N.D. Ill. 2008). And as the Seventh Circuit recently made clear, the "reasonable consumer" standard unequivocally applies to ICFA claims. *Bell*, 982 F.3d at 474-75.

The predominant common questions applicable to the Classes here are whether the CPF packaging is false or misleading and whether a reasonable consumer could be misled by the Packaging Claims and Omissions. In *Bell*, the Seventh Circuit framed the proper inquiry as whether "the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Id.* at 475. Indeed, "[w]hat matters most is how real consumers understand and react to the advertising." *Id.* at 476. And importantly, the determination of

> "whether a claim is either 'false' or 'misleading' is an issue of fact rather than law."…It is not for the judge to determine, based solely upon his or her own intuitive reaction, whether the advertisement is deceptive." Rather, the question is "what does the person to whom the advertisement is addressed find to be the message? That is, what does the public perceive the message to be?"

*Id* at 479 (citations omitted.)

The question of liability for Plaintiffs' ICFA claims focuses entirely on CPF's conduct—whether CPF engaged in deceptive acts and whether CPF intended for consumers to rely on those acts. Because the Packaging Claims and Omissions here, like the claims of many ICFA cases

"w[ere] made to all putative class members, Illinois courts have concluded that causation is susceptible of classwide proof and that individualized inquiries concerning causation do not predominate." *Rikos,* 799 F.3d at 514; *Tylka*, 178 F.R.D. at 499, 502 (finding predominance and certifying ICFA claims).

Plaintiffs' claims will stand or fall with respect to the Classes, rather than succeed as to some members of a Class but not for others. *See, e.g.*, *Suchanek v. Sturm Foods, Inc.*, No. 11-cv-565, 2018 WL 6617106, at *16 (N.D. Ill. July 3, 2018) (jury can determine deceptiveness under ICFA on a class-wide basis). For this reason, similar consumer cases have been certified. *See* *Mednick v. Precor, Inc.*, 320 F.R.D. 140, 152 (certifying multi-state class that included ICFA claim with common "reasonable consumer" standard); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1001 (C.D. Cal. 2015) (certifying ICFA claims); *Clark v. Tap Pharma Prods., Inc.*, 798 N.E.2d 123, 132 (Ill. Ct. App. 2003) (affirming certification of ICFA classes); *Morse v. Bankers Life & Cas. Co.*, No. 99-cv-0193, 2000 WL 246245, at *5-6 (N.D. Ill. Feb. 24, 2000) (certifying ICFA claims); *In re Dial Complete Mktg. & Sales Practices Litig.*, 312 F.R.D. 36, 65-66 (D.N.H. 2015) (same).

Specifically, common evidence will be used to answer, on a class-wide basis, whether (1) CPF made misrepresentations on, and omissions from, its Dog Food packaging; (2) the Packaging Claims and Omissions are material or likely to deceive a reasonable consumer, and (3) CPF had a duty to disclose.[7] For example, Plaintiffs can establish that the Packaging Claims and Omissions are uniform since they did not vary during the class period for each Class (June 1, 2016, to the present). Exs 1-11. Plaintiffs will also demonstrate materiality through common evidence, such as the expert opinions showing that the Packaging Claims are material to the reasonable consumer.

---

[7] Materiality is to be "addressed at trial or in a ruling on a summary-judgment motion …[and] should not be resolved in deciding whether to certify a proposed class." *Amgen*, 568 U.S. 455 at 470.

*See* generally Ex. 17 at ¶¶32(c)-(e), 84, 121; Ex. 70 at ¶¶179-180, Figures 12-23, Table 15. Other common evidence of materiality comes in the form of CPF's own internal documents that show CPF understood its "fresh" and "regional" packaging promises are a "great asset," and is its "biggest opportunity" and that it drove sales. *See* Ex. 15 at -3444; Ex. 60; *see supra* Section III.B.1. Finally, common evidence of both internal documents and testimony will show CPF knew the real risk of heavy metals and other contaminates like BPA but chose to conceal that information from consumers. *See* Sections III.B.2; III.B.3. This evidence sufficiently demonstrates that whether the Packaging Claims and Omissions are material to a reasonable consumer on a class-wide basis.

This same common evidence is relevant to CPF's duty to disclose as it shows (1) uniform partial representations are misleading because CPF failed to disclose material facts (the risk of and/or inclusion of heavy metals, BPA, and non-fresh ingredients), and (2) CPF had and continues to have exclusive knowledge of the physical and chemical make-up of the Dog Food, as well as its manufacturing practices and policies, and its testing protocol for ingredient suppliers. ECF 68, ¶¶26, 196, 208-210. This is sufficient common evidence for a classwide determination on a duty to disclose. *See* *Mullen v. GLV, Inc.*, 330 F.R.D. 155, 166 (N.D. Ill. 2019) ("whether the defendants had an affirmative duty to disclose his alleged misconduct may similarly be resolved for the entire class at once"); *Robert J. Kowalski, P.C. v. N. Tr. Co.*, No. 84 C 1087, 1985 WL 3935, at *3 (N.D. Ill. Nov. 13, 1985) (same); *Swanagan v. Al Piemonte Ford Sales, Inc.*, No. 94 C 4070, 1995 WL 493480, at *6 (N.D. Ill. Aug. 15, 1995) (finding statutory duty to disclose under ICFA and certifying claims). This case easily satisfies the Rule 23(b)(3) predominance requirement.

**b. Damages**

The Seventh Circuit instructs when looking at predominance, "the court should begin with a 'rigorous analysis' into whether the plaintiffs' 'damages are susceptible of measurement across the entire class.'" *Suchanek I*, 764 F.3d at 760 (citation omitted). Class damages must be "the result

of the class-wide injury that the suit alleges." *Butler*, 727 F.3d at 799; *see also* Mullins, 795 F.3d at 671 (7th Cir. 2015) ("[T]he method of determining damages must match the plaintiff's theory of liability and be sufficiently reliable."). "Calculations need not be exact, but at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 5 (2013) (internal citation omitted). It is not necessary for Plaintiffs to show that every class member has identical damages and, as the Seventh Circuit has clearly held:

> If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings…, the fact that damages are not identical across all class members should not preclude class certification. Otherwise defendants would be able to escape liability for tortious harms of enormous aggregate magnitude but so widely distributed as not to be remediable in individual suits.

*Butler*, 727 F.3d at 801.

Plaintiffs' damages model directly tracks their theory of the case—that Plaintiffs paid more for the Dog Food than they otherwise would have had they known the truth about the Packaging Claims and Omissions—and determines the price premium attributable to each of those Packaging Claims and Omissions, both alone and in combination with one another. *See In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, ("*Fluidmaster*"), No. 14-CV-5696, 2017 WL 1196990, at *57 (N.D. Ill. Mar. 31, 2017) ("A damages calculation that reflects the difference between the market price of the product as represented and as delivered is neither novel nor problematic from a class certification perspective."); *Kramer v. Am. Bank & Tr. Co., N.A.*, No. 11 C 8758, 2017 WL 1196965, at *8 (N.D. Ill. Mar. 31, 2017), *adhered to on reconsideration*, No. 11-CV-08758, 2018 WL 4052162 (N.D. Ill. Aug. 24, 2018) (finding Rule 23(b)(3)'s predominance requirement and *Comcast* were satisfied where the damages model "would measure only those damages attributable to the claimed violations" of law).

Plaintiffs' expert, Stefan Boedeker, is a statistician and economist with over 25 years of experience. Ex. 70 at ¶¶2-5. Mr. Boedeker designed and conducted a choice-based conjoint ("CBC") study to quantify the economic losses suffered by Plaintiffs and the Classes as a result of the Packaging Claims and Omissions. *Id.* at ¶12. Using CBC, which combines an empirical survey and statistical analysis of the results, Mr. Boedeker was able to "calculate class-wide damages if [CPF] had disclosed [the] misrepresentations and omissions at the point of purchase." *Id.*

In a CBC study, survey respondents are shown product profiles with different levels of product attributes based on the idea that "consumers' preferences for a particular Product are driven by attributes, features or descriptions/advertisements of attributes/features embodied in that product." *Id.* at ¶61, 65. Those product profiles included the Packaging Claims and Omissions. *Id.* ¶¶116, 121, Table 5, Table 6, Table 7. Mr. Boedeker conducted four surveys- one that showed respondents an Orijen Diet package to test the Orijen Packaging Claims, one that showed respondents an Acana Diet package to test the Acana Packaging Claims, one that tested the Omissions as to Orijen, and one that tested the Omissions as to Acana. *Id.* at ¶¶116-140. Each survey used price as an attribute based on the real-world prices of the Orijen and Acana Diets at issue. *Id.* at ¶123.

Using these survey results, Mr. Boedeker then "applied a market simulation to estimate the economic loss associated with purchased [CPF's] product when it is revealed at the time and place of purchase that there were misrepresentations and certain key information had been omitted from the product." *Id.* at ¶163. From this, he calculated the change in market value corresponding to each Packaging Claim and Omission.

| | **Attribute** | **Market Value or Price Premium** |
|---|---|---|
| **Survey 1: Orijen Misstatements** | Biologically Appropriate | 10.8% |
| | Fresh | 15.2% |
| | Fresh & Regional | 15.2% |

| | Attribute | Market Value or Price Premium |
|---|---|---|
| | Regional | 13.3% |
| | Nourish as Nature Intended | 10.9% |
| **Survey 2: Orijen Omissions** | Expired | 20.4% |
| | Heavy Metals | 43.4% |
| | BPA | 28.8% |
| | Regrinds | 9.7% |
| **Survey 3: Acana Misstatements** | Biologically Appropriate | 9.6% |
| | Fresh | 14.0% |
| | Fresh & Regional | 15.0% |
| | Regional | 12.1% |
| | Delivering Nutrients Naturally | 11.8% |
| **Survey 4: Acana Omissions** | Expired | 28.3% |
| | Heavy Metals | 58.4% |
| | BPA | 39.9% |
| | Regrinds | 14.6% |

*Id*. at Table 15. Additionally, Mr. Boedeker determined the change in market value that corresponds to each combination of Packaging Claims and Omissions for the Acana and Orijen Diets. *Id.* at ¶169 (citing Appendix 4).

This model certainly satisfies *Comcast* and measures "only those damages attributable" to Plaintiffs' theory of liability. 569 U.S. at 35. Federal courts across the country, including within this Circuit, have accepted class-wide damages models based on surveys. *See, e.g.*, *Suchanek II,* 311 F.R.D. at 246-48 (consumer survey was sufficiently reliable to support expert's opinion); *Flynn v. FCA US LLC*, 327 F.R.D. 206, 225 (S.D. Ill. 2018) (use of an "enhanced" form of conjoint survey analysis was sufficient for plaintiffs to "[meet] their burden of showing a proposed class-wide damage calculation that is consistent with their theory of liability."); *Fluidmaster,* 2017 WL 1196990, at *57 ("a 'price premium' theory based on a conjoint analysis has been accepted by several courts."); *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1368 (Fed. Cir. 2013) ("there may be a variety of ways to show that a feature drives demand, including with evidence that a feature significantly increases the desirability of a product incorporating that feature"); *ConAgra,* 90 F. Supp. 3d at 1031-32; *In re Scotts EZ Seed Litig*., 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015)

(accepting a proposed conjoint analysis ); *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 567, 576 (N.D. Cal. 2020) (accepting price premia damages model based on a CBC study).

**2. Superiority**

When assessing superiority, "the [C]ourt needs to assess the difficulty and complexity of the class-wide issues as compared with the individual issues." *Suchanek I*, 764 F.3d at 760. The class action mechanism is superior here. The common issues identified above "will be the most complex and costly to prove, while the individual issues and the information needed to prove them will be simpler and more accessible to individual litigants." *Id.* False labeling lawsuits "are cases where the class device is often essential 'to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.'" *Mullins*, 795 F.3d at 658 (quoting *Amchem*, 521 U.S. at 617). Absent class treatment, individuals would be forced to present the same legal and factual arguments in numerous trials. "For these reasons, it would be extraordinarily duplicative and wasteful of the time and resources of both the Court and the parties to litigate this question in individual cases." *Suchanek II*, 311 F.R.D. at 259. Resolving the few individual issues in this case "does not make the class format unmanageable or support the denial of class certification." *Id.* (citing *Suchanek I*, 764 F.3d at 760). These issues—such as the amount of Dog Food purchased—are simplistic and easily resolved through attestations from class members. *Id.* at 259-60. It therefore "'makes good sense' to resolve the common issue of liability 'in one fell swoop.'" *Id.* at 260 (citation omitted). Superiority is satisfied.

**C. Rule 23(b)(2) Is Satisfied**

Plaintiffs also seek Rule 23(b)(2) certification to prohibit the future sale of misbranded dog food based on the Packaging Claims and Omissions. "When a class seeks an indivisible injunction benefitting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the

dispute. Predominance and superiority are self-evident." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362-63 (2011). "[T]here is no language in Rule 23(b) which expressly limits its remedies to either sections (1), (2), or (3) of Rule 23(b)." *Tylka*, 178 F.R.D. at 501-02. CPF uniformly makes the Packaging Claims and Omissions on its Dog Food in violation of the ICFA. Much like in *Tylka*, Plaintiffs allege that CPF sold mislabeled products in untrue, deceptive, and misleading packages; these actions, if true, are in direct opposition to the Classes. 178 F.R.D. at 501. Rule 23(b)(2) is appropriate because Plaintiffs "seek injunctive or declaratory relief concerning standard practices or policies of employers applicable to the entire class." *West v. Timberlake*, No. 08-CV-670, 2009 WL 959655, at *3 (E.D. Wis. Apr. 8, 2009) (citations omitted). CPF's pervasive and common conduct toward the Classes also merits Rule 23(b)(2) certification and is applicable toward the Classes. *Saltzman*, 257 F.R.D. at 483.

### D. Alternative Rule 23(c)(4) Issues Class

Rule 23(c)(4) allows courts to certify the issue of liability or distinct issues common to the Class and bifurcate cases into liability and damages phases. *See McMahon v. LVNV Funding, LLC*, 807 F.3d 872, 876 (7th Cir. 2015); *Suchanek I*, 764 F.3d at 756 ("It is routine in class actions to have a final phase in which individualized proof must be submitted."). In fact, the Seventh Circuit has urged that, "where it is class treatment or nothing, the district court must carefully explore the possible ways of overcoming [class certification] problems." *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 776 (7th Cir. 2013); *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). If this Court determines the requirements of Rule 23(b)(3) are not met, it should certify all issues related to liability. Alternatively, the Court should certify the issues of whether CPF (1) made material misrepresentations and omissions, (2) was aware of the falsity of its representations and that it was making material omissions, (3) had a duty to disclose, and/or (4) that these representations and omissions had the likelihood or capacity to deceive a reasonable consumer.

Certifying the Classes "with respect to particular issues" means that the Court can "'carve at the joint' [by]…deciding some issues on a class wide basis and leaving others for individualized determinations." *Mednick*, 320 F.R.D. at 143 (citations omitted).

Certifying these four issues would advance the resolution of this action, economize judicial resources, and provide a more efficient mechanism than repeatedly relitigating these issues. These issues all depend on the same, non-individualized evidence that is far too costly for class members to compile and litigate on their own, and which would clog dockets if separately adjudicated. Even certification of a single issue can materially advance the ball for the Classes. For example, the issue of materiality is largely buttressed by expert opinion and CPF's documents—evidence that is common to each Class and that each Class should be able to collectively benefit from in a single proceeding. *See Endo v. Albertine*, 147 F.R.D. 164, 173 (N.D. Ill. 1993) (certifying "the issue of whether or not the alleged misstatements and omissions are material"); *In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005) (suggesting partial certification of a Rule 23(b)(3) class "to determine whether Allstate had a policy of forcing its employee agents to quit," followed by "individual hearings…to determine which of the members of the class were actually affected by the policy," would be "a more efficient procedure than litigating the class-wide issue [] in more than a thousand separate lawsuits"); *Barnes v. Air Line Pilots Ass'n*, 310 F.R.D. 551, 559-60 (N.D. Ill. 2015) (individual subjective inquiries do not defeat certification). Accordingly, this Court should certify liability or any of the core liability issues common to the Classes pursuant to Rule 23(c)(4).

## VI. CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for class certification pursuant to Rule 23(b) or 23(c)(4).

Dated: February 24, 2021

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

By: /s/ Rebecca A. Peterson
ROBERT K. SHELQUIST, Pro Hac Vice
REBECCA A. PETERSON, Pro Hac Vice
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail: rapeterson@locklaw.com
rkshelquist@locklaw.com

WEXLER WALLACE LLP
KENNETH A. WEXLER
KARA A. ELGERSMA
MICHELLE PERKOVIC
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Tel: (312) 346-2222
Fax: (312) 346-0022
Email: kaw@wexlerwallace.com
kae@wexlerwallace.com
mp@wexlerwallace.com

WEXLER WALLACE LLP
MARK T. TAMBLYN, Pro Hac Vice
333 University Avenue, Suite 200
Sacramento, CA 95825
Tel: (916) 565-7692
Email: mjt@wexlerwallace.com

ROBBINS LLP
KEVIN A. SEELY (199982)
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: kseely@robbinsllp.com

GUSTAFSON GLUEK, PLLC
DANIEL E. GUSTAFSON, Pro Hac Vice
RAINA C. BORRELLI, Pro Hac Vice
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: dgustafson@gustafsongluek.com
rborrelli@gustafsongluek.com

CUNEO GILBERT & LADUCA, LLP
CHARLES J. LADUCA
KATHERINE VAN DYCK
4725 Wisconsin Ave NW, Suite 200
Washington, DC 20016
Telephone: 202-789-3960
Facsimile: 202-789-1813
E-mail: kvandyck@cuneolaw.com
charles@cuneolaw.com

LITE DEPALMA GREENBERG, LLC
JOSEPH J. DEPALMA
SUSANA CRUZ HODGE
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
E-mail: jdepalma@litedepalma.com
scruzhodge@litedepalma.com

**Attorneys for Plaintiffs**