# EXHIBIT 17

# SILVERMAN CONSULTING LLC

## EXPERT REPORT OF BRUCE G. SILVERMAN

*AFSHIN ZARINEBAF, ZACHARY CHERNIK, and JOAN MEYER,*
*individually and on behalf of a class of similarly situated individuals,*

Plaintiffs,

vs.

*CHAMPION PETFOODS USA, INC. and CHAMPION PETFOODS LP,*

Defendants.

In the United States District Court
Northern District of Illinois
Case No. 1:18-cv-06951

*February 24, 2020*

CONTAINS CONFIDENTIAL INFORMATION

## **TABLE OF CONTENTS**

I.    Introduction......................................................................................................1

II.   Qualifications....................................................................................................4

III.  Summary Of Opinions.....................................................................................12

IV.  How Consumers Make Food Purchasing Decisions For Themselves And Their Families .......................................................................................................14

V.    Package Statements Are A Product's "Silent Salesperson" .....................................21

VI.  Many Consumers Treat Their Pets As Family Members And Are Thus Willing To Pay A Premium Price For The Food They Feed Their Pet.................................25

VII. The Challenged Statements  Communicate That Champion's Products Are Healthy, Natural, Made With High Quality Ingredients, And Are Superior To Competitive Products ......................................................................................33

       A. The "Biologically Appropriate<sup>TM</sup>" Claim...................................................35

       B. The "Fresh Regional Ingredients" Claim.....................................................39

       C. The "Natural" Claim.................................................................................46

       D. "Trust" And Other Packaging Statements Provide Additional Context .....48

       E. From A Marketing Standpoint, The Challenged Statements  Convey The Same Message To Consumers, i.e., That The Products Are "Biologically Appropriate<sup>TM</sup>," Natural, And Made With Fresh Ingredients Sourced From Local Suppliers ...............................................55

VIII. Pet Parents Would Object To The Presence or Possible Presence Of Heavy Metals, Bpa, Pentobarbital, Non-Fresh Ingredients And Non-Regional Ingredients In Champion's Dog Food Products......................................................56

       A. Presence of Heavy Metals........................................................................57

       B. Presence of BPA.....................................................................................66

       C. Possible Presence of Pentobarbital ..........................................................68

       D. Presence of Non-Fresh Regional/Local Ingredients ..................................74

IX.  Disclosure That The Champion Products Had A Risk of Containing Heavy Metals, BPA, Pentobarbital And Ingredients That Were Not Fresh, Local, or Regional Would Adversely Affect Consumer's Willingness To Purchase The Products ......................................................................................................81

EXHIBIT "A" .....................................................................................................85

EXHIBIT "B" ......................................................................................................5

EXHIBIT "C" ....................................................................................................23

# I. INTRODUCTION

1.      My name is Bruce G. Silverman. I am an advertising expert retained by Robbins LLP in connection with the action styled, *Afshin Zarinebaf, Zachary Chernik, And Joan Meyer, individually and on behalf of a class of similarly situated individuals* (hereafter "Plaintiffs"), *v. Champion Petfoods USA, Inc. and Champion Petfoods LP* (hereafter "Champion" or "Defendants"), Case No. 1:18-cv-06951, pending in the United States District Court for the Northern District of Illinois.

2.      I understand that Plaintiffs allege that Champion "…intentionally labeled their dog food to include packaging claims that targeted consumers who were willing to pay premium prices based on Defendants' representation and warranties that the Contaminated Dog Food contained fresh and local, or regionally sourced ingredients. Among other things, these packaging claims included that the food would "Deliver [] Nutrients Naturally," was "Biologically Appropriate [TM]," and contained "Fresh Regional Ingredients."[1]

3.      I further understand that Plaintiffs allege Defendants' packaging claims were misleading and fraudulently omitted that the Contaminated Dog Food contained and/or had a material risk of containing undisclosed and non-conforming ingredients and contaminants…." [2]

4.       I understand that at least the following Champion Products and packaging statements are at issue in this case:[3]

---

[1] Third Amended Class Action Complaint, ¶2.
[2] *Id.*, ¶3.
[3] References to "Champion Products" and "Challenged Statements" reflect the products and statements contained in the table below.

1

| Champion Product | Champion's Statements on Products[4] |
|---|---|
| Acana Heritage Free-Run Poultry | • Biologically Appropriate ™<br>• Delivering Nutrients Naturally<br>• Fresh Regional Ingredients |
| Acana Singles Wild Mackerel | • Biologically Appropriate ™<br>• Delivering Nutrients Naturally<br>• Fresh Regional Ingredients |
| Acana Singles Lamb & Apple | • Biologically Appropriate ™<br>• Delivering Nutrients Naturally<br>• Fresh Regional Ingredients |
| Acana Singles Pork & Squash | • Biologically Appropriate ™<br>• Delivering Nutrients Naturally<br>• Fresh Regional Ingredients |
| Acana Regionals Meadowland | • Biologically Appropriate ™<br>• Delivering Nutrients Naturally<br>• Fresh Regional Ingredients |
| Acana Regionals Grasslands | • Biologically Appropriate ™<br>• Delivering Nutrients Naturally<br>• Fresh Regional Ingredients |
| Acana Heritage Meats | • Biologically Appropriate ™<br>• Delivering Nutrients Naturally<br>• Fresh Regional Ingredients |
| Orijen Regional Red | • Biologically Appropriate ™<br>• Fresh Regional Ingredients |
| Orijen Original | • Biologically Appropriate ™<br>• Fresh Regional Ingredients |

---

[4] Third Amended Class Action Complaint, ¶2.

| Champion Product | Champion's Statements on Products[4] |
|---|---|
| Orijen 6 Fish | • Biologically Appropriate ™<br>• Fresh Regional Ingredients |
| Orijen Senior | • Biologically Appropriate ™<br>• Fresh Regional Ingredients |

5.　　I have been asked to:

(a)　　Opine on consumer perceptions regarding the Challenged Statements on Champion's Products;

(b)　　Opine on the materiality of the Challenged Statements on Champion's Products.

(c)　　Opine as to whether a reasonable consumer would rely on the Challenged Statements on Champion's Products.

(d)　　Opine on consumer perception regarding the information plaintiffs allege was omitted from Champion's product packaging.

(e)　　Opine as to whether it is reasonable to expect a consumer to discover that Defendants had omitted the presence of Heavy Metals, non-fresh and non-regional ingredients, and the possible presence of BPA and pentobarbital, in their products.

(f)　　Opine on the materiality of information plaintiffs allege was omitted from Champion's product packaging.

6.　　My opinions and recommendations as set forth herein are based, among other things, on the following:

i.　　My 50 years of professional experience in the marketing-communication industry, as set forth in further detail below;

ii.      A review of the pleadings, exhibits, deposition transcripts and other materials listed in Exhibit "A," which is hereto attached;

iii.      A review of Champion's packaging;

iv.      A review of relevant academic and industry literature; and

v.      A review of relevant websites (as noted in the text of this report).

7.      My compensation for expert witness services is $575 per hour for meetings, telephone conferences, document review, research and report writing. My fee for appearances at depositions, arbitrations or trial is $5,000 (flat rate) per day. Additionally, I am to be compensated for travel and preparation expenses associated with my work on this case. My compensation is in no way contingent on the opinions I reach or the outcome of the case.

## II. QUALIFICATIONS

8.      I am the owner and manager of Silverman Consulting LLC, an advertising and branding firm I founded in 2005 to provide advice and counsel to companies both in the U.S. and abroad engaged in marketing consumer goods and services. In addition, I have been retained more than 125 times as an expert witness on matters involving false and deceptive advertising, trademark infringement, branding, publicity rights and advertising industry custom and practice. I have testified as an expert in federal courts in Arizona, California, Delaware, Florida and Oregon, in state courts in California and Missouri, at arbitrations and before the Copyright Royalty Judges of the Library of Congress.

9.      Attached as Exhibit "B" is a copy of my *curriculum vitae.* Also attached is Exhibit "C," a list of cases in which I have given sworn expert witness testimony during the past four years.

10.     My opinions are reflective of the practical knowledge and insights I have gained over the course of a 50-year career working at the highest levels in the "real world" of marketing, branding and advertising.

11.     After graduating with a Bachelor of Arts degree from Adelphi University (Garden City, New York) in 1966 and attending Albany (New York) Law School for one year, I began my advertising career at the Ogilvy & Mather agency ("O&M") in New York in late 1967. During my more than 13 years at O&M I worked in the agency's offices in New York (twice), London, Houston and Los Angeles. During much of that period I was able to work side-by-side with advertising legend David Ogilvy, the agency's founder and one of the three most important advertising figures of the 20th century.[5] Under Mr. Ogilvy's tutelage I became a copywriter, later a copy supervisor, eventually a creative director and finally, a member of the agency's Board of Directors and Senior Vice President/Executive Creative Director of the firm's flagship New York office.[6] At that time O&M was the fifth-largest advertising agency in the world serving such clients as American Express, Avon, British Travel Association, Campbell Soup Company (Pepperidge Farm, Swanson, et al.),

---

[5] David Mackenzie Ogilvy CBE (June 23, 1911- July, 21 1999) was founder of the global advertising firm Ogilvy & Mather. Mr. Ogilvy was made a Commander of the Order of the British Empire in 1967, elected to the U.S. Advertising Hall of Fame in 1977, and to France's Order of Arts and Letters in 1990.

[6] Executive Creative Director, or Chief Creative Officer as it is sometimes called, is the highest-ranking position in the creative department of an advertising agency. He or she is responsible for the development, production and ultimately, the effectiveness of all creative materials (i.e., television and radio commercials, magazine and newspaper ads, billboards, on-line advertising, etc.) provided to the agency's clients. The Executive Creative Director manages the agency's creative department, which often includes several Group Creative Directors and their respective teams of copywriters, art directors, designers and producers. During the period I was Executive Creative Director of O&M New York the creative staff included more than 200 professionals and accounted for more than one-third of the agency's salary expense.

General Foods (Maxwell House, Gaines dog foods, Post Cereals, et al.), Hershey's, IBM, Lever Brothers (Dove soap, Imperial margarine, et al.), Mattel, Mercedes-Benz, Merrill Lynch, Ralston Purina, Sears, Shell, TWA and the United States Travel Service.

12.    I later held C-level positions (Chief Creative Officer/Chief Operating Officer) at two other global agencies, Bozell & Jacobs (1981-1983), whose clients included American Airlines, Armour Foods, Avis, Greyhound, Mary Kay, Pace Foods, Quaker Oats, Southwestern Bell and Zale Corporation), and BBDO (1984-1986), whose clients included Apple, Dodge, Coldwell Banker, Pepsi-Cola, Sizzler, and the Union Bank of California. My responsibilities at those agencies included oversight of *all* client-service functions, including the account management and media departments as well as the creative teams.

13.    In 1986 I joined the Asher/Gould agency in Los Angeles as co-owner and President. Asher/Gould grew from $10 million to $160 million in annual billings during my tenure there, becoming one of the largest privately-owned advertising agencies in the country. Our clients included Avery Dennison (office products), Baskin-Robbins, the California Department of Health Services, HBO, MGM Grand Resorts, Pabst Brewing Company, Pizza Hut, Sanyo, Sheraton hotels, Sun America (financial services) and Suzuki cars and trucks.

14.    Throughout the period I worked at Bozell, BBDO and Asher/Gould I continued to be deeply involved in the creation and production of television and radio commercials, magazine and newspaper advertisements, out-of-home ads (e.g., billboards, transit ads, etc.), package/label development and point-of-sale materials.

15.    In 1997 I was appointed President/CEO of the principal U.S. unit of Initiative, then the largest ($22 billion in annual billings) advertising media planning and buying agency in the world. Unlike the full-service agencies that I had worked at earlier

which primarily concentrated on creating advertisements and commercials, Initiative's focus was communications strategy development, media planning, and media implementation. During the period I led the agency (1997-2002) we served more than 500 clients in the U.S. including American Honda's Acura Division, Arco (gasoline stations and convenience stores), Albertson's, American Airlines, Bell South, Carl's Jr, Chevrolet, The Walt Disney Company, The Home Depot, Johnson & Johnson, Kroger, the Las Vegas Convention & Visitor's Authority, Safeway (supermarkets), Six Flags (theme parks), Taco Bell, the United States Navy Recruiting Command and Unilever.

16.     In 2002, longing to return to my creative roots, I joined Wong Doody, a top 100, privately-owned full-service agency with offices in Seattle and Los Angeles as a partner and President. The agency's clients included Alaska Airlines, Alpine Electronics, Autodesk (architectural and engineering software), Clif Bar, Inc., the Los Angeles Dodgers, MGM Home Entertainment, Sony Pictures, T-Mobile and the UCLA/Anderson School of Management.

17.     As previously noted, I founded Silverman Consulting LLC in 2005. In addition to its consulting services, it has provided both creative and media services typically offered by advertising and media planning/buying agencies to a significant number of domestic and international clients, including two of the largest healthcare systems in America, a major university, multi-state retail chains, the largest supermarket chain in the United Kingdom, professional service providers, real estate developers and independent motion picture producers.

18.     A list of clients I served during and after my advertising agency career is included in my CV (Exhibit "B").

19.     Advertising practitioners are most typically recognized within the industry for the campaigns they helped create. I coined the tagline "Don't Leave Home Without It" for American Express, which it employed as its global slogan for nearly 20 years. My "Bullish on America" campaign helped transform Merrill Lynch's reputation from that of a big retail wire house into an innovative provider of a broad range of financial services and inspired its famous logo. I helped American consumers rethink their opinion of Mercedes-Benz automobiles by advertising them as "Engineered Like No Other Car in the World." (At that time, advertising for American luxury cars such as Cadillac, Chrysler Imperial, and Lincoln Continental focused almost entirely on styling; the bigger the tailfins the better!) My global "Shell Answer Man" campaign de-commoditized Shell gasoline, helping propel the company to market leadership in the United States for more than a decade. I created advertising that ridiculed a salsa made in "Nooo Yawk Ciddy," which resulted in Pace Picante Sauce, then marketed by a tiny company in San Antonio, becoming one of America's best-selling condiments. I am particularly proud of the role I played in the strategic development and implementation of the State of California's ground-breaking tobacco-use prevention advertising campaign. It is credited with saving hundreds of thousands of lives and more than a half-trillion dollars in healthcare costs.[7]

20.     Hundreds of the advertisements I authored have been published in consumer and business magazines, newspapers, billboards and on websites. I also wrote and produced thousands of national, regional and local television and radio commercials, many of which

---

[7] James Lightwood, et al., *Health Care Cost Saving Attributable to the California Tobacco Control Program, 1989 to 2018 (Final Report)*, Dep't of Clinical Pharmacy, Sch. of Pharmacy, Univ. of Cal, San Francisco (Jul. 26, 2020), available at https://escholarship.org/uc/item/53b9b8fz (last visited Jan. 30, 2021).

have been referenced in popular books about advertising or advertising textbooks written by leading academics.

21.     I have been the recipient of numerous awards for creativity and advertising effectiveness offered by the advertising industry, including twice winning the Gold Lion at the Cannes International Advertising Festival, the "Oscar" of the advertising business. I have also been the recipient of three American Marketing Association "Effie" awards, which recognizes campaigns that are most effective at driving sales.

22.     I served on the Board of Directors of the American Association of Advertising Agencies (the principal trade association of the advertising industry) and on the boards of the Los Angeles Advertising Agency Association, the Dallas Advertising Club and the Houston Advertising Federation. I am also a long-standing member of the commercials peer group of The Television Academy (the "Emmys" organization).

23.     I have taught advertising at Pepperdine University and the University of California, Los Angeles (UCLA) Extension, where I also served for five years as a member of the Dean's Board of Advisors. In addition, I have guest-lectured on advertising at many of America's top colleges and universities, including Arizona State University, New York University, Rice University, Southern Methodist University, Stanford University, University of Arizona, University of California (Berkeley), UCLA Anderson School of Management, UCLA Fielding School of Public Health, University of Houston, University of Southern California, University of Texas and the Thunderbird School of Management.

24.     I have been interviewed by *The New York Times*, *The Chicago Tribune, The Los Angeles Times, The Washington Post, The Wall Street Journal*, *The New Yorker* and many other newspapers and magazines as well as by on-air personalities at television and radio networks and stations about issues involving advertising, branding and media.

25.     I have studied consumer purchasing behavior for more than five decades, and I am considered an expert in that field. While I have found academic studies of consumer behavior to be applicable, as a practical matter my real-world experience as an advertising professional has proven to be far more useful.

26.     One of the keys to creating effective advertising campaigns is to "walk in the consumer's shoes" – to do everything possible to understand how they learn, think and feel about the products and services they are considering purchasing. For that reason, advertisers and agencies spend millions of dollars annually on primary and secondary research studies that provide insights into what consumers understand and believe (or disbelieve) about the client's brand, its products, its competitors' products, its advertising and, especially relevant to this matter, its packaging.

27.     In addition to deriving useful information from the thousands of proprietary quantitative studies I reviewed, I estimate that over the course of my career I have personally interviewed more than 5,000 consumers and attended at least 3,500 focus group sessions for products ranging from automobiles to dog toys. Some of these focus group sessions and one-on-one interviews included topics such as how consumers went about the process of adopting a pet, why they preferred certain dog food brands, and what they liked (or did not like) in proposed commercials for dog foods.

28.     Altogether, I have spent the better part of a half century having my feet held to the fire every day by some of the most important advertisers in the world. I have thus amassed a wealth of knowledge about how consumers learn about brands in general, how they differentiate brands, and specifically how labeling influences their purchase decisions. For these reasons, I believe I am qualified to opine on Champion's packaging statements and consumer perception of those statements.

29.     My process for evaluating the advertising messages at issue in this matter is identical to the methodology I used to evaluate proposed advertisements as a senior creative executive and/or President at the advertising agencies mentioned earlier in this report.

i.     I identify and consider the demographics and psychographics of the advertiser's target audience and the nature of the product being advertised;

ii.     I then apply my knowledge of consumer purchasing behavior as to the product or service being advertised in the case;

iii.     I then evaluate the strategic appropriateness and clarity of the message, as conveyed in the ad;

iv.     I then consider whether or not the totality of the advertisement (or in this instance, the packaging or label) is likely to engage the consumer; and

v.     I then consider the persuasiveness of the message or messages.

30.     This is the standard methodology used by advertising agency creative directors throughout the western world when considering whether to approve (or not approve) an ad, be it for use on television, online video, radio, internet media or in newspapers, magazines, billboards, point-of-sale materials, brochures, other collateral materials, or product labeling. It should be noted that major advertising agencies rarely use surveys to evaluate the factors listed above; that is left to the experienced professionals who serve as creative directors.

31.     My expert testimony and my process for evaluating advertising messages regarding similar marketing issues was accepted by both the Honorable Lucy H. Koh and the Honorable William H. Orrick as evidence of materiality in their decisions certifying classes in two fairly recent cases involving similar packaging statements, i.e., *Hadley v.*

11

*Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1115 (N.D. Cal. 2018), and *Debbie Krommenhock, et al., v. Post Foods, LLC*, 34 F.R.D. 552, 565-66, 579-80, 587  (N.D. Cal. 2020), as well as by the Honorable Lorna G. Schofield in *Brandi Price, et al, v. L'Oréal USA, Inc., et al*.; No. 17-cv-614, 2020 U.S. Dist. LEXIS 153255 (S.D.N.Y. Aug. 24, 2020).

## III. SUMMARY OF OPINIONS

32.     My opinions in this report can be summarized as follows:

(a)     Affordability and taste aside, most consumers make food purchasing decisions for themselves and their families based on their perception that the products they choose are healthy, made with high-quality ingredients, natural, and are superior to other products in the same category.

(b)     Many consumers treat their pets as family members and are thus willing to pay premium prices for a pet food they perceive to be healthy, made with high-quality ingredients, natural and superior to other products in the same category.

(c)     The Challenged Statements  communicate to consumers that the Champion Products at issue are healthy, made with high quality ingredients, natural, and are superior to other products in the same category, thus favorably influencing consumer purchasing decisions

(d)     Consumers are likely to rely on the veracity of these statements.

(e)     While the Challenged Statements  are expressed slightly differently on Champion's Acana and Orijen packages, from a marketing standpoint each conveys the same message to consumers, i.e., that the products are "Biologically Appropriate[TM]", natural, and made with fresh ingredients sourced from local or regional suppliers.

(f)     The Champion packages at issue also display a number of non-challenged trust and quality statements as well as animal ingredient inclusion rates and

images of farmers, ranchers and fishermen. Together, these written and graphic messages provide contextual support for the Challenged Statements which positively affect consumer perception and trust in Champion's Products and Challenged Statements.

(g) Consumers are positively influenced by the Challenged Statements that appear on Champion's packaging when making their purchasing decision at the store as well as when they are exposed to the statements at home.

(h) Consumers who purchase premium-priced dog food are concerned about the possible presence of heavy metals, BPA, pentobarbital, non-fresh ingredients, and non-regional ingredients in those products.

(i) Consumers would see the possible presence of heavy metals, BPA, pentobarbital, non-fresh ingredients and non-regional ingredients as inconsistent with the challenged Champion statements, and material to their purchasing decisions.

(j) It is unreasonable to expect consumers to proactively determine whether the Challenged Statements that appear on the front surface of Defendants' packaging are true, or to somehow determine if Defendants had omitted on their packaging the presence of Heavy Metals, non-fresh and non-regional ingredients, and the possible presence of BPA and pentobarbital, in their products.

(k) Had Champion's packaging disclosed that its products contained and/or had a risk of containing heavy metals, BPA, pentobarbital, a material amount of ingredients that were not fresh, and/or a material amount of ingredients that were not local or regional, such disclosures would have adversely affected consumers' willingness to purchase the Champion Products.

(l) Assuming Plaintiffs' allegations are true, a reasonable consumer would be misled and deceived by Champion's packaging as a whole.

13

33.     My rationales for these opinions follow.

## IV. HOW CONSUMERS MAKE FOOD PURCHASING DECISIONS FOR THEMSELVES AND THEIR FAMILIES

34.     I have been involved in marketing food products to consumers for more than half a century. I have created advertising for fresh eggs, frozen dinners, chocolate bars, salad dressings, nutrition and energy bars, ketchup, toaster pastries, salsa, avocados, packaged salads, cookies, crackers, margarine, breakfast cereals, and most relevantly, dog foods. Although the ads and commercials I created for Gaines (then a General Foods brand) and Ralston-Purina first ran in the early 1970's, the key benefits we communicated in those ads would be as relevant today as they were decades ago. We promised that dogs would enjoy the products (taste) and that they were formulated to be good for them (shiny coats, longer lives, etc.). I have also been involved in the development of advertising for dog and cat food products that were included in major campaigns for three of the largest supermarket chains in the United States as well as for the largest supermarket chain in the United Kingdom.

35.     In my experience, most consumers make food purchasing decisions for themselves and their families based on their perception that the products they choose are healthy, made with high-quality ingredients, and are superior to other products in the same category. Most consumers buy the best food products they can afford.

36.     "Tastes good/good for you/superior" is, and has been for many years, the high ground strategy for most packaged food marketers. For that reason, differentiation is a critical task; success comes down to how that strategic message is creatively expressed.

37. One of the first accounts I ever worked on was Lever Brothers Imperial® margarine. Like most margarines of that era, Imperial was positioned as a healthier alternative to butter that cost less but tasted just as good. That "tasty/healthy/superiority" message was distinctively communicated in its television



*Figure 1. Screenshot: Imperial Margarine "Crowns" commercial. Author's collection.*

commercials when a crown magically appeared on the head of a character (and sometimes, an entire family!) after tasting Imperial.

38. I later worked on the Jim Fixx campaign for Quaker Oats' 100% Natural Cereal® brand, which emphasized its contribution to a healthy lifestyle. (Fixx famously advocated the health benefits of jogging in his best-selling book *The Complete Book of Running.*) Consumers interpreted "Natural" to mean both "healthier" and "superior" to other dry cereals, which Quaker's sterling brand image further supported.

39. Consumer concerns about health issues led to Baskin-Robbins promoting its tasty sugar-free flavors and low-fat/no-fat frozen yogurt on television, as did Pizza Hut for its "Veggie" pizza and Swanson for its line of low-calorie frozen dinners. In addition, I created campaigns for the California Egg and California Avocado commissions that both included nutritional benefit information.

40. Superiority claims – backed by "reason why" copy – are a copywriter's staple; they influence consumers for virtually every kind of product imaginable. For example, I created the launch advertising for Pace Picante Sauce, which went on to dominate the salsa category for decades. Pace's first commercial included three superiority

15

claims, each of which resonated with consumers: "Pace is made in San Antonio with fresh vegetables and spices by people who know what picante sauce is supposed to taste like," said the lead cowboy in the spot. His sidekick, after closely reading the "Brand X" label, then exclaimed, "This stuff is made in Nooo Yawk Ciddy!" (The



*Figure 2. Screen shot: Pace Picante Sauce commercial, 1982. Author's collection.*

Big Apple may be famous for its pizza… but not for salsa!)

41. "Made in San Antonio" communicated <u>authenticity</u> – real Texas salsa. "Fresh vegetables and spices" communicated <u>superior ingredients</u>; "freshness" claims are always highly valued by consumers. This claim was further augmented by a close-up of the label on the Pace bottle, which featured images of fresh-off-the vine tomatoes and peppers. "People who know what picante sauce is supposed to taste like" communicated both superior flavor and authenticity.

42. I also helped launch Luna Bar, the first nutrition bar formulated specifically for women. The advertising we created for Luna Bar was very much driven by what we learned from women at a series of focus groups. "Tell us what's in it." "Feature the ingredients that we know are good for us." "Don't be shy; we want to know what makes this new product better than a Clif Bar or a Balance Bar." That led to us emphasizing the fact that the product was fortified with nutrients females typically need more of, or sometimes have a hard time getting in their diets, such as Folic Acid. The response to the advertising was quite remarkable; within six months Luna Bar outsold both Clif Bar and Balance Bar at supermarkets, even though it was sold at a premium price.

43. As I repeatedly heard over the years from consumers at focus groups for food products, "If a food product is good for you (i.e., "healthy") and it tastes great too, it's a winner." But a third factor enters the picture when consumers are considering a <u>premium-priced</u> product such as Champion dog food: What justifies its higher price?

44. Ironically, it has been my experience that some consumers simply assume that something that costs more is automatically better and is thus worth the price premium. But others want to know <u>why</u> something is superior; they need to be able to rationalize the higher price. Pace Picante Sauce, for example, always cost a few cents more than its leading competitor, La Victoria salsa. At focus groups, consumers told us the price differential was fair and reasonable because Pace used better ingredients ("fresh vegetables and spices") and was more authentic ("made in San Antonio").

45. Adjectives are an advertising copywriter's best friend. Every brand of beer is brewed using hops, but a well-written beer commercial will qualify the word "hops" by describing them as "European…" or "German …" because consumers correctly believe that certain agricultural regions produce superior crops. And if the product is brewed using "natural spring water" (instead of plain old tap water), even better because consumers respond very positively to "natural" claims. Every premium beer commercial I ever wrote (and I wrote many) mentioned both "…the finest European hops" <u>and</u> "natural spring water." That was all consumers needed to know to justify paying a premium price for Andeker (Pabst Brewing Company's version of Anheuser-Busch's Michelob) instead of its "popular priced" Pabst Blue Ribbon.



*Figure 3.*
*Andeker beer*

17

46. Promoting the retail presence and benefits of premium-priced "natural" food products was a staple of advertising and instore promotion for every supermarket advertiser I have been involved with stretching back to 1984 when I first worked on the Hughes Supermarkets account at BBDO/West. Since then, I have worked on the Safeway, Ralphs, Fry's and Albertson's accounts at Initiative, and for the past seven years, I have served as a consultant to Sainsbury's, the



*Figure 4. Fry's Market, Tucson, AZ.*

largest grocery chain in the U.K. An ever-increasing consumer demand for natural and organic products, particularly in neighborhood stores that serve an upscale demographic, led to the installation of dedicated natural food sections in those stores, point-of-sale advertising for natural and organic products throughout the stores, and highlighted mentions of the availability of natural products in television commercials and home delivered flyers.

47. In addition to using television and magazine advertising to promote their products, my former client Clif Bar & Company reached consumers in an "up-close-and personal" way by sponsoring endurance events such as bicycle races, marathons and triathlons. Their "All Natural Ingredients" promise



*Figure 5. Screen shot: Clif Bar television commercial, 2002.*

was very important to the athletes that comprised Clif's primary target audience, so much

18

so that the product itself was produced in such a way that the bars were irregularly shaped and certain ingredients were made to "stick out," to emphasize that attribute.

48.     In my experience, the most effective marketing statements for premium-priced food products nearly always have three things in common: 1) They articulate a product attribute or benefit that the brand's target audience already cares about, such as "healthier," "natural," "highest quality ingredients," "made in small batches," "organic," etc.; 2) They introduce a "new," seemingly unique, product attribute that consumers are likely to say to themselves, "That's interesting; I want to know more about that;" and 3) The added-value attribute, benefit or new idea is communicated in a distinctive way.

49.     Claims communicating trust are also valued by consumers. If people trust a brand, they will buy it. And even more importantly, they are likely to remain loyal customers and some may even become brand advocates. This issue is so important to marketers that each year the research firm BrandSpark publishes the results of a



Figure 6. "Most Trusted" Seal.

nationwide survey that identifies the brands Americans trust most in 118 categories. The top brands are entitled to add the BrandSpark "Most Trusted" seal to their packages. Not surprisingly, the 2020 "winners" in the food category included many of America's most famous brands, including Land O'Lakes butter, Betty Crocker, Hershey's, Philadelphia Cream Cheese, Oscar Meyer Hot Dogs, Quaker Oats, and Lipton Tea.[8]

50.     I repeatedly heard consumers at focus groups use the word "trust" as a way to explain why they preferred a particular brand or "their" brand versus another brand. For example, consumers "trusted" American Airlines to get them to their destination on time. They "trusted" that the diamonds in the engagement rings they

---

[8] http://www.brandsparkmosttrusted.com/usa (last visited Feb. 6, 2021).

purchased at Zales were "as represented" from a carat, color and clarity standpoint. And the first order of business for every financial services company I ever worked with was to "build a bond of trust" with its customers.

51.     As discussed in the credentials section of this report, many of my former and current clients competed at the top end of their categories. These include Mercedes-Benz cars, Cunard cruises, J.P. Morgan & Company, Hyatt hotels, Shell Oil (for its "Super Shell" premium gasoline) and even a hospital (Century City Doctor's Hospital in Los Angeles, which provided luxury accommodations and food catered by Wolfgang Puck). If I have learned anything over the years as a result of working with marketers of best-in-class products and services, it is that unless the benefits of the higher price point are self-evident (e.g., First Class airline seats on a long-haul flight), the higher the price, the greater the need for distinctive "reason why" copy.

52.     It is important to note that when consumers peruse a package label that includes multiple claims (as is the case in this matter), in addition to noting each claim individually, they consider the *cumulative message* that is being communicated by all the claims the manufacturer chooses to feature on its package. When considered together, the multiple claims add up to the brand image the marketer is trying to project for the product.

53.     Further, it has been my experience that very few consumers make a point of checking the accuracy of each and every front of package claim by reading the fine print disclaimers that may appear on the back of a package or in a nutrition label, especially if they believe the brand to be trustworthy.  Consumers simply have better things to do while shopping than to stand in the aisle and try to analyze every line of copy that appears on a package before making a purchase. That is why prominently placed (or repeatedly placed) label claims are so important to marketers; they are the ones consumers see and respond

to. Therefore it is very likely that Defendants, like most consumer products marketers, are fully aware of the power and value of the label claims prominently featured on their products. Finally, it should also go without saying (though I will say it anyway), that it is impossible for consumers to be aware of information that might negatively influence their purchase decision if that information does not appear on the packaging at all.

54.     As noted in my CV, my former clients included some of the largest and most successful packaged-goods marketing organizations in the world. Those companies went to extraordinary lengths to be certain their advertising claims (which included label claims on packaging) were important to consumers and especially, that those claims were not untrue or deceptive. Manufacturers are well aware that today's consumers expect transparency.

55.     **Based on the material discussed above, it is my opinion that affordability and taste aside, most consumers make food purchasing decisions for themselves and their families based on their perception that the products they choose are healthy, natural, made with high-quality ingredients, and are superior to other products in the same category. To succeed in the marketplace, premium-priced products, such as those at issue in this matter, must be supported with advertising and/or product labeling that enables consumers to rationalize paying a higher than customary price for the product.**

## V. PACKAGE STATEMENTS ARE A PRODUCT'S "SILENT SALESPERSON"

56.     One of the ways companies communicate their brand promise to consumers is through product labeling/packaging. A core task of the marketer in building a successful brand is to design a product that will appeal to the consumer. A primary means of

accomplishing this is to design a product's packaging in such a manner that it communicates the product's benefits and convinces the consumer that the product will fulfill his or her needs.

57.     "According to Geoffrey Hollows, a consultant at Heawood Research [in the U.K.], there are two aspects to packaging: 'First, there is the physical function. Second, there is the psychological function and that is the one you have got to get right.' It is at this unconscious level that consumers engage with a brand. Brand owners have long realized that they can sell a product by imbuing the brand with qualities that the consumer both recognizes and aspires to. Powerful brands are those that have successfully been able to reflect and influence a consumer's ideas, values and attitudes. It's what's on the outside…"[9]

58.     As is often true of clichés, the portrayal of packaging as a brand's "silent salesperson" is correct. After all, product labels are the last means of communication with consumers before a product is either placed in her or his shopping cart or passed by in favor of another product. Research conducted by the Point-of-Purchase Advertising International trade association indicates that 76 percent of all product selections involve some final deliberations by consumers at the point of purchase.[10] The important role of packaging in the consumer purchasing decision is recognized in the classic marketing quote describing packaging as "the last five seconds of marketing" and "the first moment of truth."[11]

---

[9] *See* https://www.marketingweek.com/2003/06/12/the-silent-salesman-2/?ct_5aa9aa1f33d68=5aa9aa1f33e0a (original spelling altered to reflect U.S. usage) (last visited Jan. 29, 2021).

[10] https://www.chiefmarketer.com/p-o-p-vital-as-more-shoppers-decide-in-store-study (last visited Jan. 29, 2021).

[11] Hootstein, D. "Standing Out in the Aisles," *Marketing at Retail*, June 2007, 22-24, as quoted in Thomas C. O'Guinn, Chris T. Allen, Richard J. Semenk, *Advertising and Integrated Brand Promotion*, 2015 edition, at p. 322.

59.     Package design is not a service offered by very many advertising agencies. However, it is not unusual for an agency's creative team to be asked to provide their thoughts as to how the brand's positioning or advertising theme can be integrated into the label or package design. I was involved in dozens of packaging projects during my long agency career for many different kinds of products, including toys, beverages, condiments, automotive products such as motor oil and, relevant to this matter, dog foods. Not surprisingly, wherever possible, the best practice was to articulate the attribute(s) that consumers most wanted to hear on the package. The challenged claims on Champion's packages communicate superiority, which consumers considering a premium or ultra-premium-priced product would want and need to hear.

60.     As discussed in a 2010 *JAMA* article titled "Front-of-Package Food Labels; Public Health or Propaganda?" "Research suggests that consumers believe front-of-package claims, perceive them to be government-endorsed, and use them to ignore the Nutrition Facts Panel."[12]

61.     As illustrated in Figure 7, when displayed at retail each Champion package serves as a "mini-billboard," in this instance for the Orijen brand. Champion's



*Figure 7. Champion Orijen products displayed at the Healthy Spot pet supplies store in Studio City, CA on*

---

[12] Brian Wansink, *How do front and back package labels influence beliefs about health claims?*, J of Consumer Affairs, 2003; 37 (2): 305-316; FDA Consumer research on food labels, http:///www.fda.gov/FGood/ScienceResearch?ResearchAreas/ConsumeResearch/ucm080407.htm (last visited Jan. 24, 2021), as cited in Marion Nestle, PhD, PMH, David S. Ludwig, MD, PhD, *Front-of-Package Food Labels, Public Health or Propaganda*, JAMA. 2010, 303 (8): 771. Doi:10.1001/jama.2010.179 (also available at https://www.foodpolitics.com/wp-content/uploads/JAMA_101.pdf).

"Biologically Appropriate[TM]" "USP" statement is front and center on each package just below the variety name.

62.     The importance of package labeling in this matter is particularly critical, as Champion has historically not relied on media advertising in any meaningful way to help sell its products. In fact, for the five-year period 2013-2017, its average advertising spend (e.g., general advertising expense, display materials, print ads and website design) was less than 0.2% of revenues.[13] Rather, Champion depends on word-of-mouth from satisfied pet parents, veterinarians and positive reviews on relevant websites to "spread the word." But awareness only goes so far. Even if a consumer has heard about Champion's Products from a third party or is introduced to its products by a salesclerk at a pet supply store, the Challenged Statements on the packages help close the sale. They provide the rationales consumers need to make an informed purchase decision.

63.     At his deposition Peter Muhlenfeld, then Champion's Chief Brand Officer, testified that its packages were periodically updated for various reasons,[14] which is a standard practice in the packaged foods industry. The package images I reviewed were representative of Champion's packaging as regards the Challenged Statements throughout the class period.

64.     **Given the material discussed above, it is my opinion that consumers are positively influenced by the Challenged Statements that appear on Champion's packaging when making their purchasing decision at the store.**

---

[13] CPF1973651 at -3671.
[14] Deposition of Peter Muhlenfeld at 79:24-80:03.

## VI. MANY CONSUMERS TREAT THEIR PETS AS FAMILY MEMBERS AND ARE THUS WILLING TO PAY A PREMIUM PRICE FOR THE FOOD THEY FEED THEIR PET

65.     According to Advantage Solutions' "The Humanization of Pets" infographic, "Nearly 70% of American households include at least one pet, 9 in 10 dog and cat owners consider their pets "part of the family" – with nearly half of dog owners finding it harder to leave their pet than their human partners for a week."[15]

66.     In 2015 the trade publication, *Pet Business,* described a significant shift in the pet food industry; consumer purchase behavior was mirroring trends in the human food market. "Ever since humanization first took off, trends in the human market have increasingly influenced trends in the pet industry, and nowhere is this more prevalent than in the food category. Watching trends in human nutrition is easily the best way to predict the next big thing – history shows that how pet owners decide what's important for their pets is largely driven by what's important for them and their (human) family."[16]

67.     In a 2015 *Pet Business* article headlined "Pet Food Evolution," Carly White, the Digital Marketing Manager of the premium dog food brand WellPet, said "People are increasingly concerned with what they eat and where their food comes from, and this concern has influenced the pet food space as well. More and more, pet parents are taking

---

[15]https://advantagesolutions.net/news/the-humanization-of-pets. "The Humanization of Pets" showcases statistics from a number of sources, including the Advantage Solutions SMARTeam, American Pet Products Association, A.T. Kearney, Common Sense, e-Marketer.com, Gerber, Google Surveys, Mintel, National Pet Owners Survey 2017-2018, Packaged Facts, petfoodindustry.com, rover.com, Simmons, U.S. Census and Statista (last visited January 29, 2021).

[16] *Pet Business,* 10/6/2015, "Pet Food Evolution," by Melissa Breau, page 5.

an active role in their pet's nutrition, with a focus on quality ingredients that are [conscientiously] sourced."[17] Note Ms. White's use of the term "pet parents."

68.     This behavioral characteristic was reiterated by Megan Jander in the January 8, 2019 issue of *Pet Age*: "Good and nutritious food is a necessity for both humans and pets, so customers are now looking for products that are natural and made with high-quality ingredients."[18]

69.     According to a 2019 Nielsen report, "…it should come as no surprise that ingredients and product attributes have become key focal points among consumers as they wander through the pet food aisles – both traditional and virtual. Including fresher and more natural ingredients parallels trends across human food, and the sales at the shelf are proof points." In fact, according to a report in the *Wall Street Journal* cited by Mary Hanbury in a 2018 article in *Business Insider*, legacy pet food brands such as Mars' Pedigree, Nestle's Purina, and Smucker's Gravy Train and Kibbles 'n Bits have all seen sales lag as pet owners shift toward premium pet food products.[19]

70.     According to NPD, a leading market research company, 90 percent of U.S. consumers read the nutrition labels on packaged food products. "Consumers are interested in the content of the foods they eat, and the nutrition facts label is their best source for this information," says Darren Seifer, NPD food and beverage industry analyst. "With most

---

[17] *Pet Business,* 10/6/2015, "Pet Food Evolution," by Melissa Breau, page 2.

[18] https://www.petage.com/humanization-of-pets-pet-products-resonates-within-creative-market (1/29/2021).

[19] *Business Insider*, November 12, 2018, "Millennials are treating pets like their first born child…"

food companies working on the health profile of the foods they produce; the nutrition facts label provides them with the ability to showcase these improvements."[20]

71.     Therefore, it should come as no surprise that, as illustrated by the chart that follows, a significant percentage of dog food consumers pay close attention to labeling claims as well, particularly those that one way or another reference ingredients or processing techniques that communicate healthiness.



*Figure 8. Premium dog food purchasers expect clear*
*nutritional information on the package.*

---

[20] https://www.npd.com/wps/portal/npd/us/news/press-releases/2020/new-year-new-nutrition-facts-label-on-food-most-us-consumers-read-the-nutrition-facts-label-and-the-top-items-they-look-for-are-sugars-and-calories (last visited Jan. 29, 2021).

73.     Champion appears to me to be a very sophisticated marketer of premium-priced dog foods that understands that many of its consumers are treating their pets as family members. A 2017 market study conducted on behalf of Champion by the market research firm Leger reported, "For most respondents (73%), their dog is an extension of the family, akin to a child."[21] The report went on to say that 71 percent of dogs sleep somewhere in their owner's bedroom, and 41 percent sleep on their owner's bed.[22]

74.     The Leger survey went on to say "…for the vast majority of dog owners (84%), their pet's nutrition is important. As a result, nine-in-ten feed their dog what they believe to be a healthy and balanced diet." "97% agree that "the higher amount of fresh meat in a dog's diet, the better. 64% agree that dog food with fresh ingredients is worth paying extra for; 48% agree that dog food with local ingredients is worth paying extra for."[23] And 83 percent of Leger's survey respondents completely or somewhat agreed with the statement "I am willing to pay more for high quality food for my dog." An astounding 97 percent of the group identified by Leger as "Informed Consumers" responded positively to that statement.[24]

75.     Further, Leger identified for Champion a key sub-group of dog owners who "…often choose their dog food based on the fact that they believe it to be the best brand of dog food out there (54% vs. 40% among less-informed consumers), a belief that becomes more and more prominent as knowledgeable levels rise."[25] The study also stated that "Informed Consumers are far more likely to completely agree that (a) high quality dog food

---

[21] CPF0145434 at -5442.

[22] *Id.* at -5443.

[23] *Id*. at -5481

[24] *Id.* at -5447.

[25] *Id*. at -4539.

is worth paying extra for, and that (b) a high price automatically means it's of better quality."[26] The study also defined what makes a "better" dog food: 1) Fewer additives; 2) the more meat, the better; 3) The higher amount of fresh meat, the better; 4) Less processing is better; 5) Multiple types of meat is better." [27]

76.     Champion took the information from Leger and other market data sources it may have had to heart. In a document titled "Audience Research," it identified its "New Audience Groups" as "Pet Lovers," which it defined as the 43 million U.S. households that own dogs, and "Pet Parents," which it defined as consumers who see their pets as more than companions but more as a family member.[28] "In terms of sales, our best customers are the audience group that has the most money to spend on caring for their pets – baby boomers who exercise "'pet parenting.'"[29]

77.     A May 2016 e-mail chain that included a series of questions raised by Katie Murdoch, Editor of Executive Insight Properties' *Pet Insights* trade publication. Champion's response to the question, "How will Champion Petfoods' latest innovation reflect what consumers are demanding from the ultra premium foods category was,

- "Simply put, Pet Lovers are looking for peace of mind;

- They want to make the best choice for the pets;

- Our new Orijen foods offer pet lovers an award-winning Biologically Appropriate$^{TM}$ food;

- Foods designed to match their dog or cat's eating anatomy;

---

[26] CPF0145434 at -5440.
[27] *Id*.
[28] CPF0221173.
[29] *Id*. at -1176.

- Brimming with even higher meat inclusions (85%-90%), featuring loads of fresh meats in WholePreyTM ratios, sourced from trusted suppliers;

- All prepared in our world-class kitchens in Kentucky;

- Orijen is perfectly designed to keep dogs and cats healthy, happy and strong."

78.     Further, Champion also stated in the e-mail that "Our ingredients are locally sourced from trusted ingredient suppliers in the Kentucky region." These statements were drafted by Michelle Granger, then Champion's Director of Marketing, and approved by Peter Muhlenfeld, then its Chief Brand Officer.[30]

79.     In a May 24, 2017 e-mail to Vanessa Nieto Nieto (Senior Ingredient Development Scientist at Champion) and Jamie Kratchkowski (then Manager, Fish & Raw Meats Innovation at Champion) Chris Milam, Champion's Director of Ingredient Innovation and Supplier Partnerships, wrote "Based on feedback in the field and from our expert panels fresh regional ingredients (FRI) are our biggest opportunity. Traceability, sustainability, ethical practices, named sources, these are the dominate (sic) trends when it comes to sourcing. The ability to feature and tell this story is a great asset. More pet lovers are looking beyond the ingredient panel to see where their ingredients come from. Our ability to source transparently (named sourcing, 100 mile diet) and leverage our local smaller suppliers gives us the great advantage."[31]

80.     Thus, it is evident to me that Champion relied heavily on the challenged claims as "key ingredients" in its marketing messaging. Individually and collectively the Challenged Statements  match up well with one or more of the product attributes that rank

---

[30] CPF1720401 at -0402.
[31] CPF1803444.

highly with pet lovers inclined to purchase premium-priced dog food such as higher inclusions of fresh meats locally sourced from trusted suppliers.

81.     One of the things I learned early on in my career is that successful advertising campaigns are rarely those that merely find a clever way to say what the advertiser wants to say. Rather, the most effective ads are those predicated on responding to what consumers want to hear. People who consider themselves "pet lovers" or "pet parents" would, in my opinion, want to hear that a food they are considering purchasing for their dog is superior in a multitude of ways as compared to "lesser" brands. Pet parents want to hear the product is formulated with superior ingredients (e.g., fresh, regional ingredients sourced from trusted suppliers), will provide superior health benefits (e.g., "Biologically Appropriate$^{TM}$"), and is natural. And that is exactly what Champion tells pet lovers via the messaging on its packages.

82.     Further, it has been my experience that consumers feel better about themselves by purchasing food products they view as superior, even if those products are premium-priced. By doing so, they see themselves as better family caregivers. The emotional benefit of "buying the best" applies as much to the purchase of a premium-priced dog food as it does to paying a few cents (or dollars) extra for organic produce, chicken or beef.

83.     But "buying the best" to feel good about the purchase only goes so far. Most consumers need concrete reasons to rationalize the purchase if the price gap is significant. And in this instance, the price gap is very significant. As illustrated in the chart that follows, Defendants' Orijen and Acana products rank first and third in average cost per kilogram among the premium brands displayed.



*Figure 9. Average price per kilogram of premium dog food in the U.S. CPF1973651 at 3669.*

84.    That is why the Challenged Statements in this matter are so material to consumers. They communicate <u>why</u> Champion's Products are (allegedly) so much better than other dog foods, making them worth their extraordinarily high price points.

85.    **Given the material discussed above, it is my opinion that many consumers treat their pets as family members and are therefore willing to pay premium prices for a pet food they perceive to be healthy, natural, made with high quality ingredients (including fresh and local), and superior to other products in the same category.**

## VII. THE CHALLENGED STATEMENTS COMMUNICATE THAT CHAMPION'S PRODUCTS ARE HEALTHY, NATURAL, MADE WITH HIGH QUALITY INGREDIENTS, AND ARE SUPERIOR TO COMPETITIVE PRODUCTS

86.     In my experience, consumers are very receptive to language in food product advertising that communicates it provides superior nutrition, that the product's ingredients are exceptional, that it is more carefully processed than most other products in its category and that it is held in high regard by consumers. I have also observed consumers at focus groups stating that companies they believe hold themselves to high standards (e.g., Hershey's, Campbell Soup, Quaker Oats, Nabisco, Unilever, et al.) are admirable and trustworthy, and that their products are therefore superior to those marketed by lesser companies.

87.     In this instance, Champion's statements convey, usually individually, and especially together and in the context of other packaging elements, the message that Champion's Products are superior. These messages are material to a substantial number of consumers in that they provide support for their exceptionally high price points.

88.     Most of my adult life has been devoted to helping build brands. Many laymen believe that the word "brand" is a synonym for a product's name or trademark. That is incorrect. As defined by my mentor, Mr. Ogilvy, a brand is "the consumer's *idea* of the product."[32] Mr. Ogilvy is credited with creating the term Brand Image, which he defined as a product's "personality." "Products, like people, have personalities, and they

---

[32] https://www.ashokcharan.com/Marketing-Analytics/~bs-brand.php#:~:text=A%20brand%20is%20defined%20as,an%20imprint%20in%20their%20minds.&text=Brand%20image%20is%20the%20consumers'%20perception%20of%20the%20brand. (last visited January 29, 2021).

can make or break them in the marketplace. The personality of a product is an amalgam of many things – its name, its packaging, its price, the style of its advertising, and, above all, <u>the nature of the product itself</u>."[33]

89.     William F. Arens, Michael F. Weigold and Christian Arens are co-authors of *Contemporary Advertising and Integrated Marketing Communications,* a textbook used at many top American universities. They define a brand as "offering instant recognition and identification. They also promise consistent, reliable standards of quality, taste, size or even psychological satisfaction, which add value to the product."[34] Simply stated, branding differentiates and elevates a product or service in the eyes of its public, its customers and prospects.

90.     Marketers describe the process of embedding a brand in the minds of consumers as "positioning."

91.     Kenneth Roman, the former Chairman of Ogilvy & Mather and Jane Maas, who headed the Earle Palmer Brown advertising agency in New York, defined positioning in their book *How to Advertise* as "Placing a product in a certain way in the consumer's mind."[35] In their college-level marketing textbook, *Advertising and Integrated Brand Promotion*, Professors Thomas C. O'Guinn, Chris T. Allen, Richard J. Semenik state, "The importance of positioning can be understood by recognizing that consumers create a perceptual space in their minds for all the brands they might consider purchasing. A perceptual space is how one brand is seen on any number of dimensions – such as quality,

---

[33] David Ogilvy, *Ogilvy on Advertising*, New York, Crown Publishers, 1983, Page 14.

[34] William F. Arens, Michael F. Weigold, Christian Arens, *Contemporary Advertising and Integrated Marketing Communications, 13th Edition,* New York, McGraw Hill Irwin, 2011, Page 212.

[35] Kenneth Roman and Jane Maas, *How to Advertise,* New York, St. Martin's Press, 1976, Page 1.

taste, price, or social display value – in relation to those same dimensions in other brands."[36]

92.     It is obvious to me – and I believe that a reasonable consumer would concur with my view – that the brand image of each of the Champion Products in this case has been built on the challenged superiority claims, which support their premium price.

93.     **In short, it is my opinion that the Challenged Statements clearly communicate to consumers that the Challenged Products are healthy, natural, and superior. Further, it has been my experience that most consumer product manufacturers recognize that their product labels are "mini billboards" upon which they can advertise their product's most desirable attributes. Manufacturers expect consumers to rely on these "ads," which prompt purchase. That is exactly what Defendants have done here to convince consumers to rely upon their Challenged Statements.**

## A. THE "BIOLOGICALLY APPROPRIATE[TM]" CLAIM

94.     The "Biologically Appropriate[TM]" claim appears multiple times on the front panel of each Champion product at issue in this case. It also appears at least once on the back panel of each challenged product as well.

95.     Champion's 2018 Product Strategy document described "Biologically Appropriate[TM]" as one of two key differentiators in a list of key product attributes for its Acana and Orijen products.[37]

---

[36] Thomas C. O'Guinn, Chris T. Allen, Richard J. Semenik, *Advertising and Integrated Brand Promotion*, Third Edition, Cincinnati, OH, South-Western Cengate Publishing, 2009, Page 24.

[37] *See* CPF0258099 at -8119 (Acana Classics), -8125 (Acana Heritage), -8138 (Acana Singles), -8149 (Acana Regionals), and -8160 (Orijen).

96.     The term "Biologically Appropriate™" is explained on the back panel of the Acana Heritage 2018 Free Run Poultry package illustrated in Figure 10 as well as on the 2017 Free Run Poultry package I reviewed. "Your dog is a carnivore designed by nature to thrive on whole game, fowl or fish, and possessing a biological need for foods that are rich and varied in fresh whole animal ingredients." The copy block concludes, "Prepared in our Kentucky DogStar® kitchens from fresh local ingredients, this delicious and Biologically Appropriate™ food is



Figure 10. Acana Heritage Free Run Poultry Formula 2018 package.CPFB00033.

guaranteed to keep your cherished dog healthy, happy and strong – read our ingredients and we think you'll agree!"

97.     A similar description of the "Biologically Appropriate™" term also appears on packages of other varieties of Champion's Acana Heritage products, as well as on the packages of the Acana Regional, Acana Singles and Orijen products at issue in this matter.

98.     It has been my experience that consumers of premium-priced products are often "information seekers;" they want to know as much as possible about the products they consider purchasing and research those products via the internet as well as through access to other trusted sources such as newsletters, magazines and, for dog foods, veterinarians. On its website, Champion defines "Biologically Appropriate™" as "…foods

[that] mirror the diet that nature and evolution intended dogs and cats to eat. This means high amounts of protein from real animal ingredients, and as few carbohydrates as possible."[38]

99.     An even more complete explanation of "Biologically Appropriate[TM]" is included in a Champion document titled "Management Presentation," which lists the "Five Principles" that "…Reflect Champion's Biologically Appropriate[TM] Commitment:

> 1) Rich in Meat and Protein. To meet pets biological need for a meat and protein-rich diet, products are loaded with up to 90% meat-based ingredients (by weight), approximately three times greater than conventional pet foods, and are free of plant concentrates like potato;
>
> 2) Fresh Meat Inclusions. Unrivaled by any other dry pet food, up to two-thirds of the meats in ORIJEN and ACANA are FRESH or RAW to provide essential nutrients in their most nourishing form and the goodness all pets instinctively crave;
>
> 3) Abundant Variety of Meats. In nature dogs and cats benefit from an assortment of foods, and so Champion foods feature a rich, nourishing diversity of fresh free-run poultry, whole eggs, ranch-raised meats and wild-caught fish;
>
> 4) WholePrey[TM] Ratios. Nature matched the nutrients in WholePrey[TM] animals to meet the needs of dogs and cats. WholePrey[TM] represents muscle meat, organs and edible bone in

---

[38] https://championpetfoods.com/en/about-us.html (last visited June 27, 2020).

ratios to replicate prey and virtually eliminates the need for synthetic ingredients;

5) <u>Carbohydrate Limited</u>. The natural diets of dogs and cats are low in carbohydrates, so Champion limits carbohydrates and replaces fast sugars like potato and tapioca with whole fresh fruits and vegetables, such as pumpkin and squash."[39]

100.    It is important to note that the "Biologically Appropriate[TM]" claim includes the "[TM]" symbol, which I understand indicates an unregistered trademark. However, it has been my experience that very few consumers understand the difference between the "[TM]" symbol and the ® symbol; they see either one as the imprimatur of a term that has been legally protected. More importantly, in my experience many consumers see the "[TM]" symbol as conferring an extra level of importance and legitimacy to whatever term it is associated with.

101.    Marketers refer to a term like "Biologically Appropriate[TM]" as the equivalent of a "branded ingredient." Dr. David Aaker, Professor Emeritus at the University of California Berkeley-Haas School of Business, addressed the value of a branded ingredient in an article that appeared in the Fall 2003 issue of the *MIT Sloan Management Review*:

"Another approach to differentiation is to brand an ingredient or technology. Even if customers do not understand how the ingredient works, the fact that it was branded lends credibility to the explicit or implied claims and can result in enhanced perceptions of quality. A branded ingredient is especially useful in communicating quality when it is difficult to see it

---

[39] CPF1973651 at -3663.

objectively. Chevron, for example, would have a hard time explaining why the inclusion of the product branded as Techron in its gasoline makes it different. The brand, however, provides a communication aid. Customers may not know how Techron works (it cleans engine deposits, among other things) but they do know that Chevron thought enough about the ingredient to brand it."[40]

102.    In my opinion, the label claim "Biologically Appropriate[TM]" plays the same role in Champion's marketing as Techron does for Chevron as a branded ingredient: it provides a reason for consumers to believe Champion's Products are uniquely different and objectively better than other premium (or for that matter, non-premium) dog foods. It supports the idea that Champion's Products are superior.

103.    Speaking as an advertising expert, "Biologically Appropriate[TM]" most likely conveys to consumers that Defendants' products have been scientifically formulated (the word "Biologically" will remind consumers of their high school Bio classes), that its ingredients are top shelf and safe, and that it is different and better than other products that do not claim to be "Biologically Appropriate[TM]." And since the term is trademarked, it would also appear to most consumers to be a unique attribute.

## B. THE "FRESH REGIONAL INGREDIENTS" CLAIM

104.    The "Fresh Regional Ingredients" claim is found on the packages of all of the Champion Products at issue in this case. "Fresh Regional Ingredients" is listed as one

---

[40] David Aaker, *The Power of the Branded Differentiator*, MIT Sloan Management Review, Fall 2003, at 83.

of two "key differentiators" (the other being "Biologically Appropriate™") for these products in its 2018 Product Strategy document.[41]

105. As illustrated in Figure 11, the graphic image of the continental United States, which appears on all of the packages I reviewed that were produced at Champion's DogStar Kitchen



*Figure 11. Detail from Orijen Regional Red package. CPFB00081. Arrow added.*

during the class period, includes a circle, which appears to indicate the geographic locale (i.e. Kentucky) from which Champion claims its "fresh and regional" ingredients are sourced. [Arrow added.]

106. In my experience consumers respond very positively to "freshness" claims. "Fresh Regional Ingredients" takes that attribute a step further as locally sourced foods (and food ingredients) are increasingly popular with consumers who believe they are better.

107. As previously discussed, millions of consumers shop each week at local farmer's markets throughout the country. Why? The answer is simple: the markets are usually the best source of fresh regionally grown fruits and vegetables available to them. And many restaurants today feature regional cuisine, promising "farm to table" ingredients. Farmers markets and restaurants are both responding to consumer preference for fresh, regional ingredients.

108. According to Diana Kelter, foodservice analyst at the market research firm Mintel, leveraging regional cuisine, which includes fresh ingredients and local flavors,

---

[41] *See* CPF0258099 at -8119 (Acana Classics), -8125 (Acana Heritage), -8138 (Acana Singles, -8149 (Acana Regionals), -8160 (Orijen).

"gives restaurant operators a chance to connect more with consumers," and says "It gives a halo of fresher, more premium, and less mass-produced food, and that has become increasingly important." [42] As previously discussed, how pet parents decide what is important for their pets is largely driven by what is important for them and their (human) family.

109.     Champion clearly understands the importance of the "fresh" and "regional" promises to its consumers as they appear (with some variants) repeatedly on its packaging. For example, "Unmatched Regional Ingredients FRESH OR RAW" serves as the copy headline on the front and left side panels of the 2015 Acana Free-Run Poultry Formula package illustrated in Figure 12. [43] In addition, the product attribute list on the front panel concludes with



*Figure 12. Front panel, Acana Heritage Free-Run Poultry Formula package. CPFB00032.*

the header, "Fresh and Local," as does the caption accompanying the photograph of the field of daisies. The back panel of the package also includes multiple promises of fresh and

---

[42] https://www.qsrmagazine.com/menu-innovations/inside-rapid-rise-regional-american-cuisine (last visited Feb. 19, 2021).
[43] I have been advised that although identified as a "2015" package, it was first used by Defendants in commerce in 2016.

local ingredients, including photographs of Kentucky-based chicken farmers. (A picture – with an appropriate caption – is worth a thousand words.) As previously discussed, the most effective way to engage a consumer is to tell them what they want to hear; Champion's use of the term "fresh regional ingredients" tells me that it believes that claim will ring the consumer's bell.

110.    Again, by showing off who their "local" farmers are, Champion further drives home its "regional" message. Also, Champion actually quantifies the amount of "fresh or raw" ingredients they claim to use in each package through Meat Math, which in my opinion would further impact consumer perception that the products at issue are made from fresh ingredients.

111.    It should be noted that at her deposition, Julie Washington, Champion's former Director of Marketing, testified that Champion had never surveyed consumers to determine their understanding of the words "regional" or "fresh,"[44] as did Peter Muhlenfeld, then Champion's Chief Brand Officer, at his deposition in a related case.[45]

112.    Champion refers to its frozen or previously frozen ingredients as "raw." I do not believe that most consumers would see it that way. In fact, consumers are far more likely to understand "raw" as it is defined by Merriam-Webster, i.e., "Being in or nearly in the natural state: not processed or purified,"[46] than as it is defined by Champion. Go to any supermarket and products that are raw, be they chicken parts or veggies or fillets of fish, are sold in different areas of the store than similar products that are frozen. In my opinion, consumers have learned through experience (i.e., their weekly trips to the supermarket)

---

[44] Deposition of Julie Washington at 31:25-32:11 (Dec. 5, 2018).

[45] Deposition of Peter Muhlenfeld at 92:16-22, *Reitman v. Champion Petfoods USA, Inc.*, No. 2:18-cv-01739-DOC-JPR (C.D. Cal. Dec. 4, 2018).

[46] https://www.merriam-webster.com/dictionary/raw (last visited Feb. 19, 2021).

that raw and frozen do not necessarily mean the same thing. Champion's packaging also does not define that "raw" refers to frozen or previously frozen ingredients.

113.    My responsibility as an expert witness in this matter does not extend to opining on the reliability or truthfulness of the challenged claims. Other experts will deal with those issues. But I have seen evidence regarding Champion's statements that definitely raised my eyebrows. For example, in a 2016 e-mail chain that concludes with a series of messages between Chinedu Ogbanna, a Regulatory Specialist at Champion Petfoods LP and Peter Muhlenfeld, it appears that certain words and terms (e.g., "raw," "freshly made," "fresh," et al.) used by Champion to describe its ingredients are defined in ways that in my experience very few U.S. consumers would agree with.[47] Thus, Champion's employees acknowledge that dog food companies "plant the word fresh in the mind of consumers while it really means something else."[48] Champion also appears to be using "Fresh Regional Ingredients" to plant "fresh" into consumers' minds even though it means something else.

114.    In another e-mail, Peter Muhlenfeld wrote (about a report he received from Clement Lee at the management consulting firm Carpedia), "There are a few unpleasant surprises in here as it would appear that less than half of our local meats are actually arriving fresh, which is counter to our marketing message."[49] Here, Mr. Muhlenfeld is candid that Champion's use of non-local and non-fresh meats is "counter" to Champion's overall marketing message. At his deposition (in a related matter), Mr. Muhlenfeld contradicted the testimony of another Champion executive who Plaintiffs' counsel reported

---

[47] CPF1719813.

[48] *Id.*

[49] CPF1292285.

as saying that frozen rabbit could be described as a fresh ingredient because by the time it gets to the DogStar kitchen it is no longer frozen. Mr. Muhlenfeld testified that under those circumstances the rabbit meat should <u>not</u> be considered fresh. He further testified that as used by Champion, the words "raw" and "fresh" are interchangeable.[50] In my experience, few consumers would see it that way. Having personally visited street markets in small towns in Egypt, China, Vietnam, Cambodia, Brazil and Paraguay, raw meat is most certainly not always fresh. (The nose knows.)

115.  A document titled "President's Club: Champion Petfoods" includes a brief description of the company's history, which included the following: "What distinguished Muhlenfeld's [i.e., Reinhard Muhlenfeld, the company's founder] products from mainstream pet foods was his commitment to producing the highest quality foods that matched as near as possible the animal's wild diet. This relied on sourcing fresh supplies of ingredients…" The document goes on to say that Champion's focus was on local ingredients "…that were sustainably raised and delivered fresh to the company's kitchens. Meat, fish, poultry and vegetables were never frozen and were always preservative free."[51]

116.  At his deposition Peter Muhlenfeld frequently acknowledged that some of Champion's meat and fish ingredients arrived at its kitchens in a frozen or previously frozen state.[52]

117.  At her deposition Julie Washington was asked "When Champion uses it [meaning the word "regional"] are they understanding – is it your understanding that they're also limiting to the actual regions in the United States? Or are they saying

---

[50] Deposition of Peter Muhlenfeld at 91:16-92:23.

[51] CPF1294360.

[52] Deposition of Peter Muhlenfeld at 114:18-22.

"regional" as in, well, as long as it comes from the United States, it's regional?" Ms. Washington's response was "What Champion defines or does, I can't speak to that." She was then asked, Well, in marketing, would you think that it would be misleading if they're saying "regional" would cover the whole United States?" To that she responded, "Not if that was our intent."[53]

118.    In my opinion, consumers would disagree that it would be appropriate to use the word "regional" to refer to the whole United States. Like my prior examples for Pace Picante Sauce and Andeker beer, Champion's packaging repeatedly emphasizes its local Kentucky or Alberta suppliers as the source of their "regional" ingredients," not the entire United States or Canada.  Champion does so to appeal to its consumers' desire to buy ingredients that are traced to authentic, local, and trusted suppliers.

119.    In my opinion the "fresh regional ingredients" claim that appears on the front label of Defendants' packaging is likely to be taken literally by a reasonable consumer. And why not? Those terms are commonly used and understood. Further, they are clear and definitive statements and, most importantly, they rationalize the premium price of its products. "Not fresh" would cost less, as would "not regional." I am aware that certain information appears on the  back label of some Acana and Orijen packages that disclaims or limits those front panel claims. But as I discussed earlier, those disclaimers are most likely not going to be read at retail by a significant percentage of consumers – nor should they be expected to do so.

---

[53] Deposition of Julie Washington at 100:16-101:9.

120.    Every packaged goods marketer I ever worked with placed what they believed to be their most important – i.e., their most motivating claims – on the front panel of their packages. As the old cliché goes, "It's what's up front that counts."

**121.    As is the case with each of the Challenged Statements, "Fresh Regional Ingredients" would in my opinion be material to consumers, as they are likely to see it as a positive product attribute that points to superiority of its ingredients. Further, the statement also serves as a brand differentiator.**

122.    It is important to note that in its 2018 Product Strategy document, Champion specifically lists "no heavy metals" as one of the attributes that support its "Fresh Regional Ingredients" claim, which it considers a "Key Differentiator" for its Acana Singles and Acana Regionals products.[54] I will address the topic of "No Heavy Metals" later in this report.

## C. THE "NATURAL" CLAIM

123.    The "Natural" claim is expressed on Acana packaging as the challenged statement, "Delivering Nutrients Naturally." Merriam-Webster defines "natural food" as "food that has undergone minimal processing and contains no preservatives or artificial additives."[55]

124.    The FDA has no guidelines for use of the term "natural," and in fact, only lightly enforces the term "all-natural."[56] As a practical matter, that means animals

---

[54] CPF0258099 at -8201 and -8149.

[55] https://www.merriam-webster.com/dictionary/natural%20food (last visited Feb. 18, 2021).

[56] https://www.eater.com/2019/4/11/18304951/natural-food-organic-meaning-difference-hormel-meat-lawsuit (last visited Feb. 18, 2021)

"…raised with hormones and antibiotics can still fall under the 'natural' category, as can Cheetos, lemon-flavored Oreos, and Skippy peanut butter."[57]

125.    Rebecca Tushnet is a Harvard Law School professor who teaches intellectual property, advertising law, and First Amendment law.[58] When asked whether the word "natural" should be legally defined, she responded, "My initial reaction is that it's a good idea. People think natural is better than organic, but natural doesn't have a specific meaning. That's confusing."[59]

126.    In my experience, in the context of food labeling consumers believe foods promoted as "natural" to be healthier than foods that, for whatever reason, either cannot claim to be natural or have chosen not to make that claim, usually for legal reasons. As is the case with each of the challenged claims, "natural" would be material to consumers, as they are likely to see it as a positive product attribute. Further, most premium-priced dog foods claim to be natural.

127.    At focus groups I attended in which advertising for food products was the principal topic of discussion, consumers frequently used the words "nutrients" and "nourishing" as ways to describe product attributes that spoke to healthiness. In my opinion, when coupled in the minds of consumers with Champion's "Natural" claim, those terms would add to their impression that its products are <u>especially</u> healthy and therefore exceptionally good for their dogs.

---

[57] *Id.*

[58] https://tushnet.com/about (last visited Feb. 19, 2021).

[59] https://www.npr.org/sections/thesalt/2016/05/08/477057872/what-is-natural-food-a-riddle-wrapped-in-notions-of-good-and-evil (last visited Feb. 19, 2021).

128.    In my opinion, these "natural" claims are material to a consumer's decision to purchase Champion's dog food, and positively influence their willingness to pay premium prices for Champion's dog food.

129.    As illustrated in Figures 13 and 14, the "Natural" claim appears on the front panel of Champion's Orijen packages and the back panel of Champion's Acana packages. As previously discussed, in my experience consumers do not, nor should they be expected to, check out the back panel of a package to determine the veracity of claims made on the front panel. But many consumers do look at the back panel to learn more about the product before deciding to make a purchase. As it appears on the back panel of the Acana packages, "Delivering Nutrients Naturally" is not a disclaimer, it is a forthright marketing message.



*Figure 13. Rear panel, 2015 Acana Free-Run Poultry package PFB00032.*



*Figure 14. Detail from Acana package illustrated above.*

## D. "TRUST" AND OTHER STATEMENTS PROVIDE ADDITIONAL CONTEXT

130.    In addition to the Challenged Statements above, Champion also advertised Acana and Orijen as a trustworthy dog food that used ingredients from local, trusted suppliers. These trust packaging statements add context and support Champion's Challenged Statements, such as "Fresh Regional Ingredients."

48

### *THE "INGREDIENTS WE LOVE PEOPLE WE TRUST" CLAIM*

131.    Starting in 2016, the "Ingredients We Love People We Trust" claim appears on all of the challenged Acana packages. Before 2016, the Acana packages contained the similar claim that its ingredients were, "…all produced by people in our region we know and trust,"[60] The Orijen Original and Regional Red (produced at Champion's DogStar facility) packages include a slight variant of the claim, which reads "Ingredients We Love People We Know and Trust."

132.    In my experience, the "Ingredients We Love People We Trust" statements provide a memorable way for consumers to internalize Champion's "Fresh Regional Ingredients" claim; it is very conversational, which in my experience connects better with consumers then a flat, laundry-list type statement like "Fresh Regional



*Figure 16. Detail from Rear Panel, Orijen Regional Red package. CFPB00077,*

Ingredients" A reasonable consumer would very likely take away the same idea from all variants of the "People We Trust" message, i.e., the meats, fish, poultry, fruits and vegetables that comprise the Challenged Products are superior because the farmers, ranchers and fishermen who supply those fresh, regional ingredients are personally known and trusted by the company to provide the very highest quality ingredients.

---

[60] CPFB00033.

133.     We live in an age when most of the food products consumers' purchase for their families (which includes their beloved pets) are produced by impersonal entities that sometimes prove to not be terribly trustworthy. Two years ago dozens of people across the U.S. were sickened by contaminated romaine lettuce produced by faceless corporate farms in Arizona.[61] And packaged foods are sometimes susceptible to contamination from certain materials contained in the packaging itself.[62] That is one of the reasons why weekly Farmer's Markets are becoming ever more popular throughout the U.S., growing from 2,000 in 1994 to more than 8,600 today. Consumers know the sellers at Farmer's Markets had a direct hand in growing and harvesting the goods they offer.[63] Simply stated, people trust people and I have yet to hear a consumer dispute the idea that "the fresher the food, the better."

134.     It appears Champion is well aware of this concept. The copy imbedded in the circled area in Figure 17 reads, "Food choices are some of our most important decisions and knowing where your food is from has taken on new importance. That's why we make ACANA in our own kitchens, from fresh regional ingredients raised by people we trust, like Rob of Bluegrass Bison in Shelbyville, Kentucky – trusted supplier of fresh ranch-raised bison."

135.     Not only does Champion spell out the "Ingredients we love [from] people we trust," claim on its packages, as illustrated above it also displays <u>photographs</u> of some of those "…people we trust." In my opinion, the combination of the claim, the copy and

---

[61] https://www.usatoday.com/story/news/health/2018/11/20/romaine-lettuce-cdc-warns-e-coli-outbreak-ahead-thanksgiving/2070654002/ (Nov. 20, 2018) (last visited Feb. 19, 2021.)

[62] https://pubmed.ncbi.nlm.nih.gov/10895950/ (last visited Feb. 19, 2021).

[63] https://www.farmersmarket.net/article/why-farmers-markets-are-becoming-popular/, (last visited Feb. 19, 2021).

literally putting a face on the claim for Champion's local or regional ingredient suppliers is a very effective way to communicate to consumers that Champion's Products use superior fresh, regional ingredients as compared to the "impersonal" products marketed by its competitors.

136.    Further, in my experience some consumers are willing to pay more for food products made with fresh and local ingredients. Sometimes, <u>much</u> more. The Whole Foods Market supermarket chain is often referred to as "Whole *Wallet*" because the prices of the products they sell are often significantly higher than similar (but not identical products) sold at most other national chains. But customers still flock to Whole Foods in droves because they believe its produce, meats, chicken, fish and seafood products are superior.

137.    My former client Ralphs Markets (a unit of Kroger Corporation) created an upscale tier of stores in the Los Angeles area dubbed "Ralphs Fresh Fare" to accommodate consumers willing to pay more for extra-fresh produce,



*Figure 17. Ralphs Fresh Fare market, downtown Los Angeles.*

meat, chicken, fish and seafood. These stores were strategically located in neighborhoods served by Whole Foods and were able to successfully compete for customers who wanted fresh and local ingredients at premium prices.

### *THE "TRUSTED EVERYWHERE" CLAIM*

138.    Starting in 2016, the "Trusted Everywhere" claim appeared (albeit in somewhat different forms and different sized fonts) on all Champion packages at issue in this matter.

139.    As defined by Merriam-Webster, "trust" conveys "…assured reliance on the character, ability, strength, or truth of someone or something," or "one in which confidence is placed."[64]



*Figure 18. CPFB00081 - Orijen Regional Red packaging, rear panel.*

140.    In my experience, Champion's "Trusted Everywhere" claim is likely to be believed by consumers (despite the fact no empirical evidence supporting that claim appears anywhere on its packages or on its website) because it is, in essence, it is an implied endorsement. Third-party endorsements are highly valued by consumers. Claiming that its products are "trusted everywhere" suggests that Acana and Orijen are favored by tens (if not hundreds) of thousands of dog lovers across the globe. As previously discussed, pet parents who opt for premium-priced dog foods are acutely concerned with quality. "Trusted Everywhere" not only conveys a quality message, it also sends a strong signal that adds credibility to the validity of the other claims on its packages, including the Challenged Claims.

---

[64] https://www.merriam-webster.com/dictionary/trusted. (last visited Feb. 19, 2021)

141.    It is evident to me that Champion is well aware of the power of the word "trust." According to Keith Arnold, the manager of Champion's DogStar kitchen in Auburn, Kentucky, "Our vision for Champion Pet Foods is to be trusted by pet lovers worldwide. When you say it fast, you really don't get it. It's really three very specific words. Trusted by pet lovers worldwide. When you say it that way, it means a lot more. Let me explain. Everyone expects, when you buy food, that it's going to meet their expectations, but things happen. The way to earn trust is to exceed expectations. So, that's what we set out to do every day in everything that we do. To never disappoint, to never let our customers down, to never in any way make them wonder if they're buying the best pet food in the world or not, and our job, our mission, is to make sure that never happens. I think that's how we earn and maintain trust…" [65]

142.    In my experience, one of the ways marketers earn and maintain trust is to live up to the statements they make in their advertising, which of course includes their packaging claims. In fact, during my many years in the advertising agency business, it was standard operating procedure to have our in-house or outside counsel review the substantiation for every claim we made in the ads and commercials we created before submitting them to the client for approval. We followed the Federal Trade Commission's "Fundamental Rules For Advertising," which state "Tell the Truth. Advertisers can't mislead consumers about the benefits of what they're selling. That's true for both what they say in an ad and what they imply in the ad." The Rules further state, "Tell the Whole Truth. Advertisers can't leave out information to create the impression that the claims are

---

[65] CPF0216726 at -6731.

true, if including the missing information would make the claims false."[66] Potential legal

consequences aside, in my experience consumers are loath to forgive advertisers that

misrepresent their own product.

### *THE "NOURISH AS NATURE INTENDED" CLAIM*

143.    The "Nourish as Nature

Intended" Claim appears directly under the

brand name on the front surface of the

Orijen Regional Red package. In my

opinion this claim adds context and

supports the Challenged Statements





Figure 20. Detail from Orijen
package

Figure 19. CPFB00082 - Orijen Regional Red
packaging, front panel.

"Biologically Appropriate" and "Fresh

Regional Ingredients" as it communicates "natural," an attribute which, as previously

discussed, is often sought out by today's consumers.

---

[66] https://www.consumer.ftc.gov/sites/default/files/games/off-site/youarehere/pages/pdf/FTC-Ad-Marketing_Whole-Truth.pdf (last visited Feb. 19, 2021).

### E. FROM A MARKETING STANDPOINT, THE CHALLENGED STATEMENTS CONVEY THE SAME MESSAGE TO CONSUMERS, i.e., THAT THE PRODUCTS ARE "BIOLOGICALLY APPROPRIATE™," NATURAL, AND MADE WITH FRESH INGREDIENTS SOURCED FROM LOCAL SUPPLIERS




*Figure 21. Detail from Orijen Regional Red package, CPF0001912*

*Figure 22. Acana Free[Run Poultry package, CPFB00033.*

144.    It should be noted that some of the contextual statements are expressed slightly differently on Champion's Orijen packages then they are on its Acana packages (e.g., "Ingredients We Love People We Trust" on the Acana packages; "Ingredients We Love From People We Know and Trust" on the Orijen packages). In my opinion these slightly different sets of words convey the identical superiority message to consumers, i.e., that the products are "made with fresh ingredients and sourced from local, trusted suppliers.

145.    I have approved a lot of copy over the years intended to embellish a preceding headline. I would have accepted either of these copy lines as an appropriate way to convey the message that "Biologically Appropriate™" is shorthand for a formulation based on the idea that the best foods for dogs are those that emulate the way canines in the wild lived and hunted and ate. In my opinion a reasonable consumer would not see anything meaningfully different in these two statements. The same applies to the copy that follows

55

the "Fresh Regional Ingredients" claim that appear in Figures 21 and 22 as well. It is my understanding that the package images I reviewed were provided to Plaintiff's counsel through the process of discovery. My review included packages for each diet produced in 2016 at DogStar, including updated packaging for Acana Heritage and Acana Singles from DogStar that were introduced in 2018. The new Acana Heritage and Acana Singles packaging continues to use all of the Challenged Statements, although the copy that follows the claim itself has been simplified. In my opinion, those simplified messages would in no way change the clear meaning of the challenged claims.

## VIII. PET PARENTS WOULD OBJECT TO THE PRESENCE OR POSSIBLE PRESENCE OF HEAVY METALS, BPA, PENTOBARBITAL, NON-FRESH INGREDIENTS AND NON-REGIONAL INGREDIENTS IN CHAMPION'S DOG FOOD PRODUCTS

146.    As previously discussed in the credentials section of this report, I have played a significant role in the development and execution of advertising campaigns for more than thirty packaged foods products, including dog food, seventeen national and regional restaurant chains and three of the largest supermarket operators in America. Many of the marketing studies and surveys I reviewed, as well as the personal interviews I conducted and focus group sessions I observed related to those food advertisers. In my experience most consumers care greatly about the healthiness and safety of the foods they consume, as well as the foods their pets consume. That is why I am of the opinion that pet parents would object to the presence of heavy metals, BPA, non-fresh and non-regional ingredients and the possible presence of pentobarbital in the Champion Products at issue in this case.

56

147.    If Plaintiffs' allegations regarding the presence of heavy metals and non-fresh and non-regional ingredients in the Challenged Products prove to be true, that alone would indicate to me that the packaging as a whole is misleading and deceptive.

## A.  PRESENCE OF HEAVY METALS

### *Consumers are Concerned About Heavy Metals*

148.    Superiority, health, ingredient quality and safety issues nearly always came up at the focus group sessions I observed for packaged food products, as well as sessions devoted to discussions regarding fresh meats, poultry, fish, seafood and produce (important sales areas for my supermarket clients) and my fast food system clients. While the consumers at these sessions most certainly were not experts, media reports had made them both aware and wary of certain toxic substances or unnatural chemicals, including heavy metals, each of which consumers perceive to possibly pose safety or health risks to themselves and their pets. Although lead has received the majority of media attention, consumers would similarly be wary of and object to the presence of other heavy metals in premium priced dog food.

149.    For example, in one of its many follow-up stories regarding the Flint, Michigan lead poisoning scandal, *60 Minutes* reported on March 15, 2020 and again on July 7, 2020 that "Early Results from 174 Flint Children Exposed to Lead During Water Crisis Shows 80% of Them Will Require Special Education Services."[67]

150.    On January 23, 2020, the ABC network affiliate in Washington DC reported on a national study that raised alarms about arsenic, lead and other heavy metals in baby

---

[67] 60 Minutes, March 15, 2020. https:///www.cbsnews.com/news/flint-water-crisis-effect-on-children-60-minutes-2020-03-15 (last visited Feb. 19, 2021).

food. The report included an interview with Suzanne Price, who owns a baby boutique in San Francisco. "Instead of nursery rhymes, you'll find warnings about pesticides and toxic chemicals painted on the walls of her [store]. The mom of two daughters isn't trying to scare new parents. Instead, she says her goal is to help educate them about what could be in the products they're considering for their children and offer healthier alternatives her staff has thoroughly researched."[68] I was particularly impressed by this article because it demonstrates the lengths to which an ethical company will go to help its customers make informed purchasing decisions, which I find admirable.

151.    Pet parents, of course, are subjected to the same bad news stories as all other consumers. Thus, they are frequently exposed to news bulletins or articles that address heavy metals, which may have the potential to harm their pet or compromise their nutrition. And a plethora of stories about problematic products for pets that contained heavy metals have been available to the professional veterinary community for many years as well.

152.    The presence of lead in certain dog toys has been widely publicized. For example, a 2007 *New York Times* article by Andrew Adam Newman was headlined, "For Pet Owners, Too, Toys a Reason for Concern." The article stated, "After the pet food contamination this year, which is believed to have caused the deaths of at least 300 dogs and cats, and a spate of children's toy recalls, which highlighted the problem of lead in products from China, pet owners have been stepping forward to ask: How safe are pet toys?"[69]

---

[68] WJLA TV, Washington DC. "National study raises alarm about arsenic, lead and other heavy metals in baby food." https://wjla.com/news/spotlight-on-america/national-study-raises-alarm-about-arsenic-lead-and-othe-heavy-metals-in-baby-food.

[69] *New York Times*, December 22, 2007. For Pet Owners, Too, Toys a Reason for Concern.

153.    One answer to that question was provided by Consumer Affairs.com President James R. Hood, who was cited in the *Times* article referenced above. He pointed out that there may even be a risk to pet owners and their children who come into contact with toys containing lead that their dogs have been slobbering on. "A lot more lead will come off something when its wet and it has been partially digested in a pet's mouth." "There should be standards to protect humans first, and we need to find out what level is safe in this application."[70]

154.    No newspaper – not even *The New York Times* – has unlimited space. One of the criteria used by newspaper editors to decide what articles to run (or not) is its relevancy to its readers. In this instance, it is evident that the *Times'* editors believed that its readers would be concerned about the presence of heavy metals in products that might endanger their dogs or in some way their family members.

155.    In 2008, Oakland California's Center for Environmental Health published a report by Caroline Cox, the organization's research director, headlined "Not for our Best Friends! Lead in Dog Accessories." The report's introduction started with these words: "Lead is a stunningly toxic metal. A long list of problems has been linked to lead exposure: lowered intelligence, behavior problems, cancer, strokes, high blood pressure, kidney problems, anemia, cavities and delayed puberty."[71]

156.    A 2016 article posted on the Safety First Pet Products (a consumer pet products company) website was headlined, "Beware of Lead and Toxic Dog Toys, Be

---

https://www.nytimes.com/2007/12/22/business/22pettoys.html?searchResultPosition=3 (last visited Jan. 29, 2021).

[70] *Id.*

[71] CEH report, "Not For Our Best Friends!" June 2008, available at http://healthdocbox.com/Add/68320687-Not-for-our-best-friends-lead-in-dog-accessories.html (last visited Feb. 19, 2021).

Proactive In Monitoring What Goes In Your Dog's Mouth." The article went on to say, "What amount of lead should be allowed in the toys dogs lick, chew, slobber on and even shred? Do toys with relatively high levels pose any harm to our best friends?" It also reported on tests run by a Michigan-based organization that found that of "…the more than 400 pet products tested, 45 percent had detectable levels of one or more hazardous toxins, including arsenic, chlorine and bromine," and "…of the tennis balls tested, 48 percent contained detectable levels of lead."[72]

157.　This article also cited comments by Jeff Gearhart, research director at the Ecology Center. "For lead, the standard that applies for children's toys is appropriate for pets," Gearhart says. "I'd say the standard for children's products should at least be a starting point for those levels." And Dr. Safdar Kahn, a veterinary toxicologist with the ASPCA cited in the article supports similar guidelines. "Dogs are part of the family," says Dr. Kahn, who is director of Toxicology Research at the ASPCA Animal Poison Control Center. "They are as important as our kids or other family member. And if we feel that way about them, then we should give them things that won't affect their health.[73]

158.　*Preventive Vet* describes itself as "…a collective of veterinarians made up of general and emergency practitioners, board-certified surgeons, oncologists, behaviorists and other specialists, as well as respected trainers and other devoted pet lovers." Its website, preventivevet.com, provides "…information, educational resources, tips and advice for

---

[72] Lisa McCormick, The Bark, Safety First Pet Products website article, "Beware of Lead and Toxic Dog Toys," 5/5/2016. https://sitstayforever.com/blog/-beware-of-lead-and-toxic-dog-toys-be-proactive-in-monitoring-what-goes-in-your-dogs-mouth-/ (last visited Feb. 19, 2021).

[73] Lisa McCormick, The Bark, Safety First Pet Products website article, "Beware of Lead and Toxic Dog Toys," 5/5/2016. https://sitstayforever.com/blog/-beware-of-lead-and-toxic-dog-toys-be-proactive-in-monitoring-what-goes-in-your-dogs-mouth-/ (last visited Feb. 19, 2021).

people who want the best possible life for their cats and dogs." Its January, 2020 web posting featured an article headlined "How to Find Non-Toxic Dog Toys and Tell if a Toy is Safe," which reported that 45 percent of pet toys tested had detectable levels of one or more hazardous toxins, including arsenic, chlorine and bromine." 48 percent contained detectable levels of lead, and about half of the products tested had lead levels higher than the allowable standard for children's toys.[74]

159.    One of my former clients is The Home Depot, which spends hundreds of millions of dollars each year on advertising. I personally observed many focus group sessions at which products sold at The Home Depot were discussed, including at least a dozen sessions devoted to the subject of house paint, a very important category for them. As is typical at focus groups, the discussion sometimes veered somewhat off-course, especially when one or more of the participants felt it important to share his or her personal experiences or expertise with the group. At the paint sessions, the subject of lead poisoning invariably came up when one or more participants warned the group about the risk of chipping away old paint that might be lead-based, especially on homes built before 1978. Looking back at those sessions, which would have taken place between 1997 and 2002, it is evident to me that the toxicity of lead was already common knowledge among the do-it-yourself homeowners who participated at that time. Given the extensive coverage of the dangers posed by lead since then (e.g., Flint), it is very likely that consumer concern regarding the dangers of lead, and aversion to its presence in food (including dog food), would be even greater today.

---

[74] https://www.preventivevet.com/dogs/how-to-find-safe-non-toxic-dog-toys (last visited Feb. 19, 2021).

160.    I have reviewed documents that evidence Champion's awareness of consumer concerns over the possible presence of heavy metals in its products. For example, a series of internal e-mails from 2013 demonstrates Champion's awareness of consumer concerns about the possible presence of heavy metals such as mercury in its products. Instead of educating consumers, Champion withheld the amounts of mercury in its products from inquiring consumers. On April 17th of that year Christine Pendlebury, then Champion's Health and Nutrition Manager, e-mailed four of her colleagues writing, "Just receive (sic) the mercury / heavy metal testing back from that lot and it is 10x below the maximum tolerable limits for dietary chronic exposure to mercury. Don't really want to give the values out to the customer or retailer as they may read the results as though our diets contain mercury and are dangerous. I have included the results on this email but please do not publish these values at this time."[75]

161.    . In a February 2016 e-mail to Champion's Ingredient Sourcing group, Bonnie Gerow, its Customer Care Manager wrote, "We're beginning to receive questions regarding particular ingredients used in our DogStar Kitchen. In order to develop FAQ's for our internal teams as well as our consumers, can I ask a few questions?... In regards to our wild caught and farmed fish, do we test for heavy metals? Do we do the testing, our suppliers, audits, etc."[76]

162.    A July 2016 e-mail from Champion's Customer Care department to a customer named Randy is illustrative of how it responded to a customer query regarding Mercury and other heavy metals. Champion's consumer asked, "what is the process used to ensure the heavy metals are processed out of the food?" Champion responded

---

[75] CPF0066047.
[76] CPF1716566.

"Monitoring heavy metal levels is a critical control point for us, and part of our HACCP program includes testing for heavy metals. Our fish is tested for all heavy metals including mercury."[77] This consumer, like others, reasonably expected that Champion would ensure that heavy metals are processed out of the food.

163. Based on these emails, consumers purchasing Champion's Products expressed concern over purchasing dog food that contained heavy metals and wanted to confirm that Champion tested its dog food and ingredients for heavy metals.

### *Champion Knows that the Presence of Heavy Metals is Inconsistent with Champion's Packaging Statements*

164. It is not my responsibility to determine whether Plaintiffs' allegations regarding the issue of testing for the presence of heavy metals (or the actual presence of heavy metals) in Champion's Products are or are not correct. But as a marketing expert, I firmly believe that should Plaintiffs' allegations on this issue prove to be correct most consumers would find that information both distressing and incompatible with Champion's brand image and statements.

165. In my opinion, consumers would not believe it appropriate for a product positioned as "Biologically Appropriate™" to contain heavy metals. Consumers understand "Biologically Appropriate ™" to mean that Champion is a healthy, natural dog food, while heavy metals are perceived by consumers to have health risks for dogs.

166. Further, Plaintiffs' allege "Defendants' Packaging Claims of Biologically Appropriate and "Fresh Regional Ingredients" were misleading based on Defendants' failure to adequately test for Heavy Metals, which resulted in the Contaminated Dog Food

---

[77] CPF2074069.

containing and/or having a material risk of containing Heavy Metals that were insufficiently monitored."[78]

167.    The customer complaints that prompted the e-mails cited in paragraphs 160 and 161 as well as those described below tell me that Champion had knowledge that the presence of heavy metals in its products, even if they met industry safety standards, was inconsistent with its packaging claims. I do not believe that a reasonable consumer would see mercury, or for that matter any other heavy metal, as a "fresh regional ingredient."

168.    In a 2013 e-mail to Champion's Customer Care Department, Martina Ralie, a Resident Assistant Professor in the Department of Biochemistry and Molecular Biology at the Oregon Health and Science University wrote, "We found high levels of heavy metals in your Orijen Senior dog food as well as Acana Lamb and apple recipe." "I totally believe that you are below the NRC guidelines, however I find these levels untolarable (sic) high and am considering more tests. I don't understand why a responsible company like yours would want to stay under the EPA recommendations. Or better yet, why not comply with human grade heavy metal levels? I am honestly puzzled how THAT much heavy metal can even get into the dog food…"[79]

169.    In an e-mail to Michelle Granger dated May 2, 2017, Jessica Mercredi, a Content and Community Specialist at Champion, reported on postings from two consumers, both of whom raised concerns about heavy metal content in Defendants' products. "Heather Stanton (who has publicly stated on CLP's page she's switched brands to Stella & Chewys): …the facts are this: orijen (sic) says they use human grade products so heavy metal figures of what they send out in their pet food should be compared to epa

_____

[79] CPF0066547.

(sic) and who (sic) human levels. Period." And "Alice in Wonderland" wrote, "I don't care about NRC limits for animals. Could a human safely consume this food twice a day, every day, for 10-14 years? No. These levels are too high for everyday human consumption, but you think it's fine for our pets?! I thought I was paying premium prices for human grade food. If all the meats and produce you use are human grade, where are these contaminants coming from?!"[80]

170.    About a month later, Bonnie Gerow, Defendants' Customer Care Manager, sent a lengthy e-mail to a number of colleagues including Peter Muhlenfeld asking "...where are we with the White Paper for this? It would be helpful to have this info available." The "this" appears to be how to best respond to questions raised by consumers and journalists regarding heavy metal levels in Champion's Products. The e-mail included this excerpt from a message received by Champion from a journalist: "But that doesn't take away the fact that Orijen and Acana seem to contain way more toxins like arsenic and lead than the average kibble....I'm going to write about the Clean Label Project, and I know many people will get upset and frustrated and wouldn't want to feed Acana or Orijen anymore. Even though it is below the NRC limits...By the way, why is there any lead and arsenic in Orijen's pet foods..."[81]

171.    Another internal e-mail (dated May 9, 2017) from Bonnie Gerow to Champion's R&D Manager Sarah Brown and Food Safety Director Gayan Hettiarachchi included this complaint from a customer: "Why is Orijen so high in heavy metals in comparison to others? That is the question that has not been answered. These are pretty dismal results given the very high price that Champion charges for its food. My last dog

---

[80] CPF1758303.
[81] CPF0209796.

lived into her 17th year on Eukanuba. Why should I pay that much more for your product when it obviously has some serious issues compared to many of its competitors?"[82]

172.     These concerns expressed by consumers supports my opinions that the presence of heavy metals is perceived by consumers is inconsistent with Champion's packaging statements.  In addition, these consumers confirm that they reasonably expected Champion to hold itself to a higher standard regarding the presence of heavy metals, which Champion failed to do. Simply put, consumers view the presence of heavy metals as problematic in dog food and would not expect to find heavy metals in premium priced dog food.

173.     **In short, in my opinion consumers would perceive the presence of heavy metals in Champion's Products as inconsistent with the Challenged Statements.**

## B. PRESENCE OF BPA

### *Consumers are Concerned about the Presence of BPA*

174.     As is true of the media's coverage of heavy metals in food products, much has also been reported about BPA. Over the course of the past dozen years a number of states have proposed to ban the use of BPA in children's products, including plastic infant bottles, and a number of manufactures have agreed to abandon the use of the chemical in their products.[83]

175.     A January 2019 article online posted by Marina Martinez titled "What Pet Lovers and Guardians Must Know," referenced the results of the same study, which revealed "…scary results after testing thousands of pet food products, from 80 top-selling

---

[82] CPF0190994.

[83] EWG (The Environmental Working Group) article, "Timeline: BPA From Invention to Phase-Out," April 2008; updated March 2011.

brands, for over 130 toxins and industrial contaminants. According to their findings, some dog and cat food products we find in stores have 980 percent more BPA than a can of chicken soup – a chemical that's usually used in plastic materials and sometimes found in packaged food in "controlled" levels." Further, the article states "In terms of quality and healthiness, the so-called premium pet foods are not necessarily better. They are as much likely to have unknown and potentially dangerous ingredients as any other store-bought pet food. That's because premium labels and its "eye-catching" claims of healthy/natural/organic/gluten-free (you name it) foods are not legally valid, and most times the advertised nutritional benefits are not scientifically proven."[84]

176.    These media articles above evidence that consumers are becoming increasingly concerned about the presence of BPA in consumer goods, including dog food.

### *Champion Knows that the Presence of BPA is Inconsistent with the Challenged Statements*

177.    Documents produced by Champion through the discovery process clearly indicate that it was aware that consumers and other interested parties would be concerned about the possible presence of BPA in its products. For example, on March 17, 2016, Chinedu Ogbonna sent an e-mail to a number of Champion colleagues, including both Gayan Hettiarachchi and Peter Muhlenfeld, alerting them BPA had been added to the California Proposition 65 list of chemicals known to cause cancer. He concluded his e-mail by writing, "We also anticipate questions related to this compound [BPA] from some consumers."[85]

---

[84] https://medium.com/@MarinaTMartinez/pet-foods-contamination-mislabeling-and-damages-72695957a857 (last visited Jan. 19, 2021).

[85] CPF0099579.

178.    However, questions regarding the possible presence of BPA were received by Champion's Customer Care department as early as 2011. For example, on April 19, 2011, Jessica Peralta, whose e-mail address indicates she is a journalist, asked "Do your food containers/bags contain BPA or other potentially harmful materials?"[86] A month earlier Ms. Peralta had asked "Is it [Champion's Products] screened for chemicals like mercury?" [87]  A consumer named Suzanne Mets wrote on April 30, 2012, "I was wondering what plastics are used in your bags? With all the concerns about BPA, PFC and other chemicals in our food packaging, I wanted to ensure my dog's food is arriving in non-toxic packaging…"[88]

179.    The concern expressed by the consumers above support my opinions that the presence of BPA is perceived by consumers as inconsistent with Champion's packaging statements. Consumers would perceive BPA to be unnatural, not found in "Fresh Regional Ingredients," and not Biologically Appropriate.   Simply put, consumers view the presence of BPA as problematic in dog food and would not expect to find BPA in premium priced dog food.

180.    **In short, in my opinion consumers would perceive the presence of BPA in Champion's Products as inconsistent with the Challenged Statements.**

## C. POSSIBLE PRESENCE OF PENTOBARBITAL

### *Consumers are Concerned about even the Possible Presence of Pentobarbital*

181.    In their Third Amended Class Action Complaint, Plaintiffs allege "Defendants knew or should have known that the Packaging Claims on their Red Meat

---

[86] CPF0060579 at -0580.

[87] CPF0060579.

[88] CPF0063146.

diets were misleading to consumers because Defendants failed to monitor and test their ingredients and the Contaminated Dog Food do for the presence of pentobarbital and/or the material risk of containing pentobarbital."[89]

182.    I have learned that "Pentobarbital is a barbiturate that slows brain and nervous system activity. [It] is used short term as a sedative to treat insomnia, or to cause you to fall asleep for surgery. Pentobarbital is also used as an emergency treatment for seizures."[90] "[It]… is most commonly used as a sedative, anesthetic or to euthanize animals. Pets that eat pet food containing pentobarbital can experience drowsiness, dizziness, excitement, loss of balance, nausea, nystagmus (eyes moving back and forth in a jerky manner) and inability to stand. Consuming high levels of pentobarbital can cause coma and death."[91] I recently learned that the federal government is now using a high dose of pentobarbital to execute prisoners convicted of capital crimes.[92]

183.    A quick Google search demonstrated to me that consumer concern regarding the risks posed by the possible presence of pentobarbital. The list that follows are articles that appeared on the first page of search results:

- "FDA Alerts Pet Owners About Potential Pentobarbital Contamination…(fda.gov)"

---

[89] Third Amended Class Action Complaint ¶13(e).

[90] https://www.drugs.com/mtm/pentobarbital-injection.html#:~:text=Pentobarbital%20is%20a%20barbiturate%20(bar,an%20emergency%20treatment%20for%20seizures (last visited Feb. 19, 2021).

[91] Susannah Cullianane, *Dog food brands recalled over possible euthanasia drug*, CNN (Feb. 18, 2018), https://www.cnn.com/2018/02/18/health/dog-food-pentobarbital/index.html (last visited Feb. 19, 2021) (quoting FDA, *FDA Alerts Pet Owners About Potential Pentobarbital Contamination* (Feb. 16, 2018), https://www.fda.gov/animal-veterinary/outbreaks-and-advisories/fda-alerts-pet-owners-about-potential-pentobarbital-contamination-canned-dog-food-manufactured-jm).

[92] *Los Angeles Times*, July 15, 2020, Page A10.

- "Dog food brands recalled over possible euthanasia drug (cnn.com)," "Pentobarbital in Pet Food (thebark.com)"

- "FDA: Pet food supplier knowingly pushed out food…(wjla.com)," "How Does a Euthanasia Drug Keep Ending Up in Dog food? (gizmodo.com)"

- "Did More Pentobarbital Poisoned ingredients go to Pet Food…(truthaboutpetfood.com)"

- "Pentobarbital continues to 'dog' pet food industry…(foodsafetynews.com)"

- "How Did This Euthanasia Drug Get Into Pet Food? (dogsnaturallymagazine.com)"

- "Rendering facility warned by FDA for pentobarbital risk (petfoodprocessing.net)"

- "FDA Warning: Euthanasia Drug Found in Wet Dog Food (webmd.com)"[93] The search results on the pages that followed listed similar stories, including "Dog Deaths Now Linked to This Pentobarbital Tainted Food (healthypets.mercola.com)."[94]

184.    I have never personally observed a focus group or interviewed a consumer in which the chemical pentobarbital was discussed, though my limited understanding of the dangerous nature of that substance leads me to believe that consumers would react very negatively to the presence of that chemical in anything they ate or their cherished pets consumed. This would be especially true if the source of pentobarbital in dog food is, as I understand it to be, meat tallow derived from animals that had been euthanized.

---

[93] https://www.google.com/search?rlz=1C1CHBF_enUS769US769&ei=010DX7mfOIjN0PEPi8i9iAU&q=pentobarbital+in+dog+food&oq=pentobarbital+in&gs_lcp=CgZwc3ktYWIQARgHMgIIADICCAAyAggAMgIIADICCAAyAggAMgIIADICCAAyAggAMgIIADoECAAQRzoECAAQQzoFCAAQkQJQmENY40dg62loAHABeACAAWiIAZACkgEDMi4xmAEAoAEBqgEHZ3dzLXdpeg&sclient=psy-ab (last visited Feb. 18, 2021).

[94] https://www.google.com/search?q=pentobarbital+in+dog+food&rlz=1C1CHBF_enUS769US769&ei=ZWEDX4j5CYbu-gS755foAQ&start=10&sa=N&ved=2ahUKEwjIv4enlbnqAhUGt54KHbvzBR0Q8NMDegQIDRA_&biw=656&bih=616 (last visited Feb. 18, 2021).

185.    On February 3, 2017 Evanger's Dog & Cat Food Co. announced a recall of specific production lots of its Hunk of Beef au Jus canned dog food after pentobarbital was confirmed in samples of the product.[95] Ten days later another dog food company, Against the Grain, was forced to recall a shipment of one of its products due to pentobarbital contamination as well.[96] Both of these events were widely publicized. This led to consumers contacting Champion raising questions about the possibility of pentobarbital being present in its dog food products. On February 24, 2017, Champion's Customer Care Manager sent an e-mail to Gayan Hettiarchichi, Peter Muhlenfeld, Chinedu Ogbanna and three other company executives reading, "With everything that has happened recently with the Evangers and Against the Grain recalls we are getting requests for information from our pet lovers and I need some help. Questions include: (1) Do we use the same beef supplier as Evangers - we don't have any info on who the supplier was, Chin any progress on finding out? (2) Is there a difference in how a USDA-APHIS inspected supplier would process meats in comparison with our Category 3 or are they the same thing?; (3) If they are the same thing, how can we be confident that our ingredients will not contain pentobarbital?"[97] This tells me that Champion was well aware that consumers were concerned about the possible presence of pentobarbital in its products.

186.    But I have also seen evidence that Champion's consumers were concerned about the use of dead or diseased animals such as those euthanized by pentobarbital in its products as early as 2009. For example, this exchange of e-mails between a consumer and

---

[95] https://efoodalert.com/2019/06/03/evangers-pentobarbital-recalls-a-peek-behind-the-curtain (last visited Feb. 18, 2021).

[96] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/against-grain-pet-food-voluntarily-recalls-one-lot-pulled-beef-due-potential-adulteration (last visited Feb. 18, 2021.)

[97] CPF1748144.

Champion's Customer Service department took place on November 25th of that year: Question: "Thank you very much. Does this also include the deceased matter of other animals? We have read that pet-owners who had to put down their animals (may it be due to disease or natural -age - causes) which are then recycled into pet-food? Thank you for all the valuable information." Answer: "No problem! No, there are no diseased animals, dead pets or road kill in our pet food. Again, all of the meat, fish eggs, poultry etc. that goes into ACANA or ORIJEN is passed as human grade by the Canadian Food Inspection Agency; the same Agency that regulates the food you buy for yourself in the grocery store."[98]

187.    On January 24, 2011 "Rob" asked Champion's Customer Care department (by e-mail)_ "…I would like to ask a few questions regarding your chicken & turkey meal. What parts of the animals do you use to make your meal? Does it contain any 4-D animal products? What is your process of making meal? Do you use high temperatures when making the meal? Is your meal fit for human consumption?"[99] This shows that Defendants' had notice that their customers were concerned about 3D and 4D (dead, dying, diseased or disabled) animals. A related question was sent to Champion in September 2011: "It is my understanding that 4D animals (dead, dying, diseased or disabled) are allowable chicken meal ingredients. Can you tell me if your meals include 4D animals and if not, how you ensure that this is the case?"[100]

---

[98] CPF2003890.

[99] CPF0060100.

[100] CPF1160820 at -0821.

188.    On May 8, 2018 Champion learned that three shipments of beef tallow delivered by their supplier were contaminated with pentobarbital.[101]

### *Champion Knows that the Possible Presence of Pentobarbital is Inconsistent with the Challenged Statements*

189.    In my opinion, consumers would see the presence of – or even the possibility of the presence of – pentobarbital as inconsistent with Champion's claims that its products are "Biologically Appropriate$^{TM}$," "Fresh and Regional" and natural.

190.    I believe consumers would view the possible presence of a drug used to euthanize animals and execute humans in an ingredient used by Champion is inconsistent with its "Biologically Appropriate$^{TM}$" claim

191.    Consumers would be offended if they understood that Champion's "Fresh Regional Ingredients" included beef tallow, a non-fresh ingredient with a risk of being contaminated with pentobarbital, in its products.

192.    Further, the possible presence of an unnatural contaminant, like pentobarbital, would raise questions as to whether Champion sells natural dog food consistent with its natural packaging statement.

193.    **In short, in my opinion consumers would perceive even the possible presence of pentobarbital in Champion's Products as inconsistent with the Challenged Statements.**

---

[101] https://www.foodsafetynews.com/2018/11/pentobarbital-continues-to-dog-pet-food-industry-tainted-beef-tallow-prompts-recall/#:~:text=On%20May%208%20Champion%20Petfoods,sick%20or%20fatally%20injured%20animals (last visited Feb. 18, 2021)

## D. PRESENCE OF NON-FRESH REGIONAL/LOCAL INGREDIENTS

### *Consumers are Concerned about Non-Fresh and Non-Regional/Local Ingredients*

194.    As previously discussed, fresh, regional ingredients are desired by consumers, especially by those willing to pay a premium for products that deliver on that claim. Consumers would find the presence of ingredients that are not fresh and not regional or local as problematic and inconsistent with the Challenged Statements and Champion's contextual product imagery. Calls and e-mails received by Champion regarding the source of the ingredients in its products demonstrate the importance to consumers of Defendants' "Fresh Regional Ingredients" claim.

195.    For example, this e-mail came into Champion's Customer Care department on November 28, 2011: "Hello, You say you buy your meat from local farms. Does this mean local family farms or local factory farms of local family owned factory farms. I am very big into fear hormones being released into the meat supply and would like to switch my cats to a food that the meat is from happy animals. Do you have an example/picture of a farm?"[102]

196.    On December 6, 2011, a customer named Lisa Driscoll e-mailed with a question regarding the use of U.S. ingredients at Champion's NorthStar facility in Canada, which would have been inconsistent with its "regional" and "local" ingredients claim. "I found an online document that states your poultry ingredients are sourced from within the USA …. This is quite concerning to me as your company states all of its ingredients are 'regional' and 'local' …. I would like to know if your company has an explanation for this misleading information."[103]

---

[102] CPF2008170 at -8171.
[103] CPF1941121.

197.    Champion received these emails because consumers are concerned and interested in confirming that Champion does in fact use regional or local ingredients in its dog food.

### *Champion Knows that the Non-Fresh Ingredients is Inconsistent with the Challenged Statements*

198.    In its Third Amended Class Action Complaint Plaintiffs' allege that "Defendants knew that their representations about the Contaminated Dog Food were false because the Contaminated Dog Food contained and/or had a material risk of containing the following non-conforming ingredients [] (b) a material amount of non-fresh ingredients, including regrinds."[104] I have learned that regrinds is a low quality, non-fresh, and overcooked ingredient that was commonly used in Defendants' products.

199.    In my opinion, the use of regrinds, as well as any other non-fresh ingredient, are also inconsistent with Champion's "Fresh Regional Ingredients" claim, and that its use of non-fresh ingredients would be material to consumers.

200.    Until becoming involved in this case I never heard of the use of "regrinds" in the production of packaged food products. In fact, had I not read Plaintiffs' Complaint, I doubt I could have defined the term, at least in this context.

201.    According to Merriam-Webster, one of the definitions of the word "fresh" is "not stale, sour, or decayed," a second is "not altered by processing," and a third is "free front taint: Pure." In my experience, a reasonable consumer would be comfortable with any or all of those definitions, as "fresh" is one of those words that is commonly used every day and thus clearly understood. The fruits and vegetables sold by my supermarket clients were all promoted as "fresh," as were their meats and fish and other sea foods. In fact, the

---

[104] Third Amended Class Action Complaint ¶243.

more successful we were at persuading consumers that our supermarket clients had the "freshest" produce and meats, the more business they did (so long as their grocery items were competitively priced). Consumers know what fresh means. In my opinion, no consumer would consider a regrind ingredient "fresh" – assuming they were made aware of the presence of regrind ingredients and understood what regrinds were.

202.    Further, if Plaintiffs' allegations regarding the use of regrind ingredients proves to be true, in my opinion consumers would see that use as incompatible with Champion's claim that its products are made from "Fresh Regional Ingredients." If anything, I believe pet parents who regularly feed their dogs one of the products at issue would be horrified if Plaintiffs' allegation regarding the presence of salmonella in regrinds proves to be true.

203.    In my opinion consumers would also see Champion's alleged use of "refreshed ingredients" or "expired ingredients" or "frozen ingredients" to also be incompatible with its "Fresh Regional Ingredients" claim. Further, I do not believe consumers would consider "regrinds" or "expired ingredients" to be consistent with Champion's "Biologically Appropriate$^{TM}$" claim which, as previously discussed, it defines as "Prepared in our Kentucky DogStar® kitchens from fresh local ingredients," While consumers may not be familiar with the term "regrinds," they are highly likely to understand the commonly used terms, "expired, "refreshed" and "frozen."

204.    **In short, in my opinion consumers would perceive the presence of non-fresh ingredients in Champion's Products as inconsistent with the Challenged Statements.**

***Champion Knows that the Presence of Non-Regional Ingredients is***

***Inconsistent with the Challenged Statements***

205.    The specific claim being challenged by Plaintiffs is a phrase that in addition to "fresh" also includes the word "regional": i.e., "Fresh Regional Ingredients." I therefore think it appropriate to discuss what, in my opinion, most consumers would ascribe to the use of the word "regional" in that phrase.

206.    Merriam-Webster defines "regional" as 1) "affecting a particular region: LOCALIZED;" and 2) "of, relating to, characteristic of, or serving a region."[105] In my experience, most consumers have a very clear idea of what "regional" means; they would use it as a synonym for "local."

207.    Thus, Champion's claim "Fresh Regional Ingredients" communicates an "extra fresh" message that I believe most consumers would find compelling, as they are likely to assume that ingredients sourced from a farm or ranch near Champion's manufacturing facility must be, as the oft-used advertising cliché goes, "fresher than fresh!"

208.    In a document titled "Project Morningstar – Due Diligence Call," Champion's response to the question, "Can you please elaborate on the definition of "regional," makes it evident that Defendants' fully understood that the presence of non-regional ingredients in their products was inconsistent with their "Fresh, Regional Ingredients" claim:

> Regional basically means a named area where our ingredients come from. Originally, this term meant that we had a strong focus on sourcing ingredients from our local region and our fresh regional ingredients were required to be from the local region due to the

---

[105] https://www.merriam-webster.com/dictionary/regional; emphasis as displayed in source (last visited Feb. 18, 2021).

"fresh" definition in #8. As we have grown, we have expanded our "regional" definition to mean that we source our ingredients from a named region, with a key focus being the region nearest our kitchens, but in the absence of a good quality source, would be expanded to the highest quality source available internationally - primarily Europe or New Zealand and Australia. We have recently considered changing this definition in our BAFRINO names as we have outgrown our ability to source from our local region. This said, the term still applies to our fresh ingredients which we focus on keeping at high percentages in our diets as these ingredients are fantastic quality and perform very well nutritionally and for palatability.[106]

209.    In the e-mail previously discussed in paragraph 77 that included a response to a series of questions posed by the editor of *Pet Insights*, Champion claimed that "Our ingredients are locally sourced from trusted ingredient suppliers in the Kentucky region."[107]

210.    But at his December 4, 2018 deposition, Peter Muhlenfeld was asked to count the number of times the word "regional" (and variants such as "regionally") appeared on the front and back of a package of one of the Champion Products at issue in this matter. His answer was "…10 or 11…" (if both gussets were counted). He was then asked, "So can you also tell me anywhere on the bag just one time where they say that some of the ingredients may come from an international supplier or Canadian supplier." His response was "Not on the package." [108]

211.    Further, the captions that accompany the photographs of the farmers, ranchers and fish providers displayed on the packages of the Champion Products at issue provide an extra level of support for Champion's "Fresh Regional Ingredients" claim.

---

[106] CPF1973904.

[107] CPF1720401. at -0402.

[108] Deposition of Peter Muhlenfeld, at 258:9-261:16.

Nearly all of the people in those photographs are identified as Kentuckians, the exceptions being suppliers of Atlantic fish. In my experience, a reasonable consumer would assume that the photographs of "Charles of Clark Farms in Lexington, Kentucky," "Brendan and Amie of Hoover Farms in Pembroke, Kentucky," or "Jonathan of JSW Farms in Libertyville, Kentucky," et al. were major suppliers of chicken, duck and beef, etc. for Champion. In my opinion, if Plaintiffs' allegations regarding the extensive use of imported ingredients or ingredients sourced from outside Kentucky are true, those images are deceptive, as a reasonable consumer would assume that each bag of dog food they purchased would include ingredients sourced from the suppliers portrayed on the package.

212.    According to Plaintiffs' Third Amended Class Action Complaint, "At all times during the Class Period, Defendants knew or should have known that their Packaging Claims were misleading because Defendants sourced many ingredients from non-local and non-regional ingredient suppliers, including international ingredient suppliers."[109]

213.    Per the Third Amended Class Action Complaint, "Defendants purchased, imported, and used the following non-regional ingredients for the Contaminated Dog Food: spray dried sardines from Peru, spray dried mackerels from Morocco, herring oil and herring meal from Denmark, salmon oil from Chile, duck meal and pork meal from the European Union, palatants and vitamins from China, turmeric from India, and large amounts of lamb, cattle, goat and mutton ingredients from New Zealand and Australia."[110] "Ingredients sourced from further than 100 miles from Defendants were neither regional nor local to Defendants."[111] "During the Class Period, Defendants sourced a majority of

---

[109] Third Amended Class Action Complaint, at ¶95.
[110] *Id.*, at ¶98.
[111] *Id.*, at ¶99.

their ingredients from non-regional ingredient suppliers. For example, in 2017, Defendants sourced about 70% of their ingredients from outside of Kentucky, with 25% sourced internationally."[112]

214. **In short, in my opinion consumers would perceive the presence of non-regional ingredients in Champion's Products as inconsistent with the Challenged Statements.**

215. As previously discussed, in my experience consumers are likely to view "Fresh Regional Ingredients" as a positive marketing statement and one that helps rationalize the premium price of the at issue products. The presence of non-fresh ingredients (i.e., regrinds and meats and other ingredients shipped in to Champion's Kentucky facility from as far away as China) would be seen as a negative by most consumers, and it would materially affect their interest in purchasing the products at issue.

216. Plaintiffs' Complaint includes a plethora of additional allegations regarding the products at issue that – if true – would likely result in consumers concluding that the products are not as superior as they claim to be – and perhaps, not superior at all.

217. **Based on the material discussed above, it is my opinion that pet parents have had access to many media reports regarding the dangers posed to themselves and their pets by the presence of heavy metals, BPA, and pentobarbital in pet foods, and would therefore be very concerned about the possible presence of those contaminants in the Champion Products at issue. Further, in my experience a reasonable consumer would be impressed by Champion's claim that its products were formulated with fresh and regional (i.e., local) ingredients, but that impression would**

---

[112] *Id.,* at ¶100.

be reversed if they were to learn that its products were mostly formulated with ingredients that were neither fresh or local.

## IX. DISCLOSURE THAT THE CHAMPION PRODUCTS HAD A RISK OF CONTAINING HEAVY METALS, BPA, PENTOBARBITAL AND INGREDIENTS THAT WERE NOT FRESH, LOCAL, OR REGIONAL WOULD ADVERSELY AFFECT CONSUMER'S WILLINGNESS TO PURCHASE THE PRODUCTS

218.    In my experience, when consumers are confronted with the harsh reality that a product they like and use is not all it seems to be, they react with their wallets and sometimes even through the courts. When consumers learned through press coverage that my former client American Suzuki's Samurai SUV was prone to roll-overs, annual sales plummeted from 68,000 to 12,000.

219.    Similarly, despite heavy discounting, Volkswagen's world-wide sales dropped 24.7 percent in November 2015, shortly after the emissions-cheating scandal that hit the company became public.[113]

220.    "Ads for Dannon's popular Activia brand yogurt landed the company with a class action settlement of $45 million in 2010, according to ABC News. The yogurts were marketed as being "clinically"" and "scientifically" proven to boost your immune system and able to help to regulate digestion. The Activia ad campaign, fronted by actress Jamie Lee Curtis, claimed that the yogurt had special bacterial ingredients. As a result, the yogurt

---

[113] https://www.usatoday.com/story/money/cars/2015/12/01/vw-volkswagen-emissions-scandal-sales-drop/76609404 (last visited Feb. 19, 2021).

was sold at 30% higher prices than other similar products. However, the Cleveland judge overseeing the case said that these claims were unproven."[114]

221.    As discussed above, Champion's Challenged Statements consistently convey the message to consumers that all of the products are "Biologically Appropriate[TM]" natural, and made with fresh ingredients sourced from local, trusted suppliers. Champion's packaging uniformly failed to disclose the presence of heavy metals, BPA, pentobarbital, non-fresh, and non-regional ingredients on all of Champions products.[115]

222.    A February 2018 e-mail from Kristina Obrovac, then the International Sales Administrative Assistant at Champion Petfoods LP, to Chinedu Ogbanna contains a laundry list of "issues" she noticed at a tour of Champion's NorthStar kitchen, which included bags of supplements the company claims not to use, "white tote bags filled with kibble marked as "Inedible," "White tote bags marked – regrinds," noting "…while not wrong it raises the question of how good is the quality of our foods if we add regrinds (already cooked food) back into the mix – essentially double cooking the ingredients. Our story says that we try to use as much fresh as we can, reprocessed ingredients loose (sic) taste and nutritional value," Fresh Meat totes with supplier stickers that indicate the meat does not come from a local supplier, and "flies flying around and landing on our visitors." During a visit to the DogStar kitchen she noted the presence of two ingredients – Dry egg

---

[114] https://www.businessinsider.com/false-advertising-scandals-2016-3#activia-yogurt-said-it-had-special-bacterial-ingredients-2 (last visited Feb. 19, 2021).

[115] While some of Champion's Products note some non-regional ingredient suppliers, such as New Zealand lamb, all of Champion's Products uniformly fail to disclose the presence of many other non-regional ingredient suppliers, such as the non-regional ingredients listed in paragraph 212 above.

and Hydrolyzed Poultry Protein Concentrate – that are "not listed on the ingredient deck."[116]

223.    In my opinion, consumers would be appalled if they knew the truth about the non-fresh ingredients noted by Ms. Obrovac, especially those that are demonstrably not "fresh and local" (e.g. regrinds, meat). As Ms. Obrovac noted, Champion's "story says that we try to use as much fresh as we can," yet Champion inconsistently uses regrinds that are "reprocessed ingredients" that lose "taste and nutritional value."

224.    Further, it is evident that there is not a practical way for consumers to learn about these omissions, which specifically contradict the Challenged Claims. As previously discussed, consumers take for granted that the advertising statements that they see on the packages of products marketed by companies they consider trustworthy are true. Consumers are not "claim detectives;" they are shoppers. But in this instance, even if they were to read every line of copy that appears on the front, sides, top, bottom and back of the Challenged Products, they will not find anything that would indicate the presence of regrinds or many of the other non-fresh ingredients.

225.    **In any case, it is my opinion that if consumers were to learn of Champion's failure to disclose the presence of heavy metals, the possible presence BPA and pentobarbital and the presence of ingredients that were neither fresh, local or regional, their willingness to pay a premium for those products would decrease or they would possibly refuse purchase them at all.**

\*    \*    \*

---

[116] CPF1768703.

226.    The opinions I have expressed herein are offered to a reasonable degree of certainty based on my experience as an advertising professional. I reserve the right to amend this report if I am provided with additional evidence obtained through further discovery or otherwise, or if any expert witness report is received and/or any related deposition taken.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 24th day of February 2021, in Studio City, California.

_____
                Bruce G. Silverman

# EXHIBIT "A"

## EXHIBITS AND OTHER MATERIAL RELIED ON

### Pleadings & Discovery Reponses

Deposition of Julie Washington (Dec. 5, 2018)

Deposition of Peter Muhlenfeld, *Reitman v. Champion Petfoods USA, Inc.*, No. 2:18-cv-01739-DOC-JPR (C.D. Cal. Dec. 4, 2018)

Third Amended Class Action Complaint (June 17, 2020), Doc. 68.

### Champion Documents

| Bates | Title/Description |
|---|---|
| CPFB00033 | Acana Heritage Free-Run Poultry Formula packaging |
| CPF0001876 | Acana Singles Lamb & Apple packaging |
| CPF0001878 | Acana Singles Wild Mackerel packaging |
| CPF0001880 | Acana Singles Pork & Squash packaging |
| CPF0001894 | Acana Regionals Grassland packaging |
| CPFB00081 | Orijen Regional Red packaging |
| CPF0001912 | Orijen Regional Red packaging |
| CPF0001967 | Orijen 6 Fish packaging |
| CPFB00036 | Acana Heritage Meats packaging |
| CPF0002811 | Orijen Original packaging |
| CPF2065401 | Orijen Senior packaging |
| CPF0002842 | Acana Regionals Meadowland packaging |
| CPF0066047 | Internal Champion Petfoods e-mail from Christine Pendlebury to multiple colleagues (Apr. 17, 2013) |
| CPF0060100 | E-mail between consumer Rob and Bonnie Gerow, Champion Petfoods Customer Care Department (Jan. 24, 2011) |
| CPF0060579 | E-mail from Jessica Peralta to Customer Care (Apr. 19, 2011) |
| CPF0063146 | E-mail from consumer Suzanne Mets to Customer Care (Apr. 30, 2012) |
| CPF0066547 | Chemist's customer care complaint (June 24, 2013) |
| CPF0145434 | Brand Finance U.S. Dog Pet Food Survey (Jan. 13, 2017) |
| CPF0190994 | Internal Champion Petfoods e-mail from Bonnie Gerow to Sarah Brown and Gavan Hettiarachchi (May 9, 2017) |
| CPF0209796 | Internal Champion Petfoods e-mail from Bonnie Gerow to Peter Muhlenfeld, et al. (May 16, 2017) |
| CPF0216726 | Video Script for Keith Arnold |
| CPF0221173 | Audience Research |
| CPF0258099 | Champion Petfoods 2018 Product Strategy document |
| CPF0099579 | Internal Champion Petfoods e-mail between Chinedu Ogbonna to Gavan Hettiarachchi, et al. (Mar. 17, 2016) |
| CPF1160820 | E-mail from consumer to Champion Petfoods Customer Care (Sept. 13, 2011) |

| Bates | Title/Description |
|---|---|
| CPF1292285 | Internal Champion Petfoods e-mail between Peter Muhlenfeld and Jeff Johnston (Mar. 13, 2013) |
| CPF1294360 | President's Club: Champion Petfoods – Key Success Factors |
| CPF1716566 | Internal Champion Petfoods e-mail from Bonnie Gerow to Champion's Ingredient Sourcing group (Feb. 18, 2016) |
| CPF1719813 | Internal Champion Petfoods e-mail between Peter Muhlenfeld and Chinedu Obgonna (May 15, 2016) |
| CPF1720401 | Draft response to Champion Petfoods upcoming feature in What to See at the SuperZoo |
| CPF1758303 | Internal Champion Petfoods e-mail between Michelle Granger and Jessica Mercredi (May 2, 2017) |
| CPF1768703 | Internal Champion Petfoods e-mail (Feb. 5, 2018) |
| CPF1748144 | Internal Champion Petfoods e-mail from Bonnie Gerow to Gavin Hettiarchichi, et al. (Feb. 24, 2017) |
| CPF1803444 | Internal Champion Petfoods e-mail from Chris Milam (May 25, 2017) |
| CPF1941121 | E-mail from customer Lisa Driscoll to Champion Petfoods Customer Care (Dec. 6, 2011) |
| CPF1973651 | Champion Petfoods Management Presentation |
| CPF1973904 | Project Morningstar, Norfolk Operational Due Diligence Call (Apr. 13, 2018) |
| CPF2003890 | E-mail between consumer and Champion Petfoods Customer Care Department (Nov. 25, 2009) |
| CPF2008170 | E-mail from consumer to Customer Care (Nov. 28, 2011) |
| CPF2074069 | E-mail between Champion Petfoods Customer Care Department and consumer (July 13, 2016) |

## Literature & Public Sources

| |
|---|
| Advantage Solutions, "The Humanization of Pets" Infographic (Sept. 16, 2019), https://advantagesolutions.net/news/the-humanization-of-pets/ (last visited January 29, 2021) |
| Alan Levinovitz, *What Is 'Natural' Food? A Riddle Wrapped in Notions of Good and Evil*, The Salt, npr.org (May 8, 2016), https://www.npr.org/sections/thesalt/2016/05/08/477057872/what-is-natural-food-a-riddle-wrapped-in-notions-of-good-and-evil (last visited Feb. 19, 2021) |
| Andrew Adam Newman, *For Pet Owners, Too, Toys a Reason for Concern*, The New York Times (Dec. 22, 2007), https://www.nytimes.com/2007/12/22/business/22pettoys.html?searchResultPosition=3 (last visited Jan. 29, 2021) |
| Ashok Charan, *MarketingMind*, "Brand" section, https://www.ashokcharan.com/Marketing-Analytics/~bs-brand.php#:~:text=A%20brand%20is%20defined%20as,an%20imprint%20in%20their%20minds.&text=Brand%20image%20is%20the%20consumers'%20perception%20of%20the%20brand (last visited January 29, 2021) |
| Barney Wolf, *Inside the Rapid Rise of Regional American Cuisine*, QSR Magazine (July 2017), https://www.qsrmagazine.com/menu-innovations/inside-rapid-rise-regional-american-cuisine (last visited Feb. 19, 2021). |
| BrandSpark International Inc., http://www.brandsparkmosttrusted.com/usa (last visited Feb. 6, 2021) |
| Brenna Houck, *'Natural' Means Practically Nothing When It Comes to Food*, Eater (Apr. 11, 2019), https://www.eater.com/2019/4/11/18304951/natural-food-organic-meaning-difference-hormel-meat-lawsuit (last visited Feb. 18, 2021) |
| Brian Wansink, How do front and back package labels influence beliefs about health claims?, J of Consumer Affairs, 2003; 37 (2): 305-316; FDA Consumer research on food labels, http:///www.fda.gov/FGood/ScienceResearch?ResearchAreas/ConsumeResearch/ucm080407.htm, last visited Jan. 24, 2010, as cited in Marion Nestle, PhD, PMH, David S. Ludwig, MD, PhD, Front-of-Package Food Labels, Public Health or Propaganda, JAMA. 2010 ;303 (8): 771. Doi:10.1001/jama.2010.179 (also available at https://www.foodpolitics.com/wp-content/uploads/JAMA_101.pdf) |
| Caroline Cox, *Not for our Best Friends! Lead in Dog Accessories*, Oakland California Center for Environmental Health (June 2008), available at http://healthdocbox.com/Add/68320687-Not-for-our-best-friends-lead-in-dog-accessories.html (last visited Feb. 19, 2021) |
| *Cerner Multum, Pentobarbital (injection)*, Drugs.com (medically reviewed Mar. 2, 2020), https://www.drugs.com/mtm/pentobarbital-injection.html#:~:text=Pentobarbital%20is%20a%20barbiturate%20(bar,an%20emergency%20treatment%20for%20seizures. (last visited Feb. 19, 2021) |
| Champion Petfoods, https://championpetfoods.com/en/about-us.html (last visited June 27, 2020) |

Chris Woodyard, *First Take: VW's sales drop finally reflects its scandal*, USA Today (Dec. 1, 2015), https://www.usatoday.com/story/money/cars/2015/12/01/vw-volkswagen-emissions-scandal-sales-drop/76609404 (last visited Feb. 19, 2021)

Colin Rigley, *How to Find Non-Toxic Dog Toys and Tell if a Toy Is Safe*, Preventive Vet (Jan. 22, 2020), https://www.preventivevet.com/dogs/how-to-find-safe-non-toxic-dog-toys (last visited Feb. 19, 2021)

David Aaker, *The Power of the Branded Differentiator*, MIT Sloan Management Review, Fall 2003

David Ogilvy, *Ogilvy on Advertising*, New York, Crown Publishers, 1983

EWG (The Environmental Working Group) article, "Timeline: BPA From Invention to Phase-Out," April 2008; updated March 2011

FarmersMarket.net, *Why Farmer's Markets Are Becoming More Popular*, https://www.farmersmarket.net/article/why-farmers-markets-are-becoming-popular (last visited Feb. 19, 2021)

FDA, *Against the Grain Pet Food Voluntarily Recalls One Lot of Pulled Beef Due to Potential Adulteration with Pentobarbital* (Feb. 8, 2018), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/against-grain-pet-food-voluntarily-recalls-one-lot-pulled-beef-due-potential-adulteration (last visited Feb. 18, 2021)

FTC, *FTC Fact Sheet: The Truth, the Whole Truth, and Nothing But…*, https://www.consumer.ftc.gov/sites/default/files/games/off-site/youarehere/pages/pdf/FTC-Ad-Marketing_Whole-Truth.pdf (last visited Feb. 19, 2021)

Hootstein, D. "Standing Out in the Aisles," *Marketing at Retail*, June 2007, as quoted in Thomas C. O'Guinn, Chris T. Allen, Richard J. Semenik, Advertising and Integrated Brand Promotion, 2015 edition

Joce Sterman and Alex Brauer, *National study raises alarm about arsenic, lead and other heavy metals in baby food*, WJLA TV, Washington DC (Jan. 23, 2020), https://wjla.com/news/spotlight-on-america/national-study-raises-alarm-about-arsenic-lead-and-other-heavy-metals-in-baby-food

Kenneth Roman and Jane Maas, *How to Advertise*, New York, St. Martin's Press, 1976

James Lightwood, et al., *Health Care Cost Saving Attributable to the California Tobacco Control Program, 1989 to 2018 (Final Report)*, Dep't of Clinical Pharmacy, Sch. of Pharmacy, Univ. of Cal, San Francisco (Jul. 26, 2020), available at https://escholarship.org/uc/item/53b9b8fz (last visited Jan. 30, 2021).

Lisa McCormack, *Beware of Lead and Toxic Dog Toys*, Sit. Stay. Forever. Safety First Pet Products (May 5, 2016), https://sitstayforever.com/blog/-beware-of-lead-and-toxic-dog-toys-be-proactive-in-monitoring-what-goes-in-your-dogs-mouth-/ (last visited Feb. 19, 2021)

Marina Martinez, *Pet Foods: Contamination, Mislabeling and Damages*, Medium.com (Jan. 14, 2019), https://medium.com/@MarinaTMartinez/pet-foods-contamination-mislabeling-and-damages-72695957a857 (last visited Jan. 19, 2021)

Marketing Week, *The silent salesman* (June 12, 2003) https://www.marketingweek.com/2003/06/12/the-silent-salesman-2/?ct_5aa9aa1f33d68=5aa9aa1f33e0a (last visited Jan. 29, 2021)

Mary Hanbury, *Millennials are treating pets like 'their firstborn child*, Business Insider (Nov. 12, 2018), https://www.businessinsider.com/millennials-buy-high-end-pet-food-hurts-purina-kibbles-n-bits-2018-11

Megan Jander, *Humanization of Pets, Pet Products Resonates Within Creative Market, Pet Age* (Jan. 9, 2019), https://www.petage.com/humanization-of-pets-pet-products-resonates-within-creative-market (last visited Jan. 29, 2021)

Melissa Breau, *Pet Food Evolution*, Pet Business (Oct. 6, 2015), available at http://www.petbusiness.com/Pet-Food-Evolution/

*Natural food*, Merriam-Webster, https://www.merriam-webster.com/dictionary/natural%20food (last visited February 18, 2020).

*New Year, New Nutrition Facts Label on Food: Most U.S. Consumers Read the Nutrition Facts Label and the Top Items They Look for Are Sugars and Calories*, NPD Group, Inc. (Jan. 8, 2020), https://www.npd.com/wps/portal/npd/us/news/press-releases/2020/new-year-new-nutrition-facts-label-on-food-most-us-consumers-read-the-nutrition-facts-label-and-the-top-items-they-look-for-are-sugars-and-calories (last visited Jan. 29, 2021)

OW Lau and SK Wong, *Contamination in food from packaging material*, *J Chromatogr A*. 2000;882(1-2):255-270. doi:10.1016/s0021-9673(00)00356-3, https://pubmed.ncbi.nlm.nih.gov/10895950/ (abstract) (last visited Feb. 19, 2021)

Patty Odell, *P-O-P Vital as More Shoppers Decide in Store: Study*, Chief Marketer (May 12, 2012), available at https://www.chiefmarketer.com/p-o-p-vital-as-more-shoppers-decide-in-store-study/ (last visited Jan. 29, 2021) (cited in Thomas C. O'Guinn, Chris T. Allen, Richard J. Semenk, *Advertising and Integrated Brand Promotion*, 2015 edition)

Phyllis Entis, *Evanger's pentobarbital recalls. A peek behind the curtain.* eFood Alert (June 3, 2019), https://efoodalert.com/2019/06/03/evangers-pentobarbital-recalls-a-peek-behind-the-curtain (last visited Feb. 18, 2021)

Phyllis Entis, *Pentobarbital continues to 'dog' pet food industry; beef tallow blamed*, Food Safety News (Nov. 29, 2018), https://www.foodsafetynews.com/2018/11/pentobarbital-continues-to-dog-pet-food-industry-tainted-beef-tallow-prompts-recall/#:~:text=On%20May%208%20Champion%20Petfoods,sick%20or%20fatally%20injured%20animals (last visited Feb. 18, 2021).

*Raw*, Merriam-Webster, https://www.merriam-webster.com/dictionary/raw (last visited Feb. 19, 2021)

Rebecca Tushnet, *About Rebecca Tushnet*, https://tushnet.com/about/ (last visited Feb. 19, 2021)

*Regional*, Merriam-Webster, https://www.merriam-webster.com/dictionary/regional (last visited Feb. 18, 2021).

Ryan W. Miller, *Romaine lettuce warning*, USA Today (Nov. 20, 2018), https://www.usatoday.com/story/news/health/2018/11/20/romaine-lettuce-cdc-warns-e-coli-outbreak-ahead-thanksgiving/2070664002/ (last visited Feb. 19, 2021)

Sharyn Alfronsi, *Early Results from 174 Flint Children Exposed to Lead*, 60 Minutes (Mar. 15, 2020), https://www.cbsnews.com/news/flint-water-crisis-effect-on-children-60-minutes-2020-03-15 (last visited Feb. 19, 2021)

Susannah Cullianane, *Dog food brands recalled over possible euthanasia drug*, CNN (Feb. 18, 2018), https://www.cnn.com/2018/02/18/health/dog-food-pentobarbital/index.html (last visited Feb. 19, 2021) (quoting (quoting FDA, *FDA Alerts Pet Owners About Potential Pentobarbital Contamination* (Feb. 16, 2018), https://www.fda.gov/animal-veterinary/outbreaks-and-advisories/fda-alerts-pet-owners-about-potential-pentobarbital-contamination-canned-dog-food-manufactured-jm)

Terre Haute, *Supreme Court clears way for execution of federal prisoner*, L.A. Times. July 14, 2020, at A10, available at https://www.latimes.com/world-nation/story/2020-07-13/supreme-court-clears-way-for-execution-of-federal-prisoner

Thomas C. O'Guinn, Chris T. Allen, Richard J. Semenik, *Advertising and Integrated Brand Promotion, Third Edition*, Cincinnati, OH, South-Western Cengate Publishing, 2009

*Trusted*, Merriam-Webster, https://www.merriam-webster.com/dictionary/trusted (last visited Feb. 19, 2021)

Will Heilpern, *18 false advertising scandals that cost some brands millions*, Business Insider (Mar. 31, 2016), https://www.businessinsider.com/false-advertising-scandals-2016-3#activia-yogurt-said-it-had-special-bacterial-ingredients-2 (last visited Feb. 19, 2021)

William F. Arens, Michael F. Weigold, Christian Arens, *Contemporary Advertising and Integrated Marketing Communications, 13th Edition*, New York, McGraw Hill Irwin, 2011

https://www.google.com/search?rlz=1C1CHBF_enUS769US769&ei=010DX7mfOIjN0PEPi8i9iAU&q=pentobarbital+in+dog+food&oq=pentobarbital+in&gs_lcp=CgZwc3ktYWIQARgHMgIIADICCAAyAggAMgIIADICCAAyAggAMgIIADICCAAyAggAMgIIADoECAAQRzoECAAQQzoFCAAQkQJQmENY40dg62loAHABeACAAWiIAZACkgEDMi4xmAEAoAEBqgEHZ3dzLXdpeg&sclient=psy-ab (last visited Feb. 18, 2021)

https://www.google.com/search?q=pentobarbital+in+dog+food&rlz=1C1CHBF_enUS769US769&ei=ZWEDX4j5CYbu-gS755foAQ&start=10&sa=N&ved=2ahUKEwjIv4enlbnqAhUGt54KHbvzBR0Q8NMDegQIDRA_&biw=656&bih=616 (last visited Feb. 18, 2021)

EXHIBIT "B"

**BRUCE G. SILVERMAN**
*CURRICULM VITAE*

| | |
|---|---|
| May 2005 – Present | **SILVERMAN CONSULTING LLC (Los Angeles)**<br>**Principal** |

Advertising and branding consultant to advertisers and advertising agencies in the U.S., Europe and Asia engaged in marketing consumer goods and services. Consultant and expert witness for law firms throughout the U.S. on cases where false/misleading advertising, trademark infringement, advertising industry custom and practice, publicity rights and/or media are at issue.

| | |
|---|---|
| January 2004 – April, 2005 | **WONG DOODY ADVERTISING (Los Angeles)**<br>**President and Partner** |

Privately-owned, award-winning advertising agency with offices in Los Angeles and Seattle. Clients included Alaska Airlines, Alpine Electronics, Autodesk, Clif Bar, Inc., Los Angeles Dodgers, MGM Home Entertainment, Sony Pictures, UCLA/Anderson School of Management.

| | |
|---|---|
| April, 1997 – Dec., 2003 | **INITIATIVE PARTNERS (Los Angeles)**<br>**President/CEO; Member, Initiative Worldwide Board**<br>**of Directors** |

Principal U.S. unit of world's largest ($22BB+) advertising media planning and buying agency. Clients included Acura, Albertson's, Arco, Carl's Jr/Hardee's, Baskin-Robbins, Chevrolet, Cisco Systems, Intel, Walt Disney Company, E*Trade, The Home Depot, Johnson & Johnson, Kaiser-Permanente, Six Flags, Taco Bell, U.S. Navy Recruiting Command, Unilever, plus more than 100 advertising agencies operating throughout the United States and Canada.

| | |
|---|---|
| January 86 – March '97 | **ASHER/GOULD ADVERTISING, INC. (Los Angeles) President, Chief Creative Officer, Chief Operating Officer and Partner**<br><br>Privately-owned, top 100 advertising agency with offices in Los Angeles and Las Vegas. Clients included American Savings Bank, Avery Dennison, Baskin-Robbins, ITT/Sheraton, The Men's Wearhouse, Pabst Brewing Company, Pizza Hut, MGM Resorts, Sanyo, Southern California Cable Marketing Council, Suzuki cars and trucks, State of California Department of Health Services, SunAmerica |
| January 84 – December '86 | **BBDO/WEST, INC. (Los Angeles, San Francisco) Executive Vice President, General Manager, Chief Creative Officer and Director**<br>West Coast division of Top 10 global advertising agency. Accounts included Apple Computer International, Coldwell Banker, Hughes Supermarkets, Pepsi, PIP Printing, Sanyo/Fisher, Sebastiani Vineyards, Sizzler, Southern California Dodge Dealers, Union Bank |
| January 81 – December '83 | **BOZELL & JACOBS, SOUTHWEST, INC. (Dallas) Executive Vice President, Chief Creative Officer**<br>Southwest division of Top 10 U.S. advertising agency. Accounts included American Airlines, Armour Foods, Avis, Greyhound, Mary Kay Cosmetics, Pace Foods, Quaker Oats, Southwestern Bell, Symantec, Zale Corporation. |
| August 67 – December '80 | **OGILVY & MATHER, INC. (New York) Senior Vice President, Executive Creative Director, Member, O&M USA Council of Directors**<br>Top five global advertising agency. Executive Creative Director and General Manager, O&M Los Angeles (1977-80); Creative Director, O&M Houston (1974-77); Associate Creative Director, O&M London (1974), Associate Creative Director, O&M New York (1972-73).<br><br>Accounts included American Express, British Travel Association, Dove, French Tourism, Hershey Foods, IBM, Imperial margarine, KLM, Korean Airlines, Panasonic, Post cereals, Puerto Rico Tourism, Mattel, Maxwell House, MTV, Mercedes Benz, Merrill Lynch, Nabisco, Nickelodeon, Shell, Smith Barney, Trailways, TWA, Universal Studios |

| | |
|---|---|
| **EDUCATION** | June 1966 BA, Adelphi University, Garden City, New York |
| **INDUSTRY** | Vice Chairman, Western Region – American Association of Advertising Agencies (industry trade association) (1995-2002) |
| | National Board of Directors – American Association of Advertising Agencies (1995-2002) |
| | Vice President – Los Angeles Advertising Agencies Association (1995-2002) |
| | Member, Los Angeles Advertising Club (1978-1980; 1984-2005) |
| | Vice President – Dallas Advertising Club (1981-1983) |
| | Vice President – Houston Advertising Federation (1975-1977 |
| | Member – The Television Academy |
| | Director – Los Angeles Chapter, Forensic Expert Witness Association (2006-2009) |
| **TEACHING POSITIONS** | Instructor: Pepperdine University, UCLA Extension |
| | Guest Instructor: Arizona State University, California State University Northridge, California State University San Diego, California State University Los Angeles, California State University San Francisco, New York University, Rice University, Southern Methodist University, Stanford University, University of Arizona, University of California (Berkeley), UCLA Anderson School of Management, UCLA Fielding School of Public Health, University of Hawaii, University of Houston, University of Southern California, University of Texas, Thunderbird School of Management; Dean's Board of Advisors, UCLA Extension |
| **OTHER** | Author: *How to Create Tobacco-Use Prevention Advertising That Works*; University of Florida Press, 1996 |
| | Media Appearances: Frequent "advertising/marketing guest authority" on Bloomberg News, NBC News, ABC 20/20; cited in articles in *Wall Street Journal, New York Times, Los Angeles Times, Washington Post, USA Today, Advertising Age, AdWeek* |

8

**AWARDS:** Multiple Clios, One Show "Pencils," multiple Beldings, two Gold Lions at Cannes International Advertising Festival; three "Effie" awards, two David Ogilvy Awards.

**ADVERTISING/BRANDING CLIENTS SERVED (BY CATEGORY)**
**(Partial List; 1968-2020)**

**Apparel/Fashion**

C& R Clothiers (Asher/Gould)

Cherokee Apparel (Asher/Gould)

The Men's Wearhouse (Asher/Gould)

Harris & Frank Clothiers (Asher/Gould)

Kennedy's Clothiers (Asher/Gould)

Mervyn's (Wong Doody)

Nordstrom (Wong Doody)

**Automotive**

Acura (Initiative)

Chevrolet (Initiative)

Dodge and Dodge Dealer Associations (BBDO)

Kia (Initiative)

Jaguar (Bozell)

Mercedes-Benz (Ogilvy)

Peugeot (Ogilvy)

Suzuki (Asher/Gould)

**Beverages**

Ballantine Ale (Asher/Gould)

Brew 102 Beer (Asher/Gould)

Country Club Malt Liquor (Asher/Gould)

Country Time Lemonade (Ogilvy)

Falstaff Beer (Ogilvy; Asher/Gould)

Hamm's Beer (Asher/Gould)

Mountain Dew (Ogilvy)

M. LaMont Vineyards (Ogilvy)

Old Crow Bourbon Whisky (Ogilvy)

Olde English 800 Malt Liquor (Asher/Gould)

Olympia Beer (Asher/Gould)

Pabst Blue Ribbon Beer (Asher/Gould)

Pearl Beer (Asher/Gould)

Pepsi Light (Ogilvy)

10

Private Stock Malt Liquor by Haffenreffer (Asher/Gould)

Schaeffer Beer (Ogilvy)

Sebastiani Vineyards (BBDO)

Stolichnaya Vodka (Ogilvy)

Van Gogh Vodka (Wong Doody)

Vitel Mineral Water (BBDO)

**Corporate**

Autodesk (Wong Doody)

Avery Dennison (Asher/Gould)

Cessna Citation (Ogilvy)

Church of Jesus Christ of Latter Day Saints (Initiative)

City Investing (Ogilvy)

Cooper Industries (Ogilvy)

Dresser Industries (Ogilvy)

IBM (Ogilvy)

International Nickel (Ogilvy)

International Paper (Ogilvy)

Owens-Corning Fiberglas (Ogilvy)

Rail LA (Silverman LLC)

Shell Oil Company (Ogilvy)

Worldwide Church of God (BBDO)

**Consumer Electronics**

Alpine Electronics (Wong Doody)

Concord Electronics (BBDO)

Fisher (BBDO)

Panasonic (Ogilvy)

Sanyo (Asher/Gould)

**Direct Response**

American Express cards (Ogilvy)

Associates Financial (Bozell)

Bally's Health and Fitness (Initiative)

Bryman College (Asher/Gould)

HBO (Asher/Gould)

Intercept Program (Asher/Gould)

Jenny Craig (Initiative)

Kaiser/Permanente (Initiative)

Law Offices of Larry H. Parker (Asher/Gould; Silverman LLC)

Mobile Dynamics (Wong Doody)

National Education Centers (Asher/Gould)

Paintrol Clinics (Asher/Gould)

Southern California Cable Marketing Council (Asher/Gould)

UCLA Anderson School of Management (Wong Doody)

**Education**

Bryman College (Asher/Gould)

Geisinger Commonwealth School of Medicine (Silverman LLC)

Mobile Dynamics (Wong Doody)

National Education Centers (Asher/Gould)

National University (Initiative)

UCLA Anderson School of Management (Wong Doody)

**Entertainment**

Albuquerque Studios (Silverman LLC)

Big Moving Pictures (Silverman LLC)

Buena Vista Pictures (Initiative)

Center Theatre Group/Ahmanson Theatre; Mark Taper Forum (Initiative)

Circus World (Ogilvy)

Disney Home Video (Initiative)

Dynasty Visual Effects and Animation (Silverman LLC)

Grand Ol' Opry (Ogilvy)

HBO (BBDO and Asher/Gould)

Houston Grand Opera (Ogilvy)

Los Angeles Dodgers (Wong Doody)

MGM Home Video (Wong Doody)

MTV (Ogilvy)

Nickelodeon (Ogilvy)

Opryland USA (Ogilvy)

Pacific Ventures (Silverman LLC)

12

Ringling Brothers Barnum & Bailey Circus (Ogilvy)

Six Flags (Ogilvy and Initiative)

Sony Pictures Digital Entertainment (Wong Doody)

Southern California Cable Marketing Council (Asher/Gould)

The Walt Disney Company (Initiative)

Touchstone Pictures (Initiative)

UCLA Athletics (Silverman LLC)

UPN (United Paramount Network) (Initiative)

Walt Disney Pictures (Initiative)

Warner Brothers  (Initiative)

World Poker Tour (Wong Doody)

**Financial Services**          Allied Bank of Texas (Bozell)

American Express Credit Cards (Ogilvy)

American Express International Bank (Ogilvy)

American Savings Bank (Asher/Gould)

Associates Financial (Bozell)

Bowery Savings Bank (Ogilvy)

E*Trade (Initiative)

Gibraltar Savings & Loan of California (Ogilvy)

Gibraltar Savings & Loan of Texas (Ogilvy)

Merrill Lynch (Ogilvy)

J. P. Morgan & Co. (Ogilvy)

Nationwide Insurance (Ogilvy)

Plastic Cash International  (Wong Doody)

Republic Bank of Texas (Bozell)

Smith Barney (Ogilvy)

SunAmerica (Asher/Gould)

Union Bank of California (BBDO)

U.S. Trust (Ogilvy)

Valley National Bank – AZ (Bozell)

Wei Dong Investment Holdings Ltd.  (Silverman LLC)

**Gaming**          Augustine Casino (Wong Doody)

Bellagio Hotel & Casino (Initiative)

California Lottery (Initiative)

Desert Inn Hotel & Casino (Asher/Gould)

Las Vegas Convention and Visitor's Authority (Initiative)

MGM Grand Hotel & Casino (Asher/Gould)

Mirage Hotel & Casino (Initiative)

New York New York Hotel & Casino (Asher/Gould)

Treasure Island Hotel & Casino (Initiative)

**Grocery Products (includes. Packaged Goods)**

Armour Dinner Classics (Bozell)

Armour Hot Dogs (Bozell)

Armour Deli Meats (Bozell)

Balance Bar (Initiative)

Beijing Zhong Gao International HR Co. Ltd. (Silverman LLC)

California Avocados (Asher/Gould)

California Eggs (Asher/Gould)

Clif Bar (Wong Doody)

Conagra Foods (Bozell)

Gaines (Ogilvy)

Dove Liquid (Ogilvy)

Heath Bars (Bozell)

Hershey (Ogilvy)

Imperial Margarine (Ogilvy)

Luna Bar (Wong Doody)

Nabisco Double Stuf (Ogilvy)

Nabisco Krazy Glazy (Ogilvy)

Nabisco Saltine Crackers (Ogilvy)

Nabisco Sooper Kookies (Ogilvy)

Pace Picante Sauce (Bozell)

Pepperidge Farm (Ogilvy)

Post Alpha-Bits (Ogilvy)

Post Cocoa Pebbles (Ogilvy)

|  | Post Fruity Pebbles (Ogilvy) |
|--|--|
|  | Post Super Sugar Crisp (Ogilvy) |
|  | Purina dog chows (Ogilvy) |
|  | Quaker Oats (Bozell) |
|  | Quaker Chewy Granola Bars (Bozell) |
|  | Quaker Masa Harina (Bozell) |
|  | Quaker 100% Natural Cereal (Bozell) |
|  | Ralston-Purina Cookie Crisp cereal (Ogilvy) |
|  | Reese's Peanut Butter Cups (Ogilvy) |
|  | Swanson Frozen Dinners (Ogilvy) |
| **Health & Beauty Aids** | Avon Cosmetics (Ogilvy) |
|  | Contac (Ogilvy) |
|  | Dove Beauty Bar (Ogilvy) |
|  | Kinerase (Wong Doody) |
|  | Mary Kay Cosmetics (Bozell) |
|  | Mead-Johnson Enfamil (Ogilvy) |
|  | Mead-Johnson Metrecal (Ogilvy) |
|  | Pears Soap (Ogilvy) |
|  | Rembrandt Whitening Toothpaste (Wong Doody) |
|  | Twice as Nice shampoo (Ogilvy) |
| **Healthcare** | Cedars-Sinai Health System (Silverman LLC) |
|  | Century Aesthetics (Silverman LLC) |
|  | Century City Doctors Hospital (Silverman LLC) |
|  | Doctor Campbell Credit Dentists (Asher/Gould) |
|  | Geisinger Health (Silverman LLC) |
|  | Intercept Program (Asher/Gould) |
|  | Kaiser Permanente (Initiative) |
|  | Modern Diagnostics (Silverman LLC) |
|  | Paintrol Clinics (Asher/Gould) |
|  | Private Health Management (Silverman LLC) |
|  | Salus Surgical Centers (Silverman LLC) |
|  | UCLA Health System (Silverman LLC) |
|  | United Health Plan (Asher/Gould) |

|  | Virginia Mason Medical Center (Wong Doody) |
|---|---|
| **Hi-Tech** | Apple Computers/International (BBDO) |
|  | Autodesk (Wong Doody) |
|  | Cadforce (Silverman LLC) |
|  | Cisco (Initiative) |
|  | Compaq (Ogilvy) |
|  | Gateway (Initiative) |
|  | IBM (Ogilvy) |
|  | Intel (Initiative) |
|  | Symantec (Bozell) |
| **Industrial** | Cessna (Ogilvy; Bozell) |
|  | International Nickel (Ogilvy) |
|  | International Paper (Ogilvy) |
|  | Dresser Industries (Ogilvy) |
|  | Falcon Waterfree (Silverman LLC) |
|  | Owens-Corning Fiberglas (Ogilvy) |
|  | Shell Farm Chemicals (Ogilvy) |
|  | Shell Industrial Chemicals (Ogilvy) |
|  | Shell Plastics and Resins (Ogilvy) |
|  | Shell Synthetic Rubber (Ogilvy) |
| **Internet** | America On-Line (Initiative) |
|  | E-Trade On-Line (Initiative) |
|  | Event 411.com (Initiative) |
|  | Petstore.com (Initiative) |
|  | PlasticCash.com (Wong Doody) |
|  | Yahoo! (Initiative) |
| **Marketing Communications Agencies** | Ayzenberg (Silverman LLC) |
|  | Beijing Reach-All Investment Company Ltd. (Silverman LLC) |
|  | BH Direct (Silverman LLC) |
|  | Bright Strategic Design (Silverman LLC) |
|  | Bullpen Integrated Marketing (Silverman LLC) |

|  | Donnenfeld & Associates (Silverman LLC) |
|--|--|
|  | Eclipse Studio, Beijing (Silverman LLC) |
|  | Glyphix (Silverman LLC) |
|  | Horizon Media (Silverman LLC) |
|  | M Creative Group (Silverman LLC) |
|  | Nice Advertising (Silverman LLC) |
|  | The Phelps Group (Silverman LLC) |
|  | Radarworks (Silverman LLC) |
|  | Rogers & Associates (Silverman LLC) |
|  | Schiller LLC (Silverman LLC) |
|  | U.S. International Media (Silverman LLC) |
|  | The Woo Agency (Silverman LLC) |
| **Media/Publishing** | 24/6 Media dba Pocket Billboards (Silverman LLC) |
|  | Bulzi (Silverman LLC) |
|  | The Equestrian News (Silverman LLC) |
|  | Frontiers Media LLC (Silverman LLC) |
|  | HBO (BBDO and Asher/Gould) |
|  | KCAL 9 Television (Initiative) |
|  | Sirius XM (Silverman LLC) |
|  | Southern California Cable Marketing Council (Asher/Gould) |
|  | Triton Media (Silverman LLC) |
|  | UPN (United Paramount Network) (Initiative) |
| **Miscellaneous Products** | Paragon Luggage  (Wong Doody) |
|  | Steuben Glass (Ogilvy) |
|  | Zippo (Ogilvy) |
| **Office Products** | Avery Dennison (Asher/Gould) |
|  | Intuit – QuickBooks (Wong Doody) |
| **Petroleum Products** | Arco (Initiative) |
|  | Shell Fire & Ice Motor Oil (Ogilvy) |
|  | Shell Gasoline (Ogilvy) |

| | |
|---|---|
| **Professional Services** | Cadforce (Silverman LLC) |
| | CFO911 (Silverman LLC) |
| | Law Offices of Larry H. Parker, Inc.  (Asher/Gould; Silverman LLC) |
| | Perona, Langer, Beck Inc. (Silverman LLC) |
| **Real Estate** | Coldwell Banker (BBDO) |
| | Esprit (Silverman LLC) |
| | Move.com (Silverman LLC) |
| | Pacifica Ventures (Silverman LLC) |
| | Relocation.com (Silverman LLC) |
| | Waterwood (Ogilvy) |
| | The Woodlands (Ogilvy) |
| **Restaurants** | Acapulco (Asher/Gould) |
| | Baskin-Robbins (Ogilvy; Asher/Gould) |
| | Bennigan's (Bozell) |
| | Burger Chef (Ogilvy) |
| | Carl's Jr. (Initiative) |
| | Der Weinerschnitzel (Initiative) |
| | Godfather's Pizza (Bozell) |
| | Hardee's (Initiative) |
| | KFC (Initiative) |
| | Packard's Grill (Asher/Gould) |
| | Pioneer Chicken (Asher/Gould) |
| | Pizza Hut (Asher/Gould) |
| | Sizzler (BBDO) |
| | Steak & Ale (Bozell) |
| | Taco Bell (Initiative) |
| | Togo's (Initiative) |
| | Tom Sawyer's Old Fashioned Fried Chicken (Ogilvy) |

**Retail**               Aaron Brothers Art Marts (Asher/Gould)

Albertson's Supermarkets (Initiative)

Arco (Initiative)

Bailey Banks & Biddle Jewelers (Bozell)

Big Lots (Initiative)

C&R Clothiers (Asher/Gould)

Checker Auto Parts (Bozell)

Circle K (Initiative)

Factory2You Stores (Asher/Gould)

Family Bargain Center Stores (Asher/Gould)

Harris & Frank Clothiers (Asher/Gould)

Hughes Supermarkets (BBDO)

Kennedy's Clothiers (Asher/Gould)

Men's Wearhouse (Asher/Gould)

Mervyn's (Wong Doody)

Nordstrom (Wong Doody)

Puppy Palace (Ogilvy)

PIP Printers (BBDO)

Ralphs Supermarkets (Initiative)

Safeway Supermarkets (Initiative)

Sainsbury Supermarkets (Silverman LLC)

Sears (Ogilvy)

Sit 'n Sleep (Silverman LLC)

Stater Brothers Supermarkets (Initiative)

Steuben Glass (Ogilvy)

The Home Depot (Initiative)

Tesco Supermarkets (Silverman LLC)

Vons Supermarkets (Initiative)

Wherehouse Records & Tapes (Asher/Gould)

Zale Jewelers (Bozell)

| | |
|---|---|
| **Social Marketing** | California Department of Health Services – BabyCal (Asher/Gould) |
| | California Department of Health Services – First5 (Asher/Gould) |
| | California Department of Health Services – HIV Prevention (Asher/Gould) |
| | California Department of Health Services – Tobacco-Use Prevention (Asher/Gould) |
| | Los Angeles County Department of Public Health – Tobacco-Use Prevention (Asher/Gould) |
| | Oregon Health Department – Tobacco-Use Prevention (Asher/Gould) |
| | United States Department of Commerce, Census 2000 (Initiative) |
| | United States Government; Centers for Disease Control – Tobacco-Use Prevention (Initiative) |
| | White House office of National Drug Control Policy – Drug-use Prevention (Initiative) |
| **Telecommunications** | Nextel (Initiative) |
| | Telcentris (Silverman LLC) |
| | Southwestern Bell (Bozell) |
| | VoxOx (Silverman LLC) |
| **Tobacco** | Tijuana Smalls (Ogilvy) |
| **Tires/Batteries/ Accessories** | Arco (Initiative) |
| | Goodyear (Ogilvy) |
| | Shell (Ogilvy) |
| **Toys/Games** | Electronic Arts (Initiative) |
| | Mattel Electronics (Ogilvy) |
| | Mattel Toys and Games (Ogilvy) |

**Travel/Tourism**                    Alaska Airlines (Wong Doody)

Alaska Tourism (Initiative)

ALM Royal Dutch Airlines (Ogilvy)

American Airlines (Bozell; Initiative)

American Express Travel Service (Ogilvy)

Avis Rent-a-Car (Bozell)

Bellagio Hotel & Casino (Initiative)

British Tourist Authority (Ogilvy)

Cunard Lines (Ogilvy)

Desert Inn Hotel & Casino (Asher/Gould)

Disney Cruise Lines (Initiative)

Disneyland and Walt Disney World (Initiative)

French Government Tourist Office (Ogilvy)

Greyhound Lines (Bozell)

Hyatt Regency Maui (Ogilvy)

Hyatt Regency Waikiki (Ogilvy)

Hyatt Kuilima Resort (Silverman LLC)

KLM Royal Dutch Airlines (Ogilvy)

Korean Airlines (Ogilvy)

Las Vegas Convention & Visitors Bureau
(Initiative)

Loreto Bay (Wong Doody)

Marriott (Ogilvy)

MGM Grand Hotel & Casino (Asher/Gould)

Mirage Hotel & Casino (Initiative)

New York New York Hotel & Casino
(Asher/Gould)

Opryland USA (Ogilvy)

Six Flags (Ogilvy and Initiative)

Trailways Bus Lines (Ogilvy)

Treasure Island Hotel & Casino (Initiative)

TWA (Ogilvy)

United States Travel Authority (Ogilvy)

Universal Studios Hollywood (Ogilvy)

|  | Yosemite National Park and the Curry Company (Ogilvy) |
|---|---|
| **Utilities** | Bell South (Initiative) |
|  | Houston Lighting & Power (Ogilvy) |
|  | Nextel (Initiative) |
|  | Salt River Project (Bozell) |
|  | Southwestern Bell (Bozell) |

# EXHIBIT "C"

## EXPERT WITNESS EXPERIENCE

### DEPOSITION, ARBITRATION AND/OR TRIAL TESTIMONY

2017-2020
(Underscore indicates client)


*THOMAS BAILEY, et al. v. RITE AID CORPORATION*
United States District Court, Northern District of California
Case 4:18-cv-06926-YGR
Deposed 12/10/2020


*JENNIFER SONG AND SCOTT WERTKIN, et al. v. CHAMPION PETFOODS, USA, INC., et al.*
United States District Court, District of Minnesota
Case No. 18-CV-3205-PJS-KMM,

        and,

*CAMMEO RENFRO, BARB MCGRAW AND DESIREE DEMPSTER et al. v. CHAMPION PETFOODS USA, INC. and CHAMPION PETFOODS L.P.*
United States District Court, District of Colorado
Civil Action No: 18-cv-02756-MEH
Deposed 11/24/2020


*RALPH MILAN, SARAH AQUINO, and ELIZABETH ARNOLD v. CLIF BAR & COMPANY.*
United States District Court for the Northern District of California
Case No. 3:18-cv-02354-JD
Deposed 10/14/2020


*ALFWEAR, INC. v. MAST-JAEGERMEISTER U.S. INC. and OPPERMANWEISS, LLC.*
United States District Court for the District of Utah, Central Division
Case No. 2:17-CV-00936-tc
Deposed 8/31/2020


*STATE OF HAWAII BY ITS OFFICE OF CONSUMER PROTECTION v. LIVING ESSENTIALS, LLC, and INNOVATION VENTURES, LLC.*
In the Circuit Court of the First Circuit, State of Hawaii
Civil No. 15-1-0142-01 ECN (Other Civil Action)
Deposed 5/24/2019; 8/14/2020


*LIBERTY MEDIA GROUP, LLC, et al. v. NATIONAL PROMOTIONS and ADVERTISING, INC., et al.*
Superior Court of the State of California, County of Los Angeles, Central District
Case No. SC126900
Deposed 11/22/2019

*BRANDI PRICE and CHRISTINE CHADWICK, et al. v. L'ORÉAL USA, INC. and MATRIX ESSENTIALS, LLC.*
United States District Court, Southern District of New York
Case No. 1:17-cv-00614-LGS
Deposed 8/19/2019

*DIVISION SIX SPORTS, INC., v. SHAUN WHITE AND SHAUN WHITE ENTERPRISES, INC.*
Superior Court for the State of California, County of Los Angeles
Case No: BC2619646
Deposed 8/15/2019

*HARBOR BREEZE CORPORATION et al v. NEWPORT LANDING, INC., et al.*
United States District Court, Central District of California, Southern Division
Case No. 8:2017cv01613
Deposed 10/9/2017 and 5/9/2019; Trial testimony 6/20/2019

*UNIVERSAL STANDARD INC. v. TARGET CORPORATION, et al.*
United States District Court, Southern District Of New York Case No. 1:18-cv-06042-LGS
Deposed 5/14/2019

*STEPHEN HADLEY ET AL. v. KELLOGG SALES COMPANY*
United States District Court Northern District of California
Case No. 5:16-cv-04955
Deposed 5/28/2018; 5/1/2019

*DEBBIE KROMMENHOCK and STEPHEN HADLEY, et al. v. POST FOODS LLC*
United States District Court, Northern District of California
Case No. 3:16-cv-049585-WHO (JSC)
Deposed 2/21/2019

*AMERICAN CRUISE LINES v. HMS AMERICAN QUEEN STEAMBOAT COMPANY, et al.*
The United States District Court for the District of Delaware
Civil Action No. 13-324-rga
Deposed 10/12/2016; Trial testimony 1/9/2019

*STATE OF VERMONT, v. LIVING ESSENTIALS, LLC, and INNOVATION VENTURES, LLC.*
State of Vermont, Superior Court, Washington Unit
Civil Division Docket No. 443-7-14 Wncv
Deposed 3/8/2018; 12/6/2018

*SWAROVSKI RETAIL VENTURES LTD, v. JGB VEGAS RETAIL LESSEE, LLC*
District Court, Clark County, Nevada
Case No. A-15-727008-B
Deposed 12/21/2017

*VIP PRODUCTS, LLC v. JACK DANIEL'S PROPERTIES, INC.*
United States District Court, District of Arizona
Case No. 2:14-cv-02057-DGC
Deposed 8/12/2015; Trial testimony 10/5/2017

*LIBERTY MEDIA GROUP, LLC, et al. v. CINECAUSE, LLC, et al*
Superior Court of the State of California, Los Angeles
Case No. BC606196
Deposed 9/19/2017

*STRATEGIC PARTNERS, INC. vs. VESTAGEN PROTECTIVE TECHNOLOGIES, INC.*
The United States District Court, Central District of California
Case No. 2:16-CV-5900-RGK (PLA) 2:16-CV-5900-RGK (PLA) 2:16-CV-5900-RGK
(PLA) 2:16-CV-5900-RGK (PLA) 2:16-CV-5900-RGK (PLA) 2:16-CV-5900-RGK
(PLA)
Deposed 8/17/2017

*XIOMARA MARTINEZ ARROYO et al vs. THE NEMOURS FOUNDATION d/b/a NEMOURS CHILDREN'S HOSPITAL, ORLANDO*
Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida
Case No: 2015-CA-004791-O
Deposed 2/23/2017