**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **AFSHIN ZARINEBAF** and **ZACHARY CHERNIK, JOAN MEYER**, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>**CHAMPION PETFOODS USA INC. and CHAMPION PETFOODS LP,**<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 1:18-cv-06951<br>Hon. Virginia M. Kendall |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE PLAINTIFFS' EXPERT BRUCE G. SILVERMAN**

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. OVERVIEW OF MR. SILVERMAN'S EXPERT REPORT .......... 2

III. LEGAL STANDARD .......... 5

IV. ARGUMENT .......... 5

- A. Mr. Silverman's Opinions Are Methodologically and Factually Unreliable .......... 5
  - 1. Mr. Silverman's Testimony Is Methodologically Unreliable .......... 5
  - 2. Mr. Silverman's Testimony Does Not "Fit" the Facts of this Case .......... 8
- B. Mr. Silverman Has No Relevant Experience .......... 11
- C. Mr. Silverman Offers Nothing Helpful to the Jury .......... 14

V. CONCLUSION .......... 15

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co. LLC*,
No. 13-cv-324, 2017 WL 3528606 (D. Del. Aug. 16, 2017)....8

*Am. Honda Motor Co. v. Allen*,
600 F.3d 813 (7th Cir. 2010)....5

*Chapman v. Maytag Corp.*,
297 F.3d 682 (7th Cir. 2002)....5

*Crawford Supply Grp., Inc. v. Bank of Am., N.A.*,
No. 09-CV-2513, 2011 WL 4840965 (N.D. Ill. Oct. 12, 2011)....14

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)....5

*Ervin v. Johnson & Johnson, Inc.*,
492 F.3d 901 (7th Cir. 2007)....5

*FLIR Sys., Inc. v. Fluke Corp.*,
No. 10-cv-00971, 2012 WL 13051121 (D. Or. Nov. 5, 2012)....14

*Hadley v. Kellogg Sales Co.*,
No. 16-cv-04955, 2019 WL 3804661 (N.D. Cal. Aug. 13, 2019)....13

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*,
No. 17-cv-01613, 2017 WL 10399343 (C.D. Cal. Nov. 17, 2017)....7

*Hobbs v. Brother Int'l Corp.*,
No. 15-cv-1866, 2016 WL 7647674 (C.D. Cal. Aug. 31, 2016)....13

*Klaczak v. Consol. Med. Transp.*,
458 F. Supp. 2d 622 (N.D. Ill. 2006)....15

*Krik v. Crane Co.*,
71 F. Supp. 3d 784 (N.D. Ill. 2014)....11

*Krommenhock v. Post Foods, LLC*,
334 F.R.D. 552 (N.D. Cal. 2020)....13

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....1, 6

*Lewis v. CITGO Petroleum Corp.*,
561 F.3d 698 (7th Cir. 2009)....4, 5

*LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*,
661 F. Supp. 2d 940 (N.D. Ill. 2009)....7

*Moore v. P & G-Clairol, Inc.*,
781 F. Supp. 2d 694 (N.D. Ill. 2011) (Kendall, J.)....6

*Owens v. Auxilium Pharms., Inc.*,
895 F.3d 971 (7th Cir. 2018)....11

*Porter v. Whitehall Lab'ys, Inc.*,
9 F.3d 607 (7th Cir. 1993) ....................................................................................11

*Price v. L'Oréal USA, Inc.*,
No. 17-cv-614, 2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020)........................................13, 14

*Prime Media Grp., LLC v. Acer Am. Corp.*,
No. 12-cv-05020-BLF, 2015 WL 452192 (N.D. Cal. Jan. 22, 2015) ....................................15

*Repro-Med Sys., Inc. v. EMED Techs. Corp.*,
No. 13-cv-01957, 2019 WL 1427978 (E.D. Cal. Mar. 29, 2019).............................................7

*Timm v. Goodyear Dunlop Tires N. Am., Ltd.*,
932 F.3d 986 (7th Cir. 2019) ...........................................................................5, 11, 12

*United States v. Dewitt*,
943 F.3d 1092 (7th Cir. 2019) ..............................................................................15

**Other Authorities**

Fed. R. Evid. § 702 ..........................................................................................4, 11

Fed. R. Evid. § 702(a)...........................................................................................5

Rule 1006 ...........................................................................................................15

# I. INTRODUCTION

This motion illustrates the importance of the *Daubert* standard. Absent competent evidence supporting their claims that Defendants Champion Petfoods USA Inc. and Champion Petfoods LP's (collectively, "Champion") dog food packaging was misleading, Plaintiffs seek to smuggle pure *ipse dixit* speculation to the jury under the guise of expert testimony. Plaintiffs proffer Mr. Bruce G. Silverman, a former advertising executive, to testify as to what he thinks consumers hypothetically might think of Champion's packaging if Plaintiffs' allegations were true, without doing anything to assess what real consumers think about the actual product at issue. For example, Mr. Silverman opines that "pet parents would object to the presence or possible presence of heavy metals, BPA, pentobarbital, non-fresh ingredients, and non-regional ingredients in Champion's dog food products." *See* Expert Report of Bruce Silverman ("**Exhibit 1**," hereinafter "Report") at 58. Such opinions are inadmissible for a host of reasons.

*First*, there is no empirical, methodological, or factual support for Mr. Silverman's opinions. He employed no methodology that meets any of *Daubert*'s reliability metrics. He conducted no consumer surveys, interviews, or focus groups—despite acknowledging he would do so if assessing these issues as part of his advertising practice—and did not even review the deposition transcripts of the very consumers at issue in these cases, *the named Plaintiffs*. Such arbitrary opinions that are "connected to existing data only by the *ipse dixit* of the expert" are the hallmark of inadmissible testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999).

*Second*, Mr. Silverman admittedly lacks any experience with the particular issues on which he opines that could bridge his lack of factual or methodological support. For example, although he worked on two pet food advertising projects back in the 1970s, he has no experience—much less temporally relevant experience—with the "premium" or "super premium" dog food categories at issue here, even though he acknowledges that consumers who buy those products have different

perspectives from the consumers to whom he helped market lower priced pet foods more than 40 years ago. He similarly lacks any experience with and has no expert knowledge of pet nutrition, ingredients or their sourcing, heavy metals, BPA, or pentobarbital. Irrelevant experience—however extensive it might be—cannot salvage methodologically unreliable testimony, and his opinions fail for this additional reason.

*Third*, absent reliable methodology or experience, Mr. Silverman offers nothing of use to the factfinder. His regurgitation of dictionary definitions, news articles, and discovery documents in support of what he "thinks a consumer would think" do not constitute scientific, technical, or specialized knowledge that is helpful to the jury. Instead, Mr. Silverman serves as nothing more than a mouthpiece for Plaintiffs' counsel's arguments, an independent ground for exclusion.

Courts have excluded Mr. Silverman for all of these reasons; this Court should do the same.

## II. OVERVIEW OF MR. SILVERMAN'S EXPERT REPORT

Plaintiffs proffer Mr. Silverman, a former advertising executive with "50 years of professional experience in the marketing-communication industry," to "opine on consumer perceptions" of the following statements found on Champion packages: "Biologically Appropriate"; "Delivering Nutrients Naturally"[1]; and Fresh Regional Ingredients." Report ¶ 4 (the "Challenged Statements"). As part of his opinions, Mr. Silverman accepts Plaintiffs' allegations as true that Champion's "packaging claims were misleading and fraudulently omitted the fact that Defendants' dog foods contained and/or had a material risk of containing undisclosed and non-conforming ingredients and contaminants." *Id.* ¶ 3. He acknowledges that he did nothing to determine the veracity of those statements. *See* Deposition of Bruce Silverman dated November 24, 2020 ("**Exhibit 2**," hereinafter, "Dep. Tr.") at 85:11-16; Report ¶ 113.

[1] The phrase "Delivering Nutrients Naturally" only appears on ACANA bags. *See* Plaintiffs' Motion for Class Certification [ECF No. 95] at p. 2.

Many of the opinions summarized at Paragraph 32 of Mr. Silverman's expert report are mere recitations of obvious platitudes, such as "most consumers make food purchasing decisions for themselves and their families based on their perception that the products they choose are healthy," "Many consumers treat their pets as family members," "The Challenged Statements communicate to consumers that the Champion Products at issue are healthy," and "Consumers are positively influenced by the Challenged Statements." Report ¶¶ 32(a)-(c), (g). However, Mr. Silverman goes far beyond such general advertising platitudes when he opines that:

- Consumers who purchase premium-priced dog food are concerned about the possible presence of heavy metals, BPA, pentobarbital, non-fresh ingredients, and non-regional ingredients in those products.
- Consumers would see the possible presence of heavy metals, BPA, pentobarbital, non-fresh ingredients, and non-regional ingredients as inconsistent with the challenged Champion statements, and material to their purchasing decisions.
- It is unreasonable to expect consumers to proactively determine whether the Challenged Statements that appear on the front surface of Defendants' packaging are true, or to somehow determine if Defendants had omitted on their packaging the presence of Heavy Metals, non-fresh and non-regional ingredients, and the possible presence of BPA and pentobarbital, in their products.
- Had Champion's packaging disclosed that its products contained and/or had a risk of containing heavy metals, BPA, pentobarbital, a material amount of ingredients that were not fresh, and/or a material amount of ingredients that were not local or regional, such disclosures would have adversely affected consumers' willingness to purchase the Champion Products.
- Assuming Plaintiffs' allegations are true, a reasonable consumer would be misled and deceived by Champion's packaging as a whole.

*Id.* ¶¶ 32(h)-(l). At deposition, he characterized these opinions as his attempt to approximate "what consumers might think," Dep. Tr. at 49:19-24, or what he "think[s] that . . . consumers think about those" issues, *id.* at 52:22-25.

In formulating these opinions, Mr. Silverman did not conduct any consumer surveys or focus groups, *id.* at 30:7-21, despite it being his standard practice to do so, Report ¶¶ 26-27. Nor did he conduct any research studies. Dep. Tr. at 48:5-10. Mr. Silverman did not interview a single consumer, much less any consumer who purchased Champion dog food. *Id.* at 30:7-10. He did not

even review the deposition transcript of the named Plaintiffs in this case or those of any plaintiff in the analogous suits against Champion. *Id*. at 29:21-25, 117:14-20, 139:6-11. His opinions derive primarily from news articles and websites he Googled and a handful of Champion's internal documents selected for him by Plaintiffs' counsel. Report, Ex. A. This sort of "research" would never have been acceptable to one of his paying professional advertising clients. It should not pass muster in this Court either.

Mr. Silverman cannot fall back on his years of advertising similar products as a proxy for empirical consumer research. Mr. Silverman has never consulted for a pet food company. Dep. Tr. at 21:19-21. Although he worked on two dog food accounts (both mass producers of non-premium dog food) in the 1970s, he testified he has not performed any advertising work for any pet food company since 1980. *Id.* at 21:22-23:14. Moreover, Mr. Silverman testified that the dog food brands he worked with 40 years ago were "popular-priced" dog food brands, whereas he characterizes Champion's dog food as "premium" and "super premium" dog food with different consumers who have different consumer perceptions and habits. *Id.* at 42:25-43:17, 63:21-64:1, 94:19-95:2, 126:19-25, 135:11-14 ("You know, consumers—I doubt very much that consumers that are inclined to buy a product like Acana or Orijen are, you know, hot to buy Pedigree. They're oriented to get a premium product for their dog."). Mr. Silverman acknowledged his pet food experience is outdated and that he has no experience with consumers of premium dog food. *Id.* at 42:1-10 ("I've already told you I worked on two dog food accounts so, you know, I can arguably say that they were similar, but I don't think they were similar. They weren't selling premium products. I'm not even sure if there were premium products in those days."). He conceded that as to comparing popular-priced dog foods with premium dog foods, "as a consumer . . . it's an apple to oranges comparison." *Id.* at 133:14-134:3.

## III. LEGAL STANDARD

The proponent of the expert bears the burden of demonstrating that the expert's testimony is admissible under Rule 702 and the *Daubert* standard by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 permits an expert to testify only if that testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Expert opinions may be considered only if (1) "the testimony is based on sufficient facts or data," (2) the testimony is the product of reliable principles and methods," and (3) the expert has reliably applied the principles and methods to the facts of the case." *Id.* at 702(b)-(d). To ensure these threshold requirements are satisfied, district courts are tasked with the role of "gatekeeper" over all proffered expert or scientific testimony. *See, e.g.*, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).

As the gatekeeper, the Court must ensure that the proffered expert has the requisite knowledge, skill, experience, training, or education relevant to such evidence or fact in issue. *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010) (holding "when an expert's report or testimony is critical to class certification … a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion"). The Court must also ensure that the "expert testimony is both relevant and reliable." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).

## IV. ARGUMENT

### A. Mr. Silverman's Opinions Are Methodologically and Factually Unreliable

#### 1. Mr. Silverman's Testimony Is Methodologically Unreliable

At the first step of the admissibility inquiry under *Daubert*, the court "is responsible for ensuring that the proposed testimony 'is not only relevant, but reliable.'" *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019). Courts must consider several factors,

including "(1) whether the theory can be and has been verified …; (2) whether the theory has been subjected to peer review; (3) the known or potential rate of error; and (4) the general acceptance of the theory in the scientific community." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002). "It is incumbent upon the trial court to carefully consider these factors before admitting any expert scientific evidence." *Id.*

Mr. Silverman's testimony meets none of the *Daubert* reliability indicia. His opinions regarding premium-dog food consumers' perceptions of the "possible presence of heavy metals, BPA, pentobarbital, non-fresh ingredients, and non-regional ingredients" in Champion's dog food, *see* Report ¶¶ 32(h)-(k), are untested and untestable, have not been subject to peer-review and publication, are not subject to uniform standards, and have no general acceptance within any identifiable professional community. He did not even live up the standards and methods he set for himself over the long career that is the sole basis for his claimed "expertise."

Nor did Mr. Silverman employ "the same level of intellectual rigor that characterizes [his] practice in [his] relevant field." *Kumho Tire Co.*, 526 U.S. at 152. When attempting to describe the methodology he employed in this case, he testified that "my process is to sort of reverse engineer the process I used when creating advertising," that "starts with trying to understand what consumers want or need to hear." Dep. Tr. at 137:2-16. To understand consumers, he opined that it was his common practice as an advertising executive to conduct consumer surveys, focus groups, and interviews:

> One of the keys to creating effective advertising campaigns is to 'walk in the consumer's shoes'—to do everything possible to understand how they learn, think and feel about the products and services they are considering purchasing. For that reason, advertisers and agencies spend millions of dollars annually on primary and secondary research studies that provide insights into what consumers understand and believe. . . I estimate that over the course of my career I have personally interviewed more than 5,000 consumers and attended at least 3,500 focus group sessions for products ranging from automobiles to dog toys.

Report ¶¶ 26-27. But Mr. Silverman did none of those things in this case. He did not conduct a

single consumer survey, focus group, research study, or interview. Dep. Tr. at 29:21-25, 30:7-10, 48:5-10. He did not speak with a single consumer who purchased Champion dog food, including the Plaintiffs who brought this lawsuit. *Id.* at 29:21-25, 30:7-10. Nor did he even read those Plaintiffs' depositions. *Id.* at 117:14-20, 139:6-11.

These methodological failings alone are grounds for exclusion. *See Moore v. P & G-Clairol, Inc.*, 781 F. Supp. 2d 694, 704 (N.D. Ill. 2011) (Kendall, J.) (excluding expert who "substituted his own experience of mixing chemicals …[to] reflect[] how a consumer could botch the test. That is different than showing by testing that the consumer actually botched the test.") (citing Chapman, 297 F.3d at 688 (holding "[p]ersonal observation is not a substitute for scientific methodology and is insufficient to satisfy *Daubert*'s most significant guidepost.")); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 957 (N.D. Ill. 2009) (finding expert unqualified to provide lay definition of the word 'steam' because "[h]e has no training or expertise in linguistics" and "did not conduct any surveys or consumer research to reach these opinions").[2]

Mr. Silverman's testimony was recently rejected by a court for just these reasons:

> Mr. Silverman does not present any evidence indicating what an actual consumer would do, such as a consumer survey. Instead, Mr. Silverman merely speculates what a hypothetical consumer would do and then draws the legal conclusion that Defendants' advertisements constitute a material deception. Because Plaintiffs have not offered anything more than these bare, conclusory statements from their expert, Plaintiffs have not provided sufficient evidence that Defendants' advertisements are materially deceptive.

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, No. 17-cv-01613, 2017 WL 10399343, at *3 (C.D. Cal. Nov. 17, 2017). Indeed, Mr. Silverman's opinions have been rejected even where he did *far more* than he did in this case:

> Silverman's "informal survey" is also excluded because it lacks indicia of reliability. Silverman offers the "informal survey" to "bolster[]" his conclusion that a

[2] *See also Repro-Med Sys., Inc. v. EMED Techs. Corp.*, No. 13-cv-01957, 2019 WL 1427978, at *7 (E.D. Cal. Mar. 29, 2019) ("Without consumer survey information or other specific examples of consumers being misled, the vague anecdotal evidence alone submitted by [plaintiff's expert] is insufficient to prove that the public is likely to be misled.").

> "reasonably careful consumer" could confuse Plaintiff and Defendant even if that consumer uses a travel agent to book her cruise. The informal survey consisted of Silverman directing "an experienced market research professional" to contact travel agents in nine states to ask the question, "Do you or your customers ever get confused as to which company is which?" Plaintiff failed to provide any information on how these agents were selected, whether they are representative, and how their responses were categorized. While Plaintiff is correct, the survey "need not be a scientific survey" in any formal sense, to be admissible, the survey must be moored in some reliable process that can be tested on cross-examination.

*Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co. LLC*, No. 13-cv-324, 2017 WL 3528606, at *7 (D. Del. Aug. 16, 2017). Mr. Silverman's baseless opinions should be rejected here too.

**2. Mr. Silverman's Testimony Does Not "Fit" the Facts of this Case**

Mr. Silverman opines that consumers would be "misled and deceived by Champion's packaging as a whole" due to the "possible presence of heavy metals, BPA, pentobarbital, non-fresh ingredients, and non-regional ingredients," *see* Report ¶¶ 32(h)-(l). These opinions are untethered to the facts, and thus fail *Daubert*'s "fit" requirement.

On its face, Champion's "packaging as a whole" directly contradicts Mr. Silverman's speculative opinions that Challenged Statements like "Fresh Regional Ingredients" are somehow misleading merely because not *all* ingredients are "fresh" or "regional." *Id.* Mr. Silverman acknowledges that Champion's dog food does, in fact, contain a high amount of fresh regional ingredients. Dep. Tr. at 56:2-7, 71:1-3, 76:21-24. He concedes that Champion does not market its products as *exclusively* locally sourced, exclusively fresh, or 100 percent natural ingredients. *Id.* at 52:2-4, 93:10-13. To the contrary, he acknowledges that other statements prominently featured on the front and back of Champion's packages make clear that they contain ingredients that are *not* locally sourced—such as ingredients sourced internationally, Report at 82 n.115 ("some of Champion's Products note some non-regional ingredient suppliers, such as New Zealand lamb"), and from locations all over "America," Dep. Tr. at 90:19-24, that are nonregional to Kentucky, *id.* at 54:5-7 ("Idaho"), *id.* at 132:5-10 ("Atlantic Mackerel"). Mr. Silverman also acknowledges that Champion's packages clearly state that they contain some ingredients that are *not* fresh, such as

"dried" and "dehydrated" ingredients, *id.* at 83:25-84:9 ("Q. You'd agree that a dried ingredient is not fresh, Correct? A. Yes."), *id.* at 132:5-10. Moreover, Mr. Silverman could not identify any premium brands of dog food that were healthier or that had higher inclusions of locally-sourced ingredients, fresh or raw ingredients, or natural ingredients than Champion's dog food that could render Champion's statements misleading in comparison. *Id.* at 67:13-17, 67:24-68:3, 79:15-21.

Mr. Silverman's only attempt to account for these prominently-displayed statements flatly contradicting his opinions is to speculate that, although "certain information appears on the back label of the Challenged Packages that disclaims or limits [the Challenged Statements,] . . . those disclaimers are most likely not going to be read at retail by a significant percentage of consumers." Report ¶ 119. Not only is this speculation unfettered by any consumer research, it is contradicted by the very packaging he chooses. Prominently displayed statements on Champion's packaging make it clear that Champion is not claiming that *all* ingredients are fresh or regionally sourced—such as "Half are FRESH or RAW and loaded with goodness, and half are DRIED or OILS"—are not "disclaimers" under Mr. Silverman's own definition of that term. *See* Deposition of Bruce Silverman dated March 17, 2021 ("**Exhibit 3**," hereinafter "Dep. Tr. Vol. 2") at 26:5-17 ("[Disclaimers] are statements made in ads or in television commercials or labels that limit the—limit the claims or limit the conditions that the consumer has to meet to make the purchase. The best example I can think of is in automobile advertising . . . there'll be a very long, almost impossible to read superimposed copy on the television screen that states all the conditions that you would have to meet to lease the vehicle."). Rather, these statements are part of, and add context to, the very "marketing message[s]" Plaintiffs' claim are deceptive. *Id.* at 26:21-27:1.

Mr. Silverman agreed that such context is important when it comes to marketing statements on packaging. Dep. Tr. at 35:23-25. He also acknowledged that purchasers of premium dog food are "information seekers," inclined to closely read all information on a package. *Id.* at 70:11-17;

*see also* Dep. Tr. Vol. 2 at 24:4-16. He further admitted that the Champion packages at issue actually encouraged consumers to read their ingredients to provide context for the Challenged Statements—"read our ingredients and we think you'll agree." Dep. Tr. at 69:12-23. And, most importantly, the named Plaintiffs in this case testified they did just that.[3] *Mr. Silverman ignored this testimony.* Dep. Tr. at 29:21-25, 117:14-20, 139:6-11. His opinion that consumers of premium dog food would be misled based on the fact that Champion's dog food includes some non-regional or non-fresh ingredients, as expressly stated on its packaging, thus not only lacks any factual support—it runs contrary to all the record evidence in this case.[4]

Mr. Silverman's opinions on heavy metals, BPA, and pentobarbital are similarly counterfactual. Those opinions are based on his assumption that "I think if consumers were aware that there were high levels of some kind of contaminant [in their dog food], they would be concerned." Dep. Tr. at 115:8-10. But Mr. Silverman did nothing to determine, and thus had no opinion regarding, the levels of heavy metals or BPAs in Champion's dog foods—whether they were "high" or not. *Id.* at 106:8-10, 109:2-9. He agreed that Champion's packages do not represent that they are free of heavy metals or BPA. *Id.* at 110:15-111:3. He further agreed that heavy metals

---

[3] *See* Deposition of Afshin Zarinebaf dated November 23, 2020 ("**Exhibit 4**") at 48:19-49:10; 88:1-12; 89:24-90:3; 94:22-95:12; 96:11-20; 98:14-20; 104:4-10. 109:14-16; 109:23-110:1; 118:20-23; 123:15-17; 128:13-129:2; 135:23-136:1; 136:15-19; 139:20-23 (testifying as to the extensive detail in which he read the bags prior to purchasing, including the ingredient panel); Deposition of Zachary Chernik dated December 8, 2020 ("**Exhibit 5**") at 34:20-23; 104:14-19; 105:8-11; 123:15-20; 126:11-14; 127:18-24; 134:12-16; 147:18-21; 153:8-11 (same); Deposition of Joan Meyer dated November 13, 2020 ("**Exhibit 6**") at 66:21-67:9; 72:25-73:4; 82:6-11 (testifying she read the first few ingredients on the ingredient panel when purchasing); *see id.* at 68:21-25; 69:12-17; 71:21-24 ; 74:4-6; 74:20-75:5; 76:7-13; 78:15-19; 81:15-17; 82:14-19; 84:23-85:2; 85:12-16 (discussing extent she read the bags when purchasing).

[4] The arbitrariness of Mr. Silverman's opinion on this issue are laid bare by his own advertising experience. He prides himself on his advertising campaign for Pace Picante Sauce, for which he wrote the following copy: "Pace is made in San Antonio with fresh vegetables and spices," Report ¶ 40, a representation that is the functional equivalent of Champion's "made with" or "with" "Fresh Regional Ingredients" statements on its packaging. Mr. Silverman acknowledged that his copy did not imply that "fresh vegetables and spices" were the exclusive ingredients in Pace or that all ingredients were made or sourced in San Antonio. Dep. Tr. at 57:2-58:13. His own experience thus belies his unsupported opinion here that "consumers would perceive the presence of non-fresh ingredients in Champion's Products as inconsistent with the Challenged Statements." Report ¶ 204.

occur naturally in the ingredients Champion uses to process its foods, such as mercury in fish. *Id.* at 114:6-11. Mr. Silverman could not identify any dog food that has no detectable levels of heavy metals or BPA. *Id.* 105:25-106:6. Nor did he have any opinion on the levels of any of those substances in other companies' dog food or what levels are safe for dogs. *Id.* at 105:5-106:10. He is not aware of any pet food manufacturer in the world that discloses or warns about the presence of heavy metals or BPA in their food. *Id.* at 111:4-13. There is simply no factual basis for his opinion that consumers of premium dog food would be misled based on Champion not disclosing the potential but safe presence of trace levels of heavy metals or BPA on its packaging.

These failings go beyond mere factual quibbles that would be appropriate for cross-examination—they show the absolute lack of any methodological and factual basis for Mr. Silverman's arbitrary and speculative opinions. An expert "need[s] to show that his conclusions were the fruit of a rigorous, objectively-verifiable approach—something more than mere speculation." *Timm*, 932 F.3d at 994. Indeed, "the facts of the case must fit the scientific analysis to which they are being applied." *Porter v. Whitehall Lab'ys, Inc.*, 9 F.3d 607, 611 (7th Cir. 1993); *see* *Owens v. Auxilium Pharms., Inc.*, 895 F.3d 971, 973 (7th Cir. 2018) (holding "the district court properly exercised its discretion by concluding that Dr. Abbas's testimony did not fit the facts of [the] case."); *Krik v. Crane Co.*, 71 F. Supp. 3d 784, 790 (N.D. Ill. 2014) (finding "there is an insufficient fit between the [expert's] Videos and the facts of this case"). Mr. Silverman's unreliable testimony should be excluded at the threshold for these reasons.

**B. Mr. Silverman Has No Relevant Experience**

Lacking any empirical research, and having not followed his own standard practices, Mr. Silverman invoked his "experience" as an adequate basis for his opinions. Because past experience is subjective and untestable, it is held to a strict showing in order to pass muster under *Daubert*. Where an expert witness relies "solely or primarily on experience, then [he] must explain how that

experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Advisory Comm. Notes. "Even a supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method." *Timm*, 932 F.3d at 994.

Mr. Silverman cannot meet either the "why" or the "how" elements needed satisfy *Daubert*'s reliability requirements. He acknowledged that his limited work for pet food companies back in the 1970s was both outdated and in a different, "popular priced" category than the "premium" brand at issue here. Dep. Tr. at 42:1-10; *see also id.* at 21:19-23:14, 42:25-43:17, 63:21-64:1, 94:19-95:2, 126:19-25, 135:11-14. He conceded that the consumers of premium dog food are different from the consumers of popular priced dog food and have different perceptions and behaviors such that it would be "an apple to oranges comparison." *Id.* at 42:25-43:17, 63:21-64:1, 94:19-95:2, 126:19-25, 133:14-134:3, 135:11-14. He admittedly has no relevant experience with the precise consumer category at issue, thus failing to satisfy the "why."

Mr. Silverman similarly admitted that he has no experience or expertise with dog food ingredients, heavy metals, or BPA. Dep. Tr. at 25:7-23, 113:1-8, 132:14-25; *see also id.* at 120:8-11 ("I'm not an expert in how dog food is formulated."). Indeed, despite opining on how consumers would perceive the presence of "regrinds" in Champion's dog food, he had never even heard the term "regrinds" before this case and has no opinion as to the nutritional value of the regrinds allegedly used in Champion's products. *Id.* at 49:19-24, 51:21-52:1 ("I would have to be a nutritionist, I suppose, to have an expertise in that area."). His testimony is rife with similar admissions that he could not opine on the levels of heavy metals or BPA or the health implications of those substances in Champion's products because he had no experience or expertise in those areas. *See, e.g.*, *id.* at 109:6-9 ("It's not my area of expertise."). For example, when asked "Well, if the levels of heavy metals in the ingredients in the fresh food are at a healthy level, then why

should a manufacturer make any kind of disclosure about it?" his response was "That's outside—you know, that's not my area of expertise, that's for lawyers to determine." *Id.* at 115:15-21. Along similar lines, although Mr. Silverman seeks to opine that consumers "reasonably expected that Champion would ensure that heavy metals are processed out of food," he acknowledged that he does not even know "whether it is scientifically possible to process heavy metals out of pet food." *Id.* at 108:9-17; *see also id.* at 92:12-16 ("That was not part of my assignment."). These shortcomings all fail to meet the "how" element pertaining to his dated experience.

In short, Mr. Silverman falls woefully short of *Daubert*'s reliability standard for opinions based solely on experience. Under strikingly similar circumstances, a court excluded analogous opinions Mr. Silverman sought to offer as unreliable in *Price v. L'Oréal USA, Inc.*, No. 17-cv-614, 2020 WL 4937464, at *13 (S.D.N.Y. Aug. 24, 2020). Although the *Price* court noted that some courts had permitted Mr. Silverman to offer generic advertising opinions even where he failed to conduct a consumer survey—based on his extensive advertising experience[5]—the court precluded his testimony regarding the presence of keratin (a protein found in hair treatment) in hair products based on the lack of any reliable methodology or experience:

> Mr. Silverman's opinion that keratin is a well known ingredient in hair products, and "many women . . . are already aware of (or have ample opportunity to be aware of) the restorative properties of keratin" in hair products is not based on his experience, nor is it based on a reliable methodology. ***Mr. Silverman does not claim to have any experience from which he can opine on consumer knowledge of keratin as an ingredient in hair products***. Rather, this opinion is based on certain Google searches (one of which consisted of a search for "keratin shampoos" and others which he did not identify), a search on Amazon.com for "keratin shampoos" and a review of

[5] Mr. Silverman's testimony was permitted by California courts in *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 580 (N.D. Cal. 2020) (cereal); *Hadley v. Kellogg Sales Co.*, No. 16-cv-04955, 2019 WL 3804661, at *24 (N.D. Cal. Aug. 13, 2019) (cereal); *Hobbs v. Brother Int'l Corp.*, No. 15-cv-1866, 2016 WL 7647674, at *4 (C.D. Cal. Aug. 31, 2016) (printers). None of these cases involved Mr. Silverman attempting to opine on the perceptions of consumers with whom he had no experience regarding ingredients and substances with which he had no experience. To the contrary, the courts in those decisions relied on Mr. Silverman's experience in the relevant fields at issue, *e.g.*, "experience in th[e cereal] field, including attending numerous focus groups centered on marketing cereal and developing marketing plans for cereal products." *Krommenhock*, 334 F.R.D. at 580. These cases are not persuasive because Mr. Silverman, by his own admission, has no relevant experience here, nor any methodological or factual basis for his opinions.

> emails and testimony from Defendants' employees and the United States Patent and Trademark Office's ("USPTO") ruling on Defendants' trademark application.

*Id.* at *4 (emphasis added). Mr. Silverman's testimony was excluded for similar reasons in *FLIR Sys., Inc. v. Fluke Corp.*, No. 10-cv-00971, 2012 WL 13051121 (D. Or. Nov. 5, 2012), where he sought to opine on "advertising in the thermal imaging camera industry," because that particular industry was "outside Silverman's experience and outside his expertise." *Id.* at *3.

Because Mr. Silverman has no experience in the areas upon which he opines, his opinions should be excluded on that independent ground. *See Crawford Supply Grp., Inc. v. Bank of Am., N.A.*, No. 09-CV-2513, 2011 WL 4840965, at *3 (N.D. Ill. Oct. 12, 2011) (rejecting expert's proposed testimony based on his prior experience because "he never draws explicit connections between specific incidences or lessons from his professional history and the [facts of the case]").

### C. Mr. Silverman Offers Nothing Helpful to the Jury

Unsupported by any reliable methodology, record evidence, or relevant experience, Mr. Silverman's opinions are essentially a narrative summary of dictionary definitions, online articles that he Googled, and some internal Champion documents hand selected by Plaintiffs' counsel, interspersed with anecdotal commentary and speculation about "what consumers might think," Dep. Tr. at 49:19-24, or what he "think[s] that . . . consumers think," *id.* at 52:22-25. By way of just a few examples, Mr. Silverman's report contains opinions such as:

- "word 'Biologically' will remind consumers of their high school Bio classes," Report ¶ 103;
- "[C]onsumers are far more likely to understand 'raw' as it is defined by Merriam-Webster," *id.* ¶ 112; *see also* ¶¶ 123, 139, 201, 206 (quoting Merriam Webster);
- "Champion [uses] the words 'raw' and 'fresh' a[s] interchangeable. In my experience, few consumers would see it that way, *id.* ¶ 114;
- "I have reviewed documents that evidence Champion's awareness of consumer concerns over the possible presence of heavy metals in its products," *id.* ¶¶ 160-163, 167-172 (summarizing internal Champion documents);
- "[I]t is my opinion that pet parents have had access to many media reports regarding the dangers posed to themselves and their pets by the presence of heavy metals and the possible presence of BPA, and would therefore be very concerned about the possible presence of those contaminants," *id.* ¶ 217; *see also, e.g.*, *id.* ¶ 149 (citing a "60 Minutes report" on lead

in Flint, Michigan); *id.* ¶ 150 (citing study from an "ABC network affiliate in Washington DC" on heavy metals); *id.* ¶ 152 (citing a 2007 *New York Times* article on lead in dog toys).

He does not even try to defend 60 Minutes, the *New York Times* or local news coverage as the kind of sources experts in his (or any other) field typically rely upon as the basis for expert opinions. Mr. Silverman's rehashing of non-technical, non-scientific documents requires no "specialized knowledge" and "is unnecessary—and may even be properly excluded—[because] people of common understanding are as capable of comprehending the primary facts and of drawing correct conclusions from them[.]" *United States v. Dewitt*, 943 F.3d 1092, 1096 (7th Cir. 2019). "Expert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony." *Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 665 (N.D. Ill. 2006). And, "[e]xpert testimony is not necessary to summarize voluminous documents or records—Rule 1006 provides such a mechanism without the use of expert testimony." *Id.* at 666.

Here yet again, Mr. Silverman's testimony has been excluded by other federal courts on this very basis. For example, in *Prime Media Grp., LLC v. Acer Am. Corp.*, No. 12-cv-05020-BLF, 2015 WL 452192 (N.D. Cal. Jan. 22, 2015), the court held:

> Aspects of Silverman's opinions . . . purport[] to assess the inferences that should be drawn from certain deposition testimony. With respect to these opinions, the court finds Silverman's testimony inadmissible. The jury will be hearing testimony and reviewing documents and will be asked to evaluate that evidence and draw reasonable inferences to determine the facts of the case. This is exactly what Silverman purports to do in evaluating the deposition testimony presented to him. . . . Silverman appears to be simply performing the role of a jury—assessing the meaning and credibility of various evidence—in light of his experience in the industry. Although this may involve certain inferences that are aided by Silverman's experience, it also necessarily involves inferences—especially with respect to assessing credibility—that do not lie beyond the common knowledge of the average layperson. Inferences of this sort are the exclusive province of the jury.

*Id.* at *7. Mr. Silverman's unhelpful testimony should be excluded for this independent reason.

## V. CONCLUSION

For the foregoing reasons, Mr. Silverman's testimony should be excluded.

Dated: April 29, 2021

Respectfully submitted,

s/ *David A. Coulson*

David A. Coulson (ARDC #6199911)
Jessica J. Fishfeld (ARDC #6313149)
Jared R. Kessler (Admitted *pro hac vice*)
Robert S. Galbo (Admitted *pro hac vice*)
Elisa H. Baca (Admitted *pro hac vice*)
GREENBERG TRAURIG P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
Tel: (305) 579-0754
Fax: (305) 579-0500
Email: coulsond@gtlaw.com
johnsonj@gtlaw.com
kesslerj@gtlaw.com
galbor@gtlaw.com
bacae@gtlaw.com

Francis A. Citera (ARDC # 6185263)
GREENBERG TRAURIG LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Tel: (312) 456-8400
Fax: (312) 456-8435
Email: citeraf@gtlaw.com

Rick L. Shackelford, Esq. (*pro hac vice*)
GREENBERG TRAURIG LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Tel: 310-586-3878
Fax: 310-586-7800
Email: shackelfordr@gtlaw.com

***Attorneys for Defendants***
***Champion Petfoods USA Inc. and***
***Champion Petfoods LP***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of April, 2021, I served the foregoing document on all counsel of record identified on the below Service List via Registered Email.

*/s/ David A. Coulson*
DAVID A. COULSON

## SERVICE LIST

Charles J. LaDuca
Katherine Van Dyck
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Tel: 202-789-3960
Email: charlesl@cuneolaw.com
Email: kvandyck@cuneolaw.com

Rebecca A. Peterson
Robert K. Shelquist
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave. S., Suite 2200
Minneapolis, MN 55401
Tel: 612-339-6900
Email: rapeterson@locklaw.com
Email: rkshelquist@locklaw.com

Kevin A. Seely
ROBBINS LLP
5040 Shoreham Place
San Diego, CA 92122
Tel: 619-525-3990
Email: KSeely@robbinsllp.com

Daniel E. Gustafson
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: 612-333-8844
Email: dgustafson@gustafsongluek.com

Kenneth A. Wexler
Kara A. Elgersma
Michelle Perkovic
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Tel: 312-346-0022
Email: kaw@wexlerwallace.com

Mark J. Tamblyn
WEXLER WALLACE LLP
333 University Ave., Suite 200
Sacramento, CA 95825
Tel: 916-565-7692
Email: mjt@wexlerwallace.com

Joseph J. DePalma
Susana Cruz Hodge
LITE DEPALMA GREENBERG, LLC
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Email: jdepalma@litedepalma.com
Email: scruzhodge@litedepalma.com

*Attorneys for Plaintiffs*