## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| AFSHIN ZARINEBAF, ZACHARY CHERNIK, and JOAN MEYER, individually and on behalf of a class of similarly situated individuals, | ) ) ) ) ) | Case No. 1:18-cv-06951 |
| Plaintiffs, | ) ) ) | Honorable Virginia M. Kendall |
| v. | ) ) | |
| CHAMPION PETFOODS USA INC. and CHAMPION PETFOODS LP, | ) ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANTS CHAMPION PETFOODS USA INC. AND CHAMPION PETFOODS LP'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................1

II.   FACTUAL BACKGROUND ......................................................................3

    A.    The Evolution of Champion Petfoods ...........................................3

    B.    Champion's Wide Variety of Diets and Packaging ........................4

    C.    Champion's Historical Testing for Heavy Metals, Response to the Clean Label Project, and Genesis of this Lawsuit ...............................6

    D.    BPA Is Not an Ingredient, but Trace Levels of This Environmentally Ubiquitous Molecule Can Sometimes be Found in Champion dog food at Levels that Pose no Risk of Harm to Dogs ...........................7

    E.    Very Low and Non-Dangerous Levels of Pentobarbital were Found in an Ingredient Supplied to Champion's DogStar Kitchen in Late March 2018 for its "Red" Diets, but Not Found in its Finished Dog Food ...................7

    F.    Facts Specific to Plaintiffs and the History of this Lawsuit ...................8

III.  LEGAL STANDARD FOR RULE 23 .......................................................10

IV.  THE PROPOSED CLASSES SHOULD NOT BE CERTIFIED .........................11

    A.    Plaintiffs Fail to Carry Their Burden Under Rule 23(b)(3) Because Their Claims Are Riddled with Individualized Issues .................................11

        1.    Plaintiffs' proposed classes raise individualized issues as to the critical element of whether Champion made any misleading statements ...............................................................11

            a.    The statements on Champion bags varied widely throughout the proposed class period by brand, diet, kitchen, and time ..........12

            b.    The contents *inside* of each Champion bag must be compared to the statements made on the *outside* of the bag ............................19

                i.    Issues as to "fresh" require diet-by-diet and/or lot-by-lot analysis, generating individual issues .....................20

                ii.    "Regional" also requires individualized analysis ..............22

                iii.   Issues as to heavy metals, BPA, and pentobarbital also create individualized issues .........................................24

        2.    The putative class members' alleged damages are not susceptible to measurement across any of the mini-classes .............................26

    B.    Plaintiffs Fail to Carry Their Burden Under Rule 23(c)(4) ...................29

    C.    Plaintiffs Fail to Carry Her Burden Under Rule 23(b)(2) .......................30

V.   CONCLUSION .....................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*CE Design Ltd. v. King Architectural Metals, Inc.*,
    637 F.3d 721 (7th Cir. 2011) ................................................................10

*Clark v. Experian Information Solutions, Inc.*,
    256 Fed. Appx. 818 (7th Cir. 2007) .......................................30

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) .....................................................10, 26, 27

*In re Fluidmaster, Inc. Water Connector Components Prods. Liab. Litig.*,
    No. 14-cv-5696, 2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) ...................................28, 29, 30

*In re General Motors LLC Ignition Switch Litig.*, 14-MD02543 (JMF),
    2019 WL 3564698 (S.D.N.Y. Aug. 6, 2019)...............................29

*Jefferson v. Ingersoll Int'l Inc.*,
    195 F.3d 894 (7th Cir. 1999) .......................................30

*Langendorf v. Skinnygirl Cocktails, LLC*,
    306 F.R.D. 574, 583-84 (N.D. Ill. 2014) .............................12

*Lemon v. Int'l Union of Operating Engineers, Loc. No. 139, AFL-CIO*,
    216 F.3d 577 (7th Cir. 2000) .......................................30

*Lipton v. Chattem*,
    289 F.R.D. 456 (N.D. Ill. 2013)...............................12, 19, 30

*Oshana v. Coca-Cola, Co.*,
    225 F.R.D. 575, 585 (N.D. Ill. 2005)...............................17

*Oshana v. Coca-Cola, Co.*,
    472 F.3d 506 (7th Cir. 2006) .......................................23

*Parko v. Shell*,
    739 F.3d 1083, 1085-85 (7th Cir. 2014) .............................26

*Pavone v. Meyerkord & Meyerkord, LLC*,
    321 F.R.D. 314 (N.D. Ill. 2017)...............................11

*Reitman v. Champion Petfoods USA, Inc.*,
    830 F. App'x 880 (9th Cir. 2020) .............................2, 3, 30

*Reitman v. Champion Petfoods USA, Inc.*, No. CV181736DOCJPRX,
    2019 WL 7169792 (C.D. Cal. Oct. 30, 2019),...............................1, 2, 12, 18, 23, 27

*Retired Chi. Police Ass'n v. City of Chi.*,
    7 F.3d 584 (7th Cir. 1993) .......................................10

*In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, No. 05 C 2623,
    2007 WL 4287511 (N.D. Ill. Dec. 4, 2007)...............................19, 23

*Smith-Brown v. Ulta Beauty, Inc.*,
  335 F.R.D. 521 (N.D. Ill. 2020) ........................................................................11, 29

*Song v. Champion Petfoods USA, Inc.*
  No. 18-cv-3205, 2020 WL 7624861, at *7 (D. Minn. Dec. 22, 2020) ...........................22

*Suchanek v. Sturm Foods, Inc.*,
  764 F.3d 750 (7th Cir. 2014) .............................................................................11

*Szabo v. Bridgeport Machines, Inc.*,
  249 F.3d 672 (7th Cir. 2001) .............................................................................10

*Thorogood v. Sears, Roebuck and Co.*,
  547 F.3d 742 (7th Cir. 2008) .............................................................................10

*In Re Tropicana Orange Juice Mktg. and Sales Prac. Litig.*, No. 2:11-07382,
  2019 WL 2521958 (D.N.J. June 18, 2019) .....................................................17, 18

*Vill. of Bedford Park v. Expedia, Inc. (WA)*,
  309 F.R.D. 442 (N.D. Ill. 2015)...........................................................................11

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)...........................................................................................10

## Other Authorities

Fed. R. Civ. P. 23 ...............................................................................................10

Fed. R. Civ. P. 23(b)(2)........................................................................................30

Fed. R. Civ. P. 23(b)(3)........................................................................................11

Fed. R. Civ. P. 23(c)(4)........................................................................................29

## I.    INTRODUCTION

Plaintiffs Afshin Zarinebaf ("Zarinebaf"), Zachary Chernik ("Chernik"), and Joan Meyer ("Meyer" and collectively, "Plaintiffs") challenge Champion Petfoods USA Inc.'s and Champion Petfoods LP's ("Champion") "core mission" and "philosophy" to produce dog food that its packaging describes as "Biologically Appropriate" and made with "fresh" and "regional" ingredients. In their Motion for Class Certification (ECF No. 95, the "Motion"), Plaintiffs attempt to certify eleven classes of purchasers corresponding to eleven of the diets Plaintiffs bought beginning in June of 2016. The reason for trying to splinter the case into eleven classes is to avoid the many individual issues that have led other courts to find that common issues do not predominate in the initial putative class action brought by purchasers of Champion dog food. *Reitman v. Champion Petfoods USA, Inc.*, No. CV181736DOCJPRX, 2019 WL 7169792, at *1 (C.D. Cal. Oct. 30, 2019), *aff'd*, 830 F. App'x 880 (9th Cir. 2020).

But this splintering does not paper over individual issues. As shown below, Plaintiffs and class members purchased multiple diets and therefore were exposed to a whole host of differing statements. What Plaintiffs cannot escape is that while the words "Biologically Appropriate" and "Fresh Regional Ingredients" may appear on every package, (1) variations in package labeling among Champion's many diets furnished Plaintiffs and all other multi-diet purchasers with differing statements that provided important context as to the meaning of the statements, and (2) the contents of the food also varied such that one must examine and compare what is described on the outside to what is on the inside of the package. Plaintiffs completely downplay this and merely insert a chart with the number of times a statement appeared without supplying the critical context, which varies from package to package. However, context matters as recognized in *Reitman*:

> Even though every package contains the phrase "biologically appropriate" "never outsourced" and "fresh regional ingredients," every package also differs in providing additional statements that give context to the overall theme such that an individualized

determination must be made bag to bag to determine whether a reasonable customer would be deceived. *See* Opp'n at 13 ("[O]ne must first look on the outside of the packaging to determine how ingredients are described, and then compare those descriptions to the ingredients inside the bag to determine whether there was a misrepresentation"). In essence, though certain phrases may be found on every package, each package's labeling provides additional context that will require individualized analysis across Class members that predominate over any common questions.

*Reitman*, 2019 WL 7169792, at *10.

Plaintiffs' tactical retreat[1] is an attempt to cabin Plaintiffs' case to only truncated "mini-classes," but no number of such splintered mini-classes solve their predominance problems. Simply dropping claims about other diets does not erase the content of the bags from consumers' memories, nor address the overarching fact that the bags for each respective diet explain how the contents inside deliver on Champion's philosophy of biologically appropriate foods, and how various ingredients unique to each deliver on fresh and regional. Many members of those lawyer-created "mini-classes" would have purchased other diets over time from different kitchens and been exposed to the varied context that underscore why individual issues predominate, and why those individual issues cannot be addressed through collective evidence common to all members even of the eleven mini-classes. This mini-classes strategy also does not eliminate the myriad of individualized issues as to the contents of the bags of diets they purchased. The *Reitman* court thus rejected an in-the-alternative request for classes based on diets as it "would be futile because the analysis would still require bag-by-bag determinations that would predominate over common questions to the class." *Reitman*, 2019 WL 7169792, at *10. The Ninth Circuit specifically affirmed this finding. *Reitman v. Champion Petfoods USA, Inc.*, 830 F. App'x 880, 881 (9th Cir. 2020) ("And Reitman does not explain how creating subclasses based on diets would cure the need for individualized bag-to-bag inquiries.").

---

[1] Plaintiffs are not moving to certify classes based on Counts II and III of the Third Amended Complaint (ECF No. 68, "TAC"), for fraudulent misrepresentation and unjust enrichment; however, they refuse to dismiss these claims. *See* Mot. at 1.

Because Plaintiffs' damages methodology contains fatal flaws rendering it irrelevant and inadmissible, Plaintiffs cannot prove damages through common proof, which further warrants denial of the Motion. Nor is a Rule 23(b)(2) class appropriate because injunctive relief is not the predominant relief requested. And Plaintiffs' last-ditch pitch to certify fifteen issues classes would not "materially advance" the litigation and should be rejected for the same reasons as in *Reitman*. *Reitman*, 830 F. App'x at 882. The Court should deny Plaintiffs' Motion in its entirety.

## II.   FACTUAL BACKGROUND

### A.   The Evolution of Champion Petfoods

Reinhard Muhlenfeld founded Champion in about 1979 as a feed mill in Alberta, Canada. Declaration of Chinedu Ogbonna ("**Ex. A**") ¶ 8. When Champion began producing its own dog food in approximately 1985 under the brand ACANA, it was not very different from traditional dog foods. *Id.* ¶ 9. But around 2005, Reinhard's son Peter set out to develop dog foods tailored to the way canines, and their ancestor the wolf, evolved to eat in the wild. *Id.* ¶ 11; Deposition of Peter Muhlenfeld Vol. 1 ("**Ex. B**") at 24:1-12; *Id.* Vol. 2 ("**Ex. C**") at 138:13-139:17; 171:14-19. The result was the brand ORIJEN. Ex. C at 136:17-20. Unlike traditional dog food, which relies on grains, potatoes, or other fillers, with synthetic supplements to provide nutrition, ORIJEN consists primarily of animal-based proteins to mirror how a dog attains nutrition in nature (albeit within the limitations of dry kibble). Ex. C at 138:13-17; Deposition of Jeff Johnston Vol. 1 ("**Ex. D**") at 47:15-48:6. Over time, Champion transitioned this Biologically Appropriate approach to ACANA diets and continually innovated its development of new diets. Ex. C at 136:17-23.

Champion also broke the pet food mold in two other ways. First, it obtained as many of its ingredients as possible from suppliers who were located relatively close to Champion's manufacturing facilities (called "kitchens"), and whom it knew and trusted. Ex. A ¶ 12. Second, most of Champion's diets included a significant amount of fresh ingredients (preserved through no

more than refrigeration) and later also utilized raw (fresh frozen) ingredients, while the typical dog food had **no** fresh or raw ingredients. *Id.* ¶¶ 14-15.

Even with minimal advertising and no consumer research until 2017,[2] Champion's diets became sought after by consumers ("Pet Lovers"). Ex. B at 181:5-6; 182:5-9; 183:4-11; 186:20-23; Ex. C at 125:5-8; 128:13-15; 219:23-220:5. Yet Champion never outsourced production of its finished pet food. Ex. A ¶ 16. Three basic values—Biologically Appropriate, Fresh Regional Ingredients, and Never Outsourced—came together as "BAFRINO," which forms Champion's mission and helps explain how ORIJEN and ACANA differ from traditional dog food. *Id.* ¶ 17.

In around 1990, Champion built its NorthStar kitchen in Alberta. Declaration of Christopher Milam ("**Ex. F**") ¶ 7. In January 2016, Champion opened its DogStar kitchen in Kentucky and throughout 2016 and 2017 transitioned the manufacturing of nearly all of its dog food diets sold in the U.S. to DogStar, resulting in American consumers purchasing diets made at NorthStar until that inventory was exhausted. *Id.* ¶ 8. As a result, Illinois consumers would have purchased diets from both kitchens during 2016 and into 2017. *Id.* ¶ 9.

## B. Champion's Wide Variety of Diets and Packaging

ACANA is comprised of three distinct families (Singles, Heritage, and Regionals). Ex. A ¶ 28. Within each family, there are many diets. During the class period in the TAC, ACANA had approximately 20 different diets sold in the United States, each made from a unique formula and ingredient profile. *Id.* ORIJEN was made up of approximately 17 different diets, each with its own

---

[2] In the Motion, Plaintiff depicts Champion's marketing efforts by asserting that Champion conducted "market research [and] consumer surveys" (Mot. at 18) to "choose" "uniform" and "consistent" messages to induce consumers. *Id.* at 5-6, 18. This is not true. Champion never did TV, radio or print advertising. Ex. C at 195:23-196:1. Champion had a small marketing team led by Peter Muhlenfeld, who had no previous marketing experience or education and many of these "chosen" statements on the packaging were employee-created. *Id.* at 37:25-38:12; 106:2-16; Deposition of Peter Muhlenfeld Vol. 3 ("**Ex. E**") at 51:14-52:1; 52:9-53:18. It was not until 2017, long after all three Plaintiffs began purchasing Champion dog food (TAC ¶¶ 8a, 8b, 10), that Champion conducted its first consumer survey, which Plaintiffs cite to as though it had occurred a decade earlier at the inception of the products' launch. *See* Mot. at 5, Ex. 12 (titled "2018 Product Strategy"), Ex. 13 (excerpted exhibit, omitting first page of document dated August 9, 2017").

unique formula and ingredient profile. *Id.* ¶ 29. Within the same brand or brand family, the type of ingredients and amount of each ingredient used in the formulas vary, even amongst formulas that seemingly use similar animal proteins. Ex. F ¶¶ 12-13. The formulas for Champion's diets have changed within Plaintiff's class period and continue to change. *Id.* ¶ 14-15.

The statements on each diet's packaging reflect the diverse characteristics of that diet. Ex. A ¶¶ 30-31; Ex. F ¶ 21. The labeling on the front and back emphasize the philosophy of the diet, certain specific ingredients for that diet, and, especially with ACANA, the exact source of key ingredients. Ex. A ¶ 45; Ex. F ¶¶ 49, 51, 52 (images). Each Champion diet has a unique formula, using different ingredients and ratios of ingredients. Ex. F ¶ 12. On the back of every package is an ingredient panel listing the ingredients in descending order by weight. Ex. A ¶ 46; Mot. Ex 1-11. The back of Champion's bags include a prominent panel indicating the weight, in pounds, of key fresh, raw, dried, dehydrated, or oil ingredients used to make the particular diet, in comparison to the total weight of the dog food bag. Ex. A ¶ 47; Ex. F ¶¶ 15, 18, 19 (images); Mot. Ex. 1-11. This is referred to as "Meat Math." Ex. A ¶ 47, Ex. F ¶ 18.

Just as the formulas for Champion's diets have changed over time, so have the statements on its packaging. Ex. A ¶¶ 30, 33. Most of Champion's diets sold to U.S. consumers had at least two distinct packages between July 1, 2016 and 2019. *Id.* ¶ 38. The way Champion executes the "Biologically Appropriate" philosophy varies by diet and is seen in multiple statements on the bags that changed throughout time. *Id.* ¶ 32. "Fresh" and "regional" ingredients are descriptions that spotlight certain ingredients; Champion's packaging at issue has never claimed that *all* or *100%* of its ingredients were fresh or regional. Ex. A ¶ 34; Ex. B at 197:18-25; Ex. D at 49:18-19. Some bags focused on certain specific ingredients being fresh and regional, while others focused on other specific ingredients being fresh and regional. Ex. F ¶¶ 24, 25; Mot. Ex. 1-11.

C. **Champion's Historical Testing for Heavy Metals, Response to the Clean Label Project, and Genesis of this Lawsuit**

Nearly all foods contain some level of naturally-occurring heavy metals, such as arsenic, cadmium, lead, and mercury, because they are ubiquitous in the environment and, therefore, exist in the ingredients used to make the foods. *See* Expert Report of Dr. Robert H. Poppenga ("**Ex. G**") at 4-7. Unsurprisingly, then, heavy metals are commonly found in all dog foods, even though they are not added to the foods by the dog food maker. *Id.* at 8, 40; Deposition of Sean Callan Vol. 1 ("**Ex. H**") at 53:12-16; 54:16-55:3. Beginning in 2008, Champion conducted third-party testing to confirm that any heavy metals in its dog foods were far below any levels determined to present a health concern for dogs according to the National Research Council (NRC) and Food and Drug Administration (FDA)'s Maximum Tolerable Limits ("MTLs"). Ex. D at 102:9-14; 144:1-4. All tests conducted, both before and after this litigation, demonstrate the levels of heavy metals in Champion's diets are below both the MTLs and the European Union regulatory standards, and thus safe to consume.[3] Ex. G at 12-14, 21-28, 40-41.

In April 2017, a non-profit called the Clean Label Project ("CLP") posted a blog that rated pet foods based on several criteria, including heavy metal content, and gave one star (out of 5) to Champion's brands. Ex. A ¶ 18. This blog post generated publicity, and Plaintiff Chernik discontinued purchasing Champion dog after he learned of CLP's rating. *See* Chernik's Resp. to Interrog. ("**Ex. I**") at Rog. 4. Champion contacted CLP and learned CLP wanted it to join CLP's program for a fee and buy CLP's test results at an excessive price. Ex. A ¶¶ 20-22. Champion declined. *Id.* ¶ 23. Instead, Champion published a White Paper explaining the levels of naturally

---

[3]  The Motion at page 10 misleadingly quotes from and relies on an early 2018 internal draft strategic plan from the marketing department that brain-stormed about trying to have "no … heavy metals" in future ACANA Regionals and Singles diets. Mot. at 10 (citing Ex. 12). But that statement and exhibit are taken out of context and do not assist Plaintiffs in meeting their burden under Rule 23. First, such a representation was never made to any class members. Second, this aspirational idea was not pursued by Champion because it is scientifically impossible. Ex. D at 102:9-14; 144:1-3; 191:16-193:13; 202:9-16. And third, the level of heavy metals has nothing to do with whether ingredients are fresh or regional.

occurring heavy metals in its food were safe. *Id.* ¶ 24; Mot. Ex. 33. Champion learned in discovery that Ellipse (partner lab of CLP) sold CLP's heavy metal test results to Plaintiffs' lawyers here, who used them to sue Champion, starting with *Reitman*. Ex. H at 64:15-18; 147:7-10; 203:14-21.

### D. BPA Is Not an Ingredient, but Trace Levels of This Environmentally Ubiquitous Molecule Can Sometimes be Found in Champion dog food at Levels that Pose No Risk of Harm to Dogs

There is no claim that Champion adds BPA to its diets as an ingredient. BPA is a chemical associated with plastic and has become ubiquitous in the environment. Ex. G at 29. The TAC alleges that levels of BPA were detected by Plaintiff's Ellipse lab using a 30 ppb level of quantification ("LOQ") in most, but not all, of the Champion diets tested (based on one sample per diet). TAC Ex. 2; Ex. H at 105:9-20. Champion's toxicology expert opines that even the levels of BPA detected by Ellipse in Champion's dog food pose no possible danger to a dog's health (Ex. G at 33, 41), and Plaintiffs have no expert who opines to the contrary. Plaintiffs' ExperTox laboratory detected no BPA in 38 samples of Champion dog food (*see* Deposition of Dr. Gary Pusillo Vol. 1 ("**Ex. J**") at 21:11-18; 43:2-5). Champion's post-litigation testing showed nearly all diets (based on one sample per diet) had no detectable BPA even with a sensitive 5 ppb LOQ.

### E. Very Low and Non-Dangerous Levels of Pentobarbital were Found in an Ingredient Supplied to Champion's DogStar Kitchen in Late March 2018 for its "Red" Diets, but Not Found in its Finished Dog Food

Since 2016, Champion's DogStar Kitchen has purchased beef tallow (fat) from five different suppliers, one of them being JBS/MOPAC ("JBS"). Ex. F ¶ 62. Beef tallow is a minor ingredient in Champion's beef-based diets, including Regional Red, which is used in a spray coating on finished kibble for flavor. *Id.* ¶¶ 57, 59. On or around May 7, 2018, Champion learned that two lots of beef tallow (from the JBS rendering facility located in Pennsylvania) delivered in late March 2018 had tested positive for small amounts of pentobarbital. Deposition of Kenneth Gilmurray ("**Ex. K**") at 42:8-43:4, 218:2-10, Ex. 21. Of the 1.7 million pounds of dog food manufactured using

the affected beef tallow, Champion quarantined or retrieved from distributors approximately 1.6 million pounds; only about 100,000 pounds had been sold by distributors to retailers, with only a small (but unknowable) subset of them making it to Illinois retailer shelves. Deposition of Jim Wagner ("**Ex. L**") at 46:11-16, 129:10-25, 131:11-18. Based on (i) test results of representative composite samples of the kibble by Texas A&M Veterinary Medical Diagnostic Laboratory indicating a "Non-Detect" reading of pentobarbital, (ii) the opinion of a private consultant, and (iii) the FDA's approval, Champion determined that consumption of the kibble posed no danger to dogs and it was unnecessary to recall the affected food from retailers. *Id.* at 33:19-34:12, 47:10-24, 48:12-17, 52:20-24, 53:20-54:5, 84:14-23, 98:10-20, 152:10-153:9.

      **F.    Facts Specific to Plaintiffs and the History of this Lawsuit**

      Chernik initiated these claims in April 2018 in *Reitman*, but his claims were dismissed for lack of personal jurisdiction in October 2018. He then filed this action on October 16, 2018, along with Zarinebaf and later added Meyer as a Plaintiff in the TAC filed on June 17, 2020. [ECF No. 01, 68]. Chernik claims he began buying Champion dog food in approximately April 2006. Ex. I at Rog. 2. Chernik purchased the following diets only produced at NorthStar: ORIJEN Adult, ACANA Wild Prairie, ACANA Ranchlands, ACANA Pacifica; the following diets produced at NorthStar and DogStar: ORIJEN Six Fish, ORIJEN Regional Red, ORIJEN Senior, ACANA Lamb & Apple, and ACANA Pork & Squash; and the following diets produced only at DogStar: ACANA Heritage Free-Run Poultry, ACANA Heritage Red Meat, ACANA Regionals Wild Atlantic, and ACANA Regionals Grasslands.[4] Ex. I at Rog. 5; Ex. A ¶¶ 42-44. Chernik read the packages and ingredient panels prior to purchasing, (Deposition of Chernik ("**Ex. M**") at 34:20-23; 104:14-19; 105:8-11; 123:15-20; 126:11-14; 127:18-24; 134:12-16; 147:18-21; 153:8-11), including early NorthStar

---

[4] Chernik's purchases of all NorthStar diets and DogStar ACANA Duck & Pear and Wild Atlantic have been dropped. ECF No. 102.

ORIJEN Six Fish bags, circa 2011, which stated the ingredients were "never frozen," among other representations that do not appear on DogStar packaging. Ex. M at Ex. 4, *see id.* 119:8-20. Chernik discontinued purchasing Champion dog food by the end of June 2017 after viewing the CLP's posts about Champion. Ex. M at 63:4-25; Ex. I at Rog. 4.

Zarinebaf claims he began purchasing Champion dog food in approximately July 2013. Deposition of Zarinebaf ("**Ex. N**") at 46:22-47:6; Zarinebaf Resp. to Interrog. ("**Ex. O**") at Rog. 4. Zarinebaf did not recall purchasing many of the diets he fed his dogs because his daughter, Jasmine, often purchased the Champion dog food for their household. Ex. N at 29:1-6, 48:12-16, 53:22-24, 54:1-4, 55:21-24, 61:23-62:3, 65:4-6. Zarinebaf claims his dogs consumed the following diets manufactured at both NorthStar and DogStar: ORIJEN Six Fish, ORIJEN Tundra (at DogStar beginning in 2019), ORIJEN Regional Red, ACANA Singles Lamb & Apple, and ACANA Singles Pork & Squash; and the following diet produced only at DogStar: ACANA Regionals Grasslands.[5] Ex. N at Ex. 3; Ex. O at Rog. 5; Ex. A ¶¶ 43-44. Zarinebaf read the packages and ingredient panels of Champion dog food before purchasing them. Ex. N at 48:19-49:10; 88:1-12; 89:24-90:3; 94:22-95:12; 96:11-20; 98:14-20; 104:4-10; 109:14-16; 109:23-110:1; 118:20-24; 123:15-17; 128:13-129:2; 135:23-136:1; 136:15-19; 139:20-23. Zarinebaf discontinued purchasing the food in approximately September 2018. *Id.* at 46:22-47:6; Ex. O at Rog. 4.

Meyer claims she began purchasing Champion dog food in 2004, but that it may have been a few years later. Meyer Resp. to Interrog. ("**Ex. P**") at Rog. 4; Deposition of Meyer ("**Ex. Q**") at 30:25-31:19. She purchased the following diets only produced at NorthStar: ORIJEN Adult, ACANA Pacifica; the following diets produced at both NorthStar and later at DogStar: ORIJEN Six Fish, ACANA Singles Lamb & Apple, ACANA Singles Duck & Pear; and the following diets only produced at DogStar: ORIJEN Original, ACANA Singles Wild Mackerel, ACANA Heritage

---

[5] Zarinebaf's purchases of all NorthStar diets have been dropped. ECF No. 102.

9

Red Meats, and ACANA Regionals Meadowland.[6] Ex. P at Rog. 12, Ex. Q at Ex. 3; Ex. A ¶¶ 42-44. Meyer testified that she read the labeling of the NorthStar diets she purchased, but did not read the labeling on the DogStar diets she purchased. *Compare* Ex. Q at 68:21-25; 69:12-17; 71:21-24; 74:4-6; 74:20-75:5; 76:7-13; 78:15-19; 81:15-17; 82:14-19; 84:23-85:2; 85:12-16 (testifying as to the extent she read NorthStar bags) *to id.* at 90:20-23; 91:5-10; 91:17-21; 92:6-23; 98:8-24 (testifying as to not reading DogStar bags). Meyer also read the first few ingredients on the ingredient panel when purchasing NorthStar diets but did not read it on the DogStar bags. *Compare id.* at 66:21-67:9; 72:25-73:4; 82:6-11 *to id.* at 90:5-8. Meyer discontinued purchasing Champion dog food in approximately June 2019. Ex. P at Rog. 8.

None of the Plaintiffs allege their dogs were harmed by consuming Champion's dog food.

## III.   LEGAL STANDARD FOR RULE 23

A class may only be certified if it satisfies the prerequisites of Federal Rule of Civil Procedure 23. *E.g., Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013); *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 723 (7th Cir. 2011). This requires a "rigorous analysis" which may frequently entail "some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Because a class action presents a number of "downsides," district courts entertaining class certification must exercise "caution." *Thorogood v. Sears, Roebuck and Co.*, 547 F.3d 742, 744, 746 (7th Cir. 2008). Plaintiff must demonstrate by a preponderance of the evidence that Rule 23's requirements are met and that certification is appropriate. *Wal-Mart*, 564 U.S. at 350; *see Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 596 (7th Cir. 1993). Courts may not "accept the plaintiff's assertions as conclusive." *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). Instead, the court should "receive evidence . . . and resolve the disputes before deciding whether to certify the class." *Id.*

---

[6] Meyer dropped her purchases of NorthStar diets and DogStar ACANA Duck & Pear. ECF No. 102.

## IV.    THE PROPOSED CLASSES SHOULD NOT BE CERTIFIED

### A.    Plaintiffs Fail to Carry Their Burden Under Rule 23(b)(3) Because Their Claims Are Riddled with Individualized Issues

For a class to be certified pursuant to Rule 23(b)(3), Plaintiff must show (1) that questions of law or fact that are common to all of the class members "predominate over any questions affecting only individual members"; and (2) that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The 'starting point' of the district court's predominance inquiry is the substantive elements of plaintiffs' cause of action and ... *the proof necessary for the various elements.*" *Smith-Brown v. Ulta Beauty, Inc.*, 335 F.R.D. 521, 531 (N.D. Ill. 2020) (citation omitted). The proposed classes must be "sufficiently cohesive to warrant adjudication by representation." *Id.* at 530–31 (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 594 (1997)). And, it must "achieve economies of time, effort, and expense, and promote uniformity of decisions as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Vill. of Bedford Park v. Expedia, Inc. (WA)*, 309 F.R.D. 442, 452 (N.D. Ill. 2015). A plaintiff must show, based on a preponderance of admissible evidence, that predominance is satisfied. *Pavone v. Meyerkord & Meyerkord, LLC*, 321 F.R.D. 314, 322 (N.D. Ill. 2017). Here, critical individual issues preclude a finding of predominance, and class treatment is not the superior method of litigating them.[7]

### 1.    Plaintiffs' proposed classes raise individualized issues as to the critical element of whether Champion made any misleading statements

Plaintiffs' efforts to splinter their case into eleven mini-classes of purchasers of specific

---

[7] Plaintiff's reliance on *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014), and the district court's opinion on remand, 311 F.R.D. 239 (S.D. Ill. 2015), is misplaced. That case involved a nearly homogenous product, a coffee pod, and one purported misrepresentation or omissions related to the failure to disclose the use of instant coffee, an ingredient the defendant conceded was inferior, while representing that pod contained "some of the world's highest quality Arabica beans, roasted and ground to ensure peak flavor, then packaged to lock in optimum freshness." *Id.* at 753. In contrast, the products here varied by brand, diet, ingredients used, and manufacturing location which in turn lead to numerous variations in its packaging.

DogStar diets merely multiply the individual fact issues. Each named Plaintiff bought multiple diets and would themselves be members of more than one class. The same is no doubt true of many other members of each of the classes. *See* Declaration of David Coulson ("**Ex. R**") (showing consumers in related putative class actions often purchased multiple diets). Each named Plaintiff also bought Champion dog food over prolonged periods of time, and saw many bag variations, and often relied on earlier versions of these bags. Indeed, Meyer testified she did not even read DogStar packages and relied solely on the NorthStar packages. Ex. Q at 89:8-9; 98:8-24. Thus, Plaintiffs cannot erase the fact that early NorthStar packaging formed consumers understanding of many of the statements at issue on the DogStar packages. Nor can Plaintiffs avoid the fact that they and the putative class members were exposed to the purported deceptive statements in different contexts on a variety of bags, which all raise individual issues. *See Reitman*, 2019 WL 7169792, at *10.

> ### a. Because the statements on Champion bags varied widely by brand, diet, kitchen, and time, Plaintiffs fail to carry their burden of showing a uniform, material misrepresentation[8]

Plaintiffs attempt to meet their burden by alleging Champion "chose" "uniform" messaging and engaged in "standardized conduct." Mot. 5, 6, 18. To prevail on an ICFA claim, "each class member would have to prove that they were deceived by [Champion's] labeling of [its dog food] and that they suffered damages as a result." *Lipton v. Chattem*, 289 F.R.D. 456, 462 (N.D. Ill. 2013). Indeed, Plaintiffs must "satisfy their burden of showing causation as to each by showing materiality as to all." *Langendorf v. Skinnygirl Cocktails, LLC*, 306 F.R.D. 574, 583–84 (N.D. Ill. 2014)

---

[8] Champion takes issue with the dates attributed to some of the packaging images listed in the chart on pages 2-4 of the Motion. All bags described as "2015" bags are incorrect, as this was merely the date the images were printed by Champion's bag printer; the bags were not in circulation until, at the earliest, some unknown time in 2016 when DogStar began manufacturing that specific diet, then sold it to distributors, who then sold it to pet stores. Ex. A ¶ 39. In addition, the 3 images of ACANA Heritage Red Meat attached as Ex. 3 to the Motion are identical images of the bag in distribution during the years 2016-2017 (*see* the SKU code), and the correct image of the 2018 bag is attached to the declaration of Chinedu Ogbonna (Ex. A ¶ 40, at Ex. 1). Likewise, the 3 images of ACANA Singles Wild Mackerel attached as Ex. 7 to the Motion are identical images of the bag in distribution during the years 2016-2017 (*see* the SKU code); this diet was discontinued at the end of 2017 and not for sale in 2018. *See id.* at ¶ 41.

(denying class certification where plaintiff failed to "demonstrate[] the materiality of the 'all natural' text" on the label"). Plaintiffs cannot meet this burden. Just from 2014 through October 2018,[9] Champion sold 37 different dog food diets in Illinois, and the statements displayed on each of the bags varied to reflect the unique strengths and benefits of each diet. Ex. A ¶¶ 28, 29, 36. Courts have routinely refused to certify classes when the statements at issue vary.

Plaintiffs purport to attack three main statements "Biologically Appropriate," "Fresh Regional Ingredients," and "Delivering Nutrients Naturally." *See* Mot. at 2. This is an artificially simplified view of the statements as they appeared on the packaging at issue. Indeed, Plaintiffs invite this Court to dispense with any rigorous analysis of the actual labels to which consumers were exposed and ignore the numerous variations and contexts given to these terms, which differ by brand, diet and place and time of production.

The expression "Biologically Appropriate" is not self-defining. Rather, the expression acquires meaning from the qualifying language and the surrounding explanations on the packaging. This additional information provides critical context for what "Biologically Appropriate" means with respect to a given diet at a given time. But the explanatory language differs from bag to bag, even within the same diet, as the packages evolved over time. For example, "Biologically Appropriate" is sometimes described as "Protein Rich, Carbohydrate Limited" on the front of some of Champion's bags (*see, e.g.* Mot. Ex. 1 at 1, '16-17 ACANA Heritage Free-Run Poultry; *id.* Ex. 8 at 1, '16-17 ORIJEN Six Fish), while at other times described as "Evolutionary Diet. Protein Rich." (*See, e.g.,* Mot. Ex. 1 at 3, '18 ACANA Heritage Free-Run Poultry; *id.* Ex. 5 at 3, '18 ACANA Singles Pork & Squash). Further, ORIJEN is sometimes described as the "fullest

---

[9] The time period covered by the purported mini-classes definitions in the Motion is June 1, 2016 to the present. Plaintiff first joined a lawsuit against Champion in the Central District of California on April 19, 2018. *See Reitman*, No. 2:18-cv-01736-DOCJPR (ECF No. 39). Thus, the latest that Plaintiff could claim to be misled by any alleged false or misleading statements is April 19, 2018 (or October 16, 2018, when this action was filed before the Court), and the Rule 23(b)(3) class period thus should end no later than this date.

expression of [Champion's] Biologically Appropriate and Fresh Regional ingredients commitment." (*See, e.g.,* Mot. Ex. 9 at 1, '16-17 ORIJEN Original). And, the 2018 ACANA Heritage family is described as Champion's "original Biologically Appropriate" foods that are "prepared to [Champion's] Biologically Appropriate standards." (*See* Mot. Ex. 1 at 3, '18 ACANA Heritage Free-Run Poultry; Ex. A at Ex. 1, '18 ACANA Heritage Red Meats). The backs of some Champion bags explain this philosophy in different ways by further stating, "Our foods mirror the richness, freshness, and variety of meats for which DOGS ARE EVOLVED TO EAT." (Mot. Ex. 2 at 1, '16-17 ACANA Regionals Meadowlands), or "All dogs evolved as carnivores – biologically adapted to a diet rich in meat and protein." (Mot. Ex. 7 at 1, '16-17 ACANA Singles Wild Mackerel), or still, "Modern dogs are built like their ancestors. We believe they should eat like them too." (Mot. Ex. 8 at 6, '18 ORIJEN Six Fish). One ORIJEN bag synthesizes the philosophy as "Our Biologically Appropriate Philosophy is simple: Mirror the quantity, freshness and variety of meats your dog is evolved to eat." (Mot. Ex. 10, at 3, '16-17 ORIJEN Regional Red). And, 2018 ACANA Singles bags explain "Biologically Appropriate ACANA Singles provide complete nutrition for healthy dogs with food sensitivities using just one limited ingredient." (*See, e.g.,* Mot. Ex. 4 at 4, '18 ACANA Singles Lamb & Apple; *id.* Ex. 5 at 3, '18 ACANA Singles Pork & Squash). Plaintiffs ignore the varying statements that lend meaning to "Biologically Appropriate," yet they do not challenge the accuracy of any of these explanatory statements.

Similarly, as to "Delivering Nutrients Naturally,"[10] Plaintiffs ignore context around the statement, which is related to Champion's "Biologically Appropriate" philosophy and is part of a larger explanation that varies on ACANA's packaging. For example, the 2016-2017 bag of ACANA Heritage Free-Run Poultry states:

> "Mirroring Mother Nature, ACANA WholePrey foods feature a nourishing balance
> of poultry, organs and cartilage plus whole eggs – all of which reflect the whole

---

[10] The phrase "Delivering Nutrients Naturally" does not appear on ORIJEN Packaging. Mot. at 2.

prey animal, DELIVERING NUTRIENTS NATURALLY. That's why you won't find a long list of synthetic additives in ACANA foods."

Mot. Ex. 1 at 2. But, the 2018 bag states "ACANA features WholePrey ratios of poultry, organs and cartilage which deliver nutrients naturally." *Id.* at 3. The 2018 ACANA Singles Pork & Squash and Lamb & Apple bags state "WholePrey ratios of meat, organs and cartilage deliver nutrients naturally, without the long list of synthetic additives." Mot. Ex. 4 at 3; *id.* Ex. 5 at 3. As noted, the ingredients in a given Champion diet vary. Ex. F at ¶¶ 13-15, 20, 24-25. Pertinent here, Champion's early DogStar diets contain only one synthetic additive, zinc proteinate, which is disclosed on the front of the bags and in the ingredient panel. Declaration of Jeff Johnston ("**Ex. S**") ¶ 8. While other diets, particularly pre-2016 NorthStar diets, had more synthetic additives, if a multi-diet purchaser had no problem with those, they should have no problem with just one in the diets at issue. *Compare* Ex. M at Ex. 4 (2011 ORIJEN ingredient panel) *to* Mot. Ex. 2 at 2, Ex. 9 at 2-3 (2016 bags).

The statements about "fresh" ingredients varied significantly throughout and before the class period even for the diet within each mini-class. Most diets' formulas changed, which is reflected in the ingredient panels and critically, the prominent "Meat Math" section of the bags, which breaks down the approximate amount, in pounds, of each key ingredient, and whether they were added fresh, raw, dried, freeze-dried, dehydrated, or as oils into the formula. Ex. F ¶¶ 14, 15, 18, 19. The formula changes are sometimes also reflected on the front of the bags as well. *Compare* Mot. Ex. 2 at 2 *to* 3 (the '16-17 bag of ACANA Regionals Grasslands is made with "freeze-dried lamb liver" and the '18 bag is made with "freeze-dried lamb liver and duck liver"). In addition to these changes, context of the packaging for Champion's fish-based diets stating "wild-caught New England Fish" and "New England Mackerel" caught in "New Bedford, Massachusetts," would realize while the fish is caught fresh, it would be delivered to DogStar raw. Indeed, this is precisely what Meyer understood to be the case. Ex. Q at 83:20-84:9 (testifying the saltwater fish would be "packed on ice" after caught because "[t]hat's how we get our fish from all over the world unless

we live by the ocean" and agreeing that after it is on ice, it will become frozen). In short, a consumer's exposure to these statements about the fresh, freeze-dried, and raw ingredients, which changed over time, is critical as it informs their understanding of the "fresh" statement at issue.[11]

The statements about "regional" ingredients also varied materially, including which ingredients were "regional" and what "region" they came from.[12] Ex. A ¶ 33; Ex. F ¶¶ 50-53. Many ACANA packages state the city or county and state where some key ingredients were sourced, and identified different sources of their key ingredients, among other notable changes when their packaging changed. Ex. F ¶ 49; *see, e.g.,* Mot. Ex. 3 at 2 and Ex. A at Ex. 1 ('16-17 ACANA Heritage Red Meat bag stating Yorkshire pork sourced from Rockfield Kentucky and '18 bag stating Yorkshire pork sourced from Fannettsburg, Pennsylvania); Mot Ex. 5 at 2 and 3 (ACANA Singles Pork & Squash noting same pork supplier change). Some bags also changed the photograph of their featured supplier. Long-term purchasers of ACANA Singles Lamb & Apple could have been exposed to NorthStar bags which state on the front the lamb is from "North Island, **New Zealand**," and the '16-17 DogStar bags which explain the lamb is "[g]rass-fed on Kentucky and **New Zealand** ranches." Ex. A ¶ 34; Mot. Ex. 4 at 3. Purchasers of ACANA Regionals Grasslands would know the quail is from South Carolina and rainbow trout is from Idaho, and purchasers of ORIJEN Six Fish and ACANA diets with saltwater fish would know the fish is from New England's Atlantic waters. Mot. Ex. 2, 7, 9. Thus, those consumers would know that "regional" is not limited to Kentucky. *See* Ex. M 137:4-25 (Chernik testifying "it's starting to become nonregional" when reading on bag the New England fish is from the Atlantic), 172:7-24 (admitting Champion does not

---

[11] Chernik understood freeze-dried ingredients were not fresh. Ex. M at 147:10-13.

[12] Adding to the individualized issues is Plaintiffs' argument about the "exemplar supplier" photographs. Mot. at 9. Even Plaintiffs acknowledge that these are photos of real Champion supply partners, who furnish the pictured ingredients. *Id.* That said, Champion never identifies any of its pictured partners are exclusive supplier of any ingredients, and these featured supplier photographs varied by diet, by kitchen, and over time, as even the same diet from the same kitchen would switch out these pictures. Whether featured farmers owned their own farmland, what quantity of ingredients they supplied and how representative they were of other suppliers of that ingredient also necessitates a bag-by-bag analysis.

state all of its ingredients are regional, and that he read the NorthStar ACANA Singles Lamb & Apple bag that said the lamb was from "North Island, New Zealand," and he thought that was "definitely not regional"); Ex. N at 107:6-9, 107:22-24 (admitting the ACANA Singles Lamb & Apple bag says the "lamb is from New Zealand" and "that says it's not regional").

Plaintiffs with their mini-class approach cannot avoid the fact that labels matter, and that principle applies to the entire label, or package, not to self-selected snippets divorced from the context that gives them meaning. The varied statements that appeared on the bags sought to be certified cannot simply be clumped together as "BAFRINO" as Plaintiffs would have it for class certification, because class members would have been exposed to a variety of statements across not only the eleven diets for the mini-classes, but its many NorthStar packages and other DogStar packages, all of whose formulas and packaging changed over time. In other words, many mini-class members would have also purchased other Champion diets outside of a particular mini-class and been exposed to two brands, two kitchens from two countries, and dozens of formula and packaging changes over time. *Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 585 (N.D. Ill. 2005) (holding individual issues predominate where "each putative class member was exposed to a different mix of representations and the materiality of those representations varied among class members"). In short, the numerous contexts in which the statements have appeared could result in some class members being exposed to certain contexts and others being exposed to others, precluding Plaintiffs' claim from being susceptible to class-wide proof that Champion made untrue or misleading representations to every class member.

The decision in *In Re Tropicana Orange Juice Mktg. and Sales Prac. Litig.*, No. 2:11-07382, 2019 WL 2521958 (D.N.J. June 18, 2019), relied upon in *Reitman*, illustrates that class treatment is not appropriate when the advertising statements at issue varied. There, the plaintiff moved to certify a class over claims that Tropicana Pure Premium orange juice was misleadingly marketed

as "100% pure and natural," "100% pure," "100% orange juice," "pasteurized orange juice," "pasteurized," "pure," "natural," "fresh," and "grove to glass." *Id.* at *9. The language used, though similar in some respects, varied in terminology and style. Also, the alleged misstatements "sometimes appeared on individual packaging, and sometimes not." *Id.* Thus, the plaintiff could not "demonstrate[] that a uniform misrepresentation was made to the class," because such variations in labeling "are the poster child for lack of predominance." *Id.* at *10.

Here, as in *Reitman* and *Tropicana*, there has been no "uniform misrepresentation" that could affect all putative class members the same way. The Champion statements (and their qualifiers) attacked by Plaintiffs have appeared on some, but not all, of Champion's different diets. And when they did appear, the terminology and wording differed, and they were displayed in varying contexts in ways that cannot be captured through collective evidence. The finder of fact will be required to perform an individualized inquiry into each of the bags purchased by each mini-class member to determine what statements appeared on each consumer's packaging before determining whether the challenged statements were misleading. Plaintiffs have failed to meet their burden to establish predominance for this reason alone.

To the extent Plaintiffs are attempting to certify the mini-classes based on purported omissions, these claims fare no better and fail for the same reasons as the misrepresentation claims.[13] Additionally, Meyer knew Champion's fish ingredients were frozen on ice, Chernik read the fish was sourced from New England, and Chernik and Zarinebaf read the lamb was from New Zealand, yet the three Plaintiffs purchased the food despite realizing some ingredients were non-fresh and non-regional. Ex. Q at 83:20-84:9; Ex. M 137:4-25, 172:7-24; Ex. N at 107:6-9, 107:22-24. Meyer was aware that heavy metals are naturally occurring in animals and plants, including that

---

[13] Indeed, Plaintiffs' omissions-based claims are inextricably intertwined with the representations that they claim are misleading.

apples contained arsenic and fish contained mercury. Ex. Q at 14:11-15:15. Similarly, when asked about his awareness of heavy metals, Zarinebaf testified "they're everywhere," Ex. N at 147:3-5, and acknowledged seafood contains mercury and rice contains arsenic. *Id*. at 147:6-11. Chernik also knew that "some heavy metals do -- are on this earth that are not manmade" and that "some fish can have mercury." Ex. M at 149:23-24; 224:5. Where, like here, some plaintiffs were aware of an omission from the packaging, and proceeded to purchase the product anyways, the plaintiff cannot establish on a class-wide basis that every member of the class was deceived by the labeling and suffered damages as a result. *See Lipton*, 289 F.R.D. at 462 (N.D. Ill. 2013) ("The proposed class includes individuals who: (1) were unaware of the presence of hexavalent chromium in Dexatrim and who would not have purchased the product had they been so aware; (2) were unaware of the presence of hexavalent chromium but may have still purchased the product had they been so aware; and (3) were aware of the presence of hexavalent chromium and purchased the product anyway. These differences among the proposed class require that the key liability issues—whether a given class member was deceived by Chattem's labeling of Dexatrim and whether she suffered damages as a result—can be resolved only on an individual basis."); *In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, No. 05 C 2623, 2007 WL 4287511, at *5 (N.D. Ill. Dec. 4, 2007) (denying class certification of ICFA claim where the class included "people who (1) bought Craftsman tools but never saw any Craftsman advertising; (2) bought Craftsman tools but never saw advertising representing that the tools were made in the United States; and (3) bought Craftsman tools with the knowledge that those tools were not made in the United States"). Thus, Plaintiffs cannot certify a class based on a purported omission either.

> **b.** **The contents *inside* of each Champion bag must be compared to the statements made on the *outside* of the bag**

The statements Plaintiffs attack do not appear in a vacuum. One must first look on the outside of the packaging to determine how ingredients are described, and compare that description

to the ingredients inside the bag to determine whether there was a misrepresentation of fact. This analysis must also keep in mind that both Champion's formulas and packages changed over time.

i.      **Issues as to "fresh" require diet-by-diet and/or lot-by-lot analysis, generating individual issues**

Plaintiffs proffer what they contend is common evidence as to the use of frozen, expired, or regrind ingredients; none of this evidence is common. Quite the opposite, it demonstrates why individual issues predominate.

An ingredient that was "fresh" for one particular diet is not necessarily fresh (or described as such) in another diet. Ex. F ¶¶ 24-25. Never did Champion advertise that it uses 100% fresh ingredients. Ex. A ¶ 34; Ex. B at 197:18-25; Ex. D at 49:18-19. To the contrary, many Champion packages explain that particular ingredients are "fresh or raw" and/or were "dried," "dehydrated," "freeze-dried," or in the form of "oil." Ex. A ¶ 53; Ex. F ¶¶ 15, 19 (images). Whether an ingredient was fresh (preserved by no more than refrigeration) necessitates not only a diet-by-diet analysis, but, depending on the time of the year, a lot-by-lot analysis of the contents of its diets purchased by each class member. Ex. F ¶¶ 28-36. This cannot be established by collective evidence applicable to the entire putative mini-classes.

With respect to frozen ingredients, Champion has never claimed on any bag, for any diet, that every ingredient was "fresh." Plaintiffs speculate that Champion uses "significant amounts of non-fresh ingredients (frozen and expired ingredients)," without ever defining what "significant amounts" means. (Mot. at 6). However, the ratio of fresh to raw ingredients such as meat, fish, fruits and vegetables depended in part on seasonality, or size of the catch or harvest. Ex. F ¶¶ 28-36. These ingredients are consistent with the package denoting "Unmatched Regional Ingredients Fresh or Raw." *See, e.g.* Mot. Ex. 1 (front). Regardless, whether a meat, fish, fruit, or vegetable ingredient was fresh or raw would necessitate a lot-by-lot analysis.

With respect to expired ingredients, Plaintiffs also assert that "CPF also routinely uses

expired ingredients in its Dog Food." (Mot. at 7). The record evidence does not support this. What Plaintiffs call "expired" ingredients are merely ingredients that exceeded a best-used-by-date from the supplier. Ex. F ¶ 43. Champion employs quality control procedures to make sure it is safe to do so. *Id.* ¶ 44. Use of such ingredients is not "routine" but is infrequent. *Id.* ¶ 45. And in the few times when expired ingredients are used, it is almost always dried ingredients, not fresh or raw. *Id.* Plaintiffs cherry pick two examples of Champion using fresh ingredients that had exceeded the best used by date (Mot. at 7-8 (citing Ex. 20, 21)), but anecdotal evidence like this is not the common evidence Plaintiffs need to meet their burden of demonstrating that common issues predominate.

As to "regrinds," this is a term Champion coined for the practice of reworking product that may have been unused or rejected from a prior production run into a new production run; often this includes misshapen or unformed kibble. Deposition of Jeff Johnston Vol. 2 ("**Ex. T**") 50:7:12; Ex. F ¶ 37, Ex. S ¶ 20. Regrinds of finished kibble typically did not displace fresh or raw, but only dried ingredients. Ex. F ¶¶ 39, 41; Ex. S ¶ 22. Critically, determining whether regrinds were used in a production lot is yet another issue that requires a lot-by-lot analysis, as many production runs would have no regrinds of any type. Ex. F ¶ 39, Ex. S ¶ 21. Testimony relied on by Plaintiffs aver that most batches of Champion dog food do not contain any regrinds. Mot. Ex. 23 at 73:13-15; *see also* Ex. T at 59:24-60:5 (a lot numbered 01011250 had no regrinds at all). Champion also created a policy specifying that only certain diets can accept regrinds from certain other diets (they have to have identical or very similar formulas) and only in small percentages so that the guaranteed analysis and the ingredient panel is not materially altered. Ex. F ¶ 39; Mot. Ex. 24 at 126:1-18. Although Plaintiffs point to a few instances where the amount of regrinds in a lot exceeded Champion's internal policy, this was a rare event – it was not "common practice" as Plaintiff asserts, (Mot. at 8), and whether or not this occurred would require a lot-by-lot analysis. Mot. Ex. 24 at 126:19-25 (explaining this occurs "[f]rom time to time"). In short, episodic production realities with

no demonstrated impact on nutritional value of the foods do not create a common issue, much less one that "predominates" in the face of such a variety of issues within each mini-class.

### ii.     "Regional" also requires individualized analysis

Similarly, the description of "regional" or "regionally sourced" varies among diets and even within a diet, (Ex. F ¶¶ 47-53), in part because "regional" is an inherently relative term.[14] *See Song v. Champion Petfoods USA, Inc.*, No. 18-cv-3205, 2020 WL 7624861, at *7 (D. Minn. Dec. 22, 2020) (finding "[i]t is farfetched to suggest that a reasonable consumer would read this … as a guarantee that all of the ingredients … came from a regional source (whatever 'regional' might mean)"). In the Motion, Plaintiffs argue that Champion admits that the "regional claim" is misleading by partially quoting from an April 2018 management presentation: "We have recently considered changing this [regional] definition in our … name as we have outgrown our ability to source from our local region." Mot. at 10 (citing Ex. 32). Plaintiffs omit words from the quote and leave out the preceding and subsequent sentences. This evidence underscores that whether ingredients are regional depends on the particular ingredients advertised on a particular bag:

> "As we have grown, we have expanded our 'regional' definition to mean that we source our ingredients from a named region, with a key focus being the region nearest our kitchens, but in the absence of a good quality source, would be expanded to the highest quality source available internationally – primarily Europe or New Zealand or Australia. We have recently considered changing this definition in our BAFRINO name as we have outgrown our ability to source from our local region. This said, the terms still applies to our fresh ingredients which we focus on keeping at high percentages in our diets as these ingredients are fantastic quality and perform very well nutritionally and for palatability… The total combination of regional ingredients in most of our foods would be approximately 50%, with some formulas exceeding this depending on the primary ingredients."

Mot. Ex. 32 at -07.

In addition, some Champion bags expressly state on the front of their packaging that certain

---

[14] Chernik admitted as much. Ex. M at 121:1-5 ("Q. What does regional mean to you? A. Within a few hours. Q. Do you know how long – a few hours by plane or automobile? A. I mean, it's kind of subjective.").

ingredients are sourced internationally. For example, the 2016-2017 DogStar ACANA Lamb & Apple package states that the lamb in that diet is "[g]rass-fed on Kentucky and **New Zealand** ranches," Mot. Ex. 4 at 3 (emphasis added), and the 2014-2015 NorthStar ACANA Lamb & Apple package says the lamb is from North Island, **New Zealand**. Ex. A ¶ 34 (emphasis added). Other Champion bags expressly identify the states or regions of the United States where key ingredients were sourced, which often was outside of Kentucky. For example, the 2016-2017 package of ACANA Regionals Grasslands plainly indicates the rainbow trout is from Soda Spring, Idaho and the quail is from Columbia, South Carolina, Mot. Ex. 2 at 2, and the ACANA Singles Wild Mackerel states the mackerel is from New Bedford, Massachusetts. *Id.* Ex. 7 at 2. ORIJEN Six Fish tells consumers the saltwater fish is from the Atlantic Ocean off New England. *Id.* Ex. 8.

Since Plaintiffs' liability theory depends on Champion not disclosing that a source of ingredients could be far away from the kitchen (Mot. 8-9), a diet-by-diet, class-member to class-member analysis is required as many class members would have bought Champion diets that show ingredients' sourcing locations, and thus be aware, that "regional" does not mean 100% in America or 100% in Kentucky. The fact finder would have to review the packaging of each diet purchased by each class member to identify which particular ingredients are described as "regional," and then determine whether that representation is misleading or not based upon which kitchen made the dog food, the source of the ingredient, and whether that information was disclosed on the package.

At bottom, Plaintiffs' claims require individualized proof as to whether representations were misleading for each class member, making certification inappropriate. *See Oshana v. Coca-Cola, Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (affirming denial of certification of ICFA claim where the "class could include millions who were not deceived"); *In re Sears, Roebuck & Co. Tools Mktg.*, 2007 WL 4287511, at *1 (denying class certification where "each plaintiff will have been exposed to a different representation or mix of representations"); *Reitman*, 2019 WL 7169792, at *9.

### iii. Issues as to heavy metals, BPA, and pentobarbital also create individualized issues

Contrary to Plaintiff's suggestions (Mot. at 10-11), Champion does not advertise on its packaging that heavy metals provide nutrition or that it conducts any testing for heavy metals. Ex. A ¶ 35. Heavy metals are environmentally ubiquitous elements that are naturally present in ingredients that Champion uses. Ex. G at 4-7; Mot. Ex. 71 at 33-35. Champion does not add heavy metals into the food as an ingredient, Ex. S ¶ 11, and the presence of these naturally-occurring elements in meat and fish is unavoidable, but they are present in the finished food product at levels not harmful for dogs to consume. Ex. G at 4-7, 40. The levels of the various heavy metals vary based upon the levels in the various ingredients and types of ingredients used, and therefore, any levels in finished product necessarily vary depending on the diet. *See* Ex. G at 11-12; Mot. Ex. 71 at 24, 26, 32, 33. Plaintiffs harp on some internal emails from many years ago about Champion wanting to do more testing for heavy metals (Mot. Ex. 42, 43, 44), but ignores that Champion in fact did test for heavy metals and by 2016 had conducted abundant heavy metal testing of its products, and since the litigation started, very extensive additional testing has occurred. Ex. S ¶¶ 12-13; Ex. G at 28.

Plaintiffs posit that Champion "failed to prevent or at least reduce the inclusion of heavy metals, which CPF could have achieved by using only fresh ingredients[15] with non-detectable amounts of heavy metals in the Dog Food," and "it does not adequately test for heavy metals in its dog food." Mot. at 10-11. Both notions turn on individualized evidence. First, whether adequate testing was performed will depend on the diet, as some diets and ingredients were tested more often than others, and Plaintiffs have suggested no standard by which "adequacy" of testing could be

---

[15] Whether an ingredient is fresh has nothing to do with the level of heavy metals. An ingredient with a few nanograms of one heavy metal or another does not multiply upon being frozen, deboned, or processed for use in pet food. Plaintiffs' assertion to the contrary is unscientific.

evaluated. Ex. S ¶¶ 14-16. Second, Plaintiffs' focus on ingredients presents quintessential individual issues. Plaintiffs' example, one test result where a spray-dried herring ingredient once had a mercury level double the NRC's MTL for mercury, (Mot. at 11), underscores that an analysis of each diet and each lot is required given the different ingredients used and variability in heavy metal testing results as to diets and ingredients.

The allure of scary-sounding BPA has been almost as strong as that of heavy metals, and is equally out of place. Even though Champion does not use BPA as an ingredient or otherwise add it to the dog food, it makes no claim that its diets are "BPA free." Ex. S ¶ 10. Plaintiffs have not identified the source of BPA that might get detected in Champion dog food, (Ex. H at 15:11-12; 15:14-16; 15:22-25; Deposition of Dr. Gary Pusillo Vol. 2 ("**Ex. U**") at 112:5-13), but it is undisputed that BPA is ubiquitous in the environment.  Ex. G at 29. Whether BPA is even present requires a lot-by-lot analysis.  Although Ellipse Labs found BPA in 15 of the 19 samples of Champion diets, (Mot. Ex. 71 at 26), Plaintiffs' other expert tested BPA in another 38 samples of Champion diets, all of which showed no detectable BPA. Ex. H at 19:15-17; 21:11-18; 43:2-5; 124:9-13; Ex. U at 111:16-112:1.  Champion's testing showed no BPA in 20 out of 24, and out of the 11 diets at issue, only two diets, ACANA Free-Run Poultry and Grasslands, had samples with barely any detectable BPA. Ex. G at 31-32. Even the levels found by Plaintiffs' Ellipse Labs are not close to being harmful to a dog, *see* Ex. G at 32-33, but for Rule 23 purposes, the variability in whether BPA is even present poses an individual, lot-by-lot determination.

Finally, Plaintiffs' rely upon allegations regarding an incident where Champion received two lots of beef tallow that it later learned had tested positive for pentobarbital. The only bags that could have possibly been affected were Champion's DogStar beef-based diets that used beef tallow as an ingredient. Ex. F ¶¶ 67-68. Plaintiffs' only non-speculative evidence implicates only those bags that included beef tallow supplied by JBS/MOPAC to the DogStar kitchen in late March 2018.

25

Ex. K at 42:8-43:4, 218:2-10, Ex. 21. And it is not known if any were sold at retail to consumers in Illinois, because Champion does not know which retailers obtained what products from distributors. Deposition of Erik Flakstad ("**Ex. V**") at 72:20-21; 80:9-15; 113:16-114:9. Moreover, since 2016, Champion received tallow from four other suppliers, and in May 2018, Champion stopped purchasing tallow from JBS altogether, so many bags would have no beef tallow from JBS. Ex. F ¶ 62; Ex. K at 226:14-16. Not even Plaintiffs' expert relating to pentobarbital issues could provide any non-speculative mechanism for estimating what percentage of tallow, if any beyond the two affected lots, could have had a detectible presence of pentobarbital during the relevant period. *See* Deposition of Sean Callan Vol. 2 ("**Ex. W**") at 49:15-50:10. Where, like here, "class members could well have experienced different levels of contamination, implying different damages, caused by different polluters," (or "contaminants" as Plaintiffs collectively refer to heavy metals, BPA, and pentobarbital), "[i]t's not even clear that the plaintiffs have identified a common issue." *Parko v. Shell*, 739 F.3d 1083, 1085–86 (7th Cir. 2014). "Nor could it be assumed that every class member has experienced the same diminution in the value of his property even if every one has experienced the same level of contamination." *Id*. at 1085. As a result, individual inquiry would be required to determine which potential class members, if any, purchased one of the relatively few bags affected. In any event, pentobarbital was never found to be in Champion's finished food product. Ex. L at 48:12-17, 52:20-24, 152:10-153:9; *see* TVMDL pentobarbital test results ("**Ex. X**").

### 2. The putative class members' alleged damages are not susceptible to measurement across any of the mini-classes

It is axiomatic that a plaintiff must be able to prove damages on a class-wide basis. Otherwise, individual issues "inevitably overwhelm questions common to the class," and preclude a finding of predominance. *Comcast*, 569 U.S. at 34. "[A]t the class certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case," and "courts must conduct a rigorous analysis to determine whether that is so." *Comcast*, 569 U.S. at 35.

"[A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory." *Id.* And, Plaintiffs' damages model must be capable of isolating on any respective theory of liability. *Id.* at 38.

Plaintiffs' damages expert, Stefan Boedeker, purports to measure class-wide diminution in value damages by calculating the difference between the total dollars stemming from estimated Illinois sales of all Champion products during the class period and the dollar amount of sales that would have been earned but for the allegedly misleading statements and omissions. Mot. Ex. 70 ("Boedeker Report") ¶ 172, Table 16. This algebraic methodology, however, depends on inputs purporting to represent the diminution in value in each product, supplied by his damages theory. *Id.* ¶ 171. Boedeker arrived at the diminution in value percentage through four conjoint surveys relating to alleged ACANA omissions and misrepresentations and ORIJEN omissions and misrepresentations. *Id.* ¶¶ 171-172. The unreliability of Boedeker's surveys will be described in further detail in Champion's forthcoming Motion to Exclude Plaintiffs' Expert Witness Stefan Boedeker, but in sum, Boedecker's diminution in value calculation—and, in turn, his damages computation—provide no method for calculating damages on a class-wide basis for two reasons.

First, Plaintiffs allege that they incurred damages as a result of both Champion's misrepresentations and omissions. *See* TAC ¶¶ 227-239. But Boedecker's diminution in value cannot track this combination theory of liability because his decrease in value attributable to misrepresentations cannot simply be added to the decrease in value attributable to the omissions as he suggests. *See* Expert Rebuttal Report of Dr. Hanssens ("**Ex. Y**") at ¶ 91. For example, certain combinations of misrepresentations and omissions total greater than 100%, meaning that Champion's dog food has negative value and, in turn, means that Plaintiffs' damages exceed what they paid for the dog food. Boedeker Report ¶ 169, Table 14. Because Boedeker cannot isolate the purported diminution in value attributable to alleged misrepresentations and omissions in

combination, his damages calculations do not fit with Plaintiffs' claims and cannot be used to calculation damages on a class-wide basis. *Comcast*, 569 U.S. at 38.

In addition, Plaintiffs' damages methodology does not track their theory of liability for another reason—it double counts the alleged harm and overstates the damages by calculating both misrepresentations and omissions. In the TAC, Plaintiff alleges the "Biologically Appropriate" and "Fresh Regional Ingredients" were misleading ***because*** Champion's dog food contained and/or had a material risk of containing heavy metals, BPA, non-fresh, or non-regional ingredients. *See* TAC ¶¶ 226(a), 227. However, Boedeker's methodology improperly decreases the value of Champion's dog food both for the purported misrepresentations (*i.e.*, "Biologically Appropriate," "Fresh,"), and for the non-disclosure (*i.e.*, heavy metals, BPA, non-fresh ingredients) that purportedly make these representations misleading; thus, double counting the same alleged wrong. Indeed, Boedeker's methodology decreases the value of Champion's dog food for both representing that it includes fresh ingredients and for failing to disclose that the dog food contains non-fresh ingredients. Boedeker Report at 63-64 Tables 14-15. This deficiency negates the assertion that this methodology can be utilized to calculate class-wide damages. *In re Fluidmaster, Inc. Water Connector Components Prods. Liab. Litig.*, No. 14-cv-5696, 2017 WL 1196990, at *57 (N.D. Ill. Mar. 31, 2017) (declining to certify classes where their experts' "price premium damages model does not measure damages attributable to their liability theory").

A second fundamental flaw is that Boedeker's diminution in value calculation is based on consumers' willingness to pay only, *see* Boedeker Report ¶ 43, which is but one factor in assessing market price. It only accounts for demand-side considerations by purporting to measure changes in survey respondents' willingness to pay based on changes in information. Boedeker ignores supply-side factors such as Champion's willingness to sell at any new prices reflected in Boedeker's analyses (much less give products away for free or pay consumers to take it, as Boedeker's work

suggests). Boedeker takes no account of production costs, and competitor reactions. *See* Expert Rebuttal Report of Dr. Hitt ("**Ex. Z**") ¶¶ 16, 31-45. One need not look farther than certain combinations of Boedeker's misrepresentations and omissions which result in Champion's dog food having a negative value. Mot. at 26-27 (table). Surely, no rational economic, profit-maximizing actor would continue manufacturing a product that it would have to pay consumers to take off its hands and never even scale back on its output. Such irrationality exists only in Boedeker's "but for" world, because the behavior he assumes would defy core economic theory. Because his model produces absurd results and ignores the supply side, Boedecker's diminution in value calculation is not capable of calculating a market price in his but-for world and, for that reason, cannot be used to calculate harm to any of the mini-classes. *See In re General Motors LLC Ignition Switch Litig.*, 14-MD02543 (JMF), 2019 WL 3564698, at *12 (S.D.N.Y. Aug. 6, 2019) (excluding Boedecker's opinions because his model "did not estimate any possible changes in [the defendant's] willingness to sell"); *In re Fluidmaster,* 2017 WL 1196990, at *31 ("Asking an unrepresentative group of purchasers to artificially assign values among an arrangement of potentially unimportant attributes that fails to approximate real-world purchasing decisions does not seem designed to produce a reliable WTP estimate that can be used to calculate class-wide damages."). As Boedecker's diminution in value calculation fails to provide a valid mechanism for determining class-wide damages, Plaintiffs' Motion should be denied on this basis alone.

### B.    Plaintiffs Fail to Carry Their Burden Under Rule 23(c)(4)

Recognizing the uphill battle they face in certifying any mini-class, Plaintiffs move in the alternative for certification as to numerous issues. Mot. at 29-30. Issue certification is appropriate "only if it permits fair presentation of the claims and defenses and materially advances the disposition of the litigation as a whole." *Smith-Brown,* 335 F.R.D. at 535. And, Plaintiffs bear the burden of "adducing evidence that suffices to demonstrate that there are questions common to all

class members that are centrally important to the resolution of this litigation." *Id.* Plaintiffs failed to meet their burden under Rule 23(c)(4). They failed to show that certification of an issues class would advance the disposition of the litigation, but merely assert that it would. Mot. at 29-30.

Because of the complexities of the individualized issues identified *supra*, Plaintiffs' issue classes would not materially advance the litigation or make it more manageable, underscoring why issue certification is not appropriate. *Clark v. Experian Information Solutions, Inc.*, 256 Fed. Appx. 818, 823 (7th Cir. 2007) (affirming denial of Rule 23(c)(4) issues class "where little efficiency would be gained by certifying a class for only particular issues"); *In re Fluidmaster*, 2017 WL 1196990, at *63 (declining to certify issue classes that would result in "piecemeal litigation" plaintiffs' claims); *Reitman*, 830 F. App'x at 882 (affirming denial of issues classes).

### C. Plaintiffs Fail to Carry Their Burden Under Rule 23(b)(2)

Plaintiffs make a last-ditch effort at certification under Rule 23(b)(2) for injunctive relief. "Certification under this provision is 'permissible only when monetary relief is incidental to equitable relief." *See Lipton*, 289 F.R.D. at 461 (quoting *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898 (7th Cir. 1999)). "Put another way, Rule 23(b)(2) certification is proper only where injunctive or declaratory relief is the predominant remedy requested for class members." *Id.*; *see also Jefferson*, 195 F.3d at 898 (finding Rule 23(b)(2) certification is not appropriate when the "final relief relates exclusively or predominately to money damages"). Rule 23(b)(2) certification is unwarranted here because the plaintiffs' claim for injunctive relief is secondary to their pursuit of money damages. *See Lemon v. Int'l Union of Operating Engineers, Loc. No. 139, AFL-CIO*, 216 F.3d 577, 580 (7th Cir. 2000) (vacating class certification "since the requested monetary damages are not incidental to the plaintiffs' requested equitable relief").

### V. CONCLUSION

For all the foregoing reasons, Plaintiffs' Motion for Class Certification should be denied.

Dated:  April 30, 2021

Respectfully submitted,

s/ *David A. Coulson*
David A. Coulson (ARDC #6199911)
Jessica J. Fishfeld (ARDC #6313149)
Jared R. Kessler (Admitted *pro hac vice*)
Robert S. Galbo (Admitted *pro hac vice*)
Elisa H. Baca (Admitted *pro hac vice*)
GREENBERG TRAURIG P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
Tel: (305) 579-0754
Fax: (305) 579-0500
Email: coulsond@gtlaw.com
johnsonj@gtlaw.com
kesslerj@gtlaw.com
galbor@gtlaw.com
bacae@gtlaw.com

Francis A. Citera (ARDC # 6185263)
GREENBERG TRAURIG LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Tel: (312) 456-8400
Fax: (312) 456-8435
Email: citeraf@gtlaw.com

Rick L. Shackelford, Esq. (*pro hac vice*)
GREENBERG TRAURIG LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Tel: 310-586-3878
Fax: 310-586-7800
Email: shackelfordr@gtlaw.com

*Attorneys for Defendants*
*Champion Petfoods USA Inc. and*
*Champion Petfoods LP*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of April, 2021, I served the foregoing document

on all counsel of record identified on the below Service List via Registered Email.

*/s/ David A. Coulson*
DAVID A. COULSON

## SERVICE LIST

Charles J. LaDuca
Katherine Van Dyck
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Tel: 202-789-3960
Email: charlesl@cuneolaw.com
Email: kvandyck@cuneolaw.com

Rebecca A. Peterson
Robert K. Shelquist
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave. S., Suite 2200
Minneapolis, MN 55401
Tel: 612-339-6900
Email: rapeterson@locklaw.com
Email: rkshelquist@locklaw.com

Kevin A. Seely
ROBBINS LLP
5040 Shoreham Place
San Diego, CA 92122
Tel: 619-525-3990
Email: KSeely@robbinsllp.com

Daniel E. Gustafson
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: 612-333-8844
Email: dgustafson@gustafsongluek.com

*Attorneys for Plaintiffs*

Kenneth A. Wexler
Kara A. Elgersma
Michelle Perkovic
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Tel: 312-346-0022
Email: kaw@wexlerwallace.com

Mark J. Tamblyn
WEXLER WALLACE LLP
333 University Ave., Suite 200
Sacramento, CA 95825
Tel: 916-565-7692
Email: mjt@wexlerwallace.com

Joseph J. DePalma
Susana Cruz Hodge
LITE DEPALMA GREENBERG, LLC
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Email: jdepalma@litedepalma.com
Email: scruzhodge@litedepalma.com