# EXHIBIT 3

Page 1

1               UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF NEW YORK

3

4    RACHEL COLANGELO and KATHLEEN      )   Case No.
     PARADOWSKI, individually and on    )   6:18-cv-01228
5    behalf of a class of similarly     )   [LEK/DEP]
     situated individuals,              )
6                                       )
              Plaintiff,                )
7                                       )
     vs.                                )
8                                       )
     CHAMPION PETFOODS USA INC. and     )
9    CHAMPION PETFOODS LP,              )
                                        )
10            Defendants.               )
     _____)
11

12

13          VIDEO-RECORDED VIDEOCONFERENCE

14          DEPOSITION OF STEFAN BOEDECKER

15             Tuesday, March 16, 2021

16                     Volume I

17

18

19

20   Reported by:
     ROCHELLE HOLMES
21   CSR No. 9482

22   Job No. 4487163

23   PAGES 1 - 105

24

25

Page 2

```
1         UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF NEW YORK
3
4    RACHEL COLANGELO and KATHLEEN    )  Case No.
     PARADOWSKI, individually and on  )  6:18-cv-01228
5    behalf of a class of similarly   )  [LEK/DEP]
     situated individuals,            )
6                                     )
          Plaintiff,                  )
7                                     )
     vs.                              )
8                                     )
     CHAMPION PETFOODS USA INC. and   )
9    CHAMPION PETFOODS LP,            )
                                      )
10        Defendants.                 )
     _____)
11
12
13
14       Deposition of STEFAN BOEDECKER, testifying from
15   Henderson, Nevada, taken on behalf of Defendants, via
16   videoconference, beginning at 12:22 P.M. and ending at
17   3:58 P.M. on Tuesday, March 16, 2021, before ROCHELLE
18   HOLMES, Certified Shorthand Reporter No. 9482, Certified
19   Realtime Reporter No. 0123.
20
21
22
23
24
25
```

Page 3

```
1    APPEARANCES:
2    For Plaintiff:
3       GUSTAFSON GLUEK PLLC
4       BY:  RAINA C. BORRELLI, ATTORNEY
5       120 South 6th Street, Suite 2600
6       Minneapolis, Minesota 55402
7       (612) 333-8844
8       Rborrelli@gustafsongluek.com
9       (Appearing via videoconference.)
10   For Defendants:
11      GREENBERG TRAURIG
12      BY:  RICK SHACKELFORD, ATTORNEY
13      1840 Century Park East, Suite 1900
14      Los Angeles, California  90067
15      (310) 586-3878
16      Shackelfordr@gtlaw.com
17      (Appearing via videoconference.)
18         --and--
19      GREENBERG TRAURIG, P.A.
20      BY:  JARED KESSLER, ATTORNEY
21      333 SE 2nd Avenue
22      Miami, Florida 33131
23      (305) 579-0754
24      Coulsond@gtlaw.com
25      (Appearing via videoconference.)
```

Page 4

```
1    APPEARANCES (CONTINUED):
2
3    VIDEOGRAPHER:  SCOTT SLATER
4          (Appearing via videoconference.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1                    INDEX
2    WITNESS         EXAMINATION BY         PAGE
3    STEFAN BOEDECKER
4    Volume I
5              MR. SHACKELFORD        7
6              MS. BORRELLI        101
7
8
9              EXHIBITS
10   NUMBER         DESCRIPTION         PAGE
11       (None attached.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

1    Tuesday, March 16, 2021
2        12:22 P.M. - 3:58 P.M.
3
4        THE VIDEOGRAPHER: Good afternoon. We are on
5    the record at 12:22 p.m. Pacific Daylight Time on
6    March 16th, 2021. Please note that the microphones are
7    sensitive and may pick up whispering, private
8    conversations or cellular interference. Audio and
9    video recording will continue to take place unless all
10   parties agree to go off the record.
11       This is Media Unit 1 of the video-recorded
12   deposition of Stefan Boedeker, taken by counsel for
13   defendants in the matter of Rachel Colangelo and
14   Kathleen Paradowski, et al., versus Champion Petfoods
15   U.S.A. Inc. and Champion Petfoods LP, filed in the
16   United States District Court, Northern District of New
17   York. Case No. 6:18-cv-01228.
18       This deposition is being held as a virtual
19   deposition via Zoom with the witness located in
20   Henderson, Nevada. My name is Scott Slater from the
21   firm Veritext Legal Solutions and I am the
22   videographer. The court reporter is Shelley Holmes
23   from the firm Veritext Legal Solutions. I am not
24   related to any party in this action, nor am I
25   financially interested in the outcome.

Page 7

1        Counsel and all present will now state their
2    appearances and affiliations for the record. If there
3    are any objections to proceeding, please state them at
4    the time of your appearance, beginning with the noticing
5    attorney.
6        MR. SHACKELFORD: Rich Shackelford, Greenberg
7    Traurig, for the defendant Champion Petfoods.
8        MR. KESSLER: And Jared Kessler from Greenberg
9    Traurig for Champion.
10       MS. BORRELLI: Raina Borrelli from Gustafson
11   Gluek on behalf of the plaintiffs and the witness.
12       THE VIDEOGRAPHER: Thank you very much.
13       Will the court reporter please administer the
14   oath.
15           STEFAN BOEDECKER,
16   having been duly administered an oath in accordance with
17   CCP 2094, was examined and testified as follows:
18
19           EXAMINATION
20   BY MR. SHACKELFORD:
21   Q   Thank you, Mr. Boedeker.
22       MR. SHACKELFORD: Ms. Borrelli, we had a
23   discussion off the record. It's my understanding that
24   we're actually taking the deposition in three different
25   cases. So it's -- even though the notice was done for

Page 8

1    Colangelo, this will also apply to the Illinois case and
2    the Michigan case; is that right?
3        MS. BORRELLI: Yes, that's my understanding as
4    well.
5        MR. SHACKELFORD: I don't want to put any of
6    us through this three times, so even though it's
7    captioned under one we'll have the understanding that it
8    will be the same as if we were taking it in each of the
9    cases individually.
10       Does that work for you?
11       MS. BORRELLI: Yes.
12       MR. SHACKELFORD: Okay. Super.
13   Q   BY MR. SHACKELFORD: Mr. Boedeker, thanks for
14   your patience.
15       Again, the reason I just did the little
16   discussion is I'm actually going to ask you most
17   questions I think tee'd off of your report in the
18   Illinois case, which was for the case styled Zarinebaf.
19       MR. SHACKELFORD: Did I get that close, Raina?
20       MS. BORRELLI: I've actually never met that
21   particular plaintiff, so we'll go with it.
22       MR. SHACKELFORD: For the court reporter's
23   sake, last name is Z-A-R-I-N-E-B-A-F, so it'd be
24   Zarinebaf versus Champion Petfoods, and I suspect that
25   may be the last time I try to stumble over that name the

Page 9

1    rest of the afternoon, so we'll have some mercy there.
2    Q   BY MR. SHACKELFORD: So for purposes of our
3    record, your report in the Illinois case, we'll do it
4    that way, that's a lot of easier, consists of your
5    narrative report, your CV and some appendices; is that
6    right?
7    A   That is correct, yes.
8    Q   And you have before you the narrative report
9    which is about 70 -- I think your signature's on
10   Page 78; is that right?
11   A   Yes. Let me just -- I have three stacks for
12   each suit. Let me just find the Illinois one.
13   Q   Okay.
14   A   Yes, I got it. I'll put it to the side here.
15   Q   Great. And then as we talked, the appendices
16   are pretty voluminous. I think it's 300-and-some pages.
17   We haven't printed those out, you don't have those in
18   front of you, but if for any reason anyone needs to
19   point out anything in those appendices, you have access
20   to those and we can get at them; is that right?
21   A   That is correct. I don't have a hard copy in
22   front of me, but I can have it printed out and then have
23   it here within minutes hopefully. I know that it's very
24   lengthy, but it should be -- it's feasible to print it
25   out where I am right now.

3 (Pages 6 - 9)

Page 10

1    Q    And as I said, I don't think it will be
2    necessary and that's why we didn't go through the
3    exercise, but if we get there -- and by all means, if
4    you need to refer to anything in the appendices to
5    refresh your recollection or to answer the question,
6    then let me know and we'll make sure that we get
7    whatever you need in front of you.  Okay?
8    A    Okay.  Understood.
9    Q    Okay.  And then as part of what you've got
10   before you, do you have your CV, which I think was
11   Appendix 1 to the report?
12   A    I do have -- the CV is Exhibit A.  I have that
13   in front of me as well.
14   Q    Okay.  Great.  Because I will have some
15   questions that you may want to refer to that about.
16        But for each of the three cases we have
17   narrative report, CV, appendices and is that the
18   universe of your complete report for each of the three
19   cases?
20   A    There is support materials that I've produced,
21   which are basically calculations that feed into the
22   tables and charts that I have through all of my reports,
23   that I have not here, and those are very voluminous data
24   files, some in the gigabyte size so I didn't bring
25   those.

Page 11

1    Q    And I don't expect those are committed to
2    memory, but those have been made available to us; is
3    that right?
4    A    That is correct.  There was a production done
5    probably the day after the report was issued and these
6    files were transferred electronically.
7    Q    And then this morning I think I got some
8    errata sheets that pertain to some of the tables or
9    appendices in the various reports; is that right?
10   A    That is correct.  There was an errata sheet
11   for a table that was -- the one that was in the report
12   or the ones I should say that were in the reports were
13   inserted incorrectly.  And so I basically made available
14   the corrected.  Those are like demographic information
15   about the survey participants.
16   Q    Was the same errata done for each of the
17   three?  I printed one out, but I didn't compare them.  I
18   figured I'd just ask you as a shorthand way.
19   A    The errata sheet looked exactly the same, it
20   replaced the entire table that had some entries.  And
21   I -- I have no explanation how the wrong numbers came in
22   there, just incorrect table was inserted the day
23   reports were submitted and I provided the corrected
24   table.
25   Q    It's all the same to you, is it okay, I don't

Page 12

1    think I'll have any questions about them, but I just
2    want to make sure that we are complete and that we've
3    got straight what your report is and --
4    A    Maybe what I also should point out that
5    there's an Exhibit B as well in the materials that were
6    part of my report, which is entitled List of Documents
7    Relied Upon, and it's just one page.  That is --
8    probably got lost in the resume and the CV, there's
9    actually another one-pager in there that is Exhibit B
10   from the report.
11   Q    Thank you for pointing that out.  I think I'll
12   probably have no questions about that too, but if we do
13   we'll get there and literally make sure we're on the
14   same page.
15        I'm going to need -- we've done this before,
16   you and I have done this before, I'm going to dispense
17   with a lot of the admonitions and other things and just
18   plow right into it, unless you have any questions before
19   we jump in?
20   A    I don't have any questions.  Thank you.
21   Q    Okay.  No reason you're unable to give your
22   best testimony today, is there?
23   A    No reason.
24   Q    Okay.  As I admitted to you off the record,
25   what I really want to do is focus on, for the most part,

Page 13

1    things that are new.  And for that I'm going to ask you
2    to turn to Page 67 in your Illinois report, and about
3    the middle of the page is a numbered eight and in bold
4    type says "Expectation Survey."
5         So if you can let me know when you get there.
6    A    Yeah, this is printed double sided, so I found
7    it.
8    Q    Okay.  And put your thumb there if you could,
9    and then I'm going to look at Page 3 of that same
10   document.
11   A    Page 3?
12   Q    Yes, sir.
13   A    Okay.  I'm on Page 3 now.  I have both pages
14   in front of me.
15   Q    Okay.  Great.  What I'm interested in on
16   Page 3 is Paragraph 12 and then subparagraph E at the
17   bottom of the page.
18   A    I'm reading E, yes.
19   Q    Okay.  And does Paragraph 12E, is that
20   describing the expectation survey that is discussed
21   beginning on Page 67 of your report?
22   A    That is correct, E is a high level summary of
23   what is called numeral eight, expectation survey on
24   Page 67.
25   Q    Okay.  So the expectation survey,

4 (Pages 10 - 13)

Page 14

1 Paragraph 12E, tells me the answer to why you did the
2 expectation survey, would that be accurate?
3     A    I would think so.  I mean, it's kind of like
4 written in that intent that it's a quick brief summary
5 about what the survey is about.  And so that hopefully
6 answers your question of why it was written.
7     Q    Okay.  I thought that was probably the case,
8 but better to hear it from you than for me to guess.
9          Since you've got your CV in front of you, let
10 me ask you this question.
11    A    Hold on a second.  The CV got shuffled.
12    Q    It's okay.
13    A    Now I have three stacks in front of me, but
14 I've everything now.
15    Q    There we go.  How many expectation surveys
16 have you written before the one that's described here in
17 your report?
18    A    I have performed multiple surveys to assess --
19 descriptively assess consumers' expectations or
20 understanding.  I may not always have called them
21 expectation survey.
22    Q    Okay.
23    A    But the essence behind here is to on simple
24 scales assess consumers' understanding of certain
25 issues.  And so this is like a survey format that is

Page 15

1 frequently used that I have used in the past.  Again, I
2 might not have always called it expectation survey.
3     Q    Was there some portion -- and I'm looking at
4 Page 1 of your CV, was there some portion of any of the
5 degrees that you pursued that are described under
6 education section that included as part of the pedagogy
7 writing and feeling and expectation survey?
8     A    Within my statistics of both undergrad and
9 graduate studies, I took statistical sampling and survey
10 analysis classes.  And within those survey design and
11 survey roll-out and survey -- or statistical analysis of
12 the survey results were part of the content or the
13 topics that were taught.
14    Q    Again, referring back to the subpart 12E on
15 Page 3, is it accurate to say that what you were trying
16 to assess in your expectation survey is whether there
17 was a causal impact between the information people were
18 seeing in the survey and their purchase intent?
19         MS. BORRELLI:  Object to form.
20         THE WITNESS:  No.  That was not the goal of
21 the survey.  So I basically wanted to just figure out
22 what people expect when they read a certain label.  But
23 I did not analyze the behavior or the purchase intent
24 based on those answers.  What I did in Section 8 in my
25 report is just describe what consumers -- or

Page 16

1 participants who were consumers of the product, what
2 they expected when they read a certain label.
3     Q    BY MR. SHACKELFORD:  Okay.  Looking again at
4 Paragraph 12E, I'm looking at the last part and it says,
5 "Whether the alleged misrepresentations and omissions
6 would affect consumers' purchasing."
7          So can you explain to me what that means?
8     A    Yeah, when one of the questions was if -- and
9 I could go to specific example, or just answer it more
10 generally, if something was the case about the product,
11 then I would ask questions about and if it was an
12 attribute that may change consumers' preferences for the
13 product, then the question was would they pay more or
14 less for the product.
15    Q    Okay.  So I think I understand.  I asked you
16 about intent, and if I'm understanding the answer you
17 just gave me, what you were testing was not a change in
18 intent but a change in price; is that fair?
19    A    Yeah.  That is -- I mean, I think it's a fair
20 summary of what this expectation survey did, it just
21 looks descriptively, not in a cause and effect kind of
22 sense, but descriptively.  If something changes, an
23 attribute changes, would consumers pay more or less for
24 that particular product.
25    Q    Now I'm a little bit lost, I want to make sure

Page 17

1 I understand.
2          Is what you were testing -- I'll describe it
3 and if I screw it up, tell me, but a summary, if you
4 knew this, would it have an effect on how much you would
5 pay?
6     A    There was one line of questions about would it
7 make it more or less likely, and then one was kind of
8 asking would you -- let me find it here -- yeah, I was
9 looking for the actual wording, yeah.  Would it make you
10 more or less likely to purchase the dog food shown.
11         So it's a change in attributes as explained in
12 the question itself, and then it's the question or the
13 answers are then listed as changes in -- it goes from
14 far less likely to far more likely to purchase the
15 product.
16    Q    Okay.  Again, sort of descriptive.  Would it
17 be fair to say you were testing whether a change in
18 something would cause a change in how much they would
19 pay for it?
20    A    Yeah, again, but not in a cause and effect.
21 I'm describing the results of the questions basically,
22 descriptive and give percentages.  So if some attribute
23 changes then how much more likely from far less likely
24 to far more likely would somebody change their behavior
25 or their choices made.

5 (Pages 14 - 17)

Page 18

1    Q   Do you have an opinion whether the -- I'll
2  break them down, whether the misrepresentations caused a
3  change in consumer behavior?
4    A   There's a general trend in the data, again,
5  I'm describing the data, shows that consumers are more
6  likely to purchase as measured by the two positive
7  likelihood, more likely and far more likely when
8  statements that are talking about positive attributes
9  are true, and if omissions of attributes that are viewed
10  generally as negative, then -- and then they actually
11  have those attributes, then in general from observing
12  the data then likely to purchase goes down.
13       And that is overall from these descriptive
14  statistics that consumers change -- consumers'
15  preferences change when negative attributes are omitted
16  or when positive attributes are basically stated but
17  they are not true.  That was the general conclusion.  I
18  think it's at the very end in the summary of conclusions
19  I have one little paragraph that summarizes what I've
20  just said.
21    Q   Just so make sure we're talking about the same
22  thing, would that be Paragraph 188 of your report?
23    A   Yeah, that's exactly.  It's Paragraph 188 on
24  Page 78.
25    Q   Okay.  And in part, Paragraph 188 reads,

Page 19

1  "Consumers are misled by Champion's packaging
2  misrepresentations and omissions and that the
3  misrepresentations and omissions have an impact on the
4  purchase intention of consumers"; is that right?
5    A   That is correct.  And I think I used slightly
6  different wording when I described it more saying when
7  they -- a misrepresentation of a positive attribute that
8  ultimately is not true, then the purchase will be less
9  likely.  If an omitted negative attribute would have
10  been disclosed to the consumer, then the purchase will
11  likely also go down.
12    Q   And where you say "have an impact," does that
13  mean the same thing as causes a change?
14    A   In this sense, I did not do that causal
15  analysis.  What I did, I asked those questions and
16  ultimately concluded based on just a comparison of
17  percentages that there's a change that can be observed
18  throughout the questions and throughout the different
19  surveys.
20    Q   Was the survey designed to test whether the
21  misrepresentations or omissions caused a change?
22    A   It was designed to have a simple descriptive
23  statistics, which in this case would be the percentages
24  for the far less likely and less likely groups versus
25  the more likely and far more likely groups.  And so they

Page 20

1  show these trends that again the omission of something
2  negative when disclosed would basically lower the
3  likelihood to purchase.  And if a misrepresentation of a
4  positively viewed attribute has happened, then the same
5  trend showed in the data.
6    Q   Based on the trends in the data, do you have
7  an opinion, we'll separate them one at a time, based on
8  the trends of the data produced by your expectation
9  survey, do you have an opinion whether
10  misrepresentations caused a change in the purchase
11  intent of consumers?
12    A   I think that that is somewhat summarized in my
13  last paragraph in 188 that there is some effect, some
14  causes and effect, but I haven't quantified or deeper
15  analyzed it.  And I have stated what I call the
16  descriptive level that just shows hugely varying
17  percentages.  And I think that is what I'm concluding in
18  Paragraph 188.
19    Q   And would that same answer apply to omissions
20  and whether the omissions caused a change in the
21  purchase intention of consumers?
22    A   That's correct.  I think I answered already
23  earlier when the omission of something negative when
24  disclosed causes a change in behavior and the
25  misrepresentation or the presentation of an attribute

Page 21

1  that's viewed as positive but then turns out to be
2  misrepresentation has the same effect in lowering the
3  person's likelihood.
4    Q   Okay.  I think I understand what you said, I'm
5  going to try to put it in my words and if I screw it up
6  tell me, but I think if I understand what you're saying,
7  the results of your expectation survey are directional,
8  but you didn't try to quantify the impact; is that fair?
9    A   That's correct.  I mean, let me define
10  directional how I view it as a statistical definition.
11  That there is a defect there and defect goes into the
12  direction that I explained.  In that sense it is
13  directional and the statistical sense has that meaning
14  there's an effect, and it is a positive or negative, but
15  the effect is there, it's in the data.
16       But what I did not do, and if I understand you
17  or your second part of your question correctly, I did
18  not run a separate model that says the impact is X or
19  something like that.
20    Q   Okay.  This is encouraging.  I think we're a
21  communicating.  So thank you.
22       With the CV in front of you, are there other
23  cases that you could point to me where you've done --
24  whether you've called it an expectation survey or not,
25  where you wrote, fielded and analyzed the results of a

Page 22

1 survey like the one you've called an expectation survey
2 in your report for this case?
3     A    Let me just go through.  This is a long list.
4 Sorry.  This takes a bit longer, but I'm going as fast
5 as I can.
6          Yeah.  For example, I'm on -- it's the No. 6
7 in the deposition listing, which is Page 8 in the CV
8 portion, Exhibit A, and No. 6 is -- that was a class
9 action where it was about the wording in certain
10 automobile insurance policies, and they are part of that
11 work was to figure out what people understood when they
12 read certain sections of the automobile insurance
13 policy.  And this was about some uninsured motorist
14 coverage for accidents, if I recall it properly.
15     Q    Any others?
16     A    Yes.  I'm continuing to go through here.
17     Q    I appreciate that.  Thank you.
18     A    No. 22, there was also some survey work
19 involved there, that was a case alleging discriminatory
20 distribution of public funding for different public
21 transportation modes.  And they were -- a survey work of
22 users of the different modes of transportation.  And
23 they had questions about expectations of how money was
24 spent and how it affected their particular mode of
25 transportation that they were using most.

Page 23

1          Another example is on Page 10, J. Morrison
2 versus The Vons Company.  Part of that case was there
3 was -- I was retained by The Vons Company and it was a
4 class action about misleading coupon redemption
5 policies.  And their part -- the wording of particular
6 coupon campaigns was tested there, which would -- in the
7 context of this case I call that an expectation survey.
8 And there I think it was particularly about double
9 coupon campaigns and the expiration of those double
10 coupons.
11          Should I continue?
12     Q    If there's any others, because I want to loop
13 back on some of those and just probe with you.  I want
14 to make sure we get a complete list.  By all means, take
15 as long as you need.
16     A    In No. 82, there is the Haney versus Costa Del
17 Mar, this was also associated federal case and after the
18 case settled for the computation of the value of
19 injunctive relief, I performed what could be called an
20 expectation survey, and that case was related to
21 warranties.  And let me just -- there was something that
22 was used that was called nominal fees for repairs.  And
23 there was a second issue, the lifetime warranty versus a
24 limited lifetime warranty.  And in that case I did a
25 survey of purchases of those sunglasses and assessed how

Page 24

1 they understood what they expected when they would see a
2 statement that would say that repairs at a nominal fee.
3 And it also did -- a second part in that survey was to
4 figure out what consumers understand under a lifetime
5 warranty versus a limited lifetime warranty.
6          And there's another case that is not on here,
7 but that was about Kombucha drinks.  In that case I
8 wasn't deposed, but that case settled.  And there again,
9 to calculate injunctive relief value I did a survey to
10 assess the different understandings and expectations of
11 people when they read some of the statements.  Since I'm
12 not a Kombucha drinker, I don't recall the exact detail
13 there, but it was about pasturization of the product and
14 the existence of live bacterial cultures in the product.
15     Q    Okay.  Is that all of them?
16     A    Yeah, that comes to mind by going through the
17 CV and -- and yeah, jogging my memory about this one
18 case that is not on here.
19     Q    Okay.  Thank you for that.
20          And I just want to go back and work them in
21 order, so No. 6, the auto insurance case, were you
22 testing a causal proposition with the survey you did in
23 that matter?
24     A    No.  I would not call it a causal effect.  The
25 question was about the wording under this uninsured

Page 25

1 motorist section of the policies, what was actually
2 covered by that.  There have been accidents, consumers
3 had not been paid.  In that case I was retained by the
4 insurance company.  And so there was a class action and
5 the question was, was there something wrong with the
6 wording in the policy.
7     Q    Okay.
8     A    And so in that case, counsel actually had
9 different interpretations and then I designed a survey
10 that would test the different interpretations.
11     Q    Okay.  In No. 22, the Metropolitan
12 Transportation case that we talked about, the
13 transportation money, did your work test a causal
14 proposition in that survey?
15     A    No, it was not a causal proposition.  It just
16 was a descriptive proposition to I would say measure
17 consumer sentiment.  At that time it was actually the
18 Bay Area, there was all the money went into BART.  And
19 so other modes of transportation were basically -- not
20 defunded but funded at a lower level.  And the survey
21 was about is it worth to get a lot more cars off the
22 street by getting people to using BART at the cost of
23 potentially closing bus lines.  It was along those
24 lines.
25          So it was not a cause and effect, but it was

7 (Pages 22 - 25)

Page 26

1  assessing consumers' change in preferences and
2  perceptions about something that changed in their daily
3  routines, like, for example, a closed bus line would be
4  viewed negative by someone who doesn't use BART, for
5  example, BART gets more funding, it was along those
6  lines.
7      Q    And in the Metropolitan Transportation case,
8  did you write the questions for that survey?
9      A    The questions were -- there were certain legal
10 issues, because this was a discrimination case.  And so
11 the legal aspects were phrased by the attorneys, but
12 then there were other more consumer perception, consumer
13 preference questions there that I -- I would say it was
14 a joint product, but I did not touch the legal issues
15 that they wanted to assess that were relevant for the
16 discrimination claims.
17     Q    Probably a safe way to proceed.
18          Do you remember, was there a control group as
19 part of the survey experiment you did in the
20 Metropolitan Transportation case?
21     A    The service that was done by category of
22 public transportation, let's say the mode of public
23 transportation.  And the results from -- think about if
24 there were four modes I designed the system where every
25 -- every permutation of pairs that was possible.  And so

Page 27

1  I used these permutations as built-in control groups.
2      Q    In the Vons case, were you testing a causal
3  proposition there?
4      A    Their proposition was causal in the sense
5  the -- I had all of the frequent shopper transactions
6  and the ones that -- like this Vons club card.  And the
7  question there was does coupon -- do coupon campaigns,
8  and the wording in coupon campaigns and the redemption
9  of coupons, do they cause differences in purchase
10 behavior as measured by the transaction data that I had
11 in that case.
12     Q    So let me make sure I understand.  Were you
13 analyzing data that existed or were you fielding a
14 survey of consumers, or maybe both?
15     A    It was both.  The data themselves were
16 millions of transactions of consumer purchases.  And
17 then there was the second aspect to see how consumers
18 assessed a situation I would say subjectively is
19 probably the best way.  I feel that -- like a consumer
20 says, "Oh, yeah, I see this," and then it changes and we
21 had the data -- or I had access to the data and so I
22 could test statistically speaking if there was a
23 correlation between what the consumers thought about
24 those coupon campaigns, and then the data would be able
25 to show either the same or different picture.  That was

Page 28

1  really the goal of the exercise there.
2      Q    I think I understand.  Let me put it in my
3  words, and if I screw it up, tell me.  But were you
4  performing a survey to test what people told you they
5  thought or how they would behave and then you were able
6  to compare those responses to a body of data to see how
7  well they matched up?
8      A    That is -- I would say at the higher level
9  that is correct.  The individuals have opinions about
10 their behavior, their purchase behavior, which then
11 could be tested against objective purchase data.
12     Q    Okay.  In the Costa Del Mar case, the one
13 involving the sunglasses, did your work there test a
14 causal proposition?
15     A    I can explain what I did and then I can see if
16 there's any way of interpreting that as a causal.
17     Q    Let's do that.
18     A    Again, the goal was after the case had settled
19 and injunctive relief had been negotiated or ordered,
20 and what I really tested is when consumers read, for
21 example, what I recall vividly is that nominal fee, what
22 is over the lifetime of a pair of sunglasses, and these
23 sunglasses were expensive, they were like 2, $300, what
24 would consumers view as a nominal fee.
25          I don't think that can be viewed as causal.

Page 29

1  And the warranty part of that was like this point -- or
2  the difference between lifetime warranty and limited
3  lifetime warranty, and that was really more like
4  probably in the truest sense of the word, an expectation
5  survey, what do consumers expect when they view a
6  description like that, then how do they actually view or
7  value that.
8          So I asked the questions as a percentage of
9  the purchase price in absolute dollar terms across
10 different groupings within the class and then the test
11 to come up with -- with the value of that statement --
12 or the difference in value, I should say.
13     Q    Do you recall whether any controlled group was
14 used in your work in the sunglass case?
15     A    In this case, there was no control group
16 necessary because it was the purchases -- in the control
17 groups who were indirectly there that people were given
18 the questions as a dollar, as a percentage, so I created
19 built-in controls, it was looked at both, that was the
20 argument we used to compare the results.
21     Q    And then finally on the Kombucha drinks, was
22 there a causal proposition being tested in that work?
23     A    Again, there was the difference between the
24 way this Kombucha drink was done, but the difference
25 between the live cultures and pasteurizing something,

8 (Pages 26 - 29)

Page 30

1 Louis Pasteur, that's his name, pasturizing something
2 and then basically after the fact including the
3 cultures. So that was really more like explaining what
4 they had purchased, the consumers, versus what they
5 thought they were purchasing and then see if there's a
6 potential difference in how much more value the original
7 recipe, so to speak, where the pasteurization process
8 takes place.
9   Q   Did you write the questions yourself in the
10 survey you did in the Kombucha drink case?
11   A   Yes. That was basically getting the
12 definitions of the attributes in questions and there was
13 really no -- no legal interpretation. And same as the
14 sunglass case. I just defined -- I didn't go into the
15 legal aspects of the warranties there, I just defined
16 what the -- what basically the warranty said and then
17 how the injunctive relief changed in the wording
18 contrasted back to the original wording.
19   Q   And in the Kombucha case was any control group
20 used?
21   A   There were only the plaintiffs, there was no
22 special control group.
23   Q   In any of the survey works that we just talked
24 about, and I'll try to do it collectively, do you recall
25 using a pretest in any of these examples?

Page 31

1   A   The rollout of the first few, that number
2 varied, I don't recall exactly how large it was, but I
3 test the survey instrument, and I know the very first
4 one, that was not an internet panel survey, that was,
5 you know, from the early 2000s.
6       But they have -- the survey company who
7 conducted the survey included a pretest that I then
8 looked at, diagnosed that there was no misunderstanding
9 or confusion in that survey and didn't have to change
10 anything.
11   Q   Were the rest of these examples all internet
12 panel surveys?
13   A   I -- I mean, definitely the Kombucha and the
14 transportation was not an internet panel. There was
15 actually the survey company went out to interview people
16 as they were exiting particular public transportation
17 vehicles.
18   Q   From what you've described to me I think that
19 makes sense in that circumstance, all the others as you
20 can recall were internet panel surveys?
21   A   That is my recollection, because I know that
22 there was one that we had millions of the frequent
23 shopper cards and then we outsourced that personally. I
24 don't conduct the survey myself, the company who did the
25 survey there used information from the frequent shopper

Page 32

1 applications and then contacted the survey -- the
2 individuals or the respondents.
3   Q   Going back to the transportation one just for
4 a second, do you recall who made the decision to
5 actually talk to people as they got off public
6 transportation as opposed to using an internet panel
7 survey?
8   A   I don't recall that, how the decision was
9 made. That case is also probably at least, I don't
10 know, ten, 12 years ago. And I don't recall how the
11 decision was made.
12   Q   Okay. Regardless who made the decision, and I
13 take it you agreed with the decision and the
14 circumstances?
15   A   That is correct.
16   Q   Talking about your expectation survey in your
17 report here, do you recall, did you do a pretest of the
18 questions in this expectation survey?
19   A   Usually in surveys I use the first smaller
20 number, 50 years old, whatever comes back within day one
21 basically to -- to do some interpretation. Right now I
22 don't see the survey in front of me so I don't know if
23 we had particular questions in there. So right now I
24 don't recall.
25   Q   We're talking about 15 paragraphs, 16

Page 33

1 paragraphs in describing it.
2       Is there anything in this -- under Section 8,
3 is there any paragraph that I could look to that would
4 describe for me any pretest that you did?
5   A   Let me just find this here. See, the question
6 was in the -- and I'm on Page 69 right now on Table 17.
7 And there at the bottom it says a clear understanding of
8 the 493 versus no, the seven individuals.
9       Well, when that question was in there, then I
10 would have looked at the first 50 or so, usually
11 whatever comes in after the first day and look at those
12 answers and then made the decision that the percentage
13 is so small that no changes are necessary.
14   Q   Did you write the questions for your
15 expectation survey in these cases?
16   A   Yes. I mean, I worked with the team and we
17 looked at the statements themselves and then I decided
18 how to phrase the intro to the question. And then also
19 how to basically get the answer choices. Because in
20 this case, I did not go through all possible
21 permutations, I basically focused on some of them to
22 show a trend or to test if a trend exists. And so the
23 different categories basically I put together after
24 discussions with the team.
25   Q   And who else was on the team?

9 (Pages 30 - 33)

Page 34

1    A    In this particular instance there was a
2  Dr. Groehn, G-R-O-E-H-N, he's a director in BRG's D.C.
3  office, and then there's also Mia Kim, she's at the
4  consultant level and is in the Los Angeles office.
5    Q    Anyone else?
6    A    I think that those two individuals were the
7  ones that I recall.  I don't know, maybe pulling
8  together the tables or so may have been a more junior
9  level staff person, but I do remember having discussions
10  with those three individuals.
11    Q    And what did Dr. Groehn do, what was his role
12  or her role?
13    A    He's male.  He basically had worked with me on
14  this case, he also had worked on the Minnesota case.
15  And so we would discuss the framing of the original
16  question that you see at the top of the figures on Pages
17  70 and following.  And then we looked at the phrasing of
18  the expectations themselves.
19      So that was his role, he and I had discussions
20  and we would put it down.
21    Q    And then Mr. or Ms. Kim, what was that
22  person's role?
23    A    Ms. Kim was more junior, was part of the
24  discussions then probably wrote it down in the document
25  that I reviewed.

Page 35

1    Q    Was any control group used in the expectation
2  survey in your report in the Illinois case?
3    A    I mean, there was no control group necessary
4  because the participants were all individuals in the
5  market for dog foods, premium dog foods and therefore,
6  they saw all the same questions.
7      THE REPORTER:  Counsel, I'm sorry.  Could we
8  just take a two-minute break?
9      MR. SHACKELFORD:  Absolutely.
10      THE VIDEOGRAPHER:  We are off the record.  The
11  time is 1:16 p.m.
12      (A brief recess was taken.)
13      THE VIDEOGRAPHER:  We are back on the record.
14  The time is 1:22 p.m.
15    Q    BY MR. SHACKELFORD:  Mr. Boedeker, would you
16  find Paragraph 179 in your report, it's on Page 70 here
17  in the expectation survey, and just let me know when you
18  found that?
19    A    I'm right there.
20    Q    Okay.  Great.
21      And your report here in this paragraph said,
22  "84.2 percent of respondents either agree or strongly
23  agree that the advertised dog food does only contain
24  fresh ingredients unless otherwise specified"; is that
25  right?

Page 36

1    A    Yeah, that's what it says.
2    Q    Okay.  What's the significance of the
3  84.2 percent number?
4      MS. BORRELLI:  Object to form.
5      (Reporter clarification.)
6      THE WITNESS:  The question was what is the
7  significance of the number, Mr. Shackelford?
8    Q    BY MR. SHACKELFORD:  Yes.
9    A    The significance of the number is that the
10  large majority of respondents expect fresh ingredients,
11  only fresh ingredients when it's stated on the package.
12    Q    Okay.
13    A    So that's a source that with a statement comes
14  an expectation of the consumer who's buying that
15  product.
16    Q    What percent of respondents would agree that
17  the dog food had only fresh ingredients without being
18  exposed to the fresh statement?
19    A    This particular question was asked with
20  respect to the fresh statement.  So I did not test -- I
21  did not separately test what the number of consumers is
22  who expect that without having seen the statement.  This
23  was really a test devised to specifically look at the
24  statement itself and not compare it to a group that
25  would not see the statement.

Page 37

1    Q    Based on what you told me, do you have an
2  opinion from your survey whether the people who would
3  expect the dog food to contain fresh ingredients who had
4  not seen the statement, would that number be more than
5  84.2 percent, less than 84.2 percent, exactly
6  84.2 percent or the survey doesn't allow you to form an
7  opinion?
8    A    That's a good question.  Let me ponder that
9  for a second.  Because here I asked with reference to a
10  statement that the participants saw an 84.2 percent
11  answer.  And right now I could not tell you the
12  magnitude of that group, if it's the same respondents
13  that would have made that statement about fresh
14  regardless of having seen it.
15      So the answer cannot be given based on the
16  data that I have.
17    Q    Okay.
18    A    I mean, anything else would be speculation.
19  And of course people can speculate, but I refrain from
20  that in the deposition.
21    Q    Okay.  I think we can do this quickly.  The
22  same would be true with respect to regional, you didn't
23  ask them the question without reference to regional and
24  then compare that to the answer by showing them
25  regional?

10 (Pages 34 - 37)

Page 38

1   A   That is correct.  The design of the subsequent
2   questions is always with reference to a particular
3   statement or a particular omission, but they're not
4   comparing that to something without pointing out the
5   statement itself.
6   Q   Okay.  And so then the same is true for
7   biologically appropriate, "Nourish as nature intended";
8   correct?
9   A   That is correct.
10  Q   Okay.
11      THE REPORTER:  So, Mr. Shackelford, we have
12  lost your visual.
13      MR. SHACKELFORD:  I beg your pardon.  I'm
14  shuffling papers, I turned myself off.
15  Q   BY MR. SHACKELFORD:  In Paragraph 177.
16  A   Okay.
17  Q   You say the "Respondents were randomly
18  assigned to the Orijen and Acana study."
19      Does that mean that there were approximately
20  250 respondents in each?
21  A   Yes.  The randomization that was done for each
22  incoming for the respondent, there was a 50-50 chance
23  that they were called one way.  And I could look, I
24  mean, if you flip a coin a certain number of times, I'd
25  say 500 times, it may be that one comes up 247 and one

Page 39

1   comes up 253.
2   Q   And that's why I said approximately.  The big
3   thing I wanted to make sure I understood is that the
4   number of respondents to each survey is not 500, it's
5   approximately half that number; correct?
6   A   That is correct.  And I don't think the -- I'm
7   looking at Table 17, I just break it down by the
8   demographic questions, but overall the sample size was
9   500.
10      (Reporter clarification.)
11  Q   BY MR. SHACKELFORD:  If it was 253, 247,
12  sounds like not a big deal, it's a statistical anomaly
13  of assigning people at random; is that right?
14  A   And it's not a statistical anomaly, it's just
15  the statistical nature of --
16  Q   How it worked out?
17  A   I had to say that.
18  Q   And I deserved it in fairness.
19      Do you recall any discussion with the team
20  that you identified for me earlier whether it would be
21  appropriate to use a control group with your expectation
22  survey?
23  A   There were discussions and then I basically --
24  based on the -- let's put it this way, based on the
25  scope of what the survey was supposed to measure, I

Page 40

1   deemed it unnecessary that control groups would be
2   needed, simply for the fact that I wanted to look at
3   purchases in the market, how they viewed this.  And as
4   long as that number is -- let's say highly positive, I
5   think here's an example of 85 percent, it was not
6   necessary to know what people expect otherwise.
7   Q   Of the -- let's look at Table 17 if we could,
8   and that's on Page 69.
9   A   Okay.  I'm right there.
10  Q   Okay.  From this are you able to tell me, and
11  if it's not here but it's someplace else, that's fine,
12  I'll take that as an answer, but are you able to tell me
13  how many people of the 500 respondents summarized in
14  Table 17, how many of them had purchased an Acana
15  product?
16  A   It is not in this table, so I would have to
17  dig into the underlying data to see what the information
18  is, but it's not reported in this table.
19  Q   Would the same be true for Orijen?
20  A   Yeah, that's correct.  Same answer.
21  Q   And does the -- Table 17 doesn't tell us how
22  many of the respondents were from Illinois or any other
23  state, does it?
24  A   That is correct.  The expectation survey was
25  done across the states or the -- in the three reports,

Page 41

1   this particular survey was not conducted separately in
2   all three states, it was conducted once and then posted
3   as information.  So they were all -- I would say the
4   respondents could come from a diverse background, right,
5   that's not only focused on Illinois or New York or
6   Michigan.
7   Q   Do you know if any or all of those three
8   states were overweighted in the survey respondents?
9   A   You mean the expectation survey?
10  Q   Yes, sir.
11  A   I would have to check that.  To the best of my
12  recollection, it was not.  There were no quotas, but I
13  could check that, it's not in the table here,
14  unfortunately.
15  Q   Okay.  But make sure I'm clear.  If I wanted
16  to know the answer to the question of the 500
17  respondents to your expectation survey, if I wanted to
18  know how many of the respondents lived in Illinois and
19  bought an Acana product, those numbers are in the backup
20  data, fair?
21  A   Yes, there should be a spreadsheet in there
22  that has -- basically the columns are all the questions
23  and the rows are the respondents.  And then we just have
24  to find the intersection point with the column that
25  designates state, for example, with the particular

11 (Pages 38 - 41)

Page 42

1 individual.  And then that way one would be able to
2 identify the individualized information.  It's not
3 summarized in Table 17.
4    Q    Got it.  And do you recall -- and if need be
5 we can dig up the appendix, I don't think it'll be
6 necessary, but by all means if you want to look at it
7 we'll take the time to pull it up, but do you recall the
8 questions in the expectations survey by and large were
9 phrased as agree or disagree-type questions?
10    A    There were -- some of them -- five scale, a
11 five-point scale, there was agree, strongly agree and
12 then down to strongly disagree.  And the other one were
13 in terms of far more likely, more likely, neutral in the
14 sense, either/or and then less likely, much less likely.
15        But there was always a five-point scale used.
16 And one of them for particular questions used the degree
17 -- or strongly agree to strongly disagree scale.
18    Q    And if I understand, Paragraph 179 of your
19 report, that's basically what you're telling me with
20 respect to the range of options on agree, disagree; is
21 that fair?
22    A    That is correct.  So that's in the table, I
23 mean, it's very small, but the very dark one would be
24 the strongly agreed and then you'd go to the right from
25 there.

Page 43

1    Q    Is the range of options from strongly disagree
2 to strongly agree, is that an open-ended or a
3 close-ended-type question?
4    A    This is a question that would be considered
5 closed end, because the answer choices are given.  An
6 open-ended version here would just be what do you think
7 about the following statement and then the person could
8 write down their answer.
9        That's typically the difference between open-
10 and close-ended questions.  The five-point scale is used
11 in a very large number of consumer surveys.  And so I
12 adopted that for this survey.
13    Q    And I know elsewhere that you've cited
14 Shari Diamond's work on survey methodology elsewhere in
15 the report.
16        Do you recall that?
17    A    Yes.  And she's probably in here with her
18 work.  That's also in the scientific manual of evidence.
19    Q    Are you familiar with her commentary on the
20 type of close-ended agree/disagree questions and their
21 propriety for use in surveys that don't have a control
22 group?
23    A    At the moment I don't recall that exact cite.
24    Q    Okay.  I am looking at -- I appreciate you'll
25 have to take my word for it, so I'm going to identify it

Page 44

1 in some degree of specificity.
2        The Reference Guide on Survey Research by
3 Shari Diamond, Third Edition, 2011, that's the chapter
4 that you were talking about that Shari Diamond wrote;
5 correct?
6    A    Yeah, that sounds familiar.
7    Q    Okay.  And this is within the reference manual
8 on scientific evidence, it's one of the particular
9 chapters that begins in the third addition on Page 359.
10 I'm looking at a section -- passage -- it really begins
11 at 391 under the heading "Did the Survey Use Open-Ended
12 or Closed-Ended Questions, Was the Choice in Each
13 Instance Justified?"
14        So that's for orientation, I'm going to move
15 ahead a few pages and I'm just going to read you from
16 near the top of Page 394.  And again, I appreciate you
17 don't have it with you, but I'll read the content, set
18 the framework and then ask the question.  So here's what
19 Professor Diamond has to say, "One form of closed-ended
20 question format that typically produces some distortion
21 is the popular agree/disagree, true/false or yes/no
22 question.  Although this format is appealing because it
23 is easy to write and score these questions and their
24 responses, the format is also seriously problematic.
25 With its simplicity comes acquiescence," and then

Page 45

1 there's a quote, "'The tendency to endorse any assertion
2 made in a question regardless of its content,' is a
3 systematic source of bias that has produced an inflation
4 effect of ten percent across a number of studies.  Only
5 when control groups or control questions are added to
6 the survey design can this question format provide
7 reasonable response estimates."
8        That's the end of the statement.
9        Do you recall taking that commentary into
10 account when you were writing the expectation survey?
11        MS. BORRELLI:  Objection to the extent that
12 Mr. Boedeker does not have that text in front of him and
13 you've not entered it as an exhibit.
14        MR. SHACKELFORD:  I'm happy to mark it and
15 have a copy entered as an exhibit.  And I don't know
16 that it would help for purposes of today.
17        MS. BORRELLI:  Yeah.  He can go ahead and
18 answer the question.
19        MR. SHACKELFORD:  Sure.
20        THE WITNESS:  My reason for not being able to
21 give an answer is that I would have to see it in context
22 and I'm willing to give that answer once I get the depo
23 transcript back, but right now, as you said, there's
24 many, many pages missing between the chapter heading and
25 then what you read.  And again, there's so many

12 (Pages 42 - 45)

1  different surveys in trademark infringement service
2  where the exact wording matters very much. Different
3  things are of the essence.
4          And again, I don't know the studies that
5  Shari Diamond or Professor Diamond refers to where
6  ten percent of distortion has been observed. Here I'm
7  simply describing the results, and the results are what
8  they are. And in that simple scale I do not see how
9  people would give a wrong, incorrect or distorting
10  answer because they were told just tell me what you
11  think and when you think you strongly agree with the
12  statement then they strongly agree.
13         I don't see a distortion here because these
14  survey answers are not used for predictive or projection
15  purposes, but otherwise I would really need to read that
16  particular section of the Diamond chapter in the
17  reference manual to give a more informed answer. This
18  was just very high level here.
19     Q   I think we're still on the same page of the
20  report there, Page 70, Figure 12, let me know when you
21  have that in front of you.
22         I think I can do them all at once. What I'm
23  interested in is the printed information to the left of
24  the four bars.
25     A   Okay. I see it.

1     Q   Okay. And so the first one -- just to orient
2  us, the first one reads, "Contains only fresh
3  ingredients unless specifically stated otherwise on the
4  packaging," and then there are three more.
5          My question is this: Who wrote the words in
6  each of those expressions?
7     A   They are paraphrasing information from the
8  product descriptions. So that's kind of what I simply
9  in -- paraphrased. It's not verbatim what's out there,
10  but it's close to what people would have viewed on the
11  screens before when they were shown the products.
12     Q   Okay. I think I understand that.
13         What I was trying to get at is that were these
14  your words -- they're not direct quotes from the
15  package, we know that; right?
16     A   They're not direct quotes. For example, the
17  wording "unless otherwise stated on the packaging,"
18  those are like labels that are put in there. If it says
19  on the package that it's fresh, but there may be some
20  not fresh ingredients in there, then that's what I
21  wanted to capture with this first example you picked.
22     Q   And what I really was trying to get at is to
23  make sure whether those expressions were things that
24  your team came up with from the package or whether they
25  were written by the lawyers or someone else, that's what

1  I was trying to get at?
2     A   My team and I came up with that, we obviously
3  shared the resulting survey with the attorneys before we
4  launched it.
5     Q   Okay. That is what I was interested in.
6          In the expectation survey, did you use any
7  decoy statements?
8     A   No, I don't think in this one there were any
9  decoy statements, I'm just going through here.
10     Q   Oh, sorry. You answered the que -- I thought
11  you were looking through again, beg your pardon.
12     A   Oh, I thought there was no question pending.
13  Sorry.
14     Q   I thought you were looking through to make
15  sure, but the last question was were there any decoy
16  statements in this section and I think your answer was
17  no; is that right?
18     A   That's correct, yeah.
19     Q   Okay. You use the expression "Is formulated
20  what dogs would eat in the wild."
21          Can you explain to me how that relates to
22  fresh?
23     A   Yeah, in the wild there's no -- no
24  conservation process in the wild. Dogs eat fresh food.
25  And so that's kind of like a simple explanation there.

1     Q   Figure 13, the expressions there to the left
2  of the bars, are those also things that you and your
3  team came up with as ways of paraphrasing information on
4  the package?
5     A   That is correct. I mean, that is pretty much
6  the use of the figures, it's kind of a sentence or so
7  that is derived from knowledge about the product in
8  general to the work I've done on this case and in the
9  past on these kind of cases.
10     Q   And then the expression there in Figure 13,
11  "Does not contain any grains," how does that relate to
12  regional?
13     A   Maybe when I said that there are no decoys in
14  there, this could have been some decoy like that. And
15  so from that end it's -- there doesn't have to be a
16  direct relation to regional.
17     Q   Would it be accurate to say then that the
18  grains was included as a decoy?
19     A   It's possible. I don't recall the decision
20  about that particular descriptor on the left side, if we
21  wanted to consciously improve a decoy or not.
22     Q   The expression in Figure 14, you've told me
23  that basically extrapolated all of these or paraphrased
24  from contents on the bags, but I'm interested in the
25  one -- the very last one, "Has high palatability."

13 (Pages 46 - 49)

1    Was that used as a decoy statement in this
2  portion of the survey?
3    A  Again, I don't recall making a conscious
4  decision to include that as a decoy, but high
5  palatability was one of the -- the piece of information
6  that was actually on -- I don't know which exact box it
7  was on, but that's something that I had read in the
8  course of the work on this case.
9    Q  Sure.  When you and your team put together the
10  statements, did you ever look for ways to rewrite the
11  questions to avoid using "not"?  In other words, more
12  affirmative statements as opposed to negating
13  statements?
14    A  In this particular instance, when testing the
15  effect of omissions, I think the "not" is the only way
16  of phrasing it properly.  I don't think that that causes
17  confusion or bias when I'm showing biologically
18  appropriate.  It wouldn't make a lot of sense in my
19  opinion to ask do you expect that the product
20  biologically appropriate contains a chemical or heavy
21  metals, for example.
22    So therefore, I wanted to figure out when
23  something positive is stated what do consumers expect to
24  get or not get.  And in this case, the question was do
25  they expect anything negative when they buy biologically

1  appropriate labeled product.
2    Q  Hypothetically you could have written it, it
3  said -- on the omissions you could say, "The dog food
4  shown contains heavy metals," and then test whether they
5  agreed or disagreed with that statement; right?
6    A  Yeah, what is the question there?  I know what
7  your question is, but what is the question that you're
8  trying to present to the -- to the participant?  I don't
9  see that what you phrased is a question to the
10  participant.
11    Q  But you're putting it in the form of a
12  statement and then asking them whether they agree or
13  disagree, that's really the question; right?
14    A  Let me ponder that.  I mean, I would think if
15  I had this -- I take Figure 14 as an example.  And then
16  the question -- I could have put that "not" in the
17  overarching question, like when I'm seeing biologically
18  appropriate I do not expect that the dog food shown
19  would, and then everything else would be positive.
20    There's one point where the "not" has to be
21  put in there.  And so I put it in the descriptors to the
22  left of the box.  And that's kind of like when the
23  survey was presented on the screen there would be the
24  overarching question.  And again, there were no bars
25  with percentages yet.  What the participants saw was

1  just those five things and then they put in -- going to
2  the scale, the one to five scale and click the one they
3  most agreed with.
4    Q  But if you flipped it and said, "For
5  biologically appropriate statements, I would expect that
6  the dog food shown contains heavy metals," then you
7  don't have a "not" and you'd just be flipping it; right?
8    A  Then -- yeah, if the question is biologically
9  appropriate, I would expect that and then a consumer
10  would read that.  Since I haven't asked the question
11  that way by looking at these results what they expect to
12  not find, I would expect -- sorry -- a lot of expect in
13  this context, but I would expect that a lot of people
14  would say, "No, I strongly agree with that statement."
15    And I can infer that from having that "not" at
16  the descriptor level that the strongly agree is very
17  large, it's 50 -- no, 44.9 percent in the first bar.
18  And so knowing that 44.9 percent and then 38.9 percent
19  agree or strongly agree do not have heavy metals.  If
20  the question had been phrased along the lines that you
21  suggested that there's no "not" in there, then asking
22  the same participants I would expect to have not more
23  than 50 percent or so saying that they do expect heavy
24  metal in there.
25    Q  And the reason I ask the question is simply

1  you're familiar with academic literature that critiqued
2  negative statements as being fatiguing and burdensome to
3  respondents?
4    A  I mean, there are studies out there when every
5  single question and every single choice is like that,
6  but here since it's such a short survey with just a
7  handful of questions, and then I think the reader of
8  such a question "biologically appropriate" again is
9  viewed by and large as positive, then asking if they
10  expect something negative in there I don't think leads
11  to confusions one way or the other.
12    If you're asking, "Do you expect there's a
13  positive statement, a positive attribute and then do you
14  expect something negative or do you not expect something
15  negative?"
16    I don't think the confusion in more
17  complicated surveys of the like that you cited from
18  literature about is not applicable here.  I think the
19  questions are very clear and very simple.  And I don't
20  think there's any worry about that confusion.
21    Q  Okay.  And you didn't field any sort of draft
22  or pretests where you took out the negative statements,
23  phrased them positively so that we could compare if
24  there was a difference in the responses between the two
25  types; correct?

14 (Pages 50 - 53)

Page 54

1    A   No.  The only question I asked, "Did you
2  understand what you were asked in those questions?"
3         And since that number was very, very small
4  expressing non-understanding, I didn't feel the need to
5  change that.
6    Q   Okay.  And the expectation survey as we're
7  looking at screenshots, and again, if we need to pull
8  the appendix we can, but they were shown as suggestion
9  of the prices of the products when they were asked to
10 look at the bag; right?
11   A   In the expectation survey in the -- in the
12 introduction of the survey, I believe there was a -- a
13 situation was set.
14   Q   It didn't necessarily purport to be an actual
15 price, but it was a frame of reference for the price, is
16 that a fair characterization?
17   A   It was definitely a frame of reference, which
18 does not say that that price is not the price of the
19 actual product.  But I viewed it more as a frame of
20 reference.
21   Q   Okay.  And would you agree that when you
22 provide that frame of reference, it by itself can create
23 certain expectations about the product on the part of
24 people answering the questions that come after?
25   A   I mean, the expectation by showing a price

Page 55

1  there -- it's not $150 or $25.  It's a price that would
2  be representative of prices of Acana or Orijen,
3  depending on where somebody was assigned would see.  And
4  so by buying premium dog food, of course consumers have
5  expectations.
6    Q   And then similarly, just hypothetically, if
7  you showed an image of a Rolex watch and it had the
8  Rolex image on it, but you said, "Here's a watch offered
9  for purchase for $50," those two pieces of information
10 may have some impact on what the respondents think about
11 that product before any other questions are asked,
12 wouldn't you agree?
13       MS. BORRELLI:  Object to form.
14       THE WITNESS:  If the differences are as
15 extreme as you said, the Rolex then you talk about a
16 $50 watch or the Ferrari and you're talking about a
17 $12,000 watch, it may be.  But that's why the prices I
18 chose that were shown, the frame of reference was really
19 a frame of reference to the product that was -- that the
20 respondents were asked questions about.
21       If I take your Rolex example, and I don't know
22 how much a Rolex costs, let's say $20,000, then that is
23 not the proper frame of reference if your survey is
24 about $50 watches.
25   Q   BY MR. SHACKELFORD:  On the other hand,

Page 56

1  immediately the person who looks at it and says, "Rolex,
2  $50," they think it's a knockoff, even if you're not
3  talking about knockoff products, there's some
4  supposition or beliefs just by virtue of communicating
5  that information that may seep in even if you're not
6  asking questions about that; isn't that true?
7        MS. BORRELLI:  Object to form.
8        THE WITNESS:  That's really more like in
9  measuring behavioral changes.  And again, as a
10 statistician and economist I -- I can analyze data, but
11 I would not draw conclusions on that.
12       But I cannot rule out that somebody seeing a
13 Rolex and a $50 price even close to it, that that frame
14 of reference make them think it's a knockoff.  I can't
15 rule that out, but I didn't study that in particular.
16   Q   BY MR. SHACKELFORD:  And are you able to tell
17 me -- the price point you chose was $114.99, do you know
18 how you settled on that price?
19   A   I don't recall that.  It must have -- if you
20 can tell me -- I don't look at that document, but
21 whatever the bag size is and the product and then I
22 picked the price that was relatable.
23   Q   Okay.  As the questions came up and the way
24 the survey was fielded, were the responses in each
25 prompt randomized or did they come up the same way each

Page 57

1  time?
2    A   The -- the questions themselves or do you mean
3  the five-point scale?
4    Q   No, not the five-point scale, but, for
5  example, in Figure 13 you've got three different
6  agree/disagree statements there.
7        Were those randomized or did they come up in
8  the same order every time?
9    A   They were randomized.
10   Q   Okay.  Do you know how the randomization was
11 done?
12   A   It's basically a simple algorithm that the
13 vendor uses.  Say we have three and then there's a
14 certain number of how you can organize three in order.
15 So if you had one, two, three, one, three, two, two,
16 three, one, three, one, two and three, two, one.  And
17 then each one of those would get an equal likelihood
18 assigned.
19       And then when respondent now clicks on an
20 expression, then out of the possible permutations one
21 would select it as a uniform probability.  So that in
22 the long run, I mean, in the first five you don't see an
23 exact uniform distribution, but as you are proceeding
24 with the survey you'll see a convergence of the
25 different permutations that respondents see towards the

15 (Pages 54 - 57)

Page 58

1 uniformly distribute order.
2   Q   And so like in Figure 14 where we've got five
3 different agree/disagree statements, those would also
4 have been randomized in the same way you've described
5 according to an algorithm?
6   A   That is correct.
7   Q   Are those instructions set forth someplace in
8 your agreement with the survey company to make sure that
9 they randomized the -- randomized the options?
10   A   I would have to see, that's typically done in
11 discussions with the vendor after what I call the
12 preprogramming survey instrument has been sent to them.
13        Because what I do is I put the survey together
14 and typically in what I call the preprogramming survey
15 it has little bracketed instructions to the programmer.
16 And it would be as simple as if somebody never bought
17 dog food or they terminated it, and then it would go all
18 the way down to questions like this, it could be select
19 all that apply or in this case it would be randomize the
20 answer choices.
21   Q   And within the body of information you've
22 given us are those instructions to the vendor included
23 someplace?
24   A   I would have to check if the -- I know we
25 provided the screenshots, but right now off the top of

Page 59

1 my head I -- I don't recall if this survey -- the first
2 survey instrument that goes to the vendor, if that was
3 in there.
4   Q   You would agree with me it would be best
5 practice to rotate the options?
6   A   In general, when opinions are asked, give you
7 an example of rotating instructions wouldn't make sense
8 if you asked which state do you live in.  And I know
9 right now I live in Nevada, but if somebody randomized
10 the states and doesn't leave them in alphabetical order,
11 that would be more confusing.  Simple yes/no questions,
12 you can put them on the same line, yes/no, and then
13 sometimes put the no first or the yes.
14        I mean, in listings, for example, other or
15 don't know, not sure, I typically put at the end and
16 other ones are then randomized.  So there's certainly
17 exceptions to it, but in general, randomizing is
18 important.
19   Q   And so just limiting our question here, for
20 example, in Figure 14 to the five options there, best
21 practice would have those randomized so that respondents
22 didn't all see them in exactly the same order?
23   A   In this case that was done.  So from that --
24 and it's following best practices.  I can make a point
25 in this case because you're not choosing one or the

Page 60

1 other, the respondent here doesn't have to say the first
2 part is the best and the last part is the worst.  In
3 those instances where the order or the questions had a
4 certain logical order between better or worse,
5 definitely to avoid auto bias -- avoid auto bias that
6 has to be done.
7        Here one would make the argument that since
8 they're discreet questions following from the general
9 question that the order may not matter.  But again, I
10 have not tested that and I went the route to randomize.
11   Q   The range of options from strongly agree to
12 strongly disagree, was that order ever changed so that
13 you went from strongly agree to less agreement for some
14 and then the opposite direction for other respondents?
15   A   In this case, there was the order always went
16 from -- from the disagree, strongly disagree all the way
17 to agree, strongly agree.  And there's one category
18 there, the don't know or unsure, that was always last.
19 So the order was not changed from highest to lowest or
20 lowest to highest.
21   Q   Okay.
22        MR. SHACKELFORD:  I'm about to change topics
23 and gears, so this would be a really opportune time for
24 a break if anyone would like to take five.
25        THE WITNESS:  Okay.

Page 61

1        MS. BORRELLI:  Yep.
2        MR. SHACKELFORD:  Super.  Let's do that.
3        THE VIDEOGRAPHER:  We are off the record.  The
4 time is 2:10 p.m.
5        (A brief recess was taken.)
6        THE VIDEOGRAPHER:  We are back on the record.
7 The time is 2:23 p.m.
8   Q   BY MR. SHACKELFORD:  Okay.  Mr. Boedeker, I
9 indicated I wanted to shift gears a little bit and
10 that's really what I want to do is move from the
11 expectation survey to the conjoint.
12        And again, we've talked about those at some
13 length and I don't want to go through the whole 50, 60
14 pages of stuff on that, so in all likelihood I'll be
15 jumping around different things and stuff, but again,
16 try to avoid replowing stuff and hit some things that
17 are new.
18        And this is less about Paragraph 149, but just
19 to use it as a reference point, so it might be helpful
20 to have that in front of you.
21   A   Which one am I looking for?
22   Q   It's at Page 55.
23   A   Sorry.  Somehow the papers got mixed up.
24        I got it.
25   Q   Okay.  And again, it's just a frame of

16 (Pages 58 - 61)

Page 62

1 reference because my question is, were all four of the
2 conjoint surveys scaled at the time?
3    A  The four conjoint surveys, I don't recall
4 right now if they were all done at the exact same time,
5 but there may have been some timing difference.
6    Q  Okay.
7    A  And I'm just looking here at the date in 149,
8 that doesn't look correct. So I have to double-check
9 that, I just noticed that. September, October 2020
10 would have been too early for these three states. So I
11 have to check that date.
12    Q  Okay. When you get the transcript if you need
13 to make a correction by all means just let us know.
14 Because it's important but not earth changing.
15    A  I will certainly do that.
16    Q  Okay. Was the expectation survey fielded
17 during that same time -- well, since we're not sure that
18 that time reference is right, let me ask the question a
19 different way.
20       Was the expectation survey fielded at the same
21 time as the four conjoint surveys?
22    A  The expectation survey I think as I testified
23 earlier was done once and then used in the three reports
24 that we're talking in this deposition here about today.
25 And it was definitely done -- not in September, October

Page 63

1 2020, it was definitely done in 2021, but I don't recall
2 the correct or exact dates.
3    Q  Is it accurate that the Orijen
4 misrepresentation survey that you did in Minnesota was
5 different from the Orijen misrepresentation that you did
6 for Illinois and Michigan?
7    A  There was a change in one of the attributes,
8 but that would be the only difference.
9    Q  And why was the change made?
10    A  That was done -- I was asked to test that
11 statement, I believe it was the lone temperature with
12 the description of the dried meats and seafood. That
13 was different in -- in this survey than compared to the
14 Minnesota one.
15    Q  Okay. The group of respondents for -- and
16 let's leave New York to one side for a minute and talk
17 about Illinois and Michigan.
18       The group of respondents whose responses you
19 use in your survey were different between those two
20 reports; is that right?
21    A  They were different for the states that the
22 particular survey was situated. So I increased the
23 sample size there. And then I randomly drew respondents
24 from the larger pool of the non-states, so to speak, so
25 there would be a representation of the states

Page 64

1 proportional.
2    Q  Illinois and Michigan, did the group of
3 respondents in those two surveys overlap at all?
4    A  For the other states there was an overlap, but
5 again, that was randomly selected who would be taken to
6 make it proportional. And then the subject states let's
7 call it that as being subject of the particular lawsuit
8 were then getting that larger sample size.
9    Q  Okay. So we get two groups of respondents,
10 I'm going to call them Illinois survey, Michigan survey,
11 but I mean to include not people from those states but
12 the entire group.
13       Are you with me?
14    A  Yeah. Understood.
15    Q  Okay. Were the Illinois citizens in the
16 Michigan survey included in the Illinois survey?
17    A  Out of the overall size Illinois -- in the
18 Michigan survey, for example, would have been scaled
19 down to be proportional compared to the other
20 non-states. By non-states I mean the one -- not
21 Michigan. So -- and they would have been randomly
22 selected out of the pool of Illinois individuals that I
23 had.
24    Q  Was there some reason not to include all of
25 the Illinois residents from one panel from both surveys

Page 65

1 in the Illinois survey report?
2    A  The Illinois -- I've got to be careful, the
3 Illinois report would have included the Illinois from --
4 from the Minnesota survey, let's say. Then I would beef
5 up the particular state of interest to 167. And I
6 explained based on Orme why the 167 is the appropriate
7 sample size, it's a function of the -- the survey
8 design. And then everything else was then
9 proportionally to the size of the state included as
10 well. And that's why the sample sizes vary between the
11 different states.
12    Q  Okay. Were the -- were any of the 167
13 Illinois respondents, were their responses included in
14 either the Michigan or New York survey?
15    A  Again, that was based on the randomization,
16 but whatever was used from Illinois proportionate to the
17 size of the non-states, New York, for example, then
18 Illinois' participants were randomly selected from the
19 pool of Illinois participants that I had.
20    Q  Let me say it my way and then make sure I get
21 it right.
22       Of the 167 Illinois respondents, a number was
23 chosen at random to be included, for example, in
24 Michigan so that you had a representative share of
25 Illinois people as a non-state, non-focused state of the

17 (Pages 62 - 65)

Page 66

1 Michigan report, would that be accurate?
2    A   It would be slightly different because the
3 number was not chosen randomly.  The number was
4 calculated to make it proportionally representative.
5 But then let's say it was -- let's pick a number here,
6 30, those 30 were randomly selected of the existing
7 Illinois pool.
8    Q   Okay.  And that's what I understood, you
9 needed to hit a number and in order to hit the number,
10 you picked from 167 from Illinois at random in order to
11 get the number that you needed to make a proportional
12 representation in the non-Illinois reports?
13    A   That is correct, the number was calculated,
14 but then the selection of that number from a broader
15 pool was done on the random basis.
16    Q   Got it.  Did you do any testing to see whether
17 there was any sensitivity attached to which of the
18 Illinois residents were used for the other surveys?
19    A   I did not draw multiple samples because that
20 would have meant to do the survey itself multiple times.
21 But ultimately what I compared were across the surveys
22 part-worth for the Illinois in the other different
23 subgroups or at focus state reports.
24    Q   Okay.
25    A   Or we look at -- the bigger pool in Illinois

Page 67

1 is substantially different than the smaller pool of
2 Illinois participants in the Michigan survey, for
3 example.
4    Q   Okay.
5    A   And there I did not see any statistically
6 significant differences at the part-worth level.  The
7 part-worth as a measure of preferences was sufficient
8 for me to do this test.
9    Q   Okay.  The pretests in Illinois and New York,
10 were those identical?
11    A   The New York survey instrument was slightly
12 different.
13    Q   Sorry.  I asked you a bad question, I
14 misspoke.  I meant to say Illinois and Michigan, were
15 those pretests the same?
16    A   The pretest principle was the same by -- by
17 identifying -- I believe the number is -- yeah, 155 was
18 the number.  So there were different pretests and
19 different individuals made it into this pretest between
20 Illinois and Michigan I think you asked about.  That's
21 correct.
22        So then the pretest itself was just looking at
23 the first round of results, looking at the questions
24 that indicated confusion or non-understanding and then
25 the survey continued.

Page 68

1    Q   You asked -- in some of the survey questions
2 you asked whether the respondents had purchased either
3 Acana or Orijen at any point since January 1, 2015, does
4 that question sound accurate?
5    A   Yeah.  I asked questions about the purchase
6 during what I understood the class period's beginning
7 was.  And so that sounds right without seeing it right
8 now, but that would be the question I would have asked.
9    Q   And I think you did not ask the question in
10 the Orijen misrepresentation survey whether they had
11 actually bought Orijen during that time period.
12        Was there a particular reason why?
13    A   Right now I don't recall that, so I couldn't
14 answer it right now.  If I double-checked later I can
15 include that answer.
16    Q   And there was no question in the expectation
17 survey whether any of the respondents had ever bought
18 either Orijen or Acana, was there?
19    A   In the expectation survey the filter questions
20 were focusing on what we call premium dog food.  And
21 then they -- they were shown a bag and the statements
22 from the bag were taken from the Champion's products.
23    Q   Okay.  Let's look at -- I have to find it, but
24 it's Table 3 in your report.  It's Page 7.
25    A   Can you repeat that?  I was flipping pages, I

Page 69

1 didn't hear.
2    Q   Sorry.  It's Page 7.
3    A   Page 7?
4    Q   Yes, sir.
5    A   Okay.  I got it.
6    Q   The Orijen product in the misrepresentation
7 survey was Regional Red; correct?
8    A   The Regional -- I didn't get the second part
9 or the last word.
10    Q   Yeah, sorry.  The Orijen product used in the
11 misrepresentation survey was Orijen Regional Red;
12 correct?
13    A   I would have to look at the actual screenshots
14 to see what picture was shown.
15    Q   Okay.  Describe for me the selection process,
16 which product to use in the misrepresentation survey.
17    A   I don't recall at the moment.  We needed the
18 statements and I don't know if we based it on sales
19 figures, I don't recall that, the particular reason for
20 what images were shown.
21    Q   Do you have an opinion whether using a higher
22 retail price product like Regional Red would have had
23 any impact on the survey responses?
24    A   That would not be true, my opinion is it
25 doesn't, simply for the fact that the price range

18 (Pages 66 - 69)

Page 70

1  covered the prices that I observed as the sale prices.
2       And another reason why it doesn't matter is
3  that the way the conjoint design works, it shows every
4  permutation of possible attributes.  And so it would
5  basically show attributes or different permutations and
6  then -- in a fashion that none is shown more than any
7  other and any pair is also not shown more frequently
8  than other pair.
9       So that -- that enures like a balanced design
10 that would avoid these kind of like confusions.  On the
11 other hand, of course, if the prices were set completely
12 wrong, if I had taken from zero to $20 or from 200 to
13 $300, that can distort the impact of consumer
14 preferences.  But if the price range overlaps with the
15 market prices that were observed in the actual world,
16 then that does not happen typically.
17     Q    Okay.  A few things just to make sure -- sort
18 of consistent with what we talked about before, in an
19 earlier deposition we talked about you had not done any
20 analysis of Champion's costs for the ingredients, for
21 example, that went into its food.
22          I take it that's also still true?
23     A    That is correct, I did not analyze the cost
24 structure of the products at issue here.
25     Q    Okay.  And have you yet conducted any analysis

Page 71

1  of the costs of Champion's competitors?
2     A    No, I have not done any competitor analysis
3  either.
4     Q    Okay.  Have you done any analysis of
5  Champion's production capabilities, ability to scale up,
6  scale down?
7     A    I have not.
8     Q    Okay.  Have you looked at any aspect of
9  Champion's supply chain since the last time I took your
10 deposition?
11    A    No, I have not.
12    Q    Okay.  Done any analysis of whether Champion
13 relies on wholesalers?
14    A    I have not done a separate analysis of that
15 either.
16    Q    And have you done anything since the last time
17 I took your deposition to form an opinion of the mix of
18 sales between online compared to brick and mortar
19 stores?
20    A    No, I have not.
21    Q    And since the last time I took your deposition
22 have you done any analysis of whether Champion's pricing
23 includes store discounts or customer loyalty or bundled
24 pricing, anything of that nature?
25    A    I have not analyzed that pricing structure

Page 72

1  separately, no, I have not.
2     Q    Okay.  Since the last time I took your
3  deposition have you done anything to look at any impact
4  of return terms, the ability of retailers to return
5  products or how that may impact on what pricing they get
6  from Champion?
7     A    I have not analyzed the impact of returns on
8  prices or costs.
9     Q    Okay.  Have you looked at anything to inform
10 yourself about how retailers react to any of Champion's
11 marketing strategies?
12    A    I haven't analyzed that either.
13    Q    Okay.  Have you looked at any strategies
14 individual retailers might use in order to spur sales of
15 Champion Petfoods?  In-store discounts, two for ones,
16 anything like that?
17    A    I haven't analyzed any -- any marketing
18 activities on the retailer side.
19    Q    Okay.  Have you done anything to inform
20 yourself what kinds of information salespersons in pet
21 food retailers might give consumers who ask questions
22 about Champion Petfoods?
23    A    I have not analyzed that.
24    Q    See, I told you all that would go fast.
25         I think this was true from the last

Page 73

1  deposition.  In order to assess the impact of
2  misrepresentations and omissions where they occurred,
3  you would add the percentage impact together in order to
4  get the total impact; is that right?
5     A    It is not simply adding it together.  It's
6  looking at it and basically take the union in the sense.
7  So it's the more these statements are perceived to be
8  dependent of each other, the more the sum of the
9  individual impacts deviate from the total impact.
10         (Reporter clarification.)
11         THE WITNESS:  The more the sum is -- I should
12 rephrase that.  The more dependent the individual
13 statements are, the more the sum will deviate from the
14 joint impact.  So if they were totally independent in
15 the consumers' preferences, then there would be -- the
16 sum of the individuals would be exactly the sum of the
17 joint one.
18    Q    BY MR. SHACKELFORD:  Okay.  Is there a place
19 in your report where that phenomenon is discussed?
20    A    I don't believe I discussed that in detail or
21 at all in the report because it's a calculation of how I
22 specified the demand functions.  And there they are
23 basically in a joint equation.  And that would be in the
24 program file that calculates, has all the calculations,
25 using the software Mathematica.

19 (Pages 70 - 73)

1  Q   Is there a formula or an algorithm or
2  something that's written someplace that that can be
3  examined?
4     A   It is in the program itself when the function
5  demand curve estimation is specified.  By the way how
6  that is set up you will see that it's -- the way the
7  regression equation is specified, it is following my
8  explanation basically.  Or my explanation covers how
9  that was done.
10    Q   Hard question to ask, which came first, the
11 chicken or the egg?
12         Did you program the instructions to take
13 account of the interdependence of the statements or did
14 you form opinions about the interdependence of the
15 statements based on the results produced by running the
16 program?
17    A   The -- I hope my answer will answer your
18 question.  The specification I used for the demand curve
19 is basically such that if there are dependencies they
20 will be caught, but I didn't look at the result and test
21 it if there really are dependencies.  Because the
22 regression specification itself is the formula, so to
23 speak, that would take into account those overlaps or
24 dependencies.
25    Q   Are those programming instructions a part of

1  the backup materials that you gave us?
2     A   Yes.  I -- I -- basically, I think it was
3  entire -- it should be of an NB extension that file, and
4  the programming language is Mathematica.  And so NB
5  stands for Notebook, and that is the file that may
6  have -- I don't know, it has hundreds of thousands of
7  lines of code in it.  But imbedded in there in the
8  demand curve estimation is the particular regression of
9  prior selection.
10    Q   The damages calculations that you've done
11 for -- we'll just take them one at a time, for Illinois,
12 do they include damages for products that have both
13 misrepresentations and omissions?
14    A   I have the -- the two surveys basically,
15 preferred product group Orijen and Acana and I
16 separately calculate for each of the misstatements or
17 omissions what the damage is.  The reason for doing that
18 is that at the moment I don't -- at least to my
19 knowledge, the court has not decided which of the
20 statements ultimately would be found to be -- or felt it
21 might be found to be liable for.  And therefore, I
22 tested the entire range of omissions and misstatements
23 that counsel gave to me.
24    Q   One of the things I like about your reports is
25 your handy table of contents.

1     A   In the live Word document you can actually
2  click on it and it takes you to that specified page or
3  chapter.
4     Q   Isn't that cool?
5        Table 14 on Page 63.
6     A   Okay.
7     Q   So if you've got Orijen misstatements, Orijen
8  omissions and all occurred, do you simply add these
9  figures up in each column, the point estimate, lower
10 bound and the upper bound?
11    A   No, that's not additive.  In Appendix 4 I do
12 list all combinations.  So Appendix 4 would have a table
13 that shows each one at a time, then each possible
14 payoff, two, three, four and all the way to five or six.
15 So that table has all of the possible permutations.  And
16 since this is based on a logarithmic specification of
17 the demand curves, the statistics you see on this page
18 are not additive.
19    Q   Can you describe for me -- we'll just pick two
20 in Table 14 or if there's something else you need to
21 look at to answer the question, the relationship between
22 the first two entries here, biologically appropriate
23 and whole prey, you get 10.8 percent point estimate
24 assigned to biologically appropriate, 8.8 percent
25 assigned to whole prey.

1        What's the relationship between those two, if
2  any?
3     A   Those are the values individually that the
4  server resided in assigning to each individual
5  attribute.  So it's 10.8 percent of the price when it's
6  biologically appropriate, and whole prey has
7  8.8 percent, meaning the whole prey is valued slightly
8  lower.
9     Q   But I can't just add up those seven attributes
10 to get the 100 percent of the price?
11    A   No.
12    Q   What accounts for the difference?
13    A   What do you mean by "What accounts for the
14 difference"?
15    Q   Well, if I take 100 percent and I subtract
16 from it the sum of these attributes, what accounts for
17 the difference?
18    A   I still don't understand what you mean by --
19 adding what up right now?
20    Q   Sorry.  Let's just use nice round numbers
21 because that's what lawyers like.  Let's just talk about
22 $100 a bag is 100 percent.
23        And so if I add up the sum of these attributes
24 and the point value you've given there, I add them up,
25 subtract them from 100, I'm left with some number;

Page 78

1  right?
2      A    That is correct.  There is some number left.
3      Q    And so what does that some number represent?
4      A    Again, it's not as simple -- as I said, these
5  are all based on logarithms.  So if I want to have --
6  the combined impact calculations may not -- I mean, take
7  your example biologically appropriate and whole prey may
8  not necessarily add up to -- what would that be, 10.8
9  and 8.8, so 19.6.  So that's the first part.  It's not
10  edited because of the model specification.
11      Now, what the number, whatever it will be
12  calculated, is a product now that has none of those
13  attributes.  And taking, for example, the omissions, if
14  we're adding that up and that number is larger than
15  100 percent, then that would indicate that a product
16  that has preservatives, heavy metals, BPA, regrinds,
17  whatever the negative attributes are, if the overall
18  value meaning is negative, then that means that the
19  product with all of those negative attributes would be
20  what we call in economics a "bad."  It's not a "good"
21  anymore, it's a "bad."  Because all of those negative
22  attributes combined will create negative utility,
23  meaning that -- I mean, colloquially we say when
24  something is a bad you will have to pay me money to buy
25  that.

Page 79

1      That can happen when -- when product
2  attributes -- a product has negative attributes that
3  overall has negative value.  Buying a bag of
4  E. coli-contaminated spinach at the grocery store and it
5  cost $4, then we can argue that the farmer had to pay
6  the workers and logistics, transportation, packaging
7  cost, that the damage is not the purchase price or more.
8      So that's kind of like what is an indicator of
9  how bad a product can be or can be perceived by the
10  market.
11      Q    Based upon the results of your survey, did you
12  form an opinion whether Champion Petfoods or any of them
13  that you looked at were a "bad" as you've described
14  them?
15      A    For that I would have to look at the table,
16  but right now I can't recall what -- what -- for the
17  misstatements I do recall that the price goes really
18  down or would go down to a level of very cheap dog
19  foods.  So that's -- the price would drop significantly,
20  but from what I recall did not go below zero, which
21  would indicate that the food -- the product is a "bad"
22  per se.
23      Q    Is it Table 14 or some other table that we
24  would look at in order to be able to figure out if you
25  ever got to a point where the product was a "bad"?

Page 80

1      A    That would be the table in the Appendix 4 on
2  the top of Page 63.  I say that there in Appendix 4
3  contains the list of all possible combinations of the
4  claims.
5      And let's say we have six misstatements and I
6  would -- I did calculate every single one individually,
7  which is listed here, but also would have looked at all
8  possible pairs, triples, quadruples and so forth all the
9  way up to taking one where all statements were
10  misstatements.
11      And the reason why I did it this way is to --
12  since I don't know at the moment how the court will
13  decide on which statement will be an issue statement for
14  which the court may find that Champion's will be liable,
15  then I wanted to have that overall matrix with all
16  combinations as a guide to see what happens if the 4 and
17  3, for example, are found a liability.
18      Q    Do you have an opinion based upon the results
19  of your research whether Champion Petfoods that you
20  looked at have any intrinsic value?
21      A    You would have to define intrinsic value.
22  That's such a loaded term.
23      Q    Well, you're aware there's no claim in any of
24  the three cases that any of the plaintiffs' pets were
25  harmed by virtue of eating Champion's Petfoods; correct?

Page 81

1      A    I do not recall from the complaints of any
2  mention of harm of pets.
3      Q    So the --
4      A    I have not heard about harm to animals.
5      Q    Okay.  So the E. coli-tainted spinach example,
6  we'll just take that away, because it would be harmful
7  to consume that and that's why you wouldn't do it, but
8  there's not a claim that pets were injured or harmed by
9  virtue of eating Champion Petfoods; correct?
10      A    Not to my knowledge, that is correct.
11      Q    Okay.  And whatever else may be said about
12  them, each of the diets has -- provides calories to the
13  animal when the animal eats it, do you agree with that?
14      MS. BORRELLI:  Object to form.
15      THE WITNESS:  Yeah.  I mean, it fulfills some
16  -- some need and that's what I've shown that if all the
17  statements are not true at the same time, it would
18  basically be a product of the low-priced dog foods.
19  Maybe that's what you meant by intrinsic value.  So
20  there's some residual value because it still is a "good"
21  and not a "bad."
22      Q    BY MR. SHACKELFORD:  Did you form any belief
23  based on whether it's price per calorie, price per
24  protein gram, any kind of dollar per unit of something
25  that there was a value below which, if the price dropped

21 (Pages 78 - 81)

Page 82

1 below that it would be unreasonable?
2      MS. BORRELLI: Object to form.
3      THE WITNESS: I did not perform an analysis.
4 I just found low price pet foods that that's basically
5 around the same amount. In the ballpark.
6      Q   BY MR. SHACKELFORD: Okay. And when you got
7 to that and you saw that okay, based on the results of
8 the survey, Champion would be slotted here in the same
9 price range as these low-priced pet foods, did you take
10 it any step further to see on a per protein basis, per
11 calorie basis, per nutrient basis, do any sort of
12 comparison of whether Champion really did from a
13 nutritional standpoint compare with those lesser
14 expensive products?
15      MS. BORRELLI: Object to form. He's not a
16 nutrition expert.
17      THE WITNESS: Yeah. I did not analyze that
18 matter.
19      Q   BY MR. SHACKELFORD: Do you think it would be
20 reasonable to do some sort of comparison of ingredients,
21 nutrition facts, anything else on the package between
22 the Champion Petfoods and the lower-priced products that
23 your survey would suggest it should be sold for
24 comparable price?
25      A   I mean, first I have to slightly correct of

Page 83

1 one aspect of your question. I did not pick a product
2 and then say this is what is alike to the Champion's. I
3 just looked for prices. Because my study had shown that
4 in the statements that -- if the judge finds that they
5 are misstatements, then I have basically just provided a
6 formula what the drop-in value would be, but I have not
7 analyzed these other matters that you have mentioned,
8 simply for the fact that for what I needed to calculate
9 based on the scope of my retention that wasn't
10 necessary.
11      Q   I'll ask you to look, Mr. Boedeker, at
12 Paragraph 170 of your report?
13      A   Okay. I'm right there.
14      Q   Let me make sure I have the right thing, I'm
15 asking you the right question. That's not what I wanted
16 to ask you about. Give me just a second.
17 I'm sorry. Paragraph 166.
18      A   Okay. Page 61. I got it.
19      Q   Yes. And there's a sentence in the middle of
20 Paragraph 166 that reads, "Our regression analysis
21 isolates the contribution of each attribute level and
22 the market share to the variable price."
23      Do you see that?
24      A   Yes.
25      Q   And by all means put it in context, whatever

Page 84

1 it is, but I want to understand how this regression
2 calculates market share?
3      A   In this context of the conjoint, the target
4 population is a representation of -- the survey
5 respondents are a representation of the target
6 population. And in this context market share is not the
7 Champion's Petfood market share in the overall market.
8      Here I'm referring to by market share, it's
9 the ratio or the percentage of individual respondents
10 for which the model predicts a first probability. And
11 then aggregating this purchase probabilities across
12 the -- across the entire study group gives a percentage
13 that indicates the share of respondents who would buy a
14 particular permutation of the products that were shown
15 to them.
16      So it's not a market share in the sense that
17 it looks at any -- any dog food producer share of the
18 overall pet food market.
19      Q   So was it -- I appreciate the response. Was
20 the manner in which you did the market simulations
21 described in Paragraph 166 of your Illinois report the
22 same as it had been in the reports you did for Minnesota
23 or anywhere else?
24      A   Yeah. The methodology of using part-worth
25 calculate the purchase probabilities and then specify

Page 85

1 demand curves using the share of respondents on the
2 horizontal axis, so to speak, of the demand curves, that
3 is is -- or was consistently applied across the
4 different surveys.
5      Q   And in your report for Illinois, did you
6 calculate a market price for Champion Petfoods in the
7 but-for world?
8      A   The way the calculations are done, what is
9 basically calculated for the but-for world is the
10 willingness to pay of the marginal consumer. And by
11 definition the willingness to pay of the marginal
12 consumer is the market price. Because again, the market
13 consumer is defined as somebody who buys at the
14 willingness to pay.
15      So that's why the -- the number that comes out
16 of my equations and models is the price in the but-for
17 world for a product that doesn't exist in the actual
18 world, corrected for the alleged wrongdoing.
19      (Reporter clarification.)
20      Q   BY MR. SHACKELFORD: And I think we all know
21 the answer to this, but your analysis didn't look to
22 examine Champion's willingness to sell that same product
23 at the price the marginal purchaser would pay in the
24 but-for world; correct?
25      A   Yeah, that's not necessary to examine the

22 (Pages 82 - 85)

Page 86

1 willingness to pay because this is not a lawsuit about
2 making the producer whole. The willingness to sell of a
3 producer manufacturer is based on the notion that it
4 will be a price that minimizes the marginal cost.
5      So in this case, from a -- as a consumer class
6 action the question is by how much did the consumer
7 overpay so the consumer needs to be made whole. And
8 it's not a question what is the best price at which the
9 manufacturer will still maximize their profits and
10 margins by minimizing their marginal cost, which is
11 indicated by willingness to sell.
12   Q   Okay. So I take it -- I understand it's your
13 opinion it wasn't necessary to do that.
14      My question is, you didn't examine any aspect
15 of Champion's willingness to sell at the marginal price
16 that the marginal consumer would pay in the but-for
17 world or any other aspect of Champion's willingness to
18 sell; correct?
19   A   Let's put it this way. I did not do an
20 analysis of -- maybe I should use the notion of the
21 willingness to accept a certain price. I did not
22 analyze that.
23      But the reasoning is because it wasn't
24 necessary in my opinion.
25   Q   I'm going to ask you, Mr. Boedeker, to look at

Page 87

1 Table 15 on Page 64 and Table 14 on Page 63, and my
2 question is, what's the difference between these two
3 tables?
4   A   Let me just look at that. Unfortunately, I
5 have them printed out double-sided so I have to flip
6 back and forth in order to answer your question.
7      The difference is in Table 14 presents the
8 results of the regression estimation aggregated to
9 basically one data point to consumer -- participants I
10 should say, and then calculating the point estimates,
11 whereas in Table 15, and I have to go back into how this
12 whole estimation technique works, the conjoined
13 methodology uses --
14      (Reporter clarification.)
15      THE WITNESS: The conjoined methodology uses
16 an estimation technique that is called hierarchical
17 bayesian estimation, and it is an estimation methodology
18 there are literally -- I use 20,000 draws, the first
19 10,000 draws I use to have these part-worth converge,
20 and then I run another 10,000.
21      And here what I did to test the robustness of
22 the results from the aggregate regression, I ran 1,000
23 regressions across the draws. And that way it showed
24 that all of the results are within confidence intervals
25 of each other. So the confidence intervals reported in

Page 88

1 Table 15 overlapped the ones at the interval attribute
2 level of Table 14.
3      And that is just a robustness check to see if
4 a model based on an overall aggregate is similar, the
5 results, statistically speaking, are significantly
6 different if I choose this method where I'm going across
7 all the draws and run 1,000 different regressions.
8   Q   BY MR. SHACKELFORD: Is Table 15 used to
9 support the reasonableness of the calculations or the
10 numbers set forth in Table 14?
11   A   Yeah. It's the validity check I would call
12 it, and it shows that the numbers are not statistically
13 significantly different from each other. What might
14 happen is if the sample size were too small, one could
15 see differences between those two different
16 calculations. But here they are statistically speaking
17 not different from each other, and that was for me a
18 validation of the robustness of the aggregate level of
19 regression in Table 14.
20   Q   Is it accurate to say that the values in
21 Table 14 are the ones you used to compute damages?
22   A   That is correct, Table 14 was the basis for
23 the damages calculation.
24   Q   As between the method used to get the values
25 in Table 14 and the values in Table 15, in your opinion

Page 89

1 is one superior to the other?
2   A   No. I mean, they are used to cross-validate.
3 The one that uses the overall aggregate information is
4 the one that is -- the one that is most discussed in the
5 literature, but I wanted to see -- to test the
6 robustness I came up with this validation check by using
7 the information from more individualized drawings.
8      Again, there's a list of 10,000 of those draws
9 and I looked at steps that resulted in 1,000 different
10 regressions. Instead of just focusing on the one at the
11 aggregate level.
12   Q   Looking at Table 14, can you describe for me
13 the methodology for calculating the lower and upper
14 bounds that are set forth in those respective columns in
15 Table 14?
16   A   The lower and upper bounds in a regression
17 setting that sets formulas of how to calculate the upper
18 and lower bounds, it's basically in the first step the
19 standard error of a coefficient of the point estimate is
20 being calculated from the data. And I believe I used
21 the 95 -- yeah, 95 percent content interval as the head
22 of Table 14 indicates.
23      So the standard arrow will then be combined
24 with the desired confidence at which the interval is
25 being recorded. And then it's just applying a formula

23 (Pages 86 - 89)

Page 90

1 to calculate this.
2    Q   Is it accurate to say that in estimating the
3 economic loss or damages you have averaged the
4 part-worths of all of the respondents in your survey?
5    A   It's slightly different; it's a bit more
6 complicated.  The part-worths themselves are calculated
7 in the first step.  Then the part-worth -- and then
8 being entered to calculate purchase probabilities.  And
9 then the purchase probabilities that they are being
10 aggregated, so that I have a market-wide number, and
11 that's what I call market share, I should put that in
12 quotation marks because it's not to be confused with
13 another definition of market share.  And then those
14 quantities --
15       Excuse me?
16       Somebody's in the picture there.  I see.
17       THE REPORTER:  I'm sorry about that.  Hold on.
18       THE WITNESS:  I lost my train of thought.
19       Can you reread the last one or two sentences?
20       (Reporter clarification.)
21       THE WITNESS:  It might be easier if
22 Mr. Shackelford just repeats his question.  Sorry about
23 that.
24    Q   BY MR. SHACKELFORD:  That's okay.  We all got
25 kind of derailed a little bit.

Page 91

1       You were explaining to me that the damage
2 calculation is not strictly speaking the average of the
3 part-worths of all the respondents in the survey.
4    A   Okay.  I got it.  So I was explaining how the
5 data, the part-worth data going to the -- what's called
6 the Mixed Logits models where I'm estimating the
7 quantities, the purchase likelihoods that then are
8 summarized into the market share.
9       And then I'm basically using the demand curve
10 estimations, where I now have for different prices for
11 different product combinations, I can tell the interval
12 market share.  So now I have a bunch of data points that
13 have two components; one is a price and the other one is
14 a quantity, what I call "the market share."  And then
15 ultimately is the input for the damages calculations.
16       The difference in the market -- excuse me --
17 in the demand curve that has an attribute versus it
18 doesn't have an attribute.  So it's more -- much more
19 involved than just simply taking the part-worth number.
20    Q   And is there some authoritative source in
21 academic literature or otherwise that you relied upon in
22 the way you've calculated the economic loss as you've
23 just described it?
24    A   It is the accepted way of calculating the
25 value of attributes.  And then by calculating the value

Page 92

1 of an attribute that has the level I have -- or the
2 product has heavy metals versus it doesn't have heavy
3 metals follows the -- the recipe I was saying.  I think
4 there should be some citations in my report that shows
5 that literature.  And so that's something that is
6 documented in textbooks and then research papers.
7       MR. SHACKELFORD:  Raina, do you mind if we
8 just take five?  Because I think I'm about done.
9       MS. BORRELLI:  Oh, good.
10       MR. SHACKELFORD:  I'm going to double-check.
11       THE WITNESS:  Okay.
12       MR. SHACKELFORD:  That would be okay?  Or why
13 don't we just come back the bottom of the hour.
14       MS. BORRELLI:  All right.
15       THE VIDEOGRAPHER:  We are off the record.  The
16 time is 3:22 p.m.
17       (A brief recess was taken.)
18       THE VIDEOGRAPHER:  We are back on the record.
19 The time is 3:34 p.m.
20    Q   BY MR. SHACKELFORD:  Okay.  So, Mr. Boedeker,
21 what we've done is I've asked you to look at the last
22 page of your appendices, which will be Appendix 4, and
23 you were able to pull that up on your computer and look
24 at electronic copy; correct?
25    A   That is correct.  I'm currently looking at

Page 93

1 Page 375 out of 375.  And it's within Appendices 1
2 through 4 is the name of the document.
3    Q   Okay.  And can you explain to me what this
4 page represents?
5    A   This particular page is the -- contains the
6 results of the misrepresentations and omissions
7 individually and in combination.  So, for example, it
8 shows what each individual omission's drop-in value
9 would be, but it also shows the combination.
10    Q   Does it show the combination of
11 misrepresentations and omissions?
12    A   No.  They were separate surveys, so the
13 calculations have to be contained within the survey
14 level.  And the labeling under claims, which is the
15 second column from the left shows the combinations
16 within a particular survey.  It would be inappropriate
17 statistically speaking to mix and match the regression
18 results from different surveys.
19    Q   So if ultimately -- just as an example, if we
20 look at Acana omissions, we see the upper bound for
21 expired, heavy metals, BPA and regrinds to be 87.1;
22 right?
23    A   Which row are you at right now?  Sorry.  At
24 the bottom very bottom, yes.
25    Q   Very bottom row.

24 (Pages 90 - 93)

Page 94

1    A    I got it.
2    Q    And if you take the very bottom row of
3  misrepresentations, which would be biologically
4  appropriate, nourish and regional and the upper -- you
5  know -- what are we to make of a finding that a jury
6  decides that they agree with you, that the effect of
7  those four omissions is 87.1?  Tell me what that means.
8    A    That would be the upper bound.  I would
9  probably argue -- and in my tables for the economic loss
10  I argued with the point estimate, which is the number in
11  the middle, it's titled "Economic Value."  And so that
12  would be the 84.7 percent.  And if the court were to
13  find or the jury were to find that all of those
14  omissions really are correct, that they would find
15  Champion's liable for that, then that would be a
16  reduction of the overall price by this percentage.
17    Q    So in other words, the damages that the class
18  should get is whatever the sales were, they get 87 -- or
19  84.71 percent of that return to them as damages, is that
20  how we understand this?
21    A    Yeah.  Expression as a percentage would be
22  multiplied against the revenue figure.  That is correct.
23    Q    Okay.  And if the same jury also determines
24  that misrepresentations of biologically appropriate,
25  nourish and regional caused the price to be inflated by

Page 95

1  29.92 percent, that's what the bottom line, the last row
2  under misrepresentations reflects; right?
3    A    Yeah, let me just -- I found that.  29.92,
4  that's correct.  So that would be the -- if all of the
5  misstatements were -- all of those positive statements
6  were found to be misstated, then that would lower the
7  price by 29.  And the omissions were 84.71, so how that
8  can be interpreted right now is that a dog food that has
9  none of the positive attributes and has a lot of the
10  negative attributes that I tested would turn into an
11  economic "bad."  Because the sum is more than the
12  purchase price, right, it's greater than 100.
13    Q    And that's how these relate to one another, I
14  appreciate that they're independent surveys, but if a
15  jury finds the bottom row in Acana in each one of these,
16  they get to a damage figure that's more than 100 percent
17  of the purchase price; right?
18        MS. BORRELLI:  Objection; calls for a legal
19  conclusion.
20        THE WITNESS:  Yeah, I don't know what you're
21  adding to the 84.7 that that would give something
22  greater than 100.  Not for all of the combinations.
23    Q    BY MR. SHACKELFORD:  But I'm looking at two
24  rows and figuring out how we would deal with a jury
25  verdict that found those two rows.  Row 1 is under

Page 96

1  misrepresentations, biologically appropriate, nourish,
2  regional, and they agree with your economic value of
3  29.92.
4        With me?
5    A    Yeah.  Okay.
6    Q    Okay.  Same jury in the same case also finds
7  omissions, expired, heavy metals, BPA, regrinds, and
8  they agree with your economic value, 84.71 percent.
9        With me?
10    A    Yes.
11    Q    In the event of those two findings what are
12  the damages?
13    A    The damages here would then be -- again, would
14  be an economic "bad."  And in cases like that oftentimes
15  the purchase price would be used as the measure of
16  damages.
17    Q    And the way we know it's an economic "bad" is
18  by adding the 84.71 and the 29.92 and getting a figure
19  that is more than 100 percent; correct?
20    A    That is correct, yeah.  The overall reduction
21  exceeds the purchase price of the product, which then
22  from an economic point of view indicates that there's
23  negative utility associated in buying a product that has
24  all of the negative attributes and not any of the
25  positive attributes.  That's correct.

Page 97

1    Q    And just not to put too fine a point on it,
2  but is it an accurate extrapolation of your opinion that
3  the total damages reached with those two rows would be
4  approximately 13 percent more than total retail revenues
5  from sales of the product?
6        MS. BORRELLI:  Objection; misstates testimony.
7        THE WITNESS:  I have not studied the
8  allocation or distribution of damages, but these are the
9  results.  And again, it's quite possible that stripping
10  a product of positive attributes and adding negative
11  attributes if again the allegations in the complaint are
12  true, can turn a product into an economic "bad."  And
13  then the indicator for that would be that overall the
14  loss amount is larger than the purchase price.
15        And again, I have not seen or done a
16  calculation where that was the case, but I've seen other
17  reports where in those cases the purchase price would
18  have been the damages that were calculated.
19    Q    BY MR. SHACKELFORD:  Is it accurate to say
20  that based upon your surveys, consumers who bought Acana
21  products overpaid by virtue of misrepresentations?
22        MS. BORRELLI:  Objection; calls for a legal
23  conclusion.
24        THE WITNESS:  Again, what my study set out to
25  do is to see if an attribute changes in a product, how

25 (Pages 94 - 97)

Page 98

1 does that impact the consumers' preferences and
2 ultimately the price. And when I look at the Acana
3 misrepresentations I think you mentioned that the
4 percentages there are greater than zero. So that means
5 each attribute that I tested has a value to the
6 consumer.
7    Q Right. And the way -- on the
8 misrepresentations the way you calculate damages is you
9 subtract the percentage of each one from 100; right?
10    A No. This percentage, I'm looking at Acana
11 misrepresentation, biologically appropriate and I think
12 the number -- let me just make sure I'm on the right
13 line, 9.58.
14    Q Uh-huh.
15    A So that percentage would be applied to the
16 purchase price. If the bag was 98 -- or 89.99 I would
17 multiply that by 9.58 percent and that portion would
18 represent the economic loss.
19    Q And the value of the attribute of expired
20 under Acana omissions is 28.3 percent; right?
21    A Yeah. It's actually -- the value -- the
22 lowering of the value when the Acana product is known to
23 have expired ingredients, that would lead to a drop in
24 value of 28.3 percent. Expired is not worth 28.3
25 percent, the price will drop by that percentage when it

Page 99

1 is true when it can be shown that it contains expired
2 ingredients.
3    Q And so again, I think we've covered this, but
4 I want to make sure.
5    You said that Table 4 shows us all of the
6 combinations of the misrepresentations and all of the
7 combinations of omissions for Orijen and Acana
8 respectively; right?
9    A That is correct, yes.
10    Q And then the way we use the same table in
11 order to show the combined impact of each
12 misrepresentation and each omission for the respective
13 product; right?
14    A That's correct.
15    MS. BORRELLI: Objection; misstates testimony.
16    Q BY MR. SHACKELFORD: Again, that's the
17 justification we just talked about for adding together
18 the 29.92 percent reduction in price for the combined
19 misrepresentations of biologically appropriate, nourish
20 and regional and the omission of expired, heavy metals,
21 BPA and regrinds of a reduction in value of
22 84.71 percent.
23    We want to know the total, we just add those
24 two numbers together; correct?
25    MS. BORRELLI: Objection; misstates testimony.

Page 100

1    THE WITNESS: The combined impact of omissions
2 and misrepresentations would be the sum of whatever
3 combination you're looking for here --
4    Q BY MR. SHACKELFORD: Okay.
5    A -- that is shown in this table. The jury or
6 the judge were finding that none of the -- well, they
7 were misstatements which reflect positive attributes.
8 If the product didn't have any of the positive
9 attributes listed but would have all of the negative
10 attributes, then the fact that the sum adds up to more
11 than 100 shows that in the eyes of the consumer this
12 product now is not a "good," it's a "bad."
13    MR. SHACKELFORD: Those are all the questions
14 I have for you today, Mr. Boedecker.
15    THE WITNESS: I'll try to get back here.
16 Okay.
17    MS. BORRELLI: Could we take five minutes just
18 so I can gather my notes together? I promise to be
19 quick.
20    MR. SHACKELFORD: Sure.
21    MS. BORRELLI: Thank you.
22    THE VIDEOGRAPHER: We are off the record. The
23 time is 3:48 p.m.
24    (A brief recess was taken.)
25    THE VIDEOGRAPHER: We are back on the record.

Page 101

1 The time is 3:54 p.m.
2 ///
3    EXAMINATION
4 BY MS. BORRELLI:
5    Q Mr. Boedeker, earlier Mr. Shackelford was
6 asking you about your experience doing what we've called
7 an expectation survey in this case and other litigation
8 cases that you've been involved in.
9    Do you recall that testimony?
10    A Yes, I do.
11    Q Have you ever done surveys similar to the
12 expectation survey done here in your
13 non-litigation-related work?
14    A Yes, I've done that multiple times.
15    Q How many would you estimate?
16    A I mean, probably at least 50, if not more. I
17 did a lot of consulting work that dealt with measuring
18 consumers' expectations when assessing new products,
19 bundling of products or attributes of existing products.
20    Q Okay. And then Mr. Shackelford was asking you
21 about Appendix 4 just a bit ago and about whether you
22 could combine the results of the misrepresentations and
23 omissions survey.
24    Your testimony about whether those results
25 could be combined, did that assume that the

26 (Pages 98 - 101)

Page 102

1  misrepresentations results and the omissions results
2  were independent or dependent?
3      A    Adding those two means that they are
4  independent, it's based on that assumption, which is
5  something that I have not tested.  But under the
6  assumption of independence they're edited.
7      Q    Okay.  So you don't know sitting here today
8  whether they're independent or dependent because you
9  didn't test that?
10     A    That's right.  I haven't tested it, so I don't
11 know the degree of any dependency or independence.
12     Q    And in your report and as part of your expert
13 opinions in this case, are you opining that the
14 omissions damages and the misrepresentations damages are
15 additive?
16     A    Again, I have not opined on that because I
17 haven't done the tests necessary.  I report the damages
18 as they are one by one in my report.
19         MS. BORRELLI:  Okay.  I think that's all the
20 questions I have.  Thank you.
21         MR. SHACKELFORD:  I have no further questions
22 for you today, Mr. Boedeker.  I really appreciate your
23 time and to everyone appreciate your patience and
24 flexibility on trying to get this kicked off.  So I
25 appreciate that.

Page 103

1         THE WITNESS:  You're welcome.
2         MS. BORRELLI:  Thank you.  And we will read
3  and sign.
4         MR. SHACKELFORD:  I'm sorry?
5         MS. BORRELLI:  We will read and sign.
6         MR. SHACKELFORD:  Okay.  Perfect.
7         THE VIDEOGRAPHER:  We are off the record.  The
8  time is 3:58 p.m. on March 16th, 2021.  This concludes
9  today's testimony given by Stefan Boedeker.
10        The total number of media units used was five
11 and will be retained by Veritext Legal Solutions.
12        (Time Noted:  3:58 P.M.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 104

1              PENALTY OF PERJURY
2
3      I, STEFAN BOEDECKER, do hereby declare under
4  penalty of perjury that I have read the foregoing
5  transcript of my deposition; that I have made such
6  corrections as noted herein, in ink, initialed by me, or
7  attached hereto; that my testimony as contained herein,
8  as corrected, is true and correct.
9
10         EXECUTED this _____ day of _____,
11 20__, at _____, _____.
              (City)              (State)
12
13
14         _____
                  STEFAN BOEDECKER
15                Volume I
16
17
18
19
20
21
22
23
24
25

Page 105

1      CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2      I, Rochelle Holmes, the undersigned, a Certified
3  Shorthand Reporter of the State of California, do hereby
4  certify:
5      That the foregoing proceedings were taken
6  before me via videoconference; that any witnesses in the
7  foregoing proceedings, prior to testifying, were
8  administered an oath; that a record of the proceedings
9  was made by me using machine shorthand which was
10 thereafter transcribed under my direction; that the
11 foregoing transcript is a true record of the testimony
12 given.
13     Further, that if the foregoing pertains to the
14 original transcript of a deposition in a Federal Case,
15 before completion of the proceedings, review of the
16 transcript [X] was [ ] was not requested.
17     I further certify I am neither financially
18 interested in the action nor a relative or employee
19 of any attorney or any party to this action.
20     IN WITNESS WHEREOF, I have this date subscribed my
21 name.              Dated:  March 22, 2021
22
23
24         *Rochelle Holmes*
           _____
           Rochelle Holmes
25         CSR No. 9482, CCRR No. 0123

27 (Pages 102 - 105)

## **TRANSCRIPT ERRATA SHEET**

DEPONENT:        Stefan Boedeker
CASE NAME:       Colangelo, et al. v. Champion Petfoods USA Inc. and Champion
                 Petfoods LP, United States District Court Northern District of New
                 York
CASE NO.:        6:18-cv-01228 [LEK/DEP]
DEPOSITION DATE: March 16, 2021

| PAGE(S) | LINE(S) | CORRECTION | REASON |
|---|---|---|---|
| 1 | 14 | *Replace:* "Boedecker"  *With:*  "Boedeker" | Transcription error |
| 2 | 14 | *Replace:* "Boedecker"  *With:*  "Boedeker" | Transcription error |
| 5 | 3 | *Replace:* "Boedecker"  *With:*  "Boedeker" | Transcription error |
| 7 | 15 | *Replace:* "Boedecker"  *With:*  "Boedeker" | Transcription error |
| 15 | 11 | *Strike:* "survey - -" | Transcription error |
| 18 | 5 | *Replace:* "shows"  *With:*  "it shows" | Transcription error |
| 18 | 7 | *Replace:* "likelihood"  *With:*  "likelihoods" | Transcription error |

| PAGE(S) | LINE(S) | CORRECTION | REASON |
|---------|---------|------------|--------|
| 19 | 10-11 | **_Replace:_** "then the purchase will likely also go down."<br><br>**_With:_**<br><br>"the purchase likelihood will also go down." | Transcription error |
| 23 | 17-18 | **_Replace:_** "this was also associated federal case and after the case settled"<br><br>**_With:_**<br><br>"There was also an associates' federal case, after the cases settled" | Transcription error |
| 24 | 13 | **_Replace:_** "pasturization"<br><br>**_With:_**<br><br>**_"pasteurization"_** | Transcription error |
| 25 | 18 | **_Replace:_** "there was all the money went into BART."<br><br>**_With:_**<br><br>"where most of the funding money went into BART." | Clarification |
| 28 | 23 | **_Replace:_** "2"<br><br>**_With:_**<br><br>"$200" | Transcription error |
| 30 | 1 | **_Replace:_** "pasturizing"<br><br>**_With_**<br><br>"pasteurizing" | Transcription error |
| 31 | 13-14 | **_Replace:_** "I - - I mean, definitely the Kombucha and the transportation as not an internet panel"<br><br>**_With:_**<br><br>"I do not recall if the internet panel was an internet panel." | Transcription error |
| 31 | 14-15 | **_Replace:_** "There was actually the survey company went out to interview people" | Transcription error |

| PAGE(S) | LINE(S) | CORRECTION | REASON |
|---|---|---|---|
| | | *With:*<br><br>"There was actually the survey company who went out to interview people | |
| 31 | 22 | *Replace:* there was one that we had millions of the frequent"<br><br>*With*<br><br>"there was one where we had millions of the frequent" | Clarification |
| 32 | 20 | *Replace:* "number, 50 years old,"<br><br>*With:*<br><br>"Respondents, the first 50 or so" | Transcription error |
| 33 | 7-8 | *Replace:* "clear understanding of the 493 versus no, the seven individuals."<br><br>*With:*<br><br>"it says that 493 had the understanding, and seven did not." | Clarification |
| 34 | 23 | *Replace:* "Ms. Kim was more junior"<br><br>*With:*<br><br>"Ms. Kim is a more junior staff" | Transcription error |
| 36 | 11 | *Strike:* "only fresh ingredients" | Transcription error |
| 36 | 13 | *Replace:* "source"<br><br>*With:*<br><br>"indication" | Transcription error |
| 38 | 21-23 | *Replace:* "The randomization was done for each incoming for the respondent, there was a 50-50 chance that they were called one way."<br><br>*With:*<br><br>"the randomization was done such that each respondent had a 50-50 chance to be assigned to Orijen or Acana." | Clarification |

| PAGE(S) | LINE(S) | CORRECTION | REASON |
|---------|---------|------------|--------|
| 38 | 24-25 | ***Replace:*** "I'd"<br><br>***With:***<br><br>"Let's" | Transcription error |
| 38 | 25 | ***Replace:*** "that one comes up 247 and one"<br><br>***With:***<br><br>"heads comes up 247 and one" | Clarification |
| 43 | 18 | ***Replace:*** "scientific manual of evidence."<br><br>***With:***<br><br>"reference manual of scientific evidence." | Transcription error |
| 47 | 8-9 | ***Strike:*** "So that's kind of what I simply in - - paraphrased." | Duplicative |
| 48 | 8 | ***Strike:*** lines 8-9<br>I checked my report and in paragraphs 114 and 117 the use of decoys is explained. | Misspoke based on recollection |
| 49 | 21 | ***Replace:*** "improve"<br><br>***With:***<br><br>"include" | Transcription error |
| 50 | 3 | See Boedeker Report paragraphs 114 and 117 for definition of decoys. | Clarification |
| 50 | 19 | ***Replace:*** "product"<br><br>***With:***<br><br>"product labeled as" | Transcription error |
| 56 | 11 | ***Replace:*** "that."<br><br>***With:***<br><br>"measuring behavior changes." | Clarification |
| 56 | 19 | ***Replace:*** "I don't recall that."<br><br>***With:***<br><br>"The prices were actual prices for Acana or Orijen." | Clarification based on my report |
| 57 | 21 | ***Replace:*** "in" | Transcription error |

| PAGE(S) | LINE(S) | CORRECTION | REASON |
|---|---|---|---|
| | | *With:*<br><br>"it" | |
| 59 | 6-8 | *Replace:* "In general, when opinions are asked, give you an example of rotating instructions wouldn't make sense if you asked which state do you live in."<br><br>*With:*<br><br>"In general, when opinions are asked, giving you an example of rotating instructions wouldn't make sense if you asked which state do you live in." | Transcription error |
| 60 | 5 | *Replace:* "auto"<br><br>*With:*<br><br>"Order" | Transcription error |
| 60 | 17 | *Insert:* "each respondent always saw the same order from strongly disagree to strongly agree but the order was randomized across respondents meaning some respondents always saw from strongly disagree to strongly agree."<br><br>*After:* "strongly agree." | Clarification |
| 61-62 | 25; 7-11 | *Q:* "were all four of the conjoint surveys scaled at the time?"<br><br>*A:* "September, October 2020 would have been too early for these three states. So I have to check that date."<br><br>*Correct date should be:*<br>"Survey 1 Orijen Misstatements: 2/1/2021 – 2/11/2021<br><br>Survey 2 Orijen Omission: 1/20/2021 – 1/24/2021<br><br>Survey 3 Acana Misstatements: 12/8/2020 – 12/21/2020<br><br>Survey 4 Acana Omissions: 1/25/2021 -1/28/2021 | Clarification |

| PAGE(S) | LINE(S) | CORRECTION | REASON |
|---|---|---|---|
| | | Survey 5 Consumer Expectation Survey: 2/17/2021 – 2/23/2021"" | |
| 62-63 | 25; 1-2 | ***Replace:*** "And it was definitely done - - not in September, October 2020, it was definitely done in 2021, but I don't recall the correct or exact dates." <br><br> ***With:*** <br><br> ***Correct date should be:*** <br> "Survey 1 Orijen Misstatements: 2/1/2021 – 2/11/2021 <br><br> Survey 2 Orijen Omission: 1/20/2021 – 1/24/2021 <br><br> Survey 3 Acana Misstatements: 12/8/2020 – 12/21/2020 <br><br> Survey 4 Acana Omissions: 1/25/2021 -1/28/2021 <br><br> Survey 5 Consumer Expectation Survey: 2/17/2021 – 2/23/2021" | Clarification |
| 63 | 11 | ***Replace:*** "lone" <br><br> ***With:*** <br><br> "low" | Transcription error |
| 70 | 12 | ***Replace:*** "200" <br><br> ***With:*** <br><br> "$200" | Transcription error |
| 73 | 5-6 | ***Replace:*** "It's looking at it and basically take the union in the sense." <br><br> ***With:*** <br><br> "One must take the individual values and then eliminate the overlap to get the joint impact of all omissions and misrepresentations." | Clarification |
| 73 | 8 | ***Replace:*** "of each other" <br><br> ***With:*** <br><br> "on each other" | Transcription error |

| PAGE(S) | LINE(S) | CORRECTION | REASON |
|---|---|---|---|
| 74 | 4 | *Replace:* "function"<br><br>*With:*<br><br>"functional form" | Transcription error/Clarification |
| 74 | 19-20 | *Replace:* "they will be caught,"<br><br>*With:*<br><br>"then the model will detect them and properly incorporate them," | Clarification |
| 75 | 6 | *Replace:* "hundreds of thousands"<br><br>*With:*<br><br>"hundreds or thousands" | Transcription error |
| 75 | 8-9 | *Replace:* "the particular regression of prior selection."<br><br>*With:*<br><br>"the code for the regression specification to calculate the joint impact of multiple factors." | Misspoke/Clarification |
| 75 | 20-21 | *Replace:* "ultimately would be found to be - - or felt it might be found to be liable for."<br><br>*With:*<br><br>"Champions would ultimately be found liable for." | Clarification |
| 77 | 3-4 | *Replace:* "individually that the server resided in assigning to"<br><br>*With:*<br><br>"that the model resulted in computing for each individual attribute" | Transcription error/Clarification/Misspoke |
| 78 | 10 | *Replace:* "edited"<br><br>*With:*<br><br>"additive" | Transcription error |
| 82 | 25 | *Strike:* "of" | Transcription error |

| PAGE(S) | LINE(S) | CORRECTION | REASON |
|---|---|---|---|
| 83 | 6 | **_Replace:_** "drop-in"<br><br>**_With:_**<br><br>"appropriate" | Transcription error |
| 84 | 8 | **_Replace:_** "Here I'm referring to by"<br><br>**_With:_**<br><br>"What I am referring to here as" | Transcription error/Misspoke |
| 84 | 10 | **_Replace:_** "first"<br><br>**_With:_**<br><br>"purchase" | Transcription error |
| 84 | 11 | **_Replace:_** "this"<br><br>**_With:_**<br><br>"the" | Transcription error |
| 84 | 17 | **_Replace:_** "producer"<br><br>**_With:_**<br><br>"producer's" | Transcription error |
| 84 | 24 | **_Insert:_** "to"<br><br>**_After:_** "part-worth" | Transcription error |
| 85 | 10,11,14 | **_Replace:_** "willingness to pay"<br><br>**_With:_**<br><br>"willingness-to-pay" | Transcription error |
| 85 | 12-13 | **_Replace:_** "the market consumer"<br><br>**_With:_**<br><br>"the marginal consumer" | Transcription error |
| 86 | 3 | **_Add:_** "or"<br><br>**_Between:_** "producer manufacturer" | Transcription error |
| 86 | 1 | **_Replace:_** "willingness to pay"<br><br>**_With:_** | Transcription error |

| PAGE(S) | LINE(S) | CORRECTION | REASON |
|---|---|---|---|
| | | "willingness-to-pay" | |
| 86 | 11 | ***Add:*** "the" <br><br> ***After:*** "by" | Transcription error |
| 87 | 9 | ***Replace:*** "to consumer" <br><br> ***With:*** <br><br> "per consumer" | Transcription error |
| 87 | 12 | ***Replace:*** "conjoined" <br><br> ***With:*** <br><br> "conjoint" | Transcription error |
| 88 | 5 | ***Add:*** "not" <br><br> ***Between:*** "are significantly" | Transcription error |
| 89 | 23 | ***Replace:*** "arrow" <br><br> ***With:*** <br><br> "error" | Transcription error |
| 90 | 7-8 | ***Replace:*** "- - and then" <br><br> ***With:*** <br><br> "are" | Transcription error |
| 90 | 9 | ***Replace:*** "that they are being" <br><br> ***With:*** <br><br> "will be" | Transcription error |
| 91 | 5 | ***Replace:*** "going to the - - what's called" <br><br> ***With:*** <br><br> "will be the input to" | Clarification |
| 91 | 10 | ***Strike:*** "for" <br><br> ***Before the word:*** "different" | Transcription error |

| PAGE(S) | LINE(S) | CORRECTION | REASON |
|---------|---------|------------|--------|
| 91 | 14 | ***Replace:*** "then" <br><br> ***With:*** <br><br> "this" | Transcription error |
| 92 | 1 | ***Insert:*** "for example" <br><br> ***Between:*** "that has" | Clarification |
| 92 | 1-2 | ***Strike:*** "I have - - or the product has" | Misspoke |
| 92 | 3 | ***Replace:*** "- - the recipe I was saying." <br><br> ***With:*** <br><br> "the same recipe" | Misspoke |
| 93 | 5 | ***Strike:*** "is the - -" | Misspoke |
| 93 | 6 | ***After:*** "omissions" <br><br> ***Insert:*** "surveys" | Clarification |
| 93 | 8 | ***Replace:*** "drop-in" <br><br> ***With:*** <br><br> "decrease in" | Misspoke |
| 102 | 6 | ***Replace:*** " edited." <br><br> ***With:*** <br><br> "added." | Transcription error |

I declare under penalty of perjury under the laws of the United States of America and the State of Nevada that the foregoing changes to the transcript of my deposition, taken on March 16, 2021 are true and correct, and the transcript is deemed signed with these changes.

Executed on April 16, 2021, at Las Vegas, Nevada.

_____

Stefan Boedeker
Deponent