**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **AFSHIN ZARINEBAF** and **ZACHARY CHERNIK, JOAN MEYER**, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>**CHAMPION PETFOODS USA INC. and CHAMPION PETFOODS LP,**<br><br>Defendants. | ) | Case No.: 1:18-cv-06951<br>Hon. Virginia M. Kendall |

**DEFENDANTS' CORRECTED[1] MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE PLAINTIFFS' EXPERT DR. SEAN CALLAN'S PENTOBARBITAL OPINIONS**

[1] This Memorandum of Law was originally filed as ECF No. 111 and has been corrected to attach the correct report by Dr. Callan as Exhibit 1 to the Memorandum.

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. RELEVANT BACKGROUND ..... 2

III. LEGAL STANDARD ..... 2

IV. ARGUMENT ..... 3

A. Callan's Opinion that Pentobarbital is "Likely Present" in Champion's Finished Pet Food Products at "Some Level" is Baseless, Speculative, and Irrelevant ..... 3

B. Callan's Opinion that Champion's Sampling "was Insufficient to Assess the Actual Risk" because the Sample Size was "Too Small" is Baseless, Speculative, and Contrary to the Extant Record Evidence ..... 7

C. Callan's Opinion that Pentobarbital Must Remain in the Beef Tallow on the Asserted Basis that Tallow is "Heterogeneous" is Baseless and Speculative ..... 11

V. CONCLUSION ..... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Honda Motor Co. v. Allen*,
600 F.3d 813 (7th Cir. 2010) ....................2

*Andersen v. City of Chicago*,
454 F. Supp. 3d 740 (N.D. Ill. 2020) (Kendall, J.) ....................7

*Chapman v. Maytag Corp.*,
297 F.3d 682 (7th Cir. 2002) ....................3, 4, 12

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)....................2, 3

*Deimer v. Cincinnati Sub- Zero Prods., Inc.*,
58 F.3d 341 (7th Cir. 1995) ....................3

*Ervin v. Johnson & Johnson, Inc.*,
492 F.3d 901 (7th Cir. 2007) ....................12

*Gopalratnam v. Hewlett-Packard Co.*,
877 F.3d 771 (7th Cir. 2017) ....................3

*Kopplin v. Wisconsin Central Ltd.*,
914 F.3d 1099 (7th Cir. 2019) ....................11

*Kumho Tire Co. Ltd. v. Carmichael*,
526 U.S. 137 (1999)....................2, 4

*Lewis v. CITGO Petroleum Corp.*,
561 F.3d 698 (7th Cir. 2009) ....................2, 12

*Navarro v. Fuji Heavy Indus., Inc.*,
117 F.3d 1027 (7th Cir. 1997) (Posner, J.) ....................7

*Porter v. Whitehall Lab'ys, Inc.*,
9 F.3d 607 (7th Cir. 1993) ....................4

*Rosen v. Ciba-Geigy Corp.*,
78 F.3d 316 (7th Cir. 2009) ....................3

*Timm v. Goodyear Dunlop Tires NA., Ltd.*,
932 F.3d 986 (7th Cir. 2019) ....................3, 7

*Weaver v. Champion Petfoods*,
No. 2:18-cv-1996-JPS (E.D. Wis.) ....................9

*Weir v. Crown Equip. Corp.*,
217 F.3d 453 (7th Cir. 2000) ....................4

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
395 F.3d 416 (7th Cir. 2005) ....................8

**Other Authorities**

Fed. R. Evid. 401 ....................1

Fed. R. Evid. 402 ....................1

Fed. R. Evid. 702 ....................1, 2, 4, 7, 8, 12

## I. INTRODUCTION

Plaintiffs have designated Dr. Sean Callan (who was educated as a psychologist) as an expert on the question of whether pentobarbital was present in Champion's finished dog food product after one of its third-party suppliers shipped a minor ingredient (beef tallow) in late March 2018 that tested positive for a small amount of pentobarbital. Specifically, Callan opines that (i) pentobarbital was "likely present at some level" in certain of Champion's finished pet food products, and (ii) the sampling performed by Champion to determine the presence of pentobarbital "was insufficient to assess the actual risk"—because the "sample number and size" supposedly was too small relative to the "total size of potentially contaminated finished product," and because the "tallow" (that is, the fat) used to make the finished products was, in his opinion, "heterogene[ous]." *See* Expert Report of Sean Callan executed August 8, 2019 ("**Exhibit 1,**" hereinafter "Callan Report").

Callan's reasoning and conclusions are riddled with methodological flaws. Indeed, by his own repeated admissions, Callan has no basis upon which to testify at trial as to any of his pentobarbital-related opinions; his opinions are the baldest of "expert" say-so and speculation. They do not meet the standard required for proper expert testimony, and his unsupported musings are irrelevant to the merits issues presented here.

In short, none of Callan's pentobarbital opinions square with the baseline requirements for expert testimony under Rules 401, 402, or 702 of the Federal Rules of Evidence, or with binding Supreme Court and Seventh Circuit caselaw. For these reasons, as well as those set forth below, the Court should grant this Motion, exclude each of the pentobarbital-related opinions offered by Callan, and preclude him from testifying on those topics at trial.

## II. RELEVANT BACKGROUND

Callan has tendered two different reports touching on different subject matters. In his first report, Callan offered his views as to the supposed presence of bisphenol A (BPA) in certain of Champion's products. In his second report, the one that is the subject of this Motion, Callan purports to opine on the alleged presence of pentobarbital in certain raw materials that were used in certain of Champion's finished dog food products and speculates that Champion's finished dog food contained pentobarbital. *See generally* Callan Report.

## III. LEGAL STANDARD

Rule 702 permits an expert to testify at trial only if his or her "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Expert opinions may be considered at trial only if (1) "the testimony is based on sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case." *Id.* at 702(b)-(d). To ensure that these threshold requirements are satisfied, district courts are tasked with the role of "gatekeeper" over all proffered expert or scientific testimony. *See, e.g., Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

As the gatekeeper, the Court must ensure that the proffered expert has the requisite "knowledge, skill, experience, training, or education relevant to such evidence or fact in issue." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010) (noting the district court's "role as 'gate keeper' and its duty to determine reliability in light of the proposed expert's full range of experience and training as well as the methodology used to arrive at a particular conclusion"); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) ("A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are

based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*.") (citation omitted); *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 2009) ("[A] district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.").

A district court must also "ensur[e] that proposed expert testimony 'is not only relevant, but reliable.'" *Timm v. Goodyear Dunlop Tires NA., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019) (quoting *Daubert*, 509 U.S. at 589). In assessing reliability, "the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions." *Id.* (citation omitted).

The proponent of the evidence bears the burden of establishing that the proffered expert actually (1) has the requisite qualifications to testify, (2) offers opinions that are relevant to the issues in dispute, and (3) utilizes a sound and reliable methodology. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778–82 (7th Cir. 2017); *Chapman v. Maytag Corp.*, 297 F.3d 682, 686–88 (7th Cir. 2002) (reversing district court's refusal to exclude proffered expert because expert's "[p]ersonal observation is not a substitute for scientific methodology," and because expert "failed to satisfy any of the other Daubert guideposts for reliability"); *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 345 (7th Cir. 1995) (similar).

## IV. ARGUMENT

### A. Callan's Opinion that Pentobarbital is "Likely Present" in Champion's Finished Pet Food Products at "Some Level" is Baseless, Speculative, and Irrelevant

Callan first opines that pentobarbital is "likely present at some level" in Champion's finished pet food products, and implies that those products therefore were unsafe for animal consumption. Callan Report at 1. But he concedes he did no actual testing of Champion's finished

product to support his conclusion and did not review testing performed by anyone else that supports his opinion. *See id.* In contrast to his conclusion, Champion's testing by Texas A&M Veterinary Medical Diagnostic Laboratory (TVMDL) did ***not*** detect the presence of pentobarbital in Champion's finished product. *See* CPF2118823, TVMDL Test Results ("**Exhibit 2**"). Thus, Callan's opinion does not remotely satisfy even the basic elements of Rule 702 that his opinion be based on sufficient facts or data. *See Porter v. Whitehall Lab'ys, Inc.*, 9 F.3d 607, 611 (7th Cir. 1993) ("An expert's mere guess or conjecture . . . must be excluded."). To make matters worse, not only is his opinion founded on nothing but his own speculation (and therefore cannot be tested or verified), but it is squarely contradicted by the actual scientific testing that has been done on those products to date—testing that Callan notably takes no issue with. Put simply, Callan's opinion is pure *ipse dixit*, and it is ultimately irrelevant to the merits questions presented here. Indeed, opinions that are "connected to existing data only by the *ipse dixit* of the expert" are the hallmark of inadmissible testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999). *See, e.g., Chapman*, 297 F.3d at 688 ("[u]nsubstantiated testimony, such as this, does not ensure that the expert's opinion has a reliable basis in knowledge and experience of his discipline."); *Weir v. Crown Equip. Corp.*, 217 F.3d 453, 461 (7th Cir. 2000) (affirming district court's exclusion of expert testimony as inadmissible because "[a]ny alleged design defect which had nothing to do with plaintiffs injury is irrelevant").

Moreover, the real scientific evidence in this case underscores how baseless Callan's opinions really are. First, Callan openly admitted during his deposition *both* that TVMDL's testing on Champion's foods for pentobarbital found no detectable amount present, *and* that he has no criticism whatsoever of that testing or TVMDL's conclusions:

> Q: And then [your report] goes on to state, 'While third party testing performed by Champion did not detect pentobarbital in the finished kibble product, prior research has demonstrated that pentobarbital is not destroyed during

kibble manufacturing and is likely present at some level in the finished protect given the contamination of certain raw materials.' ... And the third-party testing you're referring to here in your summary of opinion is that done by the Texas A&M laboratory?

A: Correct.

…

Q: Now, Texas A&M's testing showed non-detects below a level of detection of 2 parts per billion; correct? A: That sounds right, yes. Q: Do you have any expert opinion that's critical of Texas A&M's, you know, method validation, their procedures, or how they implemented the testing on ... Champion's samples?

A: I do not, no.

Deposition of Sean Callan, dated August 20, 2019 ("**Exhibit 3**," hereinafter, "Callan Trs.") at 9:4-16, 29:8-16.

Since Callan has no criticism of TVMDL's testing, one would expect him to produce his own test results showing that pentobarbital was in fact present in Champion's finished product—otherwise his opinion is nothing but conjecture. But Callan acknowledged that neither he, nor anyone working for his laboratory, has ever tested any Champion dog food for pentobarbital, much less conducted an analysis or study to see if some amount of pentobarbital present in a raw ingredient necessarily continues to be present in the finished product:

Q: Have you ever conducted any testing where you took an ingredient that had a certain level of pentobarbital in it, and then after the processing of that ingredient into a finished product, then tested the finished product to determine -- you know, to compare the ... difference between the level of pentobarbital in the ingredient to the finished product?

A: To my knowledge, we've never performed that experiment.

Q: Have you reviewed any study that performed such an experiment?

A: Not to my knowledge, no.

Q: Are you aware of any such experiment ever having been performed?

A: Not to my knowledge, no.

Q: Okay. As far as testing here, are you aware of any testing that plaintiffs have conducted on Champion pet food products for the presence of pentobarbital?

A: Not to my knowledge, no.

Q: Did Ellipse Analytics ever test Champion pet food for pentobarbital at any time?

A: Not to my knowledge. I don't recall that, actually.

Callan Trs. at 65:12-66:11.

Indeed, Callan had the opportunity to conduct his own testing of Champion's finished product made with the affected beef tallow, and failed to do so. Plaintiffs requested a sample of all of Champion's potentially affected products, and Champion was willing to produce them, yet Plaintiffs ultimately decided not to conduct any testing, and Callan did not even know that Plaintiff's counsel had requested a sample. *Id*. at 97:2-17.

Finally, Callan readily conceded that in order for one of Champion's products to be considered "adulterated" under the FDA's definition of that term, Champion's finished product would need to have some amount of pentobarbital detected—a prerequisite that TVMDL's analysis showed has not been satisfied here:

Q: During the Evanger's pet food recall, the FDA stated ... 'The detection of pentobarbital in pet food renders the product adulterated in violation of the Federal Food, Drug, and Cosmetic Act.' ... Have you read the statement by the FDA previously, other than in what was posted by CLP?

A: I have.

Q: And what's the context in which you've read this statement by the FDA previously?

A: Well, as we've discussed previously during this deposition, at one point I tested -- or the company I work for tested pet foods for pentobarbital, and in the course of investigating why that might be something worth looking into and testing, I read about why it matters.

Q: ... And the reason why it matters is that ... if pentobarbital is detected in pet food, then that might be considered illegal. Is that your understanding?

A: It's considered an adulterated product.

Q: **And to be adulterated, it has to be detected; correct?** ... Is that your understanding?

A. **Yes, that is my understanding**.

Callan Trs. at 103:18-104:21 (emphasis added). Callan offered no other authoritative definition by which a product could be considered "adulterated" based upon the non-detectable presence of a substance.

In short, Callan's opinion is not based on a reliable methodology, but instead consists of the baldest of expert say-so, and is irrelevant in any event. That is because he cannot testify that pentobarbital was ever present at a detectable level in any of Champion's finished food products, which is a prerequisite to being considered adulterated under the law, as Callan concedes. Therefore, his conclusions relating to pentobarbital do not satisfy the requirements of Rule 702. *See, e.g.*, *Navarro v. Fuji Heavy Indus., Inc.*, 117 F.3d 1027, 1031 (7th Cir. 1997) (Posner, J.) (affirming order striking expert because testimony "amount[ed] to nothing more than [a] truism," and "a conclusion without any support is not based on expert knowledge and entitled to the dignity of evidence") (citation omitted); *Andersen v. City of Chicago*, 454 F. Supp. 3d 740, 745 (N.D. Ill. 2020) (Kendall, J.) ("Brzeczek essentially asks this Court, and any factfinder, to take him at his word that his opinions are correct, without supporting them. That is not a reliable methodology.").

### B. Callan's Opinion that Champion's Sampling "was Insufficient to Assess the Actual Risk" because the Sample Size was "Too Small" is Baseless, Speculative, and Contrary to the Extant Record Evidence

Despite not offering any testing of his own, Callan nonetheless offers an opinion that Champion's own testing was insufficient and unreliable. Callan Report at 1. Callan's testimony on this topic should be excluded because he concedes he has no basis for opining that Champion's pentobarbital sampling was insufficient. As such, Callan's opinion does not pass Rule 702 muster. *See, e.g.*, *Timm*, 932 F.3d at 993 (reasoning proffered expert "needed to show that his conclusions were the fruit of a rigorous, objectively-verifiable approach—something more than mere

speculation."); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term.").

First, Callan concludes that Champion's sampling was "insufficient," despite the fact that he does not know how or how often Champion sampled its finished product for pentobarbital:

> Q: Were there any production runs made out of that JBS tallow where there was no sampling done?
>
> A: I can't know that without knowing how many production runs were there. I know that they made 1.7 million pounds of kibble and tested less than a pound of it.
>
> Q: Again, you don't know whether there was any production run that had no sampling taken from it, do you?
>
> A: I would have to know how many production runs there were in order to know that. I know they tested 11 instances of product. That -- and in order to know whether that represents the totality, we would have to know how many total runs. Since I don't know how many total runs, I can't answer that question.
>
> …
>
> Q: Now, in the production line, when Champion's producing kibble, how often are samples pulled?
>
> A: I don't know the answer to that.
>
> Q: ...[H]ow long does the production run typically take? ... How long is a typical production run?
>
> A: I don't know the answer to that.
>
> Q: During a typical production run, how many samples are typically pulled?
>
> A: I don't know the answer to that.
>
> …
>
> Q: And again ..., you don't know or have an understanding of how many manufacturing runs actually had been produced using the tallow from JBS that had tested positive?
>
> A: That is correct.

Callan Trs. at 20:25-21:15, 28:17-29:7, 79:7-11.

Second, Callan readily concedes that he has no idea how Champion created the composite samples it sent to TVMDL for testing, and thus cannot possibly have any basis for suggesting that they were "inadequate" in some (undefined) way:

> Q: Now, the samples that were sent to Texas A&M's laboratory were composite samples, weren't they?
>
> A: That sounds right, yes.
>
> Q: Yeah. And what's your understanding of how Champion created the composite sample?
>
> A: I don't recall reading how they created the composite sample.

Callan Trs. at 21:16-22.

In fact, Champion's composite samples were systematically selected by Champion employees. After Champion learned from JBS that two of lots of tallow JBS shipped to Champion contained trace amounts of pentobarbital, Champion determined that the tallow in question had been used in, at most, a total of six production runs, which were comprised of eleven production shifts. *See* Declaration of Gayan Hettiarachchi in support of Champion's Motion for Summary Judgment dated August 13, 2019, filed in *Weaver v. Champion Petfoods*, No. 2:18-cv-1996-JPS, ECF No. 51-16 (E.D. Wis.) ("**Exhibit 4**," hereinafter, "Hettiarachchi Decl.") at ¶ 14. Champion took approximately 4.5- to 6-ounce samples out of larger 18-ounce samples that had been collected during the course of business, and mixed them together to create eleven individual, properly mixed and homogenized composite 18-ounce samples. *Id.* at ¶¶ 15-16. These samples were representative of all eleven production shifts using the affected JBS beef tallow. *Id.* at ¶ 17. The samples were then sent to TVMDL, whose testing revealed that there was no detectable amount of pentobarbital in Champion's finished dog food. Ex. 2 at p. 3.

Third, although Callan opines that Champion's testing plan was insufficient, he offers nothing to explain what a "sufficient" testing plan should entail, or what Champion failed to do,

in support of his "insufficiency" opinion. His ignorance regarding a baseline testing regimen manifested itself throughout his deposition testimony:

Q: Do you have an opinion as to how large of a ... sample should have been —

A: Not without performing a statistical analysis.

…

Q: Do you have an opinion as to what Champion's test plan should have been given the circumstances of receiving the tallow from JBS that had tested positive for pentobarbital?

A: Not as part of this report, though I do have an opinion.

Q: Well, let me ask you, are you — are you providing an opinion in this ca- -¬an expert opinion in this case as to what the test plan should have been?

A: I can do that, yes.

Q: Okay. It's not in your report; correct?

A: No, it is not in my report.

…

Q: By the way, going back to testing, have -- have you ever developed a test plan for a company for pentobarbital?

A: Not to my knowledge.

Q: Have you ever, yourself, conducted statistical analysis to determine what would be an adequate sample size with respect to the production of food?

A: With respect to pentobarbital?

Q: Right. We'll start with pentobarbital.

A: Not to my knowledge, no.

Callan Trs. at 26:25-27:3, 23:3-15, 30:10-20.

Furthermore, Callan openly admits that he *never even tried* to determine what would be a statistically significant sample size, and it necessarily follows that he cannot possibly provide any opinion or testimony that will assist the jury or the Court in answering the merits questions presented here:

> Q: Your last sentence [of your report] states, 'As such, a statistically representative sample would require significantly more testing than was conducted by Champion.' Correct?
>
> A: That is correct.
>
> Q: ...And again, you have no opinion as to how much more, you know — [w]hen you say 'significantly,' you have no opinion as to how much more testing should have been conducted in order to have a statistically representative sampling?
>
> A: That was not an analysis I performed as part of this report.

Callan Trs. at 84:17-85:5.

Plaintiffs cannot rebut something with nothing. Where, as here, the test results fail to support Callan's opinions, and he has no basis to opine that Champion's method for generating composite samples was not representative of the respective production runs, he should not be permitted to present his unsupported opinions to a jury.[1] Such unsupported opinions could not possibly be helpful to a jury, and the Court's gatekeeper function is specifically intended to leave such opinions on the outside looking in.

**C. Callan's Opinion that Pentobarbital Must Remain in the Beef Tallow on the Asserted Basis that Tallow is "Heterogeneous" is Baseless and Speculative**

Callan's third opinion is that pentobarbital concentrations would not degrade before or during use because tallow supposedly is "heterogene[ous]." Callan Report at 4. This conclusion is not backed up by any testing, research, or data, and it is plucked from the same ether as his other opinions. Callan repeatedly admits that he has no basis whatsoever for this opinion, and that he failed to do even the most basic work necessary to offer opinions or testimony that actually would assist the factfinder in deciding this question. *See, e.g., Kopplin v. Wisconsin Central Ltd.*, 914 F.3d 1099, 1104 (7th Cir. 2019) (excluding expert opinion where proffered expert never even

---

[1] In addition, third-party technical consultant Exponent conducted a worst-case hypothetical risk assessment and concluded that any possible level of pentobarbital in the finished product would be at such a minimal level that the food posed no risk of harm to a dog if eaten. Hettiarachchi Decl. at ¶ 18, Ex. A.

considered other factors relevant to his opinion); *Lewis*, 561 F.3d at 706 (affirming exclusion of expert testimony where there were "several notable gaps" and expert "failed to support his conclusions" and "failed to consider and discount other potential causes"); *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904-05 (7th Cir. 2007) (affirming exclusion of expert who lacked reliable basis for opinion and who could not point to data or articulate any explanation supporting conclusion); *Chapman*, 297 F.3d at 688 (finding expert's theory was "unsupported by any article, text, study, scientific literature or scientific data produced by others in his field").

First, Callan is not qualified to testify as an expert on this subject, because he does not have relevant "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. He candidly conceded that he has no experience with facilities where beef tallow and beef meal are rendered, and he thus cannot possibly testify as to the role of "rendering" in determining whether a raw ingredient is or is not "homogeneous" or "heterogeneous":

> Q: What's your understanding of JBS's flush process as it applies to Champion?
>
> A: Only that they were supposed to perform one.
>
> Q: In your professional work, have you ever dealt with a flush process before?
>
> A: I have not.
>
> Q: Have you ever had any experience with rendering facilities?
>
> A: Not specifically, no.
>
> Q: When MOPAC [JBS] collected samples for testing, how did it do that?
>
> A: I am not familiar with how they did that.

Callan Trs. at 35:4-15.

Second, Callan acknowledged that he does not know how the JBS tallow was transported to Champion's DogStar Kitchen, which means he has no basis to offer any opinion about the role of transport in determining whether a raw ingredient is or is not "heterogeneous":

Q: How was the JBS/MOPAC tallow transported to Champion?

A: I don't recall that specifically, although I believe it's shipped in a truck.

Q: ...And during transportation from JBS/MOPAC to the DogStar kitchen owned by Champion, in what state was the tallow?

A: ... [Y]ou mean state, like state of matter or like state of the union?

Q: Let's say at room temperature, would tallow be in a solid form or a liquid form?

A: I believe tallow is in like a sort of semi-solid, sort of waxy-type form, when it's in its -- when it's in its native state.

Q: During shipment, is the tallow heated at all?

A: I am not familiar with that.

Callan Trs. at 36:2-21.

Third, Callan admitted that he does not know how Champion stores tallow, whether Champion receives and keeps its tallow in liquid form, whether Champion continuously mixes the liquified tallow, whether Champion maintains tallow within a heated storage tank, or whether the way in which Champion stores its tallow results in a "homogenous" rather than "heterogenous" ingredient—all of which underscores the impropriety of his opinion:

Q: Once the truck containing the tallow arrives at Champion, what is the process for the tallow to get out of the truck and into some type of storage?

A: I'm not familiar with that.

Q: Is a pump used?

A: I'm not familiar with that.

Q: ... How does Champion store tallow that it receives?

A: I'm not familiar with that.

Q: ... Is the tallow stored under temperature?

A: I'm not familiar with that.

Q: Is the tallow stored in a storage tank where there's a pump at the bottom of the tank that continuously pumps the liquid at the bottom and then lets it off at the top?

A: I'm not familiar with that.

…

Q: How is the tallow used by Champion in the production process for dry kibble dog food?

A: I'm not an expert in dog food manufacturing, but I believe tallow is sprayed on as part of the [palliative] process.

Q: And to what degree is the spraying uniform among the kibble food?

A: That would entirely depend on the execution. I don't know. I know that the amount of tallow used varies....

Q: Well, the ... range of tallow use varies by diet?

A: Certainly. So there is some variability there. It's not uniform across diet. And so I have no way of knowing whether it's uniform within a given product.

Q: All right. So within a given production run, do you know whether the spraying of the tallow is uniform within that production run?

A: I have no way of knowing that.

Callan Trs. at 36:18-37:9, 39:12-40:9.

Fourth, Callan admitted that *he has never conducted even a single test* of the qualities of the tallow Champion received from JBS to determine whether it is in fact homogeneous or heterogeneous, and he *does not even have an opinion* as to whether the pentobarbital he claims was present in Champion's products degraded over time, or by how much—all of which, yet again, confirms his lack of basis to testify on this issue:

Q: Have you conducted any testing as to the heterogeneity or homogeneous qualities of the pentobarbital from JBS/MOPAC that was received by Champion?

A: Not personally, though I've reviewed data showing that there is variability in the amount of pentobarbital present in lots of the tallow received.

…

Q: Do you have an opinion as to whether and to what extent any degradation of pentobarbital occurred in the Champion finished pet food product?

A: Not as part of my report.

Callan Trs. at 38:16-22, 12:1-4.

## V. CONCLUSION

For the foregoing reasons, Callan's pentobarbital report should be excluded in its entirety, and he should be barred from testifying as to the opinions contained in that report at trial.

Dated: June 8, 2021

Respectfully submitted,

s/ *David A. Coulson*

David A. Coulson (ARDC #6199911)
Jessica J. Fishfeld (ARDC #6313149)
Jared R. Kessler (Admitted *pro hac vice*)
Robert S. Galbo (Admitted *pro hac vice*)
Elisa H. Baca (Admitted *pro hac vice*)
GREENBERG TRAURIG P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
Tel: (305) 579-0754
Fax: (305) 579-0500
Email: coulsond@gtlaw.com
johnsonj@gtlaw.com
kesslerj@gtlaw.com
galbor@gtlaw.com
bacae@gtlaw.com

Francis A. Citera (ARDC # 6185263)
GREENBERG TRAURIG LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Tel: (312) 456-8400
Fax: (312) 456-8435
Email: citeraf@gtlaw.com

Rick L. Shackelford, Esq. (*pro hac vice*)
GREENBERG TRAURIG LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Tel (310) 586-3878
Fax (310) 586-7800
Email: shackelfordr@gtlaw.com

***Attorneys for Defendants***
***Champion Petfoods USA Inc. and***
***Champion Petfoods LP***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of June, 2021, I served the foregoing document on all counsel of record identified on the below Service List via Registered Email.

*/s/ David A. Coulson*
DAVID A. COULSON

## SERVICE LIST

Charles J. LaDuca
Katherine Van Dyck
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Tel: 202-789-3960
Email: charlesl@cuneolaw.com
Email: kvandyck@cuneolaw.com

Rebecca A. Peterson
Robert K. Shelquist
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave. S., Suite 2200
Minneapolis, MN 55401
Tel: 612-339-6900
Email: rapeterson@locklaw.com
Email: rkshelquist@locklaw.com

Kevin A. Seely
ROBBINS LLP
5040 Shoreham Place
San Diego, CA 92122
Tel: 619-525-3990
Email: KSeely@robbinsllp.com

Daniel E. Gustafson
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: 612-333-8844
Email: dgustafson@gustafsongluek.com

*Attorneys for Plaintiffs*

Kenneth A. Wexler
Kara A. Elgersma
Michelle Perkovic
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Tel: 312-346-0022
Email: kaw@wexlerwallace.com

Mark J. Tamblyn
WEXLER WALLACE LLP
333 University Ave., Suite 200
Sacramento, CA 95825
Tel: 916-565-7692
Email: mjt@wexlerwallace.com

Joseph J. DePalma
Susana Cruz Hodge
LITE DEPALMA GREENBERG, LLC
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Email: jdepalma@litedepalma.com
Email: scruzhodge@litedepalma.com