UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS (Chicago)

| | |
|---|---|
| **AFSHIN ZARINEBAF, ZACHARY CHERNIK, and JOAN MEYER**, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>**CHAMPION PETFOODS USA INC. and CHAMPION PETFOODS LP,**<br><br>Defendants. | Case No.: 1:18-cv-06951<br>Hon. Virginia M. Kendall |

**DEFENDANTS' CORRECTED* MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE PLAINTIFFS' EXPERT STEFAN BOEDEKER**

* This Memorandum of Law was originally filed as ECF No. 117 and has been corrected to include functioning hyperlinks in compliance with the Honorable Virginia Kendall's Case Procedures.

# TABLE OF CONTENTS

I. INTRODUCTION ... 1

II. RELEVANT BACKGROUND AND CLAIMS AT ISSUE ... 3

A. Boedeker's Unscientific Expectation Survey. ... 3

B. The Alleged Misrepresentations Surveys. ... 6

C. The Alleged Omissions Surveys. ... 7

D. Boedeker's Damages Estimates. ... 7

III. LEGAL STANDARD ... 8

IV. BOEDEKER'S EXPECTATION SURVEY IS FATALLY FLAWED BECAUSE HE IGNORES SOUND SCIENCE BY FAILING TO USE A CONTROL GROUP ... 10

V. BOEDEKER'S OPINIONS ARE NOT RELEVANT TO PLAINTIFFS' CLAIMS ... 14

A. Boedeker cannot calculate class-wide damages if misrepresentations and omissions are at issue in this case. ... 14

B. Boedeker estimates only a change in WTP, not a change in market price and therefore cannot estimate the damages Plaintiffs seek. ... 17

VI. METHODOLOGICAL ERRORS MAKE BOEDEKER'S SURVEYS AND OPINIONS UNRELIABLE ... 21

A. Boedeker ignores survey best-practices by failing to conduct a pre-test of the Expectation Surveys. ... 22

B. Boedeker sampled in each of his surveys an irrelevant population; consequently, his analysis is meaningless to Plaintiffs' claims. ... 23

VII. CONCLUSION ... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Honda Motor Co. v. Allen*,
600 F.3d 813 (7th Cir. 2010) ....................................................................................9

*Andersen v. City of Chicago*,
454 F. Supp. 3d 740 (N.D. Ill. 2020) (Kendall, J.) ..................................................22

*Apple, Inc. v. Samsung Elecs. Co.*,
No. 11-CV-01846-LHK, 2014 WL 976898 (N.D. Cal. Mar. 6, 2014) ...................................21

*Chapman v. Maytag Corp.*,
297 F.3d 682 (7th Cir. 2002) ....................................................................................10

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)..............................................................................15, 16, 17

*Competitive Edge, Inc. v. Staples, Inc.*,
763 F. Supp. 2d 997 (N.D. Ill. 2010) (Kendall, J.) ..................................................24

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)..............................................................................9, 10

*Deimer v. Cincinnati Sub- Zero Prods., Inc.*,
58 F.3d 341 (7th Cir. 1995) ....................................................................................10

*In re Fluidmaster, Inc. Water Connector Components Prods. Liab. Litig.*,
No. 14-cv-5696, 2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) ........................................16, 20

*General Elec. Co. v. Joiner*,
522 U.S. 136 (1997)..............................................................................21

*In re General Motors LLC Ignition Switch Litig.*,
407 F. Supp. 3d 212 (S.D.N.Y. Aug. 6, 2019)...........................................17, 18, 19, 20, 21

*Gopalratnam v. Hewlett-Packard Co.*,
877 F.3d 771 (7th Cir. 2017) ....................................................................................9

*Hernandez v. Attention, LLC*,
429 F. Supp. 2d 912 (N.D. Ill. 2005) ........................................................................13

*In re: Kind LLC "Healthy and All Natural" Litigation*,
No. 15md2645, 2021 WL 1132147 (S.D.N.Y. Mar. 24, 2021) ...............................................21

*Kumho Tire Co. Ltd. v. Carmichael*,
526 U.S. 137 (1999)..............................................................................9

*Lewis v. CITGO Petroleum Corp.*,
561 F.3d 698 (7th Cir. 2009) ....................................................................................9

*MacDougall v. Am. Honda Motor Co., Inc.*,
No. SACV 17-1079 JGB, 2020 WL 5583534 (C.D. Cal. Sept. 11, 2020) ........................20, 23

*Marion Healthcare, LLC v. Southern Ill. Healthcare*,
No. 3:12-cv-871 (MAB), 2020 WL 1527771 (S.D. Ill. March 31, 2020) ....................16

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
238 F. Supp. 2d 1024 (N.D. Ill. 2003) ....................13

*Moore v. P&G-Clairol, Inc.*,
781 F. Supp. 2d 694 (N.D. Ill. 2011) (Kendall, J.) ....................22

*In re NJOY, Inc. Consumer Class Action Litig.*,
No. CV 14-428 (JFW) (JEMx), 2016 WL 787415 (C.D. Cal. Feb. 2, 2016) ....................21

*Price v. L'Oreal United States, Inc.*,
No. 17 Civ. 614 (LGS), 2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020) ....................20

*Rosen v. Ciba-Geigy Corp.*,
78 F.3d 316 (7th Cir. 2009) ....................9

*Timm v. Goodyear Dunlop Tires NA., Ltd.*,
932 F.3d 986 (7th Cir. 2019) ....................9

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*,
No. 3:17-cv-4372-CRB, 2020 WL 6688912 (N.D. Cal. Nov. 12, 2020) ....................20

*Weaver v. Champion Petfoods USA Inc.*,
No. 18-CV-1996-JPS-JPS, 2019 WL 7370374 (E.D. Wis. Dec. 31, 2019) ....................13

**Other Authorities**

Fed. R. Evid. 702 ....................8, 17

Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011),
*available at* https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf .................... *passim*

## I. INTRODUCTION

Plaintiffs in this putative class action claim they were damaged by overpaying for Champion pet foods due to misrepresentations on, and omissions from, Champion's ORIJEN and ACANA pet food packaging. Specifically, Plaintiffs claim the following statements on Champion's packaging are false or misleading: (i) Biologically Appropriate, (ii) Fresh Regional Ingredients, and (iii) Delivering Nutrients Naturally[1] (the "Alleged Misrepresentations"). Plaintiffs also claim that Champion made the following material omissions from its packaging: (i) Heavy Metals (Lead, Arsenic, Mercury, Cadmium), (ii) Bisphenol A (BPA), (iii) Regrinds, and (iv) Expired Ingredients (the "Alleged Omissions").

In an effort to establish the material impact of the Alleged Misrepresentations and Alleged Omissions and to quantify their claimed benefit-of-the-bargain damages (*i.e.*, the price paid minus the fair market value of the goods received), Plaintiffs employed Stefan Boedeker ("Boedeker") to design and conduct five consumer survey experiments: (1) a survey purportedly measuring consumer perception of the Alleged Misrepresentations and Alleged Omissions and assessing whether they would affect consumer purchasing interest (the "Expectation Survey"), (2) two conjoint surveys purporting to measure the change in survey respondents' willingness to pay for Champion foods due to the Alleged Misrepresentations; one survey for ORIJEN diets and one for ACANA diets (the "Alleged Misrepresentation Surveys"), and (3) two additional conjoint surveys purporting to measure the change in survey respondents' willingness to pay for Champion foods due to the Alleged Omissions; again, one survey for ORIJEN diets and one for ACANA diets (the "Alleged Omissions Surveys").

Boedeker's Expectation Survey fails to adhere to the most basic principle of scientific

---

[1] The phrase "Delivering Nutrients Naturally" only appears on ACANA bags. *See* Plaintiffs' Motion for Class Certification [ECF No. 95] at p. 2.

research: use of a control group. Using a control is fundamental when the objective of the experiment is to provide a basis for inferring cause and effect, as Boedeker concedes his Expectations Survey was meant to do. But despite consensus that a control is necessary in any valid survey experiment, Boedeker forgoes one. Since the Expectations Survey was intended to test the materiality of Alleged Misrepresentations and Alleged Omissions, Boedeker set out to determine whether the Misrepresentation or Omissions would cause a change in consumer behavior. But change is measured relative to a baseline, which is provided by responses from a control group in a properly designed survey experiment. Without such a baseline, it is impossible to measure any "change," and thus any opinion Boedeker offers based on his Expectations Survey is sheer guesswork.

Turning to Boedeker's conjoint surveys, they were done for the purpose of estimating the harm to purchasers of Champion foods from paying more than fair market value for the products due to the Alleged Misrepresentations and Alleged Omissions. His surveys fail of their essential purpose. First, Boedeker's conjoint surveys are one-sided experiments designed to measure changes in respondents' willingness to pay based upon combinations of Alleged Misrepresentations and Alleged Omissions. But even perfectly designed and perfectly executed conjoint studies only tell half the story, because they measure only demand-side effects and ignore supply-side effects. Basic economics instructs that market prices (in both the real and "but-for" worlds) are determined by the intersection of demand ***and*** supply. Since Boedeker ignores supply-side factors, he cannot reliably estimate market price (or a change in market price). As such, conjoint studies alone are insufficient calculate a fair market value of Champion products in a "but for" world in which the packages do not contain the Alleged Misrepresentation and/or disclose the Alleged Omissions. And because Plaintiffs' theory of harm is based upon paying more than the

fair market value of the products, Boedeker's survey is inadequate to the task, even if it had been perfectly designed and perfectly executed.

And it was neither. The survey instrument itself was plagued with improper questions and other design flaws. The flawed survey then was administered to the wrong population. It was not limited to people who had purchased Champion products – including many people who volunteered that they were never in the market for such expensive pet foods. Boedeker ignored such comments, which makes any opinions he expresses based upon his fatally flawed survey worthless. They should be excluded as both irrelevant, as well as for failing to satisfy *Daubert*.

Moreover, he cannot use these conjoint surveys to propose a methodology that isolates damages to each of Plaintiffs' theories of liability. Although Boedeker purportedly estimated (i) damages attributable to all combinations of the Alleged Misrepresentations, and (ii) damages attributable to all combinations of the Alleged Omissions, he does not—and admittedly cannot—combine the data generated separately from these four separate surveys to estimate damages when misrepresentations ***and*** omissions are at issue. Even though Plaintiffs claimed to have been damaged as a result of both misrepresentations and omissions, Boedeker concedes that it would be "inappropriate" to mix and match the results of his separate surveys in an attempt to make them fit both parts of Plaintiffs' damages theory. He thus offers no damages model that can isolate damages for any combination of misrepresentations and omissions (both of which are at issue in Plaintiffs' claims). His model therefore does not fit with Plaintiffs' theories of liability and should be excluded for this reason as well.

## II. RELEVANT BACKGROUND AND CLAIMS AT ISSUE

### A. Boedeker's Unscientific Expectation Survey.

Boedeker conducted his Expectation Survey to purportedly (1) measure consumer perception regarding the alleged misrepresentations and omissions at issue, and (2) assess the

extent to which those misrepresentations and omissions have a material impact on consumer purchase interest. *See* Expert Report of Stefan Boedeker Report [ECF No. 95-71] ("Boedeker Report," and a full copy of Report with appendices is attached hereto as "**Exhibit 1**") ¶ 173. The Expectation Survey consisted of a nationwide panel of 500 respondents who were randomly assigned to separate ORIJEN and ACANA studies. *See Id.* ¶ 177. Respondents were shown either an image of the front of a 25-pound bag of ORIJEN Regional Red dry dog food with a statement that the dog food sold for $114.99/bag or a 25-pound bag of ACANA Regional Meadowland dry dog food together with a statement that the dog food sold for $66.99/bag. *See* Ex. 1 at pp. 127, 199, App'x 1. Respondents next saw an image of the back of the package. *See id*. After viewing the packaging images, respondents received the following instruction:

> *We are interested in your expectations as to the dog food you just viewed. Based on what you recall from the dog food packaging you just reviewed, please select the one response closest to your opinion. If you don't know or are not sure, please indicate so.*

Boedeker Report ¶ 177. Without any context, survey respondents were then asked a series of agree/disagree questions relating to either the ACANA or ORIJEN packaging that the respondents were shown, an example of which is reflected below:[2]

---

[2] Boedeker's decision to use closed ended agree/disagree questions makes his failure to employ a control group inexcusable. As noted in the *Reference Manual on Scientific Evidence* (3d ed. 2011):

> One form of close-ended question format that typically produces some distortoin is the popular agree/disagree, true/false, or yes/no question. Although this format is appealing because it is easy to write and score these questions and their responses, the format is also seriously problematic. With its simplicity comes acquiescence, "[T]he tendency to endorse any assertion made in a question, regardless of content," is a systematic source of bias that has produced an inflation effect of 10% across a number of studies. ***Only when control groups are added to the survey design can this question format provide reasonable response estimates.***

Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011), *available at* https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf, (hereinafter, "*Reference Manual on Scientific Evidence*") at p. 394 (emphasis added).



*If you would like to look at the front and back of the dog food again, click/touch on its image and a large image will appear for you to examine.*

From the "**Biologically Appropriate**" statements on the dog food shown, I would expect that...

**The dog food shown does not contain pentobarbital.**

Strongly Disagree | Disagree | Neither Agree Nor Disagree | Agree | Strongly Agree | Don't know/ Unsure

**The dog food shown does not contain BPA (Bisphenol A).**

Strongly Disagree | Disagree | Neither Agree Nor Disagree | Agree | Strongly Agree | Don't know/ Unsure

**The dog food shown does not contain heavy metals.**

Strongly Disagree | Disagree | Neither Agree Nor Disagree | Agree | Strongly Agree | Don't know/ Unsure

*See* Ex. 1 at pp. 445-46, App'x 1. Finally, respondents answered a series of additional questions in which they were asked to indicate whether a particular given label or statement made them more likely or less likely to purchase the ACANA or ORIJEN product they saw. *See id.* For example:



*If you would like to look at the front and back of the dog food again, click/touch on its image and a large image will appear for you to examine.*

All else equal, d ... hown?

(For each statement




Far less likely | Less likely | Same | More likely | Far more likely




Far less likely | Less likely | Same | More likely | Far more likely

*See id*. at pp. 456-57. Despite having no control group to establish respondents' baseline impressions, Boedeker nonetheless opined that "a significant portion of consumers interpret the Products' packaging to be misleading, assuming Plaintiffs' allegations are true" and that "67.9% to 77.5% of respondents would be more likely to purchase the dog food bag shown if it did not contain BPA, pentobarbital, heavy metals, regrinds, or expired ingredients, respectively." Boedeker Report ¶¶ 179, 180.

### B. The Alleged Misrepresentations Surveys.

Although he calls his Alleged Misrepresentations Surveys choice-based conjoint surveys, they plainly are not, because Boedeker removed the element of "choice" from the respondents. Boedeker instructed survey participants to assume they were purchasing either (i) a 13-pound bag of ORIJEN Regional Red dry dog food or (ii) a 25-pound bag of ACANA Regionals Meadowland dry dog food. *See* Ex. 1 at pp. 127, 199, App'x 1. He then instructed participants to review images of the front and back of the product's packaging, followed by close-up images of several labels on the product's packaging, including the Alleged Misrepresentations. *See* Boedeker Report, at pp. 50-51, Table 8; *id.* at 54-55, Table 9. These labels encompass the attributes to be tested by way of the conjoint studies and include information that appeared on Champion's ORIJEN or ACANA packaging as well as "decoy" labels that did not appear on Champion's packaging.

After instructing the respondents that they were going to buy the product, and after showing images of the products' labels (or decoy labels) Boedeker presented the survey respondents with choice tasks featuring two different sets of labels, each with a given price. *See, e.g.,* Boedeker Report ¶¶ 136, Figure 7. Respondents were then asked to choose which of the two sets of labels they would prefer given the prices shown, and then asked if they would purchase the bag with the labeling option they selected. *See id.*

### C. The Alleged Omissions Surveys.

Boedeker's Alleged Omissions Survey proceeded in somewhat similar fashion, but, rather than tied to the at-issue ORIJEN and ACANA pet foods, Boedeker again instructed survey participants to assume they were purchasing a 25-pound bag of their "favorite dry dog food." *See* Ex. 1 at pp. 315, 390, App'x 1. "[N]o packaging image was presented" to the participants, *see* Boedeker Report ¶ 138, but Boedeker asked respondents to view five attribute descriptions, drafted by Plaintiffs' counsel, which *hypothetically could* appear on the product packaging. The text of those fabricated labels is re-printed below:

**Table 10: Orijen/Acana Omission Survey - Attribute Description**

| Attribute | Description |
|---|---|
| Artificial Preservatives | May contain artificial preservatives. Artificial preservatives are added to food to fight spoilage caused by bacteria, molds, fungus, and yeast. |
| Expired Ingredients | May contain expired ingredients. Expired ingredients are ingredients that have passed their "shelf life" date. |
| Heavy metals | May contain measurable amounts of heavy metals such as lead, arsenic, mercury, and/or cadmium. |
| BPA | May contain measurable amounts of BPA. BPA is a chemical compound used in plastic. |
| Regrinds | May contain regrinds. Regrinds are previously made dry dog food that is ground and then used in another batch of dry dog food. |
| Price | Price per 25-pound bag |

*See* Boedeker Report ¶ 139, Table 10. After showing survey participants these lawyer-crafted statements, Boedeker presented the participants with choice tasks featuring two sets of labels, each with a set price. *See id.* ¶140, Figure 8. Respondents completed 15 of these choice tasks. *See id.* ¶137.

### D. Boedeker's Damages Estimates.

Using the data gathered from his conjoint surveys, Boedeker used regression analysis to purportedly estimate the utility or disutility that survey participants derived from each of the labels

corresponding to the Alleged Misrepresentations or the Alleged Omissions. Though the Alleged Misrepresentations Surveys and Alleged Omissions Surveys were conducted separately, and Boedeker admitted during his deposition that it would be "inappropriate" to combine the data from these surveys, Boedeker nevertheless conflated the data to purportedly estimate the median, as well as the lower and upper bound of class-wide damages, "for ***misrepresentations and omissions*** assuming that all respective claims are included in the class-wide" damages:

**Table 16: Range of Class-Wide Damages**

| Brand | Claims | Defendants' Revenue | Estimated Retail Revenue in Illinois | Damage Range: Lower Bound | Damage Range: Median | Damage Range: Upper Bound |
|---|---|---|---|---|---|---|
| Orijen | Misrepresentation | 170,408,741 | 8,236,422 | 1,574,804 | 2,003,098 | 2,403,388 |
| | Omission | | | 5,621,358 | 5,851,978 | 6,062,007 |
| Acana | Misrepresentation | 104,552,323 | 5,053,362 | 1,217,860 | 1,627,688 | 1,993,551 |
| | Omission | | | 4,137,188 | 4,280,703 | 4,401,479 |
| | **Total** | **274,961,064** | **13,289,785** | **12,551,210** | **13,763,467** | **14,860,425** |

*See* Boedeker Report ¶ 172, Table 16 (emphasis added). As a telling witness to the design and execution flaws in his work, Boedeker's median and upper bound estimates of damages to the Illinois class of purchasers exceed his approximation of Champion's total retail sales in Illinois during the class period. *See id.*

## III. LEGAL STANDARD

Rule 702 permits an expert to testify at trial only if his or her "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Expert opinions may be considered at trial only if (1) "the testimony is based on sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case." *Id.* at 702(b)-(d). To ensure that these threshold requirements are satisfied,

district courts are tasked with the role of "gatekeeper" over all proffered expert or scientific testimony. *See, e.g.*, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

As the gatekeeper, the Court must ensure that the proffered expert has the requisite "knowledge, skill, experience, training, or education relevant to such evidence or fact in issue." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010) (noting the district court's "role as 'gate keeper' and its duty to determine reliability in light of the proposed expert's full range of experience and training as well as the methodology used to arrive at a particular conclusion"); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) ("A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*.") (citation omitted); *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 2009) ("[A] district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.").

A district court must also "ensur[e] that proposed expert testimony 'is not only relevant, but reliable.'" *Timm v. Goodyear Dunlop Tires NA., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019) (quoting *Daubert*, 509 U.S. at 589). In assessing reliability, "the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions." *Id.* (citation omitted).

The proponent of the evidence bears the burden of establishing that the proffered expert actually (1) has the requisite qualifications to testify, (2) offers opinions that are relevant to the issues in dispute, and (3) utilizes a sound and reliable methodology. *Gopalratnam v. Hewlett-*

*Packard Co.*, 877 F.3d 771, 778–82 (7th Cir. 2017); *Chapman v. Maytag Corp.*, 297 F.3d 682, 686–88 (7th Cir. 2002) (reversing district court's refusal to exclude proffered expert because expert's "[p]ersonal observation is not a substitute for scientific methodology," and because expert "failed to satisfy any of the other Daubert guideposts for reliability"); *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 345 (7th Cir. 1995) (similar).

## IV. BOEDEKER'S EXPECTATION SURVEY IS FATALLY FLAWED BECAUSE HE IGNORES SOUND SCIENCE BY FAILING TO USE A CONTROL GROUP

Boedeker's Expectation Survey fails the reliability test because he ignores a foundational requirement of scientific research: a control group. Indeed, the adjective "scientific" implies "a grounding in the methods and procedures of science[,]" and "in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." *Daubert*, 509 U.S. at 590. Properly designed survey experiments compare a control group to a treatment group. *See* Expert Report of Dominique Hanssens ("**Exhibit 2**," hereinafter, "Hanssens Report") ¶¶ 112-119.

As explained in the Federal Judicial Center's Reference Manual on Scientific Research:

> A good study design compares outcomes for subjects who are exposed to some factor (the treatment group) with outcomes for other subjects who are not exposed (the control group) . . . . ***[D]ata from a treatment group without a control group generally reveal very little and can be misleading.*** Comparisons are essential.

*Reference Manual on Scientific Evidence* at pp. 218-220 (emphasis added). Control groups are necessary to reliably examine cause and effect. Indeed, the Reference Guide on Survey Evidence (included as part of the *Reference Manual on Scientific Evidence*) notes how critical control groups are when surveys are designed to test a causal proposition. *Id.* at p. 397. But even though he used closed-ended agree/disagree questions, and even though he was testing for cause – two hallmark examples of when control groups are necessary for a survey to produce any useful information -- Boedeker chose not to use a control group in his Expectation Survey. *See* Deposition of Stefan

Boedeker ("**Exhibit 3**," hereinafter "Boedeker Dep.")[3]. at 35:1-6 ("Q. Was any control group used in the expectation survey[?] A. . . . ***there was no control group***[.]) (emphasis added).

Boedeker testified that the Alleged Misrepresentations and Alleged Omissions had "some effect, some causes and effect" on purchase intent of consumers. *See* Boedeker Dep. 20:6-21:3 But these surveys likewise had no control groups, and because of that, Boedeker cannot support his cause and effect conclusion. *See* Hanssens Report ¶¶ 114-119. Indeed, "[s]urveys that merely record consumer impressions"—precisely like Boedeker's Expectation Survey—"have a limited ability to answer questions about the origins of those impressions." *Reference Manual on Scientific Evidence* at pp. 397. Boedeker's own analysis reveals this deficiency. For example, when shown the "Biologically Appropriate" statement, 38.8% of survey respondents in the ORIJEN study "agree" that the ORIJEN Regional Red diet "does not contain heavy metals."

**Figure 14: From the "Biologically Appropriate" statements on the dog food shown, I would expect that the dog food shown...**




*See* Boedeker Report ¶ 180, Table 14. The exact same percentage of respondents had an identical reaction to Champion's "Nourish as nature intended" statement:

[3] Although noticed under the case caption for *Colangelo v. Champion Petfoods USA Inc.*, No. 6:19-cv-01228 (N.D.N.Y.), the Parties agreed that Boedeker's deposition applied equally as if noticed in this case. *See* Boedeker Dep. 7:23-8:4 ("[Defendants' Counsel]: It's my understanding that we're actually taking the deposition in three different cases. So it's - - even though the notice was done for Colangelo, this will apply to the Illinois case and the Michigan case; is that right? [Plaintiffs' Counsel]: Yes, that's my understanding as well.").

**Figure 15: From the "Nourish as nature intended" statements on the dog food shown, I would expect that the dog food shown...**




*See* Boedeker Report ¶ 180, Table 15. Boedeker's data offers no insight as to which statements (if any) cause respondents' impressions or whether survey respondents would draw precisely the same conclusions about heavy metals, BPA, and pentobarbital if they were shown a modified package with the Alleged Misrepresentations removed.[4] Defying basic principles of survey science, Boedeker tried to defend his flawed approach and testified that "it was not necessary to know what people expect otherwise[.]" Boedeker Dep. 40:5-6. Yet, without a control, he cannot determine whether respondents' agreement or disagreement was due to the Alleged Misrepresentations and Alleged Omissions, or influenced by some other factors such as preexisting impressions, general expectations about dog food, or mere guessing.[5] *See* Hanssens Report ¶ 114.

Of course, Boedeker could have designed a control to determine baseline expectations[6]

[4] Boedeker admits that he did not test whether respondents drew the same conclusions without being exposed to the tested statements. *See* Boedeker Dep. 36:16-22 ("Q. What percentage of respondents would agree that the dog food had only fresh ingredients without being exposed to the fresh statement? A. . . So I did not test - - ***I did not separately test what the number of consumers is who expect that without having seen the statement***.") (emphasis added); *See id.* at 37:21-38:9 (noting that the same is true for the statements "regional," biologically appropriate," and "Nourish as nature intended").

[5] The majority of Boedeker's Expectation Survey data was collected from respondents who have not purchased the at-issue pet food. *See* Hanssens Report ¶ 110. If Boedeker limited his analysis to focus on respondents indicating that they currently reside in Illinois and purchased (or considered purchasing) ACANA or ORIJEN products in the past three years, he would have a sample of ***<u>three</u>*** respondents. *Id.*

[6] Testing baseline expectations through use of a control group is particularly important where, like here, Boedeker posed questions relating to the Alleged Misrepresentations with no context. For example, he does not inform survey respondents that heavy metals occur naturally in the ingredients used, that BPA is

towards the Alleged Misrepresentations by, for example, (i) not showing any product packaging to the respondents and then gauging their expectations regarding the Alleged Misrepresentations, or (ii) showing a modified product package with only the Alleged Misrepresentations removed. Boedeker did neither and by failing to use a control group, he ignored fundamental scientific principles. His Expectation Survey is therefore unreliable and should be excluded. *See Reference Manual on Scientific Evidence* at pp. 398-399 ("[w]ithout the control group, it is ***not possible*** to determine how much of the [effect measured] is attributable to respondents' preexisting beliefs or other background noise.") (emphasis added); Hanssens Report ¶¶112-119; *see also* Hernandez, 429 F. Supp. 2d at 917 ("The survey's fatal flaw is that it did not make use of a control group."); *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003) ("For survey results to be considered reliable, the design, administration, and interpretation of the survey must be appropriately controlled to ensure objectivity. For a survey to be properly designed, an appropriate target population must be identified, a sample that accurately reflects the target population must be selected, and procedures must be taken to reduce the likelihood of a biased sample. … The evidence shows that none of these standard protocols of survey research were observed[.]"); *Weaver v. Champion Petfoods USA Inc.*, No. 18-CV-1996-JPS-JPS, 2019 WL 7370374, *5 (E.D. Wis. Dec. 31, 2019) (excluding expert's opinions and survey because, in part, there was a "lack of a meaningful control group" and "[w]ithout a valid control group, the Court cannot conclude that the Survey is reliable or helpful").

ubiquitous in the environment, or that they are present (or at risk of being present) in nearly all dog food and are at miniscule levels that would not harm a dog that consumes the food. *See Hernandez v. Attention, LLC*, 429 F. Supp. 2d 912, 918 n.6 (N.D. Ill. 2005) (noting survey was "significantly flawed" due to "its use of questions that take provisions of the letter out of context, its lack of any indicia that the test takers were not influenced by [the] need to reach a certain outcome, and its small sample size of approximately 40 respondents.").

## V. BOEDEKER'S OPINIONS ARE NOT RELEVANT TO PLAINTIFFS' CLAIMS

### A. Boedeker cannot calculate class-wide damages if misrepresentations *and* omissions are at issue in this case.

Plaintiffs suffered damages, they claim, because they "would have not paid [Champion's] price premium" for the at-issue products if they knew of the Alleged Misrepresentations ***and*** Alleged Omissions. *See* Third Am. Compl. ("TAC") (ECF No. 68) ¶¶ 235-236. Boedeker's damages model does not fit with these claims because he did not create a model that can reliably estimate damages allegedly resulting from any combination of Alleged Misrepresentations ***and*** Alleged Omissions. Boedeker concedes that his Alleged Misrepresentations Survey and Alleged Omissions Survey are "separate surveys," and that it "would be ***inappropriate statistically speaking to mix and match the regression results*** from" those surveys. Boedeker Dep. at 93:12-14, 16-18 (emphasis added).

When questioned at deposition about whether his model could estimate damages if both misrepresentations ***and*** omissions are at issue, Boedeker deflected to Appendix 4 of his report, which purportedly shows the unique reduction in willingness to pay attributable to all combinations of Alleged Misrepresentations and all combinations of Alleged Omissions. *See* Ex. 1 at p. 479, App'x 4. However, Boedeker did not calculate the purported diminution attributable to any combination of misrepresentations ***and*** omissions, and because he conducted separate surveys, the results by design cannot account for any combination (much less all combinations) of misrepresentations and omissions. When asked about this shortcoming during deposition, Boedeker's only proposed "fix" was to sum the results of his separate Alleged Misrepresentations Surveys and Alleged Omissions Surveys. This goes against Boedeker's own admonition, that mixing and matching the data from the surveys would be "inappropriate[.]" Boedeker Dep. at 93:16-18.

The reason it would be inappropriate is self-evident. In many instances, simply adding the mixed and matched results of Boedeker's surveys would generate a diminution of value estimate exceeding 100% of the price consumers actually paid. *See* Ex. 1 at p. 479, App'x 4.[7] This absurd result suggests that Champion would sell its pet foods in Illinois at a negative price (*i.e.*, that Champion would have to pay consumers to take its food). *See* Hanssens Report ¶¶ 89-91.

The absurd results produced by Boedeker's work are a feature, not a bug, because the tools he employed are simply not suited to cover all aspects of Plaintiffs' theory of harm. Plaintiffs' damages model must be capable of isolating on any respective theory of liability. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013) (excluding damages evidence when expert could not apportion damages between multiple theories of liability). In *Comcast*, plaintiffs sued for alleged antitrust violations, based on four distinct theories of antitrust liability. *Id.* at 31. Of those liability theories, the District Court certified only one for class treatment. *See id.* As evidence of damages, plaintiffs proffered an expert who calculated class-wide damages at approximately $875 million. *Id.* at 32. The expert's model, however, did not isolate damages resulting from the single theory of antitrust liability that was accepted for class-wide treatment; rather, the damages model considered all four theories of liability. *See id.* at 36–37.

The Ninth Circuit affirmed the District Court's certification ruling, but the Supreme Court

[7] Aside from the preposterous results achieved by summing the results of Boedeker's separate surveys, Beodeker admits that adding the data would be based on an assumption that the results from the two surveys are independent (rather than dependent). *See* Boedeker Dep. at 101:24-102:4. This assumption is baseless, as Boedeker admits that whether the results are independent or dependent "is something that [he has] ***not tested***." *Id.* at 102:5-6 (emphasis added). Even if the results were independent (a proposition Boedeker did not test), their sum would still be an inappropriate method to estimate damages. *See* Expert Report of Lorin Hitt ("**Exhibit 4**," hereinafter, "Hitt Report") ¶ 55 (noting that Boedeker's methodology "depends critically on the assumption that all relevant attributes are estimated *simultaneously*—whether they are independent or not.") (emphasis in original).

reversed, commenting that "[i]f [plaintiffs] prevail on their claims, they would be entitled only to damages resulting from [the one theory of liability that the District Court certified], since that is the only theory of antitrust impact accepted for class-action treatment by the District Court." *Comcast*, 569 U.S. at 35. "It follows," then, "that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory." *Id.* "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.*

Here, Boedeker does not—and cannot—offer an estimate that accounts for ***both*** misrepresentations ***and*** omissions. *See* Ex. 1 at p. 479, App'x 4; Hanssens Report ¶¶ 89-91. Because Boedeker cannot isolate the purported diminution in value attributable to alleged misrepresentations and alleged omissions in combination, his survey and opinions do not fit with Plaintiffs' claims and should be excluded. *See In re Fluidmaster, Inc. Water Connector Components Prods. Liab. Litig.*, No. 14-cv-5696, 2017 WL 1196990, at *31 (N.D. Ill. Mar. 31, 2017) (proposed conjoint survey unreliable, noting that "[a]sking an unrepresentative group of purchasers to artificially assign values among an arrangement of potentially unimportant attributes that fails to approximate real-world purchasing decisions does not seem designed to produce a reliable WTP estimate that can be used to calculate class-wide damages."); *Marion Healthcare, LLC v. Southern Ill. Healthcare*, No. 3:12-cv-871 (MAB), 2020 WL 1527771, at *7 (S.D. Ill. March 31, 2020) (finding expert's "damages theory is unhinged from the facts and theory of the case. His damages analysis is likely grossly inflated because it is based on a series of his own assumptions. In addition, he does not employ a standardized and reliable methodology for determining damages. While the *Daubert* analysis does not require perfection, it does demand the expert's testimony is reliable.").

In short, Boedeker's model cannot isolate the diminution in value attributable to any combination of Alleged Misrepresentations and Alleged Omissions.[8] His estimates are therefore irrelevant to Plaintiffs' claims and must be excluded. Fed. R. Evid. 702(a) (expert evidence must "help the trier or fact[.]").

### B. Boedeker estimates only a change in WTP, ***not*** a change in market price and therefore cannot estimate the damages Plaintiffs seek.

It is basic economics that the market price of a good is determined by the interaction of supply ***and*** demand. *See In re General Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 233 (S.D.N.Y. Aug. 6, 2019) ("market value is determined by the interaction of *both* supply *and* demand."). Basic economic principles recognize that both demand and supply can shift based upon changes in circumstances, with the intersection of the shifted supply and demand curves establishing a new market price. In order to measure market prices and to calculate an alleged price premium (the measure of damages Plaintiffs seek), Plaintiffs must account for any changes to both the supply and demand for the at-issue pet foods in order to establish a market price in the hypothetical "but-for" world (*i.e.*, where the alleged misrepresentations and alleged omissions do not affect Champion's ACANA packaging). *See* Hanssens Report ¶ 33. But Boedeker admits that

[8] Boedeker's Alleged Omissions Surveys cannot isolate any diminution in value relating to the at-issue ACANA or ORIJEN pet foods because it does not gather data about those products. Rather, respondents in the Alleged Omissions Surveys are explicitly instructed to assume they are purchasing a 25-pound bag of their "favorite dry dog food." *See* Ex. 1 at pp. 315, 390, App'x 1. Because the Alleged Omissions Surveys do not even attempt to gather data relating to the at-issue ACANA and ORIJEN diets, Boedeker cannot use this survey to isolate damages attributable to the Alleged Omissions which relate solely to Champion's ACANA and ORIJEN pet food (not participant's "favorite" dog food). Consequently, the Alleged Omissions Surveys are irrelevant to Plaintiffs' omission claims. *See Comcast*, 569 U.S. at 35; *see also* Hanssens Report ¶ 72 ("Since the purpose of the [Alleged] Omissions Survey is to estimate the demand for the At-Issue Products, any data collected about non-Champion products is uninformative and irrelevant.").

he attempted only to estimate how demand would change—and not how supply would change—between the actual world and the but-for world. *See* Boedeker Report ¶ 40. Consequently, Boedeker's model cannot be used to estimate market prices or, more specifically, measure an alleged price premium. *See* Hanssens Report ¶ 35.

The opinion in *In re General Motors*—a case in which Boedeker's survey and opinions were excluded—explains this distinction. *See In re General Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 312. There, plaintiffs claimed that they purchased GM vehicles with defective ignition switches and sought benefit-of-the-bargain damages (*i.e.*, "the difference between the actual value of what plaintiff has received and that which he expected to receive."). *Id.* at 221 (citation omitted). The plaintiffs hired Boedeker, and he performed a similar conjoint analysis, which measured consumer desires by asking survey respondents about their preferences for certain combinations of product features (including a defective feature), to estimate the amount that consumers would be willing to pay for a vehicle with a particular defect if it were fully disclosed. *See id.* at 234–35. Using the results of his survey, Boedeker purportedly constructed hypothetical "demand curves" for the "but-for" world—that is, the world in which GM disclosed the alleged defects before selling allegedly defective cars. *See id*. But Boedeker's model focused only on changes to demand, not supply. Thus, he calculated only changes to consumers' willingness-to-pay and thus "did not estimate any possible changes in [the defendant's] willingness to *sell* . . . instead, he assumed that 'the new equilibrium' (*i.e.*, market) 'price' in the but-for world would be the price at which 'all the purchasers of defective vehicles in the actual-world would also buy in the but-for-world.'" *Id.* at 235.

This is not evidence of damages, the court concluded. *See id.* "The benefit-of-the-bargain theory awards damages based on the difference between what the plaintiff paid for and the fair

market value of what the plaintiff received." *Id.* Because fair market value is determined according to the equilibrium price of a good which "depends on supply ***and*** demand," "where the law awards damages based on the difference in market value, ***evidence—including conjoint analyses—that measure only consumers' subjective valuation or willingness to pay is not sufficient evidence of such damages***." *Id.* at 237 (emphasis added).

The flaws that resulted in exclusion of Boedeker's analysis in *In re General Motors* plague his opinions here too. Again, Plaintiffs here seek damages measured by the difference between what they paid for Champion's pet foods and the hypothetical "but-for" market price of Champion's pet foods without the allegedly false representations and material omissions. But Boedeker cannot estimate the market price of Champion's pet foods in the but-for world because he disregards supply-side considerations. In his but-for world, consumers are free to adapt to new or different information or conditions, but suppliers are presumed to be forced to keep producing goods unabated literally for years, even if doing so meant having to pay consumers to take the goods off their hands. In other words, in Boedeker's but-for world, producers are unable to act as rational, profit-maximizers, thereby violating basic economic principles. To be sure, among other ignored supply-side factors, Boedeker did not consider Champion's cost of ingredients, production capabilities, supply chain, product returns, or retailer marketing efforts. *See* Boedeker Dep. at 70:17-24 ("Q. [I]n an earlier deposition we talked about you had not done any analysis of Champion's costs for the ingredients . . . that went into its food? I take it that's also still true? A. That is correct, I did not analyze the cost structure of the product at issue here."); *id.* at 71:4-11 ("Q. Have you done any analysis of Champion's production capabilities, ability to scale up, scale down? A. I have not. Q. Okay, Have you looked at any aspect of Champion's supply chain[?] A. No, I have not."); *id.* at 71:12-72:23.

Because he ignores half of the market price equation (*i.e.*, supply-side factors)[9] Boedeker cannot estimate a hypothetical but-for market price and consequently cannot estimate the difference between the but-for market price and real-world prices Plaintiffs and the putative class members actually paid. *See* *In re General Motors*, 407 F. Supp. 3d at 236. Without considering supply, Boedeker at best attempts to estimate a change in consumers' WTP, but such a change (even if calculated correctly) does no more than masquerade as a change in market price and cannot be used as evidence of Plaintiffs' purported damages. Other courts have stricken Boedeker's surveys and opinions for precisely this reason. *See* *id.* at 234–40 ("Boedeker's evidence is insufficient to establish market value"); *MacDougall v. Am. Honda Motor Co., Inc.*, No. SACV 17-1079 JGB (DFMx), 2020 WL 5583534, *4-6 (C.D. Cal. Sept. 11, 2020) (excluding Boedeker's conjoint survey and noting that "without the integration of accurate supply-side considerations, a choice-based conjoint analysis transforms into a formula missing half of the equation.") (emphasis in original). Of course, this defect with conjoint analysis is not limited to Boedeker's work and courts routinely exclude conjoint surveys and resulting analysis for failure to properly consider supply-side factors. *See generally*, *In re Fluidmaster*, 2017 WL 1196990, at *30; *Price v. L'Oreal United States, Inc.*, No. 17 Civ. 614 (LGS), 2020 WL 4937464, *6 (S.D.N.Y. Aug. 24, 2020) (granting motion to exclude "because certain of [the proffered expert's] assumptions regarding the quantity and price of the Products sold are unreliable."); *In re Volkswagen "Clean Diesel" Marketing*, 2020 WL 6688912, at *7 ("Calculating a premium by comparing (1) the actual price

[9] Plaintiff will likely argue that Boedeker did not need to consider supply-side factors because he purportedly kept supply in his "but-for" world *equal* to supply in the actual world. *See* Boedeker Report ¶ 40. Holding supply fixed, however, does not accurately model supply in the "but-for" world. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, No. 3:17-cv-4372-CRB, 2020 WL 6688912, *7 (N.D. Cal. Nov. 12, 2020) ("presuming that Defendants would have sold the same number of cars, at the exact price that consumers would have been willing to pay, is ***not a way to reliably incorporate supply-side considerations.***") (emphasis added).

of vehicles sold with defeat devices to unwitting consumers, and (2) consumers' willingness-to-pay for vehicles with the defeat device (as opposed to the market price of vehicles with the defeat device) is comparing apples and oranges."); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2014 WL 976898, at *11 (N.D. Cal. Mar. 6, 2014) (rejecting a damages model that failed to provide a way to compare "willingness to pay metrics—which relate only to demand for the patented feature—to the market price of the infringing devices, which reflects the real-world interaction of supply and demand for infringing and noninfringing devices"); *In re NJOY, Inc. Consumer Class Action Litig.*, No. CV 14-428 (JFW) (JEMx), 2016 WL 787415, *7 (C.D. Cal. Feb. 2, 2016) ("[a] consumer's . . . willingness to pay for products with or without the message is not an accurate indicator of restitutionary damages, because it does not permit the court to calculate the *true market price* of N-JOY e-cigarettes absent the purported misrepresentations.").[10]

## VI. METHODOLOGICAL ERRORS MAKE BOEDEKER'S SURVEYS AND OPINIONS UNRELIABLE

Sometimes, challenges to survey methodology go to the weight of expert testimony, not its admissibility. However, "conclusions and methodology are not entirely distinct from one another," and a court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered," which is the case here. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Survey evidence should therefore be excluded if it suffers from serious

[10] Champion recognizes that courts occasionally admit evidence in the form of conjoint surveys. *See generally*, *In re: Kind LLC "Healthy and All Natural" Litigation*, No. 15md2645, 2021 WL 1132147 , at *16 (S.D.N.Y. Mar. 24, 2021) (accepting proposed expert's proposal to conduct a conjoint survey to model damages but noting that because the survey had not yet been conducted, the "Court need not wade into the debate over reliability of conjoint analyses at this time."). Champion submits that decisions permitting experts to offer opinions of "market value" based on one-sided conjoint surveys are not well-reasoned and that the cases Champion relies on are more persuasive. And although Plaintiff is likely to cite cases admitting conjoint surveys, that reliance is misplaced, as the better economic theory counsels the need to consider supply in determining market price. *See, e.g.*, *In re General Motors*, 407 F.3d at 239 (rejecting conjoint for failure to account for supply-side effects on market price).

methodological flaws. *See generally Andersen v. City of* Chicago, 454 F. Supp. 3d 740, 745 (N.D. Ill. 2020) (Kendall, J.) (excluding expert with unreliable methodology); *Moore v. P&G-Clairol, Inc.*, 781 F. Supp. 2d 694, 703–04 (N.D. Ill. 2011) (Kendall, J.) (finding expert's methodology unreliable). Myriad methodological flaws contaminate Boedeker's surveys rendering them, and his related opinions, unreliable and, therefore, inadmissible.

### A. Boedeker ignores survey best-practices by failing to conduct a pre-test of the Expectation Surveys.

Boedeker admits that "[p]roperly conducted pre-tests can inform the researcher of potential flaws in the survey design or sources of potential misunderstanding of the meaning of questions, giving the researcher a chance to rephrase and change wording of the questionnaire to be clear and unambiguous." Boedeker Report ¶ 150. According to Dr. Shari Diamond (whom Boedeker relies upon), "[a] variety of pretest activities may be used to improve the clarity of communication with respondents. Focus groups can be used to find out how the survey population thinks about an issue, facilitating the construction of clear and understandable questions." *See Reference Manual on Scientific Evidence*, pp. 388-89. Moreover, in "many pretests or pilot tests, the proposed survey is administered to a small sample (usually between 25 and 75) of the same type of respondents who would be eligible to participate in the full-scale survey. The interviewers observe the respondents for any difficulties they may have with the questions and probe for the source of any such difficulties so that the questions can be rephrased" and to verify that respondents are interpreting questions and answer choices in the manner that the researcher intended. *Id.*

Boedeker failed to take into account this basic, initial step with his Expectation Surveys. Although Boedeker claims that he reviewed responses from the first "50 or so" survey respondents to determine whether the understood the questions in the survey, this is not a valid pre-test that comports with survey best-practices. *See* Boedeker Dep. 32:16-33:13; *see also* Hanssens Report

¶¶ 120-121. That Boedeker did not practice what he preaches is by itself cause for exclusion. *See MacDougall*, 2020 WL 5583534 at *7 (excluding survey evidence offered by Boedeker because, in part, he failed to conduct a valid pre-test); *see id.* at *9 ("where, as here, the reliability and relevance of an expert's study is called into question because its underlying methodology or its reasoning fails to comport with 'accepted principles' in that expert's community, the Court has a responsibility to exclude the opinion altogether.") (citations omitted).

**B. Boedeker sampled in each of his surveys an irrelevant population; consequently, his analysis is meaningless to Plaintiffs' claims.**

In all of his survey experiments, Boedeker surveyed irrelevant sample populations that are inconsistent with Plaintiffs' putative class (and subclass) definition, which includes only consumers in the State of Illinois who purchased Champion's pet food. *See* Hanssens Report ¶¶ 52-59, 106-111; *see also* TAC ¶ 213. Even though Plaintiffs' proposed classes are necessarily comprised of ***purchasers*** of Champion's pet foods, 87.1% of respondents in Boedeker's conjoint surveys (2,068 out of 2,375) have neither purchased nor considered purchasing ACANA or ORIJEN pet food in the last three years. *See* Hanssens Report ¶ 54.

As Dr. Shari Diamond—who Boedeker relies upon in his report—explains, consumers who are the purchasers or potential purchasers of the product are likely to have different preferences and exhibit different purchase behaviors than a broad population such as the population of American adults. *See Reference Manual on Scientific Evidence* at p. 377. Indeed, the "definition of the relevant population is crucial because there may be systemic differences in the responses of members of the population and nonmembers. For example, consumers who are prospective purchasers may know more about the product category than consumers who are not considering making a purchase." *Id.* Boedeker ignores this distinction in his Alleged Misrepresentation Surveys and Alleged Omission Surveys.

Highlighting the irrelevance of Boedeker's survey sample is the fact that only 98 respondents—4.1%—of respondents in the Alleged Misrepresentations Surveys and the Alleged Omissions Surveys could potentially be members of Plaintiffs' proposed class (*i.e.*, these 98 individuals indicated that they purchased *or considered purchasing* ACANA or ORIJEN pet food in the past three years and that they lived in Illinois). *See* Hanssens Report ¶ 55. Because Boedeker conducted no analysis or testing to compare members of his irrelevant target population to members of the putative classes (Illinois consumers who purchased the at-issue diets), he cannot draw meaningful conclusions about the putative Illinois class members from his surveys. *Id.* ¶ 56.

A similar problem impacts Boedeker's Expectation Surveys. There, again, his survey population is comprised almost exclusively of respondents who have not even considered purchasing Champion's products. *See* Hanssens Report ¶¶ 106-111. Because he surveyed incorrect populations in each of his surveys, the data gathered and analyzed by Boedeker, and his opinions derived from that data, are irrelevant to Plaintiffs' claims and should be excluded from this case. *See* *Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1009–10 (N.D. Ill. 2010) (Kendall, J.) (expert survey of potential consumer responses "fail[ed] to comply with generally-accepted principles of survey research and lack[ed] evidence to show that he satisfies the requirements of Rule 702 … the methods used in the administration of both the survey and the experiment render the data collected of so little reliability and utility as to be irrelevant," noting that among other things, the expert "did not define a universe for the experiment," and "there is no discussion in [the] report as to the characteristics of the target population").

## VII. CONCLUSION

Many of the flaws in Boedeker's analysis are so profound that they each would justify excluding his opinions all by themselves. But when these flaws are added to other equally deep flaws, they simply cannot be brushed aside as issues going to weight. As the gatekeeper, the Court

is tasked with ensuring expert testimony and evidence is both relevant and reliable. Boedeker's report and opinions are neither. For all the reasons set forth above, Boedeker's opinions should be excluded (1) from supporting Plaintiffs' Motion for Class Certification and (2) from testifying at trial on the merits in this case.

Dated: June 8, 2021

Respectfully submitted,

s/ *David A. Coulson*

David A. Coulson (ARDC #6199911)
Jessica J. Fishfeld (ARDC #6313149)
Jared R. Kessler (Admitted *pro hac vice*)
Robert S. Galbo (Admitted *pro hac vice*)
Elisa H. Baca (Admitted *pro hac vice*)
GREENBERG TRAURIG P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
Tel: (305) 579-0754
Fax: (305) 579-0500
coulsond@gtlaw.com
johnsonj@gtlaw.com
kesslerj@gtlaw.com
galbor@gtlaw.com
bacae@gtlaw.com

Francis A. Citera (ARDC # 6185263)
GREENBERG TRAURIG LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Tel: (312) 456-8400
Fax: (312) 456-8435
citeraf@gtlaw.com

Rick L. Shackelford, Esq. (*pro hac vice*)
GREENBERG TRAURIG LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Tel: (310) 586-3878
Fax: (310) 586-7800
Email: shackelfordr@gtlaw.com

***Attorneys for Defendants Champion Petfoods USA Inc. and Champion Petfoods LP***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of June, 2021, I served the foregoing document on all counsel of record identified on the below Service List via Registered Email.

*/s/ David A. Coulson*
DAVID A. COULSON

## SERVICE LIST

Charles J. LaDuca
Katherine Van Dyck
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Tel: 202-789-3960
Email: charlesl@cuneolaw.com
Email: kvandyck@cuneolaw.com

Rebecca A. Peterson
Robert K. Shelquist
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave. S., Suite 2200
Minneapolis, MN 55401
Tel: 612-339-6900
Email: rapeterson@locklaw.com
Email: rkshelquist@locklaw.com

Kevin A. Seely
ROBBINS LLP
5040 Shoreham Place
San Diego, CA 92122
Tel: 619-525-3990
Email: KSeely@robbinsllp.com

Daniel E. Gustafson
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: 612-333-8844
Email: dgustafson@gustafsongluek.com

*Attorneys for Plaintiffs*

Kenneth A. Wexler
Kara A. Elgersma
Michelle Perkovic
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Tel: 312-346-0022
Email: kaw@wexlerwallace.com

Mark J. Tamblyn
WEXLER WALLACE LLP
333 University Ave., Suite 200
Sacramento, CA 95825
Tel: 916-565-7692
Email: mjt@wexlerwallace.com

Joseph J. DePalma
Susana Cruz Hodge
LITE DEPALMA GREENBERG, LLC
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Email: jdepalma@litedepalma.com
Email: scruzhodge@litedepalma.com