**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| AFSHIN ZARINEBAF, ZACHARY CHERNIK, and JOAN MEYER, individually and on behalf of a class of similarly situated individuals,<br><br>               Plaintiffs,<br><br>    v.<br><br>CHAMPION PETFOODS USA INC. and CHAMPION PETFOODS LP,<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 1:18-cv-06951<br><br>  Honorable Virginia M. Kendall |

**DEFENDANTS CHAMPION PETFOODS USA INC. AND
CHAMPION PETFOODS LP'S CORRECTED[*] MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT
AS TO PLAINTIFFS' THIRD AMENDED COMPLAINT**

---

[*] This Memorandum of Law was originally filed as ECF No. 122 and has been corrected to include functioning hyperlinks in compliance with the Honorable Virginia Kendall's Case Procedures.

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    PROCEDURAL HISTORY.....................................................................................2

III.   SUMMARY OF PLAINTIFFS' REMAINING CLAIMS .................................4

IV.   STATEMENT OF UNDISPUTED MATERIAL FACTS ................................4

    A.    Background as to Champion...................................................................4

    B.    Plaintiffs' Purchases of Champion Dog Food .......................................5

    C.    Statements on Champion's Dog Food Packaging...................................7

    D.    Heavy Metals are Naturally Occurring, Not Uncommon in Dog Food, and the Levels Found in Champion Dog Food Would Not Harm a Dog ...................10

    E.    BPA is Widely Present in the Environment, Not Uncommon in Dog Food, and the Levels Found in Champion's Dog Food Would Not Harm a Dog ..........11

    F.    Very Low and Non-Dangerous Levels of Pentobarbital were Found in an Ingredient Supplied to Champion's DogStar Kitchen in Late March 2018 for its "Red" Diets, but Not Found in its Finished Dog Food.............................13

V.    SUMMARY JUDGMENT STANDARD AND ELEMENTS OF CLAIMS...................14

VI.   ARGUMENT ...........................................................................................................16

    A.    Summary Judgment Should Be Entered on Counts I-III Based on Alleged Misrepresentations ................................................................................16

        1.    "Biologically Appropriate" is Puffery and Otherwise Non-Actionable .......................................................................16

        2.    Even if "Biologically Appropriate" were Actionable, it is Not Rendered Deceptive or Unfair Due to the Presence of Heavy Metals or BPA.......................................................................17

        3.    "Biologically Appropriate" was not Rendered False by Plaintiffs' Pentobarbital Allegations .........................................................20

        4.    Champion's Statement that Its Dog Food Contains "Fresh" Ingredients is Not Untrue or Misleading ......................................22

        5.    Champion's Statement that Its Dog Food is Made With "Regional" Ingredients is Not Untrue or Misleading ......................................25

        6.    Champion's Statement "Delivering Nutrients Naturally" is Not Untrue or Misleading ......................................................................27

    B.    Summary Judgment Should be Entered on Count I Based on Alleged Omissions......................................................................................28

VII.   CONCLUSION.........................................................................................................30

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ass'n Benefit Servs. v. Caremark Rx, Inc.*,
    493 F.3d 841, 855 (7th Cir. 2007) ........................................................28

*Beardsall v. CVS Pharmacy*,
    953 F. 3d 969 (7th Cir. 2020) ............................................................18

*Bell v. Publix Super Markets, Inc.*,
    982 F.3d 468 (7th Cir. 2020) ..........................................................24, 25

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 323–24 (1986) ..........................................................15

*Fuchs v. Menard, Inc.*,
    No. 17-cv-01752, 2017 WL 4339821 (N.D. Ill. Sept. 29, 2017)............................16

*Gubala v. CVS Pharmacy, Inc.*,
    No. 14 C 9039, 2015 WL 3777627 (N.D. Ill. June 16, 2015) ................................23

*High Rd. Holdings, LLC v. Ritchie Bros. Auctioneers (Am.)*,
    No. 1:07-CV-4590, 2008 WL 450470 (N.D. Ill. Feb. 15, 2008) ......................16, 17

*Ibarrola v. Kind, LLC*,
    83 F. Supp. 3d 751 (N.D. Ill. 2015) ..........................................16, 25, 27

*Kidwell v. Eisenhauer*,
    679 F.3d 957, 964 (7th Cir. 2012) ........................................................15

*Loeb v. Champion Petfoods USA Inc.*,
    359 F. Supp. 3d 597 (E.D. Wis. 2019)....................................................19

*Loggerhead Tools, LLC v. Sears Holdings Corp.*,
    No. 12-CV-9033, 2016 WL 5080028 (N.D. Ill. Sept. 20, 2016),
    *aff'd*, 784 F. App'x 785 (Fed. Cir. 2019)................................................17

*Siegel v. Shell Oil Co.*,
    656 F. Supp. 2d 825 (N.D. Ill. 2009),
    *aff'd*, 612 F.3d 932 (7th Cir. 2010)........................................15, 16, 28

*Simpson v. Champion Petfoods USA, Inc.*,
    397 F. Supp. 3d 952 (E.D. Ky. 2019) ....................................................18

*Song v. Champion Petfoods USA, Inc.*,
    No. 18-CV-3205, 2020 WL 7624861 (D. Minn. Dec. 22, 2020)..............18, 23, 24, 25, 27, 28

*Spector v. Mondelez Int'l, Inc.*,
    178 F. Supp. 3d 657 (N.D. Ill. 2016) ....................................................29

*Toulon v. Cont'l Cas. Co.*,
    877 F.3d 725 (7th Cir. 2017) ............................................................15

*Trujillo v. Apple Computer, Inc.*,
    581 F.Supp.2d 935 (N.D. Ill. 2008) ...........................................................................16, 23, 29

*Tylka v. Gerber Prod. Co.*,
    No. 96 C 1647, 1999 WL 495126 (N.D. Ill. July 1, 1999) .................................................17, 28

*Washington v. Hyatt Hotels Corp.*,
    No. 1:19-cv-04724, 2020 WL 3058118 (N.D. Ill. June 9, 2020)............................................23

*Weaver v. Champion Petfoods USA Inc.*,
    471 F. Supp. 3d 876 (E.D. Wis. 2020).........................................................19, 23, 24, 25, 27

*Weaver v. Champion Petfoods USA Inc.*,
    No. 18-CV-1996-JPS, 2019 WL 2774139 (E.D. Wis. July 1, 2019)................................19, 28

**Statutes**

815 ILCS 505/2...........................................................................................................................15, 28

**Other Authorities**

Fed. R. Civ. P. 56.............................................................................................................................15

## I.    INTRODUCTION

Plaintiffs Afshin Zarinebaf ("Zarinebaf"), Zachary Chernik ("Chernik"), and Joan Meyer ("Meyer") (collectively, "Plaintiffs") pursue the same flawed claims asserted in actions around the country by consumers who allege they were misled by certain statements on Defendants Champion Petfoods USA Inc. and Champion Petfoods LP's (collectively, "Champion") ORIJEN and ACANA dog food packaging. In their Third Amended Complaint ("TAC") [ECF No. 68], Plaintiffs allege that Champion's dog food contained or had "a risk of containing" heavy metals, Bisphenol-A (BPA), pentobarbital, non-regional ingredients, non-fresh ingredients, and/or unnatural ingredients, which in turn, render Champion's "Biologically Appropriate," "Fresh Regional Ingredients," and "Delivering Nutrients Naturally" statements on its packaging misleading or deceptive.

However, Plaintiffs ignore the context in which Champion explains its "Biologically Appropriate" philosophy on its packaging, which has nothing to do with the presence of naturally-occurring heavy metals or environmentally-ubiquitous BPA and, in any event, is not rendered false or misleading by their minute and safe presence. Plaintiffs' rank speculation regarding pentobarbital fails because pentobarbital was never found in Champion's finished dog food, let alone the food Plaintiffs purchased. The remaining fragments of Plaintiffs' theory are whether they paid a premium price for foods that contained (a) non-fresh ingredients, (b) non-regional ingredients, and (c) "unnatural" ingredients contrary to Champion's packaging. These roads lead to a dead end. Simply put, Plaintiffs' theory requires that Champion's representations on its packaging mean that the dog food contained **no** non-fresh, non-regional, or unnatural ingredients. Based on undisputed material facts, the actual statements on the bags, read in context and measured against Plaintiffs' theory, permit the Court to determine as a matter of law

that Plaintiffs' theories fail, and that summary judgment should be granted in favor of Champion.

## II.    PROCEDURAL HISTORY

In April 2018, Chernik was a named plaintiff in the *Reitman* action in California, but his claims were dismissed for lack of personal jurisdiction. *See Reitman v. Champion Petfoods USA Inc.*, No. CV181736DOCJPRX, 2018 WL 4945645, at *6 (C.D. Cal. Oct. 10, 2018) (case voluntarily dismissed (ECF No. 269) following denial of class certification (*see* 2019 WL 7169792 (C.D. Cal. Oct. 30, 2019), *aff'd*, 830 F. App'x 880 (9th Cir. 2020)). Chernik and Zarinebaf together filed this action on October 16, 2018. [ECF No. 01].

Champion moved to dismiss Plaintiffs' Second Amended Complaint (the "SAC," ECF No. 26) on March 6, 2019. [ECF No. 36]. The Court granted Champion's motion to dismiss Plaintiffs' claims premised on the phrases "Delivered Daily," "Made with Fresh and Natural Ingredients," "Never Outsourced," "Nourish as Natured Intended," and "Premium Meat and Fish Ingredients." *See* Memorandum Opinion and Order (the "Order," ECF No. 47 at 19). The Court also dismissed Plaintiffs' fraudulent concealment claim, which was not repleaded, and dismissed without prejudice Plaintiffs' claims based on pentobarbital, which were repleaded. *Id.* However, the Court declined to dismiss Plaintiffs' claims based on heavy metals and BPA. *Id.* at 8-10. Champion respectfully submits that the full record before the Court requires entry of judgment in favor of Champion, and accordingly the Order is not controlling for two reasons.

First, the Court was required to construe all factual inferences in the light most favorable to Plaintiffs. The SAC could be construed to plead that heavy metals, BPA, and pentobarbital were ***ingredients added*** by Champion.[1] The undisputed facts demonstrate this is **not** the case.

---

[1] *See, e.g.,* SAC ¶ 1 (seeking injunctive relief "requiring full disclosure of all such substances and **ingredients** in Defendants' marketing, advertising, and labeling"); ¶ 6 (alleging "the [dog food] contain and/or have a high risk of containing heavy metals, pentobarbital, toxins, BPA, non-

Second, the Order relied on Plaintiffs' allegation that "Defendants warrant, promise, represent, mislead, label, and/or advertise that the Contaminated Dog Foods are **free of** heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients by … assuring the food represents an evolutionary diet that mirrors that of a wolf—**free of** anything 'nature did not intend for your dog to eat.'" SAC ¶ 10 (emphasis added); Order at 2 ("Defendants market the Acana and Orijen brands as being … free of anything 'nature did not intend for your dog to eat.'") (citing SAC ¶¶ 10, 56). Yet, the image in paragraph 10 of the SAC is from a brochure circulated only to distributors and retailers,[2] and its text does not appear on **any** Champion packaging. The Court, in its Order, held Plaintiffs pled a plausible claim for relief on the basis that "the mere presence of heavy metals would be material to a reasonable consumer" because Plaintiffs alleged "they relied on Defendants' statements marketing their dog food as natural and high quality, but would not have purchased the dog food if they had known it contained heavy metals." Order at 8. The Court found the same as to BPA. Id. at 9-10. As shown below, with the factual record and packaging images before the Court, Champion did not misrepresent that its food was BPA-free or heavy metal-free as alleged by Plaintiffs in the SAC, and the Rule 12 Order is not controlling as to Plaintiffs' heavy metals and BPA claims.

When Plaintiffs filed a Third Amended Complaint, which added Meyer as a Plaintiff,

---

regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels," where "**other ingredients**" following "**and/or**" and "**or**" implies that heavy metals were ingredients); ¶ 12 ("Defendants further … advertise … that the [dog foods] are made with protein, oils, and fat sources that are 'Deemed fit for human consumption' in direct contradiction to the true nature of **the ingredients utilized, which include, but are not limited to, pentobarbital, BPA** and/or unnatural ingredients.").

[2] The brochure was not distributed to the public at-large, and Plaintiffs testified that they did not read or rely on that particular Acana brochure. See Champion's L.R. 56.1 Statement of Undisputed Material Facts ("SUMF") ¶¶ 50-51. Although paragraph 10 of the SAC itself took the "free of" language out of context, debating this issue is moot since the "free of" language did not appear on any bags that Plaintiffs purchased, id. ¶ 52. and the brochure allegations were dropped altogether in the TAC. See TAC.

they dropped all allegations as to the brochure. *See* TAC. Plaintiffs further evolved their claims to allege that the dog food packaging was misleading because the dog food "contained and/or had a material risk of containing undisclosed and non-conforming contaminants and ingredients," without regard to the safety of these ingredients. TAC ¶ 3. More recently, Plaintiffs narrowed their claims further by limiting them to eleven diets produced at Champion's DogStar kitchen. [ECF No. 102]. In context, it is apparent that Champion has not misrepresented or omitted material information to consumers, necessitating a finding of summary judgment for Champion.

## III.    SUMMARY OF PLAINTIFFS' REMAINING CLAIMS

The TAC's remaining claims are: (i) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"); (ii) fraudulent misrepresentation; and (iii) unjust enrichment. The common denominator for each of Plaintiffs' claims is Plaintiffs' allegation that Champion's representations on its packaging were deceptive or misleading because its dog food allegedly "contained and/or had a material risk of containing undisclosed and non-conforming ingredients and contaminants, such as heavy metals, a material amount of non-fresh ingredients, a material amount of non-regional ingredients, Bisphenol A ("BPA"), and pentobarbital." TAC ¶ 3. Plaintiffs do not claim that any of their dogs suffered illness from or were malnourished by consuming Champion dog food, some for more than a decade.  Plaintiffs do claim, however, that they paid "premium prices" for dog food that "did not deliver what was promised." *Id.* ¶ 16.

## IV.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    Background as to Champion

In approximately 1979, Champion's founder began producing dog food in a feed mill in Alberta, Canada, and in approximately 1985 Champion launched the ACANA brand ("A" for

Alberta and "Cana" for Canada). SUMF ¶ 1. In approximately 2005, Champion developed the ORIJEN brand by adopting a "Biologically Appropriate" nutritional philosophy. *Id.* ¶ 2. Unlike dog foods that rely on grains and/or other fillers, and many synthetic nutritional supplements, ORIJEN's "Biologically Appropriate" approach uses primarily animal-based proteins in an attempt to mirror how wolves or wild dogs would get nutrition in nature (albeit within the limitations of dry kibble form). *Id.* Over time, Champion transitioned its "Biologically Appropriate" approach to ACANA. *Id.* ¶ 3. Champion's dog food consists of a variety of diets (*i.e.*, formulations) under the ORIJEN and ACANA brand names (with ACANA having three sub-brands in the United States – Heritage, Regionals, and Singles). *Id.* ¶¶ 4-5. Beginning in approximately 1990, Champion manufactured all of its dog food out of its NorthStar kitchen in Morinville, Alberta, Canada. *Id.* ¶ 6. In approximately January 2016, Champion opened its new DogStar kitchen in Kentucky and transitioned the manufacturing of nearly all of its dog food sold in the United States to come exclusively from DogStar. *Id.* ¶ 7.

### B. Plaintiffs' Purchases of Champion Dog Food

Chernik resides in Illinois, where he fed Champion dog food to his nineteen dogs. TAC ¶ 7. Chernik purchased both ORIJEN and ACANA diets produced at NorthStar kitchen beginning in 2006. SUMF ¶ 8. At some point in 2016, when Champion transitioned its dog food sold in the U.S. to its DogStar kitchen, Chernik purchased the following diets that remain at-issue in this action[3] from DogStar: ORIJEN Six Fish, ORIJEN Regional Red, ORIJEN Senior, ACANA Regionals Grasslands, ACANA Singles Lamb & Apple, ACANA Singles Pork & Squash, ACANA Heritage Free-Run Poultry, and ACANA Heritage Red Meat. *Id.* ¶ 9. Chernik discontinued purchasing Champion dog food at the end of June 2017. *Id.* ¶ 10. There is no

---

[3] Chernik's purchases of all NorthStar diets and DogStar ACANA Duck & Pear and ACANA Wild Atlantic, as alleged in TAC ¶ 7, have been dropped. *See* ECF No. 102; ECF No. 95 at 15-16.

evidence that any of his dogs' illnesses or deaths were caused by the consumption of Champion dog food. *Id.* ¶ 17.

Zarinebaf resides in Illinois. TAC ¶ 9a. He fed his two dogs ORIJEN and ACANA diets from July 2013 through approximately September 2018. SUMF ¶ 11. Zarinebaf's dogs consumed ORIJEN and ACANA diets produced at NorthStar kitchen prior to 2016. *Id.* ¶ 12. His dogs also consumed the following Champion dog food diets that remain at-issue in this action[4] produced at DogStar kitchen at some point in time between 2016 and September 2018: ORIJEN Six Fish, ORIJEN Regional Red, ACANA Singles Lamb & Apple, ACANA Singles Pork & Squash, and ACANA Regionals Grasslands. *Id.* There is no evidence that either of his dogs suffered any negative health effects due to the consumption of Champion dog food. *Id.* ¶ 17.

Meyer resides in Illinois. TAC ¶ 9b. She claims she began purchasing Champion dog food in 2004, but that it may have been a few years later. SUMF ¶ 13. Meyer began purchasing ORIJEN and ACANA produced at NorthStar kitchen and discontinued purchasing Champion dog food on or around June 2019, when it was produced at DogStar kitchen. *Id.* ¶ 14. Meyer purchased the following at-issue Champion dog food diets[5] from DogStar kitchen between 2016 until June 2019: ORIJEN Original, ACANA Singles Lamb & Apple, ACANA Singles Wild Mackerel, ACANA Heritage Red Meat, and ACANA Regionals Meadowland. *Id.* ¶ 15. Meyer testified that she did not read the labeling for any ORIJEN or ACANA diet she purchased from DogStar. *Id.* ¶ 16. There is no evidence that any of her dogs' illnesses or deaths were caused by the consumption of Champion dog food. *Id.* ¶ 17.

---

[4] Zarinebaf's purchases of all NorthStar diets have been dropped. ECF No. 102.
[5] Meyer's purchases of all NorthStar diets and DogStar ACANA Duck & Pear, as alleged in TAC ¶ 9b, have been dropped. *See* ECF No. 102; ECF No. 95 at 15-16.

### C.     Statements on Champion's Dog Food Packaging

During all relevant times, the front of the packaging for the diets Plaintiffs purchased stated the diet was "Biologically Appropriate Dog Food." SUMF ¶ 18. In its simplest form, Champion sometimes explains "Biologically Appropriate" as "Protein Rich, Carbohydrate Limited," while at other times, describes it as "Evolutionary Diet. Protein Rich." *Id*. ¶ 19. The backs of Champion bags explain the origin of this philosophy in a variety of ways, sometimes stating, "All dogs evolved as carnivores – biologically adapted to a diet rich in meat and protein," or "your dog is a carnivore, designed by nature to thrive on whole game, fowl or fish, and possessing a biological need for foods that are rich and varied in fresh whole animal ingredients." *Id*. ¶ 20.

Other bags explain how Champion implements its "Biologically Appropriate" philosophy, explaining "Modern dogs are built like their ancestors. We believe they should eat like them too," which is why Champion's "Biologically Appropriate" dog food "mirrors the richness, freshness and variety of meats for which dogs are evolved to eat." *Id*. ¶ 21.   As Champion's former Chief Brand Officer testified, "[w]e follow what's the most appropriate thing biologically. It's not biologically perfect by the way, it's biologically appropriate." *Id.* ¶ 23. ("So biologically – the philosophy of biologically appropriate is to get as close to the natural diet as possible.").

On each bag purchased by Plaintiffs, Champion indicated that they contained "fresh" ingredients, among other ingredients in other forms. SUMF ¶ 24. The front of the DogStar 2016-2017 ACANA Heritage Red Meat package purchased by Chernik and Meyer states it is "infused with freeze-dried liver" and that "this 13 lb package of ACANA is made with over 7 ¾ lb of beef, pork, & lamb ingredients. Half are FRESH or RAW and loaded with goodness and taste,

and half are DRIED or OILS that provide a strong and natural source of animal proteins and fats." *Id*. ¶ 25. The front of the DogStar 2016 ORIJEN Six Fish package purchased by Chernik and Zarinebaf and the DogStar 2016 ORIJEN Original package purchased by Meyer contain icons that state "Top 10 [ingredients] fresh or raw" and "FD: freeze-dried liver." *Id*. ¶ 26. A large panel on the back of each DogStar bag, referred to as "Meat Math," breaks down the approximate amount, in pounds, of each key ingredient, and whether they were added fresh, raw, dried, freeze-dried, dehydrated, or as oils into the formula. *Id*. ¶ 29. For example, the Meat Math for 2016 ORIJEN Six Fish and Original state, in part, "this 13 lb package of ORIJEN is made with over 11 lb of fresh, raw or dehydrated fish [animal for Original] ingredients. 2/3 fresh or raw, 1/3 dried or oils." *Id*. ¶ 30.

It is undisputed that Champion never states 100%, each, every, or all ingredients are fresh, that its ingredients are "never frozen," or that its dog food contains no frozen ingredients. *Id*. ¶ 32.

On each bag purchased by Plaintiffs, Champion also indicated that they contained "regional" ingredients. SUMF ¶ 33. Specifically, the 2016-2017 DogStar ACANA Pork & Squash, Meadowland, and Free-Run Poultry packages purchased by Plaintiffs respectively state that America's "fertile farms and ranches," "fertile farms and meadows," and "fertile farmlands" are Champion's "source of inspiration and fresh regional ingredients." *Id*. ¶ 35. On the back of these packages, Champion explains "We focus on fresh ingredients from our region that are ranched, farmed or fished by people we know and trust." *Id*. ¶ 36. The front of every ACANA bag also more specifically states the city or county, and state, province, or country where some key ingredients were sourced. *Id*. ¶ 37. For example, the front of the DogStar '16-18 ACANA Meadowlands package purchased by Meyer states: "Free-Run Chicken: Mayfield, Kentucky;

Free-Run Turkey: Mercer County, Ohio; Freshwater Catfish: Paducah, Kentucky; Rainbow Trout: Soda Springs, Idaho." *Id*. ¶ 38. And, the back of the DogStar '16-17 ACANA Lamb & Apple bag purchased by all three Plaintiffs states, "Grass-fed on Kentucky and New Zealand ranches, our fresh or raw lamb arrives in WholePrey ratios." *Id*. ¶ 39. ORIJEN bags also provide regional descriptors, for example, ORIJEN Six Fish explains the fish is from "New England's vast Atlantic waters" and a supplier of the fish is in New England. *Id*. ¶ 40.

It is undisputed that Champion never states on any of its packaging that 100%, each, every or all ingredients are regional. *Id*. ¶ 42.

Finally, the TAC alleges that the phrase "Delivering Nutrients Naturally" is misleading.[6] TAC ¶¶ 52, 195(a), 226(a)(1). This phrase appears on the back of some DogStar ACANA packages in a variety of contexts. SUMF ¶ 43. On some packages it states, in full: "Mirroring nature, ACANA WholePrey foods feature a nourishing balance of poultry, organs and cartilage — all of which reflect the whole prey animal, delivering nutrients naturally. That's why you won't find long lists of synthetic additives in ACANA foods." *Id.* ¶ 44. On other packages it states, "ACANA features WholePrey ratios of poultry, organs and cartilage which deliver nutrients naturally," and on others: "WholePrey ratios of meat, organs and cartilage deliver nutrients naturally, without the long list of synthetic additives." *Id.* ¶ 45. The front of the 2016-2017 ACANA packages state that the formulas include "zinc proteinate – our one and only supplement," which is indisputably the only synthetic ingredient used in those formulas. *Id.* ¶ 46. The nutrients provided to dogs from the consumption of Champion's dog food come from

---

[6] The TAC implies that a veritable grab-bag of other statements, representations and labels are used to bolster the other three statements, including: (i) "Trusted Everywhere"; (ii) "Ingredients We Love [From] People We Trust;" (iii) advertised inclusion ratios of animal ingredients; and (iv) featured farmer imagery and photographs. TAC ¶ 38. However, these statements do not appear to form the basis of an independent theory of liability. *Id.* ¶¶ 224-252.

natural ingredients rather than synthetic ingredients (with the exception of zinc proteinate in 2016-2017 ACANA diets). *Id.* ¶ 47.

### D. Heavy Metals are Naturally Occurring, Not Uncommon in Dog Food, and the Levels Found in Champion Dog Food Would Not Harm a Dog

Nearly all foods, whether for humans or pets, contain some levels of heavy metals, such as arsenic, cadmium, lead, and mercury. SUMF ¶ 53. These heavy metals are naturally occurring elements that are ubiquitous in the environment and commonly found in dog foods. *Id.* ¶ 54. This is because the trace levels of heavy metals in Champion's dog food are naturally found in the food's ingredients, which Plaintiffs understood.[7] *Id.* Champion does not add heavy metals as ingredients in its dog food or advertise that its food is "heavy metal-free." *Id.* ¶¶ 55, 56.

In 2005, the National Research Council ("NRC") published a study in the Mineral Tolerance Animals, 2nd Revised Edition, 2005, that provided maximum tolerable limits ("MTLs") for arsenic, cadmium, lead, and mercury in dog foods. SUMF ¶ 57. In 2011, the FDA conducted its own review as to the levels of heavy metals in pet food entitled the Target Animal Safety Review and adopted the MTLs utilized by the NRC, namely (1) Arsenic 12,500 µg/kg (12.5 mg/kg); (2) Cadmium 10,000 µg/kg (10 mg/kg); (3) Lead 10,000 µg/kg (10 mg/kg); and (4) Mercury 267 µg/kg (.27 mg/kg). *Id.* ¶ 58. In 2002, the European Union ("EU") had enacted regulations for the safe upper limits of arsenic (10 mg/kg), cadmium (2 mg/kg), mercury (.3 mg/kg), and lead (5 mg/kg) in pet foods. *Id.* ¶ 59.

---

[7] At his deposition, Zarinebaf was asked if he was "aware that heavy metals are found in nature?" he responded "Yes. They're everywhere." Zarinebaf also testified he was "aware that seafood contains mercury" and "rice contains arsenic." SUMF ¶ 69. Meyer testified that for the last ten years she was "aware that heavy metals can be naturally occurring in animals and plants." *Id.* She was also aware that "there's arsenic in apples." *Id.* Chernik testified he had "heard of the concept of naturally occurring heavy metals" and understood it to mean "that some heavy metals [] are on this earth that are not manmade." *Id.* Chernik also knew "some fish can have mercury." *Id.* Therefore, all of these Plaintiffs should have known that heavy metals would appear in the ingredients used in Champion's diets.

Heavy metals in Champion's dog food are below the MTLs set by the NRC/FDA and the EU regulatory safety standards for heavy metals in pet food. SUMF ¶ 60. This is confirmed by testing by Eurofins Laboratory performed on Champion's ingredients and diets in the ordinary course of Champion's business, as well as the testing performed for Plaintiffs by Iowa State University Veterinary Diagnostic Lab and Ellipse Analytics. *Id*. ¶¶ 61, 62. Eurofins tested competitor dog foods for arsenic, cadmium, lead, and mercury, and found each metal was present at safe levels, and Ellipse Analytics tested hundreds of dog foods and found heavy metals in almost all of them. *Id*. ¶¶ 64, 65. As Champion's toxicology expert Dr. Poppenga concluded, "the levels of naturally occurring heavy metals in ACANA and ORIJEN dog food diets do not present a health risk to dogs." *Id*. ¶ 66. Plaintiffs' expert was unable to identify any known safety standard or guideline for dog food that Champion violated. *Id*. ¶ 67.

### E. BPA is Widely Present in the Environment, Not Uncommon in Dog Food, and the Levels Found in Champion's Dog Food Would Not Harm a Dog

BPA is a chemical that is produced for use primarily in polycarbonate plastics and epoxy resins. SUMF ¶ 70. Polycarbonate plastics and epoxy resins frequently appear in water bottles, infant bottles, CDs, medical devices, and lacquers to coat products such as food cans and bottle tops. *Id*. Humans and animals are most commonly exposed to BPA through their diet, as BPA tends to leach into food and liquid. *Id.* ¶ 71. However, because of humankind's extensive use of plastics, BPA is also prevalent in the environment, and many studies have measured levels of BPA in our air, dust, and water. *Id.* ¶ 72. Given BPA's ubiquitous presence in our environment, humans and animals are exposed to BPA daily through a variety of pathways. *Id.*

Champion does not add BPA as an ingredient. *Id.* ¶ 73. Nor does Champion advertise its food as "BPA Free," or words to that effect. *Id*. ¶ 74. Plaintiffs do not claim that any of their dogs suffered any adverse health consequence from BPA exposure from any source. *See* TAC.

Table 5 of Plaintiffs' expert report of Dr. Pusillo contains BPA "testing results as alleged in the complaint,"[8] conducted by Plaintiffs' lab, Ellipse Analytics, which shows levels of BPA present in some of the diets that Plaintiffs' purchased. SUMF ¶ 75. These BPA levels range (for the at-issue diets) from "ND," non-detectable, for ACANA Grasslands purchased by Chernik and Zarinebaf and ORIJEN Original purchased by Meyer, to 82.7 ppb[9] for ACANA Regionals Meadowland purchased by Meyer. *Id.* ¶ 76. Ellipse Analytics utilized a 30 ppb Level of Quantification ("LOQ") testing criteria to obtain these results, and the test results for several hundred dog foods, and found that approximately one-third of dog foods had BPA in them. *Id.* ¶ 77. Plaintiffs' lab admitted had it used a more sensitive LOQ, it would have found BPA in even more of the dog foods it tested. *Id.* ¶ 78. Another laboratory, ExperTox, utilized by Plaintiffs to test Champion's dog food diets for BPA, did not detect ***any*** BPA in any of the 38 samples of Champion's dog food it tested, which included diets purchased by Plaintiffs. *Id.* ¶ 79. At Champion's request, Eurofins laboratory tested samples of the diets Plaintiffs purchased for BPA, utilizing a highly-sensitive 5 ppb LOQ for BPA. *Id.* ¶ 80. Eurofins testing done on samples of the diets Plaintiffs purchased (with the exception of ACANA Meadowland, Grasslands, and Free-Run Poultry), resulted in a non-detect reading because the levels of BPA (if any) were below the 5 ppb LOQ. *Id.* ¶ 81. The results for ACANA Meadowland, Grasslands, and Free-Run Poultry were 5.90, 5.43, and 5.30, respectively (but would read as a "zero" under Plaintiffs' criteria). *Id.* ¶ 82. Additionally, Eurofins' testing of competitor dog foods demonstrated that BPA was also found in competitor brands at various low levels. *Id.* ¶ 83. The levels of BPA purportedly in Champion's dog food according to Plaintiffs would not cause an adverse health

---

[8] Exhibit 2 of the TAC does not allege any levels of BPA for any Champion diets. *See* TAC at Ex. 2.

[9] 1 ppb (part per billion) is equivalent to 1 ug/kg (microgram per kilogram), and 1 ppm (part per million) is equivalent to 1 mg/kg (milligram per kilogram) or 1,000 ppb.

effect in a dog. *Id.* ¶ 84. Plaintiffs have put forth no expert who opines that the BPA levels detected would be harmful to a dog. *Id.* ¶ 85.

### F. Very Low and Non-Dangerous Levels of Pentobarbital were Found in an Ingredient Supplied to Champion's DogStar Kitchen in Late March 2018 for its "Red" Diets, but Not Found in its Finished Dog Food

Champion uses beef tallow (fat) as an ingredient in its beef-based dog food diets (branded as the "Red" diets), as it is sprayed on the kibble at the end of the production run to increase palatability. SUMF ¶ 87. Beef tallow is created through a process called "rendering," during which the supplier, a rendering facility, converts fat from a healthy slaughtered cow in part into beef meal and in part into beef tallow. *Id.* ¶ 88. Champion's ingredient specifications to its suppliers require that all beef tallow sold to Champion be rendered from "EU Category 3" standard cows, meaning "no dead, dying, or condemned" animals are allowed. *Id.* ¶ 89.

From around August 2016 to May 2018, Champion's DogStar Kitchen purchased beef tallow from several suppliers, one of them being JBS. SUMF ¶ 90. On or around May 7, 2018, Champion learned that the Pennsylvania Department of Agriculture had inspected JBS' MOPAC rendering plant in Pennsylvania and took samples of its beef tallow to determine if it contained pentobarbital. *Id.* ¶ 91. It was determined that two lots of beef tallow delivered to Champion on or around March 26, 2018 and March 28, 2018 had tested positive for small amounts of pentobarbital (at 56 ppb and 16 ppb, respectively). *Id.* ¶ 92. Pentobarbital is not added as an ingredient in Champion's dog food. *Id.* ¶ 93.

Upon learning this, Champion immediately analyzed which of its production runs (also called "lots") were made with the affected beef tallow and quarantined all unshipped kibble made with it, as well as unused tallow it had received from JBS. SUMF ¶ 95. Additionally, Champion pulled back from its distributors all of the unsold food it had that was made with the affected beef tallow. *Id.* ¶ 96. Of the 1.7 million pounds of dog food manufactured using the

affected beef tallow, Champion quarantined or retrieved approximately 1.6 million pounds; only about 100,000 pounds of kibble were sold into retail *nationwide*, and it is not known if any of that kibble was ever sold in Illinois. *Id.* ¶¶ 97, 98.

Beyond these actions, Champion retained a consultant to assess whether the consumption of dog food from the affected lots would pose a health risk to dogs. SUMF ¶ 99. Due to the low amount of pentobarbital in the affected tallow, as well as the fact that tallow is only a small fraction of the finished food, the consultant determined, using the FDA's No Observable Effect Level (NOEL), that the small amount of pentobarbital in the beef tallow used in the affected lots would not pose any danger to any dog. *Id.* ¶ 100. Third, Champion had composite samples of the quarantined dry finished kibble made with the affected tallow lots sent to Texas A&M Veterinary Medical Diagnostic Laboratory ("TVMDL") for testing. *Id.* ¶¶ 101, 102. All eleven (11) composite samples tested by TVMDL resulted in a "Non-Detect" reading with a 2 ppb LOD (level of detection), and Plaintiffs' expert Dr. Callan has no critique of this testing or these results. *Id.* ¶¶ 103, 104. The FDA's guidance states that it is pentobarbital's "detection [that] renders the product adulterated," which Plaintiffs' experts admit. *Id.* ¶¶ 105, 106.

The FDA inspected Champion's DogStar Kitchen on May 16th, 17th, and 23rd of 2018, reviewed the TVMDL test results and (i) approved of Champion's handling of the situation, including Champion's decision not to recall product from retailers because the kibble posed no danger to dogs, (ii) determined no other action was needed, and (iii) issued a No-Action letter. SUMF ¶ 107. Finally, other than those two lots from JBS, Plaintiffs have nothing beyond speculation that any other beef tallow shipment from JBS contained pentobarbital, or any Champion dog food contained detectable amounts of pentobarbital. *Id.* ¶ 109.

## V.    SUMMARY JUDGMENT STANDARD AND ELEMENTS OF CLAIMS

Summary judgment is a means "to isolate and dispose of factually unsupported claims,"

and the Supreme Court has directed courts to interpret the rule "in a way that allows [them] to accomplish this purpose." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Champion is entitled to summary judgment because "there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and Plaintiffs cannot establish an essential element to their case on which they bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

The elements of a claim under ICFA are (1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; (3) the deception happened in the course of trade or commerce; and (4) the deception proximately caused the plaintiff's injury. *See Siegel v. Shell Oil Co.*, 656 F. Supp. 2d 825, 831–32 (N.D. Ill. 2009), *aff'd*, 612 F.3d 932 (7th Cir. 2010). The ICFA also applies to "the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact." 815 ILCS 505/2. "The proximate causation requirement applies to both misrepresentation and omission claims under the ICFA." *Siegel*, 656 F. Supp. 2d at 832. Plaintiffs' claim for fraudulent misrepresentation requires that they show "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance upon the truth of the statement; and (5) damage to the plaintiff resulting from such reliance." *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 734 (7th Cir. 2017) (citation omitted). Finally, unjust enrichment under Illinois law requires that the defendant engaged in "unlawful or improper conduct as defined by law" and that the plaintiff show "(1) the defendant has unjustly retained a benefit to the plaintiff's detriment and (2) the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Siegel*, 656 F. Supp. 2d at 834.

## VI.    ARGUMENT

### A.    Summary Judgment Should Be Entered on Counts I-III Based on Alleged Misrepresentations

Plaintiffs' claims for violation of ICFA, fraudulent misrepresentation, and unjust enrichment each fail as they are premised on statements that appear on Champion's DogStar dog food packaging[10] that are not misleading, deceptive or fraudulent.  When analyzing such claims, the "test for the deceptiveness of a representation is keyed to a reasonable consumer, and deceptiveness is evaluated specifically in light of all the information available to the consumer." *Fuchs v. Menard, Inc.*, No. 17-cv-01752, 2017 WL 4339821, at *5 (N.D. Ill. Sept. 29, 2017) (internal citations and quotation marks omitted). And, "under the ICFA … [i]f other information disclosed or available to the consumer dispels any tendency to deceive, there is no deception." *Trujillo v. Apple Computer, Inc.*, 581 F.Supp.2d 935, 938 (N.D. Ill. 2008).

### 1.    "Biologically Appropriate" is Puffery and Otherwise Non-Actionable

Champion's representation that its dog food is "Biologically Appropriate" is puffery, and therefore, is not actionable. As a matter of law, statements such as "Biologically Appropriate" are non-actionable statements of opinion because they are not capable of being proven as a verifiable fact.[11]  *See High Rd. Holdings, LLC v. Ritchie Bros. Auctioneers (Am.)*, No. 1:07-CV-4590, 2008 WL 450470, at *4 (N.D. Ill. Feb. 15, 2008) ("Where such a statement is merely a

---

[10] Summary judgment is appropriate as to all of Meyer's claims because she did not read any DogStar packaging, which contained the allegedly deceptive information at issue, and therefore she could not have been misled by it. SUMF ¶ 16; *see Siegel*, 665 F. Supp. 2d at 832.

[11] Champion recognizes that the Order found that the "Biologically Appropriate" statement was actionable as pled and declined to find it was puffery. Order at 13-14. However, that was under the Rule 12 standard solely based on Plaintiffs' allegations, not record evidence. *Id.* at 13. With the factual record submitted herewith and scrutiny of the actual packaging at issue, Champion submits that "Biologically Appropriate" is an opinion about what sort of diet is appropriate for a dog. *See Ibarrola v. Kind, LLC*, 83 F. Supp. 3d 751, 759 (N.D. Ill. 2015) ("The Court must view the allegedly misleading statement in light of the information available to [plaintiff] at the time of her purchase.").

'subjective description or opinion,' it constitutes 'puffing' and is not actionable as a fraudulent misrepresentation."); *Tylka v. Gerber Prod. Co.*, No. 96 C 1647, 1999 WL 495126, at *5 (N.D. Ill. July 1, 1999) (stating "'puffing' is a defense to a fraud action [when] the statements are merely 'opinions' as opposed to 'fact'" and "[m]ere subjective descriptions or opinions do not quality as fraudulent misrepresentations of fact") (citations omitted).

Some packages purchased by Plaintiffs state, "ORIJEN is the fullest **expression** of our Biologically Appropriate and Fresh Regional Ingredient commitment," and "modern dogs are built like their ancestors [wolves]. **We believe** they should eat like them too." SUMF ¶¶ 21, 22 (emphasis added). "In matters of advertising, the court should look to the overall, net impression made by the advertisement in determining what messages may reasonably be ascribed to it." *Tylka*, 1999 WL 495126, at *6 (citation omitted). In context, nothing in these statements implies that the "Biologically Appropriate" statement is anything but Champion's opinion. But no matter how strongly Champion believes in its "Biologically Appropriate" philosophy, it is still an opinion or matter of judgment, which is not actionable. *See, e.g., Loggerhead Tools, LLC v. Sears Holdings Corp.*, No. 12-CV-9033, 2016 WL 5080028, at *5 (N.D. Ill. Sept. 20, 2016), *aff'd*, 784 F. App'x 785 (Fed. Cir. 2019) (granting summary judgment as statement was subjective and nonactionable puffery); *High Rd. Holdings*, 2008 WL 450470, at *4 (same). Because "Biologically Appropriate" is an expression of opinion regarding nutrition and "[n]utrition is a nebulous concept, … it cannot be said that the term reasonably misleads consumers," summary judgment as to Plaintiffs' claims based upon it should be entered. *Tylka*, 1999 WL 495126, at *8.

> **2.** **Even if "Biologically Appropriate" were Actionable, it is Not Rendered Deceptive or Unfair Due to the Presence of Heavy Metals or BPA**

Champion does not advertise that its diets contain no heavy metals, are free of heavy

metals, are BPA-free, or any words to that effect. SUMF ¶¶ 55, 74; *see Simpson v. Champion Petfoods USA, Inc.*, 397 F. Supp. 3d 952, 972 (E.D. Ky. 2019) ("Champion did not claim that its products were free from *any* heavy metals and any inference to the contrary reads too much into Champion's representations."). So, Plaintiffs try to hook heavy metals and BPA to the "Biologically Appropriate" statement on the packaging. But Plaintiffs have no peg on which to hang such a hat.

Trace amounts of heavy metals in Champion's foods are naturally occurring in the ingredients (mostly in the animal-based proteins) used to make the food; Champion does not add heavy metals as ingredients. SUMF ¶¶ 53-55. The heavy metals are not present at a level that would pose a danger to a dog consuming the food. *Id.* ¶ 66. Even taking the highest level of each heavy metal in each of the at-issue diets as set forth in the TAC, these levels are a fraction of any known MTL for heavy metals, and similarly well below the EU standards. SUMF ¶ 63.

The phrase "Biologically Appropriate" does not signify to a consumer acting reasonably that Champion's dog food is free of naturally occurring heavy metals. Consequently, the "Biologically Appropriate" statement is not rendered false, misleading, or unfair by the mere presence of naturally occurring heavy metals in the ingredients. *See Beardsall v. CVS Pharmacy*, 953 F. 3d 969, 977 (7th Cir. 2020) (affirming summary judgment for defendant where defendant advertised its product as 100% Pure Aloe Vera Gel despite it containing preservatives because "the presence of preservatives—in reasonably small amounts was acceptable and something [plaintiffs] *expected*"); *see also Song v. Champion Petfoods USA, Inc.*, No. 18-CV-3205 (PJS/KMM), 2020 WL 7624861, at *5 (D. Minn. Dec. 22, 2020) ("A reasonable consumer is highly unlikely to interpret 'biologically appropriate' as a guarantee that the dog food contains no heavy metals whatsoever. The phrase 'biologically appropriate' does not, on its face, say

18

anything about heavy metals, except that the dog food does not contain any ingredient (including heavy metals) that would make it unfit for a dog to consume."); *Weaver v. Champion Petfoods USA Inc.*, No. 18-CV-1996-JPS, 2019 WL 2774139, at *3 (E.D. Wis. July 1, 2019) (holding "the mere presence of heavy metals" does not defeat Champion's quality claims); *Loeb v. Champion Petfoods USA Inc.*, 359 F. Supp. 3d 597, 604 (E.D. Wis. 2019) (same).

Similarly, the trace levels of BPA sometimes found in Champion's finished food does not render Champion's "Biologically Appropriate" statement untrue or misleading. Champion's "Biologically Appropriate" philosophy pertains to the design of, *i.e.*, the formula for Champion's dog food diets. It is undisputed that ***BPA was not added as an ingredient*** to Champion's diets. SUMF ¶ 73. Indeed, Plaintiffs have no expert opinion to explain how trace amounts of BPA may sometimes get into Champion's finished product other than to speculate about possible sources. *Id.* ¶ 86. Plaintiffs' own expert admitted that his lab tested hundreds of dog food diets and found BPA in a third of them and would have found more if the lab used lower than a 30 ppb LOQ. *Id.* ¶¶ 77, 78. Finally, Plaintiffs cannot demonstrate that they ever purchased Champion dog food that contained BPA. Their BPA allegations are based on speculation.

As with heavy metals, any trace levels of BPA in Champion's foods are ***not found*** at a level that would pose a danger to dogs. SUMF ¶ 84. To that end, Plaintiffs put forth no expert who opines that the BPA levels are at an unsafe level. *Id.* ¶ 85. As stated by the *Weaver* court:

> The Court sees no reason to treat BPA differently than heavy metals. To hold Defendants liable for the risk that their products contain unintended and non-harmful concentrations of these substances, a fact common to many other pet food manufacturers, would be extraordinary.

*Weaver v. Champion Petfoods USA Inc.*, 471 F. Supp. 3d 876, 882 (E.D. Wis. 2020).[12] And,

---

[12] Plaintiffs suggest that Champion's packaging would give a reasonable consumer the impression that its dog food does not contain naturally occurring heavy metals or BPA by

Plaintiffs fail to proffer any testimony demonstrating that BPA, at the purported levels in Champion's dog food, has any effect on the quality of the dog food.

In short, Plaintiffs' theory based on the mere risk of or the actual presence of heavy metals or BPA does not render the "Biologically Appropriate" statement misleading.

### 3. "Biologically Appropriate" was not Rendered False by Plaintiffs' Pentobarbital Allegations

Likewise, the presence of a minute and non-dangerous level of pentobarbital received in two shipments of beef tallow from a supplier does not make Champion's "Biologically Appropriate" statement untrue or misleading.[13] As discussed *supra* at 13, in late March of 2018, Champion's supplier JBS sent it two lots of beef tallow, that had small levels of pentobarbital. SUMF ¶ 92. However, Plaintiffs have not and cannot demonstrate that they purchased dog food containing pentobarbital. *Id.* ¶ 109.

Plaintiffs cannot create a triable issue of fact because there are no test results that show

---

proffering an "Expectations Survey" from their expert Stefan Boedeker and offering opinions on "consumer perceptions" from another expert Bruce Silverman. Neither expert's opinions generate a genuine dispute of material fact. Mr. Boedeker's "Expectations Survey" is unscientific in that it is unreliable because it only showed respondents Champion's packaging **without a control group** and asked if they were more or less likely to purchase the dog food shown if it did not contain heavy metals and did not contain BPA. [ECF No. 117 at p. 6]. And, in no way does this survey tie the "Biologically Appropriate" statement to heavy metals or BPA. *Id.* at 12 n.4. Mr. Silverman's *ipse dixit* opinions on "consumer perceptions" were made without conducting a consumer survey, interviews, or focus groups – despite acknowledging he would do so if assessing these issues as part of his advertising practice – and he did not even review the deposition transcripts of the named Plaintiffs. [ECF No. 113 at p. 1]. Both experts' opinions are the subject of *Daubert* motions, and their opinions and testimony should be excluded from this case. [ECF No. 113; 117].

[13] Throughout the TAC, Plaintiffs imply that there was a risk of pentobarbital in all of the tallow supplied by JBS starting in 2016 until Champion terminated JBS as a supplier in May 2018 (SUMF ¶ 90) and, therefore, a risk of pentobarbital in any production runs of the "Red" diets that included JBS's tallow. TAC ¶¶ 166-167, 181. However, this supposition rests on conjecture, which Plaintiffs' expert Dr. Callan conceded, admitting "I don't have data" when asked to support an opinion as to whether any other tallow shipments received by Champion were positive for pentobarbital. SUMF ¶ 109.

pentobarbital was present in the food *they* bought.  The only Champion diets made with beef tallow are Champion's beef-based, or "Red Diets," which consist of ORIJEN Regional Red and ACANA Heritage Red Meats and two other diets that are not at-issue in this action. SUMF ¶ 87. Chernik stopped purchasing Champion dog food at the end of June 2017. *Id.* ¶ 10. Zarinebaf's produced receipts indicate he only purchased ORIJEN Regional Red on March 7, 2015 (a NorthStar diet), and Meyer's produced receipts indicate she purchased ACANA Heritage Red Meats on November 22, 2016.  *Id.* ¶ 94. Plaintiffs have no evidence they purchased a Red Diet around or after the time of the late March 2018 shipment of beef tallow from JBS, or that the bags they purchased earlier contained pentobarbital. For this reason alone, summary judgment should be entered as to the pentobarbital claims.

Moreover, the only pentobarbital testing done occurred when Champion sent composite samples of its dog food that was manufactured using the affected beef tallow to TVMDL in May 2018 to determine whether pentobarbital was present in the finished diets. SUMF ¶ 102. TVMDL determined that pentobarbital was **not** present in Champion's finished dog food product. *Id*. ¶ 103. Plaintiffs have no testing to the contrary. *Id*. ¶ 109. That no pentobarbital was detected in the finished food is dispositive here, because the FDA's guidance states that it is pentobarbital's "**detection** [that] renders the product adulterated." SUMF ¶ 105. Indeed, Plaintiff's expert Dr. Callan admitted that "[y]es, that is my understanding" that "to be adulterated, it [pentobarbital] had to be detected." *Id.* ¶ 106. Consistent with its past guidance, the FDA agreed with Champion's determination that no recall of its dog food that had made it into retail was warranted because it was undetectable, issuing Champion a No-Action letter. *Id.* ¶¶ 107, 108. Because Plaintiffs have no evidence that any detectable level of pentobarbital was in any production run of Champion's Red diets, let alone any diet they purchased, they have no

evidence Champion's food was adulterated, requiring entry of summary judgment as to Plaintiffs' pentobarbital claim.

For all the foregoing reasons, Champion's "Biologically Appropriate" statement is not untrue or misleading based on Champion having received those two lots of JBS beef tallow.

### 4. Champion's Statement that Its Dog Food Contains "Fresh" Ingredients is Not Untrue or Misleading

Plaintiffs cannot demonstrate that Champion falsely advertised its dog food as ***only*** containing "fresh" ingredients. To start, Champion never stated on its DogStar packaging that its dog food contains "only" fresh ingredients, that the ingredients are "all" fresh, or "100%" fresh, or, for that matter, "never frozen." SUMF ¶ 32. The front of every 2016-2017 and most 2018 DogStar packages purchased by the Plaintiffs state that the diet includes "**freeze-dried**" ingredients. SUMF ¶ 27. Similarly, the front of many DogStar packages purchased by Plaintiffs state how many, and which, top ingredients were delivered either "**fresh or raw**." *Id*. ¶ 28. The back of every DogStar package purchased by Plaintiffs also contain numbers and fractions indicating approximately how many pounds of ingredients included in the diet were delivered fresh, raw, dehydrated, dried, or as oils. *Id*. ¶ 29.  By way of example, the DogStar '16-17 ACANA Heritage Red Meat package purchased by Chernik and Meyer states that "this 13 lb package of ACANA is made with over 7 ¾ lb of beef, pork, & lamb ingredients. **Half are FRESH or RAW** and loaded with goodness and taste, and **half are DRIED or OILS** that provide a strong and natural source of animal proteins and fats." *Id*. ¶ 25 (emphasis added). And, the back of the DogStar '16 ORIJEN Six Fish package purchased by Chernik and Zarinebaf and the DogStar '16 ORIJEN Original package purchased by Meyer state "this **13 lb package** of ORIJEN is **made with over 11 lb of fresh, raw or dehydrated fish [or animal] ingredients. 2/3 fresh or raw, 1/3 dried or oils**." *Id*. ¶ 30. *See Song*, 2020 WL 7624861, at *8 ("[T]he

Champion packages themselves make clear that not all of the ingredients are fresh."); *Weaver,*
*471 F. Supp. 3d at 884* ("when the dog food packaging is viewed in full, it is clear that … at least
several pounds … are not fresh ingredients.").

Indeed, each Plaintiff understood there were non-fresh ingredients in the food. Zarinebaf
understood after reading an ACANA Lamb & Apple package that it contained ingredients that
were "fresh, raw, dried, and oils." SUMF ¶ 31. Chernik testified that he "agree[d] that dried fish
ingredients are not fresh fish ingredients," "dried ingredients are not fresh ingredients," and "oils
are not fresh ingredients." *Id*. And, Meyer testified that Champion's saltwater fish would be
"packed on ice" after caught because "[t]hat's how we get our fish from all over the world unless
we live by the ocean" and agreeing that after it is on ice, it will become frozen. *Id.*

In light of Champion's actual labeling, Plaintiffs' theory that all ingredients are fresh fails
as a matter of law, and Champion should be awarded summary judgment on Plaintiffs' ICFA,
fraudulent misrepresentation, and unjust enrichment claims. *See Trujillo*, *581 F.Supp. 2d at 939*
("In light of the information that Apple disclosed on the outside of the iPhone package—the
battery's limited life and the potential need to have it replaced by an outside vendor…no
reasonable jury could find that any reasonable consumer possibly could consider the missing
information—the expense involved—significant in making a decision whether to purchase the
device."); *see Washington v. Hyatt Hotels Corp*., No. 1:19-cv-04724, 2020 WL 3058118, at *5
(N.D. Ill. June 9, 2020) (dismissing ICFA and unjust enrichment claims because "Defendant
acted with … transparency: it disclosed the existence and amount of the resort fees not once but
twice during the booking process…These facts undermine Washington's claim of deception.");
*Gubala v. CVS Pharmacy, Inc.*, No. 14 C 9039, 2015 WL 3777627, at *6 (N.D. Ill. June 16,
2015) (dismissing ICFA claim because "[t]he words 'Naturally & Artificially Flavored Drink

Mix,' while smaller than the above two label items, are still clearly visible and prominently placed as part of the Product description [which] make it clear to any consumer upon first glance that the Product is not *pure* whey protein, and thus the label does not create a likelihood of deception or have the capacity to deceive"). The *Weaver* court came to this same conclusion:

> [W]hen the dog food packaging is viewed in full, it is clear that some ingredients are "fresh, raw, or dehydrated," and that some ingredients are frozen and/or freeze-dried, and that at least several pounds of both types of dog food are not fresh ingredients. It is absurd to conclude that one statement can be read in isolation regarding all the ingredients in a product while ignoring the other statements on the packaging that refute that conclusion.

*Weaver*, 471 F. Supp. 3d at 884. Moreover, it is undisputed that the diets Plaintiffs purchased did contain fresh ingredients, such as such as its chicken, turkey, pork, eggs, fruits and vegetable ingredients. SUMF ¶ 24; *see also Weaver*, 471 F. Supp. 3d at 884 ("Defendants do use fresh ingredients in their dog food, therefore the statement on the packaging is not false or misleading."). In short, Champion never represented that its finished dog food contained **all** fresh ingredients; inferring to the contrary is not reasonable as a matter of law.[14] *Id.*; *see Song*, 2020 WL 7624861, at *7 (["T]he statement that a bag of dog food contains 'fresh regional ingredients' does not imply that it is comprised *exclusively* of ingredients that are fresh and regional."). Consequently, summary judgment should be entered as to Plaintiffs' claims tied to "fresh" ingredients.[15]

---

[14] The TAC alleges that Champion has used expired ingredients (which were inspected and deemed good to use) and/or regrinds in making dog food (TAC ¶ 75), but Plaintiffs are unable to prove that they purchased a bag which contained either expired ingredients or regrinds. Since Plaintiffs consider these as examples of non-fresh ingredients, these are just a subspecies of Plaintiffs' theory that non-fresh ingredients were used in making Champion's dog food and thus do not generate a disputed issue of material fact.

[15] Champion anticipates that Plaintiffs will invoke the recent decision in *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468 (7th Cir. 2020), to argue that the "Fresh Regional Ingredients" statement is misleading. However, *Bell* simply held that the plaintiffs there plausibly alleged that the defendants' unequivocal representation that their products were "100% Grated Parmesan

5.  **Champion's Statement that Its Dog Food is Made With "Regional" Ingredients is Not Untrue or Misleading**

Plaintiffs claim that Champion's dog food in question includes "non-regional" ingredients, rendering its "regional" ingredients statement on the packaging misleading. TAC ¶ 95. Once again, Plaintiffs are off base. Champion explains that regional sourcing is but one "**focus**" of Champion's, and it never advertised its dog food as **only** containing "regional" ingredients, or that the ingredients are "all regional," or "100% regional." SUMF ¶¶ 36, 42; *Song*, 2020 WL 7624861, at *9 ("Champion has not made any statement that a reasonable consumer would interpret as a representation that every single ingredient used to make the dog food—including, for example, saltwater fish such as mackerel and flounder—comes from within 100 miles of Champion's plant in Kentucky."). Nor is there an objective definition of "regional" that Plaintiff can point to that was violated. *Ibarrola*, 83 F. Supp. 3d at 759 (dismissing ICFA claim where plaintiff "fails to plausibly allege how her understanding of the term 'no refined sugars' corresponds with the contrary information in the ingredient list").

The packaging at issue provide context for the "regional" statement. Each ACANA packaging identifies the city or county and state, province, or country of the key ingredients prominently in the front of the packaging. SUMF ¶ 37. For example, the front of the DogStar

---

Cheese" was deceptive because reasonable consumers could interpret that statement to mean that the product contained only cheese without any other additives. *Id.* at 480. In stark contrast, Champion never represented that its ingredients were "100% Regional" or "100% Fresh" or anything of the sort, which is why several courts have rejected this same theory. *See, e.g., Song*, 2020 WL 7624861, at *7-9; *Weaver*, 471 F. Supp. 3d at 884. *Bell* is inapposite for other reasons too. First, that court rejected those defendants' argument that the "100% Grated Parmesan Cheese" statement could not provide a basis for liability because the ingredient panel on the back of the product made clear it really was not "100%." *Bell*, 982 F.3d at 475-77 (citations omitted). But as noted above, Champion is not arguing that its front-of packaging statements need to be understood in light of the small-type ingredient panel. And, *Bell* found that "consumers are likely to exhibit a low degree of care when purchasing low-priced, everyday items," and that "[t]he same holds true with the low-cost groceries here." *Id.* at 479 (citations omitted). But the Plaintiffs here allege that Champion's products were false or misleading because Champion "charged one of the highest, if not the highest, price premium[s] for their dog foods." TAC ¶ 46.

'16-18 ACANA Meadowlands package purchased by Meyer accurately states some ingredients were sourced at the following locations: "Free-Run Chicken: Mayfield, Kentucky; Free-Run Turkey: Mercer County, Ohio; Freshwater Catfish: Paducah, Kentucky; Rainbow Trout: Soda Springs, Idaho." *Id.* ¶ 38. Similarly, the back of the DogStar '16-17 ACANA Lamb & Apple bag purchased by all three Plaintiffs accurately states, "Grass-fed on Kentucky and New Zealand ranches, our fresh or raw lamb arrives in WholePrey ratios." *Id.* ¶ 39.

The ORIJEN packaging purchased by Plaintiffs also disclose which ingredients are regional. For example, the DogStar ORIJEN Original package purchased by Meyer states it contains ingredients that were "sustainably farmed or fished in our region[.]" SUMF ¶ 41. The DogStar ORIJEN Regional Red diet purchase by Chernik and Zarinebaf states "America's vast and fertile lands – our source of inspiration and fresh regional ingredients." *Id*. And, ORIJEN Six Fish explains the fish is from "New England's vast Atlantic waters" and a supplier of the fish is located in New England. *Id.* ¶ 40. Indeed, nowhere on the packaging does Champion state its ingredients are 100% regionally sourced. SUMF ¶ 42.

Despite including non-regional ingredients, the ingredients that Champion represented as "regional" were, in fact, regional within the context of the full communication on the package. DogStar has sourced its chicken ingredients primarily from western Kentucky and processed in Paducah, Kentucky; turkey ingredients primarily from Mercer County, Ohio; lamb, mutton, and goat ingredients primarily from farms in Kentucky and Indiana, as well as ranches in New Zealand; beef ingredients primarily from Nebraska; pork ingredients primarily from Kentucky and Indiana; catfish and rainbow trout ingredients were caught wild in Kentucky and farmed in Idaho, respectively, and processed in Paducah, Kentucky; and egg ingredients from a facility in Freeman, Kentucky, located about an hour and 15 minutes away from DogStar kitchen. SUMF ¶

34. Similar to the fresh statement, the *Weaver* court rejected Plaintiffs' implausible interpretation of the "regional" statement:

> [T]he same flawed logic permeates Plaintiff's argument that Defendants' "regional ingredients" statement is misleading. Defendants do indeed use regional suppliers for ingredients, however, nowhere on the packaging does it state that *all* of the ingredients are regional. Further, the packaging for both NorthStar and DogStar included statements that provided context to what "regional" meant. It also seems obvious that the salt-water fish included in the Six Fish dog food would not be regional to Kentucky, but rather to the Atlantic Ocean as advertised on the packaging. Thus, because the packaging included statements that provided context to "regional" and did not state that *all* ingredients were regional, the "Regional" statement is not false or misleading.

*Weaver*, 471 F. Supp. 3d at 884.

When Plaintiffs' myopic and constricted view of regional is replaced with Champion's actual statements, the undisputed facts demonstrate that Champion did not make an untrue or misleading representation as to "regional," warranting entry of summary judgment as to this theory. *See Song*, 2020 WL 7624861, at *9 ("Champion's statements about 'regional' ingredients were not false, misleading, or deceptive."); *Ibarrola*, 83 F. Supp. 3d at 759 (dismissing natural statements as implausible since plaintiff alleged she read the entire label).

### 6. Champion's Statement "Delivering Nutrients Naturally" is Not Untrue or Misleading

Plaintiffs allege the following statement on ACANA packaging is false or misleading: "Delivering Nutrients Naturally." TAC ¶¶ 52, 195(a), 226(a)(1). To the extent Plaintiffs interpreted this phrase to mean *all* ingredients were natural, such an interpretation is implausible. Champion does not represent that all or 100% of its ingredients are natural; the statement explains "deliver[s] nutrients naturally. That's why you won't find long lists of synthetic additives in ACANA foods." SUMF ¶¶ 44, 45, 48. ACANA 2016-2017 bags state that zinc proteinate is its "one and only supplement." *Id.* ¶ 46. Regardless, it is undisputed that the nutrients derived from Champion's dog food come predominantly from natural ingredients rather

than synthetic ingredients and there is indisputably not a long list of synthetics in the diet. *Id.* ¶ 47. As such, Champion should be awarded summary judgment on the "Delivering Nutrients Naturally" statement. *See Song*, 2020 WL 7624861, at *10 ("The Court therefore finds that plaintiffs have not plausibly alleged that 'delivering nutrients naturally' is false, misleading, or deceptive."); *see also Tylka*, 1999 WL 495126, at *2, 9 (finding "Pure and natural is the way we make our food" was not a violation of the ICFA).[16]

## B. Summary Judgment Should be Entered on Count I Based on Alleged Omissions

As one court has already found, Plaintiffs are attempting to shoehorn an "omissions" claim based on the same conduct as the claims for misrepresentation. *Weaver*, 2019 WL 2774139, at *5 ("Plaintiff's claim for [common law] fraud by omission is better described as one for intentional misrepresentation."). Indeed, Plaintiffs' omissions claim under ICFA is a near mirror-image of their representation claim under ICFA. *See* TAC ¶ 55 (outlining the purported omissions). Because the omissions claim relies on the same deficient misrepresentation theories that form the basis for Plaintiffs' misrepresentation claims, these claims should also fail with summary judgment entered against them. *See* Section A.

An ICFA omission claim requires the "omission of any material fact with intent that others rely upon [its] concealment," 815 ILCS 505/2, as well as proof of proximate causation. *Siegel*, 656 F. Supp. 2d at 832. Illinois courts analyzing omission claims brought under the ICFA apply "a reasonable person standard—*i.e.*, whether the omission concerned the type of information upon which a buyer would be expected to rely in making a decision whether

---

[16] Plaintiffs' unjust enrichment count fails because it is based on the same alleged misconduct underlying the ICFA and fraudulent misrepresentation counts. *See Ass'n Benefit Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) (granting summary judgment where defendants' conduct did not arise to unlawful or wrongful conduct based on deception and thus plaintiff "failed to create a genuine issue of fact as to the element of wrongdoing necessary to support its claim of unjust enrichment.").

to purchase." *Trujillo*, 581 F. Supp. 2d at 939 (citation omitted). Moreover, "[a]n omission is actionable only where it is employed as a device to mislead." *Spector v. Mondelez Int'l, Inc.*, 178 F. Supp. 3d 657, 672 (N.D. Ill. 2016) (internal quotation and citation omitted). And, "Illinois courts have held than an omission is not actionable as fraud if it gives rise to 'an incomplete' as opposed to an affirmatively 'false impression.'" *Id.* Champion did not conceal material facts that a reasonable consumer would rely on in purchasing dog food.

*First*, Champion did not omit that its formulas utilized "non-fresh" ingredients. The front of the bags state the food includes freeze-dried ingredients, and "fresh or raw" ingredients, while the back of the bags have large panels indicating the approximate amount, in pounds, of fresh, raw, dried, dehydrated, or oils were used to make the food. SUMF ¶¶ 25-30. With respect to Plaintiffs' theories based on regrinds or expired ingredients, these are subspecies of "non-fresh" ingredients. Champion does not advertise that its ingredients are 100% fresh. *Id.* ¶ 32.

*Second*, Champion does not omit from its bag that it includes non-regional ingredients. To the contrary, ingredients sourced over 1,000 miles from Auburn, Kentucky are clearly listed on these packages along with their source, such as "Rainbow Trout: Soda Springs, Idaho" (approximately 1,600 miles from DogStar kitchen) and "Wild Mackerel: New Bedford, Massachusetts" (approximately 1,105 miles from DogStar kitchen), or "wild caught New England Fish." SUMF ¶¶ 38, 40. Some of Champion's bags even list international locations, such as New Zealand for its lamb ingredients in ACANA Lamb & Apple. *Id.* ¶ 39.

*Third*, the "Delivering Nutrients Naturally" claim is derived from ACANA bags that state the food "deliver[s] nutrients naturally. That's why you won't find long lists of synthetic additives in ACANA foods." SUMF ¶¶ 44, 45. ACANA '16-17 bags state that zinc proteinate is its "one and only supplement," which is confirmed by its ingredient panel. *Id.* ¶ 46. As reflected

by the ingredient panels on subsequent bags of ACANA, it is indisputable that Champion did not use a "long list of synthetic additives." *Id.* Thus, Champion has not omitted any material information relative to additives.

**Fourth**, Champion did not violate ICFA by not disclosing that it included, or has a risk of including, pentobarbital. Pentobarbital has **never** been detected in **any** finished dog food produced by Champion, let alone in the food Plaintiffs bought. ¶¶ 103, 109. Because pentobarbital was never found in Champion's finished food product, there was nothing for Champion to disclose. *Id.* ¶¶ 103, 106-109.

**Fifth**, Champion did not violate ICFA by not disclosing that the food included, or has a risk of including, BPA. As noted above, testing has shown the presence of trace amounts of BPA in some samples and none in many others. SUMF ¶¶ 75-82. These tests reveal that it is speculative, at best, to assume that any particular Champion dog food bag contains BPA, and thus, a disclosure on BPA is not required by ICFA.

**Finally**, the presence of heavy metals in Champion's dog food is not material to the transactions because (i) they are naturally found in Champion's ingredients, which Plaintiffs knew (SUMF ¶ 69), (ii) Plaintiffs have no evidence that the low quantities of heavy metals in Champion's foods affect the quality of the food or harm dogs (*id.* ¶¶ 17, 66), (iii) heavy metals are found in nearly all dog foods, including dog foods Plaintiffs purchased after discontinuing Champion. (*id.* ¶¶ 53, 54, 64, 65), (iv) the heavy metals are present only at safe, low levels (*id.* ¶¶ 60-63, 66-67). In light of the undisputed facts, the presence of heavy metals in Champion's food was not material to Plaintiffs' transactions and cannot serve as the basis of an omissions claim.

## VII. CONCLUSION

Champion asks the Court to grant the Motion and enter summary judgment for Champion.

Dated:  June 8, 2021

Respectfully submitted,

s/ *David A. Coulson*
David A. Coulson (ARDC #6199911)
Jessica J. Fishfeld (ARDC #6313149)
Jared R. Kessler (*pro hac vice*)
Robert S. Galbo (*pro hac vice*)
Elisa H. Baca (*pro hac vice*)
GREENBERG TRAURIG P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
Tel: (305) 579-0754
Fax: (305) 579-0500
Email: coulsond@gtlaw.com
johnsonj@gtlaw.com
kesslerj@gtlaw.com
galbor@gtlaw.com
bacae@gtlaw.com

Francis A. Citera (ARDC # 6185263)
GREENBERG TRAURIG LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Tel: (312) 456-8400
Fax: (312) 456-8435
Email: citeraf@gtlaw.com

Rick L. Shackelford, Esq. (*pro hac vice*)
GREENBERG TRAURIG LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Tel: (310) 586-3878
Fax: (310) 586-7800
Email: shackelfordr@gtlaw.com

***Attorneys for Defendants***
***Champion Petfoods USA Inc. and***
***Champion Petfoods LP***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of June, 2021, I served the foregoing document on all counsel of record identified on the below Service List via Registered Email.

*/s/ David A. Coulson*
DAVID A. COULSON

## SERVICE LIST

Charles J. LaDuca
Katherine Van Dyck
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Tel: 202-789-3960
Email: charlesl@cuneolaw.com
Email: kvandyck@cuneolaw.com

Rebecca A. Peterson
Robert K. Shelquist
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave. S., Suite 2200
Minneapolis, MN 55401
Tel: 612-339-6900
Email: rapeterson@locklaw.com
Email: rkshelquist@locklaw.com

Kevin A. Seely
ROBBINS LLP
5040 Shoreham Place
San Diego, CA 92122
Tel: 619-525-3990
Email: KSeely@robbinsllp.com

Daniel E. Gustafson
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: 612-333-8844
Email: dgustafson@gustafsongluek.com

*Attorneys for Plaintiffs*

Kenneth A. Wexler
Kara A. Elgersma
Michelle Perkovic
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Tel: 312-346-0022
Email: kaw@wexlerwallace.com

Mark J. Tamblyn
WEXLER WALLACE LLP
333 University Ave., Suite 200
Sacramento, CA 95825
Tel: 916-565-7692
Email: mjt@wexlerwallace.com

Joseph J. DePalma
Susana Cruz Hodge
LITE DEPALMA GREENBERG, LLC
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Email: jdepalma@litedepalma.com
Email: scruzhodge@litedepalma.com