**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| **AFSHIN ZARINEBAF, ZACHARY CHERNIK and JOAN MEYER,** individually and on behalf of a class of similarly situated individuals, | ) ) ) ) ) |
|  | ) |
| **PLAINTIFFS**, | ) ) |
| V. | ) ) |
|  | ) |
| **CHAMPION PETFOODS USA, INC.** and **CHAMPION PETFOODS LP**, | ) ) ) |
|  | ) |
| **DEFENDANTS**. | ) ) |

Case No.  1:18-CV-06951

 Honorable Virginia M. Kendall


**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERT STEFAN BOEDEKER**

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................... 1

II.   BACKGROUND ............................................................................................................ 2

      A.    The Misrepresentations and Omissions Surveys ........................................... 3

      B.    The Expectations Survey ................................................................................ 4

      C.    The Damages Calculations ............................................................................. 5

III.  ARGUMENT ................................................................................................................. 5

      A.    Legal Standard ................................................................................................ 5

      B.    Boedeker's Opinions Are Relevant ................................................................ 6

            1.    Boedeker Properly Measured Class-Wide Damages ........................... 7

            2.    Boedeker Adequately Accounted for Supply-Side Factors ................. 8

      C.    Boedeker's Surveys and Opinions are Reliable ........................................... 13

            1.    The Pre-Test of the Expectations Surveys was Adequate ................. 13

            2.    Boedeker Sampled an Appropriate Population.................................. 14

            3.    The Expectations Survey Included Adequate Controls .................... 15

IV.   CONCLUSION ............................................................................................................ 17

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Apple, Inc. v. Samsung Electronics Co., Ltd.*,
No. 11-cv-01846, 2014 WL 976898 (N.D. Cal. Mar. 6, 2014) ...............................................12

*Black & Decker Corp. v. Positec USA Inc.*,
No. 11-cv-5426, 2015 WL 5612340 (N.D. Ill. Sept. 22, 2015)........................................13, 16

*Broomfield v. Craft Brew Alliance, Inc.*,
No. 17-cv-01027, 2018 WL 4952519 (N.D. Cal. Sept. 25, 2018)...........................................9

*Bryant v. City of Chicago*,
200 F.3d 1092 (7th Cir. 2000) ...............................................................................................6

*Comcast Corp. v. Behrend*,
569 U.S. 27, 38 (2013).............................................................................................................7

*Competitive Edge, Inc. v. Staples, Inc.*,
763 F. Supp. 2d 997 (N.D. Ill. 2010) ....................................................................................14

*Daubert v. Merrell DOW Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)....................................................................................................... *passim*

*Dean v. Colgate-Palmolive Co.*
¸ No. 15-cv-00107, 2018 WL 6265003 (C.D. Cal. Mar. 8, 2018) ..........................................11

*Ernst v. City of Chicago*,
39 F. Supp. 3d 1005 (N.D. Ill. 2014) ................................................................................6, 13

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
326 F.R.D. 592 (N.D. Cal. 2018)...........................................................................................10

*Flynn v. FCA US LLC*,
327 F.R.D. 206 (S.D. Ill. 2018) ..........................................................................................8, 9

*Gayton v. McCoy*,
593 F.3d 610 (7th Cir. 2010) ..................................................................................................5

*Georgia-Pacific Consumer Prods. LP v. Kimberly-Clark Corp.*,
No. 09 C 2263, 2010 WL 1334714 (N.D. Ill. Mar. 31, 2010) ...............................................15

*Hadley v. Kellogg Sales Co.*,
324 F. Supp. 3d 1084 (N.D. Cal. 2018) ...................................................................................9

*In re ConAgra Foods, Inc.*,
90 F. Supp. 3d 919 (C.D. Cal. 2015) ................................................................................8, 12

*In re Dial Complete Mktg. & Sales Practices Litig.*,
  320 F.R.D. 326 (D.N.H. 2017) ...............................................................10

*In re: FCA US LLC Monostable Elec. Gearshift Litig.*
  ¸382 F. Supp. 3d 687 (E.D. Mich. 2019) .............................................10

*In re Fluidmaster, Inc. Water Connector Components Prods. Liab. Litig.*,
  No. 14-cv-5696, 2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) ...........7, 12

*In re General Motors LLC Ignition Switch Litig.*,
  407 F. Supp. 3d 212 (S.D.N.Y. 2019)...............................................11, 12

*In re MyFord Touch Consumer Litig.*,
  291 F. Supp. 3d 936 (N.D. Cal. 2018) ................................................10

*In re NJOY, Inc. Consumer Class Action Litig.*,
  No. 14-cv-428, 2016 WL 787415 (C.D. Cal., Feb. 2, 2016) ..................11

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liab.*
  *Litig.*,
  No. 3:17-cv-4372, 2020 WL 6688912 (N.D. Cal. Nov. 12, 2020). ..................11, 12

*Ironclad, L.P. v. Poly-Am., Inc.*,
  2000 WL 1400762 (N.D. Tex. July 28, 2000) .........................................16

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)..........................................................................5, 6

*MacDougall v. Am. Honda Motor Co., Inc.*,
  No. 17-cv-1079, 2020 WL 5583534 (C.D. Cal. Sept. 11, 2020) ......................11, 13

*Mannacio v. LG Elecs. U.S.A., Inc.*,
  2020 WL 4676285 (D. Minn. Aug 12, 2020) .......................................10

*McCullock v. H.B. Fuller Co.*,
  61 F.3d 1038 (2nd Cir. 1995).............................................................6, 13

*Price v. L'Oréal USA, Inc.*,
  No. 17-cv-614, 2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020)..............12

*Scotch Whiskey Ass'n v. Consolidated Distilled Prods., Inc.*,
  No. 79 C 3107, 1981 WL 40524 (N.D. Ill. May 7, 1981) .....................14

*Stollings v. Ryobi Techs., Inc.*,
  725 F.3d 753 (7th Cir. 2013) ..............................................................13

*Walker v. Soo Line R. Co.*,
  208 F.3d 581 (7th Cir. 2000) ...............................................................5

**RULES**

Federal Rule of Evidence 702 ................................................................................ *passim*

**STATUTES**

Uniform Commerial Code ........................................................................................8

**OTHER AUTHORITIES**

Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011), ......................13

## I.     INTRODUCTION

Plaintiffs' expert Stefan Boedeker is a highly qualified professional by knowledge, education, and experience, and his testimony easily is relevant, reliable, and helpful to the trier of fact in accordance with Federal Rule of Evidence 702 ("Rule 702") and *Daubert v. Merrell DOW Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). While Champion Petfoods USA, Inc. and Champion Petfoods LP (collectively, "CPF") have presented experts that disagree with Mr. Boedeker's opinions, such disagreement does not render his opinions inadmissible. Whether experts are in perfect agreement is not the relevant legal standard to exclude expert testimony. Such disagreement goes to weight must be decided by the jury.

Mr. Boedeker has extensive experience designing and conducting surveys and conjoint studies as well as statistically analyzing results from surveys. His work in this case involves well-accepted methodologies, which he applies to the facts of this case. Here, Mr. Boedeker applied his expertise and experience to conduct four conjoint surveys: two Misrepresentation Surveys, one each for Acana and Orijen; and two Omissions Surveys, one each again for Acana and Orijen. Mr. Boedeker also conducted an Expectations Survey.

The Misrepresentation Surveys studied the impact of CPF's "Biologically Appropriate," "Fresh Regional Ingredients," and "Delivering Nutrients Naturally"[1] packaging claims on consumer willingness to purchase the relevant products at various price points. The Omissions Surveys studied the impact of disclosures of the inclusion of Heavy Metals, Bisphenol A, Regrinds, and Expired Ingredients in the relevant products on demand. The Expectations Survey measured consumer perceptions regarding the misrepresentations and omissions at issue and assessed the

---

[1] The "Delivering Nutrients Naturally" claim only applies to the Acana brand of dog food and was therefore not included in the Orijen misrepresentation survey.

extent to which those misrepresentations and omissions have a material impact on consumer purchase interest.

Each of these survey studies were scientifically designed, professionally undertaken, and critically evaluated, so they deliver reliable information that is relevant to Plaintiffs' theory of liability and damages against CPF and helpful to the jury in deciding those issues. The Misrepresentation and Omissions Surveys found that the value of CPF's dog food decreased when CPF's false or misleading representations are corrected. Mr. Boedeker then used this decrease in value to calculate damages. These survey results are directly tied to Plaintiffs' claims in this case, and CPF relies on distortions to impugn the reliability of Mr. Boedeker's results. CPF does not, and cannot, dispute Mr. Boedeker's education, experience, or other expert qualifications, and their arguments regarding Mr. Boedeker's survey design choices are, at best, appropriate for cross-examination at trial and go to weight. They are not a basis to exclude his opinions, and CPF's motion should be denied.

## II.     BACKGROUND

Mr. Boedeker is an accomplished consultant with extensive international experience in the application of economic, statistical, and financial models to a variety of industries including healthcare, retail, grocery, manufacturing, technology, entertainment, automotive, energy and utilities, hospitality, and federal, state, and local government agencies. (Dkt. 129-1 ¶¶2-5.) CPF does not dispute Mr. Boedeker's qualifications. Plaintiffs asked Mr. Boedeker to provide a framework for the computation of class-wide damages, outline an economic model that quantifies the economic losses suffered by the Class, explain a statistical methodology to calculate class-wide damages, conduct empirical analysis and apply the methodology to estimate class-wide damages, and conduct consumer analysis to empirically verify consumers' understanding of the

misrepresentations and omissions. (*Id.* ¶12.) In performing these tasks, Mr. Boedeker used his knowledge, experience, and education to conduct the Misrepresentation Surveys, the Omission Surveys, and the Expectations Survey. He is qualified, has employed reliable methodology, offers opinions that follow rationally from the application of his methodology and qualifications, and presents testimony that is relevant to the case at hand. For these reasons, Mr. Boedeker's testimony satisfies Rule 702 and *Daubert*.

### A.     The Misrepresentations and Omissions Surveys

Mr. Boedeker's Misrepresentations Survey results demonstrate that consumers who are deciding which premium dog food to purchase ascribe value to CPF's false or misleading statements that its Dog Food is Biologically Appropriate, made with Fresh Regional Ingredients, or effective in Delivering Nutrients Naturally (only applicable for the Arcana brand). The Omissions Survey results show that consumers in the premium dog food market view the Dog Food as less valuable after reading corrective statements related to the presents of Heavy metals, Bisphenol A (BPA), Regrinds, and Expired ingredients. Mr. Boedeker then calculated the amount premium dog food consumers are harmed by each misrepresentation and by each omission. (Dkt. 129-1 ¶169, Table 14, ¶¶171-72.)

To reach this conclusion, Mr. Boedeker designed and conducted scientifically valid surveys that collected information from a total of 2,375 respondents. (*Id.* ¶153.) Mr. Boedeker took care to select only survey respondents who adequately reflected the putative Class of premium dog food purchasers. (*Id.* ¶108.)

For the Misrepresentations Surveys, respondents were introduced into a hypothetical purchase scenario wherein they were considering the purchase of a bag of Acana or Orijen Dog Food. They were then shown images of each side of the relevant Dog Food packaging and

completed 15 exercises. In each exercise, participants were shown two options, each with a different combination of the misleading statements and a price.[2] After respondents chose their preferred option, they were asked whether they would purchase that option. Participants were therefore able to express both a preference between two options and then to ultimately reject both. (*Id.* ¶¶117, 125-26, 129-36.)

For the Omissions Surveys, respondents were introduced to a similar hypothetical purchase scenario where they were told to assume they were purchasing a bag of their favorite dog food. (*Id.* ¶137.) Respondents then were shown attribute descriptions for each of the omissions (including a distractor related to artificial preservatives). (*Id.* ¶139.) They then completed 15 exercises each consisting of a screen with different combinations of these attribute descriptions and prices. (*Id.* ¶¶125-26, 137-140.)

### B.    The Expectations Survey

Mr. Boedeker conducted an expectation survey "1) to measure consumer perception regarding the misrepresentations and omissions at issue; and 2) to assess the extent to which those misrepresentations and omissions have a material impact on consumer purchase interest." (Dkt. 129-1 ¶173.) The survey included 500 participants who were sampled to be adequately representative of the Class. (*Id.* ¶175-76.) Participants were randomly assigned to either the Orijen or Acana study, shown an image of the product, and then were asked about their expectations based on the statements on that packaging. (*Id.* ¶177-78.) Respondents were able to choose their responses from a Likert response scale ranging from "Strongly Disagree" to "Strongly Agree," with a "Neither Agree Nor Disagree" option in the middle. ( *Id.* ¶¶177-180.) Respondents could

---

[2] Each exercise also included up to two distractor attributes in order to prevent survey participants from focusing only on the attributes of interest. (Dkt. 129-1 ¶ 117.)

also select "Don't know/Unsure" as an option. (*Id.*) Next, respondents were asked if various statements on the packaging made them more or less likely to purchase the product with a scale of options for their response, ranging from "Far less likely" to "Far more likely" with a "Same" option in the center. (*Id.*) Lastly, respondents were asked if they would be more or less likely to purchase dog food that did not contain the ingredients related to the omissions. (*Id.*)

### C.      The Damages Calculations

Mr. Boedeker used the results from the Misrepresentation Surveys and Omissions Surveys to calculate "economic losses for individual misrepresentations, groups of misrepresentations, individual omissions, and groups of omissions." (Dkt. 129-1 ¶184.) The Expectations Survey provided no input for the damages calculations. Mr. Boedeker found that, if CPF is found liable for the misrepresentations and omissions, "the economic losses presented in this report are similar to the price premium for Orijen/Acana products over non-premium brand products . . . ." (*Id.* ¶187.)

## III.    ARGUMENT

### A.      Legal Standard

Rule 702 and *Daubert* govern the admissibility of expert testimony. *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010); *Walker v. Soo Line R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000). Rule 702 permits the admission of expert opinion testimony if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," "the testimony is based on sufficient facts or data," if "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

District courts are obligated to act as a "gatekeeper" to ensure that the expert testimony is both reliable and relevant. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999);

*Daubert*, 509 U.S. at 589; *see also Ernst v. City of Chicago*, 39 F. Supp. 3d 1005, 1008 (N.D. Ill. 2014). However, judges acting as gatekeepers "do not assume 'the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul' that would inexorably lead to evaluating witness credibility and weight of the evidence, the ageless role of the jury.'" *Ernst*, 39 F. Supp. 3d at 1009 (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1045 (2nd Cir. 1995)). A Rule 702 and *Daubert* analysis is therefore limited to *reliability*, not persuasiveness. *Id.* at 1008 (citing *Kumho Tire*, 526 U.S. at 149).

The *Daubert* principles apply equally to scientific and non-scientific testimony. *Kumho Tire*, 526 U.S. at 147. Expert testimony cannot be based on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. "A district court enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000). To determine relevance, the proponent must show that the expert's "reasoning or methodology . . . properly can be applied to the facts in issue" and the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 592-93; Fed. R. Evid. 702.

Thus, in evaluating a motion to exclude expert testimony under Rule 702 and *Daubert*, the district court considers whether the proffered expert (1) is qualified, (2) has employed reliable methodology, (3) offers opinions that follow rationally from the application of the expert's methodology and qualifications, and (4) presents testimony that is relevant to the case at hand. *Kumho Tire*, 526 U.S. at 151-54; *Daubert*, 509 U.S. at 589-93; Fed. R. Evid. 702.

### B.     Boedeker's Opinions Are Relevant

CPF's relevancy challenges to Mr. Boedeker's opinions are narrow and do not challenge his credentials. First, CPF claims that Mr. Boedeker's opinions are irrelevant because his

calculations cannot simultaneously show class-wide damages for both the misrepresentations and the omissions. Second, CPF argues that Mr. Boedeker did not properly account for supply-side factors and therefore did not properly estimate damages. Both these challenges are unfounded.

### 1. Boedeker Properly Measured Class-Wide Damages

CPF argues, inconsistently and incorrectly, that Mr. Boedeker's calculations fail because they can neither be isolated nor aggregated together and that aggregation results in negative value. (Dkt. 129 at 14-17.) Mr. Boedeker's report explains:

> The results from the surveys showed that all of the misrepresentations and all of the omissions tested would result in an economic loss to the consumer when the truth would be revealed at the point of purchase (i.e., that certain facts were misrepresented and that certain facts that would make the product inferior were omitted). Further, the model enabled me to compute economic losses for individual misrepresentations, groups of misrepresentations, individual omissions, and groups of omissions.

(Dkt. 129-1 ¶184.) Mr. Boedeker also expressly testified that his report shows "the results of the misrepresentations and omissions individually and in combination. So, for example, it shows what each individual omission's drop in value would be, but it also shows the combination." (Dkt. 129-3 at 93:5-9.) He also, properly, did not calculate damages from the combination of misrepresentations. (Id. at 93:10-18.) This is well within the requirement set forth in *Comcast Corp. v. Behrend*, pointed out by CPF, that the respective theories of liability be isolated, as that is precisely what Mr. Boedeker's surveys and calculations achieve. 569 U.S. 27, 38 (2013). And, in fact, Mr. Boedeker opines, "If the Court finds Champion liable for the misrepresentations and omissions, the economic losses presented in this report are similar to the price premium for Acana products over nonpremium brand products." (Dkt. 129-1 ¶187.) The type of methodology he uses has been accepted by courts in the Seventh Circuit. *In re Fluidmaster, Inc. Water Connector Components Prods. Liab. Litig.*, No. 14-cv-5696, 2017 WL 1196990, at *57 (N.D. Ill. Mar. 31,

2017) (citing *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 953-54 (C.D. Cal. 2015)) (noting that "a 'price premium' theory based on a conjoint analysis has been accepted by several courts"); *Flynn v. FCA US LLC*, 327 F.R.D. 206, 225 (S.D. Ill. 2018) (finding a conjoint analysis "sufficiently tied to Plaintiffs' theory of liability"). And CPF's critique regarding the amount of damages that ultimately result from that methodology are an issue for the jury.

### 2. Boedeker Adequately Accounted for Supply-Side Factors

Mr. Boedeker adequately accounted for supply-side factors, and his calculations are therefore relevant as a measure of class-wide damages. He calculated diminution in value associated with correcting CPF's misrepresentations or omissions. (Dkt. 129-1 ¶184-88.) Using the survey responses, Mr. Boedeker was able to calculate the value of each misrepresentation and omission at issue. (*Id.* ¶169, Tables 14-15.) He also checked the reasonableness of these damages estimates "by comparing the prices of Defendants' products to prices of non-premium dog food" and confirmed that "[t]he misrepresentations and omissions analyzed in this study would erase many if not all benefits consumers perceive Defendants' products to have over non-premium products." (*Id.* ¶170.)

"In the But-For-World, consumers know at the point of purchase that [the Dog Food lacks valuable attributes], which makes [the Dog Food] less desirable to them. Consequently, they would pay a lower price for the product in the But-For-World." (*Id.* ¶50.) These consumers who bought in the actual world believing that the Dog Food does have these valuable attributes "thus overpaid and need to be compensated for the loss of utility they experienced from not getting [Dog Food] with [those attributes]." (*Id.*)[3] "This can only be achieved by determining the reduced price at

---

[3] CPF argues as if the benefit of the bargain concept is new or novel, even though it has been part of the common law for centuries and a UCC remedy for decades.

which . . . consumers would have purchased in the But-For-World, and providing purchasers with a compensation that effectively shifts the But-For demand curve up into the market equilibrium of the Actual World." (*Id.*) Mr. Boedeker acknowledges that in the but-for-world, "the manufacturer faces a lower demand and—if it could—would set a different price which maximizes profits" and would thereby "achieve a different volume in the but-for-world." *Id.* ¶36. "However, setting new profit-maximizing prices and volumes sold would contradict the postulate of the *Reference Guide on Estimation of Economic Damages* that the But-For-World should only correct the harmful Act." (*Id.* ¶37.) In addition to properly holding supply constant, Mr. Boedeker made sure to use real-world prices in his survey. (*Id.* ¶118-19.) Doing so takes into account the necessary supply-side factors that CPF contends must be considered—cost of production, cost of goods sold, and willingness to sell. Although CPF's expert, Dr. Hanssens, criticized Mr. Boedeker's analysis for allegedly failing to consider supply side factors, Dr. Hanssens made no effort to calculate the change in supply curve in the but-for world. (Ex. 1, Dep. of Dr. Dominique M. Hanssens at 84:22-85:12; 92:16-94:3.)[4]

Courts have held that these two factors (real world market prices and holding quantity/supply fixed) adequately account for supply-side factors for surveys determining diminution in value using a consumer survey. *See Broomfield v. Craft Brew Alliance, Inc.*, No. 17-cv-01027, 2018 WL 4952519, at *18-20 (N.D. Cal. Sept. 25, 2018) (finding Mr. Boedeker accounted for supply-side factors by using a range of prices that included actual price levels in the conjoint survey); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1105 (N.D. Cal. 2018) ("[C]ourts have also found that [survey] analyses can adequately account for supply-side factors—

---

[4] All references to "Ex. __" refer to Plaintiffs' exhibits to the Declaration of Rebecca A. Peterson filed herewith unless otherwise stated.

and can therefore be utilized to estimate price premia without running afoul of *Comcast*—when (1) the prices used in the surveys underlying the analyses reflect the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect the actual quantities of products sold during the class period."); *In re Dial Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326, 335 (D.N.H. 2017) *leave to appeal denied sub nom. Carter v. Dial Corp.*¸ 869 F.3d 13 (1st Cir. 2017) (approving a survey where "the supply element of the survey and demand price function is fixed" and included in the market price paid for the product at issue); *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 969-71 (N.D. Cal. 2018) (finding that the survey analysis adequately accounted for supply-side factors "by assuming that the supply—the quantity—was fixed"); *In re: FCA US LLC Monostable Elec. Gearshift Litig.*¸382 F. Supp. 3d 687, 702 (E.D. Mich. 2019); *Mannacio v. LG Elecs. U.S.A., Inc.*, 2020 WL 4676285, at *4 (D. Minn. Aug 12, 2020) ("[C]onjoint analyses 'adequately account for supply-side factors' when '(1) the prices used in the surveys underlying the analyses reflect the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect the actual quantities of products sold during the class period.'"); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018), *leave to appeal denied*, No. 18-80081, 2018 WL 4922825 (9th Cir. Sept. 18, 2018), and *reconsideration denied sub nom.*, No. 17-cv-00564, 2018 WL 5793479 (N.D. Cal. Nov. 2, 2018) ("Here, the conjoint survey 'used actual market-clearing prices as the basis for the prices in the survey, actual competitor products, and actual label claims on those products.' . . . [T]he conjoint survey 'was performed in a market that is long-established and efficient, where retailers' pricing is responsive to market forces,' and . . . it took into account the fixed quantity of supply . . . because those sales occurred in the past. Therefore, it does appear that plaintiffs calculated the price

premium consumers paid . . . and not just a theoretical willingness to pay. The price premium study therefore passes muster under *Daubert* and Federal Rule of Evidence 702.").

As the above authority demonstrates, courts more than "occasionally" admit conjoint surveys. CPF simply waives away the weight of this authority with a blanket statement that its preferred citations are "more persuasive" while implying that conjoint analysis is disfavored. (Dkt. 129 at 21 n.10.) However, CPF's own cited authority does not support the broad premise that conjoint analysis is disfavored by courts.

While the court in *In re NJOY, Inc. Consumer Class Action Litig.*, No. 14-cv-428, 2016 WL 787415, at *7 (C.D. Cal., Feb. 2, 2016), rejected a conjoint analysis, that position is not even uniform within that district. *See Dean v. Colgate-Palmolive Co.*, No. 15-cv-00107, 2018 WL 6265003, at *9 (C.D. Cal. Mar. 8, 2018) (acknowledging *NJOY* but finding "conjoint analysis potentially useful to calculate classwide damages"). And ultimately, the *NJOY* court actually denied the defendant's motion to exclude under Rule 702. 2016 WL 787415, at *4, 7.

CPF's remaining authorities fare little better. "In a classic mislabeling case," it "makes sense" to assume the supplied volume in the but-for-world is the same as the actual world. *In re General Motors LLC Ignition Switch Litig.* ("*General Motors*"), 407 F. Supp. 3d 212, 238-239 (S.D.N.Y. 2019). The complexity of the product at issue was also at the heart of the court's decision in *MacDougall v. Am. Honda Motor Co., Inc.*, No. 17-cv-1079, 2020 WL 5583534, at *6 (C.D. Cal. Sept. 11, 2020) (expert testimony excluded because survey choices were limited to five speculative price values in increments of $500), *appeal docketed*, No. 20-56060 (9th Cir. Oct. 15, 2020). The court's decision in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation* was premised on the complexities of vehicle pricing. No. 3:17-cv-4372, 2020 WL 6688912, at *7-8 (N.D. Cal. Nov. 12, 2020). The challenged survey suffered

11

numerous deficiencies not present here: respondents were asked "to consider vague effects going beyond low emissions," it resulted in a premium "that resemble[d] 'somewhere between almost nothing and almost everything,'" and it used an informal and inadequate pretest. *Id.* CPF's reliance on *Apple, Inc. v. Samsung Electronics Co., Ltd.*, No. 11-cv-01846, 2014 WL 976898, at *11 (N.D. Cal. Mar. 6, 2014), is similarly misplaced. First, *Apple* did not even involve a *Daubert* challenge. *Id.* at 13. Second, *Apple* involved a *lost profits* damages model for a patent infringement claim, not a price premium damages model for a consumer mislabeling claim. *Id.* When lost profits are at issue, additional supply-side factors naturally become relevant because a producer's profits are directly dependent on costs.

There are no such problems here. This is a "classic mislabeling" case as envisioned by *General Motors*. 407 F. Supp. 3d at 238. Moreover, as noted by another case upon which CPF relies, a conjoint analysis of the type Mr. Boedeker proposes "has been accepted by several courts." *In re Fluidmaster, Inc. Water Connector Components Prods. Liab. Litig.*, No. 14-cv-5696, 2017 WL 1196990, at *57 (N.D. Ill. Mar. 31, 2017) (citing *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 953-54 (C.D. Cal. 2015)).[5] CPF cites *Price v. L'Oréal USA, Inc.* incorrectly, arguing that conjoint analysis was rejected there. (Dkt. 129 at 20.) But the *Daubert* motion in *Price* was granted not for failing to consider supply side factors, but rather because the expert's *assumptions* regarding the number of units sold and price were unreliable. No. 17-cv-614, 2020 WL 4937464, at *5-8 (S.D.N.Y. Aug. 24, 2020). CPF does not challenge Mr. Boedeker's price and quantity variables here and his consideration of supply-side factors was proper and sufficient.

---

[5] While CPF cites *Fluidmaster* as an example of a court rejecting a conjoint study for failing to adequately consider supply-side factors, *Fluidmaster* is not consistent with the facts of this case. Rather, the model in *Fluidmaster* was rejected because the majority of purchasers were professional plumbers while only non-plumber consumers were proposed as survey participants. *Fluidmaster*¸ 2017 WL 1196990, at *28-31.

### C.      Boedeker's Surveys and Opinions are Reliable

CPF argues that Mr. Boedeker's surveys are unreliable for multiple reasons, all of which go to the weight rather than the admissibility of his opinions. *Black & Decker Corp. v. Positec USA Inc.*, No. 11-cv-5426, 2015 WL 5612340, at *20 (N.D. Ill. Sept. 22, 2015) (methodological issues with surveys are appropriate to explore at trial); *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony.").

### 1.      The Pre-Test of the Expectations Surveys was Adequate

While pre-testing a survey may occasionally assist the researching in improving "the clarity of communication with respondents," pre-testing is not required for a survey to be valid for purposes of Rule 702 and *Daubert*, and CPF does not cite any case law to the contrary. *See* Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011) at 388-89, *available at* https://fjc.gov/sites/default/files/2015/SciMan3D01.pdf (last visited June 4, 2021). CPF's citation to *MacDougall* is misleading because the issue there was that "the final survey given to respondents fundamentally differed from the pretest." 2020 WL 5583534, at *7. CPF's expert did no such analysis here and offers only naked speculation that the pre-test was improper. (Dkt. 129-2 ¶¶120-21.)

And while Mr. Boedeker and Dr. Hanssens have different opinions as to the adequacy of the pre-test that was undertaken for the expectations surveys, CPF has failed to supply any evidence that the survey results are invalid, only speculation. Such disagreements go the weight of the evidence, which is "the ageless role of the jury." *Ernst*, 39 F. Supp. 3d at 1009 (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1045 (2nd Cir. 1995)).

13

### 2.     Boedeker Sampled an Appropriate Population

CPF's critiques with regard to sampling are spurious. Mr. Boedeker included survey respondents only if they were 18 years of age or older, lived in the United States, had at least one dog in the past 3 years, purchased (or were involved in the purchasing decision) of dry dog food in the past 3 years, and have purchased at least one premium dog food brand in the last 3 years. (Dkt. 129-1 ¶108, 175.) CPF argues that the surveys should have only included "consumers in the State of Illinois who purchased Champion's pet food." (Dkt. 129 at 23-24.) However, CPF presents no evidence to suggest that purchasers of dog food who reside outside of Illinois provided responses that are statistically different from those located within Illinois. CPF's expert, Dr. Hanssens, admitted that he could have conducted such an analysis but simply did not do so. (Ex. 1. at 99:10-101:6.) CPF similarly fails to provide any convincing reason why a population of premium dog food purchasers is not representative of the Class, especially when the exact same label is used to drive sales in all 50 states. Purchasers of dog food who had previously purchased a premium brand of dog food are precisely the type of consumers to whom the marketing statements on the Dog Food packaging are aimed, and "the universe should include potential purchasers as well as actual purchasers." *Scotch Whiskey Ass'n v. Consolidated Distilled Prods., Inc.*, No. 79 C 3107, 1981 WL 40524, *4 (N.D. Ill. May 7, 1981). CPF's own expert recognizes this: "[T]he target population must be the set of consumers who have purchased (or would have considered purchasing) the At-Issue-Products." (Dkt. 129-2 ¶53.)

CPF's sole cited authority on this point is facially inapplicable to Mr. Boedeker's surveys, as evidenced by the portion CPF has chosen to quote. Mr. Boedeker included a "discussion in [the] report as to the characteristics of the target population." *See Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1009-10 (N.D. Ill. 2010). (Dkt. 129-1 ¶107.) Even where a survey samples a

somewhat skewed population, it does not render a survey inadmissible. *Georgia-Pacific Consumer Prods. LP v. Kimberly-Clark Corp.*, No. 09 C 2263, 2010 WL 1334714, at * (N.D. Ill. Mar. 31, 2010) (finding that a survey population skewed 70% female did not render the survey inadmissible).

Mr. Boedeker surveyed the relevant population, but CPF may raise these concerns during cross-examination.

### 3. The Expectations Survey Included Adequate Controls

In arguing that the expectations survey required a control group, (Dkt. 129 at 10-13), CPF conflates three different sets of questions in Mr. Boedeker's expectation survey that require different treatment and analyses. The first set of questions asks, based on the packaging, what respondents to the survey expect the dog food to contain. (Dkt. 129-1 ¶180, Fig. 12-15, 18-21.) The second set of questions takes specific statements on the packaging and asks respondents whether each specific label makes the respondent more or less likely to purchase the dog food shown. (Dkt. 129-1, Fig. 16, 22.) The third set of questions asks whether respondents would be more or less likely to purchase the Dog Food if it does not contain expired ingredients, regrinds, heavy metals, BPA, or pentobarbital. (Dkt 129-1, Fig. 17, 23.)

With respect to the first set of questions, for "From 'regional ingredients' stated on the dog food shown, I would expect that the dog food does not contain imported ingredients," Dr. Hanssens would show the control group the packaging without the "Regional" statement. (Dkt. 129-2 ¶114.) In this set of questions, Mr. Boedeker included control questions such as "contains no grain" or "formulated for large breed dogs." (Dkt. 129-1 ¶¶180, Fig. 13, 15, 19, 21.) When subtracting the agree/strongly agree for "contains no grain" from "does not contain imported ingredients"—an approach borrowed from trademark surveys designed to account for acquiescence bias—one can

see that the at-issue statements have a positive net impact. (*Id.*) This represents a reasonable control for this set of questions.

With respect to the second set of questions, CPF argues that Mr. Boedeker's data offers no insight as to which statements cause respondents' impression. (Dkt. 129 at 11.) But CPF ignores that the question states: "From the 'Delivering nutrients naturally' statement on the dog food shown, I would expect that the dog food shown . . . . " (Dkt. 129-1 ¶180, Fig. 21.) This question cannot, as CPF suggests, be asked with a modified package that does not show "Delivering nutrients naturally" because the question is premised entirely on respondents' expectations from that statement.

With respect to the third set of questions, Dr. Hanssens does not explain how he would design the questions related to the likelihood of purchase with a test and control group. Expectation Survey respondents were shown certain statements concerning what a dog food may contain and asked whether they were more or less likely to purchase under those circumstances. (Dkt. 129-1 ¶180, Fig. 17, 23.) Again, the entire question is premised on the respondents' reaction to the ingredient variable in question; surveying a control group without reference to these ingredients would be nonsensical, confuse survey respondents, and yield no meaningful results. In addition, the results of the Expectation Survey are reinforced by the conjoint survey. Consistent with the results of the Expectations Survey, the conjoint survey shows that the misrepresentations have a material impact on consumer demand for Defendant's at-issue products. (*Id.* ¶184.)

To the extent Dr. Hanssens would have implemented controls in a different manner, such professional differences of opinion go to the weight of the evidence rather than admissibility. *See Black & Decker*, 2015 WL 5612340, at *20 (declining to exclude survey due to lack of control group as such issues are appropriate "to explore at trial") (citing *Ironclad, L.P. v. Poly-Am., Inc.*,

2000 WL 1400762, at *8 (N.D. Tex. July 28, 2000) ("[A] Court need not exclude the survey due to the lack of a control, as generally technical deficiencies go to the weight rather than admissibility.")).

CPF further casts aspersions on the Expectation Survey due to the fact that "the exact same percentage" of respondents chose the "Agree" option when asked if they would not expect the Dog Food to contain heavy metals based on both the "Biologically Appropriate" and "Delivering nutrients naturally" statements. (Dkt. 129 at 11-12.) The overall responses to these two questions were not identical; respondents chose at least the other "Strongly Agree" and "Neither Agree Nor Disagree" response options at different rates. (Dkt. 129-1 ¶180, Fig.14, 15.) Aside from being a statistical coincidence, there is no significance to the similarity in these numbers, and CPF makes little effort to explain otherwise. As expected in the survey results, these statements merely give premium dog food consumers similar expectations.

CPF also repeats its arguments that the expectations survey respondents included an insufficient number of Illinois residents who purchased (or considered purchasing) CPF's Dog Food. (Dkt. 129 at 12 n.5.) However, as already explained, the survey respondents were selected to closely resemble the Class, and CPF has offered nothing but bare speculation that the survey respondents are not representative of the Class.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that CPF's motion to exclude the opinions of Mr. Boedeker be denied.

17

Dated: June 10, 2021

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

By: /s/ Rebecca A. Peterson
ROBERT K. SHELQUIST, *Pro Hac Vice*
REBECCA A. PETERSON, *Pro Hac Vice*
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail: rapeterson@locklaw.com
          rkshelquist@locklaw.com

WEXLER WALLACE LLP
KENNETH A. WEXLER
KARA A. ELGERSMA
MICHELLE PERKOVIC
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Tel: (312) 346-2222
Fax: (312) 346-0022
Email: kaw@wexlerwallace.com
          kae@wexlerwallace.com
          mp@wexlerwallace.com

WEXLER WALLACE LLP
MARK T. TAMBLYN, *Pro Hac Vice*
333 University Avenue, Suite 200
Sacramento, CA 95825
Tel: (916) 565-7692
Email: mjt@wexlerwallace.com

ROBBINS ARROYO LLP
KEVIN A. SEELY (199982)
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: kseely@robbinsarroyo.com

GUSTAFSON GLUEK, PLLC
DANIEL E. GUSTAFSON, *Pro Hac Vice*
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: dgustafson@gustafsongluek.com

CUNEO GILBERT & LADUCA, LLP
CHARLES J. LADUCA
KATHERINE VAN DYCK
4725 Wisconsin Ave NW, Suite 200
Washington, DC 20016
Telephone: 202-789-3960
Facsimile: 202-789-1813
E-mail: kvandyck@cuneolaw.com
        charles@cuneolaw.com

LITE DEPALMA GREENBERG AFANADOR, LLC
JOSEPH J. DEPALMA
SUSANA CRUZ HODGE
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone:  (973) 623-3000
E-mail: jdepalma@litedepalma.com
        scruzhodge@litedepalma.com

**Attorneys for Plaintiffs**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 10th day of June, 2021, I served the foregoing document on all counsel of record via the Court's electronic delivery system.

_s/ Rebecca A. Peterson_
Rebecca A. Peterson