**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AFSHIN ZARINEBAF, ZACHARY CHERNIK, and JOAN MEYER, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br>v.<br><br>CHAMPION PETFOODS USA INC. and CHAMPION PETFOODS LP,<br><br>Defendants. | ) | Case No. 1:18-cv-06951<br><br>Honorable Virginia M. Kendall |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' L.R. 56.1(a)(2)**
**STATEMENTS OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56.1(a)(2), Plaintiffs Afshin Zarinebaf, Zachary Chernik, and Joan Meyer ("Plaintiffs"), respectfully set forth the following material facts about which they contend there exists disputed, genuine issues of fact:

**Background of Champion Petfoods:**

1. In approximately 1979, Champion's founder, Reinhard Muhlenfeld began producing dog food in a feed mill, and in approximately 1985 launched the ACANA brand, which was similar to traditional dry kibble pet food. Declaration of Chinedu Ogbonna, ("Ogbonna Dec.") attached as "**Exhibit 1**," at ¶ 7.

**Response: Undisputed.**

2. In approximately 2005, Champion developed its ORIJEN brand, which is based on a Biologically Appropriate nutritional philosophy, which unlike dog foods that rely on basic grains and/or other fillers and many synthetic nutritional supplements, uses animal-based proteins to

[*] This Statement of Material Facts was originally filed as ECF No. 121 and has been corrected to Include functioning hyperlinks on compliance with the Honorable Virginia Kendall's Case Procedures.

attempt to mirror how wolves or wilds dogs would get nutrition in nature (albeit within the limitations of dry kibble form). Ogbonna Dec. ¶ 7; Deposition of Peter Muhlenfeld dated December 4, 2018 ("Muhlenfeld Dep. Vol. 1"), attached as "**Exhibit 2**," at 122:16-22; 136:17-147:19; Declaration of Jeff Johnston ("Johnston Dec."), attached as "**Exhibit 3**," at ¶ 6.

**Response: Undisputed.**

3. Subsequently, ACANA adopted this nutritional philosophy and modified its formulas accordingly. Muhlenfeld Dep. Vol. 1 at 136:17-23; Ogbonna Dec. at ¶ 7.

**Response: Undisputed.**

4. Champion sells a wide variety of dog food diets (*i.e.*, formulations) under its brand names ORIJEN and ACANA. Ogbonna Dec. at ¶ 8.

**Response: Undisputed.**

5. In the United States, the ACANA brand is a family comprised of three sub-brands: Heritage, Regionals, and Singles. Ogbonna Dec. at ¶ 8.

**Response: Undisputed.**

6. Beginning in approximately 1990, Champion manufactured all of its dog food out of its NorthStar kitchen, in Morinville, Alberta, Canada. Declaration of Christopher Milam, ("Milam Dec."), attached as "**Exhibit 4**," at ¶ 8.

**Response: Undisputed.**

7. In approximately January 2016, Champion opened its new DogStar kitchen in Kentucky and throughout 2016 transitioned the manufacturing of nearly all of its dog food sold in the United States (except for Alaska) to come exclusively from its new DogStar kitchen, with the exception of the diet ORIJEN Tundra. Milam Dec. at ¶ 9.

**Response: Undisputed**

**Plaintiffs' Purchases of Champion Dog Food:**

8. Plaintiff Zachary Chernik ("Chernik") purchased both ORIJEN and ACANA diets produced at NorthStar kitchen beginning in 2006. Chernik's Response to Champion's First Set of Interrogatories, attached as "**Exhibit 5**," at Response to Interrogatory No. 2.

**Response: Undisputed and objection.** Chernik's purchasing history for CPF diets manufactured at NorthStar is irrelevant, as Plaintiffs voluntarily dismissed, without prejudice, their claims regarding diets manufactured at NorthStar. (*See* **Dkt. 102**, Order Dismissing without Prejudice Certain Dog Food Diets at Issue, dated April 21, 2021.)

9. At some point in 2016, when Champion transitioned its dog food sold in the U.S. to its DogStar kitchen, Chernik purchased the following diets that remain at-issue in this action[1] from DogStar: ORIJEN Six Fish, ORIJEN Regional Red, ORIJEN Senior, ACANA Regionals Grasslands, ACANA Singles Lamb & Apple, ACANA Singles Pork & Squash, ACANA Heritage Free-Run Poultry, and ACANA Heritage Red Meat. Chernik's Response to Interrogatory No. 5.

**Response: Undisputed.**

10. Chernik discontinued purchasing Champion dog food at the end of June 2017. Chernik's Response to Interrogatory No. 6; Deposition of Plaintiff Zachary Chernik, ("Chernik Dep."), attached as "**Exhibit 6**," at 63:4-25.

**Response: Disputed in part.** Chernik purchased the Dog Food until approximately July 2017. (*See* **Dkt. 95-36**, Deposition of Zachary Chernik, taken December 8, 2020, at 60:23-61:6.)

11. Plaintiff Afshin Zarinebaf ("Zarinebaf") fed his two dogs ORIJEN and ACANA diets from July 2013 through approximately September 2018. Zarinebaf's Response to Champion's First Set of Interrogatories, attached as "**Exhibit 7**," at Response to Interrogatory No.

[1] Chernik's purchases of all NorthStar diets and DogStar ACANA Duck & Pear and ACANA Wild Atlantic, as alleged in the Third Amended Complaint ("TAC," ECF No. 68) ¶ 7, have been dropped. *See* ECF No. 102; ECF No. 95 at 15-16.

4; Deposition of Plaintiff Afshin Zarinebaf ("Zarinebaf Dep."), attached as "**Exhibit 8**," at 46:22-47:6.

**Response: Undisputed.**

12. Zarinebaf's dogs consumed ORIJEN and ACANA diets produced at NorthStar kitchen prior to 2016, and consumed the following Champion dog food diets that remain at-issue in this action[2] produced at DogStar kitchen at some point in time between 2016 and September 2018: ORIJEN Six Fish, ORIJEN Regional Red, ACANA Singles Lamb & Apple, ACANA Singles Pork & Squash, and ACANA Regionals Grasslands. Zarinebaf Dep. at Ex. 3; Zarinebaf's Response to Interrogatory No. 5.

**Response: Undisputed.**

13. Plaintiff Joan Meyer ("Meyer") claims she began purchasing Champion dog food in 2004, but that it may have been a few years later. Meyer's Response to Champion's First Set of Interrogatories, attached as "Exhibit 9," at Response to Interrogatory No. 4; Deposition of Plaintiff Joan Meyer ("Meyer Dep."), attached as "Exhibit 10," at 30:25-31:19.

**Response: Undisputed.**

14. Meyer began purchasing ORIJEN and ACANA produced at NorthStar kitchen and discontinued purchasing Champion dog food on or around June 2019, when it was produced at DogStar kitchen. Meyer's Response to Interrogatory No. 8; Meyer Dep. at 51:12-15.

**Response: Undisputed.**

15. Meyer purchased the following at-issue[3] Champion dog food diets from DogStar kitchen between 2016 until June 2019: ORIJEN Original, ACANA Singles Lamb & Apple, ACANA

[2] Zarinebaf's purchases of all NorthStar diets have been dropped. *See* ECF No. 102; ECF No. 95 at 15-16.

[3] Meyer's purchases of all NorthStar diets and DogStar ACANA Duck & Pear, as alleged in TAC ¶ 9b, have been dropped. *See* ECF No. 102; ECF No. 95 at 15-16.

Singles Wild Mackerel, ACANA Heritage Red Meat, and ACANA Regionals Meadowland. Meyer's Response to Interrogatory No. 12; Meyer Dep. at Ex. 3.

**Response: Undisputed.**

16. Meyer testified that she did not read the labeling for any ORIJEN or ACANA diet she purchased from DogStar. Meyer Dep. at 89:8-14, 89:21-90:1; 90:5-8, 90:20-23; 91:5-10; 91:17-21; 92:6-23; 98:8-24.

**Response: Disputed and Objection.** Disputed to the extent that Meyer testified that she purchased the Dog Food manufactured at DogStar based on her understanding and reliance on Biologically Appropriate, Fresh Regional Ingredients, and Delivering Nutrients Naturally ("Packaging Claims") that CPF featured on its NorthStar and DogStar packaging. (*See* **Dkt. 95-37,** Deposition of Joan Meyer, taken November 13, 2020, at 68:21-25, 76:7-17, 80:21-81:2, 84:23-85:4.) Objection to CPF's attempt to mischaracterize and misstate Meyer's testimony, which reflects that Meyer relied upon CPF Packaging Claims when continuing to purchase the Dog Food manufactured at DogStar.

17. There is no evidence that any of the three Plaintiffs' dogs' illnesses or deaths were caused by the consumption of Champion dog food. Expert Report of Dr. Robert H. Poppenga ("Poppenga Report"), attached as "**Exhibit 11**," at 39-40.

**Response: Undisputed and objection.** The health of Plaintiffs' dogs is irrelevant and immaterial to this case and Plaintiffs are not seeking damages related to any veterinary bill or illness of their dogs. (*See* **Dkt. 95**, Plaintiffs' Motion for Class Certification, at 1; **Dkt. 47**, Memorandum Opinion and Order on Defendants' Motion to Dismiss, at 1.)

**"Biologically Appropriate" Statements on Champion's Packaging Purchased by Plaintiffs:**

18. During all relevant times, the front of the packaging for the diets Plaintiffs purchased stated the diet was "Biologically Appropriate Dog Food." Ogbonna Dec. ¶ 10;

Plaintiff's Motion for Class Certification [ECF No. 95] ("Class Cert Mot.") at Ex. 1-11.

**Response: Undisputed.**

19. In its simplest form, Champion sometimes explains "Biologically Appropriate" as "Protein Rich, Carbohydrate Limited," (*see, e.g.* Class Cert Mot. Ex. 1 at 2, '16-17 ACANA Heritage Free-Run Poultry; *id*. Ex. 8 at 2, '16-17 ORIJEN Six Fish), while at other times describe it as "Evolutionary Diet. Protein Rich." *See*, *e.g.*, *id*. Ex. 1 at 3, '18 ACANA Heritage Free-Run Poultry; *id*. Ex. 5 at 3, '18 ACANA Singles Pork & Squash.

**Response: Disputed in part.** Disputed to the extent that reasonable consumers such as Plaintiffs interpret "Biologically Appropriate" to mean that the Dog Food does not contain heavy metals and non-fresh ingredients, and that reasonable consumers would not expect the Dog Food to risk containing BPA or pentobarbital based on the "Biologically Appropriate" claim. (*See* **Dkt. 95-36,** at 70:1-4, 141:14-20, 205:6-13, 242:5-19; **Dkt. 95-37**, at 93:23-94:2, 94:13-21, 96:24-97:18; **Dkt. 95-38,** Deposition of Afshin Zarinebaf, taken November 23, 2020, at 98:21-99:24 ("Biologically appropriate for me is that, first of all, it's fresh. It's not expired."), 142:19-143:14, 145:19-22; **Pls.' Ex. 1,** Deposition of Afshin Zarinebaf, taken November 23, 2020, at 176:19-177:14 (testifying that fresh would not have frozen ingredients).)[4] Plaintiffs' marketing and survey experts confirm that a reasonable consumer would interpret "Biologically Appropriate" to mean that heavy metals and non-fresh ingredients were not used in the Dog Food and that the Dog Food would not have the risk of containing BPA or pentobarbital. (*See* **Dkt. 95-18,** Expert Report of Bruce G. Silverman, dated February 24, 2021, at ¶32(i); ¶¶94-103 (Silverman opines that a reasonable consumer would find the presence of heavy metals and non-fresh ingredients and the risk of BPA and pentobarbital as inconsistent with Biologically Appropriate); **Dkt. 95-71,** Expert Report of

[4] All references to "Pls.' Ex. __" refer to Plaintiffs' exhibits to the Declaration of Rebecca A. Peterson filed herewith unless otherwise stated.

Stefan Boedeker, dated February 24, 2021, at Figures 14, 20 (Expectation Survey Results for Biologically Appropriate showing vast majority of respondents would understand Biologically Appropriate to mean that the dog food does not contain heavy metals, BPA, pentobarbital, and only contains fresh ingredients unless specifically stated otherwise.).)

BIOLOGICALLY APPROPRIATE™
PROTEIN-RICH, CARBOHYDRATE-LIMITED*

BIOLOGICALLY APPROPRIATE
EVOLUTIONARY DIET. PROTEIN-RICH.

20. The backs of Champion bags explain the origin of "Biologically Appropriate" philosophy in a variety of ways, sometimes stating, "All dogs evolved as carnivores – biologically adapted to a diet rich in meat and protein," (*see*, *e.g.*, Class Cert Mot. Ex. 7 at 2, '16-17 ACANA Singles Wild Mackerel), or "your dog is a carnivore, designed by nature to thrive on whole game, fowl or fish, and possessing a biological need for foods that are rich and varied in fresh whole animal ingredients." *See*, *e.g.*, Class Cert Mot. Ex. 1 at 2, '16-17 ACANA Heritage Free-Run Poultry.

YOUR DOG IS A CARNIVORE, DESIGNED BY NATURE TO THRIVE ON WHOLE GAME, FOWL OR FISH, AND POSSESSING A BIOLOGICAL NEED FOR FOODS THAT ARE RICH AND VARIED IN FRESH WHOLE ANIMAL INGREDIENTS.

ALL DOGS EVOLVED AS CARNIVORES — BIOLOGICALLY ADAPTED TO A DIET RICH IN MEAT AND PROTEIN. THAT'S WHY ACANA'S WILD MACKEREL SINGLES FORMULA IS LOADED WITH 50% WILD MACKEREL INGREDIENTS THAT NOURISH YOUR DOG ACCORDING TO HIS EVOLUTIONARY NEEDS WHILE LIMITING HIS EXPOSURE TO A SINGLE ANIMAL PROTEIN.

**Response: Disputed in part.** See dispute to ¶19. Also disputed to the extent that in Silverman's Report, he opines that CPF packaging conveys uniform, consistent marketing messages and that all of CPF packaging fails to disclose the presence of heavy metals, non-fresh ingredients, and non-regional ingredients, as well as the risk of BPA. (*See* **Dkt. 95-18**, at ¶32(e) ("While the Challenged Statements are expressed slightly differently on Champion's Acana and Orijen packages, from a marketing standpoint each conveys the same message to consumers, i.e., that the products are "Biologically Appropriate™", natural, and made with fresh ingredients sourced from local or regional suppliers); ***Id***. at ¶221 ("As discussed above, Champion's Challenged Statements consistently convey the message to

consumers that all of the products are "Biologically Appropriate™," natural, and made with fresh ingredients sourced from local, trusted suppliers. Champion's packaging uniformly failed to disclose the presence of heavy metals, BPA, pentobarbital, non-fresh, and non-regional ingredients on all of Champions products.").) Also disputed to the extent minor differences in the Dog Food's packaging do not impact the uniform "Biologically Appropriate" message CPF communicated to consumers. (***Id***.)

21. Other bags explain how Champion implements its "Biologically Appropriate" philosophy, explaining "Modern dogs are built like their ancestors. We believe they should eat like them too," (*See, e.g.*, *id*. Ex. 8 at 6, '18 ORIJEN Six Fish), which is why Champion's "Biologically Appropriate" dog food "mirrors the richness, freshness and variety of meats for which dogs are evolved to eat." *See, e.g.*, Class Cert Mot. Ex. 2 at 2, '16-17 ACANA Regionals Meadowland.




**Response: Disputed in part.** See disputes to ¶¶20-21.

22. ORIJEN is sometimes described as the "fullest expression of [Champion's] Biologically Appropriate and Fresh Regional ingredients commitment." *See, e.g.*, Mot. Ex. 9 at2, '16-17 ORIJEN Original.

**Response: Disputed in part.** See disputes to ¶¶20-21.

23. As Champion's former Chief Brand Officer testified, "[w]e follow what's the most appropriate thing biologically. It's not biologically perfect by the way, it's biologically appropriate." Muhlenfeld Dep. Vol. 1 at 120:7-10; 154:1-3 ("So biologically – the philosophy of biologically appropriate is to get as close to the natural diet as possible.").

**Response: Disputed in part.** See disputes to ¶¶20-21.

**“Fresh” Statements on Champion’s Packaging Purchased by Plaintiff:**

24. Although the statements on Champion’s packaging vary by diet and other factors, Champion’s diets purchased by Plaintiffs indicated that they contained, and did in fact contain, fresh ingredients, such as its chicken, turkey, pork, eggs, fruits and vegetable ingredients, among other ingredients in other forms, such as raw, dried, dehydrated, freeze-dried, or oils. Milam Dec. at ¶ 13; Class Cert Mot. at Ex. 1-11.

**Response: Disputed in part.** Disputed to the extent that reasonable consumers, such as Plaintiffs, understood CPF’s “Fresh” statements to mean that CPF only used fresh ingredients in its Dog Food. (*See* **Dkt. 95-36,** at 34:24-35:3 (testifying he understood CPF’s packaging to communicate that the ingredients were “never frozen.”), 205:4-22 (he did not expect regrinds to be in the Dog Food); **Dkt. 121-7** at 155:7-22 ((“fresh” fish could be put on ice “to keep their temperature cool, but not to the point of making them frozen.”); **Pls.’ Ex. 2**, Deposition of Zachary Chernik, taken December 8, 2020, at 53:16-21 (there is a difference between fresh and frozen), 198:2-11 (CPF’s use of dried ingredients makes the Dog Food “less and less fresh”); **Dkt. 95-37,** at 80:3-7; 84:23-85:19 (testifying fresh fish meant it was caught and delivered fresh to CPF), 97:5-6 (expired ingredients are not fresh); **Dkt. 95-38,** at 86:23-87:5; 96:23-97:11; 176:19-177:14 (“Fresh should not have any frozen ingredients in it.”); **Dkt. 121-9** at 107:19 (“Raw means it’s not frozen.”); **Dkt. 113-4,** Deposition of Afshin Zarinebaf, taken November 23, 2020, at 101:21-102:2 (raw food should be handled in a “way [] that it protects [] freshness of the food and not expired and not frozen. Raw does not mean frozen.”), 102:16-21 (When asked what freeze-dried lamb means, Plaintiff Zarinebaf responded that it meant the lamb was produced fresh, not “stored for many weeks or months” and “not regr[ound] and then sold later.”).) Plaintiffs’ marketing and survey experts confirm that a reasonable consumer would interpret “Fresh” statements to mean

that CPF only used fresh ingredients in its Dog Food. (**Dkt. 95-18,** at ¶32(i); ¶¶104-122 (Silverman opines that a reasonable consumer not expect CPF to use non-fresh ingredients in its Dog Food based on the "Fresh" statements); **Dkt. 95-71**, at Figures 12, 18 (Expectation Survey Results for Fresh statements showing vast majority of respondents (84.7% to 84.2%) would understand CPF's "Fresh" statements to mean that the Dog Food only contains fresh ingredients unless specifically stated otherwise.); ***id***. (additionally, survey showed 77-88% of respondents did not expect "Fresh" claims to include expired or reground ingredients.).) Further disputed to the extent that Plaintiffs, like other reasonable consumers, did not understand that CPF's claim of "raw" referred to the industry-specific definition by AAFCO, which defines "raw" as "Food in its natural or crude state not having been subjected to heat in the course of preparation as food." (*See* **Dkt. 95-38,** at 39:4-12 ("…being raw, not frozen."); **Dkt. 121-9**, at 107:19-22 ("Raw means it's not frozen. Fresh means that freshly produced by the farmers and delivered to the factory to give to consumers."); **Dkt. 113-4**, at 100:19-22 (When asked the difference between lamb that is raw and lamb that is frozen, Plaintiff Zarinebaf testified that "[t]he lamb is fresh, it's not regrind, it's not expired, it's not stored in the warehouse for a long period of time. And raw for me is not frozen."); Pls.' Ex. 2 at 139:6-20, 140:2-4 (testified that raw means uncooked and unprocessed); **Dkt. 95-18**, at ¶112 ("Champion refers to its frozen or previously frozen ingredients as "raw." I do not believe that most consumers would see it that way.").) Further disputed to the extent that CPF packaging does not properly disclose the use of frozen ingredients, expired ingredients, and regrinds, all of which are non-fresh. (*See* **Dkts. 95-2; 95-3; 95-4; 95-5; 95-6; 95-7; 95-8; 95-9; 95-10; 95-11; 95-12** (packaging for the Dog Food showing that frozen ingredients, expired ingredients, and regrinds are completely omitted from the Dog Food packaging.).) Further disputed to the extent that [redacted]

[redacted] (*See* **Pls.' Ex. 3**, CPF1306889 [redacted]

25. The front of the DogStar '16-17 ACANA Heritage Red Meat package purchased by Chernik and Meyer states it is "infused with freeze-dried liver" and that "this 13 lb package of ACANA is made with over 7 ¾ lb of beef, pork, & lamb ingredients. Half are FRESH or RAW and loaded with goodness and taste, and half are DRIED or OILS that provide a strong and natural source of animal proteins and fats." Class Cert Mot. Ex. 3 at 2.




**Response: Disputed in part.** See dispute to ¶24.

26. The front of the DogStar '16 ORIJEN Six Fish package purchased by Chernik and Zarinebaf and the DogStar '16 ORIJEN Original package purchased by Meyer contain icons that state "Top 10 [ingredients] fresh or raw" and "FD: freeze-dried liver." Class Cert. Mot. Ex. 8 at 2; *id*. Ex. 9 at 2.






**Response: Disputed in part.** See dispute to ¶24.

27. In fact, the front of every 2016-2017 and most 2018 DogStar packages purchased by Plaintiffs state that the diet includes "freeze-dried" ingredients. *See* Class Cert. Mot. Ex. 1-11, '16-18 ORIJEN Original ("freeze-dried liver infused for natural flavor"), '16-18 ORIJEN Six Fish (same),'16-18 ORIJEN Senior (same), '16-18 ORIJEN Regional Red ("freeze-dried tripe" and "freeze-dried liver"), '16-18 ACANA Regionals Meadowlands ("infused with freeze-dried chicken liver"), '16-18 ACANA Heritage Free-Run Poultry (same), '16-17 ACANA Heritage Red Meat ("infused with freeze-dried liver"),'16-18 ACANA Regionals Grasslands ("infused with freeze-dried lamb liver"), '16-17 ACANA Singles Lamb & Apple (same),'16-17 ACANA Singles Wild Mackerel ("infused with freeze-dried mackerel"), and '16-17 ACANA Singles Pork & Squash ("infused with freeze-dried pork liver").

**Response: Disputed in part.** See dispute to ¶24. Further disputed to the extent that "freeze-dried" ingredients were minor ingredients in the above diets and did not disclose CPF's use of other frozen ingredients. (*See* **Dkts. 95-2; 95-3; 95-4; 95-5; 95-6; 95-7; 95-8; 95-9; 95-10; 95-11; 95-12**); (packaging shows "freeze dried" liver and tripe ingredients were very minor ingredients in these diets and listed near the bottom of the ingredient panel, which is ordered by weight, and after at least thirty other ingredients.).)

28. And, the front of many DogStar packages purchased by Plaintiffs state how many, and which, top ingredients were delivered either "**fresh or raw**." *See, e.g.*, Class Cert. Mot. Ex. 9 at 2, '16-17 DogStar ORIJEN Original ("Top 10 fresh or raw poultry, fish, and egg ingredients"); *id.* Ex. 8 at 2, 6, '16-17 ORIJEN Six Fish ("Top 6 fresh or raw wild and sustainably caught fish"); *id.* Ex. 4 at 2, '16-17 ACANA Singles Lamb & Apple ("First ingredient from fresh or raw lamb").

**Response: Disputed in part.** See disputes to ¶¶24 and 27.

29. A panel on the back of each DogStar bag, referred to as "Meat Math," breaks down

the approximate amount, in pounds, of each key ingredient, and whether they were added fresh, raw, dried, freeze-dried, dehydrated, or as oils into the formula. Milam Dec. ¶¶ 15-16 (images).

**Response: Disputed in part.** See disputes to ¶¶24 and 27.

30. For example, the Meat Math for ORIJEN Six Fish and Original state, in part, "this 13 lb package of ORIJEN is made with over 11 lb of fresh, raw or dehydrated fish [animal for Original] ingredients. 2/3 fresh or raw, 1/3 dried or oils." Class Cert. Mot. Ex. 8 at 3; *id*. Ex. 9 at 3.




**Response: Disputed in part.** See disputes to ¶¶24 and 27.

31. Each Plaintiff understood there were non-fresh ingredients in the food. Zarinebaf Dep. at 136:15-19 (testifying that he understood that an ACANA Lamb & Apple package contained ingredients that were "fresh, raw, dried, and oils."); Chernik Dep. at 156:18-20, 182:21-25 (testifying that he "agree[d] that dried fish ingredients are not fresh fish ingredients," "dried ingredients are not fresh ingredients," and "oils are not fresh ingredients."); Meyer Dep. at 83:20-84:9 (testifying that Champion's saltwater fish would be "packed on ice" after caught because "[t]hat's how we get our fish from all over the world unless we live by the ocean" and agreeing that after it is on ice, it will become frozen).

**Response: Disputed in part.** See disputes to ¶¶24 and 27.

32. Champion never states 100%, each, every, or all ingredients are fresh, that its

ingredients are "never frozen," or that its dog food contains no frozen ingredients. Ogbonna Dec. ¶ 11; Deposition of Peter Muhlenfeld dated November 11, 2018 ("Muhlenfeld Dep. Vol. 2"), attached as "**Exhibit 12**," at 197:7-25; Deposition of Jeff Johnston dated November 29, 2018 ("Johnston Dep."), attached as "**Exhibit 13**," at 49:18-19; Class Cert Mot. at Ex. 1-11.

**Response: Disputed in part.** See disputes to ¶¶24 and 27.

**"Regional" Statements on Champion's Packaging Purchased by Plaintiff:**

33. Although the statements on Champion's packaging vary by diet and other factors, Champion's diets purchased by Plaintiff indicated that they contained, and in fact did contain, "regional" ingredients. Milam Dec. at ¶ 17; Class Cert Mot. at Ex. 1-11.

**Response: Disputed in part.** Disputed to the extent that reasonable consumers, like Plaintiffs, understood CPF's "Regional" statements to mean that nearly all, if not all, of the ingredients used in the Dog Food were regional to the DogStar kitchen. (*See* **Dkt. 95-36**, at 205:6-13, 242:5-19; 248:7-17 ("I thought there should be -- like 90 percent plus would be regional, because they talk about regional all the time."); **Dkt. 95-38**, at 39:4-12 ("Primary thing was the ingredients that was mentioned on the package: fresh, you know, biological proper for the dog, and also local produced, being raw, not frozen."), 86:23-87:5 ("It said fresh, local, and produced by local farmers…"), 96:23-97:11 ("…You look at the bag, and it says all this nutrition stuff and freshness, locally produced by the local farmers, regional produced…").) Plaintiffs' marketing and survey experts confirm that a reasonable consumer would interpret "Regional" ingredients to mean that CPF used mostly, if not entirely, regional ingredients in the Dog Food. (*See* **Dkt. 95-18**, at ¶32(i); ¶¶104-122 (Silverman opines that a reasonable consumer not expect CPF to use non-regional ingredients in its Dog Food based on the "Regional" statements); **Dkt. 95-71**, at Figures 13, 19 (Expectation Survey Results for Regional statements showing vast majority of respondents (73.7% to 76.9%) would not expect imported ingredients in the Dog Food based on "Regional"

statements and that each ingredient was sourced regionally (79.4% to 77.3%) based on CPF "Regional" statements.).) Further disputed to the extent that CPF itself considers its "Regional" packaging claims to be inconsistent with its actual use of numerous non-regional ingredients. (*See* **Dkt. 95-33**, CPF1973904 at -07 ("We have recently considered changing this [regional] definition in our . . . name as we have outgrown our ability to source from our local region.").) Disputed to the extent that the Dog Food packaging does not disclose that CPF sources ingredients outside the United States, such as turmeric from India, which a reasonable consumer would consider material and inconsistent with the "Regional" packaging claims. (*See* **Dkt. 95-27**, CPF0244035 at -35 ("[Turmeric] is currently form India.").)

34. DogStar has sourced its chicken ingredients primarily from western Kentucky and processed in Paducah, Kentucky; turkey ingredients primarily from Mercer County, Ohio; lamb, mutton, and goat ingredients primarily from farms in Kentucky and Indiana, as well as ranches in New Zealand; beef ingredients primarily from Nebraska; pork ingredients primarily from Kentucky and Indiana; catfish and rainbow trout ingredients were caught wild in Kentucky and farmed in Idaho, respectively, and processed in Paducah, Kentucky; and egg ingredients from a facility in Freeman, Kentucky, located about an hour and 15 minutes away from DogStar kitchen. Milam Dec. at ¶ 18.

**Response: Disputed in part.** See dispute to ¶33. Further disputed to the extent that CPF intentionally omits that its main suppliers of chicken were Pilgrim Farms and Tyson, Inc., because it knew that its consumers would find these suppliers as inconsistent with their "Fresh Regional" promises. (*See* **Dkt. 95-30**, CPF1817671, at -7672 (Internal CPF e-mail from November 2017 "My take is that we shouldn't mention the name of the farm, since Tyson is a huge multinational conglomerate…"); **Dkt. 95-32**, CPF1949251, at -9251 (Internal CPF e-mail from October 2016 wherein Customer Care did not want to disclose Pilgrim's Pride as its chicken supplier because

Pilgrim's Pride "had a Class 1 recall involving over 4.5 million pounds of chicken for contamination with plastics, wood, rubber, and metal."); *see also* **Dkt. 95-18**, at ¶110 ("Again, by showing off who their 'local' farmers are, Champion further drives home its 'regional' message."); ***Id***. at ¶211 ("a reasonable consumer would assume that each bag of dog food they purchased would include ingredients sourced from the suppliers portrayed on the package.").)

35. The DogStar '16-17 ACANA Singles Pork & Squash, Regionals Meadowland, and Heritage Free-Run Poultry packages purchased by Plaintiffs respectively state that America's "fertile farms and ranches," "fertile farms and meadows," and "fertile farmlands" are Champion's "source of inspiration and fresh regional ingredients." Class Cert. Mot. Ex. 1, 5, 6.










**Response: Disputed in part.** See disputes to ¶¶33-34.

36. On the back of these packages, Champion explains "We focus on fresh ingredients from our region that are ranched, farmed or fished by people we know and trust." Class Cert. Mot. Ex. 1, 5, 6.




**Response: Disputed in part.** See disputes to ¶¶33-34.

37. The front of every ACANA bag also more specifically states the city or county, and state, province, or country where some key ingredients were sourced. Ogbonna Dec. at ¶ 13.

**Response: Disputed in part.** See disputes to ¶¶33-34.

38. For example, the front of the DogStar '16-18 ACANA Meadowland package purchased by Meyer states: "Free-Run Chicken: Mayfield, Kentucky; Free-Run Turkey: Mercer County, Ohio; Freshwater Catfish: Paducah, Kentucky; Rainbow Trout: Soda Springs, Idaho." Class Cert. Mot. Ex. 6 at 2, 3. And, the front of the DogStar '16-17 ACANA Wild Mackerel states: "Wild Mackerel: New Bedford, Massachusetts." Class Cert Mot. Ex. 7 at 2.




**Response: Disputed in part.** See disputes to ¶¶33-34.

39. And, the back of the DogStar '16-17 ACANA Lamb & Apple bag purchased by all three Plaintiffs states, "Grass-fed on Kentucky and New Zealand ranches, our fresh or raw lamb arrives in WholePrey ratios." Class Cert. Mot. Ex. 4 at 3.

Grass-fed on Kentucky and New Zealand ranches, our fresh or raw lamb arrives in WholePrey™ ratios — a richly nourishing balance of meat, organs and cartilage that mirrors the natural diet, virtually eliminating the need for synthetic additives in our foods. Generous infusions of freeze-dried lamb liver make ACANA a perfect choice for fussy eaters.

**Response: Disputed in part.** See disputes to ¶¶33-34.

40. ORIJEN bags also provide regional descriptors, for example, ORIJEN Six Fish explains the fish is from "New England's vast Atlantic waters" and a supplier of the fish is in New England. Class Cert. Mot. Ex. 8.

NEW ENGLAND'S VAST ATLANTIC WATERS – OUR SOURCE OF INSPIRATION AND FRESH REGIONAL FISH




**Response: Disputed in part.** See disputes to ¶¶33-34. Further disputed to the extent that CPF advertises NORPEL as its "trusted supplier of fresh regional fish" when most (if not all) of the fish used in the Acana Singles Wild Mackerel, Orijen Six Fish, Orijen Adult, and Orijen Regional Red diets is frozen, and then ground into a non-frozen state by one of CPF's fish suppliers prior to delivery to Dogstar. (*See* **Dkt. 95-19**, CPF0256512, at -6514 ("Our facility takes frozen blocks, grinds them in to a fresh slurry and ships the slurry in insulated food vats.").) CPF regularly manufactures its Dog Food with red meat—such as Acana Regionals Grasslands, Acana Heritage Meats, Acana Singles Lamb & Apple, Orijen Adult, and Orijen Regional Red—using frozen meat ingredients from New Zealand. (*See* **Dkt. 95-20**, CPF0249062.) For example, in 2017, CPF was purchasing half of its goat meat and almost all of its lamb and mutton meat from New Zealand in frozen form. (***Id***.)

41. The DogStar ORIJEN Original package purchased by Meyer states it contains ingredients that were "sustainably farmed or fished in our region" and the DogStar ORIJEN Regional Red diet purchase by Chernik and Zarinebaf states "America's vast and fertile lands – our source of inspiration and fresh regional ingredients." Class Cert. Mot. Ex. 9 at 3, 6; Ex. 10 at 2, 6.

**Response: Disputed in part.** See disputes to ¶¶33-34, 40.

42. It is undisputed that Champion never states on any of its packaging that 100%, each, every or all ingredients are regional. Ogbonna Dec. ¶ 12; Muhlenfeld Dep. Vol. 2 at 197:7-25; Johnston Dep. at 49:18-19; Class Cert Mot. at Ex. 1-11.

**Response: Disputed in part.** See disputes to ¶¶33-34, 40.

**<u>Other Statements on Champion's Packaging Purchased by Plaintiffs:</u>**

43. The phrase "Delivering Nutrients Naturally" appears on the back of some DogStar ACANA packages in a variety of contexts. *See, e.g.*, Class Cert. Mot. Ex. 1-7.

**Response: Disputed in part.** Disputed to the extent that reasonable consumers, like Plaintiffs, understood "Delivering Nutrients Naturally" to mean that the Dog Food did not risk containing unnatural contaminants, such as BPA and pentobarbital, and did not contain non-nutritious and undesirable contaminants, such as heavy metals. (*See* **Dkt. 95-36**, at 187:24-188:8 ("Q: What did 'delivering nutrients naturally' mean to you? A: …BPA free, it would be, you know, heavy metal free. I mean, where in the world is pentobarbital occurring naturally in nature unless it's injected by a human?"); **Dkt. 95-38**, at 112:11-16 ("delivering nutrients naturally" means "that the food is not contaminated, it's not expired, it's not regrained.").) Plaintiffs' marketing and survey experts confirm that a reasonable consumer would interpret "natural" statements to mean that the Dog Food did not contain heavy metals or risk containing BPA and pentobarbital. (*See* **Dkt. 95-18**, at ¶32(i); ¶¶173, 180, 193 (Silverman opines that a reasonable consumer would consider the presence of heavy metals and the risk of containing BPA and pentobarbital as inconsistent with CPF's natural packaging claims); **Dkt. 95-71**, at Figure 21 (Expectation Survey Results for "Delivering Nutrients Naturally" showed that 84.7% of respondents would not expect the Dog Food to contain heavy metals based on this natural claim; 74.4% would not expect the Dog Food to contain BPA; and 71.9% would not expect the Dog Food to contain pentobarbital.).)

44. On some ACANA packages it states, in full: "Mirroring nature, ACANA WholePrey foods feature a nourishing balance of poultry, organs and cartilage — all of which reflect the whole prey animal, delivering nutrients naturally. That's why you won't find long lists of synthetic additives in ACANA foods." *See, e.g.*, Class Cert. Mot. Ex. 5 at 2, Ex. 6 at 2.




**Response: Disputed in part.** See dispute to ¶43. Further disputed to the extent that this

additional packaging context did not detract from CPF's uniform marketing messaging that the Dog Food was natural and did not contain undesirable contaminants like heavy metals or risk containing unnatural contaminants like BPA and pentobarbital. (*See* **Dkt. 95-18**, at ¶32(i); ¶¶173, 180, 193.)

45. On other ACANA packages it states, "ACANA features WholePrey ratios of poultry, organs and cartilage which deliver nutrients naturally," (*see, e.g.*, Class Cert. Mot. Ex. 1 at 3), and on others: "WholePrey ratios of meat, organs and cartilage deliver nutrients naturally, without the long list of synthetic additives." *See, e.g.*, *id.* Ex. 4 at 4, Ex. 5 at 3.







**Response: Disputed in part.** See disputes to ¶¶43-44.

46. The front of '16-17 ACANA packages state that the formulas include "zinc proteinate – our one and only supplement," which is, in fact, the only synthetic ingredient used in these formulas, as reflected in the ingredient panels (*see* Class Cert. Mot. Ex. 1 at 2, Ex. 2 at 2, Ex. 3 at 2, Ex. 4 at 2, Ex. 5 at 2, Ex. 6 at 2) and the ingredient panels on subsequent bags of ACANA list all supplements or synthetics used by Champion and reveal that Champion did not use a "long list of synthetic additives." *Id.*




**Response: Disputed in part.** See disputes to ¶¶43-44.

47. The nutrients provided to dogs from the consumption of Champion's ACANA dog food come from natural ingredients rather than synthetic ingredients (with the exception of zinc proteinate in 2016-2017 ACANA diets). Johnston Dec. ¶¶ 7-9.

**Response: Disputed in part.** See disputes to ¶¶43-44.

48. Champion does not represent that all or 100% of its ingredients are natural, that its

food is "all natural," "100% natural," or made of "only natural ingredients," or anything of the sort. Johnston Dec. ¶ 11; Ogbonna Dec. ¶ 14.

**Response: Disputed in part.** See disputes to ¶¶43-44.

49. The back of every Champion package has an ingredient panel that lists all ingredients in order of weight, which each Plaintiff testified they read. Ogbonna Dec ¶ 24; Zarinebaf Dep. 96:2-4, 96:11-14, 109:14-16, 139:20-23; Chernik Dep 126:11-14, 126:22-127:3. However, Meyer only read the first few ingredients on NorthStar bags and did not read the ingredients on DogStar bags. Meyer Dep. at 66:21-67:9; 72:25-73:4; 82:6-11; 90:5-8.

**Response: Disputed in part.** See disputes to ¶¶24, 27.

50. The image in the Paragraph 10 of the Second Amended Complaint (ECF No. 26) is from a brochure that was only circulated to distributors and retailers and was generally not circulated to the public at-large. Ogbonna Dec. ¶ 17.

**Response: Undisputed.**

51. Plaintiffs testified that they did not read or rely on that particular Acana brochure. Chernik Dep. 111:24-113:14. Meyer Dep. 32:23-25; Zarinebaf Dep. 41:4-6.

**Response: Undisputed.**

52. The "excluding…anything else nature didn't intend your dog to eat" language from the brochure seen in Paragraph 10 of the First Amended Complaint does not appear on any packages of the diets Plaintiff purchased. Ogbonna Dec. ¶ 18; Class Cert. Mot. Ex. 1-11.

**Response: Undisputed.**

<u>**The Levels of Heavy Metals in Champion Dog Food are Not Unsafe:**</u>

53. Nearly all foods, whether for humans or pets, contain some levels of heavy metals, such as arsenic, cadmium, lead, and mercury, including the dog foods Plaintiffs purchased after discontinuing Champion. Poppenga Report at 8, 9-21, 40 (Conclusion A); Expert Rebuttal Report

of Dr. Robert H. Poppenga ("Poppenga Rebuttal Report"), attached as "Exhibit 14," at 9-10.

**Response: Disputed in part and objection.** The notion that "nearly all foods, whether for humans or pets contain some level of heavy metals," is unsupported by the FDA's own testing. Specifically, the FDA, using substantively lower limits of detection, failed to detect heavy metals in chicken and turkey – both main ingredients of numerous diets at issue here. (*See* **Pls.' Ex. 4**, FDA Total Diet Study.) Specifically, the FDA tested 32 lots of chicken breast, oven-roasted (skin removed) and turkey breast oven roasted for arsenic, cadmium and lead, and as well as testing 15 lots of each for mercury. According to the FDA Total Diet Study, 71.85% of the chicken breast tested non-detect (below 0.010 mg/kg) for arsenic; 93.75% tested non-detect (below 0.002 mg/kg) for cadmium; 100% tested non-detect (below 0.010 mg/kg) for lead; and 100% tested non-detect (below 0.010 mg/kg) for mercury. Similarly, 75% of the turkey breast tested non-detect for arsenic; 96.875% tested non-detect for cadmium; 100% tested non-detect for lead; and 86.66% tested non-detect for mercury. For context, the Dog Food tested positive for heavy metals at much higher levels when tested by Plaintiffs, with arsenic up to 3.256 mg/kg; cadmium up to 0.200 mg/kg; lead up to 0.489 mg/kg; and mercury up to 0.0549 mg/kg. (**Dkt. 68**, Third Amended Complaint, at Ex. 2.) CPF's own testing from its expert, Dr. Poppenga, similarly confirms the consistent presence of heavy metals in the Dog Food. (*See* **Dkt. 124-7**, Expert Report of Dr. Poppenga, at 8, 25-27.) Plaintiffs' expert, Dr. Pusillo, opines that CPF can reduce or remove the presence of heavy metals through good manufacturing practices, such as screening out ingredients with heavy metals and using ingredients, such as deboned chicken, that CPF knows can be purchased without the presence of detectable amounts of do not contain heavy metals. (*See* **Dkt. 95-39**, Deposition of Dr. Pusillo, taken April 26, 2019, at 139:1-2 ("They should buy ingredients that don't have heavy metals in it."); **Dkt. 95-41**, CPF1252530 (CPF third party testing showing non-detectable amounts of heavy metals in deboned chicken).) CPF uses non-fresh ingredients, such as pollock oil, that contain

high levels of heavy metals. (*See* **Pls.' Ex. 5**, EUROFINS000122 (Heavy metal test result for pollock oil, which contained 6.91 mg/kg of arsenic); **Pls.' Ex. 6**, EUROFINS000118 (CPF third-party testing shows catfish meal contained 0.014 mg/kg of cadmium, 0.250 mg/kg of lead, and 0.121 mg/kg of arsenic.).)

54. Arsenic, cadmium, lead, and mercury are naturally occurring elements that are ubiquitous in the environment and commonly found in dog foods and in the ingredients used to make Champion's food. Poppenga Report at 4-7, 9-21, 40 (Conclusion A); Poppenga Rebuttal Report at 9-10; Expert Report of Dr. Gary Pusillo titled "Test Results of Champion Petfoods USA, Inc. and Champion Petfoods LP for Heavy Metals and Plasticizers" ("Pusillo Test Report"), [ECF No. 108-3] at 33-35.

**Response: Disputed in part, objection, and immaterial.** See dispute to ¶53. Heavy metals vary by region and ingredient, and there is evidence that heavy metals can be controlled by using ingredients with non-detectable amounts of heavy metals. CPF's own expert, Dr. Poppenga, conceded that dog food manufacturers could take into "a number of different factors that would go into sourcing different ingredients" when asked how to lower the presence of heavy metals in dog food, but admitted that these good manufacturing practices are "beyond his expertise." (*See* **Pls.' Ex. 7**, Deposition of Dr. Poppenga, taken March 12, 2021, at 39:6-15.)

55. Champion does not add heavy metals as ingredients into its foods. Johnston Dec. ¶ 12.

**Response: Disputed in part.** Disputed to the extent that CPF does not disclose that it knowingly uses ingredients that contain heavy metals in the Dog Food and does not disclose that the Dog Food contains heavy metals anywhere on its packaging. (*See* **Dkts. 95-2; 95-3; 95-4; 95-5; 95-6; 95-7; 95-8; 95-9; 95-10; 95-11; 95-12** (CPF Packaging for the Dog Food showing that the presence of heavy metals and the use of ingredients containing heavy metals is omitted from the Dog

Food packaging.).)

56. Champion does not advertise that its diets contain no heavy metals or are "heavy metal-free." Ogbonna Dec. at ¶ 16; Class Cert Mot. Ex. 1-11.

**Response: Disputed in part.** Disputed to the extent that reasonable consumers, such as Plaintiffs, understood "Delivering Nutrients Naturally" to mean that the Dog Food did not contain non-nutritious and undesirable contaminants, such as heavy metals. (*See* **Dkt. 95-36**, at 187:24-188:8 ("Q: What did 'delivering nutrients naturally' mean to you? A: …BPA free, it would be, you know, heavy metal free. I mean, where in the world is pentobarbital occurring naturally in nature unless it's injected by a human?"); **Dkt. 95-38**, at 112:11-16.) Plaintiffs' marketing and survey experts confirm that a reasonable consumer would interpret "natural" statements to mean that the Dog Food did not contain heavy metals. (**Dkt. 95-18**, at ¶32(i); ¶¶173, 180, and 193 (Silverman opines that a reasonable consumer would consider the presence of heavy metals is inconsistent with CPF natural packaging claims); **Dkt. 95-71**, at Figure 21 (Expectation Survey Results for "Delivering Nutrients Naturally" showed that 84.7% of respondents would not expect the Dog Food to contain heavy metals based on this natural claim.).) Disputed to the extent that reasonable consumers, like Plaintiffs, interpret "Biologically Appropriate" to mean that the Dog Food does not contain heavy metals. (*See* **Dkt. 95-36**, at 70:1-4, 141:14-20, 205:6-13, 242:5-19; **Dkt. 95-37**, at 93:23-94:2, 94:13-21, 96:24-97:18; **Dkt. 95-38**, at 98:21-99:24; 142:19-143:14, 145:19-22, 176:19-177:14.) Plaintiffs' marketing and survey experts confirm that a reasonable consumer would interpret "Biologically Appropriate" to mean that the Dog Food did not contain heavy metals. (**Dkt. 95-18**, at ¶32(i); ¶¶94-103 (Silverman opines that a reasonable consumer would find the presence of heavy metals as inconsistent with Biologically Appropriate); **Dkt. 95-71**, at Figures 14, 20 (Expectation Survey Results for Biologically Appropriate showing vast majority of respondents would understand Biologically Appropriate to mean that the dog food does not contain heavy metals.).)

57. In 2005, the National Research Council ("NRC") published a study in the Mineral Tolerance Animals, 2nd Revised Edition, 2005, that provided maximum tolerable limits ("MTLs") for arsenic, cadmium, lead, and mercury in dog foods. Poppenga Report at 22.

**Response: Undisputed.**

58. In 2011, the FDA conducted its own review as to the levels of heavy metals in pet food, entitled the Target Animal Safety Review, and by way of this report, approved of and uses the following NRC MTLs to help guide regulatory decisions: (1) Arsenic 12,500 µg/kg (12.5 mg/kg); (2) Cadmium 10,000 µg/kg (10 mg/kg); (3) Lead 10,000 µg/kg (10 mg/kg); and (4) Mercury 267 µg/kg (.27 mg/kg). Poppenga Report at 22-23.

**Response: Disputed in part.** See disputes to ¶¶53-56. Disputed to the extent that the NRC MTLs are irrelevant to a reasonable consumer's expectations and understanding of the Dog Food's content and quality based on its packaging. Further disputed to the extent that the FDA has not adopted the MTLs as a regulation or even an official guideline. Dr. Poppenga admits that he believes a dog food manufacturer could still be allowed to sell dog food that contained heavy metals in excess of the NRC MTLs, and that the NRC MTLs "are not regulatory limits," "action levels" or "tolerances." (*See* **Pls.' Ex. 7**, at 28:4-20.) The Target Animal Safety Review was merely a peer-reviewed article authored by the Center for Veterinary Medicine that stated MTLs could be considered in determining whether dog food is adulterated (not allowed to be sold in commerce). (**Pls.' Ex. 8**, Target Animal Safety Review.) In its 2011 Target Animal Safety Review, the FDA confirmed that it "has not promulgated guidance, action levels, or tolerances for maximum content" for heavy metals, and instead review heavy metals strictly as to whether the food is adulterated. (*Id.* at 3.) Additionally, the NRC MTLs are irrelevant and immaterial to this case and Plaintiffs' damages are not based on any illness caused by their dogs' consumption of the Dog Food. (**Dkt. 95**, at 1.)

59. In 2002, the European Union ("EU") had enacted regulations for the safe upper

limits of arsenic (10 mg/kg), cadmium (2 mg/kg), mercury (.3 mg/kg), and lead (5 mg/kg) in pet foods. Poppenga Report at 23-24.

**Response: Undisputed and objection.** EU regulations and standards govern dog food sold in Europe, and are irrelevant to Plaintiffs' claims for CPF's misleading packaging sold in Illinois. Additionally, the EU safety standards are irrelevant and immaterial to this case and Plaintiffs' damages are not based on any illness caused by their dogs' consumption of the Dog Food. (**Dkt. 95**, at 1.)

60. The levels of heavy metals in Champion's dog food are well below the MTLs set by the NRC/FDA and the EU safety standards for heavy metals in pet food. Poppenga Report at 12-14, 25-28, 41 (Conclusion E).

**Response: Disputed in part.** See disputes and objections to ¶¶53-56, 58-59.

61. Eurofins' testing at the request of Champion during the ordinary course of its business establishes that the levels of heavy metals in Champion's dog food are well below the MTLs set by the NRC/FDA and the EU safety standards for heavy metals in pet food. Poppenga Report at 28, 41 (Conclusion E).

**Response: Disputed in part.** See disputes and objections to ¶¶53-56, 58-59.

62. Testing performed for Plaintiff by Iowa State University Veterinary Diagnostic Lab and Ellipse Analytics establish that the levels of heavy metals in Champion's dog food are well below the MTLs set by the NRC/FDA and the EU safety standards for heavy metals in pet food. Poppenga Report at 27; Pusillo Test Report at 24, 26.

**Response: Disputed in part.** See disputes and objections to ¶¶53-56, 58-59.

63. Taking the highest level of each heavy metal in each of the at-issue diets, as set forth in the TAC (DogStar ORIJEN Six Fish: 3169.80 ug/kg[5] of arsenic (25.36% of MTL); DogStar

[5] 1 ppb (part per billion) is equivalent to 1 ug/kg (microgram per kilogram), and 1 ppm (part per million) is equivalent to 1 mg/kg (milligram per kilogram) or 1,000 ppb.

ORIJEN Six Fish 200.50 ug/kg of cadmium (20.05% of MTL); DogStar ORIJEN Six Fish 54.90 ug/kg of mercury (20.56% of MTL); ACANA Heritage Red Meats 1731.90 ug/kg of lead (17.32% of MTL)), these levels are still a fraction of any known MTL for heavy metals in dog food and are well below the EU standards. TAC Ex. 2; Poppenga Report at 27.

**Response: Disputed in part.** See disputes and objections to ¶¶53-56, 58-59.

64. At Champion's request, Eurofins tested 65 samples of competitor dog foods (including samples of diets Plaintiffs purchased after discontinuing to purchase Champion dog food) for arsenic, cadmium, lead, and mercury, and found each sample had metals present at safe levels. Poppenga Report at 15-20.

**Response: Disputed in part and irrelevant.** See disputes and objections to ¶¶53-56, 58-59. The levels of arsenic, cadmium, lead, and mercury found in Champion's competitors' dog foods is irrelevant and immaterial to this case.

65. Ellipse Analytics tested hundreds of dog foods and found heavy metals in almost all of them. Deposition of Sean Callan dated May 9, 2019 ("Callan Dep. Vol. 1"), attached as "**Exhibit 15**," at 53:12-16; 54:16-55:3.

**Response: Disputed in part and irrelevant.** See disputes and objections to ¶¶53-56, 58-59, 64.

66. The levels of naturally occurring heavy metals in ACANA and ORIJEN dog food diets do not present a health risk to dogs. Poppenga Report at 40-41 (Conclusion D).

**Response: Disputed in part and irrelevant.** See disputes and objections to ¶¶53-56, 58-59, 64.

67. Plaintiff's expert Dr. Gary Pusillo did not identify any known safety standard or guidelines applicable to canines or to dog food that Champion's dog food exceeds. Deposition of Dr. Gary Pusillo dated April 26, 2019 ("Pusillo Dep. Vol. 1"), attached as "**Exhibit 16**," at 11:21-12:22; 13:21-14:12; 31:4-8; Deposition of Dr. Gary Pusillo dated May 31, 2019 ("Pusillo Dep.

Vol. 2”), attached as “**Exhibit 17**,” at 86:8-17; 93:5-18; 94:4-12.

**Response: Disputed in part and irrelevant.** See disputes and objections to ¶¶53-56, 58-59, 64.

68. Plaintiff’s expert Dr. Pusillo is not a pet food safety expert or a toxicologist. Pusillo Dep. Vol. 1 at 36:23-37:5; 130:6-14; 143:22-24; Pusillo Dep. Vol. 2 at 67:21-23.

**Response: Undisputed and objection.** Dr. Pusillo is qualified to opine on the nutritional impact of the inclusion of heavy metals in dog food. (*See* D**kt. 95-72**, Expert Testing Report of Dr. Pusillo, at 13-18.) Plaintiff’s expert, Dr. Pusillo, opines that CPF can reduce or remove the presence of heavy metals through good manufacturing practices, such as screening out ingredients with heavy metals and using ingredients, such as deboned chicken, that CPF knows can be purchased without the presence of detectable amounts of do not contain heavy metals. (*See* Dkt. **95-39**, Deposition of Dr. Pusillo, taken April 26, 2019, at 139:1-2 (“They should buy ingredients that don’t have heavy metals in it.”); **Dkt. 95-41**, CPF1252530 (CPF third party testing showing non-detectable amounts of heavy metals in deboned chicken).) Instead, CPF intentionally uses non-fresh ingredients, such as pollock oil, that contain high levels of heavy metals. (*See* **Pls.’ Ex. 5** (Heavy metal test result for pollock oil, which contained 6.91 mg/kg of arsenic); **Pls.’ Ex. 6** (CPF third-party testing shows catfish meal contained 0.014 mg/kg of cadmium, 0.250 mg/kg of lead, and 0.121 mg/kg of arsenic.).) CPF’s own expert, Dr. Poppenga, conceded that dog food manufacturers could take into “a number of different factors that would go into sourcing different ingredients” when asked how to lower the presence of heavy metals in dog food, but admitted that these good manufacturing practices are “beyond his expertise.” (*See* **Pls.’ Ex. 7**, at 39:6-15.)

69. Plaintiffs in this case testified that they knew heavy metals are naturally found in Champion’s ingredients. Meyer Dep. at 14:11-15:15 (testifying she was aware for the last ten years that heavy metals are naturally occurring in animals and plants, including that apples contained

arsenic and fish contained mercury); Zarinebaf Dep. at 147:3-11 (when asked about his awareness of heavy metals, Zarinebaf testified "they're everywhere," and acknowledged seafood contains mercury and rice contains arsenic); Chernik Dep. at 149:19-24; 224:5 (testified he had "heard of the concept of naturally occurring heavy metals" and understood it to mean "that some heavy metals [] are on this earth that are not manmade," and testifying that "some fish can have mercury.").

**Response: Objection.** Misstates Plaintiff's testimony. Chernik testified that he had "heard of the concept of naturally occurring heavy metals," but did not testify that he knew heavy metals were found in CPF's ingredients when he purchased the Dog Food. (**Dkt. 121-7**, Deposition of Zachary Chernik, taken December 8, 2020, at 149:19-24.) Zarinebaf testified that CPF should not use ingredients that contain heavy metals, whether naturally occurring or not, in the Dog Food. (**Dkt. 121-9**, Deposition of Afshin Zarinebaf, taken November 23, 2020, at 146:21-147:2 ("Q: Okay. My next question is are you aware that heavy metals are naturally occurring? A: Naturally what? Q: Occurring. A: But does that mean you should put in it the dog food?").) Meyer testified that she adjusted her purchasing habits to avoid buying products with heavy metals after her son told her that heavy metals can be naturally occurring. (**Dkt 121-11**, Deposition of Joan Meyer, taken November 13, 2020, at 15:20-16:1 ("Q: And what specifically did your son inform you about with respect to heavy metals starting about ten years ago? A: He started telling me that I should be eating organic as much as possible, canned foods are out. It can occur in the water so I needed to be filtering the water.").)

**The Levels of BPA Found in Champion's Dog Food Would Not Harm a Dog:**

70. Bisphenol-A (BPA) is a chemical molecule that is produced for use primarily in the production of polycarbonate plastics and epoxy resins, which frequently appear in water bottles, infant bottles, CDs, medical devices, and lacquers to coat products such as food cans and bottle tops. Poppenga Report at 29.

**Response: Disputed in part and objection.** Disputed to the extent that CPF purports that these products cannot be found without BPA. (*See* **Dkt. 95-46**, Deposition of Dr. Poppenga, taken May 22, 2019, at 133:9-134:10 (BPA can be controlled and excluded from products); **Dkt. 95-47**, Deposition of Sean Callan, taken May 9, 2019, at 187:3-5 ("You can select for BPA-free options."); *see also* **Dkt. 121-12**, Expert Report of Dr. Poppenga, dated May 12, 2021, at 30 (CPF's expert also stated, "[b]ecause of the ubiquitous presence of BPA in our environment, it is nearly certain that BPA is present in most food products.").) This purported fact is also irrelevant to whether the labeling was misleading.

71. Humans and animals are most commonly exposed to BPA through their diet, as BPA tends to leach into food and liquid. Poppenga Report at 29.

**Response: Disputed in part and Objection.** Disputed to the extent the opinion actually states, "can leach" and says nothing about the most common method. (*See* **Dkt. 121-12**, at 29-33.) Disputed as the opinion also states toys and training devices are a source of exposure to BPA for dogs. (***Id***.) Disputed to the extent that this does not reflect that BPA has been addressed in certain products, including water bottles and baby food, which has led to the reduction of BPA exposure. (*See* **Pls.' Ex. 9**, Deposition of Sean Callan, taken May 9, 2019, at 186:20-187:2.) Disputed as previous testing on several hundreds of Dog Food diets showed relatively infrequent detectable levels of BPA. (*See* **Dkt. 121-16**, Deposition of Sean Callan, taken May 9, 2019, at 54:10-15.) This purported fact is also irrelevant to whether the labeling was misleading.

72. Because of humankind's extensive use of plastics, BPA is also prevalent in the environment, and many studies have measured levels of BPA in our air, dust, and water, showing humans and animals are exposed to BPA daily through a variety of pathways. Poppenga Report at 29.

**Response: Disputed in part and Objection.** Disputed to the extent that BPA-free containers are available and "regulatory agencies have encouraged elimination of BPA in ... infant containers." (**Dkt. 95-46**, at 133:9-134:10 (BPA can be controlled and excluded from products); **Dkt. 95-47,** at 187:3-5 ("You can select for BPA-free options."); *see also* **Dkt. 121-12,** at 30 (CPF's expert also stated, "[b]ecause of the ubiquitous presence of BPA in our environment, it is nearly certain that BPA is present in most food products.").) Also disputed to the extent previous testing on several hundreds of dog food diets showed relatively infrequent detectable levels of BPA. (**Dkt. 121-16,** at 54:10-15.) This fact is also irrelevant as to whether the labeling was misleading.

73. Champion does not add BPA as an ingredient in its dog foods. Johnston Dec. at ¶ 13.

**Response: Disputed in part and Objection.** Disputed to the extent that CPF does not disclose that the Dog Food, ingredients, and packaging have a risk of containing BPA. Plaintiffs interpreted the Packaging Claims to mean that the Dog Food, its ingredients, and its packaging did not contain BPA and considered the presence of BPA as material to their purchasing decisions. (*See* **Dkt. 95-36**, at 70:1-4, 141:14-20, 242:5-19; **Dkt. 95-37**, at 93:23-94:2, 94:13-21, 96:24-97:18; **Dkt. 95-38**, at 142:19-143:14.) Plaintiffs' marketing and survey experts confirm that a reasonable consumer would interpret "Biologically Appropriate" to mean that the Dog Food would not have the risk of containing BPA. (*See* **Dkt. 95-18**, at ¶32(i); ¶¶94-103, 177-180 (Silverman opines that a reasonable consumer would find the risk of BPA as inconsistent with Biologically Appropriate); **Dkt. 95-71**, at Figures 14, 20, 21 (Expectation Survey Results for Biologically Appropriate showing 73.2% to 71.3% would not expect BPA to be present based on Biologically Appropriate and 74.4% would not expect BPA to be present based on Delivering Nutrients Naturally).)

74. Champion does not advertise its food as "BPA Free," or words to that effect. Ogbonna Dec. at ¶ 15; Class Cert. Mot. Ex. 1-11.

**Response: Disputed in part.** See dispute to ¶73.

75. Table 5 of Plaintiffs' expert report of Dr. Pusillo contains BPA "testing results as alleged in the complaint," conducted by Plaintiffs' lab, Ellipse Analytics, which shows levels of BPA present in some of the diets that Plaintiffs' purchased. Pusillo Test Report at 26.

**Response: Undisputed.**

76. The BPA levels reported by Ellipse Analytics range (for the at-issue diets) from "ND," non-detectable, for ACANA Grasslands purchased by Chernik and Zarinebaf and ORIJEN Original purchased by Meyer, to 82.7 ppb for ACANA Regionals Meadowland purchased by Meyer. Pusillo Test Report at 26.

**Response: Undisputed.**

77. Plaintiffs' lab, Ellipse Analytics, utilized a 30 ppb Level of Quantification ("LOQ") testing criteria to obtain these results, and the test results for several hundred dog foods, and found that approximately one-third of dog foods had BPA in them. Callan Dep. Vol. 1 at 53:12-16; 54:10-15; 55:4-8.

**Response: Undisputed and objection.** The amounts of BPA found in other dog foods are irrelevant to this case

78. If Plaintiffs' lab had used a more sensitive LOQ, it would have found BPA in even more of the dog foods it tested. Callan Dep. Vol. 1 at 59:2-16.

**Response: Undisputed and objection.** The amounts of BPA found in other dog foods are irrelevant to this case.

79. Another laboratory, ExperTox, utilized by Plaintiffs to test Champion's dog food diets for BPA, did not detect any BPA in any of the 38 samples of Champion's dog food it tested, which included diets purchased by Plaintiffs. Pusillo Dep. Vol. 1. at 19:15-17; 21:11-18; 43:2-5; 124:9-13; Pusillo Dep. Vol. 2. at 111:16-112:1.

**Response: Undisputed.**

80. At Champion's request, Eurofins laboratory tested samples of the diets Plaintiffs purchased for BPA, utilizing a highly-sensitive 5 ppb LOQ for BPA. Poppenga Report at 31-32.

**Response: Undisputed.**

81. Eurofins testing done on samples of the diets Plaintiffs purchased (with the exception of ACANA Meadowlands, Grasslands, and Free-Run Poultry), resulted in a non-detect reading because the levels of BPA (if any) were below the 5 ppb LOQ. Poppenga Report at 31-32.

**Response: Undisputed.**

82. The results for ACANA Meadowlands, Grasslands, and Free-Run Poultry were 5.90, 5.43, and 5.30, respectively (but would read as a "zero" under Plaintiffs' criteria). Poppenga Report at 31-32.

**Response: Undisputed.**

83. Additionally, Eurofins' testing of competitor dog foods demonstrated that BPA was also found in numerous competitor brands at various low levels. Poppenga Report at 32.

**Response: Undisputed and objection.** The amounts of BPA found in other dog foods are irrelevant to this case.

84. The levels of BPA purportedly in Champion's dog food according to Plaintiffs would not cause an adverse health effect in a dog. Poppenga Report at 33, 41 (Conclusion H).

**Response: Undisputed and objection.** Whether the levels of BPA would or would not cause an adverse effect in a dog is immaterial and irrelevant as there are no allegations that levels of BPA caused harm to any dogs. (**Dkt. 95**, at 1.)

85. Plaintiffs have put forth no expert who opines that the BPA levels detected would be harmful to a dog. Pusillo Dep. Vol. 1. at 26:12-16; 108:22-109:1; Pusillo Dep. Vol. 2. at 112:5-

13; Callan Dep. Vol. 1. at 84:17-85:18.

**Response: Undisputed and objection.** Whether the levels of BPA would or would not cause an adverse effect in a dog is immaterial and irrelevant as there are no allegations that levels of BPA caused harm to any dogs. (**Dkt.** **95**, at 1.)

86. Plaintiffs' expert, Dr. Pusillo, is not a BPA expert and gave no opinion on the source of BPA (*i.e.* how it could have come to be present) in Champion's dog food. Pusillo Dep. Vol. 1 at 15:11-16; 15:22-25; Pusillo Dep. Vol. 2 at 112:5-13.

**Response: Undisputed and objection.** Disputed to the extent that Dr. Pusillo is qualified to opine on the nutritional impact of BPA inclusion in dog food and manufacturing practices to avoid the presence of BPA. (*See* **Dkt.** **95-72**, at 13-18.) This is irrelevant and prejudicial as there are no allegations in this case that levels of BPA caused harm to any dogs.

**Very Low and Non-Dangerous Levels of Pentobarbital were Found in an Ingredient Supplied to Champion's DogStar Kitchen in Late March 2018 for its "Red" Diets, but Not Found in its Finished Dog Food:**

87. Champion uses beef tallow (a/k/a fat) as an ingredient for its beef-based dog food diets[6] and spray it on the kibble at the end of the production run primarily for palatability. Milam Dec. ¶¶ 19, 22.

**Response: Undisputed.**

88. Beef tallow is created through a process called "rendering," during which the supplier, a rendering facility, converts fat from a healthy slaughtered cow in part into beef meal and in part into beef tallow. Milam Dec. ¶ 21.

**Response: Disputed in part.** Disputed to the extent that the "rendering" process used by the supplier also handled unhealthy, condemned carcasses that exposed the beef tallow to the risk

[6] Champion's beef-based diets are branded as the "Red" diets, which consist of ORIJEN Regional Red, ACANA Heritage Red Meat, as well as ACANA Heritage Appalachian Ranch and ACANA Singles Beef & Pumpkin (which are not at-issue in this case). Milam Dec. ¶ 20; *See* ECF No. 102; ECF No. 95 at 15- 16.

of pentobarbital if the supplier failed to adequately segregate condemned carcasses from the slaughtered carcasses. (*See* **Dkt. 95-54**, JBS0022724 [redacted]

89. Champion's ingredient specifications to its suppliers require that all beef tallow sold to Champion be rendered from "EU Category 3" standard cows, meaning "no dead, dying, or condemned" animals are allowed. Deposition of Kenneth Gilmurray ("Gilmurray Dep."), attached as "**Exhibit 18**," at 180:14-19, 181:1-11, 186:25-189:8, 247:6-248:12, Ex. 18 ("EU certified, category 3. Product shall not contain animals dead or condemned upon reaching the slaughter facility. Product shall be from animals deemed fit for human consumption, and consist of meat, organ and bone."), **Ex. 19** (same).

**Response: Disputed in part.** Disputed to the extent that CPF's subpar quality assurance requirements turned a blind eye to its supplier's failure to adequately segregate condemned carcasses from the slaughtered carcasses used to manufacture its beef tallow and exposed CPF beef tallow to the risk of pentobarbital. (*See* **Dkt. 95-54** [redacted]

CPF did not audit JBS in 2016 or 2017. (*See* **Dkt. 95-55**, CPF2117189 (Audit records showing JBS was not audited in 2016 or 2017.).) When CPF finally audited JBS in early 2018, its auditor uncovered built-up excessive product on JBS's equipment, demonstrating the cross-contamination between CPF beef tallow and other products derived from condemned carcasses, which have the potential of being contaminated with pentobarbital. (*See* **Dkt. 95-56**, CPF2117191.) Despite this

troubling observation, CPF did not require JBS to adjust its manufacturing practices to ensure that condemned carcasses were sufficiently segregated from its beef tallow. (*See* **Dkt. 95-57**, CPF2119942 (in discussing JBS's audit, CPF's Director of Certification and Compliance admits "following up on [corrective action] after audits" is "a weak point" for him).)

90. From around August 2016 to May 2018, Champion's DogStar Kitchen purchased beef tallow from several suppliers, one of them being JBS, but discontinued purchasing beef tallow from JBS in May 2018. Milam Dec. at ¶¶ 23, 24; Gilmurray Dep. at 226:14-16.

**Response: Undisputed.**

91. On or around May 7, 2018, Champion learned that the Pennsylvania Department of Agriculture had inspected JBS' MOPAC rendering plant in Pennsylvania and took samples of its beef tallow to determine if it contained pentobarbital. Gilmurray Dep. at 42:8-43:4, Ex. 21.

**Response: Undisputed.**

92. The Pennsylvania Department of Agriculture determined that two lots of beef tallow delivered to Champion by JBS on or around March 26, 2018 and March 28, 2018 had tested positive for small amounts of pentobarbital (at 56 ppb and 16 ppb, respectively). Gilmurray Dep. 218:2-10, Ex. 21.

**Response: Disputed in part.** Disputed to the extent that the FDA later discovered that beef tallow manufactured at JBS during the period CPF received beef tallow from JBS also tested positive for pentobarbital. (*See* **Dkt. 95-58**, FDA visit-related observations of the JBS Souderton facility, dated October 17, 2018 (test results confirming three samples of beef tallow from November 2017, December 2017, January 2018, and March 2018 *all tested positive* for pentobarbital).)

93. Pentobarbital is not added as an ingredient in Champion's dog food. Johnston Dec. ¶ 14; Milam Dec. ¶ 28.

**Response: Disputed in part.** See disputes to ¶¶88-89, 92. Disputed to the extent that CPF intentionally used ingredients, such as beef tallow, that had a material risk of pentobarbital contamination due to CPF's failure to ensure that its supplier's quality assurance practices were sufficient to segregate condemned carcasses and the risk of pentobarbital. Further disputed to the extent that CPF admits the use of ingredients contaminated with pentobarbital is illegal. (*See* **Dkt. 95-59**, 30(b)(6) Deposition of Jim Wagner, taken April 3, 2019, at 51:7-11 ("So once you know an ingredient has a contaminant in it… you can't use it. So we by law cannot use it.").)

94. Zarinebaf's produced receipts indicate he purchased ORIJEN Regional Red on March 7, 2015, and Meyer's produced receipts indicate she purchased ACANA Heritage Red Meats on November 22, 2016. Zarinebaf Dep. Ex. 3 at 5, Meyer Dep. Ex. 3 at 9.

**Response: Disputed in part.** Disputed to the extent that Zarinebaf continued to purchase the Dog Food until September 2018 and Meyer continued to purchase the Dog Food until June 2019. (*See* **Dkt. 121-8**, Afshin Zarinebaf's Response to Defendants' First Set of Interrogatories, at 6; **Dkt. 121-10**, Joan Meyer's Response to Defendants' First Set of Interrogatories, at 9.)

95. After receiving the May 7, 2018 letter from the Pennsylvania Department of Agriculture, Champion immediately analyzed which of its production runs (also called "lots") were made with the affected beef tallow and quarantined all unshipped kibble made with it, as well as unused tallow it had received from JBS. Deposition of Jim Wagner dated April 3, 2019 ("Wagner Dep."), attached as "**Exhibit 19**," at 47:22-24, 133:9-12.

**Response: Undisputed.**

96. Champion pulled back from its distributors all of the unsold food it had that was made with the affected beef tallow. Wagner Dep. 131:14-18.

**Response: Disputed in part**. Disputed to the extent that CPF did not pull over 100,000 pounds of unsold food that was made with the affected beef tallow from retail markets. (*See* **Dkt.**

**95-59**, at 131:11-18.) Further disputed to the extent that CPF admits that it would be illegal to knowingly manufacture the Dog Food using the tallow contaminated with pentobarbital. (***Id***. at 51:7-11). Also disputed to the extent that CPF failed to notify consumers about the presence of pentobarbital in the Dog Food sold in retail stores because CPF wanted to avoid "panic in the marketplace." (***Id***. at 47:10-20, 47:25-48:17; 98:6-20.)

97. Of the 1.7 million pounds of dog food manufactured using the affected beef tallow, Champion quarantined or retrieved from its distributors approximately 1.6 million pounds; only about 100,000 pounds of kibble were sold into retail nationwide. Wagner Dep. 46:11-14, 129:10-25, 131:14-18.

**Response: Disputed in part.** See dispute to ¶96.

98. It is not known if any of 100,000 pounds of kibble made with the affected JBS beef tallow was ever sold in Illinois. Deposition of Erik Flakstad dated December 7, 2018, attached as "**Exhibit 20**," at 72:20-21; 80:9-15; 113:16-114:9.

**Response: Undisputed.**

99. Champion retained a consultant to assess whether the consumption of dog food from the affected lots would pose a health risk to dogs. Declaration of Gayan Hettiarachchi, ("Hettiarachchi Dec."), attached as "**Exhibit 21,**" at ¶ 18, Ex. A.

**Response: Undisputed.**

100. Due to the low amount of pentobarbital in the affected tallow, as well as the fact that tallow is only a small fraction of the finished food, the consultant determined, using the FDA's No Observable Effect Level (NOEL), that the small amount of pentobarbital in the beef tallow used in the affected lots would not pose any danger to any dog. Hettiarachchi Dec. ¶ 18, Ex. A.

**Response: Disputed in part and objection.** Disputed to the extent CPF's internal calculations estimated that the maximum risk of pentobarbital exposure was 3.4 ppb, which is a

detectable amount of pentobarbital that, according to the FDA, would designate the affected Dog Food as adulterated. (*See* **Pls.' Ex. 10**, CPF2118689 ("Estimated max. amount in diet = 3.40 ug/kg [ppb]"); **Pls.' Ex. 11**, *Champion Petfoods USA Inc., v. JBS USA Food Co.* complaint.) Further disputed to the extent the FDA has previously stated there is "no tolerance level for pentobarbital in pet food." (**Pls.' Ex. 12**, FDA Warning letter to Evanger's Pet Food, dated June 29, 2017, at 3 ("In your firm's correspondence dated 5/18/17, it was stated that if any amount of pentobarbital were to be found in any of your ground loaf products, it would be in an amount that a laboratory would deem as being within the possibility of error and well within the range that FDA had previously deemed not be a health or safety concern in pet foods. ***FDA does not agree with your assessment that the process of grinding will dilute any pentobarbital present in the loaf products to non-detectable or safe levels. The agency notes that there is no tolerance level for pentobarbital in pet food.***") (emphasis added); **Pls.' Ex. 11** at ¶25 ("the FDA considers pet food containing any level of pentobarbital residue to be adulterated under federal law").) CPF's expert, Dr. Poppenga, agrees that CPF's internal calculations concluded with the possibility of a detectable amount of pentobarbital as well. (*See* **Dkt. 121-12**, at 38-39; **Pls.' Ex. 13**, Deposition of Dr. Poppenga, taken August 26, 2019 at 48:14-49:9.) Furthermore, Exponent's reliance on the FDA's NOEL is irrelevant and prejudicial because the FDA opined that any detectable amount of pentobarbital constitutes adulteration, without consideration as to whether the FDA's NOEL is exceeded. (**Pls.' Ex. 14**, *Questions & Answers: Contaminants in Pet Food*, available at https://www.fda.gov/animal-veterinary/animal-health-literacy/questions-answers-contaminants-pet-food (last accessed June 14, 2021).)

101. Champion determined that it had run only 6 production runs, comprised of 11 production shifts, with the affected beef tallow, and was able to take 11 individual properly mixed and homogenized composite 18-ounce samples, which were representative of the 11 production

shifts. Hettiarachchi Dec. ¶ 16; Wagner Dep. at 48:21-50:9.

**Response: Disputed in part.** Disputed to the extent that Dr. Callan found that the quantity of sampling performed by CPF was insufficient to assess the actual inclusion of pentobarbital in the finished kibble given the small number (11) and size tested relative to the total size of potentially contaminated finished product (approximately 0.26 pounds out of an approximate 1.7 million pounds) and the heterogeneity of certain raw materials. (*See* **Pls.' Ex. 15**, Expert Report of Sean P. Callan, dated August 6, 2019, at 1.)

102. Champion submitted these 11 composite samples of the quarantined dry finished kibble made with the affected tallow lots to Texas A&M Veterinary Medical Diagnostic Laboratory ("TVMDL") for testing. Hettiarachchi Dec. ¶ 15; Wagner Dep. at 152:11-17.

**Response: Disputed in part.** See dispute to ¶101.

103. All eleven (11) composite samples tested by TVMDL resulted in a "Non-Detect" reading with a 2 ppb LOD (level of detection). *See* TVMDL Test Results, CPF2118823-24, attached as "**Exhibit 22**"; Wagner Dep. at 152:11-153:9.

**Response: Disputed in part.** See dispute to ¶101.

104. Plaintiffs' expert has no critique of the TVMDL testing of the 11 composite samples or of TVMDL's results. Deposition of Sean Callan dated August 20, 2019 ("Callan Dep. Vol. 2"), attached as "**Exhibit 23**," at 29:8-16.

**Response: Disputed in part.** See dispute to ¶101. Plaintiffs' expert opined that CPF sampling was insufficient to assess the inclusion of pentobarbital in the finished kibble, as CPF tested a mere 0.26 pounds out of 1.7 million pounds of finished kibble.

105. FDA's guidance states that it is pentobarbital's "**detection** [that] renders the product adulterated," *See* FDA, *Questions and Answers: Evanger's Dog and Cat Food* (webpage archived on Feb. 7, 2019 at 19:57) https://wayback.archive-it.org/7993/20190207195700/

https://www.fda.gov/AnimalVeterinary/NewsEvents/ucm544348.htm (last accessed August 14, 2019), attached as "**Exhibit 24**."

**Response: Disputed in part.** Disputed to the extent this statement implies that some level of pentobarbital is acceptable in dog food. CPF acknowledged "any level" (of pentobarbital) is an adulterant according to the FDA, which is support by previous FDA statements to the pet food industry. (*See* **Pls.' Ex. 11**, at ¶25; **Pls.' Ex. 17**, CPF2118826; **Pls.' Ex. 12**.) CPF testified it could not legally make Dog Food from the tallow that tested positive for pentobarbital because the ingredient contained pentobarbital. (*See* **Dkt. 95-59**, at 51:3-11 ("So once you know an ingredient has a contaminant in it and it's detectable, you can't use it. So we by law cannot use it. We wouldn't use it if it had a potential risk with it.").) CPF's internal calculations estimated that the maximum risk of pentobarbital exposure was 3.4 ppb, which is a detectable amount of pentobarbital that, according to the FDA, would designate the affected Dog Food as adulterated. (*See* **Pls.' Ex. 10** ("Estimated max. amount in diet = 3.40 ug/kg [ppb]").)

106. Plaintiffs' experts agreed that it is pentobarbital's detection that renders a product adulterated. Callan Dep. Vol. 2 at 103:18-104:21 (testifying "[y]es, that is my understanding" when asked "to be adulterated, it [meaning pentobarbital] has to be detected, correct?"); Deposition of Gary Pusillo dated September 12, 2019 ("Pusillo Dep. Vol. 3"), attached as "**Exhibit 25**" at 20:7-16.

**Response**: Disputed in part. See disputes to ¶¶100-101, 105.

107. The FDA inspected Champion's DogStar Kitchen on May 16th, 17th, and 23rd of 2018, reviewed the TVMDL test results and (i) approved of Champion's handling of the situation, including Champion's decision not to recall product from retailers, (ii) determined no other action was needed, and (iii) issued a No-Action letter. Wagner Dep. 33:5-34:12, 53:20-54:12, 84:14-23, Ex. 4.

**Response: Disputed and objection.** The FDA requested that CPF submit an entry to the Reportable Food Registry which is reserved for "when there is a reasonable probability that the use of, or exposure to, an article of food will cause serious adverse health consequences or death to humans or animals." (*See* **Pls.' Ex. 16**, FDA's *Reportable Food Registry for Industry*, available at https://www.fda.gov/food/compliance-enforcement-food/reportable-food-registry-industry (last accessed June 14, 2021); **Pls.' Ex. 17** ("The FDA requested that we complete an entry in the Reportable Food Registry….").) The FDA stated it would not escalate the incident to a recall as long as there are "no reports of related serious illness of pets." (***Id.*** at -28.) The FDA's "no action indicated" conclusion was limited to the inspection of CPF's DogStar facility. (*Id*.; Pls.' Ex. 18, FDA's *Clinical Investigator Inspection List (CIIL) Database Codes*, https://www.fda.gov/drugs/enforcement-activities-fda/clinical-investigator-inspection-list-ciil-database-codes (last accessed June 14, 2021).) There is no evidence the FDA approved of CPF's decision to leave the remaining Dog Food on store shelves, as the FDA simply deemed its conclusion as no action.

108. Based on (i) TVMDL "Non-Detect" test results on the composite samples of the kibble, (ii) the opinion of a private consultant, and (iii) the FDA's approval, Champion determined that consumption of the kibble posed no danger to dogs and it was unnecessary to recall the affected food from retailers because the finished dog food posed no danger to dogs. Wagner Dep. at 33:24-34:2, 47:10-24, 48:12-17, 52:20-24, 53:20-54:5, 84:14-23, 98:10-20, 152:11-153:9; Hettiarachchi Dec. ¶ 18, Ex. A.

**Response: Disputed and objection.** Disputed to the extent that there is no evidence that the FDA approved of CPF's decision to leave the remaining 100,000 pounds of Dog Food on retail store shelves. Furthermore, the safety of the Dog Food is irrelevant as to whether a reasonable consumer would expect the Dog Food to contain pentobarbital based on CPF's Packaging Claims.

Plaintiffs' own testimony and plaintiffs' expert opinions demonstrate that a reasonable consumer would be shocked to discover that the Dog Food contained and/or had the risk of containing pentobarbital. (*See* **Dkt. 95-18**, at ¶¶190-193 (A reasonable consumer would find the risk of pentobarbital as inconsistent with CPF Packaging Claims); **Dkt. 95-36**, at 70:1-4, 141:14-20; **Dkt. 95-38**, at 142:19-143:14; **Dkt. 95-71**, at Figures 14, 20-21 (Between 68.2% and 69.9% would not expect pentobarbital based on "Biologically Appropriate" and 71.9% would not expect pentobarbital based on "Delivering Nutrients Naturally").)

109. Plaintiffs have no testing or evidence showing that any other beef tallow shipment from JBS contained pentobarbital, or any Champion dog food contained detectable amounts of pentobarbital. Callan Dep. Vol. 2 at 53:18-24 (Plaintiffs' expert admitting "I don't have data" when asked to support an opinion as to whether any other tallow shipments received by Champion were positive for pentobarbital); 65:12-66:11 (admitting neither he, nor anyone at his lab, has ever tested any Champion dog food for pentobarbital); 97:2-17 (admitting he was unaware that Plaintiffs' counsel requested a sample of Champion's products made with the affected beef tallow, and no testing was done on the sample).

**Response: Disputed in part.** Disputed to the extent that the above statement implies no other shipments of tallow received by CPF contained pentobarbital. CPF was receiving beef tallow from JBS that contained or was at risk of containing pentobarbital. (**Pls.' Ex. 19**, JBS0007485 (Texas A&M Veterinary Medical Diagnostic Laboratory Final Report dated May 17, 2018, where Five Rivers Cattle Feeding (a subsidiary of JBS) sent several tallow samples to be tested. These samples tested positive: Tallow – 11/22/17 TRL1039 JBS MOPAC – 52 ppb; Tallow – 1/18/18 TRL1036 JBS MOPAC – 29 ppb; Tallow – 2/12/18 TRL1028 JBS MOPAC – 133 ppb.).) CPF purchased beef tallow from JBS despite JBS's processing of condemned carcasses since September 2016. (*See* **Dkt. 95-54** [redacted]

[redacted]

Dated: June 21, 2021

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

By: /s/ Rebecca A. Peterson

ROBERT K. SHELQUIST, *Pro Hac Vice*
REBECCA A. PETERSON, *Pro Hac Vice*
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail: rapeterson@locklaw.com
rkshelquist@locklaw.com

WEXLER WALLACE LLP
KENNETH A. WEXLER
KARA A. ELGERSMA
MICHELLE PERKOVIC
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Tel: (312) 346-2222
Fax: (312) 346-0022
Email: kaw@wexlerwallace.com
kae@wexlerwallace.com
mp@wexlerwallace.com

WEXLER WALLACE LLP
MARK T. TAMBLYN, *Pro Hac Vice*
333 University Avenue, Suite 200
Sacramento, CA 95825
Tel: (916) 565-7692
Email: mjt@wexlerwallace.com

ROBBINS LLP
KEVIN A. SEELY (199982)
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: kseely@robbinsllp.com

GUSTAFSON GLUEK, PLLC
DANIEL E. GUSTAFSON, *Pro Hac Vice*
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: dgustafson@gustafsongluek.com

CUNEO GILBERT & LADUCA, LLP
CHARLES J. LADUCA
KATHERINE VAN DYCK
4725 Wisconsin Ave NW, Suite 200
Washington, DC 20016
Telephone: 202-789-3960
Facsimile: 202-789-1813
E-mail: kvandyck@cuneolaw.com
charles@cuneolaw.com

LITE DEPALMA GREENBERG & AFANDOR, LLC
JOSEPH J. DEPALMA
SUSANA CRUZ HODGE
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
E-mail: jdepalma@litedepalma.com
scruzhodge@litedepalma.com

**Attorneys for Plaintiffs**