```
 1                      IN THE UNITED STATES DISTRICT COURT
                        FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                                 EASTERN DIVISION

 3    AFSHIN ZARINEBAF, ZACHARY          )  Docket No. 18 C 06951
      CHERNIK, and JOAN MEYER,           )
 4    individually and on behalf of a    )
      class of similarly situated        )
 5    individuals,                       )
                         Plaintiffs,     )  Chicago, Illinois
 6                                       )  September 9, 2021
                      v.                 )  11:03 a.m.
 7                                       )
      CHAMPION PETFOODS USA INC. and     )
 8    CHAMPION PETFOODS LP,              )
                         Defendants.     )
 9
                   TRANSCRIPT OF PROCEEDINGS - Daubert Hearing
10                 STEFAN BOEDEKER and DR. ROBERT POPPENGA
                   BEFORE THE HONORABLE VIRGINIA M. KENDALL
11
      APPEARANCES:
12
      For the Plaintiffs:        LOCKRIDGE GRINDAL NAUEN PLLP by
13                               MS. REBECCA A. PETERSON
                                 100 Washington Ave. S., Suite 2200
14                               Minneapolis, Minnesota 55401-2179

15                               GUSTAFSON GLUEK PLLC by
                                 MR. DANIEL E. GUSTAFSON
16                               MS. KARLA GLUEK
                                 Canadian Pacific Plaza
17                               120 South 6th Street, Suite 2600
                                 Minneapolis, Minnesota  55402
18
                                 WEXLER WALLACE LLP by
19                               MR. KENNETH A. WEXLER
                                 55 West Monroe Street, Suite 3300
20                               Chicago, Illinois  60603

21

22

23    Court Reporter:           GAYLE A. McGUIGAN, CSR, RMR, CRR
                                 Official Court Reporter
24                               219 S. Dearborn Street, Room 2504
                                 Chicago, IL 60604
25                               312.435.6047
                                 gayle_mcguigan@ilnd.uscourts.gov
```

```
 1   A P P E A R A N C E S :   (Continued)

 2   For the Plaintiffs:      ROBBINS LLP by
                              MR. TREVOR R. LOCKO
 3                            5040 Shoreham Place
                              San Diego, California  92122
 4

 5   For the Defendants:      GREENBERG TRAURIG PA by
                              MR. DAVID A. COULSON
 6                            MS. ELISA HEVIA BACA
                              MR. JARED REED KESSLER
 7                            333 S.E. 2nd Avenue, Suite 4100
                              Miami, Florida  33131
 8
                              GREENBERG TRAURIG LLP by
 9                            MR. FRANCIS A. CITERA
                              77 West Wacker Drive, Suite 3100
10                            Chicago, Illinois  60601

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        (In open court.)

 2             THE CLERK:  18 C 6951, Zarinebaf versus Champion

 3   Petfoods.

 4             Please come up to the lectern and present yourselves.

 5             Also please use one of the microphone envelopes

 6   with -- the seam side is where the stitching is.

 7             THE COURT:  You put a little cover over the

 8   microphone.

 9             THE CLERK:  Grab one of these, and you put it on the

10   microphone.  You have to open it.

11             There you go.

12             MR. GUSTAFSON:  I didn't do that very quietly.

13             THE COURT:  It's not on all the way.  And you can't --

14   it's impossible to do it quietly.

15             Okay.  Please put your names on the record.  Start

16   with plaintiffs.

17             MR. GUSTAFSON:  Good morning, your Honor.  Dan

18   Gustafson, Gustafson Gluek, on behalf of the plaintiffs.

19             THE COURT:  Good morning.

20             MR. WEXLER:  Good morning.  Excuse me.  Haven't spoken

21   in court in a while.

22             THE COURT:  I know.

23             MR. WEXLER:  Ken Wexler from Wexler Wallace for the

24   plaintiffs.

25             THE COURT:  Good morning.
```

1        MS. PETERSON:  Good morning, your Honor.  Rebecca

2   Peterson on behalf of the plaintiffs.

3        THE COURT:  Good morning.

4        Who are all these other creatures?

5        MS. GLUEK:  Karla Gluek from Gustafson Gluek on behalf

6   of plaintiffs.

7        THE COURT:  Good morning.

8        MR. LOCKO:  Trevor --

9        COURT REPORTER:  Excuse me.  I did not hear you.

10       THE COURT:  Go to the microphone.

11       MR. LOCKO:  Trevor Locko, Robbins, LLP, on behalf of

12   the plaintiffs.

13       THE COURT:  Good morning.

14       MR. INMON:  George Inmon.  I'm the courtroom tech for

15   them.

16       THE COURT:  What was your last name?

17       MR. INMON:  Inmon.  I-N-M-O-N.

18       THE COURT:  Good morning.

19       MS. OTTO:  Ashtin Otto, Wexford Wallace, paralegal.

20       THE COURT:  I didn't hear the last name.

21       MS. OTTO:  Otto, O-T-T-O.

22       THE COURT:  What are you doing?

23       MS. OTTO:  Just setting up the easel.

24       THE COURT:  Okay.  All right.  Good morning.

25       MR. CITERA:  Good morning, your Honor.  Frank Citera

1    from Greenberg Traurig in Chicago here on behalf of the

2    defendants.

3            THE COURT:  Good morning.

4            MR. COULSON:  Good morning, your Honor.  David Coulson

5    from Greenberg Traurig, Miami, on behalf of the defendants.

6            THE COURT:  Good morning.

7            MR. KESSLER:  Good morning, your Honor.  Jared

8    Kessler, also from Greenberg Traurig, on behalf of the

9    defendants.

10           THE COURT:  Good morning.

11           MS. BACA:  Good morning.  Elisa Baca from Greenberg

12   Traurig on behalf of defendants.

13           THE COURT:  Okay.

14           MR. COULSON:  Then we have our technology helper here,

15   George.

16           THE COURT:  What is your last name?  George?

17           MR. MAYLABEN:  Maylaben.

18           THE COURT:  Can you spell it for me?

19           MR. MAYLABEN:  M-A-Y-L-E-B, as in boy, E-N.

20           THE COURT:  Maylaben.

21           I like to know Mr. Inmon and Mr. Maylaben in this time

22   because we just got off of a six-week patent trial and they're

23   the more critical people in the courtroom most of the time.

24           Okay.  So let me give you some guidance on how we're

25   going to do this.

1       We do have a protocol in place in the courtroom.  You

2   all have your masks on.  Most of you, if not all of you, are

3   probably vaccinated.  Doesn't matter any longer.  If the -- if

4   this goes more than a day, which it shouldn't, you have to be

5   tested downstairs if you're in the courthouse more than two

6   days at a time, just so you know as we move forward with these.

7       The next thing is you should be socially distanced in

8   the gallery as well.  You, I know, as trial lawyers, if you

9   affirmatively tell me that you're vaccinated and you've been

10  working together in the same room at your offices, it's silly

11  to separate you at this time.  But we are really critically

12  careful about the COVID in the courthouse.  We test every day

13  in this courthouse.  My staff and I get tested twice a week.

14  And every week somebody is getting positive.  No one in a jury

15  trial has ever gotten sick and no judge and no juror, and I

16  want to keep it that way, okay?  We don't want to be the ones

17  that break that rule.  So let's make sure that we do all of the

18  safety protocols.

19      When you come to the microphone, the questioner, the

20  examiner, put on a little thing like you just did, one of those

21  little white hoods.  And then when you are done, take it off

22  and throw it in the garbage, okay?  And then the same thing for

23  your witness, if you have a live witness.  And then the next

24  witness comes up and puts it on.

25      If for some reason somebody left one, you should take

1    it off, throw it in the garbage, and wash your hand with the

2    hand sanitizer, just to be safe.  Making sure the microphones

3    don't collect any droplets or whatever.  Okay?

4         The witness -- the live witnesses and the witness of

5    course by video can take masks off during examination.

6         If you tell me that you've had a COVID double vaccine

7    or the Moderna with the one, I let the examiner take your mask

8    off.  It's a protection, though, for like my court reporter and

9    my courtroom deputy, you're closer to them than to me, but I

10   have a hard time hearing you with your masks on sometimes and

11   so does the witness.  So while you're examining, if you've been

12   vaccinated, I'll let you take your masks off, okay?

13        Does that sound like a protocol?

14        All right.  Now, what I need to know is what you have

15   agreed to do for your presentation today, the format of it.

16   And I've got -- our IT guy here is going to help me -- because

17   your first witness is by video, right?

18        MR. GUSTAFSON:  That's right, your Honor.

19        THE COURT:  Okay.

20        MR. COULSON:  Yes, your Honor.  This is David Coulson

21   for the defense.

22        The order that we had agreed to go in is that we will

23   take up the motion to exclude Bruce Silverman first.  He's out

24   in California.  And he would appear through WebEx.

25        THE COURT:  Okay.

1          MR. COULSON:  And then Mr. Boedeker would be next, who

2     is the consumer survey and damages expert for plaintiffs.

3          MR. GUSTAFSON:  He is here in person, your Honor.

4          THE COURT:  Okay.  Oh, good morning.

5          THE WITNESS:  Good morning.

6          MR. COULSON:  Third would be the plaintiffs' motion to

7     exclude Dr. Poppenga, who is a defense witness.  He's a

8     veterinary toxicologist.  He's here in Chicago back at the

9     hotel room.  When we get closer, we'll have him come over.

10         THE COURT:  Okay.  So how long do you think all of

11    this is going to take?

12         MR. COULSON:  You told us approximately two hours per

13    witness, so we're going to try to make that work.

14         THE COURT:  Okay.  All right.  Let's get started.

15    Okay?

16         Do you -- did we get our tech guy here?

17         THE CLERK:  Alex is in there.  He's working on it,

18    your Honor.

19         MR. COULSON:  Your Honor, the general counsel for

20    Champion Petfoods is located in Edmonton, Canada.  Normally,

21    she would be here in person but for the COVID complication, but

22    we were hoping she could connect through WebEx.  Is that a

23    possibility?

24         THE COURT:  You'll have to talk to Lynn.  Is that

25    possible once we get started?

```
 1              THE CLERK:  She wants to -- I didn't hear --
 2              MR. COULSON:  She just wants to be able to listen in
 3    on the proceedings.
 4              THE CLERK:  She can call in.  There are people already
 5    on the line called in, so she can call in.  I don't know who I
 6    send that information to.
 7              MR. COULSON:  Okay.  Yes, we should try to get it
 8    to --
 9              MR. GUSTAFSON:  I'm not sure Mr. Silverman has the
10    link either.
11              MS. PETERSON:  Your Honor, we don't have the link yet
12    for Mr. Silverman --
13              THE CLERK:  Alex was working on that.  He's supposed
14    to send it to you because I sent it to him.
15              MS. PETERSON:  Okay.  I haven't seen it yet.
16         (Off-the-record discussion.)
17              MR. CITERA:  Judge, just quickly on the testing
18    protocol, my understanding was if it was two days in the same
19    week --
20              COURT REPORTER:  Can you please speak up?
21              MR. CITERA:  Sure.  It's Mr. Citera.  I think our next
22    scheduled date is September 22nd, if I'm not mistaken.
23              THE COURT:  So then you're not going to be here.  You
24    are fine.
25              MR. CITERA:  That's what I understood.
```

```
1              THE COURT:  I do not think that microphone is working.
2         (Off-the-record discussion.)
3              MR. GUSTAFSON:  In terms of scheduling, my
4    understanding is we have a second day scheduled in a few weeks.
5    And I suspect we're going to go today as long as your Honor
6    would like and then finish up on the second day.
7              Since we're having -- since we don't have the link for
8    the video for Mr. Silverman, do you want to start with
9    Mr. Boedeker instead?
10             It doesn't matter to us.  The defense would like --
11   they prefer Mr. Silverman first, but we're happy to use the
12   time with Mr. Boedeker if you prefer.
13             THE COURT:  I think I'm going to just give it a
14   minute.  He's usually wonderful with getting this set up.
15             MR. GUSTAFSON:  Okay.
16             THE COURT:  Let's just give it a minute.
17             MR. GUSTAFSON:  And then do you expect we'll have a
18   lunch break --
19             THE COURT:  Yes.  I have an Executive Committee
20   meeting at 12:30, so I have to go to that.
21             MR. GUSTAFSON:  Okay.  And we'll return at?
22             THE COURT:  1:30, I -- I mean, I don't know how -- no,
23   those are usually fast.  Let's say 1:15.
24             MR. GUSTAFSON:  Okay.
25             THE CLERK:  I'm sending the link now, your Honor.
```

1    There's a lot of attorneys.

2              THE COURT:  Thank you.

3         (Off-the-record discussion.)

4              MS. PETERSON:  You can send it to Trevor Locko.  He is

5    in the courtroom.  And he can forward it to Mr. Silverman,

6    please.  He did make an appearance.  If you don't have his

7    email, let me know and I can put it on the record.

8              MS. BACA:  For the defense, you could send the link to

9    Elisa Baca.

10             I received the link.  Thank you.

11             MS. PETERSON:  We got it also.  Thank you very much.

12   We'll send it out to the witness now.

13             MR. COULSON:  Do you contemplate each of us giving

14   just a very short introduction and then the examination and

15   then --

16             THE COURT:  That's the best.  Just orient me.  I'm

17   coming off of a trading software patent, so I need to switch

18   gears and learn.

19             And I think I could probably make trading software

20   after that trial.

21        (Laughter.)

22             MR. GUSTAFSON:  Those patent trials are technical,

23   aren't they?

24             THE COURT:  They're very technical.

25             I asked the jurors at the end, I said, "Do you think

1    jurors should listen to these cases?" And they said -- all

2    unanimously said "No." It was interesting. But they were very

3    good. They listened. They came. They were on time. They

4    were very careful. So they did a good job in that regard.

5    It's just that it's hard for average people to pick up that

6    type of case and just sit here during these times and listen.

7              MR. GUSTAFSON: I've been involved in several

8    complicated patent trials over the years, and I think it's hard

9    on the Court in claim construction issues, things like that,

10   and it's very hard on the jury, although my experience has been

11   that the jury gets it right. They may not get it

12   technically -- they may not understand it technically correctly

13   or something like that, but they get it right who is doing the

14   wrong thing.

15             THE COURT: I think that's -- there may be some truth

16   to that.

17             MR. GUSTAFSON: Yeah.

18             THE COURT: This one, there were about ten attorneys

19   on each side. And I was in the ceremonial courtroom. We could

20   only fit I think six on each -- in the courtroom. They paid

21   for live streaming both to the offices and to those who were

22   not in the courtroom, like out in the rooms. And so one

23   attorney would be arguing, you know, appear in front of me, and

24   then I would look over here and it would pop up a motion, you

25   know? So they were all filing motions in the back. I would

1    finish the day, go home, and have to do all of the rulings on

2    the motions that came in.  It was exhausting.

3              MR. GUSTAFSON:  That's hard work, yeah.

4              THE COURT:  That's why we get paid so much.

5         (Laughter.)

6              MR. GUSTAFSON:  Yes.  There is usually so much at

7    stake in those cases also.  It's not your normal slip-and-fall.

8              THE COURT:  The expert was paid $3.4 million, the

9    damages expert.  And I thought, oh, I have got to get into that

10   line of business.

11        (Laughter.)

12             MR. GUSTAFSON:  Right.  No contingent -- no

13   contingency either.  Paid up front.

14             THE CLERK:  He can't get this set up to show the

15   courtroom, but I believe I have the witness on -- is her name

16   Tricia?

17             MR. COULSON:  No, that's -- Tricia Waddell is our

18   general counsel.

19             THE CLERK:  I can publish my screen, but they can't

20   see the courtroom.  They can't see the attorneys at this point.

21   They have to get John up to see.

22             THE COURT:  Okay.  So then let's flip it.  Let's do

23   your other -- the other live witness.

24             MR. GUSTAFSON:  Okay.

25             THE COURT:  I'm sorry, but we don't want to waste

1    time.

2            We're going to have to move this screen.

3            Just let John know that he can come up at 12:30 --

4            THE CLERK:  Okay.

5            THE COURT:  -- because I'm going to break --

6            THE CLERK:  Then we'll do it.

7        (Off-the-record discussion.)

8            THE COURT:  This is William Moran.  He's my law clerk

9    assigned with me to this case.  He just started, so we're going

10   to teach him some stuff today.

11           MR. GUSTAFSON:  It is the greatest job in the world.

12           THE COURT:  That is right.

13           MR. GUSTAFSON:  You get involved in all the

14   interesting decisions, but you don't have to make any of the

15   hard ones yourself.

16       (Laughter.)

17           THE COURT:  So, Alex, I'm breaking at 12:30 for the

18   Executive Committee meeting.

19       (Off-the-record discussion.)

20           THE COURT:  We'll just switch gears and do a live

21   witness for now.

22           MR. GUSTAFSON:  Your Honor, I am fully vaccinated.  I

23   am very sensitive to the notion that masks help, and I'm happy

24   to talk loudly if -- with my mask on.

25           THE COURT:  Okay.

Opening Statement - Kessler

1      MR. GUSTAFSON:  If you think that you can't hear me
2  for some reason, let me know and I'll take it off --
3      THE COURT:  Okay.
4      MR. GUSTAFSON:  -- but I don't want your staff to be
5  one iota at risk, if possible.
6      THE COURT:  I appreciate that.  Thank you.
7      MR. GUSTAFSON:  And I do have a fairly loud voice, so
8  I will try to project.
9      THE COURT:  Okay.  You may proceed.
10     MR. GUSTAFSON:  Thank you, your Honor.
11     MR. KESSLER:  Your Honor, should we begin since it's
12  our motion?
13     THE COURT:  Oh, yes, I guess that's probably correct.
14     MR. KESSLER:  Jared Kessler from Greenberg Traurig on
15  behalf of defendants Champion.
16     Good morning, your Honor.  We're here now on
17  Champion's motion to exclude Mr. Boedeker.
18     By way of a very brief background, Mr. Boedeker's work
19  in this case consists of several surveys.  He performed four
20  conjoint surveys:  Two that he calls misrepresentation surveys,
21  and two that he refers to as omission surveys, one each of
22  those for Champion's Orijen and Champion's Acana line of pet
23  foods.
24     Mr. Boedeker attempts to use those conjoint surveys to
25  estimate plaintiffs' damages in this case, which, of course,

Opening Statement - Kessler

1  equal the diminution in value between what the plaintiffs paid

2  and what they allege they have received.

3         In addition to Mr. Boedeker's conjoint surveys, he's

4  also performed what he refers to as expectation surveys, which

5  were purportedly designed to gauge consumer impression of

6  certain labels appearing on Champion's packaging, labels like

7  "biologically appropriate," "nourish as nature intended,"

8  "fresh," and "regional."

9         THE COURT:  Can you just stop for a second?

10         I'm trying to take my notes, and I -- I don't even see

11  Word on this.

12         What happened to this?

13     (Pause in proceedings.)

14     (Off-the-record discussion.)

15         THE COURT:  Okay.  Thank you.  You may pick up where

16  you left off.

17         MR. KESSLER:  Thank you, your Honor.

18         What the evidence will show this morning and what

19  we're going to hear is that all of Mr. Boedeker's surveys are

20  unreliable and they're irrelevant to the issues in this case.

21         If we start with his expectation surveys, today we're

22  going to hear that Mr. Boedeker performed these surveys, he

23  conducted his analysis, and he came to his conclusions without

24  employing any sort of a control group.

25         The testimony is going to show that Mr. Boedeker

Opening Statement - Kessler

1   doesn't know and didn't even attempt to find out what his

2   survey respondents' impressions of Champion's dog food might be

3   without seeing the at issue statements.

4           If we turn next, your Honor, to Mr. Boedeker's

5   conjoint studies and his damages model, the evidence is going

6   to show us that his model doesn't fit plaintiffs' claims.

7           First and foremost, Mr. Boedeker's omission surveys

8   don't gather data about any at issue product.

9           Instead, we'll hear that in those surveys,

10  Mr. Boedeker instructed respondents to assume that they were

11  purchasing a bag of their favorite dry dog food, not any dog

12  food at issue in this case.

13          Even if, your Honor, those surveys generated any sort

14  of relevant data, which they don't, we'll hear that

15  Mr. Boedeker's model can't estimate damages if both

16  misrepresentations and omissions are at issue in this case.

17  And we know they are.  Plaintiffs' liability theory is based on

18  omissions from and misrepresentations on the packaging.

19          Furthermore, your Honor, with respect to

20  Mr. Boedeker's damages model which attempts to estimate a

21  change in market price between the actual world -- the world in

22  which plaintiffs allege they were harmed -- and the but-for

23  world -- a world in which the alleged omissions and alleged

24  misrepresentations don't affect Champion's packaging -- we'll

25  hear today that Mr. Boedeker, through his conjoint study, does

Opening Statement - Gustafson

1  not take any effort to model supply.

2          And without considering supply in his but-for world,

3  he can't determine a market price in that but-for world.  And,

4  of course, if he can't determine market price in the but-for

5  world, he can't determine a change in market price between the

6  actual world and but-for world.

7          Finally, your Honor, we will hear today about a

8  fundamental flaw that flows through all of Mr. Boedeker's work,

9  and that's that he surveyed in all of his surveys an irrelevant

10  population of respondents.

11          We'll hear that Mr. Boedeker did not limit survey

12  respondents to Illinois residents or purchasers of Champion pet

13  food.  Rather, he surveyed -- he conducted his surveys across

14  nationwide panels of consumers.  What we won't hear today is

15  any reference to anywhere in Mr. Boedeker's report where he

16  analyzes whether a nationwide panel of consumers is in any way

17  representative of Illinois purchasers of Champion's pet food.

18          So, in sum, your Honor, today the evidence is going to

19  show us that Mr. Boedeker's work is unreliable, it's

20  irrelevant, and that the Court should exercise its gatekeeping

21  function to exclude him from this case.

22          THE COURT:  Okay.  Thank you.

23          MR. KESSLER:  Thank you.

24          MR. GUSTAFSON:  Good morning again, your Honor.  Good

25  morning.  Dan Gustafson on behalf of the plaintiffs.

Opening Statement - Gustafson

1        Your Honor, the question of whether Mr. Boedeker's

2   testimony should be excluded under *Daubert* is not a question of

3   his qualifications.  They don't attack his qualifications and,

4   essentially, they admit that he is qualified both as an

5   economist and as a survey expert.  Because of that, we're not

6   going to spend any time on his qualifications, but I would

7   direct you to his C.V.  It is full of his experience and his

8   education with respect to surveys and economic analysis.

9        Instead, as you've just heard, they take issue with

10  certain portions of how he conducted his surveys.  They don't

11  take issue that conjoint surveys are well accepted in the

12  academic research world.  They don't take -- they don't take

13  any issue that conjoint surveys have been accepted by courts

14  across the country to model damages in false representation

15  cases.  What they do is they say the way he did his conjoint

16  survey, because he didn't do the certain things that you just

17  heard listed, make it unreliable.

18       In fact, Mr. Boedeker will explain to you on each of

19  those elements why he did what he did.

20       For example, with respect to his supply side, to

21  suggest that he didn't take into consideration the supply side

22  economics with respect to his conjoint surveys is just wrong.

23       He has page after page after page in his report about

24  why he -- what supply side considerations he took into

25  effect -- took into consideration, why he did it the way he did

Opening Statement - Gustafson

1    it, and why he came to the result that he came to.  You'll hear

2    him explain that to you in more detail shortly.

3           But the issues that are presented here are not issues

4    of failures of methodology.  They're issues of difference of

5    opinion about the results that were obtained.  Those issues go

6    to the weight.

7           Let me just talk about supply side as an example.

8           Mr. Boedeker says in his report that he held supply

9    constant.  He held it constant because that was the number of

10   units that were sold in the actual world, and that was the

11   number of units of dog food sales that people were subjected to

12   these potential misleading or omission statements.  He didn't

13   alter the supply of the dog food that was sold because to alter

14   the supply of the dog food that was sold would under-compensate

15   the consumers.  If he moved the supply curve back, if you

16   will -- lessened the supply curve, as defendants suggest he

17   should have, in response to the lower price -- it would result

18   in an over -- or an under-compensation of the people who paid

19   for the Champion dog food.  In other words, it would benefit

20   Champion because instead of selling -- and I'm just going to

21   use example numbers.  Instead of selling a million bags of dog

22   food in their but-for world, they would have only sold 900,000

23   bags and, therefore, 100,000 bags would go uncompensated.

24   Mr. Boedeker will explain why that's not the appropriate way to

25   calculate damages in a misrepresentation case.

21

Opening Statement - Gustafson

1    Let me speak just briefly about the cases that are

2  cited in the briefs.

3    There are a handful of cases -- more than a handful.

4  There are six or eight cases on each side of this issue with

5  respect to supply side.

6    And if you look at the supply side -- if you look at

7  the decisions where courts have said you need to take into

8  consideration a more detailed examination of the supply side,

9  you will find that, by and large, those cases deal with:

10    One, more complex products, generally automobiles, the

11  *GM Ignition Switch* case, the *American Honda* case, the *VW Clean*

12  *Diesel* case;

13    Two, they deal with products that have a product

14  defect.  They don't deal with products where the claim is a

15  misrepresentation or an omission on the label;

16    Third, they deal with cases in which there's a

17  secondary market.  And this is really important because there

18  is no secondary market for dog food.  Consumers buy the dog

19  food, they feed it to their loved pets, and there's no resale.

20    Think about the automobile situation where the claim

21  is that there's a defective transmission, for example.  That

22  product then is first sold with the potential defect, but it

23  some day goes into the secondary market where consumers buy it

24  again.  And so the market transactions that price the defect

25  are more complicated than they are in this situation where you

Opening Statement - Gustafson

1    have the dog food on the shelf, it's bought by a consumer, and

2    it's never resold because there is no secondary market.

3           And so if you look at those cases where conjoint

4    analysis has been criticized with respect to the supply side

5    issues, you'll see a reoccurring trend through those cases

6    involve defect, larger more complicated products, a secondary

7    market, and a last thing, often prices and quantities are

8    estimated because pricing data doesn't exist.

9           Here, Mr. Boedeker used pricing data that he obtained

10   from Champion's documents, so the price ranges that he used in

11   his conjoint survey comes from Champion's own documents.  And

12   the quantities sold are quantities that were actually sold in

13   the actual world because those, too, come also from Champion's

14   documents.

15          I'm going to talk just briefly about one more issue.

16   There's a few others that I'm going to leave for Mr. Boedeker.

17          One of the other principal attacks that they make on

18   Mr. Boedeker is that he didn't choose the right target

19   population.  And as you know, your Honor, choosing the right

20   target population for the survey is an important component of

21   survey design and development.

22          Here, they suggested that the survey should have been

23   only Champion dog food purchasers and only in Illinois.  That's

24   too narrow of a construct.

25          The proper market -- the proper target market in this

Opening Statement - Gustafson

1    case, as Mr. Boedeker will tell you, is people who are in the
2    premium pet food market.  Nobody disputes that Champion's dog
3    food is in the premium market, that is, it's in the higher end
4    of dog foods that are available to consumers.  And Champion's
5    own documents list their competitors, people they believe are
6    their competitors.  And that's various companies that sell into
7    this premium market.
8            And so when Mr. Boedeker was constructing his survey,
9    his target population was not just Champion users, but anybody
10   who was buying premium dog food who could consider buying
11   Champion or who had bought Champion at one time and had bought
12   a different premium dog food at another time.  So that's the
13   correct marketplace.
14           Geographically, it turns out that Mr. Boedeker has
15   done this survey in many states.  He has done this survey in
16   Illinois, New York, Michigan, Minnesota, among other states.
17   And he has observed, as part of his experience, that there's
18   not geographic variation that is statistically significant.
19   And what that means is this:  The consumers in Illinois who buy
20   premium pet food, the so-called pet lovers, don't have
21   particularly different attitudes with respect to the attributes
22   of premium dog food than those from Minnesota or those from
23   Iowa or those from Indiana or those from Wisconsin.  And so to
24   suggest that he should have only used Illinois consumers simply
25   misses the mark.  The target population is the premium pet food

24

Boedeker - Direct by Gustafson

1    buyers and people who considered buying because they're in the

2    marketplace as well, people who owned a dog within the last

3    three years, and the geographic dispersion doesn't have any

4    effect on the outcome.

5              MR. KESSLER:  Your Honor, if I may, I object to the

6    extent we're discussing surveys that Mr. Boedeker has conducted

7    in other states.  There is certainly no analysis --

8              THE COURT:  I just want to get to the witness.  I

9    think you've given me plenty of information.  Can we just get

10   to testimony?

11             MR. GUSTAFSON:  Ready, your Honor.  Thank you.

12              STEFAN BOEDEKER, PLAINTIFFS' WITNESS, SWORN

13                          DIRECT EXAMINATION

14   BY MR. GUSTAFSON:

15   Q   Good morning, Mr. Boedeker.

16             Will you please state your full name and spell your

17   name for the record?

18   A   Stefan Boedeker.

19             THE COURT:  You need to be sworn in first.

20             Please raise your right hand.

21        (Witness duly sworn.)

22             THE COURT:  You may take your mask off while you're

23   testifying if you're comfortable with that.  Otherwise, you can

24   keep it on.

25             THE WITNESS:  I'm comfortable --

Boedeker - Direct by Gustafson

1      THE COURT:  Is there an objection to him keeping it
2   on?
3      MR. KESSLER:  Keeping the mask on?
4      THE COURT:  Yes.
5      MR. KESSLER:  No objection if that's what he's
6   comfortable with.
7      THE COURT:  Okay.
8      THE WITNESS:  Give me a second.
9      THE COURT:  There you go.
10     THE WITNESS:  Okay, yeah.
11  BY MR. GUSTAFSON:
12  Q   Please state and spell your last name, please.
13  A   The last name is Boedeker.  B-O-E-D-E-K-E-R.
14  Q   And where do you currently work, Mr. Boedeker?
15  A   I work for the Berkeley Research Group.
16  Q   Tell the Court generally what Berkeley Research Group does.
17  A   Berkeley Research Group is a management and litigation
18  consulting firm, international, with offices in the U.S., but
19  also in Europe and overseas.  And I'm a managing director
20  responsible for statistical consulting at the Berkeley Research
21  Group.
22  Q   Mr. Boedeker, I have put in front of you a book that looks
23  like this, which has been marked Exhibit 1.
24      Do you have that book in front of you?
25  A   Yes.  Let me just -- yes.  On page 2 -- it says Exhibit 1,

Boedeker - Direct by Gustafson

1    yes.  I confirm I have the book in front of me.

2    Q   Just for the record, for the court reporter, tell me

3    what -- tell me what this book is.

4    A   It has my report in it, and then it has support materials,

5    and also my C.V.

6    Q   And that's the report that you filed in this court -- in

7    this case?

8    A   That is correct.

9         MR. GUSTAFSON:  And, your Honor, do you want us to

10   offer these into evidence?

11        THE COURT:  I would.  I think it's just easier to make

12   sure your record is solid.

13        MR. GUSTAFSON:  Sure.  Thank you.  I move Exhibit 1.

14        THE COURT:  Any objection?

15        MR. KESSLER:  No objection, your Honor.

16        THE COURT:  Okay.  It's in.

17       (Said exhibit received in evidence.)

18        MR. GUSTAFSON:  Thank you, your Honor.

19   BY MR. GUSTAFSON:

20   Q   What was the purpose of your report, Mr. Boedeker?

21   A   I was retained to ascertain if it's possible to come up

22   with a quantification of the economic loss due to the fact that

23   consumers had bought dog food and not knowing about certain

24   misrepresentations and omissions.

25   Q   And I know your report is long and I don't want you to go

Boedeker - Direct by Gustafson

1   through all the detail, but were you able to accomplish that
2   task?
3   A    Yes.  I was able to identify such model, develop an
4   empirical study to get the data to then quantify economic
5   losses due to the alleged misrepresentations and omissions.
6   Q    And tell the judge how you did that.  Tell her generally
7   how you went about that, and then we'll sort of get into the
8   details of the criticisms.
9   A    The general approach I used is called choice-based conjoint
10  analysis, which is a survey-based analytical tool that collects
11  data and then ultimately uses those data to quantify the value
12  of particular characteristics and features of a product to the
13  consumer.  It will be able to then test if, when you change
14  some of those features of a product, if there's a change in the
15  price that consumers would pay for that product.  And,
16  ultimately, I used demand curves to statistically quantify what
17  the difference is if it existed in the product --
18  Q    All right.
19  A    -- based on the misclassifications and omissions.
20  Q    Thank you.
21       And is there any doubt in your mind that conjoint --
22  choice-based conjoint surveys are well-accepted by the academic
23  community?
24  A    There's no doubt about that, no.
25  Q    And in your own experience, they've been accepted by

Boedeker - Direct by Gustafson

1    federal and state courts across the country for this very

2    purpose?

3    A    That is correct.

4    Q    All right.  And in this case, as I understand it, you did

5    four different conjoint surveys; is that right?

6    A    That is correct.

7    Q    You did two based on the misrepresentation allegations in

8    the complaint.

9    A    That is correct.

10   Q    One for Acana brand and one for Orijen brand?

11   A    That is correct.

12   Q    And then with respect to the claims of omissions, you did

13   two more.  Again, one for Acana and one for Orijen.  Is that

14   right?

15   A    That is correct.  So that the combination of two brands

16   with different price ranges and two types of allegations,

17   omissions and misrepresentations, resulted in a total of four

18   separate surveys.

19   Q    All right.  And I'm going to just take -- I'm going to just

20   go sideways for a second.

21        Plaintiffs also asked you to do an expectation survey.

22   That's my word.

23        Tell the judge what you did for the plaintiffs with

24   respect to an expectation survey.

25   A    The expectation survey was also a consumer survey, but not

Boedeker - Direct by Gustafson

1    a conjoint study.  This was a simple survey showing consumers

2    the label of the product and asked what they think when they

3    see certain words and what they expect from that product when

4    they read certain labels.

5    Q   Is it fair to say that what I call the expectation survey,

6    which I guess we're all starting to use that term, is it fair

7    to say that that survey is measuring what is important to

8    consumers when they look at a label of dog food?

9    A   It is a consumer survey that assesses what consumers deem

10   important and what they expect or not expect when they read

11   certain information.

12   Q   Have you conducted expectation-type surveys before?

13   A   I've conducted numerous expectation surveys, not

14   necessarily using that exact same label; but under the label of

15   consumer surveys, I've done surveys that I would call

16   expectation surveys.

17   Q   And how would you describe for the judge, what was the

18   purpose of the expectation survey?

19   A   The purpose of the expectation survey was to assess

20   qualitatively and descriptively what consumers expect when they

21   see certain labels and what particular attributes and

22   characteristics are important to consumers.  Without scoring

23   them or necessarily putting a dollar value to it, it was a

24   qualitative survey.

25   Q   Right.  So the expectation survey didn't try to measure any

Boedeker - Direct by Gustafson

1    damages or anything like that, did it?

2    A    It did not.

3    Q    How many -- with respect to the expectation survey, let's

4    start there, how many survey respondents did you have?

5    A    I had 500 respondents.

6    Q    How did you select the target group?

7    A    The target population was deemed to be people who are in

8    the market for premium dog food.  And so they had to have a

9    dog.  They had to have made a purchase of dog food in the last

10   three years.  And they had to be the decision-maker.  And then

11   I showed them labels of dog foods that Champion identified as

12   their competitors, without any price information.  And based on

13   what they said that they had either purchased or considered

14   purchasing, so by self-identification, I extracted the target

15   group from a larger consumer panel.

16   Q    Try not to talk too fast because the court reporter is

17   taking down everything you say.  I think you're doing okay, but

18   don't get ahead of yourself.

19   A    My apologies to the court reporter.

20   Q    So let me make sure I'm clear on the target group.

21        You chose the target group based on your review of

22   Champion documents, the people that they thought were

23   competitors of theirs in the premium dog food market; is that

24   right?

25   A    That is correct.

Boedeker - Direct by Gustafson

1    Q    And when you showed your survey respondents those other

2    brands, you showed them those other brand labels so they knew

3    what dog food you were talking about; is that right?

4    A    Yes.  There were images, labels.  And they had a -- it was

5    a long list of different brands.  And they were just asked:

6    Mark the ones that you either considered purchasing or that you

7    have purchased.

8    Q    Now, one of the things they criticized you for on this

9    expectation survey is they say you didn't do a formal pre-test.

10           Can you first tell the judge, what is a pre-test?

11   A    A pre-test is typically a tool to assess if the actual

12   survey that is to be launched does not cause any confusion or

13   misunderstandings, so it's testing the survey that is being

14   rolled out or is about to be rolled out at a smaller group, but

15   that smaller group is also from the target population.

16   Q    And the point of the pre-test is to make sure that your

17   questions aren't confusing or ambiguous; is that right?

18   A    That is correct.

19   Q    So did you do a formal pre-test in this case with the

20   expectation survey?

21   A    I did not do a formal pre-test labeled pre-test; but what I

22   did is I looked at the first 50 to 75 completes and analyzed

23   the data statistically speaking and then concluded that there

24   was no confusion or misunderstanding of the very simple set of

25   questions.

Boedeker - Direct by Gustafson

1  Q    Does that -- is that essentially the same as a pre-test --

2  as doing a pre-test, what you just described?

3  A    It is going through the same steps.  And if I had found

4  that one question caused confusion or misunderstanding, then I

5  would have halted the survey and fixed whatever issues I did

6  identify or I could have identified, which I didn't.

7  Q    All right.  Thank you.

8          So the defendants also criticized this expectation

9  survey because you didn't use a control group.

10          So tell the judge, first, what is a control group in

11  terms of the survey methodology.

12  A    The idea of a control group really comes out of the science

13  of how to conduct experiments where a -- and causal effect is

14  about to be tested.  The best example right now is obviously

15  the COVID vaccines.  And to test the efficacy of a new vaccine,

16  there have to be two groups:  One group who gets the treatment,

17  and the other group who doesn't get the treatment.  And it's --

18  so that's in science.  It's like pharmaceuticals, for example.

19          In the survey world, in a trademark infringement case,

20  for example, control groups are also often used because, one,

21  the test group will be shown the infringing trademark, which

22  can be a symbol, sentence, a statement, and then there's a

23  second group, the test -- control group which is also shown

24  something that is slightly altered, and then the two are

25  combined to see what the potential net confusion is about a

Boedeker - Direct by Gustafson

1    trademark.

2            Since I, in this case, asked simple questions on a

3    scale, there was no control group necessary.

4    Q    You've used control groups in the past, I take it.

5    A    I have done that, yes.

6    Q    And you decided, as a matter of your professional view, on

7    this case, because you were only asking about expectations,

8    that a control group wasn't necessary.

9    A    That is correct.  There was no causal relationship to be

10   tested.

11   Q    So tell the Court a little bit more about that.

12           I think in their criticisms, the defendants say when

13   you measure cause and effect, you say causal relationship, is

14   that the same --

15   A    Yes, it's the same meaning.

16   Q    Okay.  And so tell us why this -- tell us why this

17   expectation survey didn't need a control group because it

18   wasn't measuring cause and effect.

19   A    For example, I asked questions in the expectation survey

20   what a consumer thinks if they see a certain label, and then I

21   ask them do you agree.  And then there were really six answer

22   choices.  And they went from strongly agree to strongly

23   disagree with a neither/nor in the middle, but I also included

24   that they don't know or not sure.  And with that, I gave all

25   possible explanations for a simple question, but I did not ask

Boedeker - Direct by Gustafson

1     if there's any causal relationship between the label and what

2     they ultimately do.  What I did test is only do they agree or

3     not agree with certain statements I showed them.  There was no

4     control group necessary.

5     Q    Right.  So you mentioned that you gave them an "I don't

6     know" choice.

7              Why is it important that you gave them an "I don't

8     know" choice?

9     A    If there is a closed-ended question, which is a question

10    where answers are given to the participant, and something is

11    left out, then participants are forced to pick one of the

12    choices given.  So by putting in the "I don't know" or "unsure"

13    or "don't remember" option, I have pretty much summarized the

14    entire choice -- possible choices of answers.

15    Q    So let me put it a different way.

16             If the person didn't know the answer, you gave them an

17    option to choose that so they wouldn't have to guess at an

18    answer that they didn't know; is that fair?

19    A    It's like that, but even -- of course, these were

20    assessments, right?  They were not knowledge questions, what is

21    the capitol of Spain or something like that.  I asked them do

22    you agree or disagree.  And -- but somebody may look at

23    something and don't have an opinion about it and they could now

24    choose "unsure" or "don't know."  So they were not forced in

25    one of the other five choices.

Boedeker - Direct by Gustafson

1   Q    Now, I've looked at the survey, and not all of the

2   questions have "I don't know" as a choice.  For example, when

3   you asked the people where they lived or what their age was,

4   those are not the kind of questions that require an "I don't

5   know," I take it.

6   A    That is correct.  Factual questions don't need "I don't

7   know" or "unsure" kind of like answers.

8   Q    So once you got these results, were you able to reach any

9   conclusions based on your expectation surveys about the

10  consumers in the target group here?

11  A    The qualitative solutions that are the statistical analysis

12  of the data from the expectation survey were as follows:

13       Consumers do not expect the product to have negative

14  attributes.  They are more prone to agree with statements when

15  there's a positive statement, and then they'd expect basically

16  that there's no negative attributes about that product.

17       And the second conclusion is also like a qualitative

18  conclusion in the sense that consumers generally prefer

19  products that do not omit negative attributes and products

20  where stated positive attributes are true.

21  Q    So let me say it my way, and you tell me if you agree with

22  this.

23       The questions that you asked them about the

24  misrepresentations and the omissions in the expectation survey,

25  the answers mattered to the consumers that you surveyed.

Boedeker - Direct by Gustafson

1    A    That is exactly what I probably said in more than one word.

2    So it matters when something is advertised as positive that it

3    is positive, and people or consumers do not expect omissions of

4    negative attributes.

5    Q    Thank you, Mr. Boedeker.

6            Let's turn to the conjoint surveys now.

7            You told us already that you did four of them, two

8    each for misrepresentation and two each for omissions.

9            And the two -- the reason there's two each is because

10   you've tested both the Acana brand and the Orijen brand, right,

11   both Champion brands; is that right?

12   A    That is correct, two brands.

13   Q    And give the judge just a brief overview of how you

14   designed these conjoint surveys.

15   A    Yeah, I will step back and give the general overview of

16   what conjoint does.

17           So conjoint is a survey tool that does not ask

18   participants of the study directly how much would you pay.

19   Instead, it shows a product profile with different

20   characteristics and attributes of the profile for different

21   price points.  And there's -- the way I designed that is that

22   basically when I had, let's say, five mislabel statements

23   and -- that all had a yes or no, it's on the package or not,

24   that would give 32 different combinations.  Now I multiplied

25   that with the five price points that I chose from the range at

Boedeker - Direct by Gustafson

1    which the product was really sold.  That gives me 160 different
2    product combinations in the study.
3              Now, those 160 combinations will now be assigned to
4    the participants so that each combination and each pair of
5    combination is shown equally often.  There's no bias in showing
6    something more often than other things.  And that's called a
7    balance design.  And that's what I used to derive the data that
8    I later analyzed.
9    Q   And you have designed and performed these conjoint-type
10   surveys that you just described many, many, many times, right?
11   A   That is correct, yes.
12   Q   And they've been accepted by many courts across the
13   country.
14   A   That is also correct, yes.
15   Q   And sometimes they've been rejected by courts.
16   A   Yes, that is correct.
17   Q   And one of the reasons that they've been rejected by courts
18   is this what people generally refer to as supply side
19   considerations.
20             Are you with me?
21   A   Yes, I'm with you.
22   Q   All right.  And did you consider the supply side in this
23   case when you did your conjoint analysis?
24   A   I did consider the supply side.  I used the products, and I
25   used prices of the products based on Champion's own

Boedeker - Direct by Gustafson

1    documents --

2    Q    Let me interrupt you there for a second.

3         The quantities sold you got from Champion, from

4    Champion documents that were provided to you; is that right?

5    A    That is correct.

6    Q    And the prices that you picked, they were actual Champion

7    prices that you could observe from the Champion data, right?

8    A    That is correct.

9    Q    Okay.  And so you didn't make up any of the quantities or

10   the prices that caused some courts to be suspect of these kinds

11   of surveys; is that right?

12   A    That's right.  Those were actual data points that I

13   retrieved from information from Champion's in this case.

14   Q    All right.  I'm sorry.  I interrupted you.  You were

15   talking about what supply side considerations you used.

16   A    Yes.  I did use the products, the competitors, to identify

17   the target population.  And I also used price points that were

18   from the Champion's documents.  And I used the volume, the

19   quantities sold.  And that is the supply side in the actual

20   world where, if plaintiffs' allegations are true, consumers

21   were misled by certain statements or by the omission of others.

22   And so that is the quantity right now for which damages would

23   have to be calculated, again, if the allegations are true.

24   Q    Right.

25   A    And that's what I did.

Boedeker - Direct by Gustafson

1    Q    So let's just make sure we're clear on the record.

2          The actual world is the world in which the things

3    actually happened, right?  The sales occurred and the potential

4    misrepresentations or omissions were present; is that right?

5    A    That is correct.  The actual world is really where

6    transactions occurred where consumers bought Champion Petfoods'

7    products that had the alleged misrepresentation or alleged

8    omissions.

9    Q    Right.  And the expert work that you were asked to do here

10   was to create what would have occurred in the but-for world.

11   Just so the record has it and the judge can hear you say it,

12   tell me what you -- how you would describe the but-for world?

13   A    The but-for world, in general -- and I'm going to the

14   "Scientific Manual of Evidence" -- is defined as the world that

15   is the same as the actual world except for a correction of the

16   wrongdoing, the alleged wrongdoing.

17         The alleged wrongdoing in this case is the mislabels

18   or -- not -- omission of bad attributes.

19         Now, the correction now is that the consumer now is

20   aware at the point of purchase of that misrepresentation, which

21   the consumer was not in the actual world.

22         And now I'm trying to find the price at which the

23   other parameters will not be changed from the actual world, so

24   I find the price at which the same number of units would have

25   been sold.

Boedeker - Direct by Gustafson

1  Q    Sometimes economists use the phrase "all other things
2  equal."
3            Is that what you meant by none of the other parameters
4  would be changed?
5  A    That is correct.  And that's, again, based on the "Manual
6  of Scientific Evidence."  And there's a chapter on economic
7  damages.  And that's how they describe, the two authors, the
8  but-for world.
9  Q    And so let me give you a little bit of an example.  Like
10  you didn't change how Champion sold the dog food, you didn't
11  change the quantities that they sold or the prices that they
12  charged, you didn't change any of those things in the but-for
13  world that didn't touch on the allegations that plaintiff made
14  here.  The only thing you changed here were the things that
15  plaintiff alleged were violations of the labeling laws or the
16  deceptive consumer statutes, correct?
17  A    Yeah, in that aspect, I really only changed the information
18  that consumers have at the point of purchase, in the but-for
19  world, now they had been made aware of the mislabels.
20  Q    All right.  And when you got your survey data, tell me what
21  you did next.
22  A    The survey data that I received were a big spreadsheet
23  where the columns were all the answers to the different
24  questions in the survey and the rows were the participants.
25  And that data I now used to calculate what is called a

Boedeker - Direct by Gustafson

1   part-worth of an attribute of a product.

2           And a part-worth is really coming from the idea that a

3   product has different components and that the value of the

4   product has to do with the value of its components.  And so

5   that's the part-worth I calculated in the first step.

6           Based on the part-worth, I now have a ranking of

7   preferences, but no dollar values.

8           So I used an econometric choice model that tries to

9   now assess how preferences drive choices.

10          So based on these part-worth, I was able to calculate

11  the share of participants in the study who would buy a certain

12  product that has certain attributes.  And these attributes I

13  mixed in the sense that I would be able to calculate some

14  products may have the "biologically appropriate" statement and

15  other ones didn't.  Some products were using a certain price,

16  other products a different price.  So for all of these

17  different combinations, I was now able to assess the share of

18  participants who would buy that product.

19          In the next and final step of my analysis, I now used

20  statistical analysis of what's called demand curves, where I

21  looked at different prices from the range of actually charged

22  prices in the actual world, and I looked how does the share

23  change when the prices change.  And I did that for all

24  different product permutations, including the ones that had the

25  challenged statements.

Boedeker - Direct by Gustafson

1    Q    So let me break this down a little bit by bit.

2          For the misrepresentation surveys, the two surveys,

3    you used an Acana product and an Orijen product, you used the

4    actual labels of the dog food, correct?

5    A    I used, yeah --

6    Q    Or photos of the labels.

7    A    Statements, yeah.  They were photos, but they had the

8    statements off the labels on the photo of the packaging.

9    Q    So you showed the language from the actual dog food.

10   A    That is correct.

11   Q    And then you asked your con -- choice-based conjoint

12   questions of the survey recipients.

13   A    Yes.  And the conjoint specific questions are not simple

14   questions, "What would you pay for that?"

15         I showed them options with different permutations of

16   the product, and then they could make a choice, and also

17   included the no choice option, right?  From what I showed them,

18   they could say, "Yeah, I like this one better than this one,

19   but I wouldn't buy either one."  And that gives me the data

20   points to ultimately calculate the preferences of the consumers

21   in the survey.

22   Q    And with respect to the omissions, you did it slightly

23   differently, correct?

24   A    Yeah, the omissions, they are not on there, right?  That's

25   why this lawsuit is about omitting bad attributes.  And so

Boedeker - Direct by Gustafson

1    there I put the consumer in that situation where they have now

2    picked their favorite dog food and then they get additional

3    information about it.

4    Q    So defendants criticized you for that because they say you

5    took away the choice for the consumers there by making them

6    choose their favorite dog food.  How do you respond to that?

7    A    That is incorrect because the consumers were asked about

8    their preference, but then also about buying that particular

9    product.  So if somebody in the participant group did not find

10   their choice presented in the menu, they could always choose,

11   no, I don't purchase.

12   Q    So, in essence, what the omissions conjoint -- choice-based

13   conjoint studies did was test a dog food that was familiar to

14   the recipient.

15   A    That is correct.  And every recipient had at least

16   identified three dog foods, so it was not a simple -- a single

17   participant, in -- in all four studies, of over 2,000 total

18   participants who had just singled out one particular dog food.

19   Three was the minimum.

20   Q    Let me back up because I should have asked you a couple

21   other questions.

22        Did you do pre-tests for these conjoint surveys?

23   A    Yes, I did.

24   Q    And why did you do pre-tests on these, but not the

25   expectation survey?

Boedeker - Direct by Gustafson

1    A    The expectation survey was a simple survey trying to assess

2    percentages, in a very simple term, across a different set of

3    choices.

4          Conjoint modules, often referred to in the literature,

5    they have a lot of information.  They explain the setting.

6    They may explain certain product attributes.  And then making a

7    choice out of multiple choices when you're absorbing several

8    attributes in the menu and a price, it's more complex than

9    asking you yes, no, or don't know question.  And, therefore, in

10   this case, for the conjoint modules, I did pre-test.

11   Q    And you were satisfied from the pre-test results that your

12   questions were neither ambigu -- a problem because of ambiguity

13   or confusion?

14   A    That is correct.  And I did some calculations in this

15   pre-test analysis that showed me that.

16   Q    Okay.  And I skipped this also.  What was your target

17   population?

18   A    The target population were individuals who had -- were dog

19   owners, had purchased dog foods, and identified premium dog

20   food brands.  And that target population I chose because it is

21   implied by Petfoods' documents -- by Champion's, sorry,

22   Champion's Petfoods' documents.

23   Q    Again, you chose the target population for the survey based

24   on Champion's own analysis of their competitors?  Is that a

25   fair way to say it?

Boedeker - Direct by Gustafson

1    A    It's Champion's own data of their own way of how they

2    market the products, but also relative to who they view as

3    competitors, yes.

4    Q    All right.  And once you got all this survey information

5    done -- oh, I'm sorry, one more thing.

6              Did you do the same thing with respect to Illinois

7    that you did with the expectation survey, that is, you did not

8    limit your target group to just Illinois?

9    A    Yeah, the target group does include Illinois consumers, but

10   it's not limited to just Illinois.

11   Q    And tell us -- tell the judge why this is not a population

12   that varies geographically or tell her -- tell her why you know

13   that.

14   A    First of all, Champion markets their products nationally.

15             Second, in other work I've done before, I've seen that

16   there are no different preferences.  I did not run additional

17   statistical tests for the Illinois case, but I had done that

18   previously.

19   Q    So let me ask you.  You said Champion markets their product

20   nationally.  To your knowledge, do the dog food bags' labels

21   vary by any geographic region in the United States?

22   A    I have not seen any differences in the bags.

23   Q    Right.  So the Illinois bags are the same as the Minnesota

24   bags are the same as the Indiana bags are the same as the

25   Wisconsin bags, to your knowledge?

Boedeker - Direct by Gustafson

1    A    Yeah, that is my -- my understanding of --

2    Q    And that gives you some comfort that using a nationwide

3    target population is appropriate here.

4    A    That is correct, yes.

5    Q    All right.  I understand then -- I don't know how this

6    works, but I understand next that you used Sawtooth?  Is that a

7    program?

8    A    Yes.  Sawtooth is a software that was specifically designed

9    to translate by very complex statistical calculations survey

10   choices in the conjoint modules into what I called earlier the

11   part-worth of the different levels and attributes.  There's

12   other softwares out there that I've used in the past, but I've

13   used Sawtooth for this particular case.

14   Q    All right.  And Sawtooth is a widely accepted software

15   that's used by survey folks who are experts in the field?

16   Nobody disputes that, do they?

17   A    I haven't heard any Sawtooth -- disputes about using

18   Sawtooth in conjoint analyses to calculate part-worth.  That is

19   a universally accepted software.

20   Q    Now, you came up with some, after your regression analysis

21   and all of the number crunching, if you will, that you did with

22   these survey results, you came up with some numbers, and you

23   applied those to the various misrepresentations and the

24   omissions, right?

25   A    That is correct.  After doing the analysis, what I

Boedeker - Direct by Gustafson

1    basically computed were percentage changes in the demand

2    curves.  And that's what my report displayed.

3    Q    Okay.  And that -- in Appendix 4 of your report, which is a

4    quite thick part of your report, you set forth the combinations

5    of misrepresentations and their values that occurred -- that

6    you got from doing your survey work, right?

7    A    That is correct, yes.

8    Q    And separately you set forth in Appendix 4 the results that

9    you got for the omissions, that is, had these omissions been

10   disclosed, here's what people's view of an appropriate price

11   would have been, right?

12   A    That is correct, yes.  There are two separate tables in the

13   appendix.

14   Q    Two separate tables.

15            And those tables can't be mixed, right?

16            The one survey measures misrepresentations, and they

17   can be -- they can be mixed, that is, you can sort of pick and

18   choose which misrepresentations apply, and you can get a

19   cumulative number.  Is that a fair way to say it?

20   A    Yeah, that's fair -- I mean, it's up to the Court to decide

21   what claims will continue in this litigation.  But for whatever

22   is chosen within the misrepresentations and also within the

23   omissions, I have provided numbers for different combinations

24   of misrepresentations and the value loss based on those.  That

25   is correct, yes.

48

Boedeker - Direct by Gustafson

1   Q    And you understood that some of the omissions overlap with

2   some of the misrepresentations, right?

3   A    Yeah, it's my understanding, for example, when something is

4   biologically appropriate, it wouldn't contain heavy metals.  Or

5   if something is fresh, it wouldn't be containing regrinds, for

6   example.  That was my understanding.  So there's overlap.

7            Think about like there's two circles, right?  And

8   there's overlap between what people think when there's heavy

9   metal or when it's biologically appropriate.  So there is

10  definitely overlap, which I didn't quantify.

11  Q    Right.  And so you developed these surveys so as to set the

12  omissions separately from the misrepresentations rather than

13  trying to quantify the overlap.

14  A    That is correct.  At this stage of my analysis, I presented

15  that as two separate -- from -- two separate kind of surveys.

16  Q    Right.  And I don't want to talk about what you talked to

17  the attorneys about, but I will say this:  You understood that

18  the Court has not yet ruled on what claims will go forward at

19  trial.  There's a summary judgment motion pending.  And the

20  Court may very well say that, for example, heavy metals is not

21  going to go forward at trial or "biologically appropriate" on

22  the misrepresentation side is not going to go forward at trial,

23  right?

24  A    Yeah, it was my understanding that the alleged false

25  statements or omissions from the complaint have not been ruled

Boedeker - Direct by Gustafson

1    on by the Court as to which ones continue to go into the

2    damages phase.

3    Q    So when the Court does make that ruling and when the

4    plaintiffs choose their final trial strategy, you will be able

5    to take your data and evaluate it and come up with a damage

6    figure depending on the claims that remain, correct?

7    A    That is correct.

8    Q    And you haven't done that work yet because we asked you not

9    to do that work until we did -- until we knew what claims were

10   going to go forward; is that right?

11   A    That is correct.

12   Q    One of the things that they criticize you for with respect

13   to this conjoint survey is that if you add up all of the

14   damages numbers that you've come up with, both the omissions

15   and the misrepresentations, it adds up to more than 100 percent

16   of the cost of the product.  But that's not what you intended,

17   right?

18   A    Yeah, that is a table, I think, where I'm adding up

19   everything to show if the omissions and the misstatements were

20   independent, which we know they're not, then adding up across

21   the two surveys, that would what economists call turn the

22   product into a "bad."  We're talking about goods we're

23   purchasing.  And the name "good" really has that meaning that

24   there's something positive in it, that means that the consumer

25   has positive utility from using that, the service to good,

Boedeker - Direct by Gustafson

1    whatever it is.

2          However, there are constellations of products where

3    the negatives outweigh the positives so that net net, they

4    create negative utility to the consumer.

5          And a dog food product that has omissions of bad

6    attributes and where all of the labels that are presented on

7    the package that have positive attributes in them are untrue,

8    what my study showed, that would lead to a potential economic

9    bad, right, because there's too many negative attributes that

10   have been omitted and the positive ones aren't true, so that

11   would be the extreme case where a product could have a negative

12   overall utility.

13   Q    But that is not actually your opinion in this case because

14   your testimony is that the omissions and the misrepresentations

15   overlap.  So, right now, all we know is that if you add up the

16   omissions, they're less than 100 percent.  And if you add up

17   the misrepresentations, they're less than 100 percent.  And

18   until the Court rules on summary judgment, that's all we can

19   do, right?

20   A    That is correct.  I mean, this was an illustrative example

21   to show that something could be an economic bad rather than a

22   good.  But that is not the final damages number because I yet

23   do not know which of these claims will remain in the next phase

24   of the proceedings.

25   Q    Let me have one more question on the supply side.

Boedeker - Direct by Gustafson

1          Tell me why the defendants are wrong that you should

2     readjust the supply after you readjust the demand curve?  Why

3     are they wrong in this single sale product where there's no

4     secondary market?  Tell the judge why they're wrong.

5     A    First of all, from an economic principle, I heard the word

6     "market price" earlier.  The market price would in the but-for

7     world, as I think it was Mr. Kessler who spoke earlier, would

8     basically be the price at which the producer would minimize the

9     marginal -- the marginal cost and, therefore, maximize their

10    profits.  But -- and that would be something you would do in a

11    trademark case, to see by how much the trademark infringer, for

12    example, benefit from the infringement.  But here where there's

13    a set number of units that were sold in the actual world,

14    damages have to be calculated for that set number of units.

15    And that is basically focusing on the same point of the supply

16    curve in the actual world to apply to the price that I'm

17    calculating for the but-for world.

18    Q    Mr. Boedeker, I asked you a bit about your target group,

19    and I asked you a bit about the geographic variation and the

20    rest.

21          Is there any hesitation at all in your mind that the

22    way you constructed this survey using respondents from around

23    the country accurately measures the consumers in Illinois?

24    A    I have no doubt about that.

25    Q    Is there anything about your survey with respect to the

Boedeker - Direct by Gustafson

1    target market -- that is, premium dog purchasers who have

2    purchased or considered within the last three years -- is there

3    anything about that that you doubt accurately captures the

4    purchasers of Champion dog food and in Illinois?

5    A    It does not, particularly since I used information from

6    Champion's own documents.

7    Q    And that information, again, is the price and quantity

8    information?

9    A    That is correct, and whom they view as competitors.

10   Q    Thank you.

11         Did you have a chance to read Dr. Hanson's expert

12   report?

13   A    Yes, I did.

14   Q    Dr. Hanson is your chief critic in this regard with respect

15   to your survey methodology.  Fair enough?

16   A    Yeah, he commented on my report, so -- I think he

17   criticized certain aspects.

18   Q    Right.  Did you -- did you see Dr. Hanson do any survey

19   work that would contradict your answers?

20   A    Dr. Hanson did not use any scientific approach, i.e., using

21   a survey or doing his own data analysis.  He cited literature

22   what could potentially or possibly go wrong in the survey, but

23   that's not a scientific method to prove something that I did as

24   wrong.

25   Q    So he raised the kind of classroom questions, right, that

Boedeker - Direct by Gustafson

1   could go wrong if you did surveys this way under certain

2   circumstances, but he didn't conduct a single survey, did he?

3   A   That's correct.  He did not do any survey work.  And if you

4   don't mind, I will adopt the classroom survey terminology in my

5   future life.  That's exactly what he did.  Yes.

6   Q   Thank you, Mr. Boedeker.

7            MR. GUSTAFSON:  I don't have any further questions at

8   this time, your Honor.

9            THE COURT:  Okay.  I wish I had my expert with me

10  today.  I have the court dogs.  Have you seen this on the

11  website?  They're therapy dogs, and they come to court and sit

12  right here.  And I was curious if she would have been here

13  today, she might have been listening because she definitely

14  knows the word "dog food."

15       (Laughter.)

16            THE COURT:  She kept the passions down with my very

17  worked-up patent lawyers during the past month.

18       (Laughter.)

19            THE COURT:  Okay.  Go ahead.  We'll go for about five

20  minutes, and then I have to take a break to get to that

21  meeting, okay?

22            MR. KESSLER:  Okay.

23            THE COURT:  Thank you.

24            MR. KESSLER:  Sure.

25            Thank you, your Honor.

Boedeker - Cross by Kessler

1              CROSS-EXAMINATION

2    BY MR. KESSLER:

3    Q    Good morning again, Mr. Boedeker.

4            Mr. Boedeker, with respect to the expectation survey,

5    sir, you didn't use a control group; is that right?

6    A    There was no need to use a control group in that setting.

7    Q    The answer is no, you didn't use a control group?

8    A    I believe I said no, there was no need to use a control

9    group.

10   Q    So, for example, in the expectation survey, you didn't show

11   one group of respondents a bag of Champion pet food, show

12   another group of respondents a bag of Champion pet food with,

13   for example, the "biologically appropriate" language removed,

14   and compare results from those two groups, did you?

15   A    I did not because I didn't have to.  It was not an ad

16   perception survey that I conducted.

17   Q    So, Mr. Boedeker, I'd like to point your attention to

18   Figure 12 in your report, which is on page 70.

19   A    Yeah, let me just flip the page.

20   Q    Yes, of course.  Just let me know when you are there.

21   A    Did you say 70 or 17?

22   Q    7-0.  70.

23   A    Thank you.

24            Okay.  I'm there.

25   Q    Thank you.

Boedeker - Cross by Kessler

1      So let's look at Figure 12.

2      It says here, read along with me, "From the 'fresh'

3  statements on the dog food shown, I would expect that the dog

4  food shown," and then down, sort of the left-hand side there,

5  you have four different statements, right?  Are we seeing the

6  same thing?

7  A   Yes.

8  Q   Okay.  And according to this Figure 12, 43.5 percent of

9  your survey respondents indicated that they agree with the

10 statement that the Orijen food contains only fresh ingredients

11 unless otherwise specifically stated on the packaging; is that

12 right?

13 A   Yes, I see that.

14 Q   But, Mr. Boedeker, you didn't test in your experiment how

15 many respondents would expect Champion's dog food to contain

16 only fresh ingredients without seeing the "fresh" statement,

17 did you?

18 A   Can you repeat that?

19 Q   Sure.

20     You didn't test how many respondents would expect that

21 Champion's food contains only fresh ingredients without seeing

22 the "fresh" statement.

23 A   I did not test it because that was a different question.

24 Q   The answer is, no, you didn't test that?

25 A   I did not test that.  Sorry if I didn't say no, but I meant

Boedeker - Cross by Kessler

1    the negative in the "I did not."

2    Q    And if we look down at the next statement, does -- down on

3    the left-hand side, "does not contain any expired ingredients."

4    Do you see that?

5    A    Yes.

6    Q    And, again, it looks like 30.6 percent of your respondents

7    indicated that from the "fresh" statement -- or after having

8    seen the "fresh" statement, they agree with the statement "does

9    not contain expired ingredients," right?

10   A    They agree with the -- that they do not expect that it has

11   expired ingredients.  It is slightly different from what you

12   said.

13   Q    Okay.  Thank you.

14        But you didn't test whether respondents expect that

15   Champion's food does not contain expired ingredients without

16   seeing the "fresh" statement, did you?

17   A    Again, that was not necessary, so I didn't do it.

18   Q    Let's just close out Figure 12 and look at the next two

19   statements.  "Does not contain any reground dog food" and "is

20   formulated to resemble what dogs would eat in the wild."

21        Again, you didn't test how many survey respondents

22   would agree with either of those statements without being

23   exposed to the "fresh" statement, did you?

24   A    No.  Again, that's something I did not have to test.  I was

25   interested in figuring out what they expect when they see the

Boedeker - Cross by Kessler

1    "fresh" statement which is on the packaging.

2    Q    Mr. Boedeker, let's look at the next figure, Figure 13.

3         There we write, "From the 'regional' statements on the

4    dog food shown, I would expect that the dog food shown," and

5    there you have three different statements down the left-hand

6    side; is that right?

7    A    Yes.

8    Q    And, again, with respect to these statements in Figure 13,

9    you didn't test what percentage of your survey respondents

10   would have these same expectations without seeing the

11   "regional" statement on Champion's bags, did you?

12   A    I did not test that because, again, that's a totally

13   different question, as you will see the heading of Figure 13

14   says from the "regional" statements on the dog food shown, what

15   you expect, and then it lists three items.  I would not have

16   had that opportunity to ask that question if they hadn't seen

17   the "regional" statement on the packaging, so, therefore, the

18   question that you asked me I didn't ask.  Logically speaking,

19   it is just -- doesn't make sense, in my opinion.

20   Q    But your answer was, no, you didn't test that?

21   A    I didn't test it because there would not have been a

22   question to be tested.

23   Q    So if we move on and look at Figure 14, you write, "From

24   the 'biologically appropriate' statement on the dog food shown,

25   I would expect that the dog food," and in this particular

58

Boedeker - Cross by Kessler

1    figure, there are five statements down the left-hand side,

2    right?

3    A    That is correct, yes.

4    Q    And you conclude here in your report that 38.8 percent of

5    survey respondents expect, after having been shown the

6    "biologically appropriate" statement, that Champion's food does

7    not contain heavy metals; is that right?

8    A    That is correct.  And then there's also the dark blue,

9    which is the strongly agree, but -- and the agree is the light

10   blue.

11           COURT REPORTER:  Would you repeat that, please?

12   BY THE WITNESS:

13   A    Sorry.  I was trying to adjust my glasses so I didn't get

14   the percentage that you had, Mr. Kessler.  But there's the

15   light -- lighter blue and the darker blue who have the

16   percentages for the agree and strongly agree.

17   Q    Right.  So if we look at just the respondents who indicated

18   that they agree, that's the 38.8 percent.

19   A    That is correct.  Now I see the percentage.  Sorry.

20   Q    Okay, no problem.  Thank you.

21           THE COURT:  We're going to stop there, all right?

22   We'll come back at 1:15 after lunch.  And I'm going to go to my

23   movie -- I mean to my meeting.  Boy, that was a wish, wasn't

24   it?

25        (Laughter.)

Boedeker - Cross by Kessler

1    LAW CLERK:  All rise.

2    (Lunch recess taken from 12:25 p.m. to 1:34 p.m.)

3    THE COURT:  I'm sorry that I'm late, but -- the

4  committee meeting was still going on, and I left.

5    So please be seated.

6    Sir, you're still under oath.  Do you understand that?

7    THE WITNESS:  Yes, I do, your Honor.

8    THE COURT:  You can take your mask off to testify, and

9  I will put mine on.

10   And you may pick up where you left off.

11   MR. KESSLER:  Thank you, your Honor.

12  BY MR. KESSLER:

13  Q   Mr. Boedeker, welcome back.

14  A   Thank you.

15  Q   I believe we left off, we were looking at Figure 14 in your

16  report.  We were on page 71.

17  A   I'm right there.

18  Q   Okay.  So I had asked you, and I'll just -- I will go back

19  one question.

20   But you conclude here, from Figure 14, that from

21  seeing the "biologically appropriate" statement, 38.8 percent

22  of survey respondents indicated that they agree that Champion's

23  pet food does not contain heavy metals.  Is that right?

24  A   That's correct.  That's in the chart.

25  Q   But you didn't test how many survey respondents would

Boedeker - Cross by Kessler

1    expect that Champion's Orijen dog food does not contain heavy

2    metals without seeing the "biologically appropriate" statement,

3    right?

4    A    I did not test that separately, no.

5    Q    And if we look at just the next four statements down the

6    left-hand side, "does not contain BPA," "does not contain

7    pentobarbital," "only contains fresh ingredients unless

8    specifically stated otherwise," and "has high palatability,"

9    Mr. Boedeker, you didn't test what percentage of respondents

10   would have these expectations without being shown the

11   "biologically appropriate" statement, right?

12   A    Slightly different.  It's not if they do or do not have the

13   expectations.  If they agree with the statement.  It's slightly

14   different.

15   Q    But you didn't test that, did you?

16   A    I did not test it without the statement because then I

17   could not have asked the question from the statement

18   "biologically appropriate."  So I did not test that.

19   Q    So if we move on to the next figure on page 72, Figure 15,

20   you write here, "From the 'nourish as nature intended'

21   statements on the dog food shown, I would expect that the dog

22   food shown" -- and, again, you have four statements down the

23   left-hand side.  And your report indicates that 38.8 percent of

24   survey respondents indicated that they agree that from the

25   "nourish as nature intended" statement, they expect Champion's

Boedeker - Cross by Kessler

1   pet food does not contain heavy metals; is that right?

2   A    That is correct, yes.

3   Q    And, again, you didn't test how many respondents in your

4   expectation survey might have that same expectation without

5   seeing the "nourish as nature intended" statement, did you?

6   A    I did not test that.  Same reasoning as earlier.

7   Q    And the same would be true of the other statements -- "does

8   not contain BPA," "does not contain pentobarbital," and "is

9   specifically formulated for large breed dogs" -- you didn't

10  test what percentage of respondents might agree or strongly

11  agree with those expectations without seeing "nourish as nature

12  intended," did you?

13  A    I did not test that.

14  Q    And if we looked, Mr. Boedeker, at Figures -- we won't walk

15  through each of these -- but if we looked at Figures 18, 19,

16  20, and 21 in your expectation survey, your answers would be

17  the same, wouldn't they, that you didn't test respondents'

18  expectations without being exposed to the statements in those

19  particular figures; isn't that true?

20  A    Yeah, I think these are similar questions.  It's just this

21  time it is the Acana study group --

22  Q    Right.

23  A    -- and so it would be the same answers, yes.

24  Q    Mr. Boedeker, the respondents in your expectation survey

25  were fielded from across the nation; isn't that right?

Boedeker - Cross by Kessler

1   A   That is correct, yes.

2   Q   So those respondents in the expectation survey were not

3   limited to Illinois residents, correct?

4   A   That is correct, yes.

5   Q   Isn't it true that only 29 out of 500 of the respondents in

6   your expectation survey actually live in Illinois?

7   A   I don't have that number at my fingertip here.  If it's in

8   the report, yeah, then that's the correct number.

9   Q   And, likewise, respondents in the expectation survey were

10  not limited to purchasers of Champion's Acana or Orijen pet

11  foods; isn't that right?

12  A   That is correct.  The filter asked for premium pet foods as

13  identified --

14          COURT REPORTER:  Excuse me, would you repeat that,

15  please?

16  BY THE WITNESS:

17  A   I had a filter question in this survey that asked to

18  identify dog food that they had purchased or considered

19  purchasing, and those were the same images that we discussed

20  earlier of competing brand of Champion's -- or brands, I should

21  say, that Champion viewed as competitors for their premium dog

22  food product.

23  BY MR. KESSLER:

24  Q   Mr. Boedeker, isn't it true that only 3 people out of 500

25  in the expectation survey indicated that they both live in

Boedeker - Cross by Kessler

1   Illinois and purchased or considered purchasing Acana or Orijen

2   pet foods in the last three years?

3   A   Again, I don't have that table or that number in front of

4   me right now, but I take your word for it.

5   Q   Well, as you sit here today, do you know how many people in

6   the expectation survey both live in Illinois and purchased or

7   considered purchasing Champion pet food?

8   A   I believe you just said it was three.  But, again, as I

9   said, I have not committed that particular number to memory and

10  don't have a reference table here in front of me right now.

11  Q   Okay.  Mr. Boedeker, I'd like to shift gears a little bit

12  now and talk to you about the conjoint surveys that you

13  performed.

14          You refer to those as the misrepresentation surveys

15  and the omission surveys, right?

16  A   That is correct, yes.

17  Q   So I am now looking in your report at paragraph 137.

18  A   Can you give me a second to find them?

19  Q   Yes, of course.  And I can give you a page number, too.

20  A   That would be helpful.  Thank you.

21  Q   Give me one second.

22          So we're on page 49 of your report at paragraph 137.

23  A   Got it.

24  Q   Okay.  And you -- in this paragraph, you instruct

25  respondents to the omission surveys to assume that they are

Boedeker - Cross by Kessler

1    purchasing a 25-pound bag of your favorite dry dog food.

2          Did I read that right?

3    A    Let me just find that -- in the italicized portion, yes, I

4    found it, that's correct.

5    Q    Now, each of your four conjoint surveys was conducted

6    separately; is that right?

7    A    What do you mean by separately?

8    Q    They were separate surveys.  Isn't that true?

9    A    That's correct.  So there was a new draw of participants

10   for those two brands and -- omission and false statements, so

11   four different surveys, four different samples from the target

12   population, if that's what you mean by --

13   Q    Yes.

14   A    -- the question.

15   Q    So you'd agree with me, wouldn't you, that because the

16   conjoint surveys were separate surveys, it would be

17   inappropriate, statistically speaking, to mix and match the

18   analysis from those surveys; isn't that right?

19   A    That is a very broad question.  It would have to be a

20   little bit more specific.

21   Q    Well, if they are -- I guess let me try to rephrase it.

22          Would you agree with me that because the surveys are

23   separate, you can't mix and match the data in your regression

24   analysis of those surveys?

25   A    That's correct.  I mean, data collected from the Acana

Boedeker - Cross by Kessler

1    misrepresentation, for example, would not be used in the Orijen

2    omission, if that's what you mean.  That's correct, yes.

3    Q    Mr. Boedeker, I'd like to look at Appendix 4 to your

4    report, which is I believe just a very -- it's one page.  I

5    think it's the very last page of the packet.

6    A    Give me a second.

7    Q    Sure, of course.

8    A    I found Appendix 4.  And I need my reading glasses, so just

9    give me a second.

10   Q    Yes.  Just let me know when you are ready.

11   A    Okay, I got it.

12   Q    Okay.  Thank you.

13          So this Appendix 4 is entitled "Estimated Damages for

14   All Possible Claim Combinations."  Is that right?

15   A    That is correct.

16   Q    But Appendix 4, if we're looking at it, it doesn't reflect

17   any estimation for any combination of alleged

18   misrepresentations and alleged omissions, does it?

19   A    No.  They're all separate by the two brands and by the

20   type, misrepresentation or omission, so there's no combined

21   computations in here.

22   Q    Mr. Boedeker, I'm flipping back now to -- in the body of

23   your report at page 16.

24   A    Yeah, I'm on page 16.

25   Q    Okay.  So there, in what I'll call sort of the top third of

Boedeker - Cross by Kessler

1    the page, you have a section entitled "Consideration of the
2    Supply Side in the But-For World."
3           Are you with me?
4    A    Yes.
5    Q    And looking at paragraph 51, you write that, "The shape of
6    the supply curves in the actual world and in the but-for world
7    is irrelevant for quantification of economic damages because
8    the focus is to determine a price in the but-for world for the
9    units sold in the actual world."
10          Did I read that correctly?
11   A    That is correct, yes.
12   Q    Okay.  And, Mr. Boedeker, in connection with your conjoint
13   surveys, you didn't do any analysis of Champion's cost of
14   ingredients, did you?
15   A    I did not do a cost analysis, no.
16   Q    And you didn't do any analysis of the costs of Champion's
17   competitors; isn't that right?
18   A    I did not do that analysis either.
19   Q    And you didn't do any analysis of Champion's supply chain,
20   right?
21   A    I did not analyze that.
22   Q    And you didn't do -- you haven't done any analysis
23   regarding the mix of Champion's sales from pet stores, online,
24   or in retail; isn't that right?
25   A    I did not separate that out.  I analyzed the sales data

Boedeker - Cross by Kessler

1    that I had in aggregate.

2    Q    You didn't do any analysis of whether Champion's pricing

3    includes store discounts or customer loyalty or bundled

4    pricing, did you?

5    A    The price was from Champion's data, but I used the prices

6    as they were stated in the spreadsheet that I was provided

7    with -- without an analysis whether they were based on sales

8    promotions or other considerations.

9    Q    So I think your answer is you didn't do that analysis?

10   A    I did not.

11   Q    Okay.  So now, Mr. Boedeker, I'm looking now at paragraph

12   20 of your report?

13   A    Paragraph 20?

14   Q    Yes, 20, 2-0.

15   A    Could you give me a page reference?

16   Q    Oh, yes.  Sorry.  Page 7.

17   A    Page 7.

18        Okay.  Got it.

19   Q    So for purposes of your damages model, you estimated

20   Champion's total U.S. sales to consumers to be $458 million

21   during the time period June 2016 to December '18; isn't that

22   right?

23   A    Where are you right now?

24   Q    I'm at the end -- it's the next page, so it's the top of

25   page 8?

68

Boedeker - Cross by Kessler

1    A    Oh, page 8.

2    Q    Yeah, the end of paragraph 20.

3    A    Yes.

4    Q    You write in paragraph 21 that:  "Defendants did not

5    provide information on retail sales in general and on sales to

6    customers in Illinois in particular."

7              Did I read that correctly?

8    A    Yes.

9    Q    So you didn't have available to you in this case retail

10   sales data, did you, Mr. Boedeker?

11   A    That is correct.

12   Q    And because you didn't have available to you retail sales

13   data, in order to estimate Champion's total pet food sales in

14   Illinois, you relied upon estimates published by the American

15   Veterinary Medical Association, the AVMA; isn't that right?

16   A    Yes.

17   Q    Okay.  And using the AVMA's estimate that 2.9 percent of

18   dogs owned in the United States are owned by households in

19   Illinois, you assumed that Illinois consumers spent

20   $13.3 million on Champion products during that period June 2016

21   to December 2018; isn't that right?

22   A    Yes.  That's a proportionality argument.

23   Q    Now, I'm jumping back forward again to paragraph 118.  And

24   I'll give you a page number.  Page 34.

25   A    Okay.  I'm there.

Boedeker - Cross by Kessler

1    Q    And you write in paragraph 118, the first sentence there,

2    "Price is an important attribute of conjoint surveys and

3    required to estimate the demand curves" in your study.

4            Isn't that right?

5    A    Yes.

6    Q    So for purposes of your conjoint studies, you used

7    Champion's MSRP.  That is Manufacturer Suggested Retail Prices.

8    Isn't that right?

9    A    That is correct.

10   Q    Isn't it true, Mr. Boedeker, that you don't know the actual

11   price that any putative class member paid for Champion's

12   product?

13   A    I do not know that actual price.  That's why I expressed

14   the decline in the percentage.

15   Q    And, Mr. Boedeker, like we discussed with your expectation

16   survey, in your conjoint surveys, you fielded respondents from

17   all across the United States, right?

18   A    There was from all around the United States with a minimum

19   size, sample size, for Illinois.

20   Q    But respondents in your conjoint studies were not limited

21   to Illinois residents, right?

22   A    That is correct, yes.

23   Q    And they weren't limited to purchasers of Champion pet

24   food, right?

25   A    That is also correct.

Boedeker - Redirect by Gustafson

1  Q   Isn't it true that only 4.1 percent or 98 out of over 2,300

2  survey respondents indicated that they purchased or considered

3  purchasing Champion's pet foods and that they live in Illinois?

4  A   Again, that number I don't have in front of me right now

5  and I have not put it to memory, but it sounds about right.

6  Q   Okay.  Mr. Boedeker, thank you.  At this time I don't have

7  any further questions for you.

8          THE COURT:  Go ahead, please.

9          MR. GUSTAFSON:  Thank you, your Honor.  Very briefly.

10                    REDIRECT EXAMINATION

11 BY MR. GUSTAFSON:

12 Q   Mr. Boedeker, when counsel was asking you questions about

13 whether you asked the respondents in the expectation survey the

14 question without the phrase "biologically appropriate" -- do

15 you remember that series of questions?

16 A   I do, yes.

17 Q   And I thought you said I could not have tested the -- the

18 actual question if you had asked that first.

19          Do you recall that?

20 A   Let me -- yeah, that was in the context when I'm asking

21 with the specific statement on the label, then if I don't have

22 that intro into the question, then it wouldn't be the same

23 question, just for a different group.

24 Q   And that's why you didn't ask those control group questions

25 in the expectation survey because it would have defeated the

Boedeker - Redirect by Gustafson

1    purpose of your expectation survey, correct?

2  A    That is correct.

3         MR. GUSTAFSON:  That's all I have, your Honor.  Thank

4    you.

5         THE COURT:  Anything on that?

6         MR. KESSLER:  No additional questions, your Honor.

7    Just argument.

8         THE COURT:  Okay, very well.

9         Then you may step down, sir.  Thank you.

10        THE WITNESS:  Thank you.

11        THE COURT:  And if you could just take that off and

12   throw it in the garbage next to you.

13        Is there a garbage there?

14        THE WITNESS:  On my way down.

15        THE COURT:  Thank you.

16     (Witness excused.)

17        THE COURT:  Do you have your witness available now so

18   that -- on video?  Is that what you want to do next?  Because

19   if so, I would rather we not waste time and do testimony and

20   you can do argument for everything at the end.

21        MR. COULSON:  Your Honor, what we discussed was, since

22   we have Dr. Poppenga out here from Davis, California, live,

23   he's our --

24        THE COURT:  Oh, good.  That's fine.  Okay.

25        MR. COULSON:  If we could take him next.

Boedeker - Redirect by Gustafson

1          THE COURT:  Okay.  That's fine.

2       (Pause in proceedings.)

3          THE COURT:  Okay.  Please call your witness.

4          MS. BACA:  Elisa Baca for Champion Petfoods.

5          Champion offers Dr. Robert Poppenga as an expert in

6    this action.

7          THE COURT:  Okay.  And you're moving to exclude?

8          MS. PETERSON:  Plaintiffs are moving to exclude.

9          THE COURT:  Okay.  Let me just hear the arguments

10   later.  I'd much rather hear oral arguments later and just get

11   the testimony done.

12         You may can -- you can come -- come on up here, if I

13   can speak clearly.

14      (Approaching.)

15         THE COURT:  Sir, please raise your right hand.

16      (Witness duly sworn and takes the stand.)

17         THE WITNESS:  I can take off the mask?

18         THE COURT:  Yes, you may.

19         You can come over to this one if it -- you know, to

20   see him.  Are you directing?

21         MS. BACA:  I'm going to the direct examination, yes.

22         THE COURT:  Do you want to stand there where you're

23   closer?

24         MS. BACA:  Sure.

25         Is there anything you need to remove from the podium?

Dr. Poppenga - Direct by Baca

1      MS. PETERSON:  Of course.  And I haven't -- I just put

2  that on, but I -- would you like me to remove this because I'm

3  the one that put it on?  And have her put on --

4      THE COURT:  Yes.  Then you need one to put on for

5  yourself.

6      MS. PETERSON:  There's one up there for you.

7      THE COURT:  There you go.

8      Now you can see her better, right?

9      THE WITNESS:  That's good.

10     DR. ROBERT POPPENGA, DEFENDANTS' WITNESS, SWORN

11                    DIRECT EXAMINATION

12  BY MS. BACA:

13  Q    Good afternoon, Dr. Poppenga.

14       Could you please state your name for the record and

15  spell it as well?

16  A    Dr. Robert Poppenga.  It's P-O-P-P-E-N-G-A.

17  Q    And what is your profession?

18  A    I'm a professor of veterinary toxicology at the School of

19  Veterinary Medicine at UC-Davis.

20  Q    Could you please tell the judge a little bit about what the

21  term "veterinary toxicologist" means?

22  A    Yeah, veterinary toxicology is actually a specialty

23  recognized by the American Veterinary Medical Association, so

24  it's one of the specialty areas.  It requires a veterinary

25  degree and specialized training in toxicology.  And the

Dr. Poppenga - Direct by Baca

1    veterinary degree is obviously a very comparative type of

2    education with regard to biomedical sciences, and that's the

3    same with the toxicology component of that.

4    Q    And how long have you worked as a veterinary toxicologist?

5    A    Since 1987.

6    Q    And your credentials are not at issue today, but, for

7    completeness, could you just very briefly tell us about your

8    education and training?

9    A    Sure.  I did my pre-veterinary education at Western

10   Illinois University in Macomb, and then was accepted into the

11   University of Illinois College of Veterinary Medicine.

12           After getting a DVM degree, I was out in practice for

13   four years, primarily small animal.  Decided to go back and

14   specialize in toxicology, veterinary toxicology, so I went back

15   to the University of Illinois for a Ph.D. degree.

16           After that, I was at Michigan State University for

17   several years, and then University of Pennsylvania before going

18   to UC-Davis where I've been for 14 years.

19   Q    Thank you.

20           Throughout today's examination, when I refer to the

21   words arsenic, cadmium, mercury, and lead, collectively, which

22   are the metals at issue in this case, I'm going to call them

23   the heavy metals.  Is that okay?

24   A    That's fine.

25   Q    So where are heavy metals found?

Dr. Poppenga - Direct by Baca

1    A    Heavy metals are ubiquitous in our environment.  They're

2    found in air and soil and food, water, so they're just very

3    widespread.

4    Q    You mentioned food.  What's a common food that might

5    contain metals?

6    A    Well, probably the best example might be seafood.  Most of

7    the seafood that we eat is going to contain arsenic.  Cadmium

8    can be in leafy greens because it's taken out by the plant from

9    soil.  Just two examples.

10   Q    And so why do Champion's dog foods have heavy metals?

11   A    Well, they are naturally occurring.  It's really impossible

12   to get away from them.  There are natural compounds in the

13   earth, and so it's not unusual then for these metals to find

14   their way into food items, hopefully at very low levels.

15   Q    And what is the National Research Council?

16   A    So the NRC is actually under the auspices of the National

17   Academy of Sciences.  It's sort of the operational body for the

18   NAS.  And they will authorize committees to be set up, of

19   experts, to look into questions that might arise.  And their

20   biggest customer is the federal government.  So it's a resource

21   for the government to tap into expertise that the government

22   itself may not have.

23   Q    And what is the Center of Veterinary Medicine?

24   A    So the Center of Veterinary Medicine is one of the six

25   centers of the FDA.  It has regulatory oversight of animal

Dr. Poppenga - Direct by Baca

1    drugs, livestock feeds, pet foods.

2    Q    And so how is, if at all, the CVM, the Center of Veterinary

3    Medicine, related to the National Research Council?

4    A    Well, as a federal agency, they could approach the NRC and

5    ask for specific questions to be answered.

6    Q    Okay.  So what guidance, if any, has the NRC provided on

7    heavy metals for dogs?

8    A    Well, several years ago, back in 1980, they constituted a

9    committee to look at minerals in animal use and health.  That

10   was updated in 2005.  So this was a committee that was put

11   together under the auspices of the NRC to specifically look at

12   mineral tolerances of 37 different elements to animals.

13   Q    And so what is the *Mineral Tolerance of Animals*, Second

14   Edition, from 2005?

15   A    Well, that was an update of the 1980 edition.  And it was

16   basically updating the recommendations, the information that,

17   you know, was useful to the Center for Veterinary Medicine and

18   others as well.

19   Q    So what is a maximum tolerable level, which sometimes today

20   we might refer to that as the MTL?

21   A    So the MTL was a threshold that this committee put

22   together, below which there would not be a concern about animal

23   health or safety, above which there might be a concern.  So it

24   was sort of a benchmark to help professionals judge whether

25   animals were being exposed to excessive concentrations of the

Dr. Poppenga - Direct by Baca

1   metals.

2   Q   What is an adverse effect?

3   A   Well, an adverse effect would be something that would be

4   detrimental to a person's health or an animal's health.

5   Q   What is the MTL for arsenic in dog food?

6   A   So for arsenic, the NRC committee has put together an MTL

7   of 12.5 parts per million.

8   Q   And what is the MTL for cadmium for dogs?

9   A   The cadmium would be 10 parts per million.

10  Q   And how about lead?

11  A   Lead is also 10 parts per million.

12  Q   And, finally, what is the MTL for mercury?

13  A   .267.  Very precise level.

14  Q   That's also parts per million, correct?

15  A   Parts per million, yes.

16  Q   Thank you.

17          And how small is a part per million?  Is there any

18  sort of comparison or analogy that you can provide for us?

19  A   Yeah, probably one analogy that I think is relevant, one

20  part per million would be one minute in two years.  Part per

21  billion, which is -- also often used, is -- would be one minute

22  in a thousand times two years, so 2,000 years.

23  Q   And so how, if at all, are the MTLs useful?

24  A   Well, again, they provide guidance to individuals like

25  myself.  If we've got an animal feed that we're testing metals

Dr. Poppenga - Direct by Baca

1    on and we find metals that are maybe a little bit higher than

2    we like to see, we can benchmark our interpretation based upon

3    those MTLs.

4    Q    And how do you use the MTLs in your expert report?

5    A    Well, in my laboratory, we do a lot of testing.  I'm in the

6    California Animal Health and Food Safety Laboratory system as a

7    toxicology section chief.  We do a lot of testing of various

8    animal feeds.  So if we get some results that I would have a

9    concern about, I could refer to the *Mineral Tolerance of*

10   *Animals* for guidance.

11   Q    Right.  And so how did you use them in your report?

12   A    Well, in this particular situation, there were a lot of --

13   there was a lot of information with regard to metals in a lot

14   of different pet foods, and that was sort of the benchmark

15   against which we would judge the safety of that particular

16   food.

17   Q    And so what conclusions did you reach in your expert report

18   using the MTLs?

19   A    Well, based at least on very extensive testing, in my view,

20   none of the pet foods that had the heavy metals tested exceeded

21   the NRC MTLs.

22   Q    And so what, if any, regulation has the FDA enacted

23   regarding heavy metals in dog food?

24   A    The FDA, specifically the Center for Veterinary Medicine,

25   has no specific guidelines for metals in animal feeds.

Dr. Poppenga - Direct by Baca

1  Q   And does the FDA have a formal standard that they've
2  enacted?
3  A   They do not have a formally adopted standard.
4  Q   So what has the FDA said, if anything, about the levels of
5  heavy metals in dog food?
6  A   Well, in certain situations, they have defaulted to the NRC
7  recommendations, the MTLs, to help inform any regulatory
8  decisions that they might want to make.
9  Q   And so let me ask you, what is the FDA's *Target Animal*
10 *Safety Review Memorandum* from 2011?
11 A   This was a response on the part of the Center for
12 Veterinary Medicine to a publication that came out testing
13 various metals in pet foods and raising some concerns about
14 whether those levels that were detected might be a problem in
15 terms of adverse effects on pets.
16 Q   So I'd like to read for you an excerpt from that
17 memorandum, and then I'd like to have you elaborate on that.
18        MS. BACA:  So this memorandum was previously marked as
19 Exhibit 17 in the joint report we filed, and I'd like to move
20 that into evidence.
21        THE COURT:  Any objection?
22        MS. PETERSON:  No, your Honor.
23        THE COURT:  It will be in.
24     (Said exhibit received in evidence.)
25        MS. BACA:  I'd like for our trial graphics assistant

Dr. Poppenga - Direct by Baca

1  to project it onto the screen and then we all can kind of read
2  it together.

3          THE COURT:  All right.  I tried Defense 1.  Let's try
4  Defense 2.

5          There it goes, except my screen isn't on.
6  BY MS. BACA:
7  Q    I'll read one of the paragraphs that appear on the top of
8  page 3 of the memorandum.  And it says, "It is true that FDA
9  has not promulgated guidance, action levels, or tolerances for
10 maximum content in feeds for the 15 elements measured and
11 discussed in the manuscripts.  The specific 15 elements
12 measured in the Atkins studies, as well as other elements in
13 the periodic table, may be naturally occurring constituents of
14 feeds and feed ingredients.  The Federal Food, Drug, and
15 Cosmetic Act requires that the amount of a poisonous or
16 deleterious substance that is itself not directly added to
17 food, but rather is a constitutive component of food, needs to
18 be present in an amount that ordinarily renders the product
19 injurious to health before the food can be considered
20 adulterated and actionable under the prohibitions of the Act.
21 To meet this adulteration standard for elements present in
22 animal feeds, including pet foods, the FDA considers the
23 information and recommendations of the National Research
24 Council of the National Academies Committee on Minerals and
25 Toxic Substances in Diets and Water for Animals as published in

1  the "Mineral Tolerances of Animals," Second Revised Edition,

2  2005."

3          Did I read that correctly, Dr. Poppenga?

4  A   Yes.

5  Q   And could you please just explain what is being said here,

6  what's happening?

7  A   Well, I think the concern was whether the elements found in

8  the Atkins study might render one of the pet foods adulterated;

9  but the FDA has taken a stance that if you're dealing with

10  naturally occurring substances, whether they be metals or plant

11  toxins or mold toxins, they would have to actually be in that

12  food item at a potentially injurious level to health before the

13  FDA would consider it to be adulterated.

14  Q   So what's an adulteration standard?

15  A   More typically, an adulteration standard, let's say it's a

16  man-made chemical, if there is no specific regulations or

17  guidance by the FDA, in theory, any amount that is found in a

18  food item, that food item could be considered adulterated.  But

19  in this case, that's a little different because these are

20  naturally occurring substances.

21  Q   And so what, if any, additional statements has the FDA come

22  out with after this 2011 memorandum?

23  A   Well, they've had additional information provided on their

24  website with regard to heavy metals in animal foods, and this

25  is part of their surveillance program.  They have an active

Dr. Poppenga - Direct by Baca

1   surveillance program that looks at animal foods and pet foods

2   for a variety of different things, including metals.

3   Q   So I'd like to ask you an additional question regarding a

4   document that was previously marked as Exhibit 18.

5           MS. BACA:  And I'd like to move that into evidence as

6   well.

7           THE COURT:  I don't know what it is.

8           MS. BACA:  Excuse me.  It is the 2019 Report on Heavy

9   Metals in animal food by Deemy, et al., and it was by the

10  Center of Veterinary Medicine.

11          THE COURT:  Okay.

12          MS. PETERSON:  No objection, your Honor.

13          THE COURT:  Okay.  It will be in.

14      (Said exhibit received in evidence.)

15          MS. BACA:  Thank you.  I'd like for our team to

16  project that onto the screen.

17          THE COURT:  You may.

18  BY MS. BACA:

19  Q   So I'd like to focus on the third paragraph on the first

20  page.  I'm not going to read it.  I'll give you a chance to

21  look it over.

22          It appears similar to the paragraph we saw in the 2011

23  memorandum.  Is that correct, Dr. Poppenga?

24  A   That's correct, yes.

25  Q   And so what is your take-away from this?

Dr. Poppenga - Direct by Baca

1    A    Well, the FDA has broad regulatory discretion; but they --

2    when it comes to metals, they do rely extensively on the

3    *Mineral Tolerance of Animals* to provide some guidance.

4    Q    And so even in 2019, we're seeing the FDA is looking to

5    these MTLs; is that right?

6    A    Correct.

7         MS. BACA:  We can take that down from the screen.

8    BY MS. BACA:

9    Q    And so are there any other governmental regulations that

10   you've relied on in your report, even if it's maybe a different

11   country?

12   A    Yeah, the EU also has some regulations, more formal

13   regulations, for the metals, arsenic, cadmium, mercury, and

14   lead.

15   Q    Are you referring to the EU regulation 2002/32/EC?

16   A    Yes.

17   Q    And how do you use the EU regulation in your expert report?

18   A    For comparative purposes.  It's slightly different than the

19   NRC.  But, you know, it just provides another authoritative

20   source of information to judge whether a particular metal is at

21   excessive concentrations in a food item.

22   Q    And so what conclusions do you reach in your report by

23   using the EU regulation?

24   A    Well, based upon all of the testing that's been done for a

25   variety of different pet foods, the thresholds established by

Dr. Poppenga - Direct by Baca

1    the EU really are not exceeded as well.

2    Q    So I'd like to turn our attention now to the heavy metal

3    testing that was used in your report.  And so let's begin with

4    talking about Champion's heavy metal test results.

5            And so in the ordinary course of Champion's business,

6    what did it test for?  What kind of metals or elements or

7    substances?

8    A    Well, over the years, Champion has done very extensive

9    testing for a variety of different constituents in their pet

10   foods, metals being one aspect of that.

11           I think the focus has been very much on arsenic, lead,

12   mercury, cadmium, but a number of foods were tested for a

13   variety of other elements as well, but there's a lot of

14   nutritional parameters that were also measured, even

15   contaminants like dioxin in some -- some of the foods were

16   tested.  So it's just a real broad spectrum of analyses.

17   Q    So things like calcium, selenium, for example, things like

18   that, right?

19   A    Sure, that would be part of sort of a standard nutritional

20   assay, to look for the essential minerals.

21   Q    And so in the ordinary course of Champion's business, what

22   kind of samples are they testing?  Is it finished food

23   ingredients?  What are they doing?

24   A    Well, over the course of a number of years, they tested

25   both their finished pet foods and also ingredients that went

Dr. Poppenga - Direct by Baca

1    into those pet foods, so it was both.  Both of those.

2    Q    Okay.  And so in your report, why did you choose not to

3    reference any testing done on Champion's ingredients?

4    A    Well, to me, it's the pet food that is being ingested by

5    the pets, so it's what's in that and not the ingredients that

6    are going into that.  And I think that point was also made by

7    the Deemy FDA document where they said, well, we test the

8    ingredients, but, ultimately, it's what's in the finished

9    product that's of concern.

10   Q    And so do you recall which labs were engaged by Champion

11   for the testing that it did in its ordinary course of business?

12   A    Champion used a number of well-established, well-known

13   laboratories.  So Eurofins is one example, but also Maaxam is

14   another name at the time, Silliker Laboratories.  Some

15   university labs have also been used.

16   Q    And so do you recall, what was the approximate date range

17   of these tests that you reviewed from Champion's ordinary

18   course of business?

19   A    So I looked at lab reports really from about 2008 to --

20   through 2018, maybe an outlier or two at 2019.

21   Q    And what did you compare Champion's ordinary course of

22   business testing to in your report?

23   A    Would you restate that?

24   Q    Sure.

25        What did you compare Champion's testing to in your

Dr. Poppenga - Direct by Baca

1  report?

2  A    Okay.  So I think the main comparators were the guidelines

3  from the NRC and the EU, but also thorough scientific

4  investigation is what's in the peer-reviewed literature.

5  There's a number of papers where investigators have also looked

6  at pet foods for a variety of different metals, including the

7  heavy metals that we're concerned about here.

8          MS. BACA:  And so I'd like to move into evidence what

9  has been previously marked as Exhibit 1, which is your expert

10 report dated February 24, 2021.

11         THE COURT:  Okay.  That will be admitted.

12         MS. PETERSON:  Your Honor, my only objection is that

13 Exhibit 1 has already been entered.

14         MS. BACA:  Oh, I apologize.  What was it marked as?

15         MS. PETERSON:  14.

16         MS. BACA:  14.

17         MS. PETERSON:  And then there's no objection.

18         THE COURT:  Okay.  So we won't remark it then.  We'll

19 call it 14.

20         MS. BACA:  14.  The February 24, affirmative expert

21 report.  Not the rebuttal report.

22         MS. PETERSON:  That would be -- I'm sorry.  Exhibit 8.

23 I'm so sorry.  Exhibit 8 is what it was previously marked as

24 or --

25         THE COURT:  It's not 14?  It's 8?

87

Dr. Poppenga - Direct by Baca

1      MS. PETERSON:  Yes.  That's right, your Honor.

2      THE COURT:  Okay.  All right.  Now it's 8.

3      MS. BACA:  Thank you for your assistance.

4      I do have that written down.  Exhibit 8.

5      (Said exhibit received in evidence.)

6      MS. BACA:  I'd like for our trial graphics team to put

7      that on the screen, if he will.  I'd like to focus on page 12,

8      Table 5.

9      BY MS. BACA:

10     Q   Could you briefly explain for us, when we get there,

11     Dr. Poppenga, what's happening in this table.

12     A   Yes.  So this is a table that compares several Champion pet

13     food products with what Kim, et al. had reported in a

14     peer-reviewed scientific article.  And in Kim, they sort of

15     divided up the foods into major constituents like fish,

16     poultry, red meat, and did the metal analyses.  So this is

17     comparing Champion fish-containing products with the values

18     that Kim found in fish-containing pet foods that he looked at.

19     Q   Right.  And so on our left-hand side, we're seeing some

20     test results from Maaxam, we're seeing some test results from

21     Eurofins and other tests as well.  And then those are the

22     fish-based diets from Champion, we're comparing them to

23     fish-based diets in Kim; is that correct?

24     A   That's correct.

25     Q   And what was your take-away from this table?

Dr. Poppenga - Direct by Baca

1    A    That the Champion pet foods were really in line with what

2    Kim found in fish-based diets.

3              MS. BACA:  We can take that down from the screen.

4    BY MS. BACA:

5    Q    So, just generally, what conclusions did you reach in your

6    expert report after reviewing Champion's testing in the

7    ordinary course of business?

8    A    I didn't see any cause for concern.  It's very in line with

9    what has been found in a variety of different pet foods over

10   the years by a variety of different investigators, so there was

11   nothing really surprising with the Champion results.

12   Q    So let's move on to testing that Champion did during the

13   course of this litigation.

14             I'd like to direct your attention to testing that

15   Champion did on inorganic versus organic arsenic.

16             So, briefly, what is the difference between organic

17   and inorganic arsenic?

18   A    So when you talk about the toxicity of metals, it really is

19   very dependent upon the form of the metal.  So there are

20   inorganic metal salts.  There are organic forms of metals.  And

21   in this particular case, arsenic is in different forms, and the

22   toxicity is quite variable.

23             So in fish-based diets, even though there's a fair

24   amount of arsenic present, it's present in an organic form that

25   is essentially non-toxic.  So you can't just look at the total

89

Dr. Poppenga - Direct by Baca

1    arsenic.  You have to look at the inorganic and the organic

2    forms.

3    Q    And so this testing was done because the European Union

4    regulation takes a distinction between these two forms of

5    arsenic; is that right?

6    A    That's correct.  So for total arsenic, they set a threshold

7    at 10 ppm; and for the inorganic arsenic, it's 2 ppm.  So that

8    reflects the higher toxicity of the inorganic forms versus the

9    organic forms.

10   Q    What conclusion did you reach regarding the testing done on

11   the organic and inorganic arsenic in your report?

12   A    Well, the Champion pet foods, the overwhelming majority of

13   the arsenic is an org -- in an organic form --

14            COURT REPORTER:  I'm sorry, in an?

15            THE WITNESS:  In an organic form.  In organic.

16            COURT REPORTER:  I'm sorry --

17            THE COURT:  So it's in --

18            THE WITNESS:  In an --

19            THE COURT:  -- A-N --

20            THE WITNESS:  -- organic.

21            THE COURT:  -- organic form.

22            THE WITNESS:  Correct.

23            THE COURT:  Yes, that's important.  That's important.

24   BY MS. BACA:

25   Q    Correct.

Dr. Poppenga - Direct by Baca

1        So the natural kind, basically.

2   A    It's --

3   Q    The organic kind.

4   A    It's what would be expected in a fish-based, seafood-based

5   formulation.

6   Q    Okay.  Thank you.

7        So what additional heavy metal testing occurred during

8   the litigation by Champion?

9   A    Well, there's been a lot of testing of other brands of pet

10  food not made by Champion, and I think that's been fairly

11  extensive, and that has happened over a period of time.

12  Q    And so how did you use testing done on other dog food

13  brands in your report?

14  A    Well, to compare the results from other brands to the

15  Champion test results.

16  Q    Why was that helpful for you?

17  A    Well, it just re-emphasized the point that these metals are

18  ubiquitous in our environment.  They are found in large number

19  of food items, whether you're talking human or animal, at low

20  levels that I would consider safe.

21  Q    So let's move on now.  Let's talk about the heavy metal

22  testing that the plaintiffs did.

23       What kind of heavy metal testing did plaintiffs

24  provide in this case?

25  A    I think the main information was testing done by the Iowa

Dr. Poppenga - Direct by Baca

1    State Veterinary Diagnostic Lab on a number of Champion pet

2    foods.

3    Q    Did they use another lab as well?

4    A    They also used Ellipse Analytical and --

5    Q    And so how did you use plaintiffs' Iowa State heavy metal

6    testing in your report?

7    A    Well, here again, it was another opportunity to sort of

8    compare what is in Champion pet foods with what is in other

9    brands of pet food.

10         MS. BACA:  So let's put that on the screen.  We'll go

11   to page 25 of his report at Section 10.

12   BY MS. BACA:

13   Q    And so could you just explain for us what's happening here

14   in this table?

15   A    So this is looking at some test results on Champion pet

16   foods done by the Iowa State Diagnostic Lab with the levels of

17   arsenic, cadmium, lead, and mercury reported, and then

18   comparing those levels with both the NRC and the EU thresholds

19   that we talked about earlier.

20   Q    And so what conclusions did you reach after looking at

21   plaintiffs' test results?

22   A    So the concentrations of the metals in the Champion pet

23   foods were significantly below either the MTL or the EU

24   thresholds.

25         MS. BACA:  We can take that down.

Dr. Poppenga - Direct by Baca

1  BY MS. BACA:

2  Q    And so just -- let's wrap this up.

3           How, if at all, did plaintiffs' test results impact

4  the conclusions you reached after you had looked at all of

5  Champion's testing?

6  A    It didn't change my opinion at all.

7  Q    Okay.  And how, if at all, in your daily practice as a

8  veterinary toxicologist, do you rely on animal feed or

9  livestock feed test results?

10 A    We do a lot of feed testing, and not only for particular

11 cases, but also for the California Department of Food and Ag.,

12 so metal testing is a major component of that.

13 Q    And so you'll use those results to reach conclusions in

14 your daily practice; is that right?

15 A    Yeah, that would be a benchmark against which I would judge

16 what we detect in a particular food.

17 Q    Okay.  Thank you.

18           Let's pivot our focus.  Let's talk about Champion's

19 White Paper.

20           What is Champion's White Paper, to your understanding?

21 A    The White Paper was something that Champion made available

22 to consumers of their product in 2017, really in response to

23 concerns about the metals in their pet foods.  And so this was

24 providing the consumer with some averages in terms of the

25 metals of concern and putting it in context with regard to the

Dr. Poppenga - Direct by Baca

1    MTLs and other safety information.

2    Q    And so who, if anyone, at Champion did you speak to to

3    learn about the White Paper?

4    A    I had spoken to Gayan Hettiarachi.

5    Q    And what did you learn after speaking with Mr. Hettiarachi?

6    A    It was basically the process that they had used to

7    determine those averages and the standard deviations.

8    Q    And it's my understanding Champion might have used a

9    weighted average to reach these averages.

10           Could you briefly explain to us what a weighted

11   average is?

12           I know you're not a statistician or mathematician, but

13   what was your understanding of how the weighted average

14   happened?

15   A    So my understanding is that they categorize their feed,

16   their pet foods, based upon ingredients, so fish-based

17   ingredients versus poultry-based ingredients versus, say, red

18   meat ingredients, they had different numbers in each of those

19   categories.  They took the average in each of those categories,

20   and then they averaged the averages, which helps -- helps

21   balance out the results so it's not weighted too much towards

22   the fish-based or the poultry-based.

23   Q    Okay.

24   A    So it is a statistical approach to, you know, making sure

25   you're not biased in your averages.

Dr. Poppenga - Direct by Baca

1   Q    So what, if anything, did you review pertaining to the

2   White Paper?

3   A    It was basically the results that they had included in the

4   White Paper.

5   Q    And did you also review a spreadsheet of the test results

6   as well?

7   A    That's what I had looked at, yes.

8   Q    How do you use the White Paper in your expert report?

9   A    Well, I mean, it's something that consumers saw, and so

10  it's sort of a basis for comparison with all of the other test

11  results.  And it's just -- I think looking more holistically

12  outside of the White Paper, I think we found that test results

13  were very consistent with what was reported in the White Paper.

14  Q    So if the White Paper didn't exist, would any of the

15  conclusions that you reached in your report change?

16  A    No, because there was much more extensive testing that was

17  done beyond the White Paper.

18  Q    Okay.  Let's move on to talk about scientific articles that

19  you relied on in your report.

20       What type of research articles did you rely on?

21  A    Well, I've done a number of literature searches on a

22  variety of different topics; but for this particular report on

23  the heavy metals, it was searching available databases like

24  PubMed or Chem Abstracts for papers that looked at metals in

25  pet foods specifically.

Dr. Poppenga - Direct by Baca

1  Q    Were the articles that you relied on peer reviewed?

2  A    They were peer reviewed.  I think the Center for Veterinary

3  Medicine took a little exception with the Atkins paper.  It was

4  less clear how thoroughly that was reviewed, but the others

5  were peer reviewed.

6  Q    Do you rely on articles in your ordinary practice as a

7  veterinary toxicologist?

8  A    Yes, every day.

9  Q    Okay.  And so how did you use the studies in your report,

10 just briefly?

11 A    Well, there were a number of reports that looked at a

12 variety of different pet foods for the metals of concern, and

13 so I took those test results and compared them to the Champion

14 test results.  And it was just to confirm my opinion that

15 metals are in pretty much every pet food and at levels that are

16 safe, and Champion's pet foods were comparable.

17 Q    So I want to talk about two studies that you cite in your

18 report and that the plaintiffs have taken issue with to an

19 extent in their *Daubert* motion.

20      The first is called the Atkins study.

21      You briefly mentioned there are some critiques.

22      Could you just tell us about the Atkins study?

23 A    Yeah, this was a study that -- probably one of the first

24 ones that looked at metals in pet foods.  And this was not done

25 by, you know, veterinarians or health professionals.  It was

Dr. Poppenga - Direct by Baca

1    done by individuals that, in my view, misinterpreted the

2    results of their analyses.  And that was really what the Target

3    Animal Safety document from the FDA was in response to.

4    Q    And so what did the FDA say in this Target Animal Safety

5    Memorandum about the Atkins study?

6    A    Yeah, so the FDA didn't critique the actual values that

7    Atkins found --

8    Q    Okay.

9    A    -- but they did critique a number of other areas.  Their

10   biggest critique was using human health-based thresholds to

11   make judgments about animals and not using something like the

12   NRC MTLs --

13   Q    You're referring to like the EPA or the WHO, the World

14   Health Organization?

15   A    Yeah, so the EPA, World Health Organization, has

16   established various health-based thresholds for metals, for

17   example, lead and arsenic, and they felt that that was not an

18   appropriate threshold for comparison.

19   Q    And so even though there were critiques in the Atkins

20   study, why did you end up using it in your report and to what

21   extent did you end up using it in your report?

22   A    Well, it was another dataset in terms of metal

23   concentrations in pet foods.  And the method is -- couldn't

24   critique the method.  It's pretty well-established, pretty

25   straightforward.  And the FDA did not critique the actual

Dr. Poppenga - Direct by Baca

1    results.  They critiqued the interpretation of those results.

2    Q    Okay.  So you just used the results; is that right?

3    A    Correct.

4    Q    And plaintiffs' *Daubert* motion states that you did not

5    address something that the Atkins authors said.  And I'm going

6    to quote from the Atkins authors.  They said, "The trace

7    element data generated in this study have shown that there

8    might be a cause of concern for owners who feed their pets

9    commercially available dog and cat food."

10        Do you agree with this statement?

11   A    No.

12   Q    And why not?

13   A    Because there's real -- there's really no evidence, you

14   know, based upon established thresholds, either the MTLs or the

15   EU thresholds, that the metals that were found by Atkins were a

16   concern.

17   Q    Right.  So you're saying there's no evidence based on

18   established thresholds.  And just to confirm and clarify, the

19   Atkins authors were not using those established thresholds; is

20   that right?

21   A    They were using human-based health thresholds.

22   Q    Thank you.

23        So let's discuss a second study that plaintiffs raise

24   in the *Daubert* motion.  This is the Kim study.

25        Could you briefly tell us about the Kim study?

Dr. Poppenga - Direct by Baca

1    A    Well, this was another study that the authors tested a

2    number of different pet foods, dog foods specifically, 51, and

3    looked at metal concentrations, a pretty straightforward type

4    of study.

5    Q    So there's 51 brands of dog food that were tested.  Do you

6    recall if Champion's Acana and Orijen brands were part of those

7    51 foods?

8    A    They were included in the 51 foods.

9    Q    I'm going to read a quote from the Kim authors.  They said,

10   "The products that we have examined appear safe for

11   consumption."

12         Do you agree with that conclusion?

13   A    I do.

14   Q    And is that consistent with the conclusions that you

15   reached in your report?

16   A    It is.

17   Q    I'm going to read a second quote from the Kim authors.

18   They stated, "Consumers may want to solicit information from

19   companies regarding heavy metal contamination before purchase."

20         And can you tell us why that was not addressed in your

21   report?

22   A    Well, if you read the entire article, they make it clear in

23   a number of different spots that they didn't think there was a

24   real issue with the concentrations they were finding in the pet

25   foods.  This was the last line of the article.  It was more of

Dr. Poppenga - Direct by Baca

1   an opinion, not necessarily based on what they found, so I

2   didn't think it was relevant.

3   Q   So you would agree it's more of the authors' opinion rather

4   than a scientific conclusion that they reached?

5   A   I would -- yes, I would agree with that.

6   Q   Okay.  Let's move on from heavy metals.  Let's move on now

7   to BPA.

8           So what is BPA?

9   A   So BPA is bisphenol-a, which is a man-made chemical that's

10  used in polycarbonate and also epoxy resins.

11          THE COURT:  Can you spell it for my court reporter?

12          THE WITNESS:  Yes.  B-I-S-P-H-E-N-O-L dash A.

13          THE COURT:  Thank you.

14  BY MS. BACA:

15  Q   And so bisphenol-a.  We're going to refer to that today as

16  BPA.  And where is BPA found?

17  A   Well, very similar to the metals we've talked about, it's

18  pretty ubiquitous in the environment because it's been widely

19  used.

20  Q   And is it found in our dust, possibly?

21  A   It can be found in pretty much anything you want to look

22  at.  It's been found in household dust.  It's been found in a

23  number of food items.  Can be found in water.

24  Q   Okay.  And what extent, if any, do Champion dog foods

25  contain BPA?

Dr. Poppenga - Direct by Baca

1    A    Well, a number of their products were tested for BPA and,

2    indeed, a few of the products did contain measurable amounts,

3    in the parts per billion range.  The vast majority that were

4    tested were BPA was not found at or above 5 ppb.

5    Q    What, if any, guidance has the FDA come out with BPA for

6    dogs or dog food?

7    A    For dogs or dog food, none.

8    Q    What do you use then in your expert report to assess the

9    Champion's BPA levels when they are present?

10   A    Well, the nature of toxicology is you use the information

11   that you can glean from various sources.  So in this particular

12   case, there was one study in dogs that was cited by the FDA on

13   their website.  It was never peer reviewed or published, but it

14   was exposing dogs to BPA and coming up with an estimate of the

15   toxic threshold or a safe level.  But you can look more broadly

16   because BPA has a lot of interest on the part of regulatory

17   authority -- authorities, so there's a lot of laboratory animal

18   information with regard to BPA.

19   Q    Are you also referring to a scientific article that

20   pertained to rodents in your report?  Is that something you

21   looked at?

22   A    Yes.  I used rodent information, very extensively peer

23   reviewed, a chronic BPA study on the part of the government

24   that established a NOEL.

25   Q    Can you explain for me -- you mentioned the word NOEL.

Dr. Poppenga - Direct by Baca

1          MS. BACA:  And for the court reporter, that's N-O-E-L.

2    BY MS. BACA:

3    Q    Can you explain the difference between the NOEL, the No

4    Observable Effects Level, and the NOAEL, the No Observable

5    Adverse Effect Level?

6    A    Yeah, let's start with the Adverse one first because that's

7    pretty easy to understand.  That's a level above which there

8    might be an adverse effect.  The No Observable Effect Level

9    maybe couldn't be an adverse effect, it could be a physiologic

10   effect.  So maybe there's an increase in liver enzyme activity

11   that occurs.  But it's not what would be considered a toxic

12   effect.  It's just a physiologic effect.

13   Q    Let's talk about the kind of BPA testing done by Champion

14   in this case.

15          What did they have done?

16   A    Well, they tested a number of their foods for BPA and --

17   Q    Did they also test anything else for BPA?

18   A    Yeah, there were a few of the competitor dog foods that

19   were tested.  I think ten were tested for BPA.

20   Q    Okay.  And what labs were engaged by Champion for the BPA

21   testing?

22   A    That was Eurofins.

23   Q    Eurofins is an accredited lab, right?

24   A    Yeah, that's a highly regarded international laboratory

25   that is ISO 17025 accredited.

Dr. Poppenga - Direct by Baca

1   Q   How did you use the BPA testing that's in your report?

2   What did you do with the test results?

3   A   Well, the -- since there were no real regulatory

4   guidelines, one does a risk assessment.  So one looks at the

5   toxicity information that's available; one looks at what the --

6   maybe the worst-case exposure scenario is for the pet; and then

7   try to decide if there's really a risk based upon thresholds

8   like the No Observable Adverse Effect Level.

9   Q   You did the risk assessment.  You looked at the No

10  Observable Effect Level.  What was the conclusion that you

11  reached?

12  A   That the BPA levels were so far below any sort of

13  recognized toxicity threshold that it was not a health concern

14  at all.

15  Q   What testing, if any, did the plaintiffs in this case do

16  for BPA?

17  A   BPA was also tested by Ellipse Analytical.

18  Q   And what did Ellipse Analytical find?

19  A   They found some positives.  Also some non-detect

20  concentrations in the foods they tested.  And for the risk

21  assessment, what I tried to do is take the highest level that

22  was detected for the risk assessment, not the lowest that was

23  detected.

24  Q   Right, so you're taking the highest level for your

25  worst-case scenario; is that right?

103

Dr. Poppenga - Direct by Baca

1    A    For a very conservative estimate of, you know, the risk.

2    Q    To your understanding, did plaintiffs' laboratory ExperTox

3    also test for BPA?

4    A    It's my understanding they did.  I don't know that I have

5    actually seen any lab reports related to BPA testing by

6    ExperTox.

7    Q    And so if you had not seen laboratory testing for it or

8    results, was your conclusion that they were not able to read

9    any detectable amounts of BPA?

10   A    Yeah, that would be speculation on my part.  I don't know

11   why they -- I didn't see a --

12   Q    Okay.

13   A    -- certificate of analysis.

14   Q    Did plaintiffs' BPA testing alter any conclusions that you

15   reached after your risk assessment?

16   A    No.

17   Q    Okay.  Let's move on now to our final topic.  This is

18   pentobarbital.

19        MS. BACA:  For the court reporter, that's

20   P-E-N-T-O-B-A-R-B-I-T-A-L.

21   BY MS. BACA:

22   Q    So what is pentobarbital?

23   A    So pentobarbital is a barbiturate that has a long history

24   of use in veterinary medicine.  Not so much anymore, but early

25   on, it was an anesthetic agent.  Now it is used almost

Dr. Poppenga - Direct by Baca

1    exclusively as a euthanasia agent.

2    Q    What pentobarbital testing was done by third parties on

3    Champion's beef tallow?

4    A    So this is -- was in response to a Pennsylvania Department

5    of Ag. investigation of beef tallow from a supplier of tallow

6    to Champion.  They collected tallow samples and actually sent

7    them to the -- to our laboratory in Davis, the California

8    Animal Health and Food Safety Laboratory.

9    Q    So just to clarify, it was the Pennsylvania Department of

10   Agriculture, and they sent some beef tallow testing to the

11   University of California at Davis; is that correct?

12   A    Correct.

13   Q    Were you involved at the University of California-Davis for

14   this testing?

15   A    I was not involved directly in the testing.

16   Q    And the testing that the Pennsylvania Department of

17   Agriculture, when they took the tallow, was that just from one

18   supplier of Champion's?  Are you aware of that, based on your

19   knowledge of this case?

20   A    That was one supplier located in Pennsylvania.  That's why

21   the Pennsylvania Department of Ag. was involved.

22   Q    What pentobarbital testing, if any, was done by Champion in

23   this case?

24   A    So Champion, once they realized there was some detectable

25   pentobarbital and some tallow that may have been supplied to

105

Dr. Poppenga - Direct by Baca

1    them, they went back and tested a number of their finished

2    products for pentobarbital, and that was done by the Texas

3    Veterinary Medical Diagnostic Lab.

4    Q   And so do you recall when Texas A & M did the testing on

5    Champion's finished kibble?

6    A   Yeah, all this occurred in 2018.

7    Q   And what, if any, guidance has the FDA come out with or

8    anything that they have said regarding detectable pentobarbital

9    in dog food?

10   A   Well, this would go back to there are no guidelines, so if

11   you actually find it, then they -- the FDA can consider it

12   adulterated.

13   Q   So if it's detected, it's adulterated.  Is that what you're

14   saying?

15   A   If it's detected, yes.

16   Q   Okay.  And so what did the Texas A & M test results show?

17   A   The finished products were uniformly negative at the two

18   part per billion detection limit.

19   Q   And so, in other words, there was no detectable

20   pentobarbital in Champion's dog food; is that right?

21   A   Correct.

22   Q   What testing, if any, have plaintiffs done on pentobarbital

23   in this case?

24   A   To my knowledge, none.

25   Q   None.

Dr. Poppenga - Direct by Baca

1          So have they not tested any of Champion's kibble or

2    tallow for pentobarbital?

3    A    To my knowledge, no.

4    Q    And what guidance or benchmarks or anything, I mean, what

5    are you using in your expert report to reach your pentobarbital

6    conclusions?

7    A    Well, several different lines of, you know, information.

8    Pentobarbital in pet food is not a new thing.  In fact, the FDA

9    looked into this back in the late '90s.  And in response back

10   then, they actually did a study in beagle dogs, looking at

11   thresholds that would be safe.

12         Phenobarbital has been used in veterinary medicine for

13   a long time.  A related barbiturate, it's given on a daily

14   basis for epilepsy.  So you can look at the information on

15   acceptable levels of phenobarbital and extrapolate to

16   pentobarbital.  So there's some information out there that

17   would allow you to judge whether a concentration in a pet food

18   would be a problem or not.

19   Q    So was there a pentobarbital Observable Effect Level or

20   Adverse Effect Level study that was -- you were able to use?

21   A    Well, the FDA did do their own study.  They don't indicate

22   it was done outside of the FDA, so it may have been done

23   internally, but it did provide some guidance in terms of some

24   risk levels of pentobarbital.

25   Q    So you did a risk assessment; is that right?

Dr. Poppenga - Direct by Baca

1   A    Yes.

2   Q    So what was the results of your risk assessment for

3   pentobarbital in your report?

4   A    That it had to be theoretical because we didn't find it in

5   the finished Champion product, so I theoretically took the

6   highest level that was found in the beef tallow and the largest

7   amount of beef tallow added into a product and how much

8   pentobarbital would that translate into and then did the risk

9   assessment on that.  So it was purely a hypothetical worst-case

10  risk assessment.

11  Q    And based on that hypothetical, what was the conclusion you

12  reached based on that figure?

13  A    That there would be no problem with even, you know -- I

14  think the value I used was 3.4 parts per billion --

15  Q    Okay.

16  A    -- in the risk assessment, that that is so far under

17  anything of concern, it would --

18  Q    And --

19  A    -- would not be relevant to the health of the animal.

20  Q    And a part per billion is smaller than a part per

21  million --

22  A    Correct.

23  Q    That we discussed earlier?

24  A    Yes, correct.

25  Q    Okay.  And so just one last question for you.

Dr. Poppenga - Cross by Peterson

1      I believe we've established today that the MTLs and
2  those Observable -- No Observable Effect Level and No
3  Observable Adverse Effect Level, so we've established that
4  those are not enacted as a statute or regulation that's binding
5  on Champion.  And so if that's the case, why did you end up
6  using them in your report?
7  A   Well, they are the guidance that's available.  And at least
8  with the MTLs, it's guidance that the FDA uses to help inform
9  their regulatory decisions.
10 Q   Thank you, Doctor.
11      MS. PETERSON:  Your Honor, can I approach Dr.
12 Poppenga --
13      Hi, Dr. Poppenga.
14      THE COURT:  Sure, of course.
15      MS. PETERSON:  -- with copies of binders, just in case
16 I reference anything.
17      And then, finally, I am double vaccinated.  I tend to
18 have a voice that doesn't carry as well as others, so is it
19 okay if I take this off?
20      Even without a mask, I'm often told to speak better
21 for the court reporter.
22                    CROSS-EXAMINATION
23 BY MS. PETERSON:
24 Q   All right.  Good afternoon, Dr. Poppenga.
25 A   Good afternoon.

Dr. Poppenga - Cross by Peterson

1  Q    How are you?

2  A    Good.

3  Q    Good.  It's good to see you again.

4        I just wanted to ask a couple things at the beginning

5  just so I'm certain that your expert opinion hasn't been

6  changing and you're not changing your testimony, and that first

7  is that, Dr. Poppenga, you've done numerous reports for

8  Champion in similar-related cases, correct?

9  A    Correct.

10 Q    Okay.  And throughout those reports, your opinion has been

11 similar, correct?  I mean, there's been no real material

12 changes.

13 A    That's correct.

14 Q    Okay.  And let's talk about safety first.

15        So, Dr. Poppenga, you are a veterinarian toxicologist,

16 correct?

17 A    Correct.

18 Q    And toxicology is the study of poisons, correct?

19 A    That's correct.

20 Q    Okay.  And you're not here offering any type of opinion as

21 to what a reasonable consumer would understand as to the risks

22 imposed by heavy metals at any level, including MTLs, correct?

23 A    I'm not putting myself in the mind-set of a consumer.

24 Q    Okay.  And you're also not here testifying as to whether or

25 not a consumer would understand the inclusion of heavy metals

Dr. Poppenga - Cross by Peterson

1     in Champion pet food based on their packaging, correct?

2     A    I think it's very difficult for lay people to assess

3     relative risk, so -- I think there's plenty of studies that

4     indicate people really don't have a good handle on relative

5     risk.  But beyond that, I'm not going to, again, put myself in

6     the mind-set of a consumer with regard to what they desire.

7     Q    Okay.  Just -- thank you, Dr. Poppenga.  And I'm -- I --

8     just so we're clear, I'm not trying to be rude.

9            So is your answer correct, you are not offering any

10    type of expert testimony today or in this case about whether or

11    not a reasonable consumer is misled by Champion's packaging as

12    to heavy metals?

13    A    I'm not, no.

14    Q    Okay.  And when your counsel was speaking to you, there was

15    a question about where heavy metals came from.  And I just --

16    this is one that I do really want to clear up because I want to

17    make sure I understand what your expert testimony would be in

18    this case.  And I do know your opinion, number one --

19           MS. PETERSON:  If you can bring that up, please.

20    BY MS. PETERSON:

21    Q    It says, "Heavy metals occur in nature and the environment

22    and are routinely found in pet foods at safe levels."

23           THE COURT:  Hold on a second.  I'm trying to find your

24    computer.

25           MS. PETERSON:  I apologize.

Dr. Poppenga - Cross by Peterson

1    THE COURT:  That should have been it.  I've got -- no,
2    wait.
3    BY MS. PETERSON:
4    Q    Dr. Poppenga, it is in --
5    THE COURT:  There you go.  Thank you.
6    BY MS. PETERSON:
7    Q    And for your reference, it's in Exhibit 8, which is your
8    Illinois report, on page 40.  I believe.
9    Okay.  So Dr. Poppenga, there was -- you had
10    testified -- well, I believe you were asked where are the heavy
11    metals coming from, and your testimony of what I just
12    understood was that they're naturally occurring.  Is that
13    correct?
14    A    Correct.
15    Q    So are you changing your testimony here, as an expert
16    opinion, that you actually know where the heavy metals in
17    Champion's dog food is coming from and that it's all naturally
18    occurring in the environment?
19    A    Metals are naturally occurring.  You can't create or
20    destroy metals.  So some can result from man's activity; others
21    can -- other environmental sources can result from just natural
22    processes.
23    Q    So is your -- is your testimony that you -- you as an
24    expert know that Champion pet food has heavy metals in it
25    simply and only because of naturally occurring heavy metals in

Dr. Poppenga - Cross by Peterson

1    the environment?

2    A    Well, naturally occurring, that's a component of it.

3    They're in our environment, but they can also occur from man's

4    activities.  I think I mentioned that.  So through our

5    industrial activities, the burning of coal, for example,

6    releases mercury into the environment, but a significant amount

7    of the mercury that's in our environment actually comes from

8    natural degassing of the earth's crust.  So it's a combination

9    of natural occurrence and man's redistributing metals for our

10   own purposes.

11   Q    And so is it your testimony then that you can't tell me

12   today because you didn't look into it exactly what ingredients

13   or what sourcing causes the heavy metals to be present in

14   Champion's dog food, correct?

15   A    I think that would be speculative on my part.  I think one

16   could make an educated guess that metals like mercury and

17   particularly arsenic that we've already talked about probably

18   are coming from seafood.

19   Q    Okay.  Thank you, Dr. Poppenga.

20           And then I just want to talk about a couple things so

21   I make sure that we're on the same page.

22           When you were testifying before, when your counsel was

23   asking questions and you were talking about the Target Memo,

24   which I believe she put in as Exhibit 17, and you were

25   referring to the FDA as to the Target Memo, correct?

Dr. Poppenga - Cross by Peterson

1    A    Correct.

2    Q    But the FDA never officially adopted the Target Memo,

3    correct?

4    A    No.

5    Q    That's actually the CVM, correct?

6    A    The CVM is part of the FDA, so it would be the FDA that

7    would have approved that, but it's, you know, it's under CVM's

8    purview in terms of regulations.

9    Q    Okay.  Then we're on the same page for that, so thank you.

10            And then I also wanted to talk about the 2019

11   statement that is Exhibit 18 that was -- you spoke to with your

12   counsel about.

13            And as to that document, it's got a -- you know, the

14   D -- the "CVM CY 15-17 Report on Heavy Metals."  Do you recall

15   that document?

16   A    Yes.

17   Q    Can I ask, when you were making your expert opinions and

18   drafting your expert report, did you rely on this in this

19   specific case?

20   A    In this case, it was one of the documents I looked at and

21   was informed by.

22   Q    Right, because this actually post-dated some of your

23   previous reports in, let's say, the Reitman case, correct?

24   A    Correct.

25   Q    Okay.  And so I believe you were testifying that this

Dr. Poppenga - Cross by Peterson

1    document shows that the FDA still considers the MTLs, correct?

2    A    Correct.

3    Q    Because the Target Memo was in 2011, correct?

4    A    Correct.

5    Q    And the NRC was 2005, correct?

6    A    Correct.

7    Q    So this is 2019.

8    A    Correct.

9    Q    And this is the most recent statement guidance, whatever

10   you want to call it, from the FDA on heavy metals in dog food,

11   correct?

12   A    To my knowledge, yes.

13            MS. PETERSON:  Can you pull up the exhibit, please?

14   BY MS. PETERSON:

15   Q    So I'm going to have the conclusion of Exhibit 8, which is

16   on page of 4 -- page 4 of it, put up in front of you.

17            And I believe you and your counsel talked about that

18   first initial paragraph where it talks -- and it refers to both

19   the NRC and AAFCO.

20            But I -- what I'm interested in is that -- the second

21   part of the conclusion, and I would like to know if you

22   considered this in your expert opinions and how you considered

23   it.

24            So in the second -- or third line, they conclude,

25   "Considering that animals may be exposed to heavy metals from

Dr. Poppenga - Cross by Peterson

1    different sources and that these various low levels could
2    potentially add up to a level of concern in the future, the
3    Feed Contaminants Program will direct the collection and
4    analysis of specific samples to aid in performing targeted
5    metrics."
6            Do you see that?
7    A    I do.
8    Q    So did you -- would you agree that the FDA as of 2019 is
9    saying that more information -- more data should be collected
10   because of, even at low levels, they could add up to levels of
11   concern in dogs?
12   A    Well, I think the thrust of this was to document that the
13   FDA has ongoing surveillance.  So the information they used was
14   from 2015 to 2017.  That's part of the FDA's mission is
15   surveillance.  And I think that that's something that, you
16   know, they're going to continue to investigate in terms of
17   surveillance activities.
18   Q    But you have testified multiple times, Dr. Poppenga,
19   correct, that you don't think any additional data is needed to
20   come to a -- to come to your conclusions that there are no
21   concerns about the levels of heavy metals in Champion pet food,
22   correct?
23   A    Repeat that first part, that I -- you said -- that I don't
24   think any --
25   Q    I apologize.  I apologize.  That probably wasn't a very

Dr. Poppenga - Cross by Peterson

1    clear question.

2           So, Dr. Poppenga, you, though, have testified multiple

3    times in the various cases that you don't think any additional

4    data does need to be collected to render your opinions that the

5    levels are safe in Champion dog food of heavy metals, correct?

6    A   I think that could be a little bit of a

7    mischaracterization.

8           Based upon the information that is available, I don't

9    see that there's a safety issue.

10          Maybe in the future, there will be a revision of the

11   NRC, who knows.  Maybe there will be additional studies.  That

12   would inform any opinion at that time.

13          But based upon all the informing that's available to

14   me today, I don't believe there's a safety issue.

15   Q   So do you disagree with the conclusion of the FDA that:

16   "Considering that animals may be exposed to heavy metals from

17   different sources and that these various low levels could

18   potentially add up to a level of concern" -- and notice they're

19   not talking about MTLs anywhere -- "in the future, the Feed

20   Contaminants Program will direct the collection and analysis of

21   specific samples to aid in the performing of targeted metrics,"

22   do you -- do you disagree with that, Dr. Poppenga?

23   A   So I look at "may," I look at "potentially."  This is part

24   of the FDA's mission is to make sure, with regard to CVM, make

25   sure that livestock feed and pet foods are safe.  So they found

Dr. Poppenga - Cross by Peterson

1    a few ingredients that were maybe a cause for concern, and

2    these are mostly ingredients that you would expect to have a

3    lot of metals in, like mineral supplements.  This is just being

4    cautious and pursuing their mission to protect our food supply,

5    whether it be human or pets.

6    Q    That wasn't my question, but thank you, Dr. Poppenga.

7         My question is:  Do you disagree with that conclusion?

8    A    I fully endorse continued surveillance.  That's what

9    they're saying there.

10   Q    Okay.  And just a random question.  You just referenced

11   mineral supplements as a big concern for potential heavy metal

12   contamination for dog food, correct?

13   A    Mineral supplements are made up of minerals, concentrated

14   amounts of minerals, so that certainly could be a source of

15   exposure.

16   Q    And do you know if Champion pet food has any mineral

17   supplements in its ingredients?

18   A    I would have to go back and -- I can't answer that at the

19   moment, no.

20   Q    Did you look at any of the ingredients of the pet foods

21   before making your opinions here as to the safety -- the safety

22   of Champion pet food and also the existence of heavy metals in

23   Champion pet food?

24   A    I've certainly looked at their labels which would contain

25   their ingredients.

Dr. Poppenga - Cross by Peterson

1   Q    And you don't recall, though, if any of those had mineral
2   supplements?
3   A    Oh, I'm sure that, in some cases, there are minerals that
4   are added, which is pretty routine.  But keep in mind it's the
5   ingredient versus the complete product, so that's what my
6   concern is is the complete product.
7   Q    Okay.  Thank you.
8        Dr. Poppenga, let's start talking about the MTLs and
9   also your methodology in forming your opinions.
10       So you understood that your job was to gather and
11  review all necessary information and evaluate it with your
12  expertise in reaching your expert opinion, correct?
13  A    Correct.
14  Q    And in forming your expert opinion, you relied on:  One,
15  the MTLs; two, the stated averages of heavy metal inclusion in
16  Champion pet foods in the White Paper, correct?
17  A    That was included, yes.
18  Q    Yep.  Okay.  Champion's testing on its own products,
19  correct?
20  A    Yes.
21  Q    Champion's testing on other dog foods, correct?
22  A    Yes.
23  Q    Testing that was available in peer-reviewed articles that
24  you cite in your report, correct?
25  A    Correct.

Dr. Poppenga - Cross by Peterson

1    Q    Plaintiffs' testing that you had access to, correct?

2    A    Correct.

3    Q    And I am limiting this, I'm sorry, to just your opinions on

4    heavy metals.

5         Was there any -- anything else that I missed that you

6    relied on in your conclusions?

7    A    I think you covered --

8    Q    Okay.

9    A    -- the primary sources, yes.

10   Q    And -- but none of that was testing you did, correct,

11   Dr. Poppenga?

12   A    I did not do testing in my laboratory, no.

13   Q    But you have that capability of -- at University of

14   California-Davis, correct?

15   A    We have metals testing capacity, yes.

16   Q    And you didn't do additional tests -- in fact, you didn't

17   even ask for the testing that Champion provided to you of other

18   dog foods, correct?

19   A    I did not suggest that that was something they needed to

20   do, no.

21   Q    But it was something you relied on in your report, correct?

22   A    Yes.

23   Q    Okay.  And as to the NRC, I think we've talked about the --

24   as to the MTLs, I believe you have testified that they were

25   published in 2005, correct?

Dr. Poppenga - Cross by Peterson

1   A   Correct.

2   Q   And that they have never been adopted as a regulation by

3   the FDA, correct?

4   A   Correct.

5   Q   And that they are not action levels set by the FDA,

6   correct?

7   A   Correct.

8   Q   And that they are not established tolerance levels set by

9   the FDA, correct?

10  A   Correct.

11  Q   And they're not even official guidelines by the FDA,

12  correct?

13  A   Depends on what you mean by "guidelines," but it's not --

14  they have not been officially adopted.

15  Q   Correct, I mean, the Target Memo, which the 2011 one, I

16  believe the quote that was read in says specifically they're

17  not guidelines, correct?

18  A   Correct.

19  Q   Okay.  And, in fact, the NRC in 2005, so 15-plus years ago,

20  gave some precautions about using the MTLs, correct?

21  A   They were doing their due diligence and certainly providing

22  what they considered uncertainties in the information.

23  Q   And is it fair to say that there are approximately 95

24  veterinary toxicologists in the United States?

25  A   Approximately.

Dr. Poppenga - Cross by Peterson

1    Q    Okay.  And that you spoke to not a single one regarding how

2    they use or when they rely on the MTLs in drafting your expert

3    opinions for this case.

4    A    I don't think I would necessarily gain much by talking to

5    my colleagues.  I'm fully capable of making my own

6    interpretations and experience.

7    Q    And you don't teach the MTLs at vet. schools, correct?

8    A    To veterinary students, no.  But there's a reason for that.

9    We provide veterinary students with what they need to know as

10   emerging veterinarians, not specialists.  So what they need to

11   know is that lead is toxic, that arsenic is toxic, but they

12   don't have to know about MTLs.  That's what specialists like

13   myself are here for, to help.

14   Q    And you spoke to no one at the FDA in drafting your expert

15   opinions or the reports in the -- this case or the related

16   cases, correct?

17   A    No.

18   Q    And you spoke to no one at UCS -- UC-D, I'm sorry,

19   University of California-Davis, about also how they use the

20   MTLs in their practice, correct?

21   A    Well, up until about a year ago, I was the only veterinary

22   toxicologist there, so talking to colleagues was probably not

23   an option at the time many of these reports were put together.

24   But, no, there's no need to.

25   Q    Okay.

Dr. Poppenga - Cross by Peterson

1    MS. PETERSON:  Could you please bring up his opinion

2  Number 2?

3  BY MS. PETERSON:

4  Q    And -- but your -- your expert opinion that -- in this case

5  is that:  "The MTLs established by the NRC and used by the FDA

6  to inform regulatory decisions are the best and most widely

7  used scientific guidance available for determining what are

8  safe levels of heavy metals in dog food."  Correct?

9  A    Yes.

10  Q    And, in fact, you've testified that "best" is not a

11  scientific term, correct?

12  A    That very well could be.  It's not a scientific term,

13  "best."

14  Q    And you didn't even review, in concluding that it's the

15  best and most widely used, you didn't even go and review the

16  underlying studies and articles relied on by the NRC in 2000,

17  2001, while they were drafting the MTLs for the heavy metals at

18  issue here, correct?

19  A    That's not true.  I have looked at the relevant studies.  I

20  mean, they look across species, and I have reviewed the ones

21  specific to dogs and cats.

22  Q    Okay.  Let's go into that because I have testimony that

23  says otherwise.

24        What were the ones that you looked at as to dogs and

25  cats here?

123

Dr. Poppenga - Cross by Peterson

1    A    Well, the reference listed -- it's listed in the *Mineral*
2    *Tolerance of Animals*.  They have an extensive reference list at
3    the end, across species, all the information that they use to
4    form their opinions.  And, you know, I have looked through
5    those references and noted what studies had been used.
6    Q    You have -- when you say you have looked at those, when --
7    in drafting this report?  Or just throughout your career as a
8    vet toxicologist?
9    A    Yeah, I basically relied on the conclusions of the
10   committee of experts that came up with their opinions with
11   regard to safe levels.  It is useful to look at some of the
12   references that they used.  But I think as a committee they
13   were very competent in terms of providing a peer review of the
14   information that they used.
15   Q    Right.  In fact, you based your reliance on the MTLs on the
16   fact that the panel looked at all the studies and reviewed the
17   studies from the 1950s, the 1960s, the 1970s, cited in the NRC,
18   but you didn't do any independent review of those studies,
19   correct?
20   A    I did not do an independent critique of those studies, no.
21   Q    And, in fact, you've testified that some of those studies
22   were no doubt old, correct?
23   A    Well, really only in terms of when they were published.  I
24   don't think old necessarily doesn't -- that does not mean that
25   they're not useful or have useful information in them.

124

Dr. Poppenga - Cross by Peterson

1    Q    And you believe if there is new information, like the FDA

2    has stated in 2019 it's going to be collecting, it would be

3    prudent to revisit the MTLs, correct?

4    A    I think at some time that will probably happen.  The first

5    edition was 1980.  The second edition was 2005.  You know, a

6    related publication relied on extensively is the nutrient

7    requirements of dogs and cats.  That was in 2006.  I don't

8    think that's been updated since then.

9              So if the -- if the FDA, for example, Center for

10   Veterinary Medicine feels it's necessary, they will probably

11   ask the NRC to update the information.

12   Q    And so are you changing any of your expert opinions here

13   today about the MTLs and it being safe with the -- with the

14   note that further data should be studied and further data

15   should be -- or -- yeah, further data should be studied and

16   collected as to the bio-accumulation of heavy metals in dogs?

17   A    Well, you know, you're throwing in another term there,

18   "bio-accumulation."

19             Additional data is always useful, whether it

20   reinforces your already-formed opinions or changes those

21   opinions.  That's what science is all about.

22   Q    And do you know if any consumer knows about the MTLs?

23   A    I would think not.

24   Q    But you're not offering an expert opinion as to that,

25   correct?

125

Dr. Poppenga - Cross by Peterson

1    A    I'm not.  I don't know.

2    Q    And you're not offering an expert opinion as to whether a

3    consumer would agree with you as a veterinary toxicologist that

4    unless the dog foods are above the MTLs, there is no health

5    risk, correct?

6    A    I don't know whether they would agree or disagree with me.

7    Q    Dr. Poppenga, let's talk about the White Paper.

8              First, is the White Paper a peer-reviewed article?

9    A    It is not.

10   Q    And, in fact, the White Paper was drafted in a response to

11   a crisis at Champion because some -- a third party released

12   testing that showed heavy metals in Champion pet food, correct?

13   A    It's my understanding that it was in response to consumer

14   concerns, yes.

15   Q    And you don't know how many, if any, consumers saw the

16   White Paper, correct?

17   A    Well, the -- Champion put it on their website.  I think

18   they made the information readily available, but I don't know

19   how many consumers actually saw it, no.

20   Q    Right, you don't know, correct?

21   A    I don't know.

22             MS. PETERSON:  Could you please bring up the White

23   Paper averages?

24   BY MS. PETERSON:

25   Q    And, Dr. Poppenga, you did rely on the White Paper

126

Dr. Poppenga - Cross by Peterson

1  averages, which is the chart in front of you, correct, in your

2  opinions?

3  A   Yes.

4  Q   And you agree that this is averages and it's not actual

5  stated levels of the amount of heavy metals found in Champion

6  pet food, correct?

7  A   It does not provide the absolute range.  It provides a

8  standard deviation, which gives you some idea of what the range

9  might be.

10 Q   And no other article that you relied on in your report or

11 testing provided to you just stated averages, correct?  They

12 all actually had a specific level for a specific diet tested.

13 A   The peer-reviewed papers and the laboratory reports were a

14 specific concentration of a metal, yes.

15 Q   And is that also true for the NRC MTLs?  Was their data

16 based on actual levels that a pet food tested or was it based

17 on averages?

18 A   It was based upon the scientific literature, based upon

19 studies in a variety of different species.  To my knowledge,

20 they didn't use absolute numbers in forming their opinions.

21 Q   Okay.  And with regard to your reliance on the White Paper,

22 you never attempted to confirm whether these actually published

23 averages were correct.

24 A   Well, I looked at the spreadsheet that was provided to me.

25 I did not do calculations to verify the calculations in the

Dr. Poppenga - Cross by Peterson

1    White Paper, no.

2    Q    So you did no independent verification or examination of

3    the methodology used for the White Paper stated averages

4    because you had no reason to question the results, correct?

5    A    No, I think I mentioned earlier that I had talked to Gayan

6    Hettiarachi at Champion Petfoods and went through the

7    process -- the statistical process that he used.  I did not

8    look at the underlying certificate of analyses for the metal

9    results.

10                MS. PETERSON:  Can you pull up Number 49, please?

11   BY MS. PETERSON:

12   Q    So, Dr. Poppenga, your first report issued in one of these

13   cases was the one in the California Reitman action, correct?

14   A    Correct.

15   Q    And at that point, you had similar opinions, and you relied

16   on the White Paper, correct?

17   A    Correct.

18   Q    And at that point, you hadn't talked to Champion about the

19   weighted averages, correct?

20   A    Actually, it was -- I don't know the precise time, but it

21   was in 2019 when I had the conversation with Mr. Hettiarachi.

22   Q    And it was in response to the fact that we had asked you

23   about whether or not you had actually talked and done any

24   independent verification of the White Paper, correct?

25   A    That I don't have a recollection.  It could be.

128

Dr. Poppenga - Cross by Peterson

1    Q    Okay.  Because if you look in front of you, on page 30,

2    your testimony in the Reitman case, which was May 22nd, 2019,

3    the question starts -- I apologize.  On page 29, on line 25.

4              (Reading:)

5              "And would you -- as a scientist, do you typically

6    just accept someone else's results when examining their

7    methodology?"

8              Your answer is:  "It would depend on the

9    circumstances.  I had no reason to question the results they

10   put out in their White Paper table."

11             Do you see that?

12   A    Correct.

13   Q    So, again, you did no independent verification because in

14   your opinion, your expert opinion, you had no reason to

15   question the results, correct?

16   A    In this particular case, I took the averages at face value,

17   certainly.  And knowing the process and the underlying data

18   that was used, I didn't feel uncomfortable accepting that.

19   And, you know, I think if there's some questions about how the

20   data was derived or the process, I think probably

21   Mr. Hettiarachi can address that.

22   Q    But you weren't concerned at all of the fact that this was

23   to put out a fire by consumers because they cared about the

24   fact that they just found out there was heavy metals in the dog

25   food?

Dr. Poppenga - Cross by Peterson

1    A    Well, I think it was certainly in response to that.  I

2    can't get into the mind of, you know, the -- Champion in terms

3    of the motivation for doing that.  I think it was appropriate

4    that they provided information to consumers.  It's on the

5    website.  I think if you look at all of the data holistically

6    across a number of other sources of information, the averages

7    in the White Paper were not out of line with what has been

8    described elsewhere.

9    Q    But you didn't review all the underlying data for the White

10   Paper, correct?

11   A    Well, by "underlying data" --

12   Q    The test results.  You said you looked at a spreadsheet,

13   but you actually didn't look at all the underlying data that

14   Champion used to calculate its stated averages.

15   A    I didn't look at the methodology, no.  I think it's pretty

16   standard methodology for metal analyses, pretty

17   straightforward.

18   Q    And you actually don't even know if Champion tested all of

19   its diets in concluding the averages, correct?

20   A    I don't know -- I know how many were included in the White

21   Paper, and so the -- have no reason to think that that was not

22   representative of the foods that they produce.

23   Q    But you don't know if they tested every single diet,

24   whether it be from the Orijen line or the Acana line, in

25   drafting the White Paper, which is not peer reviewed, correct?

Dr. Poppenga - Cross by Peterson

1    A    So by every single diet, you mean every batch of food being
2    tested?  I don't know whether -- the extent of their testing of
3    the pet food in terms of individual batches of samples that
4    were tested.
5    Q    Do you know if -- and I apologize.  Diets.  Do you know
6    anything about what they tested?  Can you tell me anything
7    about what was the testing they relied on?
8    A    Well, there's a number of third-party -- third-party lab
9    results that pertain to Champion foods, extensive testing in my
10   view.  So, you know, I think that that's what I looked at is
11   what was done by not only their own laboratory, but by
12   well-recognized third-party laboratories.
13   Q    And are you aware if all of that testing was what was used
14   in calculating the stated averages in the White Paper?
15   A    It was not.
16   Q    Is that typical?  If you're going to, as a toxicologist,
17   you're studying poison, which you say dose -- what's your
18   saying again?  Dose is the response?  Is that the --
19   A    The dose makes the poison.
20   Q    Dose makes the poison.  Thank you.
21           So is that something that you would do, that you would
22   not include all the food that was tested and just, you know,
23   pick and choose which ones you're going to use to come to an
24   average?
25   A    Well, I think you can sample.  You don't have to use every

Dr. Poppenga - Cross by Peterson

1   result in your averages as long as the sample that you're

2   including in the analysis is representative of the larger

3   number of samples that you're concerned about.

4         MS. PETERSON:  I'm sorry.  You can take that down.  I

5   apologize for leaving that up.

6   BY MS. PETERSON:

7   Q    Okay.  And, Dr. Poppenga, you don't know if the White Paper

8   was based on testing that included ingredients, correct?

9   A    To my knowledge, no.

10  Q    Okay.  So it's only the end product, correct?

11  A    That's what I understand.

12  Q    But you do agree that the sourcing of ingredients is a

13  mechanism for how heavy metals can get into dog food, correct?

14  A    Well, the source ultimately is one ingredient or another

15  because it winds up in the final product.  So, yeah, the

16  ingredients are how it winds up in the complete ...

17  Q    Dr. Poppenga, let's go back to your Opinion 1, which is --

18        MS. PETERSON:  If you can put that up, please, again.

19  BY MS. PETERSON:

20  Q    (Reading:)

21        "Heavy metals occur in nature and the environment and

22  are routinely found in pet foods at safe levels."

23        Correct?

24  A    Correct.

25  Q    Okay.  Are you changing that testimony at all as to

132

Dr. Poppenga - Cross by Peterson

1   relation to the fact that more data should be collected?

2   A   No, I think there's extensive data that's available.

3   Q   And does that opinion take into consideration

4   bio-accumulation?

5   A   Well, it would because bio-accumulation would be taken into

6   account with regard to the MTLs or the EU guidance.

7   Q   How does that balance with the 2019 FDA statement that even

8   low levels can add up to concern so more data is required?

9   A   Well, I think surveillance is always good.  There has -- I

10  think that surveillance is part of the name of the game to

11  protect the food supply, whether for us or animals.  But the

12  bio-accumulation is something that would be accounted for in

13  the review and establishment of the MTLs or the EU guidance.

14  Q   So would you change this opinion to heavy metals occur in

15  nature and the environment and are routinely found in pet foods

16  at safe levels, but continued surveillance is a good idea?

17  A   I think for what I was asked to do, this is my conclusion.

18  I think that I would just leave it at that.

19  Q   Would you agree with what I just said?

20  A   I had not disagreed that continued surveillance is useful

21  and the FDA, that's what their mission is --

22  Q   And you actually --

23  A   -- is surveillance.

24  Q   Oh, I apologize.

25          And you actually agree that bio-accumulation is a

133

Dr. Poppenga - Cross by Peterson

1    recognized principle in toxicology, correct?

2    A    Absolutely.

3    Q    And that it's something that can occur in dogs, correct?

4    A    It can, yes.

5    Q    And it can occur with specific heavy metals, correct?

6    A    It can.

7    Q    Okay.  So let's go back to this opinion.

8             "Heavy metals occur in nature and the environment and

9    are routinely found in pet foods at safe levels."

10            Can I ask you, do you know the percentage of pet foods

11   that were tested that you relied on in determining that they

12   were routinely found in pet foods?

13   A    Percentages?  No.  I mean, there are the number of tests

14   that were actually run.

15   Q    Right, but you don't know if that represents 11 percent of

16   the market, 50 percent of the market, 90 percent of the market,

17   correct?

18   A    I would have no idea about that.

19   Q    Okay.  And, in fact, you don't even know what percentage of

20   Champion's pet food was tested in reaching that --

21   A    A percentage --

22   Q    -- opinion.

23   A    -- no.

24   Q    No.  Okay.  Because you also have a -- if we go to your

25   third opinion.

Dr. Poppenga - Cross by Peterson

1          MS. PETERSON:  Bring that up.

2     BY MS. PETERSON:

3     Q    You give an expert opinion about Champion's sufficient

4     testing, and it says, "Testing performed by Champion was

5     sufficient to identify whether there was an ongoing systematic

6     [sic.] presence of excessive amounts of metals of concern,

7     which there was not."

8          And are you changing this opinion in any way?

9     A    I'm not, no.

10    Q    Okay.  But you can't tell me today what actually was the

11    schedule at Champion for testing, correct?

12    A    I don't know exactly what their percentages were, as you

13    referred to, with regard to testing.  I think it's important to

14    point out there were multiple tests.  And I think what is

15    striking is how consistent those results are.  They were not

16    outliers, so to speak, unexpected results.  So I think they're

17    very consistent with, you know, their internal results and

18    what's been reported by others.

19    Q    But you can't tell me that the testing was quarterly,

20    yearly, correct?

21    A    I -- I cannot, no.

22    Q    And you can't even tell me, was it every diet or was it

23    just the fish diet, was it all of the meat diets, correct?

24    A    They tested a broad array of their products.

25    Q    But you don't know if it represented all their diets,

Dr. Poppenga - Cross by Peterson

1    correct?

2    A    I don't, no.

3    Q    And you don't know if they're continuing to test as of

4    today, correct?

5    A    Not specifically, no.  I would think they are, but -- I

6    looked at data up through 2018, '19.

7    Q    And you don't have an expert opinion as to what exactly was

8    the testing protocol followed by Champion, correct?

9    A    I did not look at documents that provided that information,

10   no.

11   Q    And, in fact, you say it was sufficient, but they didn't

12   test between -- they didn't distinguish between inorganic and

13   organic arsenic, correct?

14   A    Well, that's not true.  They did testing on a number of

15   their products for inorganic and organic --

16   Q    I apologize, that was a bad question.

17         Well, they did since they hired you for your report.

18   But the historical testing at Champion that was -- you relied

19   on and that the White Paper relied on did not test between

20   inorganic and organic arsenic, correct?

21   A    To my knowledge, no, that was the first time, but they did

22   not have any total arsenic values that exceeded the guidance

23   levels.

24   Q    And UC-D, your employer, does not test for inorganic and

25   organic, correct?

136

Dr. Poppenga - Cross by Peterson

1    A    We have the capacity to do that testing.

2    Q    But you don't do that when you test dog foods, correct,

3    based on your previous testimony?

4    A    We don't differentiate.

5    Q    And the FDA itself doesn't when it asks your employer or

6    UC-D to do heavy metal testing on pet foods, correct?

7    A    There's generally no need because we don't find arsenic

8    levels of concern and, therefore, there's no real need to

9    determine the form.

10   Q    And you testified that it was good that the White Paper was

11   on the website because Champion was telling consumers, correct?

12   A    Correct.

13   Q    But you also know that Champion actually doesn't update

14   that nor disclose their testing results on their labels,

15   correct?

16   A    I'm not aware that they do, no.

17   Q    And, in fact, they don't also do it on the website,

18   besides -- to this specific testing results, correct?

19   A    You'd have to ask Champion that.  I don't believe they --

20   I'm not aware of them updating.

21   Q    Okay.  Let's talk about then -- let's move on to your

22   opinions as to other pet foods.

23        Is it your understanding that this case is just about

24   Champion pet foods, correct?

25   A    That would be my understanding, yes.

Dr. Poppenga - Cross by Peterson

1    Q    And it's also your understanding that there's not a single

2    allegation as to harm to a dog from eating Champion pet foods,

3    correct?

4    A    I would probably disagree with that.  On your third amended

5    complaint, there is some reference to the FDA and safe levels,

6    particularly of arsenic.  And, you know, I think Dr. Pusillo in

7    his expert report has "safety" in the title.

8    Q    Well, again, you don't -- I'm saying that the plaintiffs

9    here do not allege that their specific dogs have injury based

10   on consumption of Champion pet food, correct?

11   A    To my knowledge, that's correct.

12   Q    Okay.  And, in fact, what's going on here is a question of

13   whether or not Champion, not other pet foods, Champion pet

14   foods was mislabeled, correct?

15   A    Well, I was retained to look at the safety issue, the

16   health risk of the metals in the pet foods.  And from that

17   standpoint, I don't see that there's any issue with regard to

18   adverse effects in dogs or cats.

19   Q    What about other pet foods?  Are you also opining today in

20   the Champion case that other pet foods are safe because they

21   all show testing under the MTLs?

22   A    Well, that's what I said.  And I think it's important to

23   put it in context, is that it is very common to find these

24   kinds of levels of metals in pet foods.  It's not unusual, and

25   Champion was not an outlier in that regard.

Dr. Poppenga - Cross by Peterson

1    Q    But you actually -- again, you say it's common, it's

2    routine, but you don't know the percentage of the pet food

3    market that you have reviewed testing of, you don't know if

4    that was 10 percent of the dog food on the market versus

5    90 percent of the dog food on the market, correct?

6    A    That's correct.  But I do want to point out that, you know,

7    the total diet study, looking at contaminants in our food

8    performed by the FDA, looks at a very, very, very small amount

9    of the food we consume.  So it's a very low percentage.  And

10   you can refer to, you know, some of the FDA documents with

11   regard to how many samples they would actually test.

12   Q    Okay.  So you're saying I get to say it's common because

13   the FDA got to say it's common, and something about human food,

14   then we're talking about dog food.  Is that your opinion?

15   A    I think with the number of tests that were run and the

16   consistency of the results, across brands, across different

17   formulations, it's not unusual to find low levels, safe levels,

18   of these metals in pet foods.

19   Q    Okay.  Yeah, I -- that's -- that is your expert opinion in

20   this case.

21        Okay, but let's go to your opinion Number 8.

22        MS. PETERSON:  If you can bring that up.

23   BY MS. PETERSON:

24   Q    That says, "It is clear that other pet foods purchased by

25   plaintiffs" followed the discontinuance -- "following

Dr. Poppenga - Cross by Peterson

1  discontinuance of Champion pet food had similar concentrations

2  of arsenic, cadmium, lead, and mercury."

3           Do you see that?

4  A   I'm looking at something different.  I'm looking at Opinion

5  8.

6  Q   Oh, that's not 8.  Sorry, that's 8 in my outline.  It's

7  your rebuttal report at 13.

8           You may not have it.

9           But if you -- I should put that in the -- I

10  apologize -- record.

11          MS. PETERSON:  Can we add into the record what has

12  been previously marked as Exhibit 9, which is the expert

13  rebuttal report of Dr. Robert Poppenga, dated March 29th, 2021,

14  please?

15          THE COURT:  Okay.  That will be admitted.

16      (Said exhibit received in evidence.)

17          MS. PETERSON:  Thank you.

18          I don't know what that is.  Is that the --

19  BY MS. PETERSON:

20  Q   Well, okay, so on that page -- on page 13.  So everyone

21  should have a hard copy of it since we're having problems with

22  the actual --

23          Do you see that your rebuttal opinion is, "It is clear

24  that other pet foods purchased by plaintiffs following

25  discontinuance of Champion pet food had similar concentrations

Dr. Poppenga - Cross by Peterson

1    of arsenic, cadmium, lead, and mercury."

2    A    Correct.

3    Q    Okay.  And can I ask if that opinion -- are you changing

4    that opinion at all today?

5    A    No.

6    Q    Okay.  And can you confirm if -- what testing that you

7    relied on in forming that opinion?

8    A    This was ongoing testing that was done on other brands of

9    pet foods.

10   Q    And was this testing that Champion provided to you?

11   A    It is.

12   Q    And was it testing that you also included in your opening

13   report?

14   A    Yes, uh-hum.

15   Q    Okay.  And is that the testing that's on page -- in your

16   Table 1 in your report, of your rebuttal report, if you look at

17   page 10?  Is that the basis for --

18   A    Yeah, that's -- that's definitely what we're talking about,

19   yes.

20   Q    Okay.  And so you believe that all of these had similar

21   levels to those of Champion pet foods, correct?

22   A    Yes.

23   Q    And you believe that this is all the food that Champion --

24   the plaintiffs purchased after buying Champion, correct?

25   A    I don't have knowledge of all the food, no.

Dr. Poppenga - Cross by Peterson

1    Q    But you believe this is representation of the food that

2    they purchased after they stopped buying Champion and not

3    before, correct?

4    A    That I am not sure that it's food that the -- I think the

5    plaintiffs had purchased and used in -- for their pets.

6    Q    But your opinion is that it's after.  You would have

7    confirmed that this is actual product they bought once they

8    stopped buying Champion based on your expert opinion, correct?

9    A    Yeah, it's my understanding that most was purchased after

10   discontinuing the Champion pet foods.

11   Q    Okay.

12        MS. PETERSON:  Can you pull up the White Paper

13   averages?  Again, the -- okay.

14   BY MS. PETERSON:

15   Q    So in this report, you have the parts per billion, correct,

16   on this page on Table 1?

17   A    It's off.  It probably is, yes.

18   Q    Because that's why the numbers are much larger than what

19   Champion put in their White Paper, which is parts per million,

20   correct?

21   A    Correct.

22   Q    Okay.  So it is your opinion that these levels -- for

23   instance, let's look at Purina Pro Plan Sport Salmon and Rice,

24   7.01 parts per billion is equivalent to the mercury average

25   in -- stated in the White Paper, which is .002 part per

Dr. Poppenga - Cross by Peterson

1   million, correct?

2   A   Correct.

3   Q   And what is .002 part per billion -- or million?  How does

4   that translate?  Can you do that math for me?

5   A   For parts per million to parts per billion?  Is that what's

6   you're after?

7   Q   Yeah.

8   A   That would be 20 parts per billion.

9   Q   20 parts per billion.  Okay.

10          And so let's go to arsenic, which is .89, correct?

11  A   Correct.

12  Q   And you would find that all other dog foods have the

13  similar level of .89, which is 890, correct?

14  A   That's 890 parts per billion, yes.

15  Q   Okay.  And if you look at, in your report, because you said

16  you also based it on the testing in the original report, which

17  is of all the competitor dog foods that Champion gave to you,

18  which is on page -- starts on page 17 -- or 14, I apologize, of

19  Exhibit 8 -- or -- sorry, page 15, Table 8 -- and now this

20  testing is also competitor dog foods, correct?

21  A   Correct.

22  Q   And this, again, is reported in parts per billion versus

23  parts per million that Champion does on its weighted averages,

24  correct?

25  A   Correct.

Dr. Poppenga - Cross by Peterson

1  Q    And here you'll see that some of them are bolded, correct?

2  A    Correct.

3  Q    And you bolded them because those were ones that tested

4  above Champion's?

5  A    Correct.

6  Q    And when you did that, is that based on the plaintiffs'

7  testing or Champion's internal testing or White Paper averages?

8  A    That was based on the White Paper averages.

9  Q    Okay.  And the White Paper averages are actually below a

10 lot of individual testing results, correct?

11 A    Correct.

12 Q    Okay.  So, here, would you agree that the majority of the

13 numbers are not bolded?

14 A    Well, you're sort of comparing apples to oranges here.

15 You're comparing individual test results against the White

16 Paper averages, but you have to look at the standard deviation.

17 So you have to look at the range that went into that average,

18 and that's going to vary from the .89 or the 890 parts per

19 billion arsenic.

20 Q    Well, but you're -- you're the one that compared the apples

21 and oranges.  You're taking individual testing results and

22 you're using White Paper averages.  That's our whole thing.  Is

23 that -- is that methodology something you would use?  You would

24 use averages over individual testing results in deciding

25 whether or not the dose is the poison in toxicology?  Isn't the

Dr. Poppenga - Cross by Peterson

1   actual number, the actual level, the most important thing?

2   A   Well, the averages are useful from the standpoint that

3   that's the average that an animal would be exposed to over a

4   period of time, not one individual product that has a little

5   bit higher or a little bit lower.  You look at the chronic

6   exposure.  So, you know, I think, you know, in the context of

7   whether these values that are found either in Champion or the

8   competitors are -- present a safety hazard, that's really the

9   criteria, right?  And none of these values do exceed the MTLs.

10  Q   And, in fact, you've testified that if one product had 35

11  parts per billion and another had 3,000 parts per billion,

12  which Champion has had, that those would be different

13  concentrations, correct?

14  A   Well, they're obviously different concentrations; but in

15  the context of what the question is, whether they're safe or

16  not, they're really not different.

17  Q   So are you going to change your opinion in the rebuttal

18  report that it is clear that other pet foods plaintiffs

19  purchased by -- purchased by plaintiffs following

20  discontinuance of Champion pet food had similar concentrations

21  of arsenic, cadmium, lead, and mercury because they all fell

22  under the MTLs?

23  A   Yes.  That's -- that's the -- that's the criteria that

24  we're using to make judgments about the importance of finding

25  these concentrations in the pet food.

Dr. Poppenga - Cross by Peterson

1  Q    Okay.  So that opinion is actually because we can add

2  because they're all under the MTLs.

3  A    Yes, you could add that.

4  Q    And then, Dr. Poppenga, just a few concluding questions.

5         Your counsel also talked to you about the Kim

6  article --

7  A    Correct.

8  Q    -- which you rely on and we've talked about before.

9         And I believe when you were asked about the Kim

10 article before, you said, yes, it's cited, but I don't -- I

11 didn't agree or I couldn't remember all the conclusions; but

12 when I read them to you, you didn't agree with them.  Correct?

13 A    What's the timing on that?  Was that today or --

14 Q    Oh, no, I apologize.  In a deposition -- I think our last

15 deposition together was when -- in one -- in a previous dep --

16 previous testimony, you -- I asked you about Kim and whether

17 you agree with the opinions at -- at the end, not just the

18 testing results, and you said you disagree, correct?

19 A    Well, from the standpoint that they actually contradicted

20 themselves in the other parts of the publication.  And it was

21 more of an opinion on the part of the authors, not based upon,

22 you know, any of the facts in the paper.

23 Q    It's a peer-reviewed article, correct?

24 A    That one was peer reviewed, yes.

25 Q    And do they say that -- anywhere in it that their

Dr. Poppenga - Cross by Peterson

1   conclusions shouldn't be considered because that's just side
2   commentary?
3   A   I've peer reviewed a number of papers over the years.  You
4   know, I think that's an imprecise exercise.  I don't know what
5   those particular peer reviewers had in mind with their
6   comments, but it is something that I would not agree with.  I
7   don't think there's a basis in fact based upon the results of
8   that paper.
9   Q   But you didn't actually put that in your expert opinion --
10  or report, I apologize, that you don't agree with the Kim
11  study, but you're only adopting the testing because you didn't
12  want to do your own testing.
13  A   Well, I think you've relied on the Kim study quite a bit
14  for that last opinion.  It was not germane because I did look
15  at the raw results that they got to compare to Champion foods,
16  and, indeed, they did test a few Champion products as well.
17  Q   But you could have done testing and not had to rely on an
18  article that you don't agree with the conclusion that consumers
19  may want to solicit information from companies regarding heavy
20  metal contamination before purchase, correct?
21  A   Well, in that article and multiple other spots, they said
22  that the concentrations that they were detecting they did not
23  feel were a risk to pets, so it seemed to contradict a lot of
24  their other opinions in that particular paper.  But for my
25  report, what I was interested in was looking at the data that

147

Dr. Poppenga - Cross by Peterson

1    they generated and comparing it to what we found in other

2    brands and other Champion products to see if there was any

3    difference.  And in my view, it was very consistent.

4    Q    But is that typical methodology to rely on an article that

5    you don't agree with and you think it contradicts itself when

6    you could have done your own heavy metal testing for those same

7    pet foods?

8    A    My own heavy metal testing, I mean -- go ahead and repeat

9    the question because I think you're asking two different --

10   Q    Have you ever, in any of your peer-reviewed articles or in

11   the -- in your work, decided to rely on a peer-reviewed article

12   that you disagree with, that you think contradicts itself

13   internally, instead of just going out and doing your own

14   testing?

15   A    Well, you look at the data that's in the paper and you make

16   an evaluation as to whether the data is good or not, whether

17   the statistics used was good or not.  You can disagree with

18   comments in a peer-reviewed article.  I mean, it happens all

19   the time in the discussion of the paper.

20   Q    Thank you, Dr. Poppenga.

21        So just one final question.

22        Your -- is it fair to say your opinions are about

23   whether or not Champion dog food is safe for a dog based on

24   heavy metals, BPA, or pentobarbital?

25   A    Correct.

Dr. Poppenga - Redirect by Baca

1    Q    Okay.  Thank you.  That's all I have.

2              THE COURT:  Okay.  Ms. Baca.

3              MS. BACA:  Just very brief, your Honor.

4                        REDIRECT EXAMINATION

5    BY MS. BACA:

6    Q    Dr. Poppenga, we've heard from Ms. Peterson.  She asked you

7    a few questions about how you didn't do your own testing.

8              Is it common for you when you're at UC-Davis to go,

9    you know, back and, you know, go under the microscope and

10   actually physically do the heavy metal or feed -- livestock

11   feed testing yourself personally?

12   A    I don't personally do it.  I mean, I have a staff that

13   actually runs the tests.

14   Q    And so is it common for you to take data from third-party

15   studies, from peer-reviewed articles, from other laboratories

16   outside of UC-Davis, and then to draw conclusions based off

17   those figures and data points?

18   A    Yeah, absolutely.  And if you trust the laboratories that

19   are doing the analyses, fully accredited laboratories running

20   official methods, you know, there's really no need to criticize

21   or, you know, be concerned about the values they're reporting.

22   Q    There was discussion today about how it's common in science

23   as a study, as a field, and for scientists to use additional

24   data and to have continuing surveillance and it's always nice

25   to have additional data points, but would you agree that you

Dr. Poppenga - Redirect by Baca

1    saw enough testing from Champion that, you said from 2008 to

2    2018, to form your conclusion about sufficient testing was done

3    and the opinions you reached in your report?

4    A    Yes.

5    Q    And so with the testing that you had in front of you, you

6    felt you had a sufficient amount of testing in order to draw

7    the conclusions you reached?

8    A    I did, particularly given the consistency across a number

9    of different sources of that information.

10   Q    Regarding the White Paper, are there any conclusions in

11   your report that are completely dependent on the White Paper?

12   A    No.

13   Q    Would you agree that the White Paper is just one data point

14   amongst other data points that you considered in your report?

15   A    Yes, I would agree with that.

16   Q    And would you agree that the averages in the White Paper,

17   you did not do the underlying mathematics to confirm those

18   averages because, in general, the White Paper averages were in

19   line with other test results that you reviewed for Champion?

20   A    Correct.

21        MS. BACA:  I have no further questions.

22        THE COURT:  Okay.  Do you have anything on that?  Any

23   redirect -- any recross on that?

24        MS. PETERSON:  No, your Honor.  Thank you.

25        THE COURT:  All right.  You may step down and be

Closing Statement - Kessler

1    excused.

2              If you could just throw away that little hat on the

3    microphone, please, I'd appreciate it.

4              Thank you.

5         (Witness excused.)

6              THE COURT:  All right, folks.  It's getting rather

7    late, so why don't I have you sum up -- do a summation argument

8    for the two that we heard today, and then we'll pick up with

9    the hearing at the next hearing date on the 21st.  Okay?

10             MR. KESSLER:  Thank you, your Honor.

11             So, again, now we are on Champion's motion to exclude

12   Mr. Boedeker.

13             Your Honor, plaintiffs, as Mr. Boedeker's proponent,

14   have the burden to show that his work and his opinions are

15   reliable and that they're relevant.

16             They failed to carry that burden here, your Honor.

17             I'd like to start by discussing with you

18   Mr. Boedeker's expectation survey.

19             We heard today, Mr. Boedeker sat there in front of us,

20   he told us he didn't use a control group.  He didn't, for

21   example, show one group of respondents a bag of Champion's pet

22   food with the challenged statements, show another group that

23   bag with those statements removed, and compare their responses.

24   He didn't do that.  He doesn't have any kind of control.

25             But, your Honor, why do we need a control?

Closing Statement - Kessler

1          Well, the reference guide on survey research, a

2    document Mr. Boedeker cites in his report, tells us that

3    without a control group it's not possible to determine how much

4    of a measured effect is attributable to survey respondents'

5    pre-existing beliefs or background noise.

6          And Mr. Boedeker admitted today that he doesn't know

7    what survey respondents' impressions would be without seeing

8    the challenged statements in this case.

9          He didn't test how many respondents would expect that

10   Champion's pet food doesn't contain heavy metals.

11         He didn't test how many respondents would otherwise

12   expect Champion's pet food not to have BPA.

13         He didn't test how many respondents would expect

14   Champion's pet food not to contain pentobarbital without seeing

15   the challenged statements.

16         And he didn't test how many respondents would

17   otherwise expect Champion's pet food to contain only fresh or

18   regional ingredients.

19         And at bottom, your Honor, he doesn't know if

20   respondents' expectations, as reported by him in his report,

21   are the result of Champion's labels, which he showed to

22   respondents, the result of respondents' pre-existing beliefs

23   about dog food in general, or some other background noise.

24         And plaintiffs today said, well -- you know, they

25   asked Mr. Boedeker, well, you know, the way the questions were

Closing Statement - Kessler

1   designed, there couldn't be a control group.  But, your Honor,

2   well, that's just a design defect.  The questions should be

3   designed in a way that there can be a control.

4           And, again, if we look at the reference guide, it

5   tells us that surveys that merely record consumer impressions,

6   exactly like Mr. Boedeker's expectation survey here, have a

7   limited ability to answer questions about the origin of those

8   impressions.

9           Now, your Honor, how do we know in this case that we

10  have an origin problem with the source of these impressions?

11          Well, Mr. Boedeker's own figures highlight it.

12          George, could we see, please, Slide 1?

13          THE COURT:  Oh, I have to give you the control.  Hang

14  on.

15          MR. KESSLER:  Thank you, your Honor.

16          Slide 1, please.

17          THE COURT:  Were you Defense 2 or 1?  Let's see.

18          THE CLERK:  Defense 2, your Honor.

19          THE COURT:  Okay.  There it is.

20          MR. KESSLER:  Thank you.

21          So, again, your Honor, the question was, well, how do

22  we know that there's an origin problem with these -- the source

23  of these impressions.  And the answer comes from Mr. Boedeker's

24  own figures.

25          When asked the question about "biologically

153

Closing Statement - Kessler

1    appropriate," how many respondents would expect that Champion's

2    dog food doesn't contain heavy metals, 38.8 percent of

3    respondents agreed.

4         When asked that exact same question about the

5    statement "nourish as nature intended," 38.8 percent of survey

6    respondents agree that they would expect the dog food not to

7    contain heavy metal.

8         Without a control group in the expectation survey, we

9    don't know what's actually driving that expectation about heavy

10   metals.

11        We don't know, again, is it the "biologically

12   appropriate" statement, is it the "nourish as nature intended"

13   statement, is it pre-existing beliefs that the respondents each

14   have, or is it something else altogether?  We don't know.

15        And, your Honor, a case out of this district by

16   Judge Gottschall, *Hernandez v. Attention*, which we cite in our

17   briefing, highlights this point.  The issue there was whether

18   specific language in a debt collection letter caused confusion

19   for its recipients.  And the plaintiffs in that case

20   commissioned a survey in an effort to show that the challenged

21   language did, in fact, cause confusion, but that survey didn't

22   use a control group, which would have been shown a version of

23   the letter without the challenged language.  That flaw of not

24   having a control group was a fatal flaw, Judge Gottschall

25   concluded, and noted that the purpose of a control group was to

Closing Statement - Kessler

1    make clear that any consumer confusion was caused by the

2    challenged language instead of something else.  That's the

3    origin problem we just discussed, your Honor.  And that's

4    exactly what the issue is here.  Is it the challenged language

5    or is it something else that's causing consumers' expectations?

6    We don't know.  And Mr. Boedeker admits that his survey didn't

7    even attempt to find out.

8            And, your Honor, this control problem is not something

9    new in these Champion cases.

10           In a related case, albeit a different survey, Judge

11   Stadtmueller from Wisconsin excluded a survey because it lacked

12   a meaningful control.  And he there wrote, "Without a valid

13   control group, the Court can't conclude that the survey is

14   reliable or helpful to the fact-finder."

15           So, your Honor, at bottom, without a control group,

16   Mr. Boedeker just has no benchmark to do what he claims to do,

17   which is measure consumer perception.  Again, he doesn't know

18   what's driving consumers' expectations in his expectation

19   survey.

20           And he admits that he didn't test cause and effect.

21   There is no causal inference from his survey.  That alone

22   renders his survey irrelevant to this case.

23           So without a control, Mr. Boedeker's expectation

24   survey is unreliable and it's unscientific, and his conclusions

25   are also unreliable.  His expectation survey for that reason

155

Closing Statement - Kessler

1    should be excluded.

2         And, your Honor, next I'd like to turn to

3    Mr. Boedeker's conjoint surveys.

4         Now, there are two problems with his conjoint surveys

5    that I'll discuss:  First, a lack of fit to plaintiffs' claims;

6    and, second, a failure by Mr. Boedeker to consider supply.

7         Excuse me.

8         So, your Honor, to begin with the lack of fit, we

9    heard today from Mr. Boedeker that his omissions survey

10   instruct respondents to assume that they are purchasing a bag

11   of their favorite dry dog food.  Not any product at issue in

12   this case.  Respondents' favorite dog food.  Boedeker even told

13   us today as he was sitting on the stand, Mr. Boedeker said his

14   intent was to test a dog food familiar to the respondents, not

15   necessarily test any product at issue in this case.

16        And in their briefing, your Honor, plaintiffs don't

17   even respond to this argument.  But the fact that Mr. Boedeker

18   doesn't test any product at issue renders his omission surveys

19   entirely irrelevant.  For that reason alone, the omission

20   surveys should be excluded.

21        And, your Honor, even if those omission surveys

22   collected data that had any value to the claims in this case,

23   which they don't, Mr. Boedeker's model doesn't and can't be

24   used to estimate damages when both misrepresentations and

25   omissions are at issue.  And we know plaintiffs' liability

Closing Statement - Kessler

1   theory here is based both on misrepresentations on and alleged

2   omissions from Champion's packaging.

3           So *Comcast*, of course, which we cite in our brief,

4   your Honor, tells us that plaintiffs' damages model must fit

5   with their liability theory, and here it doesn't.  Again,

6   Mr. Boedeker's model is incapable of calculating or estimating

7   damages when both misrepresentations and omissions are at

8   issue.

9           He's even admitted today under oath that his surveys

10  were separate and it would be inappropriate to combine the data

11  from those surveys.

12          George, can we see Slide 2, please?

13          So this is Appendix 4, which we discussed with

14  Mr. Boedeker, Appendix 4 to his report.  It's apparent from the

15  face of this appendix that Mr. Boedeker hasn't done and can't

16  calculate or estimate damages when there is any combination of

17  omissions and misrepresentations in this case.  These are all

18  broken out separately.

19          And Mr. Boedeker said today that these results are not

20  independent.  They can't be added together.  And we know that

21  they can't be added together, your Honor.  Mr. Boedeker even

22  admitted that there's overlap between some of these statements,

23  these misrepresentations and alleged omissions.  "Biologically

24  appropriate" and "heavy metals," for example, overlap.  "Fresh"

25  and "regrinds," for example, overlap.  Mr. Boedeker hasn't done

Closing Statement - Kessler

1  any work to quantify or estimate damages when those combined

2  misrepresentations and omissions are at issue in this case.

3          And, your Honor, we know we can't add these values

4  together just by looking at Mr. Boedeker's -- his numbers here.

5          George, can we see Slide 3, please?

6          For example, if we look at his misrepresentation

7  survey, you see we have in the middle, in the middle column

8  there, the median economic value, for "fresh" by itself a value

9  of 15.18; for "regional" by itself, a value of 13.29.  But

10 those two values combined, only 15.15, lower even than "fresh"

11 alone.  So we know we can't simply sum up the values in his

12 table.

13         Even if we did, your Honor, if we summed the values in

14 this table, we're left with a world where Mr. Boedeker's

15 damages estimate far exceeds even his best guess of retail

16 sales in Illinois, which really just gives us the absurd

17 proposition that Champion would be paying people to take its

18 dog food.

19         So, your Honor, because Mr. Boedeker admitted today

20 that he didn't do anything to quantify or estimate damages when

21 both misrepresentations and omissions are at issue in this

22 case, his model and his damages estimates just don't fit

23 plaintiffs' claims.  To the extent that he suggested he could

24 do additional work once the Court rules on summary judgment and

25 we know precisely what omissions or representations are at

Closing Statement - Kessler

1  issue, that constitutes a new opinion, your Honor. He hasn't
2  done that work. He hasn't set out any way to estimate those
3  combinations. That's just an impermissible new opinion that we
4  have heard of for the first time today.
5          Your Honor, I'd like now to turn to the next issue
6  with Mr. Boedeker's conjoint surveys, which is the fact that in
7  his model he hasn't considered the supply side in the but-for
8  world.
9          So courts around the country, your Honor, exclude
10 conjoint surveys like Boedeker's and, in fact, Mr. Boedeker's
11 conjoint surveys for this precise failure, for failure to
12 account for the supply side of market price in the but-for
13 world.
14         The *General Motors* case, which we cite in our
15 briefing, is instructive. There, the Court excluded
16 Mr. Boedeker's conjoint survey, which was offered to estimate
17 economic damages resulting from GM's failure to disclose
18 defective ignition switches. There, like here, Mr. Boedeker
19 assumed that the supply curve would stay the same in the
20 but-for world. He even in his report in that case included a
21 section entitled "Consideration of Supply," just like he did in
22 his report in this case.
23         But the *GM* court concluded that Mr. Boedeker's
24 demand-side-only evidence failed to estimate hypothetical
25 market conditions, and it failed to qualify as evidence of

Closing Statement - Kessler

1    damages.  And to assume, the *GM* court noted, as Mr. Boedeker
2    does, that GM would sell the same number of vehicles in the
3    but-for world, despite commanding a lower price for each
4    vehicle at the same marginal cost, is to assume a massive
5    forced sale.  In other words, Mr. Boedeker wasn't calculating a
6    but-for market price.

7           And, really, that's exactly what we see here with
8    Mr. Boedeker's damages estimates, damages estimates, again,
9    that exceed retail sales.  He's assuming a massive forced sale
10   on Champion's part.

11          So, your Honor, by modeling only demand in the but-for
12   world, Mr. Boedeker has estimated at best only half of the
13   equation.  He cannot estimate market price in the but-for
14   world, which, of course, we know is the intersection of demand
15   and supply.  And if he can't estimate market price in the
16   but-for world, he certainly can't compare market price in the
17   but-for world with market price in the actual world, that
18   difference being the quantification of damages that plaintiffs
19   seek.  His model is incapable of offering that estimate.

20          Now, your Honor, plaintiffs have said and are going to
21   say, well, Mr. Boedeker didn't need to model supply.  He
22   accounted for supply because he held supply constant.  And they
23   cite in their brief a string cite of cases suggesting that if
24   supply is held constant, supply is adequately accounted for in
25   a conjoint survey, and they have cited several cases allowing

Closing Statement - Kessler

1  conjoint to proceed on that basis.

2          But, your Honor, if we look closely at those cases,

3  they actually cut against plaintiffs.

4          So, to begin, two of them have no analysis of the

5  supply side factors.  But the cases that actually take up the

6  supply side issue note that where holding supply constant

7  satisfies and works for a conjoint study, it's in instances

8  where real-world pricing data and real-world quantity is known.

9  Those are the two important factors that all of these cases

10  identify:  Real-world pricing data, real-world quantity.

11          These cases that had real-world pricing data and

12  real-world quantity are what the *GM* case refers to as classic

13  mislabeling cases.  But, your Honor, this is not what we have

14  here.  This is not a classic mislabeling case.

15          Mr. Boedeker admitted today he doesn't have retail

16  sales data.  In fact, he had to resort to the AVMA estimates of

17  sales to come up with a best guess of Champion's sales in

18  Illinois.  He doesn't know the quantity that was sold to the

19  class.

20          He also admitted he doesn't know the actual price that

21  any respondent -- I'm sorry, not respondent -- that any

22  putative class member paid.

23          So Mr. Boedeker doesn't have actual quantities, and he

24  doesn't have actual prices, so he can't hold either of those

25  constant in his model.

161

Closing Statement - Kessler

1      So, your Honor, even under plaintiffs' shortcut

2    approach to supply, Mr. Boedeker's model fails.

3      So, your Honor, because Mr. Boedeker's conjoint

4    surveys do not and cannot estimate the damages that plaintiffs

5    seek, his conjoint surveys and his opinions based upon them

6    should be excluded.

7      Finally, your Honor, I want to touch on a

8    methodological error that flows through all of Mr. Boedeker's

9    work, and that is his survey populations are irrelevant.

10     So of course we know that the putative class in this

11   cases -- and Mr. Boedeker writes it in his report -- but the

12   putative class here is limited to persons residing in Illinois

13   who purchased Orijen or Acana pet foods during the relevant

14   time period.

15     In Mr. Boedeker's expectation survey, only 3 -- 1, 2,

16   3 -- out of 500 respondents live in Illinois and purchased or

17   even considered purchasing Champion's pet foods in the last

18   three years.

19     Similarly, in his conjoint surveys, only 4.1 percent

20   or less than 100 out of nearly 2,400 respondents live in

21   Illinois and purchased or considered purchasing Orijen or Acana

22   foods.

23     And there's no analysis in Mr. Boedeker's report

24   comparing Illinois consumers to consumers across the nation,

25   for example, in Texas or Vermont or California, and there's no

Closing Statement - Kessler

1  basis to conclude that data that he gathers from a nationwide

2  panel is in any way representative of Illinois purchasers of

3  Champion's products.

4       As this very Court noted in the *Competitive Edge* case,

5  which we cite in our briefing, your Honor, the probative value

6  of a survey depends largely on the universe of respondents, and

7  the reliability of a survey is diminished if the universe of

8  desired respondents is erroneous or undefined.  That's what we

9  have here, your Honor.  We have an erroneous population of

10  survey respondents.

11       So, your Honor, to briefly conclude, Mr. Boedeker's

12  expectation survey is unreliable because it lacks a control.

13  And without one, Mr. Boedeker cannot isolate the source of

14  consumers' expectations.

15       And Mr. Boedeker's conjoint surveys are irrelevant

16  because they lack fit to plaintiffs' claims.  First and again,

17  the omission survey doesn't relate to any at issue product.  It

18  relates to some wide variety, some unknown list of survey

19  respondents' favorite dry dog food.  And, second, the surveys

20  cannot be used to estimate damages if both alleged

21  misrepresentations and alleged omissions are at issue in this

22  case.

23       Boedeker admits as much -- sorry, Mr. Boedeker admits

24  as much today, that he doesn't have that analysis and he can't

25  provide those damages estimates.

163

Closing Statement - Kessler

1     The conjoint surveys fail for the additional reason,

2   your Honor, that they fail to consider supply side factors.

3     And, again, you'll hear from plaintiffs that we don't

4   need to consider supply when we -- supply when we hold supply

5   constant.  But, your Honor, courts that have permitted that to

6   proceed have found that supply was held constant when we have

7   actual quantity and actual sales prices.  Here, we don't have

8   actual sales prices, and we don't have actual quantity.  We

9   don't have either of those two factors to hold constant.

10     And, finally, your Honor, all of Mr. Boedeker's work

11   is unreliable because his data is generated from surveys with

12   irrelevant populations.  In fact, we can count on one hand the

13   number of survey respondents in the expectation survey that

14   actually live in Illinois and bought an at issue product.

15     So, your Honor, in light of the flaws in

16   Mr. Boedeker's work, plaintiffs simply cannot carry their

17   burden of demonstrating that his opinions are relevant or

18   reliable.  They're neither.

19     For all the reasons I've discussed now and as set

20   forth in our briefing, Mr. Boedeker's surveys and opinions

21   should be excluded from this case.

22     THE COURT:  Okay.  Thank you.

23     MR. KESSLER:  Thank you.

24     THE COURT:  Response?

25     MR. GUSTAFSON:  That is a noisy process, your Honor.

Closing Statement - Gustafson

1    THE COURT:  Oh, my gosh, sit through six weeks of

2  that.

3       (Laughter.)

4       MR. GUSTAFSON:  I can imagine.

5       Your Honor, I spent a lot of time this morning telling

6  you what Mr. Boedeker was going to say with respect to these

7  issues.  They have been briefed by the parties.  And I'm not

8  going to elaborate for long on our closing position.

9       But let me just say that those are perhaps issues that

10  will sound nice for cross-examination at trial.  These are not

11  issues that go to the validity of the surveys.

12      The defendants admit that conjoint surveys are well

13  accepted in the scientific community.  They don't take issue

14  with Mr. Boedeker's qualifications.  Rather, they pick around

15  the edges at things that they think he could have done

16  differently if they -- because they think that that would have

17  affected the results.

18      We didn't move to exclude their survey expert,

19  Dr. Hanson, because he didn't do any surveys.  I can't wait to

20  cross-examination -- cross-examine him in front of the jury

21  when he criticizes Mr. Boedeker and he doesn't have any results

22  that would show a different outcome.

23      With respect to the expectation survey, they go on and

24  on about the lack of a control group.  You heard Mr. Boedeker

25  tell you why he didn't need a control group.  He wasn't trying

Closing Statement - Gustafson

1    to demonstrate a cause and effect situation.  He wasn't trying

2    to compare two things like in a trademark case the likelihood

3    of confusion as between two symbols or two phrases.

4          What he was trying to do was show only that the

5    positive effect of those statements matter to people.  He

6    didn't try to quantify them.  He didn't -- he doesn't -- he

7    doesn't take issue.  He doesn't say this caused that.  All he

8    was doing was demonstrating that the statements made on those

9    bags mattered to consumers.

10         And they -- if you look at the "Reference Manual on

11   Scientific Evidence," which both parties cite, if you look at

12   the citations in their brief to that manual, when they talk

13   about using a control group, they're talking about surveys that

14   are different than the one Mr. Boedeker did.  The one

15   Mr. Boedeker did doesn't require a control group, and it's

16   perfectly fine.  To the extent that they want to cross-examine

17   him on those issues, that's what -- that's what trial is for.

18   But this easily meets the test with respect to admissibility

19   under *Daubert*.

20         With respect to the conjoints, as I said, the conjoint

21   surveys, well-accepted in the science, well-accepted by the

22   courts, and, in fact, the case that they cite to you as the

23   most important case, the *GM Ignition Switch* case, says exactly

24   what I said this morning.  Conjoint is perfectly suited for the

25   classic mislabeling case, which is what we have here.

Closing Statement - Gustafson

1    And let me just touch for a second on this notion that

2 there should have been only Champion buyers in Illinois.  They

3 don't have regional differences in their packaging.  They sell

4 their product nationwide.  Orijen, Acana, every single product,

5 the bag is the same whether it's sold in Illinois, Nebraska,

6 Minnesota, California.  Every consumer sees the same label with

7 respect to those surveys.  And you heard Mr. Boedeker talk

8 about the fact that he's done these surveys in other cases and

9 that these results are consistent across those cases.

10    Let me just say for a second, the reference to the

11 Wisconsin case, that was a different surveyor -- different

12 survey expert and also not a conjoint survey.  So to the extent

13 that there's a comparison to the Wisconsin case that they just

14 brought up a minute ago, it's not even a conjoint survey.

15    With respect to the supply side -- and I suggest you

16 look at the cases -- the cases are pretty clear that if it's a

17 product defect case, if it's a complex product like a car,

18 automobile, if there is a secondary market for the product,

19 that the supply side analysis needs to be deeper.  It's frankly

20 just false to say that Mr. Boedeker didn't consider the supply

21 side.  He considered it.  He just didn't consider what they

22 think he should have considered.  That's a classic

23 cross-examination topic.  He took into account the units they

24 sold and the prices that they provided to him in discovery.

25    You know, they love to use this analysis of he had to

Closing Statement - Gustafson

1   make an estimate of the Illinois sales from the association.

2   That's dividing up how much of their national sales went to

3   Illinois.  That doesn't have anything to do with how many units

4   were actually sold and what the suggested retail prices were.

5   He knew that.  He got it from them.  That was the best

6   information that was available.  It is not, like the cases that

7   they cite, a situation where Mr. Boedeker made up the prices

8   based on his assumptions.  He took the range of prices from

9   their data.  Their data.  That was the best information that

10  was available, and that's what covers the gamut of the supply

11  side analysis.

12          There are certainly things, Judge, that they rightly

13  feel like they can criticize Mr. Boedeker about.  But just like

14  your *Staples* case, they referenced it, just like your *Staples*

15  case, Mr. Boedeker took the right population, he took the

16  people who were interested in premium dog foods, he took people

17  who owned a dog within the last three years, so they were in

18  the market for dog food, he took the people who had either

19  purchased or considered purchasing that premium dog food, that

20  was the target population for his surveys, and he is right on

21  target for this case.  That's exactly what this case is about.

22  People who went to the store and looked at the product labeling

23  and made a decision based on that labeling whether that product

24  was fresh, regional, et cetera.

25          With respect to the omissions and the favorite dog

Rebuttal Statement - Kessler

1    food, of course they can't show the Champion labels with the

2    omissions on them because the omissions are by definition not

3    there.

4           So Mr. Boedeker did what he thought was the best

5    alternative, which was to provide people with omissions saying

6    if you -- if you knew this information, how likely would you be

7    to buy the dog food?  It's a question -- there's no way to know

8    how Champion would disclose this information if they had been

9    truthful in their disclosures in the first instance.

10          So I'll wrap up by saying there's certainly fodder

11   here for them to cross-examine Mr. Boedeker.  You heard some

12   today, and you should hear the same at trial.  This is not a

13   situation where his survey lacks the reliability to the extent

14   that it should be discarded.

15          Thank you.

16          THE COURT:  Okay.  Thank you.

17          MR. KESSLER:  May I briefly respond?

18          THE COURT:  Very briefly.

19          MR. KESSLER:  Thank you, your Honor.

20          So, your Honor, with respect to the expectation

21   survey, Mr. Boedeker's lack of a control group does not merely

22   pick around the edges as plaintiffs' counsel suggests.  Rather,

23   it goes to the heart of the scientific method.

24          This Court, your Honor, in a case *Moore* that we cite

25   in our briefing, noted that the most significant *Daubert* factor

Rebuttal Statement - Kessler

1   is whether the scientific theory has been subjected to the

2   scientific method.

3           Mr. Boedeker's lack of a control goes to the heart of

4   that method.  His method is unreliable, and his expectation

5   surveys should be excluded.

6           Your Honor, to the extent that Mr. Boedeker testified,

7   well, there was no cause and effect -- there was no causal

8   proposition in the expectation survey, well, your Honor, then

9   these expectation surveys are telling us nothing of value to

10  this case.  They're irrelevant.  To say that I was only

11  interested in a positive effect of particular statements,

12  Mr. Boedeker can't show a positive effect of any particular

13  statements.  He has an origin problem.  We talked about that.

14  We looked at his different figures.  He doesn't know what

15  statements are driving consumers' expectations.  How then can

16  he quantify a positive impact?  He simply can't, your Honor.

17          Plaintiffs -- with respect to Mr. Boedeker's conjoint

18  surveys, plaintiffs have said, well, this is a

19  well-established, well-accepted methodology.  And, your Honor,

20  like I -- like I mentioned that we were going to hear that this

21  was according to plaintiffs a classic mislabeling case.  And,

22  again, your Honor, in these quote, unquote, classic mislabeling

23  cases, an expert has had both a known quantity and a known

24  price point.  Mr. Boedeker testified today he does not know the

25  price that any class member paid.  And he doesn't have

Closing Statement - Peterson

1    quantity.  He doesn't have a known quantity in Illinois, which

2    is the putative class that we're looking at.  That is the

3    relevant -- the relevant quantity for the purposes of his

4    model.

5                    THE COURT:  Okay.

6                    MR. KESSLER:  He has no quantity in Illinois.

7                    THE COURT:  I don't think I need any more reply

8    because I have to get going, and I want to hear from the other

9    lawyers, and you have covered this.

10                   So let me hear a follow-up on the other expert,

11   please.

12                   Start with the movant.

13                   MS. PETERSON:  Sorry.  I'm going to keep it super

14   short because you've heard the testimony.  You have our

15   briefing.  But the main thing is we don't think that

16   Dr. Poppenga's opinion fits in this case.  This case is not

17   about whether or not the actual consumption of the Champion pet

18   food injured any plaintiff.  It's about whether -- the fact

19   that a consumer was misled because they didn't know there was

20   heavy metals, and they care about heavy metals because of the

21   potential risks, including bio-accumulation.  So the big thrust

22   of our motion is that it's irrelevant, it doesn't fit, he

23   doesn't need to come.

24                   The second is, even if you find it's relevant, his

25   methodology, for the reasons that are discussed in our motion

Closing Statement - Baca

1  and was highlighted by his testimony -- he testified today he

2  didn't do his own testing.  He didn't confirm the testing he

3  relied on.  The MTLs, he agrees that there should be

4  additional, what should I say, collection of data.  And he, in

5  fact, even changed one of his testimony -- one of his opinions

6  this morning in court saying that he would agree that it should

7  be because it's below the MTLs.

8            So I think after today and in our motions, it's clear

9  that, one, his testimony is not relevant; and, two, even if it

10 is relevant, his methodologies as to the MTLs and testing,

11 which is the majority of the bases for his heavy metal

12 opinions, should be excluded.

13           Thank you.

14           THE COURT:  Okay.  Thank you.

15           MS. BACA:  Elisa Baca on behalf of Champion Petfoods.

16           Champion offered Dr. Poppenga as an expert in this

17 action.  He is a professor of Clinical and Diagnostic

18 Veterinary Toxicology and head of the Toxicology section at

19 UC-Davis.  His qualifications are not at issue in this case.  I

20 point the Court to his C.V., which is very extensive, as to his

21 qualifications.

22           Plaintiffs claim in the third amended complaint that

23 the presence or the risk of the presence of arsenic, cadmium,

24 mercury, and lead or BPA in Champion's dog food or the risk of

25 the presence of pentobarbital in Champion's red meat diets

Closing Statement - Baca

1   renders Champion's dog food packaging misleading.

2          Plaintiffs' main critique with Dr. Poppenga is that

3   his opinions on the safety of Champion's dog food is

4   irrelevant.  But safety remains relevant in this case for both

5   context and for materiality.

6          Throughout the third amended complaint, the plaintiffs

7   are referring to the substances as undesirable, as unnatural,

8   as contaminants, that cause health risks, and cause adverse

9   health issues.  The third amended complaint also defines

10  Champion's dog food as the contaminated dog food.

11         Plaintiffs argue that the risk of the presence of

12  those substances is material to consumers' purchasing decisions

13  because they are associated with those health risks to dogs and

14  humans.

15         And so the concept of risk has a negative connotation.

16         When somebody takes a risk, usually it's not a great

17  thing.  And so with the implication that there's a risk

18  associated with Champion's dog food, it's saying that something

19  is wrong or unhealthy or unnatural or unsafe about Champion's

20  dog food.

21         So plaintiffs really want to have their cake and eat

22  it, too, when it comes to the safety argument because

23  plaintiffs are citing to the FDA and the EPA and other sources

24  to exemplify health risks in their third amended complaint.

25         They're also relying on an advertising executive,

Closing Statement - Baca

1    Mr. Silverman, who testified at his deposition that the words
2    "heavy metals" are alarming to consumers.
3              And then plaintiffs served an expert report of
4    Dr. Pusillo titled "The Evaluation of Champion Petfoods for
5    Safety."
6              And so it's Champion's position that plaintiffs have
7    actually placed safety at issue in this case.
8              And so the Court should not allow plaintiffs to have
9    the sword of using the scary-sounding terms like "arsenic" and
10   "cadmium" that can alarm consumers or a jury with little to no
11   scientific background, and then deprive Champion of the shield
12   of placing it into context.  And that's exactly what this Court
13   ruled in the case *Martin versus F.E. Moran, Incorporated*, in
14   2017.  This Court held that one expert's testimony was relevant
15   because it, quote, will be helpful in contextualizing the other
16   evidence at trial.  And another expert's testimony was
17   relevant, quote, to provide a broader context for plaintiffs'
18   claims.
19             And so Champion offers Dr. Poppenga to provide
20   critical context about where are heavy metals found, if they're
21   naturally occurring, where is BPA found, and how many of these
22   substances are found in most human and dog foods and only found
23   at Champion's dog food in low levels.  And so this goes to
24   materiality, this context.
25             Plaintiffs, in their *Daubert* motion, they argue that

Closing Statement - Baca

1    this is not a toxic tort case and safety is not at issue

2    because they're not worried about the death of any of the dogs

3    of the plaintiffs.  And in doing so, they've relied on the Rule

4    12 order.  But, respectfully, the Rule 12 order has limited

5    applicability at this stage of the case.

6         As the Court knows, on a motion to dismiss, it needs

7    to construe the lights [sic.] of -- the facts most favorable to

8    the plaintiff.  It's confined to the four corners of the

9    complaint.  And the second amended complaint, it could have

10   been construed in a way that it made it seem like Champion had

11   advertised its food as free of BPA or free of heavy metals and,

12   in part, that was due to an image of a brochure with Champion's

13   allegations underneath it talking about how the food was free

14   of anything that you wouldn't expect to be in there.

15        But with the record now in this case, it's clear that

16   that language is not on Champion's packaging.  It's not on the

17   bags.  Plaintiffs did not see it on the bags.  And Champion did

18   not add heavy metals or BPA into their foods.

19        And, in addition, the Rule 12 order, it held that the

20   success of plaintiffs' claims to survive on a motion to dismiss

21   did not need to allege what level it was that the heavy metals

22   became unsafe.  And so the Court was concerned about the level.

23   At what point was it unsafe?

24        And so in doing so, the Court still recognized, on

25   page 3 and page 13 of its order, that there were potential

Closing Statement - Baca

1    health risks associated with heavy metals.

2              And when the Court really got down to the crux of the

3    case, it looked at the related case, *Leppert*, which was a cat

4    food case also before this Court, for Champion.  And it said

5    that plaintiffs thought the food was healthy and natural.  And,

6    again, this goes back to context, your Honor.  Dr. Poppenga

7    testified that heavy metals are natural because they're

8    naturally found.  That's helpful for the context of this case.

9    Dr. Poppenga explains that these metals are not harmful or

10   unhealthy.  Again, that goes to plaintiffs' thinking that the

11   food was healthy.

12             So, again, based on the context, he is necessary for

13   this case.

14             Plaintiffs raised two additional arguments in their

15   *Daubert* motion.  I'd like to briefly address those as well.

16   Plaintiffs' second argument is that Dr. Poppenga's reliance on

17   the MTLs, the EU guidance, and these No Observable Effect

18   Levels results in Dr. Poppenga reaching a legal conclusion

19   about whether there's a duty to disclose that's being

20   triggered, but that argument needs to be rejected.

21             Dr. Poppenga has not argued that Champion has no duty

22   to disclose.  He has not advocated that this Court needs to

23   adopt the MTLs.  He does not opine that Champion's heavy metals

24   are under these levels and, therefore, Champion has no

25   liability.  He has testified today, these are guidelines and

Closing Statement - Baca

1   benchmarks.  They are helpful for him for comparison purposes

2   and in no way form liability conclusions for this Court.

3        Should the Court have any concerns, I believe that

4   this is a perfect time to use a limiting instruction for the

5   jurors to not get confused with these guidelines.

6        Finally, the last argument plaintiffs raise in their

7   *Daubert* motion is that Dr. Poppenga has not used a reliable

8   methodology.  And they make that argument in two ways.  I'll

9   begin with the first.

10       To be clear, plaintiffs' *Daubert* motion does not argue

11  that Dr. Poppenga has cherrypicked which test results he used

12  in his expert report.  The *Daubert* motion also does not argue

13  that Dr. Poppenga cherrypicked which scientific studies he's

14  using in his report.

15       What plaintiffs argue is that Dr. Poppenga did not

16  address some sentences inside of the scientific studies he

17  relied on.

18       And he did not actually disagree with the Kim study.

19  When I questioned him on direct exam, we discussed how Kim

20  tested 51 pet foods, including Champion's two brands, Acana

21  Orijen, and that Kim concluded all the levels they saw were

22  safe.  So he agreed with Kim.  What he did not agree with was a

23  sentence at the end that he felt was an opinion of the authors.

24  However, that opinion said that some consumers might want to

25  inquire to pet food manufacturers about heavy metals, and we

Closing Statement - Baca

1   learned later in our testimony from Dr. Poppenga that the White

2   Paper by Champion was put online for consumers that did

3   inquire.  So Champion is really not contradicting what the Kim

4   authors are saying here.

5           So, therefore, with regards to that argument about the

6   stray sentences in these studies, I think we can put that to

7   bed.

8           The final argument that plaintiffs raise is for

9   reliability of his methodologies regarding the White Paper.

10          So the White Paper -- there's some background for the

11  Court because plaintiffs referred to a fire being put out.

12  Really, the White Paper was created in response to an

13  organization called The Clean Label Project that raised some

14  concerns online about Champion's pet food containing heavy

15  metals.  And as a result to The Clean Label Project's ranking

16  of Champion pet foods, as well as some of their social media

17  tactics, Champion decided that they would put out a White Paper

18  to discuss heavy metals and place it online as a place where

19  they can point consumers to this document should they have any

20  questions.

21          And so the White Paper's averages are really just one

22  data point among many that Dr. Poppenga relied on.  He

23  testified to that, that even if the White Paper did not exist,

24  he wouldn't change his conclusions.  He had so many other

25  things that he looked at to reach his conclusions that the

Closing Statement - Baca

1    White Paper really didn't make or break it for him.

2           In addition, Champion's fact witnesses really will be

3    able to provide the necessary factual foundation for the White

4    Paper.  So if there's really any confusion or question about

5    why were certain test results left out, why were only certain

6    years, you know, used in the White Paper, any questions that we

7    have and that Dr. Poppenga could not answer would be able to be

8    answered by Champion's fact witnesses.

9           And how many and which tests Champion used for the

10   White Paper is insignificant really because this is not a case

11   about what happened back at the factory and Champion's

12   adherence to a test schedule and how often they were testing.

13   This is a mislabeling case, as you know.  And, therefore, I

14   think the White Paper arguments can also be put to rest.

15          In conclusion, your Honor, based on the testimony from

16   Dr. Poppenga, the argument that I've put before you today, as

17   well as our briefing, we believe that Dr. Poppenga should be

18   allowed to testify in this case should this go to trial, and

19   that his opinions should be admitted.

20          Thank you.

21          THE COURT:  All right, folks.  There you go.  Right

22   about a little over four hours.  So I have to move on, and I

23   will see you again -- what day do we have?  The 21st?

24          MR. GUSTAFSON:  22nd.

25          THE COURT:  Oh, 22nd?  First day of autumn it says on

1   my calendar here.

2        All right.  Thank you for that.  And we'll pick up

3   with the video person?  Is that correct?

4        MS. PETERSON:  Yes.  There will be -- and then I

5   believe one live -- we'll have a video and a live.

6        THE COURT:  Okay, great.  Have a nice evening.

7        MULTIPLE SPEAKERS:  Thank you, your Honor.

8     (Concluded at 4:27 p.m.)

9             C E R T I F I C A T E

10    I certify that the foregoing is a correct transcript of the

11  record of proceedings in the above-entitled matter.

12

13  */s/ GAYLE A. McGUIGAN*             *September 16, 2021*
     GAYLE A. McGUIGAN, CSR, RMR, CRR

14  Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25