IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AFSHIN ZARINEBAF and ZACHARY CHER-NIK, individually and on behalf of a class of similarly situated individuals, | ) ) ) | No. 18 C 6951 |
| | ) | |
| *Plaintiffs*, | ) | Hon. Virginia M. Kendall |
| v. | ) | |
| | ) | |
| CHAMPION PETFOODS USA INC. and CHAMPION PETFOODS LP, | ) ) | |
| | ) | |
| *Defendants*. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is a putative class action brought by Plaintiffs Afshin Zarinebaf, Zachary Chernik, and Joan Meyer (collectively, "Plaintiffs") on behalf of Illinois consumers. The consumers are purchasers of dog food who allege that they were deceived by the packaging on the dog food that indicated that the food was nutritious and fresh when in fact it contained amounts of various metals and unnatural ingredients. Defendants Champion Petfoods USA Inc. and Champion Petfoods LP (collectively "Champion") responded to the allegations by asserting that the trace amounts of alleged contaminants contained within the dog food is negligible, found in nature, and safe. Both parties moved to exclude proffered experts. The Court held Daubert hearings to review the testimony in its gatekeeping function. Defendants move to exclude the proposed testimony of Plaintiffs' experts Stefan Boedeker [116], Bruce G. Silverman [112], Dr. Sean Callan [110], and Dr. Gary Pusillo [107]. Plaintiffs move to exclude the proposed testimony of Champion's expert Dr. Robert Poppenga. [140]. For the following reasons, the motions to exclude Boedeker, Silverman, and Poppenga are denied. The motions to exclude Pusillo and Callan are granted.

1

## BACKGROUND

In their Third Amended Complaint ("TAC"), Plaintiffs allege that Champions' ORIJEN and ACANA branded dog food contains or has a risk of containing heavy metals, Bisphenol-A (BPA), pentobarbital, non-regional ingredients, non-fresh ingredients, and/or unnatural ingredients. (Dkt. 68). Plaintiffs' claim is that the presence (or risk of presence) of these various "contaminants" and ingredients in the dog food brands render certain statements on the dog food packaging— "Biologically Appropriate," "Fresh Regional Ingredients," and/or "Delivering Nutrients Naturally"—misleading or deceptive. (*See generally* TAC). Plaintiffs thus allege violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), fraudulent misrepresentation, and unjust enrichment.

A three-day *Daubert* hearing was held in this case on September 9, September 22, and September 27, 2021, and each of the five challenged experts testified and were cross-examined as to their qualifications, methodology, and the relevance of their opinions (to the extent challenged by the movant). (*See* Dkts. 167, 173, 174 (hearing transcripts)). There is a fully briefed motion for summary judgment pending, and the parties agreed that the Court would first decide the instant Daubert motions.

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Trial judges act as gatekeepers to screen expert evidence for relevance and reliability. *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786; *see also C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). Under Rule 702, a "witness who is qualified as an expert by

knowledge, skill, experience, training, or education may testify in the form of an opinion" if the following conditions are satisfied:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In other words, "the key to the gate is not the ultimate correctness of the expert's conclusions ..., it is the soundness and care with which the expert arrived at her opinion." *Schultz v. Akzo Nobel Paints,* LLC, 721 F.3d 426, 431 (7th Cir. 2013). In evaluating the expert's proposed testimony, the Court should "scrutinize proposed expert witness testimony to determine if it has the same level of intellectual rigor that characterizes the practice of an expert in the relevant field so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc*., 689 F.3d 802, 805 (7th Cir. 2012) (internal quotation marks omitted).

The Court utilizes a three-part analysis when applying the *Daubert* framework to proposed Rule 702 evidence. The Court determines (1) "whether the witness is qualified"; (2) "whether the expert's methodology is scientifically reliable"; and (3) "whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted); *see also Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). The expert's proponent bears the burden of demonstrating that the testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *See Gopalratnam*, 877 F.3d at 782; *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment. "A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 805 (7th Cir. 2012).

## DISCUSSION

I.    **Stefan Boedeker**

Champion moves to exclude the opinions of Plaintiffs' expert Stefan Boedeker. (Dkt. 116). Plaintiffs retained Boedeker, an experienced statistician and economist, to identify a framework to compute class-wide damages, outline an economic model to quantify alleged economic losses to the class, conduct empirical analysis to estimate damages, and conduct consumer analysis on the alleged misrepresentations and omissions. (Dkt. 132 at 2, Dkt. 167 Tr. 26:21-24).  As an initial matter, Champion agrees that Boedeker is qualified and challenges only the reliability and relevance of his proffered opinions. (Dkt. 160) ("The Parties agree and stipulate to Mr. Boedeker's [] qualifications, and do not move to exclude [him] under the qualification prong of the *Daubert* standard.")

Boedeker conducted five consumer surveys, the results of which form the bases of his opinions: four conjoint surveys and one "Expectation Survey." The conjoint surveys were conducted on (i) the alleged misrepresentations related to the accused ACANA brand; (ii) the alleged misrepresentations related to the accused ORIJEN brand; (iii) the alleged omissions related to the accused ACANA brand; and (iv) the alleged omissions related to the accused ORIJEN brand. Boedeker employed "choice-based conjoint analysis" to "quantify the value of particular characteristics and features of a product to the consumer…to then test if, when you change some of those features of a product, if there's a change in the price that consumers would pay for that product." (Dkt. 167 Tr. 27:9-19).  There were 2,375 respondents for the conjoint surveys.  Boedeker concluded from his analysis of these conjoint surveys that consumers ascribe value to the alleged misrepresentations and omissions, and view dog food as less valuable after reading corrective

statements and used demand curves to quantify the amount of harm caused by each alleged mis-representation and omission. (*Id.*; *see also* Dkt. 129-1 at 56-60, 76-77).

Boedeker's Expectation Survey, with 500 respondents, measured consumer perception re-garding the alleged misrepresentations and omissions. The purpose of the Expectation Survey was to "assess qualitatively and descriptively what consumers expect when they see certain labels and what particular attributes and characteristics are important to consumers." (Dkt. 167 Tr. 29:19-24).

Champion argues that Boedeker's failure to use a control group for his Expectation Survey renders his methodology unreliable. (Dkt. 129 at 10-13). It is undisputed that Boedeker did not use a formal control group. (Dkt. 167 Tr. 54:3-9). Well-structured surveys typically use a control group or control question. *See, e.g., Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 2010 WL 1687883 at *7 (N.D. Ill. Apr. 26, 2010) ("[T] ability to evaluate the effect of the wording of a particular question makes the control group design particularly useful in assessing responses to closed-ended questions.") Champion contends that without a control group, it is impossible to measure the change in perception and reliably examine cause and effect. (Dkt. 129 at 10). In response, Boedeker offers the explanation that the goal of the Expectation Survey was not to show cause and effect (Dkt. 167, Tr. 33:16-34:14) but rather to demonstrate that statements matter to consumers. In the first set of questions asked in the Expectation Survey, he asked consumers what they expected dog food to contain based on packaging to "show[] positive net impact." In the second set, Boedeker asks consumers what they expect based on the specific alleged misrepresen-tations; for example, what they expect from the statement "Delivering Nutrients Naturally." Boedeker reasons that this question could not benefit from a control group because the premise is based on expectations from that statement. This position may limit the use of the Expectation Survey based on Boedeker's representations that it is *not* a cause-and-effect survey (that typically

5

requires a control group) in order to measure a change in consumer perception, and Champion can raise that as a merits issue. Still, Boedeker's reasoning is methodologically reliable enough to pass muster at the *Daubert* stage. His rationale—that use of a control group that did not reference the statements and/or ingredients would be nonsensical, confuse survey respondents, and yield no meaningful results—is not so scientifically unreliable to be excluded, but goes to the weight to be afford to the results. *See, e.g., MacDougall v. Am. Honda Motor Co*., 2021 WL 6101256, at *1 (9th Cir. Dec. 21, 2021) (Reversing the exclusion of Boedeker's conjoint surveys and observing that "technical inadequacies in a survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility."); *see also Stollings v. Ryobi Techs., Inc.,* 725 F.3d 753, 765 (7th Cir. 2013) ("The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony.")

Champion argues that failure to do a pre-test to confirm that the question set was clear and understandable demonstrates unreliability. Boedeker did not take a formal "pre-test" before conducting his Expectation Survey but did analyze the data from the first 50-75 completed surveys to confirm there was no confusion or misunderstanding of the question set. (Dkt. 167 Tr. 31:16-25). Pre-tests are not *required*, and conducting an informal pre-test provided Boedeker with the opportunity to address any confusion or misunderstandings that may have arisen. (*Id.* Tr. 32:1-6).[1] This is not a basis to exclude Boedeker's opinions.

The putative class in this case are Illinois consumers. (*See* TAC ¶¶ 213, 231). Champion objects that Boedeker's conjoint survey population, primarily not Illinois residents and 87.1% of

---

[1] Champion relies on a California case, *MacDougall v. American Honda Motor Co.,* that excluded Boedeker's testimony for, *inter alia*, failure to conduct a valid pre-test and conducting a survey that "fundamentally differed" from the pre-test—a factually different situation than here, where Boedeker did not need to make adjustments after reviewing the earliest responses. *MacDougall*, 2020 WL 5583534 (C.D. Cal. Sept. 11, 2020). Following the *Daubert* hearings in this case, the Ninth Circuit overturned the exclusion of Boedeker's testimony in the *MacDougall* case. 2021 WL 6101256 (9th Cir. Dec. 21, 2021).

whom have not purchased or considered purchasing ACANA or ORIJEN brand dog food in the last three years, leaves the survey results irrelevant to Plaintiff's claims. (Dkt. 129 at 23-24). Selecting the right universe of respondents significantly affects the probative value of a consumer survey. *See Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 394 n.5. An "erroneous or undefined" universe diminishes the survey's reliability. *See Competitive Edge, Inc. v. Staples, Inc.*, 763 F.Supp.2d 997, 1008 (N.D. Ill. 2010). Once the universe is defined, a sample population must be selected "that accurately represents the universe." *Id.; see also Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 850 (N.D. Ill. 2018), *aff'd,* 926 F.3d 409 (7th Cir. 2019).

Boedeker sought survey respondents if they were (i) 18 years or older; (ii) lived in the United States; (iii) owned at least one dog in the previous three years; (iv) purchased or was involved in the purchasing decision of dry dog food in the previous three years; and (v) purchased at least one premium dog food brand in the last three years. (Dkt. 129-1 at ¶ 108). The packaging and labels at issue in this case are the same in all 50 states, and Boedeker tailored his survey population to include only recent dog owners with an interest in premium dog foods. (Dkt. 132 at 14; Dkt. 167 Tr. 45:19-22). This is not a case where Boedeker simply interviewed a few thousand random people from across the country. Instead, he focused on a narrow group of individuals that recently purchased premium dog food and were involved in the purchase or purchasing decision. An even narrower group—to only potential class members, or to only those individuals who purchased the specific ACANA or ORIJEN products— is not required to find the survey population sufficiently reliable and relevant to the claims at issue in this case.

Even viewed cumulatively, as Champion urges, these perceived flaws go to the weight that should be assigned to each of Boedeker's studies, rather than their admissibility. These types of technical defects and study design choices may lessen the evidentiary weight to be afforded but do

not leave the surveys so flawed as to be unreliable or unhelpful to a trier of fact. *See Subsidiary Holding Co. v. Stuart Hale Co.,* 1 F.3d 611, 618 (7th Cir.1993) ("While there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, such situations will be rare.")

Beyond its objections to Boedeker's methodology, Champion also challenges the relevance of the conclusions drawn from his conjoint studies; namely, that the conjoint surveys cannot adequately calculate class wide damages and that Boedeker failed to consider supply side economics when reaching his conclusions. (Dkt. 129 at 21-24).

As to the first issue, Champion argues that conjoint surveys are supposed to measure harm to purchasers, but Boedeker measures only the demand-side effects and ignores supply-side effects. (Dkt 129 at 17). Without those supply-side considerations, Champion argues that Boedeker cannot reliably estimate market price, because he cannot estimate the difference between a "but-for" market price and real-world prices Plaintiffs and the class actually paid. (*Id.*) However, Boedeker's opinion includes the acknowledgement that in a but-for world, "the manufacturer faces a lower demand" and if possible, would "set a different price which maximizes profits," but still holding supply constant is still appropriate (Dkt. 129-1 at ¶ 36-37) ("However, setting new profit-maximizing prices and volumes sold would contradict the postulate of the Reference Guide on Estimation of Economic Damages that the But-For-World should only correct the harmful Act.") Boedeker uses "real world" prices in his conjoint survey based on Champion documents and contends that doing so considers the supply side factors that Champion argues should be considered (e.g., the cost of production, the cost of goods sold, and the willingness to sell.) (*Id.* at ¶ 118-119). Boedeker also checked the reasonableness of his damages estimates by comparing the prices of Champion's products to the prices of non-premium dog food and concluded that ""[t]he

misrepresentations and omissions analyzed in this study would erase many if not all benefits consumers perceive Defendants' products to have over non-premium products." This is consistent with Plaintiffs' theory of damages that the harm is the premium they paid. Champion points to *In re General Motors*, a case where Boedeker's opinions were excluded for failure to consider supply-side effects. 407 F. Supp. 3d 212 (S.D.N.Y. 2019). There, the district court distinguished cases that involved "classic allegations of mislabeling" as opposed to "dangerous defects." *Id.* at 238-239 ("On the whole, the courts in these [classic mislabeling cases] cases found that the conjoint analyses 'adequately account[ed] for supply-side factors' because '(1) the prices used in the surveys underlying the analyses reflect[ed] the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect[ed] the actual quantities of products sold during the class period.'") (internal citations omitted). Boedeker has adequately accounted for supply side factors in this case by using actual market prices.

Boedeker used the results from the four conjoint surveys to calculate "economic losses for individual misrepresentations, groups of misrepresentations, individual omissions, and groups of omissions." (Dkt. 129-1 at ¶ 184). Champion last argues that these surveys cannot be used to reliably estimate class-wide damages. Because it would be "inappropriate statistically speaking" to mix and match results from each of the four conjoint surveys, Champion submits that the damages model does not fit with Plaintiff's claims. (Dkt. 129 at 14). However, Boedeker's report does allow for the results to be viewed in isolation or in combination. (Dkt. 129-1 ¶ 184). Boedeker's report also concludes that if Champion is found liable for alleged misrepresentations and omissions, "the economic losses presented in [his] report are similar to the price premium for Orijen/Acana products over non-premium brand products." (Id. ¶187). A price premium theory based on a conjoint analysis is an acceptable method for computing damages. *See In re Fluidmaster, Inc.*

*Water Connector Components Prods. Liab. Litig.,* 2017 WL 1196990, at *57 (N.D. Ill. Mar. 31, 2017). Champion's motion to exclude Boedeker is denied. (Dkt. 116).

## II.     Bruce Silverman

Champion moves to exclude the opinions of Bruce Silverman. (Dkt. 112). Silverman, an advertising executive with many years of experience, will opine for Plaintiffs that (i) that pet parents have had access to many media reports regarding the dangers posed to themselves and their pets by the presence of heavy metals, BPA, and pentobarbital in dog foods; (ii) that consumers would be very concerned about the possible presence of those contaminants in CPF's dog food; and (iii) that consumers rely on packaging messages when deciding which dog food to purchase, which is true of the challenged claims; (iv) that consumers would not be happy to hear that CPF's products were mostly formulated with ingredients that are neither fresh or local; and (v) that disclosure of such material information would change consumer behavior. (Dkt. 113-1 ¶¶ 217-225). Champion argues that Silverman's opinions (1) are methodologically unreliable; (2) do not fit the facts of this case; (3) are outside of Silverman's relevant experience; and (4) offer nothing helpful to the jury.

Silverman is a former advertising executive with decades of experience but limited experience with dog food campaigns. (Dkt. 173, Tr. 9:15—19:8; 58:3-14). Champion argues that Silverman's methodology is unreliable because it is "untested and untestable" (Dkt. 113 at 6) in part because Silverman did not conduct interviews, surveys, or focus groups. Instead, Silverman relies on his years of experience to opine on what Champion's packaging would convey to a reasonable consumer. (Dkt. 135 at 9-10). While a survey, if conducted, must meet the *Daubert* standard for reliability, neither *Daubert* nor Rule 702 require surveys or other specific types of external investigation in order to present expert opinions. Champion's counsel agreed at the *Daubert* hearing

that it was not a fatal flaw to not have performed a survey as a marketing expert, but instead argued that Silverman specifically should have "done more" because his work is not specialized in dog food advertising. (Dkt. 173, Tr. 97:22-98:7). Whether or not Silverman could have "done more" can be fairly explored on cross-examination.

Silverman's testimony has been challenged and sometimes limited in other districts. In *Hadley v. Kellogg Sales Co*., the district court declined to strike Silverman's testimony where his opinions on consumer behavior were based on years of marketing experience and his review of Kellogg's documents. 2019 WL 3804661 (N.D. Cal. Aug. 13, 2019). In *Hobbs v. Brother Int'l Corp*, Silverman was permitted to opine "on a reasonable consumer's perceptions of the statements on Defendant's [advertising]," and that "the Silverman declaration [is] relevant to assess whether a significant portion of reasonable consumers would be misled by Defendant's [advertising]," because "[t]hese statements are within Silverman's expertise as an advertising consultant." 2016 WL 7647674 (C.D. Cal. Aug. 31, 2016). In another case, a Delaware district court rejected an informal survey conducted by Silverman for lacking the indicia of reliability but found that Silverman had supported his advertising opinions with "analysis based on his wealth of experience and with citation to factual support." *See Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co. LLC*, 2017 WL 3528606 (D. Del. Aug. 16, 2017); *see also Price v. L'Oréal United States, Inc.,* 2020 WL 4937464, at *3 (S.D.N.Y. Aug. 24, 2020) (allowing opinions based on expertise and personal review of product labels but excluding opinion inferring consumer knowledge of keratin in hair products not based on his experience). Finally, in *FLIR Sys., Inc. v. Fluke Corp.*, Silverman was barred from testifying as to custom and practice in the thermal camera industry but was permitted to testify about advertising more generally. 2012 WL 13051121 (D. Or. Nov. 5, 2012). What these cases reflect is that Silverman's testimony has been excluded when he has stepped too far outside

11

the bounds of his experience in the advertising and marketing arena. In this case, he is not offering opinions on custom and practice (as in the *FLIR* case) nor has he conducted any informal and unscientific surveys (as in *Am. Cruise Lines*). Here, Silverman's opinions are tailored to his advertising expertise and supported by his review of the packaging and labels of the products at issue.

Champion also reasons that Silverman's opinions are unreliable because they fail the requirement that opinions "fit" the facts of the case. It is true that "the facts of the case must fit the scientific analysis to which they are being applied." *Porter v. Whitehall Lab'ys, Inc.*, 9 F.3d 607, 611 (7th Cir. 1993); *see also Owens v. Auxilium Pharms., Inc.*, 895 F.3d 971, 973 (7th Cir. 2018) (holding "the district court properly exercised its discretion by concluding that [expert] testimony did not fit the facts of [the] case."). The types of issues that Champion raises here—and the way it pressed on these issues during the *Daubert* hearing—are reminiscent of a cross-examination. This is not the *Owens* case, where the expert testified he could not offer an opinion when presented with a hypothetical that closely resembled the facts of that plaintiff's case. Arguments about what the packaging does or does not tell consumers does not reach the same level. *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765–67 (7th Cir. 2013) (the quality of testimony and soundness of factual basis are questions for jury; debatable input to expert's model was an "arguable limitation" of his opinion, not an error rendering it irrelevant.) The existence of contrary evidence is insufficient, by itself, to exclude an otherwise reliable opinion.

Silverman's expertise comes in the form of his past experience in advertising (as opposed to scientific or technical knowledge). This is permitted under Federal Rule of Evidence 702, but such an expert must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Advisory Comm. Notes. Silverman's proffered opinions are not mere *ipse dixit*

that simply presents a bottom line without sufficient analysis. Silverman explained that in the advertising sector, companies want to understand consumers and how a product fits into their lifestyle, and how best to reach those consumers. Based on that understanding from working on advertising for "hundreds of products and services," he opines on what a reasonable consumer would "take away from the messaging" a company uses. (Dkt. 173, Tr. 26:8-14, 29:12-25). Silverman testified that he was familiar with how and why advertising is crafted, and how consumers review and consider packaging. He applied the same analysis to this case and provided an opinion as to the materiality of the messaging on Champion's ACANA and ORIJEN branded dog foods. The criticisms of Silverman's lack of experience with premium dog food, specifically, do not render his opinions unreliable. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761-762 (7th Cir. 2010) (allowing financial services expert testimony based on experience where an expert based his opinions on experience in industry). Of course, Silverman's choice not to speak to consumers—given his own lack of particularized experience with premium dog food—is something Champion could inquire into on cross-examination. Those criticisms go to weight, not admissibility. *See Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("Shaky expert testimony may be admissible, assailable by its opponents through cross-examination") (internal citations omitted); *see also Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016) ("The fact that an expert may not be a specialist in the field that concerns [his] opinion typically goes to the weight to be placed on that opinion, not its admissibility.")

Finally, Champion argues that Silverman offers only anecdotal commentary and speculation that will not aid the jury. (Dkt. 113 at 14-15). If a matter is within the understanding of jurors, expert testimony is not "specialized knowledge" that will help the trier of fact as required by FRE 702. *United States v. Dewitt,* 943 F.3d 1092, 1096 (7th Cir. 2019) (finding no expert testimony

required where the assessment of certain facts was "regularly made in everyday life.") (internal citations omitted).  Silverman has specialized knowledge in advertising and marketing that he has brought to bear on his opinions related to packaging claims and consumer perception. While these may not be hyper-technical or scientific issues that the average juror would find wholly unapproachable, Silverman's testimony—backed by his experience—would aid the jury in its comprehension of the marketing materials, the packaging claims, and consumer perceptions of both.  *See, e.g., In re Fluidmaster,* 2017 WL 1196990 at *8 (N.D. Ill. March 31, 2017) ("[T]his court is not compelled to exclude the expert just because the testimony may, to a greater or lesser degree, cover matters that are within the average juror's comprehension.") (internal citations omitted).  Champion's motion to exclude Silverman [112] is denied.

### III.    Sean Callan

Champion also moves to exclude the affirmative opinions of Dr. Sean Callan, Plaintiffs' expert.  Dr. Callan is the Senior Vice President at Ellipse Analytics, holds  a Ph.D. in psychology with a major in behavioral and cognitive neuroscience, and a minor in statistics, and received postdoctoral training in molecular neuroscience with a focus on molecular biochemistry.  (Dkt. 127-1 at ¶4). Dr. Callan submitted two expert reports in this case: one, on BPA and the other, on pentobarbital. Champion seeks to exclude Dr. Callan's opinions on pentobarbital as "baseless and speculative." (Dkt. 127-1).

Dr. Callan summarizes his pentobarbital opinions:

> [P]entobarbital was present in certain raw materials used in creating Champion dog foods. While third party testing performed by Champion did not detect pentobarbital in the finished kibble product, prior research has demonstrated that pentobarbital is not destroyed during kibble manufacturing and is likely present at some level in the finished product given the contamination of certain raw materials. Additionally, the quantity of random sampling performed by Champion was insufficient to assess the actual risk given the small sample

14

> number and size tested relative to the total size of potentially con-
> taminated finished product and the heterogeneity of certain raw ma-
> terials."

(*Id*. at ¶ 3).

Dr. Callan's opinion that pentobarbital is "likely present" in Champion's finished dog food is based on a series of conclusory observations: that pentobarbital was present in JBS tallow, that Champion did receive lots of tallow that contained pentobarbital, that pentobarbital is not destroyed during the manufacture of kibble, and therefore Champion's dog food "likely" contained pentobarbital. (See Dkt. 127-1 at 6-7). Plaintiffs argue this opinion is supported by his qualifications—however, as qualified as Dr. Callan may be, he still must offer reliable and relevant opinions. *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019) ("Even a supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method.") Here, Dr. Callan has not offered a verifiable scientific methodology, but rather a series of unscientific leaps. For example, one such leap is that "pentobarbital was present in multiple lots" from JBS—lots that did not go to Champion but to other companies with different specifications for their tallow shipments. (*See* Dkt. 146 at 2). Dr. Callan did not conduct any testing of Champion's products to reach his conclusion, nor did he review any study that conducted such testing. (Dkt. 127 at 5). *See Porter v. Whitehall Lab'ys, Inc.*, 9 F.3d 607, 611 (7th Cir. 1993) ("An expert's mere guess or conjecture . . . must be excluded.") There is simply "to great an analytical gap between the data [or lack therof] and the opinion proffered" to allow this opinion to reach a jury. *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).

The remainder of Dr. Callan's opinions are similarly unsupported and must be excluded. With respect to his opinions on Champion's sampling and on the heterogeneity of tallow, Dr. Callan lacks factual support and once again draws conclusions without proving sufficient support for

those conclusions.  Dr. Callan may be qualified to opine generally on sampling size or margin of error as scientific concepts, but must be able to tie those concepts to the specific facts of this case and has not done so.  He could not identify how often Champion tests samples, how many samples are pulled,  or how Champion created the composite sample that contained the tallow from JBS that it sent for its own testing.  *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 2009) ("[A] district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.")

Dr. Callan's opinions on Champion's sampling and the heterogeneity of tallow are conclusory not sufficiently reliable to aid a trier of fact.  As Champion argues (and is supported by the record):

> [Callan] has no experience with beef tallow, did not test the tallow himself, does not know how it was transported or stored, does not know how it is rendered into the final product, does not know how much tallow goes into the final product, and did not know how many production runs of Champions' finished dog food—if any— were made using the small batch of tallow that tested positive for pentobarbital.

(Dkt. 144 at 3).  Instead, Dr. Callan relies primarily on conjecture that Champion's testing was insufficient, without opining on what would have been sufficient or conducting his own testing. (*See* Dkt. 127-3 at 26:25-27:3, 23:3-15, 30:10-20).  Without more, this amounts to "I know it when I see it" and not a reliable scientifically backed methodology.  Champion's motion to exclude Dr. Callan is granted. (Dkt. 110)

## IV.    Gary Pusillo

Finally, Champion moves to exclude the affirmative opinions of Plaintiffs' expert Dr. Gary Pusillo from both of his expert reports. (Dkt. 107).  Dr. Pusillo offers the opinions that t (1) the Dog Food contains Heavy Metals and risked containing bisphenol A ("BPA"), which were then

consumed by dogs eating the Dog Food; (2) the sources of Heavy Metals and BPA in the Dog Food vary and can be controlled by reasonable manufacturing practices; and (3) some of CPF's ingredients do not match its claims of Biologically Appropriate and Fresh Regional Ingredients. (Dkt. 134 at 1). Champion objects to Dr. Pusillo's opinions as exceeding the bounds of his expertise such that he is not qualified under Rule 702. Champion also argues that Dr. Pusillo's opinions are not relevant, based on unreliable methodology, and would not aid the jury.

Under Federal Rule of Evidence 702, an expert witness must be qualified to testify by "knowledge, skill, experience, training, or education." F.R.E. 702. To determine if an expert is qualified, "we ask not whether an expert 'is qualified in general' but whether he is qualified to answer a 'specific question.' " *United States v. Truitt*, 938 F.3d 885, 889 (7th Cir. 2019) (quoting *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010)). A court "must look at each of the conclusions [the witness] draws individually to see if he has the adequate education, skill, and training to reach them." *Gayton*, 593 F.3d at 617.

Dr. Pusillo is an animal nutritionist and as part of his work, "deal[s] with everything that influences the nutritional health and the health of the animal" (Dkt. 173 Tr. 93:11-22). Dr. Pusillo has three degrees: a B.S. in animal husbandry, a M.S. in animal production, and a Ph.D. in animal nutrition. (Dkt. 108-2 at 7). He testified that his education included education in heavy metals and that his work and continuing education also includes heavy metals. (Dkt. 173, Tr. 98-101). Dr. Pusillo has testified that he serves as a consultant for companies and as part of that work, is involved in "testing protocols, SOPs for testing, cleaning, and everything involved with food safety." (Dkt. 108-4 at 114:21-24). Dr. Pusillo is not a veterinarian, veterinary toxicologist, general toxicologist, chemist, microbiologist, or food safety expert. (Dkt. 173, Tr. 131-132). He is also not an expert in BPA. (*Id.*) The fact that Dr. Pusillo does not have these specific qualifications does not

categorically disqualify him. *See United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (The

court must "consider [Pusillo's] *full range* of experience and training.")

Plaintiffs summarize Dr. Pusillo's opinions into three categories:

1.  [T]he Dog Food contains Heavy Metals and risked containing bisphenol A ("BPA"), which were then consumed by dogs eating the Dog Food (see CPF Ex. 1 at 5, Test Report Opinions 8, 14; CPF Ex. 1 at 13, Evaluation Report Opinions 7, 20);

2.  [T]he sources of Heavy Metals and BPA in the Dog Food vary and can be controlled by reasonable manufacturing practices, such as the testing and certifying of ingredients for Heavy Metals, that Dr. Pusillo himself has overseen (see CPF Ex. 1 at 5, Test Report Opinions 9-13); and

3.  [S]ome of CPF's ingredients do not match its claims of Biologically Appropriate and Fresh Regional Ingredients ("Packaging Claims") (see CPF Ex. 1 at 13, Evaluation Report Opinions 8-10, 12-13).

(Dkt. 134 at 2). The Court will refer to these as "Safety Opinions," "Heavy Metal Opinions," and

"Packaging Opinions," respectively.

Dr. Pusillo is undoubtedly a well-credentialed individual; however, some of Dr. Pusillo's

proffered opinions challenged by Champion extend too far beyond his expertise. *See Timm v.*

*Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019) ("Though Woehrle has

expertise with the design and operation of tires, the record supports the district court's conclusion

that this knowledge and experience does not extend to motorcycles. Indeed, Woehrle himself

acknowledged that he is not an expert in the design of tire pressure monitoring systems for motor-

cycles and he has never conducted any research on this topic. While the court recognized that Dr.

Lee did have significant experience with motorcycles, Lee testified during his deposition that he

lacked familiarity with tire pressure monitoring systems.") Dr. Pusillo conceded that he is not a

veterinarian, veterinary toxicologist, general toxicologist, chemist, microbiologist, or food safety

expert, nor an expert in BPA. While Plaintiffs point to his hands-on experience with heavy metals, Plaintiffs have not established that Dr. Pusillo's qualifications in animal nutrition qualify him to render his specific opinions in BPA; nor have they presented sufficient evidence of qualification in any other field that provide the necessary expertise to render those opinions. For that reason, Dr. Pusillo may not present expert opinions on BPA. Dr. Pusillo's extensive work experience involving heavy metals, in addition to his education and continuing education, render him qualified to offer his opinions on heavy metals. (*See generally* Dkt. 173, Tr. 110-117).

Finding Dr. Pusillo qualified to offer his non-BPA opinions, the Court must still consider whether his remaining opinions are sufficiently reliable and relevant to render admissible. While Plaintiff categorizes his Safety Opinions and Heavy Metals Opinions as simply opining on what Champion's dog food contains, he also opines that Champion's dog food is not "tested" or "certified for safety." But Plaintiffs—who are the masters of their case—have argued that safety is not at issue. *See, e.g., Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706, 712 (7th Cir. 2005) (expert evidence is properly excluded as "irrelevant and inapplicable" where there is a "disconnect between [that] evidence and [plaintiff's] theory of liability"). In addition, there are no claims that Champion represented to consumers that it tests its food for heavy metals, nor that it should have used different manufacturing processes to test for heavy metals. These opinions are irrelevant for the additional reason that they are not adequately supported by sufficient facts and data, as required by FRE 702(b). For example, Dr. Pusillo has no opinion on what amount of these "contaminants" would be safe, or what amounts would cause an adverse reaction. (Dkt. 108 at 8-9). Without such foundational scientific reasoning, Dr. Pusillo is left with unsubstantiated opinions that are neither reliable nor relevant.

Dr. Pusillo's Packaging Opinions are also not reliable nor relevant. He is not an expert as to what constitutes "raw" or "fresh" in the pet food industry, so cannot offer a sufficiently reliable opinion as to whether Champion's pet food meets those standards. (Dkt. 108-4 at 52:13-15). The opinions he does offer are too conclusory—for example, that Champion's food contains ingredients "not in agreement" with the alleged misrepresentations in this case. In addition, several of Dr. Pusillo's "opinions" are merely statements of fact that do not require an expert opinion, e.g., whether Champion uses supplements in their formulations, or food additives/premises that are not "100% fresh ingredients." (Dkt. 108-1 at 5, Opinions 12-13). Such opinions would not aid the jury.

Finally, Dr. Pusillo's opinions are unreliable because of the evidence that portions of his reports are simply regurgitations of other sources with varying degrees of scientific reliability. (Dkt. 108 at 10 n.5). Plaintiffs offer no response to Champion's accusation—supported by Dr. Pusillo's own deposition testimony—that his report improperly borrows from sources, does not attribute that information, and otherwise "uses" the work of others without meaningfully engaging in the expert role of analyzing that work to present his own opinions. That type of approach must be caught at the gate. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999).

Champion's motion to exclude Dr. Pusillo [107] is granted.

## V.    Dr. Robert Poppenga

Plaintiffs move to exclude twelve opinions of Champion's expert Dr. Robert Poppenga. Dr. Poppenga is a veterinary toxicologist and the current Head of the Toxicology Section at the University of California Davis. Plaintiffs do not take issue with Dr. Poppenga's qualifications. (Dkt. 160) ("The Parties agree and stipulate to Mr. Boedeker's and Dr. Poppenga's qualifications, and do not move to exclude these experts under the qualification prong of the *Daubert* standard.") The twelve opinions that Plaintiffs do challenge:

(1) "Heavy metals occur in nature and the environment and are routinely found in pet foods at safe levels."

(2) "The MTLs established by the NRC and used by the FDA to inform regulatory decisions are the best and most widely used scientific guidance available for determining what are safe levels of heavy metals in dog food."

(3) "Testing performed by Champion was sufficient to identify whether there was an ongoing, systemic presence of excessive amounts of metals of concern, which there was not."

(4) "Based upon my review of the provided testing information, scientific literature, and guidelines (MTLs) followed by the FDA, the levels of naturally occurring heavy metals in ACANA and ORIJEN dog food diets do not present a health risk to dogs."

(5) "ACANA and ORIJEN pet food arsenic, cadmium, lead and mercury concentrations fall within ranges that have been reported in the scientific literature in numerous pet food samples. Detected concentrations also are well below concentrations that have been determined to be associated with adverse effects by veterinary toxicology and regulatory agency experts with oversight of pet foods."

(6) "While there are some variations in metal concentrations between dog foods, these variations are not important in the context of whether a concentration exceeds the MTLs and EU guidance levels."

(7) "Based upon conservative, theoretical, worst-case pentobarbital and bisphenol-A exposure assessments using FDA data and guidelines specific to dogs, the risk assessment results indicate the potential exposure was a small fraction of the FDA NOEL [no observable effect level] or NOAELs [no observable adverse effect level] and thus well below a level that might cause harm to a dog."

(8) "It is clear that other pet foods purchased by Plaintiffs following discontinuance of Champion pet food had similar concentrations of arsenic, cadmium, lead and mercury."

(9) "Dr. Pusillo fails to assess the safety of arsenic, cadmium, lead, mercury, and bisphenol-A for dogs using any relevant health-based benchmarks."

(10) "There is no indication that Dr. Pusillo examined the veterinary medical records of the Plaintiffs' dogs to evaluate whether any health issues were identified that would be consistent with known adverse effects of the chemicals of concern."

(11) There is insufficient evidence in the scientific literature to support the assertion that pet foods with low concentrations of metals or other chemicals such as BPA adversely affect the health of pets, either directly or indirectly through adverse impacts on microbial populations in the GI tract or the nutritional adequacy of the foods."

(12) "Dr. Pusillo's Expert Safety Report relies heavily on information taken verbatim from many of his references and does not appear to provide evidence of independent and careful evaluation of peer-reviewed data to inform his opinions."

*See* Dkt. 114-7 (Opinions 1-7); Dkt. 108-7 (Opinions 8-12).

Plaintiffs argue that (i) all twelve of Dr. Poppenga's opinions are irrelevant to the issues in the case; (ii) opinions 2, 4-7, and 9 are impermissible legal conclusions; and (iii) opinions 1-7, 9, and 11 are unreliable.

First, Plaintiffs frame this case as one of consumer protection, not safety. (Dkt. 141 at 1). As they describe their own case, they allege that consumers relied on the dog food packaging, and subsequently paid a premium based on their expectations. (*Id.*; see also TAC ¶¶ 187). Because this case is not about safety, Plaintiffs contend, there is no need for Dr. Poppenga's opinions on the safety of the brands at issue and such opinions will only serve to confuse the jury. (Dkt. 141 at 8-9). In response, Champion argues that Plaintiffs have placed safety at issue by including allegations in the TAC that identify "health risks" related to Champion's products. (Dkt. 147 at 7-9). The TAC makes allegations, for example, that exposure to heavy metals and pentobarbital can "have the most significant impact on public health" and "can lead to adverse health issues." (TAC ¶¶ 61-63, 145). Given these allegations, Champion presents Dr. Poppenga's opinions as "scientific context" that will be helpful to the jury. *See, e.g., Martin v. F.E. Moran, Inc.*, 2017 WL 1105388 (N.D. Ill. Mar. 24, 2017) ("[T]estimony related to the science of implicit bias will be helpful in

contextualizing the other evidence at trial." Plaintiffs also challenge Dr. Poppenga's comparison of Champion's products to other dog foods on the market. (Dkt. 141 at 8). This testimony, however, is sufficiently relevant when considering that Plaintiffs will have to prove that any alleged misrepresentations or omissions were material and impacted their choice to pay a premium for Champion brand dog foods. As Champion put it, "[c]onsumers have a choice between dog foods, and therefore whether Champion's brands are comparable is a relevant consideration and could aid the jury in making a materiality determination." (Dkt. 147 at 9).

Second, Dr. Poppenga is not offering impermissible legal conclusions. "It is the role of the judge, not an expert witness, to instruct the jury on the applicable principles of law ... accordingly, an expert may not offer legal opinions." *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013); *see also Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). However, the opinions Dr. Poppenga offers are not on the applicable law of this case, but on regulatory guidance in the industry. For example, his opinion that "[t]he MTLs established by the NRC and used by the FDA to inform regulatory decisions are the best and most widely used scientific guidance available for determining what are safe levels of heavy metals in dog food" is not the type of opinion that supplants the role of the judge in instructing the jury on the law of this case, nor does it determine the outcome of the case. The Court agrees that discussion of these guidelines could be helpful context for the jury, and acceptance of these guidelines would not decide liability in this case. As with all opinions that survive a *Daubert* challenge and are presented at trial, they are also available to be challenged during vigorous cross-examination. Plaintiffs

could also seek a limiting instruction on these opinions should the case proceed to trial, to advise the jury on the nature of such guidelines.[2]

Finally, Plaintiffs argue that even if relevant, Dr. Poppenga's opinions are not sufficiently reliable. Plaintiff contends that Dr. Poppenga's opinions are "based on his wholesale adoption of unverified data" from a "White Paper" created by Champion, and further that his opinions "cherry-pick" data from studies that, when viewed in their entirety, tend to support Plaintiffs' claims. (Dkt. 141 at 10-15). The "White Paper" is a document that Champion made available to consumers in 2017 in response to concerns about the metals in Champion's brands of dog food. (Dkt. 167, Tr. 92:20-25; 125:7-14). Dr. Poppenga relied on the data in the White Paper to reach his opinions, including by speaking to a Champion employee, Gayan Hettiarachi, to discuss the statistical process used in the White Paper (*Id.*, Tr. 125:25-127:9). With respect to methodology, it is imperative that an expert's opinion "be reasoned and founded on data," but reliability is "primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013). Dr. Poppenga considered the methodology of the White Paper and, applying his years of experience as a toxicologist, found the methodology "standard" and "straightforward." (Dkt. 167, Tr. 127:22-129:17). "[T]he process of analyzing assembled data while using experience to interpret the data is not illicit; an expert need not actively conduct his or her own tests to have a valid methodology." *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 743 (N.D. Ill. 2005). The data relied on by the expert must simply be of the sort that "experts in the particular field would reasonably rely on." Fed. R. Evid. 703. Dr. Poppenga considered analytical

---

[2] Plaintiffs also challenge Dr. Poppenga's opinions relating to Dr. Pusillo's opinions and methodology. *E.g.,* Opinions 9-12. As Dr. Pusillo's opinions are excluded (discussed *supra*), the Court need not reach whether Dr. Poppenga's opinions on his report are impermissible legal conclusions.

results from accredited laboratories and peer-reviewed studies to form his opinions—the type of scientific materials experts in his field would reasonably rely on. *See, e.g., Daubert*, 509 U.S. at 593 (reliance on "empirical test[s]" and "peer reviewed journal" studies are indicia of reliability). That the White Paper analysis only covers a short period of time, or that it was commissioned by Champion in response to a public relations crisis, are certainly areas that Plaintiffs could explore on cross-examination, but do not create an issue of admissibility. The same is true of the scientific papers that Plaintiffs accuse Dr. Poppenga of "cherry-picking." This argument boils down to a disagreement about Dr. Poppenga's expert analysis of data presented scientific literature and the conclusions he draws. "Assuming a rational connection between the data and the opinion—as there was here—an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility." *Manpower, Inc.*, 732 F.3d at 809. Plaintiffs' motion to exclude the opinions of Dr. Poppenga (Dkt. 140) is denied.

## CONCLUSION

For these reasons, the motions to exclude Boedeker, Silverman, and Poppenga (Dkts. 112, 116, 140) are denied. Champion's motions to exclude Dr. Pusillo and Dr. Callan (Dkts. 107, 110) are granted.

Virginia M. Kendall
United States District Judge

Date: March 29, 2022