IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AFSHIN ZARINEBAF and ZACHARY CHERNIK, individually and on behalf of a class of similarly situated individuals, | ) ) ) | No. 18 C 6951 |
| | ) | |
| *Plaintiffs*, | ) | Hon. Virginia M. Kendall |
| v. | ) ) | |
| CHAMPION PETFOODS USA INC. and CHAMPION PETFOODS LP, | ) ) ) | |
| *Defendants*. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Afshin Zarinebaf, Zachary Chernik, and Joan Meyer (collectively, "Plaintiffs") bring this putative class action alleging that Defendants Champion Petfoods USA Inc. and Champion Petfoods LP (collectively, "Defendants") deceptively marketed their dog food in order to convince consumers to pay a premium for it. Specifically, Plaintiffs claim that two of Defendants' brands—ORIJIN and ACANA—made statements that mispresented or omitted the presence or potential presence of heavy metals, BPA, and/or pentobarbital. Defendants now move for summary judgment on all of Plaintiffs' claims in their Third Amended Complaint (Counts I–III). For the reasons explained herein, Defendants' motion (Dkt. 120) is granted in part and denied in part.

## BACKGROUND

Champion produces and sells ACANA and ORIJEN branded dog food. The ACANA brand comprises three "sub-brands": Heritage, Regionals, and Singles. (Dkt. 137-1 ¶ 5). With the exception of the ORIJEN Tundra dog food, all of Champion's dog food sold in the United States

1

(except for Alaska) has been manufactured in its DogStar kitchen in Kentucky since 2016. (*Id.* ¶ 7).

Plaintiff Zachary Chernik purchased eight different formulations of ORIJEN and ACANA dog food manufactured in the DogStar kitchen. (*Id.* ¶ 9). Chernik discontinued purchasing Champion dog food in approximately July 2017. (Dkt. 95-36 Tr. 60:23-61:6). Plaintiff Afshin Zarinebaf purchased five ORIJEN and ACANA formulations manufactured in the DogStar kitchen between 2016 and approximately September 2018. (Dkt. 137-1 ¶¶ 11-12). Plaintiff Joan Meyer also purchased five different ORIJEN and ACANA formulations manufactured in the DogStar kitchen between 2016 and June 2019. (*Id.* ¶¶ 14-15). Meyer testified that she looked at packaging when the Champion dog food was manufactured in Canada prior to 2016, but once Champion switched its manufacturing to Kentucky she "didn't really read the package[s]" for the ORIJEN or ACANA foods. (Dkt. 121-11, Tr. 89:814, 89:21-90:1; Dkt. 95, Tr. 76:7-17, 84:23-85:4).[1]

Plaintiffs are not seeking damages related to actual harm to their dogs. (Dkt. 137-1 ¶17). The damages sought are for the premium paid over the cost of other dog foods. (*See* Dkt. 95 at 1).

## I. Statements on Champion's Packaging

The ORIJEN and ACANA food sold by Champion is marketed as "Biologically Appropriate." Champion sometimes explains "Biologically Appropriate" as "Protein-Rich, Carbohydrate-Limited" or "Evolutionary Diet. Protein-Rich." (Dkt. 137-1 ¶ 19).





---

[1] Plaintiffs voluntarily dismissed their claims regarding diets manufactured at NorthStar. (*See* Dkts. 95, 102).

(*Id.* ¶ 19).

Other ORIJEN and ACANA diets state: "All dogs evolved as carnivores – biologically adapted to a diet rich in meat and protein," (ACANA Singles Wild Mackerel); "your dog is a carnivore, designed by nature to thrive on whole game, fowl or fish, and possessing a biological need for foods that are rich and varied in fresh whole animal ingredients" (ACANA Heritage Free-Run Poultry); "Modern dogs are built like their ancestors. We believe they should eat like them too" (ORIJEN Six Fish); or "mirrors the richness, freshness and variety of meats for which dogs are evolved to eat" (ACANA Reginal Meadowland). (*Id.* ¶¶ 20-22).

Champion's dog foods contain a variety of statements pertaining to "fresh" ingredients, and Champion's diets do include fresh ingredients. (Dkt. 137-1 ¶¶ 24-30). For example, the ACANA Heritage Red Meat brand states it is "infused with freeze-dried liver" and most DogStar packages state that the diet includes "freeze dried ingredients." (*Id.* ¶¶ 26-27). Other packages identify that the dog food contains dried ingredients, oils, or dehydrated ingredients.





(*Id.* ¶¶ 25-30). Each Plaintiff has testified (1) that they understood there were "non-fresh" ingredients in Champion's food, but that (2) they understood the "fresh" statements to mean that Champion only used fresh ingredients or used mostly fresh ingredients. (*Id.* ¶ 31). Champion does not state on its packaging that all or 100% of the ingredients in the dog food are fresh or that the food contains no frozen ingredients. (*Id.* ¶ 32).

Champion's packaging also contains a variety of statements pertaining to containing "regional" ingredients. (Dkt. 137-1 ¶¶ 33-40). Champion's products do contain "regional" ingredients. (*Id.*). Champion does not state on its packaging that all or 100% of the ingredients in the dog food are regional. (*Id.* ¶ 42). The front of the ACANA brands state the area where some of their key ingredients are sourced.



(*Id.* ¶¶ 37-28). ORIJEN brands provide "regional descriptors" like "New England's vast waters." (*Id.* ¶ 40). Plaintiffs have testified that they understood the "regional" statements to mean that all or nearly all ingredients were regional to the DogStar kitchen. (*E.g.*, Dkt. 95-36 Chernik Tr. 248

("I thought there should be -- like 90 percent plus would be regional, because they talk about regional all the time.")).

Some ACANA brands contain the phrase "Delivering Nutrients Naturally" on the back of their packages. Other ACANA brands contains phrases like: "Mirroring nature, ACANA WholePrey foods feature a nourishing balance of poultry, organs and cartilage — all of which reflect the whole prey animal, delivering nutrients naturally. That's why you won't find long lists of synthetic additives in ACANA foods;" "ACANA features WholePrey ratios of poultry, organs and cartilage which deliver nutrients naturally;" or "WholePrey ratios of meat, organs and cartilage deliver nutrients naturally, without the long list of synthetic additives." (Dkt. 137-1 ¶¶ 43-44).

> WholePrey ratios of meat, organs and cartilage deliver nutrients naturally, without the long list of synthetic additives.

ACANA packages from 2016-2017 state that the formulas include "zinc proteinate" as the only supplement used in ACANA formulations.

> Mirroring Mother Nature, ACANA WholePrey™ foods feature a nourishing balance of poultry, organs and cartilage plus whole eggs — all of which reflect the whole prey animal, DELIVERING NUTRIENTS NATURALLY.
>
> That's why you won't find long lists of synthetic additives in ACANA foods.
>
> PLUS ZINC PROTEINATE – OUR ONE AND ONLY SUPPLEMENT

(*Id.* ¶¶ 45-46).

## II.    Heavy Metals, BPA, and Pentobarbital in Champion's Dog Food

Champion does not add heavy metals (arsenic, cadmium, lead, and mercury) into its dog food and does not advertise that its brands contain no heavy metals or are "heavy metal free." (*Id.* ¶¶ 55-56). Champion does not add Bisphenol-A ("BPA") into its dog food and does not advertise

that its brands contain no BPA or are "BPA free." (*Id.* ¶¶ 73-74). Both heavy metals and BPA can be ubiquitous to the environment. (*Id.* ¶¶ 54, 70).

Champion uses beef tallow (fat rendered from animal carcasses) as an ingredient in its beef-based dog food at issue in this case, ORIJEN Regional Red and ACANA Heritage Red Meat. Champion receives the tallow used from several supplies, including JBS. (Dkt. 137-1 ¶¶ 87-90). In May 2018, Champion learned two lots of tallow it had received from JBS in March of 2018 had tested positive for small amounts of pentobarbital and discontinued purchasing beef tallow from JBS. (*Id.* ¶¶ 91-92). Champion submitted composite samples of the kibble made with the affected tallow to Texas A&M Veterinary Medical Diagnostics Laboratory (TVMDL), and all samples resulted in a "non-detect" reading. (*Id.* ¶ 103). About 100,000 pounds of the 1.7 million pounds manufactured with the affected tallow was not quarantined or retrieved and was sold into retail, and it is unknown if any of the affected kibble was ever sold in Illinois. (*Id.* ¶¶ 97-98). Chernik stopped purchasing Champion food in July 2017. Zarinebaf's produced receipts show he purchased ORIJEN Regional Red in 2015, while Meyer's produced receipts indicate she purchased ACANA Heritage Red Meats in November 2016. (*Id.* ¶ 94).

### III. Expert Testimony

Plaintiffs offer expert testimony from Stefan Boedeker, an economist and statistician, and Bruce Silverman, a former marketing executive.[2] Boedeker conducted five surveys: four conjoint surveys and one "expectations" survey. The expectation survey attempted to measure what a "reasonable consumer" would think about the statements on Champion's dog food:

---

[2] The Court previously excluded the opinions of Plaintiffs experts Dr. Sean Callan and Dr. Gary Pusillo.

| EXPECTATIONS SURVEY OF REASONABLE CONSUMERS | Acana Diets | Orijen Diets |
|---|---|---|
| **From the "Biologically Appropriate" statements on the Dog Food, consumers would expect that:** | | |
| The dog food shown does not contain heavy metals. | 84.3% | 82.8% |
| The dog food shown does not contain BPA (Bisphenol A). | 73.2% | 71.3% |
| The dog food shown does not contain pentobarbital | 68.2% | 69.9% |
| The dog food shown only contains fresh ingredients, unless specifically stated otherwise on the packaging. | 83.9% | 89% |
| **From the "Fresh" statements on the Dog Food, consumers would expect that:** | | |
| The dog food shown contains only fresh ingredients unless specifically stated otherwise on the packaging. | 84.7% | 84.2% |
| The dog food shown does not contain any expired ingredients. | 88.4% | 79.4% |
| The dog food shown does not contain any reground dog food (dog food previously manufactured by this manufacturer but that did not meet its specifications for sale). | 76.9% | 78.5% |
| **From the "Regional" statements on the Dog Food, consumers would expect that:** | | |
| The dog food shown does not contain imported ingredients. | 76.9% | 73.7% |
| Each ingredient in the dog food shown is from the region where the food is made unless specifically stated otherwise on the packaging. | 77.3% | 79.4% |
| **From the "Delivering nutrients naturally" statements on the Dog Food, consumers would expect that:** | | |
| The dog food shown does not contain heavy metals. | 84.7% | n/a |
| The dog food shown does not contain BPA (Bisphenol A). | 74.4% | n/a |

(Dkt. 149 ¶ 7; *see also* Dkt. 95-71, Fig. 12-23). Silverman opines that a "reasonable consumer" would interpret "Biologically Appropriate" to mean that heavy metals and non-fresh ingredients were not used in Champion's dog food, and that they would expect no risk of BPA or pentobarbital. (Dkt. 95-18, ¶¶ 32, 94, 103, 173, 180, 193). Silverman offers similar opinions that reasonable consumers would not expect non-fresh or non-regional ingredients based on the "Fresh" and "Regional" statements. (Dkt. 95-18, ¶¶ 32, 221). Silverman opines that "[h]ad Champion's

packaging disclosed that its products contained and/or had a risk of containing heavy metals, BPA, pentobarbital, a material amount of ingredients that were not fresh, and/or a material amount of ingredients that were not local or regional, such disclosures would have adversely affected consumers' willingness to purchase the Champion Products." (*Id.* ¶ 32(k)).

Dr. Robert Poppenga is a veterinary toxicologist that has presented expert testimony for Champion relating to heavy metals and BPA. For example, Dr. Poppenga opines that nearly all foods contain some levels of heavy metals. (Dkt. 137-1 ¶ 53). Dr. Poppenga also explains that the National Research Council ("NRC") published a study in the Mineral Tolerance Animals, 2nd Revised Edition, 2005, that provided maximum tolerable limits ("MTLs") for arsenic, cadmium, lead, and mercury in dog foods. Dr. Poppenga opines that the level of heavy metals in Champion's dog food are below the MTLs set by the NRC/FDA. (*Id.* ¶¶ 58-61). Champion conducted testing of competitor dog foods for arsenic, cadmium, lead, and mercury and found each sample had metals present at safe levels. (*Id.* ¶ 64).

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g., Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). As the "'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted). The parties genuinely dispute a material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). The Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in his favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## DISCUSSION

In order to be held liable for a violation of the Illinois Consumer Fraud and Deceptive Practices Actg (ICFA), Plaintiffs must establish that: (1) the defendant undertook a deceptive act or practice; (2) the defendant intended that the plaintiff rely on the deception; (3) the deception occurred in the course of trade and commerce; (4) actual damage to the plaintiff occurred; and (5) the damage complained of was proximately caused by the deception. *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 883 (7th Cir. 2005); *see also* 815 ILCS 505/2. The ICFA also applies to "the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact." 815 ILCS 505/2. "[W]hen analyzing a claim under the ICFA, the allegedly deceptive act must be looked upon in light of the totality of the information made available to the plaintiff." *Davis*, 396 F.3d at 884.

A claim for fraudulent misrepresentation requires that Plaintiff show (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance upon the truth of the statement; and (5) damage to the plaintiff resulting from such reliance. *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 734 (7th Cir. 2017) (citation omitted). Finally, unjust enrichment under Illinois law requires

that the defendant engaged in "unlawful or improper conduct as defined by law" and that the plaintiff show "(1) the defendant has unjustly retained a benefit to the plaintiff's detriment and (2) the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Siegel*, 656 F. Supp. 2d at 834.

## I.     Alleged Misrepresentations

When analyzing misrepresentation claims under the ICFA, the "test for the deceptiveness of a representation is keyed to a reasonable consumer, and deceptiveness is evaluated specifically in light of all the information available to the consumer." *See e.g. Fuchs v. Menard, Inc*., No. 17-cv-01752, 2017 WL 4339821, at *5 (N.D. Ill. Sept. 29, 2017) (internal citations and quotation marks omitted). "Under the ICFA … [i]f other information disclosed or available to the consumer dispels any tendency to deceive, there is no deception." *See Trujillo v. Apple Computer, Inc*., 581 F. Supp. 2d 935, 938 (N.D. Ill. 2008).[3]

### A.     "Biologically Appropriate"

As an initial matter, Champion argues that the phrase "Biologically Appropriate" as used in their marketing is non-actionable puffery.[4]     (Dkt. 131 at 16-17). Under Illinois law, mere puffery or a statement of seller's opinion is not actionable under either a common law fraud or ICFA claim "based on the sound reasoning that no reasonable consumer would rely on such an implicit assertion as the sole basis for making a purchase."  *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 926 (Ill. 2007) ("Puffing in the usual sense signifies meaningless superlatives that no reasonable person would take seriously, and so it is not actionable as fraud.") (citing *Speakers*

---

[3] Plaintiffs' three claims are all premised on the same alleged misrepresentations and omissions.  The Court thus considers them together for purposes of summary judgment.

[4] Plaintiffs argue that Champion is judicially estopped from making this argument because they took the position that "Biologically Appropriate" was a factual statement while litigating *See e.g. Song v. Champion Petfoods USA, Inc*., No. 18-CV-3205, 2020 WL 7624861, at *5 (D. Minn. Dec. 22, 2020).  Champion is not so estopped because they did not affirmatively argue the factual nature of "Biologically Appropriate" in the *Song* case.

of Sport, Inc. v. ProServ, Inc., 178 F.3d 862, 866 (7th Cir. 1999)). "Puffery is 'exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely.'" *Adkins v. Nestle Purina PetCare Co.*, 973 F. Supp. 2d 905, 919 (N.D. Ill. 2013) (internal citations omitted).

The Court rejected Champion's contention at the motion to dismiss stage, observing:

> "Biologically appropriate" is an "assertion[ ] of fact," and Plaintiffs have successfully alleged that the "[dog] food does not conform to th[is] fact because it contains heavy metals, which are associated with potential health risks and therefore not 'biologically appropriate,' and BPA, which is an industrial chemical and therefore [not] 'biologically appropriate.'"

*Zarinebaf v. Champion Petfoods USA Inc*., 2019 WL 3555383, at *7 (N.D. Ill. July 30, 2019) (citing *Leppert v. Champion Petfoods USA Inc*., 2019 WL 216616, at *7 (N.D. Ill. Jan. 16, 2019)). Champion, recognizing the Court's previous opinion, nevertheless argues that the factual development of this case now warrants a different outcome. It does not.

Champion's marketing phrase "Biologically Appropriate" is not the type of superlative that would put the reasonable consumer on notice that the comment was "meaningless sales patter." *See Tylka v. Gerber Prod. Co.,* 1999 WL 495126, at *5 (N.D. Ill. July 1, 1999) (noting that "[n]utrition is a nebulous concept, though quantifiable in some respects. With respect to… 'optimum nutrition,' or 'nutritionally, you can't buy a better food [],' or the 'most wholesome nutritious safe foods you can buy anywhere in the world,' add little to the daily informational barrage to which consumers are exposed"). As Champion themselves state, the claim that its food is "Biologically Appropriate" reflects that it "mirrors the richness, freshness, and variety of meats for which dogs are evolved to eat." (Dkt. 150 at 7 (citing Dkt. 137-1 ¶ 21)). It is not claiming the food to be the *best* or *most* biologically appropriate. *See, e.g., Bietsch v. Sergeant's Pet Care Prods.,* 2016 WL 1011512, at *4 (N.D. Ill. Mar. 15, 2016) (finding nutrition claims based on recognized standards "tested and verifiable" and therefore not puffery). While this case falls

11

somewhere between *Tylka* and *Bietsch,* it is closer to *Bietsch*. Plaintiffs have alleged that "Biologically Appropriate" conveys to consumers that their food does not contain or have the risk of containing heavy metals, BPA, or pentobarbital. The label "Biologically Appropriate" could arguably mislead a consumer into thinking there is no risk or actual presence of these allegedly dangerous "contaminants" (that a consumer might argue are "inappropriate"), so it cannot be deemed non-actionable puffery.

Champion contends that, even if "Biologically Appropriate" is actionable, the presence (or risk of presence) of heavy metals, BPA, and/or pentobarbital does not render the phrase misleading. The Court takes first the allegations related to heavy metals and BPA.[5] The allegations related to BPA are not so speculative as to merit dismissal. BPA is ubiquitous in the environment and tends to leach into food and liquid. (Dkt. 149 ¶ 23). While some testing showed no detectable BPA in samples of Champion's dog food, other samples did detect BPA. (*Id.*). While Champion argues that Plaintiffs cannot explain how BPA may sometimes get into its finished product, and cannot demonstrate they bought food that contained BPA, there is sufficient evidence in the record to engender a genuine issue of material fact with regard to the presence or risk of BPA in Champion's finished dog food, including food bought by Plaintiffs.

Next, Champion contends that because the packaging claim "Biologically Appropriate" and its surrounding context are not related to heavy metals or BPA, this claim must be dismissed. (Dkt. 150 at 7-9). Champion does not advertise that its food contains no heavy metals, is free of heavy metals, or is BPA-free. (Dkt. 137-1 ¶¶ 55, 74). Champion also does not *add* heavy metals

---

[5] Champion argues in a footnote to its Motion that Meyer should be dismissed from the case altogether because she testified that she never read the packaging after Champion moved its production to DogStar kitchen (the location where all the products at issue in this case were manufactured). However, a dispute of fact exists because her testimony does not clearly reflect whether or not she relied on the statements on the DogStar formulations. *Compare* Dkt. 137-1 ¶ 16 *with* Dkt. 95-37, Meyer Tr. 68:21-25, 76:7-17, 80:21-81:2, 84:23-85:4.

or BPA to its food. (*Id.* ¶¶ 53, 55, 73). Examples of statements surrounding "Biologically Appropriate" on Champion's packaging are "Protein-Rich. Carbohydrate-Limited" and "Evolutionary Diet. Protein-Rich." (Dkt. 137-1 ¶ 19).

Champion neatly sums up Plaintiffs' condition to defeat summary judgment: "[s]ince there is nothing inherently misleading about 'Biologically Appropriate' on its face, Plaintiffs must demonstrate with evidence that a reasonable consumer would interpret the phrase 'Biologically Appropriate' to mean that Champion's dog food was free of heavy metals and BPA." (Dkt. 150 at 8) (citing *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927 (7th Cir. 2021)).[6] Plaintiffs have presented exactly such evidence of a reasonable consumer. First, Plaintiffs offers their expert, Boedeker and the consumer survey he conducted. That survey reflects that when viewing the phrase "Biologically Appropriate," 82.8-84.3% of consumers would not expect Champion's dog food to contain heavy metals, while 71.3-73.2% of consumers would not expect the food to contain BPA. (Dkt. 95-71 at Fig. 14, 20; Dkt. 149 ¶ 7). Second, Plaintiffs' testimony is that they would not have expected the presence of heavy metals or BPA. (*See* Dkt. 149 ¶¶ 9-10). For example, Champion challenges this testimony as inconsistent with other testimony from Plaintiffs suggesting they should have expected the presence of heavy metals, which are near-ubiquitous in society. (Dkt. 137-1 ¶¶ 54, 70; Dkt. 149 ¶ 9). Whether or not Plaintiffs' expectations were those of a reasonable consumer given their general knowledge of heavy metals is a question of fact.

While another district court found that "[a] reasonable consumer is highly unlikely to interpret 'biologically appropriate' as a guarantee that the dog food contains no heavy metals

---

[6] The district court in *Weaver* noted that "[t]o hold Defendants liable for the risk that their products contain unintended and nonharmful concentrations of these substances, a fact common to many other pet food manufacturers, would be extraordinary." *Weaver*, 471 F. Supp. 3d at 882. On appeal, as discussed *infra*, the Seventh Circuit specifically noted the *Weaver* plaintiff's lack of expert opinion or evidence outside plaintiff's own self-serving testimony. *Weaver*, 3 F.4th at 937. Whether or not such "extraordinary" liability should be attached to Champion based on these claims, when considering the evidence proffered here, is a question for the jury.

whatsoever," that case was decided on a motion to dismiss. *See Song v. Champion Petfoods USA, Inc.*, 2020 WL 7624861, at *5 (D. Minn. Dec. 22, 2020), *aff'd*, 27 F.4th 1339 (8th Cir. 2022). Here, Plaintiffs have presented evidence of how a reasonable consumer might interpret the phrase "biologically appropriate," and the evidence is sufficient to put a question of fact before a jury.

Plaintiffs' ICFA claim related to pentobarbital, however, cannot survive. The only confirmed shipments of contaminated tallow that Champion received were in March of 2018. At that time, Chernik had already stopped purchasing Champion brand food. (Dkt. 137-1 ¶ 109). Plaintiffs Zarinebaf and Meyer did generally continue to purchase Champion food during the time that pentobarbital was discovered in those two affected tallow lots but have no evidence that either of them bought the specific brands of Champion food that might have been affected.[7] (Dkt. 137-1 ¶¶ 94-94. *See also Weaver*, 3 F.4th at 936).

Plaintiffs contend that the risk of pentobarbital contamination existed even before it was detected in tallow lots sent to Champion in 2018. That argument does not pass muster, as the district court in *Weaver* explained:

> Plaintiff counters that the risk of pentobarbital contamination existed well before the chemical was detected in the 2018 shipments, because Defendants had been using JBS for years, and JBS's shoddy business practices presented an ongoing threat of contamination. Thus, Plaintiff contends that his purchases may have indeed been contaminated, but the issue went undetected at the time. This line of reasoning departs from the record evidence and enters the realm of mere speculation, which is insufficient to ward off summary judgment. *Borcky v. Maytag Corp.*, 248 F.3d 691, 695 (7th Cir. 2001). Without evidence that pentobarbital was present in prior shipments, Plaintiff cannot credibly allege that the products he purchased had a detectable level of pentobarbital, or a meaningful risk of such a level. To the contrary, the only testing that was done was by Defendants in 2018, and it did not detect any pentobarbital in the finished products. Defendants are, therefore, entitled to

---

[7] Of the finished Champion dog food that may have been impacted by the affected tallow lots, 1.6 out of 1.7 million pounds never made it to market, and it is unknown if any of the remaining 100,000 pounds of food was ever sold in Illinois. (Dkt. 137-1 ¶¶ 97-98).

> summary judgment as to whether pentobarbital's alleged presence
> rendered "Biologically Appropriate" misleading.

471 F. Supp. 3d at 883, *aff'd* 3 F.4th 927 (7th Cir. 2021). Plaintiffs rely on almost identical reasoning as the plaintiffs in *Weaver*. They point to Champion's alleged "inadequate quality control" and the nature of beef tallow "as a high-risk ingredient." (Dkt. 137 at 22-23). This reasoning departs the land of evidence and enters the realm of conjecture. *See Estate of Biegert by Bieger v. Molitor*, 968 F.3d 693, 701 (7th Cir. 2020) ("A dispute of fact is not genuine if 'the evidence supporting [one] version of events does not rise above speculation or conjecture.'") (quoting *King v. Hendricks County Commissioners*, 954 F.3d 981, 986 (7th Cir. 2020)). Champion has presented testing results that determined pentobarbital was not detected in its finished product. (Dkt. 137-1 ¶¶ 102-104). Plaintiffs presented no contrary testing of their own. (Dkt. 137-1 ¶ 109).

Ultimately, even considering the facts in a light most favorable to the Plaintiffs, there is no evidence for a reasonable jury to infer that they purchased Champion dog food containing pentobarbital. *SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 601 (7th Cir. 2019) ([S]peculation may not be used to manufacture a genuine issue of fact."). Therefore, Plaintiffs' claim that "Biologically Appropriate" is misleading because of the mere risk of the presence of pentobarbital in Champion's ORIJIN and ACANA dog food is dismissed.[8]

### B. "Fresh" Statements

Plaintiffs contend that based on Champion's packaging and labeling concerning statements that it is "fresh," a reasonable consumer would likely to be deceived as to the contents of its food. Champion argues that the packages do contain fresh ingredients, and its packages do identify that there are "non-fresh" ingredients, so as a matter of law the packaging claims of "fresh" are not

---

[8] This reasoning applies to all alleged misrepresentations and omissions that concern the alleged risk that Champion's finished product could contain pentobarbital.

deceptive or misleading. Plaintiffs do not (and cannot) contest that Champion's packaging says that its food is "100%," "all," or "only" fresh ingredients. (Dkt. 137-1 ¶ 32). Instead, they argue that the "fresh" claim was likely to deceive reasonable consumers even if it is not a literal falsehood.

At the threshold, Plaintiffs and Champion dispute which recent Seventh Circuit decision should guide analysis of the "fresh" claims. Plaintiffs rely on *Bell*, while Champion argues that the more-recently decided *Weaver* counsels for dismissal.[9] *See Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468 (7th Cir. 2020); *Weaver*, 3 F.4th 927. Neither is wholly correct in their analysis. *Bell* "stand[s] by the general principle that deceptive advertising claims should take into account all the information available to consumers and the context in which that information is provided and used." 982 F.3d at 477. In *Bell*, the plaintiffs claimed the label "100% Grated Parmesan Cheese" was deceptive because the product actually contained 4-9% additives that were only disclosed on the back panel. The Seventh Circuit reasoned that "an accurate fine-print list of ingredients does not foreclose as a matter of law a claim that an ambiguous front label deceives reasonable consumers." *Bell,* 982 F.3d at 476. *Bell* addressed these types of claims at the motion to dismiss stage of litigation, not summary judgment. *Weaver*, addressing almost identical claims about Champion's packaging to those at issue here on summary judgment, is a closer fit. However, Champion is wrong that *Weaver* compels their motion for summary judgment to be granted.

The Seventh Circuit affirmed the dismissal of Weaver's claims based on representations of "fresh" ingredients, but it was a question of "whether [plaintiff] has provided sufficient evidence from which a jury could find that a reasonable consumer would be materially misled by Champion's representations that its food is made with fresh, regional ingredients." *Weaver*, 3

---

[9] *Weaver* was decided between Plaintiffs' submission of their opposition brief and the submission of Champion's reply brief.

F.4th at 938. There, "Weaver relie[d] solely on his own testimony that he expected all the ingredients to be fresh" which the Seventh Circuit determined fell "short of evidence from which a reasonable jury could find that there is a 'probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Id.* at 937 (quoting *Beardsall v. CVS Pharm.*, 953 F.3d 969, 973 (7th Cir. 2020)). In particular, the Seventh Circuit observed that because "Champion's representations that its food is made with fresh regional ingredients are not clearly misleading . . . Weaver thus needed to offer something more than his own testimony" because "such evidence is needed 'where the advertising is not clearly misleading on its face." *Id.* Such extrinsic evidence, as explained in *Weaver* and *Beardsall*, can include consumer surveys or market research. *Id.* at 938 (citing *Beardsall*, 953 F.3d at 976).

Here, Plaintiffs present exactly the type of extrinsic evidence that *Weaver* suggested was necessary when the advertising is not clearly misleading on its face (as Champion argues). As contemplated by *Weaver*, Plaintiffs' consumer study conducted by Boedeker suggest that a reasonable consumer could consider the "fresh" statements misleading, as 84.7% to 84.2% of respondents would understand the "fresh" statements to only contain fresh ingredients unless specifically stated otherwise. (Dkt. 95-71, Fig. 12, Fig. 18). Silverman also opined that a reasonable consumer would not expect non-fresh ingredients based on Champion's "fresh" statements on its packaging. (Dkt. 95-18 ¶ 32). Plaintiffs further point to the amount of times the claim "fresh" is presented on Champion's packaging compared to significantly less (in its estimation) marketing about any non-fresh, freeze-dried, or raw ingredients. (Dkt. 137 at 17). Further, Plaintiffs present testimony about what a reasonable consumer would actually understand from the terms "raw" and "freeze dried." (*E.g.,* Dkt. 149 ¶ 12). While Champion disputes the

17

relevance of these points, that is a dispute that a trier of fact should evaluate. *See Bell*, 982 F.3d at 479 ("[H]ow consumers perceive advertising and how they make decisions … are matters of fact, subject to proof that can be tested at trial.").

Unlike *Weaver*, Plaintiffs here have presented evidence that the "fresh" claims were false and/or misleading beyond their own self-serving testimony. *Cf. Beardsall*, 953 F.3d at 973 (7th Cir. 2020) (granting summary judgment because "plaintiffs have not presented any actual evidence that the label is likely to mislead consumers…"). Viewed in a light most favorable to Plaintiffs, summary judgment is not appropriate on this claim.

### C. "Regional" Statements

Similar to its other allegations, Plaintiffs argue a reasonable consumer would find Champion's various packaging claims of regional ingredients false and misleading because of the presence of non-regional ingredients in its dog foods. As with its other claims, Champion argues that it has never advertised its dog food as "only" containing regional ingredients or that the ingredients are "all" or "100%" regional. Champion also argues that its packaging provides context for any statements concerning the regional nature of its ingredients.

The discussion in *Weaver* requiring plaintiffs to present extrinsic evidence to challenge statements that are not clearly misleading on their face applies with equal force to Plaintiffs' claims that Champion's representations of "regional" ingredients are false and misleading. Plaintiffs *do* present such external evidence, through Boedeker's consumer survey and Silverman's opinions on the message of Champion's marketing. (*See generally* Dkt. 95-71 and Dkt. 95-18). Plaintiffs' experts opine, based on the consumer study and their experience, that reasonable consumers would not expect non-regional ingredients based on the "regional" statements on Champion's packaging. (*Id.*) Plaintiffs have testified that they understood Champion's "regional" packaging claims to

18

mean that its ingredients were purchased from the advertised regional farmers and similar regional farms. (Dkt. 137-1 ¶33; Dkt. 149 ¶¶56, 57). A jury could therefore find that a reasonable consumer, faced with these "regional" packaging claims, would think those claims misleading due to the presence of non-regional ingredients (like tumeric from India, imported fish oils, and vitamins from China).

Nothing in the *Ibarrola* case Champion relies on necessitates a different outcome here. *Ibarrola v. Kind, LLC,* 83 F. Supp. 3d 751 (N.D. Ill. 2015). That court found that no reasonable consumer would think sugar in products was in its natural, completely unrefined state—which would be sugar cane stalks. *See* 83 F. Supp. 3d at 759. In contrast, Plaintiffs have presented evidence that a reasonable consumer could expect "regional" to mean that most of the ingredients used in Champion's food were regional to the DogStar kitchens where the food is produced.

### D. "Delivering Nutrients Naturally"

The final statements that Plaintiffs allege are false and misleading on Champion's dog food pertain to the concept of "delivering nutrients naturally." Plaintiffs' position is that reasonable consumers would read "delivering nutrients naturally" and expect that there are no "non-nutritious or unnatural contaminants" in Champion's food. Because Champion's dog food does contain heavy metals (which Plaintiffs allege are "harmful and non-nutritious") and BPA (which they allege is synthetic and unnatural), Plaintiffs allege that a reasonable consumer could find those claims misleading. Champion responds that an interpretation of the phrase "delivering nutrients naturally" to mean that *all* ingredients are natural is an implausible interpretation. (Dkt. 131 at 27).

To demonstrate that the claim is not misleading, Champion argues that the packaging contextualizes the "delivering nutrients naturally" language to mean that the customer "won't find long lists of synthetic additives in ACANA foods" and that "Zinc Proteinate is the one and only

19

supplement." (Dkt. 137-1 ¶¶ 44-46). Champion reasons that because the nutrients in its food are derived from predominantly natural (as opposed to synthetic) ingredients, there is no dispute that "delivering nutrients naturally" cannot be false and misleading.

As discussed above, Plaintiffs have offered specific evidence to support their claim that precludes summary judgment. Champion's main argument in reply is that "the flawed trio of Plaintiffs' testimony, Silverman, and the consumer survey" cannot "generate a fact issue." (Dkt. 150 at 12). The Court, having decided that Boedeker's consumer survey and Silverman's testimony sufficiently reliable and relevant to pass muster under *Daubert*, cannot discount Plaintiffs' expert opinions and insert its own evaluation of the factual evidence to find summary judgment is appropriate. *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013) ("The district court usurps the role of the jury . . . if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed.") Plaintiffs have testified that they interpreted "delivering nutrients naturally" to understand that there were not heavy metals or BPA in Champion's dog food. (Dkt. 149 ¶ 9; *see also* Dkt. 95-36 Chernik Tr. 187:24-188:4 ("Q: What did 'delivering nutrients naturally' mean to you? A: …BPA free, it would be, you know, heavy metal free.); Dkt. 95-38, Zarinebaf Tr. 112:11-16 ("delivering nutrients naturally" means "that the food is not contaminated, it's not expired, it's not regrained.")) Boedeker's consumer survey results are consistent: when viewing this packaging statement, 84.7% of respondents expected that the Dog Food would not contain heavy metals, and 74.4% of respondents expected that the Dog Food would not contain BPA. (*Id.* ¶ 7). Silverman also opines that a reasonable consumer, viewing the packaging claim, would perceive the presence of heavy metals and BPA to be inconsistent with that claim—and that the presence of BPA and heavy metals would be material to their purchasing decisions. (*Id.* ¶ 10). Together, this evidence is sufficient to

raise a dispute of fact about whether the phrase "delivering nutrients naturally" is, in fact, false and misleading to a reasonable consumer.

## II.    Alleged Omissions

An ICFA omission claim requires the "omission of any material fact with intent that others rely upon [its] concealment," 815 ILCS 505/2, as well as proof of proximate causation.  *Siegel*, 656 F. Supp. 2d at 832 (citing *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514–515 (7th Cir. 2008) ("[A] private cause of action under the ICFA requires a showing of proximate causation.")). "[W]hether an omission is material in light of all the circumstances is a question of fact." *Gavin v. AT&T Corp.*, 543 F.Supp.2d 885, 910 (N.D. Ill. 2008).  In assessing the materiality element of an ICFA claim based on omission, courts apply "a reasonable person standard—i.e., whether the omission concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Trujillo*, 581 F. Supp. 2d at 939 (citation omitted).  "An omission is actionable only 'where it is employed as a device to mislead.'" *Spector v. Mondelez Int'l, Inc.*, 178 F. Supp. 3d 657, 672 (N.D. Ill. 2016) (quoting *Pappas v. Pella Corp.*, 844 N.E.2d 995, 998 (2006)).  Plaintiffs' omission claims largely rest on the same factual allegations discussed in more detail in Part I, *supra*.

Champion claims there is no omission pertaining to whether its dog food formulations use "non-fresh" ingredients, non-regional ingredients, or a risk of including BPA or heavy metals. (Dkt. 131 at 29).  Champion also alleges that the omission claims fail when applied to Champion's advertising of "Delivering Nutrients Naturally."  (*Id*.).  Plaintiffs assert that the issue of whether Champion made material omissions includes triable facts. (Dkt. 137).  Specifically, Plaintiffs point to Champion's lack of "100% claims" as insufficient to result in summary judgment.  (*Id*.). Plaintiffs argue "whether [Champion's] fine print and partial disclosures have the capacity to

mislead in light of the promises [Champion] makes on the Dog Food bags, is a question of fact for the jury." (*Id*.). Plaintiffs assert that Champion is concealing the facts from consumers to "garner premium prices." (*Id*.). In response, Champion directed the Court to the packaging in full, and specifically that "on the front of every bag that its food includes freeze-dried and raw ingredients." (Dkt. 150; Dkt. 137-1 ¶ 26). The packaging provides locations of key ingredients as well as panels with the approximate weight of the key raw, dried, dehydrated, or oil ingredients used to make the food. (*Id.* ¶¶ 25, 29, 30, 38–40 (images showing packaging with ingredients from Idaho, New England, and New Zealand)). However, it is a question of fact as to whether Champion omission of reference to frozen (as opposed to freeze-dried), "expired" ingredients, and regrinds created the capacity to mislead a reasonable consumer.

Whether Champion improperly omitted the risk of the presence of heavy metals or BPA depends on if the omission was "from a communication." *See e.g., O'Connor v. Ford Motor Co.*, 477 F. Supp. 3d 705, 720 (N.D. Ill. 2020). A "general failure to disclose" is insufficient for an omission claim. *Id*. Plaintiffs allege that Champion's packaging statement that the Dog Food is "Biologically Appropriate" suffices as communication that omitted the risk of a presence of heavy metals or BPA. For the same reasons as discussed in more detail related to Plaintiffs' misrepresentation allegations related to "Biologically Appropriate," it is a question of fact as to whether "Biologically Appropriate" communicates information to a reasonable consumer about the presence or risk of presence of heavy metals and/or BPA.

Moreover, Champion argues that Plaintiffs cannot prove the requisite proximate cause because of Plaintiffs' testimony related to the ubiquitous nature of heavy metals. (Dkt. 150; Dkt. 137-1 ¶ 69). "[I]n a consumer fraud action, the plaintiff must actually be deceived by a statement or omission . . . If [not] a plaintiff cannot prove proximate cause." *De Bouse v. Bayer*, 235 Ill. 2d

544, 555 (Ill. 2009). While Plaintiffs have testified generally about their knowledge of heavy metals, it is a question of fact as to whether that general knowledge creates an inability to be deceived such that proximate cause cannot be proven.

Champion finally argues that Plaintiffs' omission claims do not create a triable issue of fact because the risk of the presence of heavy metals or BPA was not material to Plaintiffs or made with the intent to induce Plaintiffs to make the purchase. (Dkt. 150). "A material fact exists where a buyer would have acted differently knowing the information, or if it concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 595 (1996). That is a question of fact, as Plaintiffs' testimony on the general presence of heavy metals in ingredients used by Champion, when viewed in a light most favorable to Plaintiffs, is not a sufficient basis to dismiss the claim on summary judgment. Plaintiffs have presented evidence, including from Boedeker and Silverman (as discussed more fully in Part I) that a reasonable consumer would consider the risk of heavy metals or BPA material when making their purchasing decisions.

## CONCLUSION

For these reasons, Champion's Motion for Summary Judgment (Dkt. 120) is granted in part and denied in part. Plaintiffs' claims based on the existence or risk of existence of pentobarbital in Champion's dog food are dismissed. The remainder of Plaintiffs' claims survive.

_____
Virginia M. Kendall
United States District Judge

Date: March 31, 2022