IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AFSHIN ZARINEBAF and ZACHARY CHERNIK, individually and on behalf of a class of similarly situated individuals,<br><br>    *Plaintiffs*,<br> v.<br><br>CHAMPION PETFOODS USA INC. and CHAMPION PETFOODS LP,<br><br>    *Defendants*. | No. 18 C 6951<br><br>Hon. Virginia M. Kendall |

**MEMORANDUM OPINION AND ORDER**

  Afshin Zarinebaf, Zachary Chernik, and Joan Meyer ("the plaintiffs") purchased dogfood manufactured by Champion Petfoods USA Inc. and Champion Petfoods LP ("Champion"). Champion advertised two brands of dogfood—ORIJIN and ACANA—as "biologically appropriate," "fresh," "regional," "natural," or some combination of these qualities. The plaintiffs sued Champion, alleging that Champion's advertising is deceptive because the dogfood contained heavy metals, BPA, and pentobarbital; that Champion used non-regional sources; and that non-fresh ingredients were used in the manufacturing process. Champion previously moved for summary judgment, and this Court largely denied the motion but granted summary judgment for the claims involving pentobarbital. (Dkt. 190) The plaintiffs now move for class certification on behalf of themselves and other similarly situated consumers who purchased eleven different Champion products. (Dkt. 195). For the following reasons, their motion to certify a class is denied. (*Id.*)

1

**BACKGROUND**

The Court is familiar with the facts from its prior opinions. (*See, e.g.*, Dkts. 189, 190). Champion produces and sells ACANA and ORIJEN dogfood; these two brands include several sub-brands and products. (Dkt. 137-1 ¶¶ 4, 5). The plaintiffs purchased ORIJEN and ACANA dogfood almost exclusively manufactured in Champion's Kentucky kitchen. (*Id.* ¶ 8). Champion's dogfood marketed its products as being "biologically appropriate," "fresh," made from "regional" sources, and "natural[]." (Dkt. 68 ¶ 12). The plaintiffs maintain that Champion's products were not "biologically appropriate" or "natural" because they contained the presence of heavy metals and BPA (bisphenol A). (*Id.* ¶¶ 13, 52–53, 57–74). Similarly, the company uses frozen, expired, and regrinds (old, nonconforming kibble), which the plaintiffs argue are not "fresh" ingredients. (*Id.* ¶¶ 54, 95–108). And ingredients were not "locally sourced" because Champion purchases products from international suppliers in the European Union, New Zealand, Norway, Latin America, India, and China. (*Id.* ¶¶ 54, 109–26).

The plaintiffs offered—and the Court accepted—expert testimony from Stefan Boedeker, an economist and statistician, and Bruce Silverman, a former marketing executive.[1] (Dkt. 189 at 1). Based on five consumer surveys, Boedeker conducted analysis on the alleged misrepresentations and omissions, created an economic model to quantify the alleged economic losses to the class, and identified a framework to compute class-wide damages. (*Id.* at 4). On the qualitative side, Silverman opined, based on his decades of experience in advertising, that a "reasonable consumer" would interpret "Biologically Appropriate" to mean that heavy metals and non-fresh ingredients were not used in Champion's dog food at all, and that consumers would expect no risk of BPA. (*Id.* at 10; *see also* Dkt. 95-18, ¶¶ 32, 94, 103, 173, 180, 193). Similarly,

---

[1] The Court previously excluded the opinions of Plaintiffs' experts Dr. Sean Callan and Dr. Gary Pusillo. (Dkt. 190); *see also* (Dkt. 107, 110, 112, 116).

reasonable consumers would not expect non-fresh or non-regional ingredients based on the "fresh" and "regional" statements. (Dkt. 95-18 ¶¶ 32, 221). "Had Champion's packaging disclosed that its products contained and/or had a risk of containing heavy metals [and] BPA … a material amount of ingredients that were not fresh, and/or a material amount of ingredients that were not local or regional, such disclosures would have adversely affected consumers' willingness to purchase the Champion Products." (*Id.* ¶ 32(k)).

The plaintiffs brought a three-count complaint against Champion for violations of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA"), fraudulent misrepresentation, and unjust enrichment, seeking to recover the premium paid over the cost of other dogfoods. (*See generally* Dkts. 68, 190). Champion moved for summary judgment. (Dkt. 120). This Court denied the motion in part and granted the motion in part, dismissing the claim based on the existence or risk of existence of pentobarbital. (Dkt. 190). The plaintiffs now move for class certification on a single ICFA claim for eleven Champion products that contained allegedly false or misleading advertising. (Dkt. 195).

## DISCUSSION

A class action lawsuit allows a single person or small group to represent the interests of a larger group by pooling together claims. *Anderson v. Weinert Enterprises, Inc.*, 986 F.3d 773, 776 (7th Cir. 2021). The device serves an important adjudicative role by reducing "economies of time, effort and expense" and promoting "uniformity of decisions." Joseph M. McLaughlin, *McLaughlin on Class Actions* § 1:1 (2022). A class action claim is, nevertheless, "an exception to the general rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). Therefore, a party wishing to make use of this exception must comply with the class-

certification and maintenance requirements set out in Federal Rule of Civil Procedure 23.[2] *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)); *see also Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1025 (7th Cir. 2018). Additionally, the law of several circuits, including the Seventh Circuit, has added a threshold requirement that "classes be defined clearly and based on objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015).

## I. Class Definition

A class must be identifiable.[3] *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006); *see also Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977) ("It is axiomatic that for a class action to be certified a 'class' must exist."). "The language of this well-settled requirement," though, "is susceptible to misinterpretation." *Mullins*, 795 F.3d at 659. Proposed classes generally "flunk" this requirement in one of three ways: they are defined (1) too vaguely; (2) "by subjective criteria … [that] fail[] the objectivity requirement"; or (3) "in terms of success on the merits—so-called 'fail-safe classes.'" *Id.* at 659–60. Champion argues that the plaintiffs propose an overly broad class. (Dkt. 199 at 9). An overly broad class definition makes it difficult "to identify who will receive notice, who will share in any recovery, and who will be bound by a judgment." *Id.* at 660. "To avoid vagueness class definitions generally need to identify a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Id.*

The plaintiffs' proposed class action is sufficiently defined. *See id.* The identified group is those persons who have purchased one of eleven types of Champion's food. (Dkt. 197 at 13–14).

---

[2] "The requirements for class certification are not merely pleading requirements. Parties seeking class certification must prove that they can actually satisfy them." *In re Allstate Corp. Securities Litigation*, 966 F.3d 595, 603 (7th Cir. 2020) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)).

[3] This Court shares the confusion, expressed by the plaintiffs, over why Champion claims not to be "contesting the ascertainability of Plaintiffs' class definitions," yet does just that for three pages. (Dkt. 199 at 11 n.6). There is no practical difference between challenging the so-called "ascertainability" principle for eleven "mini-classes" but not the overarching single class action. If the eleven sub-classes cannot be identified, then plaintiffs cannot maintain their class action combining unidentifiable classes.

The timeframe is noted for each respective product, and extends no longer than six years, often shorter. The location is the state of Illinois, a well-delineated geographical area. And the harm suffered by this group, the plaintiffs have consistently stated, is overpaying for dog food based on allegedly false and misleading advertising. Thus, the plaintiffs have checked all the boxes outlined by the Seventh Circuit in its recent authoritative opinion on class-definition requirements, *Mullins v. Direct Digital, LLC*, 795 F.3d 654.

Champion places undue reliance on *Oshana v. Coca-Cola Co.*, 472 F.3d 506. While *Oshana* has some comparative force, it is distinguishable—particularly as clarified by later Seventh Circuit precedent. The case began when the plaintiff, Carol Oshana, discovered that bottled Diet Coke had different ingredients than fountain Diet Coke. *Id.* at 509. She brought a class action under the ICFA on behalf of "[a]ll individuals who purchased for consumption and not resale fountain Diet Coke in ... Illinois from March 12, 1999, through the date of entry of an order certifying the class." *Id.* at 510. The district court concluded that the class lacked sufficient ascertainability and that it also failed the Rule 23(a) and (b) requirements. *Id.* at 513–14. The Seventh Circuit affirmed. Oshana's proposed class was both too large and legally deficient. *Id.* at 514. Millions, if not tens of millions of Americans (maybe more), had purchased Diet Coke from a fountain over the almost ten-year period. *Id.* Many of these individuals were also not deceived; indeed, a large percentage may have bought fountain diet coke because of the difference in ingredients. *Id.*

The plaintiffs here propose a much smaller class than all the fountain Diet Coke drinkers in America over almost a decade. Champion did not sell even a comparable amount of product in Illinois during the relevant six-year period. Far from the tens of millions of potential plaintiffs in *Oshana*, the number of potential dogfood purchasers is manageable—and, thus, ascertainable. The

nature of the claim also differs. While Oshana brought her claim under the same statute, the similarities end there. The plaintiffs challenging Champion's advertising have produced evidence that the company's dogfood contained levels of harmful substances marketed as biologically appropriate, paired with misleading advertising about where this food was sourced. A consumer would logically pay less for a product that was inferior to the one advertised. In contrast, a fountain Diet Coke purchaser might reasonably prefer different ingredients, as they might offer potential health or lifestyle benefits.

Critically, *Oshana* and related cases "did not opine that class certification was *never* appropriate in consumer fraud cases, only that it was inappropriate in the circumstances before it." *Pella Corp. v. Saltzman*, 606 F.3d 391, 393 (7th Cir. 2010). Consumer-fraud cases no doubt "present difficulties" that must be carefully considered, but careful consideration does not mean certain defeat. *Id.* One animating concern is that a class might "include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct," signifying that "the class is defined too broadly to permit certification." *Messner v. Northshore Univ. Health System*, 669 F.3d 802, 824 (7th Cir. 2012). Permitting class certification then would force the defendant to settle many meritless cases in which a plaintiff stood no chance to recover. Such was the case in *Oshana*. Many people like their Diet Coke just as much from the fountain as from the fridge. A class action would have pressured Coco-Cola to settle potentially millions of frivolous claims. But that concern is not present here. The narrower proposed class does not sweep in "a great number" of "unharmed" plaintiffs—if the plaintiffs prevail at trial, then most purchasers of the specific Champion brands suffered a recognizable injury.

6

## II. Rule 23(a)

Rule 23(a) provides the familiar requirements that putative classes must establish for class certification. *Anderson*, 986 F.3d at 776–77. "Courts and practitioners alike shorthand these basic prerequisites as numerosity, commonality, typicality, and adequacy of representation." *Id.* Champion does not contest that the plaintiffs have met their burden here—and for good reason. (*See* Dkt. 199 at 9–10). Numerous customers purchased Champion's products during the relevant period. *Orr v. Shicker*, 953 F.3d 490, 497–98 (7th Cir. 2020). There are common issues for purposes of Rule 23(a)(2),[4] and the claims "arise from the same events or course of conduct" shared by other putative class members. *Beaton*, 907 F.3d at 1026. Finally, the named plaintiffs would adequately represent the class as whole, as they have competent counsel and no known conflicts of interest. *Wal-Mart*, 564 U.S. at 348.

## III. Rule 23(b)

A class action certified under Rule 23(b) can be maintained only if (1) prosecuting separate actions would risk inconsistent or varying adjudications; (2) injunctive relief is appropriate because the defendant "has acted or refused to act on grounds that apply generally to the class"; or (3) questions of law or fact predominate and the class-action mechanism "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(1)–(3). Rule 23(b) is disjunctive; proponents of a class need to satisfy only one method to prevail. The plaintiffs argue that their suit involves common questions of law that would be more efficient to adjudicate as a class action or, alternatively, injunctive relief is appropriate.

---

[4] Satisfying Rule 23(a)'s requirements for typicality and commonality is different than the predominance test for Rule 23(b)(3), elaborated below. *Messner*, 669 F.3d at 814. "[T]he predominance criterion is far more demanding." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997).

### A. Rule 23(b)(3)

To certify a class under Rule 23(b)(3), a court must find first "'that the questions of law or fact common to class members predominate over any questions affecting only individual members," and second that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Erica P. John Fund, inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (quoting Fed. R. Civ. P. 23(b)(3)). The Court considers only the first step because the plaintiffs cannot satisfy this requirement.

"Predominance is a qualitative rather than a quantitative concept." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). Courts do not engage in bean counting, painstakingly tallying the potential common issues and differences without assessing the relative importance. *Id.* Rather, "[t]he guiding principle behind predominance is whether the proposed class's claims arise from a common nucleus of operative facts and issues." *Santiago v. City of Chicago*, 19 F.4th 1010, 1016 (7th Cir. 2021) (quoting *Beaton*, 907 F.3d at 1029); *see also Messner*, 669 F.3d at 815 ("Rule 23(b)(3)'s predominance requirement is satisfied when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." (cleaned up)). At bottom, the "inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

"Considering whether 'questions of law or fact common to class members predominate" begins, of course, with the elements of the underlying cause of action.'" *Erica P. John Fund, Inc.*, 563 U.S. at 809. At the same time, class certification is not a dress rehearsal for trial—courts should refrain from deciding the merits of a case unless necessary to ensure compliance with the certification requirements. *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 845 (7th Cir. 2022). The Seventh Circuit has elaborated,

> The Rule 23(b)(3) predominance requirement inherently requires the court to engage with the merits of the case, yet without deciding the merits. To decide predominance, the court must understand what the plaintiffs will need to prove and must evaluate the extent to which they can prove their case with common evidence. In other words, a court weighing class certification must walk a balance between evaluating evidence to determine whether a common question exists and predominates, without weighing that evidence to determine whether the plaintiff class will ultimately prevail on the merits. We recognize the contradiction built into the standard. The judge must examine the evidence for its cohesiveness while studiously ignoring its bearing on merits questions.

*In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 603 (7th Cir. 2020) (internal citation omitted).

Here, the "engage[ment] with the merits" begins with the plaintiffs' assertion that Champion violated the ICFA by marketing various products as biologically safe, fresh, natural, or regionally sourced (or some combination of these terms). *Id.* An ICFA claim has five elements: (1) the defendant must undertake a deceptive act or practice; (2) the defendant intended that consumers rely on the deception; (3) the deception occurred in trade or commerce; (4) damages ensued; and (5) the deception caused the damages. *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 883 (7th Cir. 2005). The plaintiffs then will need to establish that some common deceptive practice, as understood by consumers, occurred such that "a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Messner*, 669 F.3d at 815 (cleaned up). They cannot. The plaintiffs' proposed class certification involves too many different products, too many different product labels, too many different purchasers, and too many different package contents to effectively resolve the legal claim together.

During the relevant time, from 2014 through October 2018, Champion sold thirty-seven different dogfood diets in Illinois alone. (Dkt. 114-1 ¶¶ 28, 29, 36). Each bag had unique packaging. The plaintiffs' complaints show as much. They supply at least twenty-three different label pictures. (Dkt. 26 ¶ 25; *see also* dkt. 68 at 59–76, Ex. 1). Moreover, the products inside the bag varied not just year-to-year but also season-by-season. (Dkt. 199 at 19). Consider "fresh" petfood.

9

Ingredients are often seasonal; fish typically caught in the spring can be used "fresh" in the spring but "frozen" in winter. (Dkt. 114-1 ¶ 34; Dkt. 114-2 at 197:18-25). That is why Champion also includes terms such as "dried," "dehydrated," or "freeze-dried" on its packaging. (Dkt. 114-1 ¶ 53; Dkt. 114-6 ¶¶ 15, 19). Champion does, as the plaintiffs note, use "regrinds," which are made from reworked earlier product. (Dkt. 199 at 20). But "most" food does not, meaning that some batches will contain the regrinds while a majority will not. (Dkt. 95-24 at 73:4-15). And most Champion consumers purchase different products and, therefore, are exposed to many products.[5]

The allegedly deceptive term must also be considered next to the label's context, and—given the number of terms and labels at issue—this requirement produces many combinations. For example, the term "biologically appropriate" appeared on both "Orijen Six Fish," which was made with New England Mackeral, Herring, Flounder, Redfish, Monkfish, and Silver Hake, and the same named product, "Orijen Six Fish," which contained only Wild-Caught Fish and Freshwater Fish Dry. (Dkt. 26 ¶ 25; *see also* dkt. 68 at 59–76, Ex. 1). Whether labeling each product "biologically appropriate" was deceptive depends on the contents of each bag. An unacceptable level of heavy metals might be natural for New England fish but not for Wild-Caught Fish from Alaska.

The legal question for an ICFA claim involving one package with one label in a standard product requires a comparison between the deceptive phrases, the label's context, and contents of the bag. Multiply that one legal question by the number of products, labels, formulas, and consumers at issue here, and the result is that no legal question or set of discrete legal questions predominate over the rest. There are simply too many combinations for a single jury to consider. *Contra Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 761 (7th Cir. 2014) (reversing a district court's

---

[5] The plaintiffs again prove the point. Zarinebaf admitted he knew not every ingredient in Champion's products was regional, yet he still purchased its products. (Dkt. 199-3 at 91:7-92:2). Cherznik based his beliefs about Champion products on earlier packaging unrelated to this lawsuit. (Dkt. 199-2 at 159:12-18). And Meyer testified that she did not even read the packages at issue. (Dkt. 199-4 at 89:8-14).

denial of class certification where there was an isolated issue of whether "Sturm deceived consumers by telling them that the GSC pods contained freshly ground coffee, when at most 5% of the pod did so").

The growing number of judicial opinions in related cases demonstrates the varied interpretation of the relevant terms. *See, e.g.*, *Song v. Champion Petfoods USA, Inc.*, 27 F.4th 1339, 1344 (8th Cir. 2022) ("We thus agree with the district court that '[i]t is simply not plausible to suggest that a reasonable consumer would read the phrase 'biologically appropriate' on a dog-food package—a package that makes clear that the dog food contains meat and fish—and understand Champion to be representing that it eliminated all traces of heavy metals from the dog food.'"); *Renfro v. Champion Petfoods USA, Inc.*, 25 F.4th 1293, 1304 (10th Cir. 2022) ("We agree with the district court that the phrase can only be understood in the context of the entire packaging of Champion's dog food. … In fact, the ingredients listed on the Orijen and Acana packaging belie any understanding that the food is entirely fresh by listing non-fresh and non-regional ingredients."); *Weaver v. Champion Petfoods USA, Inc.*, 3 F.4th 927 (7th Cir. 2021) ("Champion's representations that its food is made with fresh regional ingredients are not clearly misleading—its food does, in fact, contain some ingredients that are fresh and sourced regionally."); *Colangelo v. Champion Petfoods USA, Inc.*, No. 18-CV-1228, 2022 WL 991518, *22 (N.D. N.Y. March 31, 2022) ("To start, the Court finds that the use of frozen ingredients was not misleading. Defendants' products are labeled, in several places including on both the front and back of the package, with the phrase 'fresh or raw.'"); *Reitman v. Champion Petfoods USA, Inc.*, 18-CV-1736 2019 WL 7169792, *9 (C.D. Cal. Oct. 30, 2019) ("Defendants show the Court that the phrases at issue require context that differs from bag to bag.").

Nor can the creation of subclasses cure the class deficiencies. *See* Fed. R. Civ. P. 23(c)(4). As explained, analyzing each possible combination of products, labels, and bag contents, even divided into subclasses, would be unmanageable. The jury would need to pair each unique combination with a possible calculation of damages (assuming damages can even be established). Creating subclasses is useful where clear dividing lines exist—that is not here. As such, the plaintiffs cannot avail themselves of Rule 23(b)(3).

### B. Rule 23(b)(2)

Rule 23(b)(2) allows class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Practically, the rule permits injunctive relief for a plaintiff seeking compensatory damages when "monetary relief is incidental to the equitable remedy." *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898 (7th Cir. 1999); *see also Lemon v. Int'l Union of Operating Engineers, Loc. No. 139, AFL-CIO*, 216 F.3d 577, 582 (7th Cir. 2000). The request for an injunction here is certainly not incidental to monetary relief. The plaintiffs make clear they seek compensatory damages for allegedly overpaying on pet food. (Their brief for class certification is almost entirely dedicated to Rule 23(b)(3), which allows for monetary relief. (*See generally* Dkt. 196.)). Therefore, class certification is inappropriate here as well.

### CONCLUSION

The plaintiffs have not established their claims should be adjudicated through the "exception" to the general rule of litigation. *Comcast*, 569 U.S. at 33. For these reasons, their motion to certify a class is denied. (Dkt. 195).

Date: March 17, 2023

_____
Virginia M. Kendall
United States District Judge